UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                              CRIMINAL NO. 18-20027

v.                                         HON. TERRENCE G. BERG

PRABHU RAMAMOORTHY,

      Defendant.

### United States of America's Sentencing Memorandum

Prabhu Ramamoorthy committed one of the most brazen airplane sexual assaults ever prosecuted in this district. While seated next to his wife, he took advantage of a 22-year-old woman traveling alone. As she slept on a late-night flight, he untied her shirt, unzipped her pants, and shoved his fingers inside of her with such force that it woke her up. It was only then that he stopped, turned the other way, and pretended to sleep on his wife. When confronted by law enforcement, he claimed that he had been in a deep sleep and insisted that he did not intentionally touch her. Hours later, after relaying multiple different versions of the event, he finally admitted to touching her intentionally. Then at trial, he violated her even further by accusing her of imagining the whole thing. He refused

to take responsibility for his actions and instead deflected blame onto her. The jury saw through the charade and convicted him of Sexual Abuse. The United States recommends a sentence of **130 months'** imprisonment as sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I. Factual and Procedural History

### A. Offense Conduct

On January 2, 2018, Laura planned to fly home to Detroit after spending the holidays in San Diego with her boyfriend. Her boyfriend was in San Diego on a work trip, so he and Laura took separate flights. Laura's boyfriend's flight was supposed to leave that morning, and Laura planned to take a red-eye flight leaving later in the evening, with a brief layover in Las Vegas.

The day did not go exactly as planned. Laura and her boyfriend accidentally overslept and he missed his flight. They decided to go to the airport in the early afternoon and figured they would hang out together while her boyfriend waited to get on a standby flight. Laura's boyfriend ended up getting on a flight earlier than expected, so they had a quick lunch together before he departed. Laura was then left with several hours to kill before her evening flight. She hung out in the airport and worked. She drank alcohol and ate a flatbread pizza. She knew she would be

flying overnight and wanted to make sure she would be able to sleep on the plane.

Laura had no issues on her flight from San Diego to Las Vegas. During her layover in Las Vegas, she drank at the airport bar and chatted with some fellow travelers. She then boarded her flight to Detroit. Her seat was toward the back of the plane, in Row 27. She sat in the window seat. Next to her, the defendant sat in the middle seat, though his boarding pass indicated he was supposed to sit in the aisle. The defendant's wife ended up in the aisle seat to his left. The defendant and his wife were already seated when Laura took her seat.

Laura put headphones in her ears, played some relaxing music, and covered herself in a blanket before falling asleep. The next thing she remembered was waking up and feeling a sensation in her lap area, as if someone was touching her. She thought she was imagining it and tried to go back to sleep. A few seconds later, she was jolted awake by the feeling of the defendant's fingers inside of her vagina. At trial, Laura testified that he was "shoving them in and out…back and forth really fast, in and out." (Doc. 61, 26: 5-8).

When he realized Laura was awake, the defendant turned and pretended to sleep on his wife's shoulder while his wife stared at Laura. Laura testified that she felt frozen in that moment, that she was petrified. She did not know what to do. Her first instinct was to text her boyfriend and tell him what happened, even

3

though the messages were not going through mid-flight. Then she got up and told the flight attendants.

At trial, Laura's text messages showed the progression of disbelief, terror, fear, and finally, the stunned realization that she had been sexually violated. She first sent the message: "Oh my god. I just woke up and the guy next to me had his hands down my pants and in my vagina…Holy sh*t what the f*ck just happened." She continued in steam-of-consciousness style: "I swear this guy just shoved his fingers in me while I was asleep…Who do I call…Do I tell a flight attendant…My phones gonna die…Oh my god I'm gonna cry." Shortly before deciding to tell the flight attendants, Laura typed: "I want to button my pants but I'm ducking mortified and I can't move…Oh my god he's with a ducking woman and she keeps looking at me." Laura described the feeling of being violated at trial: "It was unmistakable. You can tell when somebody's inside you. It – you felt it. It was – it wasn't a dream." (Doc. 61, Tr. 37: 17-18).

The flight attendants testified that Laura approached them looking disheveled and shell-shocked. Her shirt and pants were unbuttoned. She told them that the man next to her had his fingers inside of her. The flight attendants kept Laura safe in the back galley, and then moved her to a different seat for landing. While she was in the back galley, Laura noticed that her bra was unhooked.

Both a flight attendant and Laura testified that the defendant's wife kept looking back to see what was going on. The defendant's wife also got up and tried to go to the back galley (even though it was previously announced that the back lavatories were inoperable), until the flight attendants sent her away.

Upon landing, airport police officers met the plane at the gate. They escorted Laura off first, and then the defendant. Officers questioned the defendant at the jet bridge and later at the gate. He stated that he was sleeping and that Laura was sleeping on him, but he was not sure where he kept his hand. He stated that he was in and out of a deep sleep because he was not feeling well. He also stated—twice—that he was sure he did not intentionally touch her. He wrote and signed a statement saying he "didn't [do] anything to her." (**Exhibit A, Defendant's Statement**). The defendant also told officers two separate times that he believed Laura drank something and was "drunk." The officers placed the defendant under arrest.

Officers also spoke with the defendant's wife at the airport gate. Without any prompting from the officer, the defendant's wife immediately began talking about Laura. She stated that her husband fell asleep right after they boarded and that Laura fell asleep on his lap. She also claimed she did not want to disturb Laura while she slept.

5

B. <u>Defendant's FBI Interview</u>

While at the airport police station, FBI agents interviewed the defendant for about an hour after giving him *Miranda* warnings. First, he tried to deflect and talked about Laura getting up out of her seat and eating chips. He repeated that he thought she was drunk. Then, he claimed that Laura fell asleep on him and demonstrated all the ways in which she flopped herself into his personal space. Eventually, he admitted that he was touching her while she was sleeping. He admitted to playing with her bra and said he "might" have unhooked it. He admitted to putting his fingers in her pants and "trying" to get his fingers in her vagina. The defendant demonstrated to the agents what he did using his hands. A transcript of that interview is attached as **Exhibit B** to this memorandum.

C. <u>Trial</u>

On January 17, 2018, a grand jury indicted the defendant on one count of Sexual Abuse in violation of 18 U.S.C. § 2242(2). Prior to trial, the defendant moved to suppress the statements he made to the FBI agents, claiming that he did not comprehend English well enough to understand the *Miranda* warnings, and that he was coerced into signing the *Miranda* waiver form because he thought he would be tortured by the police. The Court denied the motion.

The jury convicted the defendant after a one-week trial. The defendant's

witnesses included an airline passenger named Tom Selleke and the defendant's wife. Tom Selleke testified that he saw Laura drinking at the airport bar and did not think she was appropriately dressed for the winter. The defendant's wife testified that she initially fell asleep on the plane but woke up and saw the victim sleeping on her husband. She denied seeing any sexual contact between the defendant and the victim. She stated that if she thought the defendant was inappropriately touching the victim, she would have gotten up and slapped him. She also testified that the defendant has a limited understanding of the English language. The defendant's wife claimed she had never spoken to the defendant about the case and had not seen any of the documents, despite jail call conversations showing that she actively assisted the defendant in preparing a defense that involved accusing the victim of lying.

## II. Applicable Guideline Range

Under Section 2A3.1(a)(2) of the guidelines, the defendant's base offense level is 30 for a violation of 18 U.S.C. § 2242(2). Both the United States and the probation department believe that the facts of this case support the application of a two-level enhancement for a vulnerable victim under Section 3A1.1(b)(1), which would result in a total offense level of 32. (PSR ¶ 19).

The vulnerable victim enhancement applies when a defendant "knew or

should have known that a victim of the offense was a vulnerable victim" due to "age, physical or mental condition" or is otherwise "particularly susceptible to the criminal conduct." § 3A1.1, Application Note 2. Here, the defendant knew that Laura was both intoxicated and sleeping on the airplane. Laura testified that she had enough to drink before the flight that she could not have driven a car and was ready to sleep. The defendant talked about and demonstrated that Laura was sleeping countless times to airport officers and the FBI agents. He wrote in his written statement that he believes she "drank some alcohol, it's my assumption." (**Exhibit A**). He stated that Laura was "drunk" to airport officers and made the following statements during his FBI interview:

- One more thing, that's my understanding, she was drunk. If I got it (UI) I'm not sure. Okay. But my understanding, she drunk. (**Exhibit B,** page 15).

- But I am very sure she is, uh, drunk, but that's my opinion. (**Exhibit B,** page 25).

- Yes, first I think she's trying to do that, but then she did like this. Okay? Then again she came like this, (UI) obviously is coming (UI). Then, uh, one more… my (UI) drunk obviously is drunk. Okay? Something (UI) like this. (**Exhibit B,** page 29).

Courts in the Eighth and Ninth circuits have applied this enhancement in similar situations. *United States v. Betone*, 636 F.3d 384, 388 (8th Cir. 2011) (upholding vulnerable victim enhancement where defendant knew victim had

passed out from intoxication); *United States v. Plenty*, 335 F.3d 732, 735 (8th Cir. 2003) (victim who was asleep and could not fight back was unusually vulnerable); *United States v. Crudden*, 76 F.3d 389 (9th Cir. 1996) (the defendant was aware of the victim's unusual vulnerability because she was intoxicated and sleeping at the time of the sexual abuse).

The commentary does caution against applying subsection (b) if the factor that makes a person a vulnerable victim is incorporated in the offense guideline calculation. *See* § 3A1.1, Application Note 2. But courts have found that the base offense level for this particular crime does not take into account the intoxication or incapacitation of the victim, even though the statute of conviction does – so it is not double counting. The applicability of this enhancement for a conviction under 18 U.S.C. § 2242(2) is specifically discussed in *United States v. Schoenborn*:

> Additionally, § 2A3.1 does not incorporate an enhancement for a specific offense characteristic based on the incapacity of the victim. The commentary to § 3A1.1 precludes application of the vulnerable victim enhancement only 'if the factor that makes the person a vulnerable victim is incorporated in the offense guideline.' As the victim's vulnerability in this case was not accounted for in either the base offense level or a specific offense characteristic, we conclude the enhancement was appropriately applied. 793 F.3d 964 (8th Cir. 2015).

9

The defendant does not have a criminal history and is therefore a category I. Based on an offense level of 32 and criminal history category I, his guideline range is **121-151 months.**

### III. Section 3553(a) Factors Warrant a Sentence of 130 Months

The Supreme Court has noted that, in formulating the sentencing guidelines, the U.S. Sentencing Commission's goal is to carry out the objectives of 18 U.S.C. § 3553(a). *United States v. Rita*, 551 U.S. 338 (2007). While advisory, the Guidelines remain an important factor in fashioning a just sentence. This is because "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id.* at 350. The starting point here is **121 – 151 months**. A sentence of **130 months**, within that guideline range, achieves section 3553(a)'s objectives based on the following factors.

#### a. The nature and circumstances of the offense

Airplane sexual assault is a serious offense that is on the rise. FBI statistics indicate that investigations of midair sexual assaults increased by 66% from fiscal

year 2014 to 2017.[1] That is in part due to increasingly "cramped, confined spaces; alcohol and drugs; fewer flight attendants; and dark cabins on night flights" – factors that "likely embolden offenders."[2] The cramped style of airplane seating can exacerbate trauma for victims. According to mental health professionals, victims who are violated in confined spaces feel even more helpless, vulnerable, and powerless.[3] Victims may also feel intimidated by the person sitting next to them since the seating arrangement means that the perpetrator is effectively blocking the victim from getting up.

There are very few things that can demean a woman's sense of security and wellbeing more than vaginal penetration without consent. It is the ultimate violation. Especially where, as here, the victim is already isolated, confined, and cut off from communication with the outside world. The trauma that the defendant

---

[1] CNN, *FBI: Sexual assaults on flights increasing 'at an alarming rate,'* June 20, 2018, available at: https://www.cnn.com/2018/06/20/politics/fbi-airplane-sexual-assault/index.html.

[2] The New York Times, *Recent Incidents Put a New Focus on Sexual Assault on Airplanes*, October 20, 2016, available at: https://www.nytimes.com/2016/10/20/travel/recent-incidents-put-a-new-focus-on-sexual-assault-on-airplanes.html?_r=0.

[3] Bustle, *Experts Explain Why Sexual Assaults Occur on Airplanes & What Airlines Can Do To Stop It*, August 16, 2017, available at: https://www.bustle.com/p/experts-explain-why-sexual-assaults-occur-on-airplanes-what-airlines-can-do-to-stop-it-70903.

inflicted on Laura will impact her for the rest of her life. After the assault, she was not able to work because of what happened.

### b. The history and characteristics of the defendant

Ramamoorthy grew up in Tamil Nadu, India, where his parents were farmers. (PSR ¶ 39). He earned his bachelor's degree and got a visa to work in the United States. (PSR ¶¶ 56-68). By his own account, he was raised by both parents with all his material needs met. (PSR ¶ 40). Many criminal defendants that appear before this Court are not so fortunate. They often struggle with poverty, neglect, lack of education, and inability to access available resources. Ramamoorthy did not– he carries a college education in a highly technical field, and worked his way to a lucrative opportunity within the United States. Despite these advantages, he still felt the need to impose his will upon on a young woman and treat her like nothing more than a sexual object, while in the presence of his wife. And, trapped in the corner seat, vulnerable from sleep and alcohol, Laura was not able to stop it from happening.

Throughout this case, several individuals from Ramamoorthy's community have submitted letters on his behalf. They describe him as hardworking, devoted, and respectful. They express disbelief that he committed these acts. Given the facts, it is not surprising that community members are confounded by his behavior.

Ramamoorthy did this in secret, on a dark overnight flight where he knew no one could see what he was doing, except perhaps his wife. The characteristics that Ramamoorthy displayed in committing the offense and during the investigation paint a different picture than that of a law-abiding citizen. When he got caught, he quickly formulated a phony story and attempted to shift the blame to Laura. Then, he presented himself to the Court as a confused man stranded in America without English language skills despite his sophisticated technological job. His lack of empathy and remorse should not go unnoticed by this Court.

    The defendant will likely argue that he is being punished enough by his impending deportation. However, by virtue of the deportation, he will not be subject to the stringent conditions that come with being a sex offender in the United States and the difficulties that accompany such status. In fact, the defendant plans to work as a software technician and/or obtain a master's degree in technology once he returns to India. (PSR ¶¶ 45, 58). Individuals who come to America and commit sexual assaults should not simply be permitted to return to their home countries without fair punishment.

    **c.    Seriousness of the offense, promotion of respect for the law and just punishment for the offense, and adequate deterrence and protection of the public**

As noted above, the circumstances of the defendant's offense and its impact on Laura should not be taken lightly. General deterrence is of particular importance here, with mid-air sexual assault becoming increasingly rampant and garnering national attention. The Court has the opportunity to send a message that assaulting vulnerable people on an airplane is a serious matter deserving of significant punishment.

Members of the public deserve to be free from the fear that they could be assaulted on an airplane or on public transit. In no other circumstance are strangers forced to sit in such close proximity for hours on end, oftentimes sleeping next to each other. Women should not have to be perpetually on guard for those looking to take advantage of these circumstances. A guideline sentence will send the message that this type of abuse is not tolerated.

    **d.    Providing defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; kinds of sentences available and the need to avoid unwarranted sentencing disparities**

The Bureau of Prisons has the expertise to classify Ramamoorthy to the appropriate facility. He may wish to take advantage of programming while incarcerated, including sex offender therapy. A guideline sentence fits within the

14

range of sentences that similarly situated defendants have received. Defendants around the country have received guideline sentences for similar crimes. *See e.g., United States v. Jahagirdar*, 466 F.3d 149, 156-157 (1st Cir. 2006) (upholding sentence of 87 months for digitally penetrating a sleeping victim where guideline range was 87-108); *United States v. Aksal,* 638 Fed. Appx. 136, 141-42 (upholding sentence of 97 months where guideline range was 97-121). The sentencing court in *Jahagirdar* specifically noted the defendant's lack of concern for the victim. 466 F.3d at 157.

## IV. Restitution

Restitution is mandatory under 18 U.S.C. § 2248. The parties are currently working to reach an agreement as to the amount of restitution. In the event that an agreement is not reached prior to sentencing, the United States will ask the Court to set a restitution hearing not to exceed 90 days from sentencing.

## V.  Conclusion

The United States recommends a sentence of **130 months'** imprisonment.

>                    Respectfully submitted,
> 
>                    MATTHEW SCHNEIDER
>                    United States Attorney
> 
>                    *s/Amanda Jawad*
>                    Amanda Jawad
>                    Margaret M. Smith
>                    Assistant United States Attorneys
>                    211 W. Fort Street, Suite 2001
>                    Detroit, MI  48226
>                    Phone: (313) 226-9116
>                    E-Mail: amanda.jawad@usdoj.gov

Dated:  December 6, 2018

## Certificate of Service

I certify that on December 6, 2018, I electronically filed the United States of America's Sentencing Memorandum with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following:

James Amberg
Attorney for Defendant Prabhu Ramamoorthy

*s/Amanda Jawad*
Amanda Jawad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9116
E-Mail: amanda.jawad@usdoj.gov