Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.888   Page 1 of 21
Detention Hearing • Thursday, January 4, 2018

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,
 4
                         Plaintiff,
 5   vs.                               Case No. 18-30003

 6   PRABHU RAMAMOORTHY,

 7                       Defendant.
     _____/
 8

 9                       DETENTION HEARING

10          BEFORE THE HONORABLE R. STEVEN WHALEN
            Executive United States Magistrate Judge
11          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
12               Detroit, Michigan  48226
                 Thursday, January 4, 2018
13
     APPEARANCES:
14
     For the Plaintiff          AMANDA JAWAD
15   United States of America:  U.S. Attorney's Office
                                211 W. Fort Street
16                              Suite 2001
                                Detroit, Michigan  48226
17                              313-226-9116

18   For the Defendant          RICHARD J. O'NEILL
     Prabhu Ramamoorthy:        Federal Defender Office
19                              613 Abbott
                                Fifth Floor
20                              Detroit, Michigan  48226
                                313-967-5852
21

22      To obtain a certified copy of this transcript, contact:
           Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
23                        Official Court Reporter
              (313) 234-2616 • www.transcriptorders.com
24
          TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING
25         TRANSCRIBER NOT PRESENT AT LIVE PROCEEDINGS
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.889   Page 2 of 21
Detention Hearing • Thursday, January 4, 2018

2

1                          TABLE OF CONTENTS

2                                                        Page

3      DETENTION HEARING:

4      Proffer by Ms. Jawad.................................3
       Argument by Ms. Jawad...............................8
5      Argument by Mr. O'Neill............................12
       Further Argument by Ms. Jawad......................13
6      Further Argument by Mr. O'Neill....................14
       Further Argument by Ms. Jawad......................15
7      Comments/Ruling by the Court.......................16

8

9

10

11                          EXHIBITS

12     Identification                    Marked      Received

13     NONE

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.890   Page 3 of 21
Detention Hearing • Thursday, January 4, 2018

3

```
1              Detroit, Michigan
2              Thursday, January 4, 2018
3                        —  —  —
4              (Proceedings commenced at 2:12 p.m., all parties
5              present)
6              THE CLERK:  Calling Case No. 18-30003, the United
7    States of America versus Prabhu Ramamoorthy.
8              MS. JAWAD:  Good afternoon, Your Honor.  Amanda Jawad
9    appearing on behalf of the United States.
10             MR. O'NEILL:  Good afternoon, Your Honor.  Richard
11   O'Neill, Federal Defenders Office, on behalf of Mr.
12   Ramamoorthy.
13             THE COURT:  Okay.  Good afternoon.  Today's the date
14   for a detention hearing.  I've been provided a Pretrial
15   Services Report that does recommend a $10,000 unsecured bond
16   with certain conditions.
17             Ms. Jawad, what's your position?
18             MS. JAWAD:  We're continuing to seek detention and
19   ask that we go forward with the hearing.
20             THE COURT:  Okay.  Are you ready to go forward?
21             MR. O'NEILL:  Yes, Your Honor.
22             THE COURT:  Will you be proceeding by proffer or by
23   live testimony?
24             MS. JAWAD:  By proffer, Your Honor.
25             THE COURT:  Go ahead.
```

1    MS. JAWAD:  At approximately midnight this past

2  Tuesday a 22-year-old female boarded a Spirit Airlines flight

3  from Las Vegas to Detroit that was set to arrive around 7:00

4  a.m. the next day, which would be yesterday, Wednesday.  The

5  female was seated in a window seat, the defendant was seated in

6  the middle seat next to her, and on the other side of the

7  defendant was his wife.

8    The 22-year-old female went to sleep.  She had her

9  head leaning on the window and she had a blanket wrapped from

10  her shoulders to her feet.  When she --

11    THE COURT:  I'm sorry, let me back up for a second.

12  The female's in the window seat?

13    MS. JAWAD:  Correct.  The defendant was in the middle

14  seat and the defendant's wife was in the aisle seat.

15    THE COURT:  Okay.  I gotcha.  Okay.  Go ahead.

16    MS. JAWAD:  When the 22-year-old female woke up, she

17  saw that both her shirt and her pants had been unbuttoned.  She

18  was actually wearing a shirt that tied in the front, so her

19  shirt was untied and her pants were unbuttoned and the

20  defendant had his fingers in her vagina.  As she described it,

21  "He was shoving his fingers in my vagina and vigorously moving

22  them."  The victim reported that once she fully woke up, the

23  defendant stopped.  She then immediately got up, went to the

24  back of the plane and notified the flight attendants that were

25  on board.

1          There were two flight attendants who gave written

2    statements.  They indicated that approximately 40 minutes prior

3    to landing, which would have been close to 6:00 a.m., probably

4    around 5:30 a.m., the victim approached them and gave a

5    detailed report that the man next to her had his -- had

6    unbuttoned her pants and placed his hand inside of her vagina.

7    The victim told the flight attendants that she felt shocked and

8    violated.  They noticed that her shirt was untied at the time

9    and her pants were still unbuttoned.  The flight attendants

10   also observed that the victim was visibly upset and crying.

11   The flight attendants kept the victim in the back of the plane

12   and then seated her in a different seat until the flight

13   landed.

14          The flight attendants also reported that while they

15   were talking to the victim in the back of the plane, the

16   defendant's wife got up and approached them as if to see what

17   was going on, and there had already been an announcement that

18   the lavatories in the back were not working so the flight

19   attendants asked the defendant's wife to sit back down.

20          Once the plane landed, the defendant and his wife

21   gave written statements.  In this written statement the

22   defendant admits he got on the flight from Las Vegas to

23   Detroit.  He says he was not feeling well so he took a tablet

24   and then fell into a deep sleep.

25          He states in the written statement that through his

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.893   Page 6 of 21
Detention Hearing • Thursday, January 4, 2018

6

1   wife he came to learn that the girl next to him was sleeping on

2   his knees while he was sleeping, and he says in the written

3   statement he's not sure where he kept the hand on her or kept

4   his hand on her.  And through his knowledge, he says he didn't

5   do anything to her.

6           The defendant's wife's written statement also says

7   that they were traveling from Las Vegas to Detroit and that

8   during the flight the defendant had his knees folded against

9   the seat in front of him.  And the wife says she noticed that

10  the victim was sleeping on his lap while he was in a deep

11  sleep.

12          She stated that she woke her husband up and then they

13  called the flight attendants to try to change seats.  The

14  flight attendants did not report that anyone asked them to

15  change seats other than the victim, and they did not, in fact,

16  change seats at any time.

17          The wife and the defendant also gave lengthier

18  interviews after they provided written statements.  The wife

19  maintained that the victim was resting her head on the

20  defendant's leg, but she stated at the end of the interview

21  she's afraid something happened that she doesn't know about or

22  that her husband doesn't know about.

23          When the agents pressed the wife as to what

24  medication her husband was taking that put him into this deep

25  sleep, the only medication she was able to come up with, and

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.894   Page 7 of 21
Detention Hearing • Thursday, January 4, 2018

7

1    she had all of the luggage for both her husband and her, was

2    Tylenol.  And when the defendant was pressed, he -- he admitted

3    that he took Tylenol as well, and it was not prescription

4    Tylenol with codeine or anything like that, it was just plain

5    Tylenol.

6          The wife also admitted that once the victim got up to

7    go to the back of the plane, she kept checking to see what was

8    going on and was concerned because she thought the victim

9    seemed uncomfortable about sitting next to her husband.

10         During the defendant's interview he again stated that

11   the victim was leaning over him while his knees were on the

12   back of the seat in front, and then he said that her elbow and

13   his -- her breasts were touching him as she was sleeping.

14         When the agents asked him how the victim's bra became

15   unhooked, the defendant stated -- and I'm just -- I'm

16   paraphrasing here, I don't yet have the audio back from this

17   interview -- the defendant stated that he doesn't know whether

18   he unhooked the bra or not but that he was playing with the bra

19   and he may have unhooked it.  He also admitted that his hand

20   was around her and that he might have cupped her breasts.

21         He also told the agents that he was trying to unzip

22   her pants but he was having difficulty because he's

23   left-handed.  He said that had she been on the other side of

24   him, he would have been able to get the zipper fully down.

25         He admitted that he was trying to get his finger

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.895   Page 8 of 21
Detention Hearing • Thursday, January 4, 2018

8

1    through the zipper but gave some conflicting reports.  He first

2    said that his finger was not inside of her underwear, but then

3    at another point in the interview he said he may have gotten

4    his finger inside her underwear, and he was unclear about

5    exactly where his hands were.

6           Turning now to the Pretrial Services Report, the

7    defendant is not a United States citizen.  He's been here for

8    approximately two and a half years on a temporary work visa.

9    He does not have relatives in the United -- or in Michigan, in

10   the metro Detroit area, and he has family in India and that is

11   the country of his passport.

12          He does not own his home but rents.

13          And that concludes the government's factual proffer.

14   Would you like me to continue to argument or should I wait?

15          THE COURT:  Why don't you continue the argument and

16   Mr. O'Neill will have the chance to present facts and argument.

17          MS. JAWAD:  Sure.

18          THE COURT:  Go ahead.

19          MS. JAWAD:  The government believes we've met the

20   factors in 18 USC 3142(g) to warrant detention.  Starting first

21   with the nature and circumstances of the offense, sexual abuse,

22   especially one that involves forcing your way into a victim's

23   pants, is always a serious offense, especially where there is

24   penetration, and in this case there was digital penetration

25   that was described as vigorous.

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.896   Page 9 of 21
Detention Hearing • Thursday, January 4, 2018

9

1        But what makes this offense particularly egregious

2    and the defendant even more of a danger to the community is the

3    fact that it took place on an airplane.  He was brazen enough

4    to do this in -- basically in public next to his wife where

5    anyone could have seen him, but at the same time the victim was

6    effectively trapped.  She couldn't have ran away from him, she

7    couldn't have gotten up.  He basically trapped her and took

8    advantage of her while she was sleeping.

9        And given how bold and egregious that is, there's a

10   strong inference here that it's not a one-off incident.  The

11   defendant felt comfortable enough to remove pieces of her

12   clothing or attempt to remove pieces of her clothing and put

13   his hand into her pants.  It just doesn't make sense that

14   someone could go from never having done anything like this to

15   being comfortable enough to undo a sleeping person's clothes

16   and put their hands into her vagina.

17       Turning to the nature -- the history and

18   characteristics of the defendant, I'd like to point out that he

19   was not truthful with the officers initially.  He said, "I

20   didn't do anything, I don't think I did anything to her."  It

21   was only later after additional interviewing that he started to

22   make admissions, although he did minimize his behavior.  He

23   denied penetrating her with his finger, although he stated that

24   he did try.

25       And I'm not sure if I mentioned this in the factual

1    proffer, I may have forgotten, but he did state also that had

2    his wife not been there, it would have -- it might have been

3    different or something else might have happened.  He kind of

4    alluded to the agents that if his wife wasn't there, it would

5    have been easier to remove the clothing and place his hands on

6    her.  And if he's this comfortable lying to law enforcement

7    officers, he certainly can't be trusted to be honest with our

8    Pretrial Services officers and follow the conditions of his

9    bond.

10         He also does not have family ties to Michigan, to

11   this area.  His wife is his only family here.  They don't have

12   children.  His family is in India.

13         His wife is also not an adequate third-party

14   custodian.  Based on her interview, it seems that she's either

15   colluding with the defendant to cover up his actions or she's

16   completely oblivious to what he did.  In either circumstance,

17   it doesn't seem that she would be fit to be able to monitor his

18   behavior and be honest with the Court as a third-party

19   custodian.

20         THE COURT:  What's -- do you know what his wife's

21   citizenship status is?

22         MS. JAWAD:  I don't know, Your Honor.  If I could

23   have a moment.

24         THE COURT:  Sure.

25         (Brief pause)

1         MS. JAWAD:  Your Honor, I believe she's also on a

2  temporary work visa.

3         THE COURT:  Okay.

4         MS. JAWAD:  Also want to point out that the defendant

5  has a significant income, he makes $70,000 a year, so he does

6  have resources and would be able to afford travel and would --

7  makes him possibly a flight risk.

8         He does not have a criminal history, but I would

9  point out that he's only been here in the country for two and a

10  half years and he's 34 now, so we really don't know anything

11  about his past conduct and what his record was like in India.

12         And just finally, the nature and circumstance --

13  seriousness of danger to any person or community -- any person

14  or the community if the defendant is released.  If the

15  defendant is willing to do this on an airplane surrounded by

16  people, he's really willing to do this anywhere, which makes

17  him a threat to women everywhere.  There's nowhere where he can

18  go that he's not a threat.  Both this victim and women in

19  general deserve to be free from the fear that they will be

20  sexually assaulted while doing normal, everyday things like

21  traveling and public transportation.

22         It is the government's belief that there are no

23  condition or combination of conditions that will reasonably

24  assure the safety of other persons in the community and we

25  recommend detention.

1          THE COURT:  Thank you.  Mr. O'Neill?

2          MR. O'NEILL:  Your Honor, we object to the

3    government's indicating that there's more than one incident

4    when there's nothing to bring before this Court indicating

5    that.  It's the government's supposition and it's pure

6    speculation.

7          Pretrial Services has indicated that there are

8    conditions of release.  We would ask the Court to adopt those

9    conditions.  I have his passport right here.  We're prepared to

10   turn it over to Pretrial Services.

11         He is working.  He's been working at the Systems

12   Technology Group.

13         There's been no allegations from anywhere that his

14   behavior has ever been inappropriate prior to this incident.

15         Your Honor, he's been approved for a visa to come

16   from India to the United States.  I'm sure that involves a

17   background check, that they just don't hand those out.

18         He is employed at the Systems Technology Group; he's

19   a project manager.  He's been there for two and a half years.

20         We would ask the Court to adopt the recommendations

21   of Pretrial Services.  He can -- the Court can order that he

22   not have any contact with any victims or witnesses, and I think

23   that's more than adequate.

24         This is a 22-year-old, not an infant, not a child.

25   She's on the plane.  I have a hard time with some of these

Case 2:18-cr-20027-TGB-MKM  ECF No. 78  filed 03/05/19  PageID.900  Page 13 of 21
Detention Hearing • Thursday, January 4, 2018

13

```
1    allegations, but that's what a trial's for.  So until then, we
2    would ask the Court to adopt the recommendations of the
3    Pretrial Services.
4              THE COURT:  Ms. Jawad, I'll give you the last word.
5              MS. JAWAD:  Your Honor, I just want to clarify.  I
6    did not want to indicate that -- that we know that this may
7    have happened in the past or there is any evidence even that
8    this happened in the past.  I was merely saying that this
9    instance was so bold and so brazen that it seems illogical to
10   say that he never did anything like this in the past.
11             THE COURT:  It doesn't seem illogical to me.  I mean
12   it's -- I have to tell you, factually there's a lot of things
13   here that are -- I guess would be sort of counterintuitive.
14   His wife is in the next seat, his -- I mean it's -- it -- it's
15   the kind of thing that I think it's -- it's perhaps equally
16   logical or more logical to say this is a one-off thing, but
17   it's -- it's of such a character that, you know, one has to
18   wonder what's going on in terms of --
19             MS. JAWAD:  Well, I think --
20             THE COURT:  Of course it's not only alleged criminal
21   behavior but very odd.
22             MS. JAWAD:  It is odd, but I don't think that a
23   person goes from being a normal, law-abiding citizen to
24   suddenly placing their hand in someone's pants and taking off
25   their clothes.
```

Detention Hearing • Thursday, January 4, 2018

14

1       THE COURT:  I don't know.  I mean -- anyway.
2   Anything else?
3       MS. JAWAD:  In any event, even just taking this
4   isolated incident, we do believe that poses a threat to the
5   community.
6       THE COURT:  What about -- and I think maybe perhaps
7   you -- you addressed this already, I apologize, but in terms of
8   the flight aspect of it, I understand he's not a U.S. citizen,
9   that he has family in India.  Does the, you know, relinquishing
10  his passport or any other conditions, monitoring or anything
11  else, would that address your concern about whether he might be
12  a flight risk?
13      MS. JAWAD:  Given that he does have the means to
14  travel, I know -- I mean there -- there are ways to travel
15  without your passport, especially if one has an incentive to --
16  to flee the country, and it doesn't seem like he has much
17  incentive to stay here and be prosecuted.
18      THE COURT:  How do you get out of the country if you
19  don't have a passport?
20      MS. JAWAD:  I mean you can make fraudulent passports.
21  You can -- there are other ways he could go: By -- by boat,
22  by -- there are ways to -- to travel illegally.
23      MR. O'NEILL:  Your Honor, I would point out to the
24  Court that it is now wintertime and the Saint Clair River is
25  very difficult to traverse it when there are chunks of ice

1    floating down it, so I don't think a boat is really.

2         THE COURT:  Yeah, okay.

3         MR. O'NEILL:  -- applicable at this time of year.

4         Also, there's nothing to indicate in his background

5    that he would even have the knowledge of where to go to seek an

6    illegal passport.  He's turning in his passport.  He can be --

7    he's going to be ordered not to obtain any other passport or

8    document that would allow international travel.

9         He does have a very good job and hopefully he will be

10   allowed to keep that job and continue to work.

11        I think there are more grounds here for his release

12   than for his detention.  There's never been any allegations of

13   inappropriate behavior.  He's been a project manager for two

14   and a half years.  I'm sure if there was something that had--

15   anything that had happened, we would be hearing about that.

16        MS. JAWAD:  Well, that's not entirely true.  I mean

17   sexual assault happens all the time and is very rarely

18   reported.

19        THE COURT:  I'm -- I'm not going to assume that there

20   were any other incidents.  I don't have any evidence of that

21   and any offer of proof as to that other than speculation, so

22   let's stick to what the facts of this case are, which, frankly

23   are bad enough.

24        MS. JAWAD:  Well, it is our position that since this

25   happened on an airplane, he would be a threat if he were to be

Case 2:18-cr-20027-TGB-MKM ECF No. 78 filed 03/05/19 PageID.903 Page 16 of 21
Detention Hearing • Thursday, January 4, 2018

16

1    released into the community.  I mean he's -- it would be

2    frankly unsafe for him to be around anyone else if he's willing

3    to do this to a complete stranger on an airplane while his wife

4    sits next to him.

5         THE COURT:  Okay.  All right.  Well, look, I

6    understand -- it's a very unusual case, and I understand we

7    have a Pretrial Services Report that recommends a bond for an

8    individual who, up to this point, objectively speaking, you

9    know, it's like he's a young man, apparently educated, has a

10   good job, he's married.  The allegations -- and, you know, this

11   isn't a -- this isn't a trial.  I'm not deciding guilt or

12   innocence or even -- even probable cause at this point.

13        But the fact of the matter is the -- there are

14   some -- the government has some significant proof.  I mean it

15   seems to me that as this case goes forward, there are going to

16   be facts that perhaps will shed some more understanding as to

17   what happened.  But the fact of the matter is we have the young

18   woman, the victim, who goes back to report this to the flight

19   attendants.  They note that her shirt is unbuttoned, her pants

20   are unbuttoned.  We have the -- the defendant's own statements

21   to the agents, while not perhaps completely co-extensive with

22   what the victim is saying, nonetheless are basically in the

23   form of admission.

24        This is a serious offense, carries a very heavy

25   sentence in this court.  This would be, if -- if proved beyond

Detention Hearing • Thursday, January 4, 2018

17

```
 1    a reasonable doubt, would be a First Degree Sexual Conduct in
 2    the State of Michigan.  And it's so -- not only is it so out of
 3    character with what the objective background of the defendant
 4    would -- would indicate, it just leads one to believe what --
 5    what kind of control this is.  He's on an airplane not only
 6    with other passengers, with his wife sitting in the next seat.
 7    One would think that that would be a sufficient deterrent to
 8    one doing an act like this and yet here we are.  And again, I'm
 9    not -- I'm not judging guilt or innocence, but the facts are --
10    the facts are there to -- to give me pause as to whether -- if
11    the circumstances of this offense aren't sufficient deterrent,
12    is an order of this court a sufficient deterrent?
13            Secondly, the flight situation, he's not a citizen,
14    he has no family here except his wife, and we -- again, we have
15    a lot of conflicting statements about what's going on.  Even if
16    the passport is turned over, I think that would make it
17    difficult for him to leave the country, but I -- I -- I agree
18    that he does have the means and he does have incentive and he
19    does have I think the ability to -- you know, we're right over
20    the border from -- from Canada.
21            MR. O'NEILL:  Your Honor, if I may interrupt the
22    Court.
23            THE COURT:  You may.
24            MR. O'NEILL:  If there is a concern, then the Court
25    could order a GPS tether placed on him.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.905   Page 18 of 21
Detention Hearing • Thursday, January 4, 2018

18

```
 1                THE COURT:  Tethers can -- tethers can be cut, you
 2    know.
 3                MR. O'NEILL:  That's going to allow people to know
 4    very quickly that something has gone completely wrong.
 5                THE COURT:  Well, you know, I gotta tell you, Mr.
 6    O'Neill --
 7                MR. O'NEILL:  It would be --
 8                THE COURT:  Yeah.
 9                MR. O'NEILL:  -- notification very quickly, and then
10    I don't think he's going to make it across the border --
11                MS. JAWAD:  Your Honor, I --
12                THE COURT:  Maybe not.
13                MR. O'NEILL:  -- if that's a concern.
14                THE COURT:  Maybe not.  But be that as it may, you
15    can cut a tether and you can get across the border pretty
16    quickly.
17                But be that as it may, I don't want to overly
18    speculate about what or what may not, you know, be possible or
19    how quickly he might be discovered.  But it comes down to two
20    things.  It comes down to the -- just the strange circumstances
21    of this offense which indicate -- I -- I think Ms. Jawad used
22    the term brazen, and it was brazen, and -- and the normal
23    constraints that one would have.  And we've been reading a lot
24    about sexual assaults in the news over the last month or so,
25    but this -- this even goes -- all right.  I won't make any
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 78   filed 03/05/19   PageID.906   Page 19 of 21
Detention Hearing • Thursday, January 4, 2018

19

1    political comments.

2           But coupled with the lack of any ties to this country

3    other than his job and his strong ties to India, coupled with

4    the conflicting statements that he's made following this thing,

5    the -- while he was taking this -- this medication, okay, maybe

6    you take medication with some narcotic medication, that would

7    explain the grossly antisocial behavior, but then we don't see

8    that there's anything other than normal Tylenol.

9           I agree that it's -- it's a close question, but I

10   gotta come down -- I'm not -- I am convinced that the

11   government has carried its burden showing that there are no

12   conditions that would reasonably assure either Mr.

13   Ramamoorthy's appearance as required or the safety of the

14   community.  So on that basis, I'll order him detained pending

15   trial.

16          Mr. Ramamoorthy, my decision is appealable, as your

17   lawyer knows, to the presiding judge who I believe is Judge

18   Murphy this week, and I'd encourage you to take that appeal.

19          Okay.  Preliminary examination?

20          THE CLERK:  January 24th at 1:00 p.m.

21          THE COURT:  Okay.  Anything else for the record?

22          MS. JAWAD:  I'd just like to note for the record I

23   did communicate with the Indian Consulate Office in Chicago and

24   they are aware of Mr. Ramamoorthy's arrest.

25          THE COURT:  Thank you.

1          MR. O'NEILL:  Okay.  You've been ordered detained.

2     I'll be able to come see you soon, okay?

3          DEFENDANT RAMAMOORTHY:  Okay.

4          (Proceedings concluded at 2:38 p.m.)

5                    —   —   —

| | |
|---|---|
| 1 | C E R T I F I C A T I O N |
| 2 | I, Linda M. Cavanagh, Official Court Reporter for the |
| 3 | United States District Court, Eastern District of Michigan, do |
| 4 | hereby certify that the foregoing pages 1 through 20 comprise a |
| 5 | full, true and correct transcription, to the best of my |
| 6 | ability, of the digital sound recording taken in the matter of |
| 7 | United States of America vs. Prabhu Ramamoorthy, Case No. |
| 8 | 18-30003, on Thursday, January 4, 2018. |
| 9 | |
| 10 | |
| 11 | s/Linda M. Cavanagh |
| 12 | Linda M. Cavanagh, RDR, RMR, CRR, CRC<br>Federal Official Court Reporter |
| 13 | United States District Court<br>Eastern District of Michigan |
| 14 | |
| 15 | Date: March 4, 2019 |
| 16 | Detroit, Michigan |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |