Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1216   Page 1 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5    vs.                             Case No. 18-20027
                                      Hon. Terrence G. Berg
 6    PRABHU RAMAMOORTHY,

 7                          Defendant.
      _____/
 8
                          JURY TRIAL: VOLUME 2B
 9
               BEFORE THE HONORABLE TERRENCE G. BERG
10                  United States District Judge
            Theodore Levin United States Courthouse
11               231 West Lafayette Boulevard
                    Detroit, Michigan  48226
12                  Thursday, August 9, 2018

13    APPEARANCES:

14    For the Plaintiff       MARGARET M. SMITH
      United States of America:  AMANDA JAWAD
15                            U.S. Attorney's Office
                              211 W. Fort Street
16                            Suite 2001
                              Detroit, Michigan  48226
17                            313-226-9135

18    For the Defendant       JAMES AMBERG
      Prabhu Ramamoorthy:     Amberg and Amberg
19                            104 W. Fourth Street
                              Suite 305
20                            Royal Oak, Michigan  48070
                              248-681-0115
21
                              VICTOR MANSOUR
22                            Mansour & Mansour, P.C.
                              32000 Northwestern Highway
23                            Farmington Hills, Michigan 48334
                              248-932-3322
24
      Also Present:           Rengachari Vijayaraghavan
25                            Court Interpreter
```

1          To obtain a certified copy of this transcript, contact:
2              Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                           Official Court Reporter
3              (313) 234-2616 • www.transcriptorders.com

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1218   Page 3 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

3

1

TABLE OF CONTENTS

2                                                          Page

3   PRELIMINARY JURY INSTRUCTIONS BY THE COURT          4

4   OPENING STATEMENT BY MS. SMITH                     15

5   OPENING STATEMENT BY MR. AMBERG                    23

6   Government Witnesses:

7   ALEXANDRA HATHAWAY

8       Direct Examination by Ms. Jawad                29
        Cross-Examination by Mr. Amberg                51
9       Redirect Examination by Ms. Jawad              62

10  OSCAR BURCIAGA

11      Direct Examination by Ms. Jawad                65
        Cross-Examination by Mr. Amberg                80
12      Redirect Examination by Ms. Jawad             103
        Redirect Examination Cont'd by Ms. Jawad      107
13      Recross-Examination by Mr. Amberg             107

14

15                          EXHIBITS

16  Identification                  Offered    Received

17  Government Exhibit Nos. 1 and 2,      37        37
18  Spirit Airlines plane diagrams

19

20

21

22

23

24

25

```
1              Detroit, Michigan

2              Thursday, August 9, 2018

3                        _  _  _

4              (Proceedings in progress at 12:28 p.m., continued

5              from Jury Trial Transcript Volume 2A)

6              THE COURT:  All right.  Let's swear our jury then.

7       Ladies and gentlemen, please stand and raise your right hand,

8       and you can respond by indicating "I do."

9              Do you solemnly swear or affirm that you will well

10      and truly try the issues now here pending and a true verdict

11      render according to the law and evidence given to you in open

12      court?  I do.

13             THE JURORS:  I do.

14             THE COURT:  All right.  Thank you very much.  You may

15      be seated.

16             So members of the jury, now that you've been sworn,

17      I'm going to give you some preliminary instructions that will

18      guide you in your participation in the trial.

19             It will be your duty to find from the evidence what

20      the facts are.  You and you alone will be the judges of the

21      facts.

22             You will then have to apply those facts to the law as

23      the Court will give it to you.  You must follow that law

24      whether you agree with it or not.

25             Nothing the Court may say or do during the course of
```

Case 2:18-cr-20027-TGB-MKM  ECF No. 83  filed 03/05/19  PageID.1220  Page 5 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

5

1   the trial is intended to indicate or should be taken by you as

2   indicating what your verdict should be.

3          The evidence from which you will find the facts will

4   consist of the testimony of witnesses, documents and other

5   things received into the record as exhibits and any facts that

6   the lawyers agree to or stipulate to or that the Court may

7   instruct you to find.

8          Certain things are not evidence and must not be

9   considered by you.  I will list them for you now.

10         Number one, statements, arguments and questions by

11  the lawyers are not evidence.

12         Number two, objections to questions are not evidence.

13  Lawyers have an obligation to their clients to make objections

14  when they believe evidence is being offered that -- when they

15  believe evidence being offered is improper under the rules of

16  evidence.

17         You should not be influenced by the objection or by

18  the Court's ruling on it.  If the objection is sustained,

19  ignore the question.  If it is overruled, treat the answer like

20  any other.  If you are instructed that some item of evidence is

21  received for a limited purpose only, you must follow that

22  instruction.

23         Number three, testimony that the Court has excluded

24  or told you to disregard is not evidence and must not be

25  considered.

1          Number four, anything that you may have seen or heard

2    outside the courtroom is not evidence and must be disregarded.

3    You are to decide the case solely on the evidence presented

4    here in the courtroom.

5          There are two kinds of evidence, direct and

6    circumstantial.  Direct evidence is direct proof of a fact such

7    as testimony of an eyewitness.  Circumstantial evidence is

8    proof of facts from which you may infer or conclude that other

9    facts exist.  I will give you further instructions on these as

10   well as other matters at the end of the case, but keep in mind

11   that you may consider both kinds of evidence.

12         It will be up to you to decide which witnesses to

13   believe, which witnesses not to believe, and how much of any

14   witness's testimony to accept or reject.  I will give you some

15   guidelines for determining credibility of witnesses at the end

16   of the case.

17         As you know, this is a criminal case.  There are

18   three basic rules about a criminal case that you must keep in

19   mind.

20         First, the defendant is presumed innocent until

21   proven guilt.  The indictment brought by the government against

22   the defendant is only an accusation, nothing more.  It is not

23   proof of guilt or anything else.  The defendant therefore

24   starts out with a clean slate.

25         Second, the burden of proof or responsibility to

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1222   Page 7 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

7

1    prove its case is on the government until the very end of the

2    case.  The defendant has no burden to prove his or her

3    innocence or to present any evidence or to testify.

4          Since the defendant has the right to remain silent,

5    the law prohibits you from arriving at your verdict by

6    considering that the defendant may not have testified.  You may

7    give no weight whatsoever to a defendant's decision not to

8    testify, it may not be held against him in any way.

9          Third, the government must prove the defendant's

10   guilt beyond a reasonable doubt.  I will give you further

11   instructions on this point later, but bear in mind that in this

12   respect, a criminal case is different from a civil case.

13         Count One of the indictment accuses the defendant of

14   Sexual Abuse, in violation of federal law.  Title 18, United

15   States Code, Section 2242(2) makes it a crime for anyone to

16   engage in a sexual act with another person if that person is

17   incapable of appraising the nature of the conduct, incapable of

18   declining to participate in the sexual act, or incapable of

19   communicating unwillingness to engage in a sexual act.

20         For you to find the defendant guilty of this crime --

21         MR. AMBERG:  Your Honor, Your Honor, I apologize.

22   Can we have a second so he can explain that part to Mr.

23   Ramamoorthy?

24         THE COURT:  Yes.

25         MR. AMBERG:  Thank you.

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1223   Page 8 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

8

1          (Brief pause)

2          THE COURT:  All right.  Thank you.

3          For you to find the defendant guilty of this crime,

4    you must be convinced that the government has proved each and

5    every one of the following elements beyond a reasonable doubt:

6          First, that the defendant knowingly engaged in a

7    sexual act with the person I will now call Adult Victim 1.  You

8    will learn the person's name during the trial.

9          Second, the defendant knew that Adult Victim 1 was

10   incapable of appraising the nature of the conduct, physically

11   incapable of declining participation in or communicating

12   unwillingness to engage in that sexual act.

13         Third, the offense was committed within the special

14   aircraft jurisdiction of the United States.

15         The term "sexual act" means:

16         A, contact between the penis and the vulva or the

17   penis and the anus;

18         B, contact between the mouth and the penis, the mouth

19   and the vulva, or the mouth and the anus;

20         C, the penetration, however slight, of the anal or

21   genital opening of another by a hand or finger or by any object

22   with an intent to abuse, humiliate, harass, degrade, or arouse

23   or gratify the sexual desire of any person;

24         Or D, the intentional touching, not through the

25   clothing, of the genitalia of another person who has not

1    attained the age of 16 years with an intent to abuse,

2    humiliate, harass, degrade, or arouse or gratify the sexual

3    desire of any person.

4         Three, the term "special aircraft jurisdiction of the

5    United States" includes a civil aircraft of the United States.

6         If you are convinced after hearing the evidence that

7    the government has proved all of these elements, you would say

8    so by returning a guilty verdict on this charge.  If you have a

9    reasonable doubt about any one of these elements after hearing

10   the evidence, then you must find the defendant not guilty of

11   this charge.

12        Now, a few words about your conduct as jurors.  You

13   as jurors must decide this case based solely on the evidence,

14   the evidence presented here within the four walls of this

15   courtroom.  This means that during the trial you must not

16   conduct any independent research about this case, the matters

17   in the case, and the individuals involved in the case or the

18   corporations involved in the case.  In other words, you should

19   not consult dictionaries or reference materials, search the

20   Internet, websites or blogs or use any electronic tools to

21   obtain information about this case or to help you decide this

22   case.  Please do not try to find out information from any

23   source outside the confines of this courtroom.

24        Until you retire to deliberate, you may not discuss

25   this case with anyone, even with your fellow jurors.  After you

Jury Trial: Volume 2B • Thursday, August 9, 2018

10

1   retire to deliberate, you may begin discussing the case with

2   your fellow jurors, but you cannot discuss the case with anyone

3   else until you have reached a verdict and the case is at an

4   end.

5          I know that many of you use cell phones or

6   Blackberrys and the Internet and other tools of technology.

7   You also must not talk to anyone at any time about this case or

8   use these tools to communicate electronically with anyone about

9   this case.  This includes your family and friends.  You may not

10  communicate with anyone about the case on your cell phone,

11  through e-mail, by Blackberry or iPhone or text messaging or on

12  Twitter or on any blog or website, including Facebook, Google,

13  LinkedIn or Youtube.  You may not use any similar technology of

14  social media even if I have not specifically mentioned it here.

15         I expect you will inform me as soon as you become

16  aware, if you do become aware, of any juror's violation of

17  these instructions.  A juror who violates these instructions

18  jeopardizes the trial and a mistrial could result which would

19  require the entire trial process to start over.

20         Finally, do not form any opinion until all the

21  evidence is in.  Keep an open mind until you start your

22  deliberations at the end of the case.

23         I hope that for all of you this case will be

24  interesting and noteworthy.

25         You will have the opportunity to ask questions of the

1   witnesses in this case in writing.  When a witness has been

2   examined and then cross-examined by counsel and after I may ask

3   any clarifying questions, I will ask whether any juror has any

4   further clarifying questions for the witness.  If so, you will

5   write your question down on a piece of paper and hand it to my

6   clerk.  Do not discuss the question with any other juror.

7            I'll review your question with counsel at sidebar and

8   determine whether the question is appropriate and allowable

9   under the rules of evidence.  If it is allowable, I will ask

10  your question, though I might put it in my own words.  If the

11  question is not permitted by the rules of evidence, it will not

12  be asked, and you should not draw any questions -- any

13  conclusions about the fact that your question might not be

14  asked.

15           Following your questions, if they have any, the

16  attorneys may ask additional questions.

17           If I do ask your question, you should not give the

18  answer to it any greater weight than you would to any of the

19  other testimony.

20           If you want to take notes during the course of the

21  trial, you may do so.  However, it is difficult to take

22  detailed notes and pay attention to what the witnesses are

23  saying at the same time.  If you do take notes, be sure that

24  your note taking does not interfere with your listening to and

25  considering all of the evidence.

1      Also, if you do take notes, do not discuss them with

2   anyone before you begin your deliberations.

3      Do not take your notes with you at the end of the

4   day.  Be sure to leave them in the jury room.

5      If you choose not to take notes, remember that it is

6   your own individual responsibility to listen carefully to the

7   evidence.  You cannot give this responsibility to someone who

8   is taking notes.  We depend on the judgment of all of the

9   members of the jury.  You all must remember the evidence in

10   this case.

11      So we will begin the trial after our lunch break.

12   First, the government will make an opening statement, which is

13   simply an outline to help you understand all the evidence as it

14   comes in.

15      Next, the defendant's attorney may, but does not have

16   to, make an opening statement.

17      Opening statements are neither evidence nor

18   arguments.

19      The government will then present its witnesses and

20   counsel for the defendant may cross-examine them.

21      Following the government's case, the defendant may,

22   if he wishes, present witnesses whom the government may

23   cross-examine.

24      After all the evidence is in, the attorneys will

25   present their closing arguments to summarize and interpret the

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1228   Page 13 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

13

 1    evidence for you.

 2            And the Court will then instruct you on the law.

 3            After that, you will retire to deliberate on your

 4    verdict.

 5            Those are the instructions that I wanted to give you

 6    prior to our lunch break and prior to our opening statements.

 7    And so I think we can take our lunch break now.

 8            Are there any matters that we need to take up before

 9    we discharge the jury for lunch?

10            MS. SMITH:  Not from the United States, thank you.

11            MR. AMBERG:  No, Your Honor.

12            THE COURT:  All right.  Thank you very much.  Please

13    rise for the jury.  We'll see you back at approximately 1:30.

14            (Jury excused at 12:43 p.m.)

15            (Court in recess at 12:43 p.m.)

16            (Proceedings resumed at 2:02 p.m., all parties

17            present, jury not present)

18            THE LAW CLERK:  Court recalls Case No. 18-20027,

19    United States of America versus Prabhu Ramamoorthy.

20            Counsel, will you please place your appearances on

21    the record?

22            MS. JAWAD:  Good afternoon, Your Honor.  Amanda Jawad

23    and Maggie Smith on behalf of the United States.  With us at

24    counsel table is Meghann O'Connor, a paralegal from our office,

25    and Special Agent Kyle Dodge with the FBI.

```
 1              THE COURT:  Good afternoon.
 2              MR. AMBERG:  Good afternoon, Your Honor.  Jim Amberg
 3    on behalf of the defendant who is standing to my right.  To his
 4    right is Mr. Vijay, the interpreter, and to my left is Mr.
 5    Mansour who is co-counsel in the case with me.
 6              THE COURT:  Well, good afternoon, Counsel.  Good
 7    afternoon, Mr. Ramamoorthy and Mr. Vijay.
 8              Let me just apologize I'm a little bit later than I
 9    thought I would be, but I had an unavoidable obligation that I
10    was able to take care of and was important.
11              I guess our jury is ready to join us.  Are there any
12    matters we need to take up before we bring in the jury?
13              MS. JAWAD:  No, Your Honor.
14              THE COURT:  So we're prepared to begin with opening
15    statements?
16              MS. SMITH:  Yes, Your Honor.
17              THE COURT:  All right.  Then let's bring in the jury
18    please.  All rise for the jury.
19              THE LAW CLERK:  All rise.
20              (Jury entered the courtroom at 2:04 p.m.)
21              THE COURT:  Good afternoon, ladies and gentlemen.
22    You may be seated.  Welcome back everyone.  I hope you had
23    enough time for lunch.  I do apologize for getting started a
24    bit late.  That was my fault, not the attorneys' fault, and so
25    you can blame me, and I do apologize for that.
```

1          But we are ready to get started with our trial at

2     this time, and that would be to begin with the opening

3     statements of counsel.  Is the government ready to proceed?

4          MS. SMITH:  Yes, Your Honor.

5          Your Honor, may I begin?

6          THE COURT:  You may.

7          MS. SMITH:  When Laura boarded Spirit Airlines Flight

8     788, she expected to get some much-needed rest, but instead she

9     was sexually assaulted.

10          Ladies and gentlemen, the evidence in this case will

11     show that on the morning of January 2nd, 2018 Laura woke up in

12     San Diego, California, and little did she know that by the end

13     of the next day, she would be subjected to a nurse performing a

14     rape kit on the most private parts of her body.

15          Now, back to San Diego.  Laura had traveled there

16     over the New Year holiday to be with her boyfriend.  He had

17     traveled there from Detroit for business and she had gone to

18     stay with him.  And on January 2nd they were both headed back

19     to Detroit, but they were on separate flights because his work

20     paid for his flight and she had to pay for hers herself, so she

21     went with the most economical option she could find, which was

22     Spirit Airlines.

23          Her flight was scheduled to depart San Diego around

24     9:30 that night and her connecter was in Las Vegas, Nevada.

25     Now, that flight from Vegas to Detroit was supposed to leave at

1   about 11:30 p.m., that's the flight that's often called the

2   red-eye, and it was supposed to arrive in Detroit about quarter

3   after 6:00 the next morning.

4            So Laura and her boyfriend arrived at the San Diego

5   airport early that day and they had lunch together and her

6   boyfriend was able to catch a flight right after lunch.  Of

7   course, Laura's flight didn't leave until the evening so she

8   had many hours to kill in the airport.  An experienced flier

9   and alone in the airport, Laura opened up her computer and did

10  some work to pass the time.  She also had some drinks.  Some

11  might say she had a lot to drink.

12           But Laura's going to tell you that she was nervous

13  about flying overnight.  She had a little bit of anxiety

14  because she knew that if she didn't sleep on that trip, then

15  she would arrive the next morning having not slept at all.  And

16  so to prepare for her flight while she was in the airport, she

17  ate dinner and she drank enough alcohol to help her sleep on

18  the flight.

19           Now, the first leg of her trip from San Diego to Las

20  Vegas was short and unremarkable.  And once in Vegas, she

21  stopped at the airport bar for a nightcap before getting on the

22  Las Vegas to Detroit flight.  Little did she know that she was

23  about to experience every woman's nightmare.

24           This is Laura.  She's going to tell you that her seat

25  was assigned towards the back of the plane and she was on the

```
1    window.  To her left sat this man with his wife on the aisle.

2            Planning to get some rest, Laura put her earphones in

3    and turned on the music on her iPhone and she pulled up a thick

4    furry blanket that she had brought with her for the flight.

5    Leaning against the window, she promptly fell fast asleep.

6            Now, sometime close to daybreak Laura felt something

7    not right, and at first she kind of ignored it and then the

8    unmistakable feeling.  Jolted awake, she could see that this

9    man had his hands in her pants and his fingers in her vagina.

10   When he realized that she had come to, she saw him quickly turn

11   away and pretend like he was sleeping.  And Laura's going to

12   tell you she felt a rush of emotions in that moment in time:

13   fear, terror, shock, confusion, and the realization that she

14   had been sexually assaulted.

15           What did she do first?  Now, you're going to learn

16   that Laura's first instinct was to text her boyfriend.  And of

17   course they're still in the air at this point so the text

18   messages aren't going to go through to him, but that was the

19   first thing she thought to do.  Her first outcry stated, "Oh,

20   my God, I just woke up and the guy next to me had his hands

21   down my pants and in my vagina."

22           After sending a dozen more texts to him, one right

23   after the other after the other, Laura finally decides "I'm

24   telling," and she did.  Laura found her way to the back of the

25   plane, which was just a few rows back, where she encountered
```

```
1    flight attendants.
2           You're going to meet a couple of the flight
3    attendants that were working on the flight that night and they
4    will describe Laura's demeanor: shook up, disheveled, scared.
5    Her shirt was untied, her pants were unbuttoned.  They moved
6    her to a different part of the plane and contacted the police.
7           When the flight landed a short time later, Wayne
8    County Metro Airport Police Authority was there to greet them.
9    Those officers took Laura off the plane to a safe place and
10   then they removed the defendant from the plane.
11          You're going to also hear from some of those
12   responding officers.  They are going to describe Laura's
13   demeanor to you, but they're also going to tell you how the
14   defendant reacted.  They will explain how, despite the fact
15   that no one told him why they had brought him off the plane, he
16   immediately said he was in a deep sleep and blurted out, "I
17   don't know where I put my hand."
18          But you don't have to take their word for it because
19   Wayne County Metro Airport Police wear body cameras and we're
20   going to show you the footage.  You will see the defendant's
21   gestures and body language and you will hear him easily
22   converse with law enforcement using the English language.
23          Now, the officers arrested the defendant in the
24   terminal of the airport, and from there you're going to learn
25   he was taken to the airport police station where he was met by
```

1   FBI agents.  The defendant agreed to be interviewed by the FBI,

2   and that interview too was video and audio recorded, so you're

3   going to have an opportunity to see and hear the defendant

4   confess in English to sexually assaulting Laura.

5        And we will prove that the defendant's version of

6   events evolved over the course of that morning.  They contained

7   lots of inconsistencies and minimizations.  He claimed he was

8   in a deep sleep.  Later he said he was awake.  He referred to

9   Laura as a strange girl.

10       But we will show you that one thing is clear.  By

11  listening to his words and watching his actions, the defendant

12  says what he means and he means what he says.  He admits to

13  touching Laura.  He admits to unhooking her bra.  He admits to

14  undoing her pants.  He admits to unzipping her pants zipper.

15  He admits to shoving his fingers in her pants and even

16  demonstrates for the FBI how he did it.

17       During the course of this trial you're also going to

18  meet Special Agent Erin Erkkinen who assisted with the

19  investigation.

20       You're going to hear from a nurse who performed the

21  rape kit on Laura at Detroit Receiving Hospital later that day.

22  She works for the Wayne County Sexual Assault Forensic

23  Examination Program, and she's going to explain to you that

24  many sexual assault victims do not have physical injuries to

25  their bodies.

```
 1          You're also going to meet a DNA scientist, and she is
 2   going to explain to you that she was not surprised that she did
 3   not find a match of DNA between the defendant and Laura.
 4   She'll tell you that not every case has DNA and not every touch
 5   results in DNA.  And, in fact, she's going to explain to you
 6   that the chances of obtaining DNA are dramatically decreased
 7   when someone has an opportunity to wash or wipe their hands or
 8   touch other objects, and you're going to learn through the
 9   course of the morning that the defendant had plenty of
10   opportunity to do that both before the flight landed and after.
11          At the end of this case as well as earlier before
12   lunch, the judge instructed you on some of the law.  It sounds
13   complicated but it's not complicated when you think about it.
14   There's three elements to proving Sexual Abuse.
15          The first element is that the defendant knowingly
16   engaged in a sex act with Laura.
17          There's three ways to prove the second element: that
18   the defendant knew that Laura was incapable of apprising the
19   nature, she was incapable of understanding; she was physically
20   incapable of declining; or she was physically incapable of
21   communicating unwillingness for all of this to happen to her.
22          And the third element is that this all happened
23   within the special aircraft jurisdiction of the United States.
24          Now, as I said before, you're going to get more
25   instructions on the law when we get to the end of the case.
```

1   But the judge is also going to tell you that if you find beyond

2   a reasonable doubt that the defendant committed the crime of

3   Sexual Abuse or if he attempted to commit that crime, then he

4   is guilty, and that is because attempt is included in the

5   federal law.

6          One more thing about how we will proceed with this

7   trial.  You're going to meet Laura and she's going to testify

8   about what happened to her.  Now, I want you to think about,

9   yesterday for some of you and for some of you today, when you

10  walked into this courtroom for the first time.  Were you

11  nervous?  Think about your trip downtown, finding the federal

12  courthouse, finding the parking, navigating your way through

13  some unfamiliar territory.  How about when they handed you the

14  microphone to start talking about personal details of your

15  life?  Did it make you a little nervous that this whole roomful

16  of people were listening to you talk about personal things, did

17  it feel a little intimidating?  Now think about having to talk

18  about one of the most traumatic events of your life in front of

19  all of these people.  Could you do it?

20         During this trial, ladies and gentlemen, this young

21  woman is going to walk through those doors and she's going to

22  take this witness stand.  She's going to tell you about a

23  horrible event in her life, waking up to a stranger sexually

24  assaulting her.

25         And think about this as you hear the testimony of the

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1237   Page 22 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

22

```
 1   witnesses through the course of this trial because you are the
 2   judges of credibility here.  Her testimony we will show is
 3   corroborated by the other evidence in this case, and we will
 4   prove that a man she had never met sexually violated her while
 5   she was incapable of either apprising the situation, or
 6   communicating that she didn't want to participate, or
 7   physically incapable of declining.
 8           Ladies and gentlemen, this is a simple case.  This
 9   defendant took advantage of a 22-year-old woman, alone and
10   sleeping on an airplane, for his own sexual gratification.  And
11   when he got caught, the evidence will show he cooked up a story
12   to make it appear he was totally asleep.  But when confronted
13   with the truth, the defendant admitted that he violated this
14   young woman.
15           And when you have seen and heard all the evidence in
16   this case, we will have proven beyond all reasonable doubt that
17   this defendant is guilty of the crime charged and we will ask
18   you to hold him accountable for his actions.  Thank you.
19           Thank you, Your Honor.
20           THE COURT:  Thank you very much.
21           Mr. Amberg, do you wish to make a statement?
22           MR. AMBERG:  Yes, Your Honor.  I would like the
23   lights on though and the PowerPoint off.
24           THE COURT:  Turn the lights on.  Thank you very much.
25           You may proceed when ready.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1238   Page 23 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

23

```
 1              MR. AMBERG:  Thank you.  Thank you, Your Honor.

 2         Prabhu is innocent.  The -- the facts of this case,

 3    the evidence of this case will show he is innocent of the

 4    charges that the government has brought against him.  To

 5    understand why he is innocent, you have to listen to what

 6    happened on that day and that evening that we've been talking

 7    about.

 8              It starts out in Seattle a few days before where

 9    Prabhu and his wife Geetha, who you will meet during the course

10    of this trial, are visiting friends.  At the time Prabhu starts

11    to get a little sickness, one of those sinus infections that

12    maybe many of us have had over the course of our lives.

13              Now, he has a return flight to Las Vegas with his

14    wife and then back to Detroit where they live here, where he

15    works, and what happens is that they decide when there in Las

16    Vegas, because they have a day or two of a layover, to go

17    experience the town.

18              Now, they are people who do not drink, they are

19    people who do not gamble or anything like that.  So what they

20    do is when they are in Las Vegas, they decide to go to the

21    Grand Canyon, so on the morning of this flight, Prabhu and his

22    wife Geetha drive out to the Grand Canyon.

23              Now, like I said, he was sick and he is still sick at

24    that point and it's getting worse.  They drive to the Grand

25    Canyon.  He's the one who is driving.  They see the Grand
```

1   Canyon and then they drive back to the airport where they take

2   this flight from Las Vegas to Detroit.

3          Now, they get on the flight together, and as we've

4   heard from the government, the complainant in this case is also

5   sitting down in the same row as them.  Now, if you know what a

6   Spirit Airlines flight is, this is a flight where the seats are

7   very close together.  We have the complainant on the right by

8   the window, we have Prabhu in the middle and we have his wife

9   right next to him, very tight quarters.

10         Now, what you're going to hear is this: is that

11   during this flight and even in the beginning part of this

12   flight, Prabhu and his wife are trying to sleep.  He's sick.

13   She gives him a Tylenol.  He's trying to sleep off his illness.

14   But the problem is is that the complainant who is sitting next

15   to them, she keeps on getting up multiple times.  They're

16   almost asleep, she gets up, almost asleep, she gets up

17   throughout the course of this flight.

18         Now, as you will hear from other witnesses and I will

19   get into it in a little bit in a minute, it's clear that she's

20   intoxicated.

21         Prabhu and his wife are not from the United States,

22   they are from India, and in India one thing that you do is you

23   sort of say -- stay to yourself, and especially in America you

24   are taught and you are supposed to basically defer to the

25   Americans, if -- if that makes sense.  And what happens is

1    that's what they do because during this flight, as you will

2    hear not just from his wife but also from one of the flight

3    attendants, the complainant is sleeping on Prabhu.

4           Now, the reason why we know that, and you're going to

5    hear that in a little bit, is that one of the flight attendants

6    makes a connection with the complainant in this case.  As she

7    gets on to the flight, they have a conversation together and he

8    remembers her.  And throughout this flight he is the head

9    flight attendant and he walks up and down the aisles and checks

10   to see how people are doing and he does this.  And because he

11   remembers her, he's going to be able to testify this afternoon

12   that he remembers seeing the complainant sleeping on Prabhu,

13   not just on his shoulder, but on a different time he couldn't

14   see her but I believe what he'll testify to is she may have

15   been on his lap sleeping.

16          But I want to stop there and talk a little bit about

17   the complainant and what leads her to this point and what's

18   going on here.  As the government indicated, she started her

19   day in San Diego.  She drinks five beers, she takes four shots

20   of Jameson whiskey.

21          She then flies from San Diego to Las Vegas where a

22   gentleman named Tom Selleke, who you will meet next week, an

23   independent witness who has nothing to do with this case, is

24   sitting at the bar and he watches her and she's behaving

25   strangely.  She's talking with these random guys at the bar,

1    she's consuming alcohol, and I believe she'll even admit she

2    had three drinks while she was there.  They all get on the

3    flight together.

4           Now, getting back to where they're all sitting down.

5    The flight is going, it's a turbulent flight, and so while

6    Prabhu is trying to sleep and his wife is trying to sleep, she

7    is awake.  He is mostly sleeping as we will hear from multiple

8    witnesses, but she's basically awake.  She never sees anything.

9           She's going to tell you that what she does see is

10   that before the flight lands, about 40 minutes, she sees the

11   complainant text messaging and then eventually getting out of

12   her seat, that's it.

13          You will not hear a single person say they saw

14   anything.  You will not hear any other passenger say they heard

15   anything.  Nobody screamed.  The complainant didn't jump out of

16   her seat.  Instead, for ten minutes she texted.

17          Now, this is chaotic.  Ultimately these people are

18   taken off the plane.  And one important fact as we go through

19   this and you listen to this, and you'll hear this, is that

20   during the entire time Prabhu is sitting there, these people

21   are watching him.  He doesn't go to the bathroom.  In fact, one

22   of the flight attendants puts a gentleman to sit next to him.

23   He never gets up.  You're going to see these body cams.  When

24   he gets off the plane, he never goes to the bathroom.  He's not

25   rubbing his hands, he's not doing anything like that.

1    And the reason why that's important and what wasn't

2    brought up before was this: is that the authorities and

3    investigators in this case did an extensive DNA test on

4    Prabhu's hands.  And you will hear our DNA expert come and,

5    quite to the contrary, say if a hand enters this private area

6    of a woman, you will have DNA literally all over your entire

7    hand.  The report done in this case, no DNA, none.

8    You'll hear evidence that in addition to the DNA

9    testing that indicates nothing happened, you're also going to

10   hear that fiber analysis was done on Prabhu's nails and the

11   jeans worn by the complainant.  What that is is if you touch

12   somebody's clothing or fibers, things, whether it's hairs,

13   fibers, things like that, they get into your nails.  This is

14   why they do these tests.  And guess what?  Nothing.

15   They even did a fingerprint analysis in this case.

16   They don't do this for no reason.  They do this because, as you

17   will hear, fingerprints generally show people touch things.

18   Nothing.

19   What ultimately happens is this: is that Prabhu is

20   taken into a very scary situation for a guy who's nor from this

21   country.

22   A little more that you need to know about Prabhu when

23   you ultimately watch his interview is this.  He can speak

24   enough English to get by to where at first glance, as you'll

25   hear testimony about, you can understand him and he can

1    understand you, understand you.  But he only understands about
2    60 percent of the English language.  Prior to him moving to
3    America about a year before this happened, he had never been to
4    the United States.  His English was limited to school in India.
5         And so when he's being interviewed while he's sick
6    and he's exhausted and he doesn't understand what's happening,
7    the investigators, trained professionals who are trained to get
8    people to say things, kind of walk him along and you hear this
9    sort of attempt at a confession, which we'll ultimately argue,
10   because it's not my time now to argue, but ultimately that it
11   means nothing.
12        Because the actual facts of this case, the actual
13   evidence, the real evidence, not the evidence of statements of
14   the complainant who clearly was intoxicated, who could very
15   well have been dreaming, who, when assaulted of this nature,
16   instead of running away text messages for ten minutes, the
17   actual facts, the no DNA, the no fibers in the fingers, no hair
18   in the fingers, the no fingerprints, that all suggests that
19   Prabhu is innocent.
20        And because of that, folks, when you ultimately go
21   and deliberate, and I'm going to ask you this again when I get
22   back here for closing argument, I'm going to ask that you find
23   him not guilty, not just because the government can't prove
24   their case beyond a reasonable doubt, but because he is
25   actually innocent in this case.

```
 1              Thank you very much for your time.
 2              THE COURT:  Thank you, Mr. Amberg.
 3              Government ready to present its first witness?
 4              MS. JAWAD:  Yes, Your Honor.
 5              THE COURT:  Call your first witness.
 6              MS. JAWAD:  United States calls Alexandra Hathaway.
 7              THE COURT:  Come forward please.  Will you raise your
 8    right hand please.
 9                A L E X A N D R A   H A T H A W A Y
10    was thereupon called as a witness herein, and after being
11    first duly sworn to tell the truth and nothing but the truth,
12    testified on her oath as follows:
13              THE WITNESS:  I do.
14              THE COURT:  You may be seated.
15                         DIRECT EXAMINATION
16    BY MS. JAWAD:
17    Q.  Good afternoon.  Could you please tell the jury what your
18    name is?
19    A.  Allie.
20    Q.  And what's your last name?
21    A.  Hathaway.
22    Q.  Ms. Hathaway, where do you currently live?
23    A.  Dallas.
24    Q.  And where do you work?
25    A.  For Spirit Airlines.
```

1    Q.   What do you do for Spirit Airlines?

2    A.   I'm a flight attendant.

3            THE COURT:  Ms. Hathaway, could you please speak

4    right into the microphone and go ahead and project your voice

5    so everyone can hear you please.

6            Go ahead please.

7    BY MS. JAWAD:

8    Q.   How long have you been a flight attendant for Spirit

9    Airlines?

10   A.   Fourteen months.

11   Q.   What did you do before that?

12   A.   I worked in an emergency room.

13   Q.   What type of training or schooling is required to become a

14   flight attendant?

15   A.   For Spirit Airlines you go to training in Fort Lauderdale

16   for three and a half weeks.

17   Q.   And did you complete that training program?

18   A.   Yes.

19   Q.   What types of things are you trained while you're in the

20   training program in Fort Lauderdale?

21   A.   We're trained to evacuate a plane, handle emergency

22   situations, beverage service, things like that.

23   Q.   And how are you trained to handle emergency situations?

24   A.   I would have to refer to a -- my manual for individual

25   things, but there's a wide variety of situations we could

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1246   Page 31 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

31

1    encounter.

2    Q.  But in general, when someone reports an emergency on

3    board, what do you typically do?

4    A.  You report it to the lead flight attendant, and if you are

5    the lead flight attendant, you report to it the captain.

6    Q.  So what is the difference between a lead flight attendant

7    and a non-lead flight attendant?

8    A.  The lead flight attendant will be in the front of the

9    plane at all times and they have a few different duties to

10   carry out through different flight procedures.

11   Q.  And going back to your training that you received before

12   you began your work, were you also trained on how to recognize

13   intoxication in passengers?

14   A.  Yes.

15   Q.  And could you tell us a little bit about that training?

16   A.  I would have to refer to the flight attendant manual for

17   some specifics, but in general there's a -- they call it

18   traffic light system.

19   Q.  And could you explain what that is?

20   A.  There's certain different behaviors that would put a guest

21   in a green light whereas they're okay, a yellow light maybe you

22   want to slow service down, things like that, and then red

23   behaviors you would stop.

24   Q.  And do you in the course of your duties as a flight

25   attendant serve alcohol to passengers?

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1247   Page 32 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

32

1    A.   Yes.

2    Q.   And you said that when a passenger reaches a yellow light

3    level, you may want to slow down service, is that what I

4    understood?

5    A.   Yes.

6    Q.   And when someone -- what happens when someone reaches the

7    red zone?

8    A.   You discontinue serving alcohol.

9    Q.   And why is it important that a flight attendant be able to

10   recognize these different levels of intoxication?

11   A.   Well, you never want to have any intoxicated passenger.

12   Q.   And are you authorized to remove an intoxicated passenger

13   during the boarding process?

14   A.   I would defer to the captain.

15   Q.   Are you supposed to notify the captain if someone is at a

16   red light or a yellow light level?

17   A.   Yes.

18   Q.   Okay.  Let's talk about just your responsibilities in

19   general as a flight attendant.  You said there were lead flight

20   attendants and regular flight attendants.

21   A.   There are different positions, but there's lead, which is

22   a letter A, and then there's at least a B and C as well.

23   Q.   So how many flight attendants are typically on a plane at

24   one time?

25   A.   At least three.

1    Q.  An what are your responsibilities during the boarding
2    process?
3    A.  It depends on my position.
4    Q.  If you are a non-lead flight attendant, what are your
5    responsibilities?
6    A.  It still varies.
7    Q.  And what are some of those ways that it can vary?
8    A.  If you are a certain flight -- flight attendant B, for
9    example, you'll be throughout the cabin.  If you're flight
10   attendant C, you remain in the back galley.
11   Q.  And what -- where does the lead flight attendant remain?
12   A.  The front galley.
13   Q.  And are all of the flight attendants responsible for
14   serving food and beverage?
15   A.  Yes.
16   Q.  Ms. Hathaway, were you working as a flight attendant on
17   January 2nd, 2018 in the evening?
18   A.  Yes.
19   Q.  And did that flight you were working on continue into
20   January 3rd, 2018?
21   A.  Yes.
22   Q.  So what -- what flight were you assigned to that evening
23   and then morning?
24   A.  I'm not sure I understand the question.
25   Q.  What was the origin of the flight that you were on that --

1    the evening of the 2nd?

2    A.   I don't recall the first flight I did that day.

3    Q.   I mean the -- in the evening of January 2nd, what flight

4    were you on?

5    A.   I worked Las Vegas to Detroit.

6    Q.   And do you know, just approximately, what time that flight

7    left?

8    A.   I don't.

9    Q.   Was it later in the evening, was it late afternoon, was it

10   somewhere in between?

11   A.   It was late night.

12   Q.   And is that commonly called a red-eye?

13   A.   Yes.

14   Q.   In what ways do red-eye flights differ from non-red-eye

15   flights?

16   A.   In what way do you mean?

17   Q.   What are some of the differences between a red-eye flight

18   and a regular flight?

19   A.   As far as what aspect of a red-eye flight?

20   Q.   Um, well, when you -- it's called red-eye because it's a

21   late at night flight, is that right?

22   A.   Right.

23   Q.   Okay.  And so are typically people doing different things

24   on a red-eye flight than they would be doing if it was a flight

25   during the day?

Case 2:18-cr-20027-TGB-MKM  ECF No. 83  filed 03/05/19  PageID.1250  Page 35 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

35

1    A.  Most passengers are typically asleep on a red-eye flight.

2    Q.  And are the lights different on a red-eye flight versus a

3    flight during the day?

4    A.  Yes, at that time.

5    Q.  And so what happens with the lights on a red-eye flight?

6    A.  Before takeoff the cabin lights are turned off.

7    Q.  And how dark is the plane when the lights are off?

8    A.  I'm not sure how to quantify that.

9    Q.  Is it pitch black?

10   A.  No.

11   Q.  But dark enough that it's different than when the lights

12   are on during the day?

13   A.  Yes, it's different than having lights on.

14   Q.  And dark enough so that people can sleep through the

15   night?

16   A.  Depending on the person, sure.

17   Q.  Do you still offer food, food and beverage service on a

18   red-eye flight?

19   A.  Yes.

20   Q.  Just like a regular flight?

21   A.  Yes.

22   Q.  And on that flight from Las Vegas to Detroit, how many

23   different flight attendants were working with you that day?

24   A.  Three others.

25   Q.  And which role were you assigned to?

1   A.   I was flight attendant B.

2   Q.   And what does that mean?

3   A.   I -- on that particular plane I have a seat in the back of

4   the plane and I have different compliance areas and things like

5   that.

6   Q.   So you were not the lead flight attendant on that flight?

7   A.   No.

8   Q.   And do you remember what type of plane that was and how

9   many passengers?

10   A.   It was an Airbus 320 and there was 182 passengers.

11   Q.   Ms. Hathaway, there is an exhibit book in front of you.

12   Would you mind opening that and turning to tab 1?

13        Do you recognize this?

14   A.   Yes.

15   Q.   What is it?

16   A.   It's a schematic of an Airbus 320.

17   Q.   And does that schematic fairly and accurately depict the

18   layout of the plane that you were describing?

19   A.   Yes.

20   Q.   And can you flip to the next page, which is marked for

21   identification as Government's Exhibit 2, and is that just a

22   close-up picture of Government's Exhibit 1?

23   A.   Yes.

24   Q.   Is that also a fair and accurate depiction of the airplane

25   you were describing?

1    A.  Yes.

2           MS. JAWAD:  Your Honor, at this time we would offer

3    United States Exhibit 1 and 2 into evidence.

4           THE COURT:  Any objection?

5           MR. AMBERG:  No objection.

6           THE COURT:  1 and 2 are admitted.

7           MS. JAWAD:  Like to publish Government's Exhibit 1.

8           THE COURT:  You may.

9           (Brief pause)

10          MS. JAWAD:  Looks like we're having a little bit of

11   technical issue.  We can wait.  We can move on for now and

12   we'll come back to the photo as soon as it's working again.

13          THE COURT:  Go ahead.

14   BY MS. JAWAD:

15   Q.  So were you spending most of the -- the flight in the back

16   of the plane you said?

17   A.  Yes.

18   Q.  And at some point did a female passenger come to the back

19   to report an issue?

20   A.  Yes.

21   Q.  And about how far into the flight did this happen?

22   A.  Approximately 45 minutes prior to landing.

23   Q.  And how long is a flight from Vegas to Detroit?

24   A.  I don't recall specifically.

25   Q.  Would you say it's closer to two hours, four hours, longer

1   than that?

2   A.   Probably around three hours.

3   Q.   And are there any ways in which flights to and from Las

4   Vegas are different than flights from other areas?

5   A.   You tend to encounter more passengers that have been

6   drinking in Las Vegas than other areas.

7   Q.   So about 40 minutes before landing you said this female

8   approached the back area, is that right?

9   A.   Yes.

10  Q.   And who was seated in the back area with you?

11  A.   Myself and flight attendant C.

12  Q.   And could you see the female when she approached you?

13  A.   I didn't see her when she initially came up the aisle

14  because I was facing towards the lavatory door.

15  Q.   When did you first see her?

16  A.   When she entered the galley area.

17  Q.   And how would you describe her appearance?

18  A.   She was tearful, upset and looked disheveled.

19  Q.   Was it difficult to make out what she was saying at first?

20  A.   No.

21  Q.   And without saying what she said, did she indicate what --

22  whether this incident had just happened or if it happened

23  earlier in the flight?

24  A.   Yes.

25  Q.   Would it -- how soon before that conversation did the

1   incident happen?

2          MR. AMBERG:  I -- Your Honor, I would object to that.

3   I think it's a -- it's an answer based on a hearsay statement.

4          MS. JAWAD:  Your Honor, I'm establishing a

5   foundation.

6          THE COURT:  Overruled.  Overruled.  Go ahead.

7   BY MS. JAWAD:

8   Q.  How soon into the -- or how soon before this conversation

9   did she say the incident occurred?

10  A.  Just prior.

11  Q.  And did she appear to still be upset about that incident?

12  A.  Yes.

13  Q.  Okay.  And what did she say to you about what happened?

14  A.  I don't recall the specific wording, but she indicated to

15  me that she had been asleep and when she woke up, the male

16  passenger next to her had his fingers inside her vagina.

17  Q.  And did you know where she had been sitting on the

18  airplane?

19  A.  Not specifically.

20  Q.  Was it near the back of the plane or the front of the

21  plane?

22  A.  Relatively close to the back.

23  Q.  Could you estimate about how many rows away?

24  A.  I would say about five.

25  Q.  And while she was telling you about what happened, were

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1255   Page 40 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

40

1    you able to observe her clothing?

2    A.   Yes.

3    Q.   What did you observe about that?

4    A.   The button of her pants was undone and she had a few

5    buttons of her shirt undone.

6    Q.   And did she say who undid her clothing?

7    A.   The male passenger next to her.

8    Q.   Did she tell you whether she was sitting in a window seat

9    or an aisle seat?

10   A.   The window.

11   Q.   And before you spoke with the victim in the back of the

12   plane, did you have any interaction or notice her at all prior

13   to the -- prior to that?

14   A.   No.

15   Q.   Did she stand out to you in any way during the boarding

16   process?

17   A.   No.

18   Q.   If a passenger were to board with their shirt unbuttoned

19   and their pants unbuttoned, is that something you do typically

20   notice?

21   A.   I would think so.

22   Q.   And what did you do next after she reported the assault to

23   you?

24   A.   I told her to stay in the back with me.  I pulled a bin

25   down for her to sit on, and flight attendant C called the lead

1    flight attendant.

2    Q.  What did you do next?

3    A.  The lead flight attendant came to the back.  We informed

4    him of what was happening.  He called the captain and went out

5    into the cabin to find her a different seat and I stayed in the

6    back with her.

7    Q.  And why was it important to find her a different seat on

8    the airplane?

9    A.  Because we didn't want to make her sit next to someone she

10   just had an incident with.

11   Q.  And before you found that seat for her, did she stay in

12   the back galley with you?

13   A.  She stayed with me, yes.

14   Q.  And did she continue to be visibly upset and tearful as

15   you described?

16   A.  Yes, intermittently.

17   Q.  Were you -- while you were sitting in the back -- and let

18   me just ask, was this a full flight?

19   A.  Yes.

20   Q.  Is that why it took a while to find another seat for the

21   victim?

22   A.  Yes.  It was completely full.

23   Q.  And during that time that the victim was sitting in the

24   back with you, could you see the defendant or his wife?

25   A.  I could see the backs of their heads.

1    Q.  And did you notice anything about the defendant's wife at

2    that time?

3    A.  Intermittently throughout the time.

4    Q.  What was she doing?

5    A.  She kept glancing back at me and at one point attempted to

6    come to the back galley.

7    Q.  And what did you do when she approached the back galley?

8    A.  I stated "no" and pointed at her seat.

9    Q.  Did she then go back to her seat?

10   A.  Yes.

11   Q.  And during that time was she and her husband sitting alone

12   in that row?

13   A.  Yes.

14   Q.  And were they sitting together alone until another

15   passenger was able to fill that seat?

16   A.  As far as I know.

17   Q.  And prior to the incident being reported, did either the

18   defendant or his wife make any complaints to you?

19   A.  No.

20   Q.  Did they indicate to you that anyone was sleeping on them?

21   A.  No.

22   Q.  Did you have any -- you already said you didn't have any

23   interaction with the victim prior to the incident, is that

24   right?

25   A.  Yes.

1  Q.  So you didn't serve her any beverages while on board?

2  A.  Not that I recall.

3  Q.  And do you recall serving her any food either?

4  A.  Not that I recall.

5  Q.  About how long was she back there in the galley with you

6  before she moved to a different seat?

7  A.  Right before the landing gear came down.

8  Q.  And what did you do when the plane landed?

9  A.  I remained in the back galley.

10        MS. JAWAD:  Your Honor, if I could just have one

11  moment to check on the technology.

12        THE COURT:  You may.

13        (Brief pause)

14        MS. JAWAD:  Your Honor, can we have a sidebar?

15        THE COURT:  You may.

16        (Sidebar discussion as follows):

17        THE COURT:  Okay.  What is it?

18        MR. AMBERG:  Judge, can you -- I don't know if you

19  can hear, but his tether's going off for low battery.  I don't

20  know what to do about the thing.

21        MS. SMITH:  I thought it was the headphones.

22        MR. AMBERG:  I did too.

23        THE COURT:  I could hear something; I wasn't sure

24  what it was.  I'm not entirely sure it's audible to everyone

25  else.  Does he know how to operate it?  Can he make it stop?

```
 1            MR. AMBERG:  I think he would have to charge it.

 2            THE COURT:  I'm sorry?

 3            MR. AMBERG:  I think -- I think he would have to

 4     charge it.  I don't know.

 5            MS. SMITH:  Here's my suggestion.  Here's my

 6     suggestion.  We're having a technology issue.  We need to get

 7     somebody from Pretrial down here to take care of this tether at

 8     least for the rest of the day.  Perhaps we tell them that his

 9     headset has run out of battery, and in case anybody's heard

10     that low battery announcement, they'll think it's the

11     transmitter from the headset, and maybe take the jury out for

12     ten minutes while we solve this issue.

13            THE COURT:  Right now?

14            MS. SMITH:  Yes.

15            THE COURT:  All right.

16            MS. SMITH:  I'm sorry.

17            MR. AMBERG:  Thank you.

18            (End of sidebar discussion)

19            THE COURT:  All right.  Well, thank you very much.

20            Ladies and gentlemen, we're going to take a brief

21     break.  The technology is not working.  You may be hearing a

22     noise about recharging a battery so it's a little bit

23     distracting.  We're going to take care of that, and so let's

24     make sure we don't have that going off during -- during these

25     proceedings.  So let's take a brief break and we'll be back on
```

1    the record shortly.

2            All rise for the jury.

3            (Jury excused at 2:50 p.m.)

4            THE COURT:  You may be seated.  So let's try to get

5    this resolved.  I'll try to get ahold of Pretrial as well.

6            (Brief pause)

7            THE COURT:  Is it possible for Mr. Ramamoorthy to

8    remove it on his own or is that not possible?

9            MS. SMITH:  No, they have to do it.

10           THE COURT:  Yeah.

11           (Court in recess at 2:56 p.m.)

12           (Proceedings resumed at 3:03 p.m., all parties

13           present, jury not present)

14           PRE-TRIAL OFFICER:  Your Honor, Roland Jonville for

15   the record

16           I called our monitoring center and they're supposed

17   to deactivate it.  It just needs to be charged.  So until it's

18   charged, it's going to continue to beep, but we should be okay

19   now.

20           THE COURT:  Okay.  You think --

21           MS. SMITH:  Are you saying you deactivated the

22   tether?

23           PRE-TRIAL OFFICER:  Yes.

24           MS. SMITH:  Okay.

25           PRE-TRIAL OFFICER:  Yes.

```
 1              MS. SMITH:  Will they --

 2              THE COURT:  Thank you.

 3              MS. SMITH:  -- reactivate it at the end of the day?

 4              PRE-TRIAL OFFICER:  Yes, it will -- at the end of the

 5   day he just needs to charge it.

 6              MS. SMITH:  And I think we're cooking with gas over

 7   here.  Did you get it?

 8              THE COURT:  Thank you for your help.

 9              Should we bring in the jury?

10              MS. SMITH:  Yes, because if we don't get this -- if

11   we don't get this solved, then perhaps the Court would let us

12   just pass these diagrams to the jury.  It's just the pictures

13   of the plane.

14              MR. AMBERG:  I would have no objection just to make

15   it happen here.

16              THE COURT:  All rise.

17              (Brief pause)

18              THE COURT:  Hold on.  Just a minute.  What is the

19   issue?

20              MS. SMITH:  Beep.

21              MR. MANSOUR:  They may have not fixed it.

22              MS. SMITH:  The same -- the same issue.

23              THE COURT:  Ladies and gentlemen, go back in the jury

24   room please.  I apologize.

25              (Brief pause)
```

Case 2:18-cr-20027-TGB-MKM    ECF No. 83    filed 03/05/19    PageID.1262    Page 47 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

47

1        MS. SMITH:  Your Honor, he has to go upstairs if they
2    take it off, for them to take it off.
3        THE COURT:  All right.  There's no way to do it down
4    here real quick?
5        PRE-TRIAL OFFICER:  I can bring somebody down if you
6    like.
7        THE COURT:  I'm sorry?
8        PRE-TRIAL:  I can bring somebody down if you like.
9    There's some tools involved though.
10       THE COURT:  How long will it take?
11       PRE-TRIAL OFFICER:  Fifteen minutes maybe, max.
12       THE COURT:  All right.  Well, we're going to have to
13   take a break then.  This is totally inappropriate.
14       MR. AMBERG:  Go, go, go, go, go, go, go.
15       THE COURT:  Get it done please as quickly as
16   possible.  We'll be on recess then for about 15 minutes.
17   Please give the jury my apologies.
18       And ma'am, you can step down, make yourself
19   comfortable.
20       (Court in recess at 3:05 p.m.)
21       (Proceedings resumed at 3:13 p.m., all parties
22       present, jury not present)
23       THE COURT:  Do we have our witness?
24       MS. SMITH:  I'll go get her.
25       MR. AMBERG:  We're missing Mr. Ramamoorthy.

Case 2:18-cr-20027-TGB-MKM    ECF No. 83    filed 03/05/19    PageID.1263    Page 48 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

48

```
 1              THE COURT:  Where is Mr. Ramamoorthy?

 2              MR. AMBERG:  Waiting for him out there, Judge.  I can

 3    go back out there and get him in here as soon as he comes back

 4    down the elevator.

 5              THE COURT:  All right.  Oh, so he's still having the

 6    tether removed?

 7              MR. AMBERG:  Yes.  Yes.  Your Honor, do you want me

 8    to go out there and kind of flag him in as fast as possible?

 9              THE COURT:  Yes.

10              (Brief pause)

11              (Defendant enters the courtroom at 3:17 p.m.)

12              THE COURT:  Just a moment.  Just a moment.  All

13    right.  Do we have everyone that we need?

14              MS. SMITH:  I believe so.

15              THE COURT:  All right.

16              MR. AMBERG:  Yes, Your Honor.

17              THE COURT:  Mr. Ramamoorthy, you need to keep that

18    charged.  Do you understand, sir?

19              DEFENDANT RAMAMOORTHY:  Yes, sir.

20              THE COURT:  Don't let that happen again.  That's your

21    responsibility, sir.  Don't let that happen again.  There are

22    going to be consequences if it happens again.  You keep it

23    charged.

24              All rise for the jury.

25              (Jury entered the courtroom at 3:17 p.m.)
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1264   Page 49 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

49

1           THE COURT:  Welcome back, ladies and gentlemen.  All
2   right.  Are we all here?  You may be seated.
3           Thank you for your patience.  Sometimes we have these
4   technical difficulties.  There's nothing anybody can do about
5   it unfortunately because we seem to live and die by technology
6   these days, and I do appreciate your patience.  Everyone's been
7   doing what they can to not waste your time and so we're very
8   appreciative of that.
9           So go ahead, Ms. Jawad.
10  BY MS. JAWAD:
11  Q.  Ms. Hathaway, before we took a break, you said that you
12  were trained to identify different levels of intoxication in
13  passengers, is that right?
14  A.  Yes.
15  Q.  And when you were speaking with the victim in the back of
16  the plane, did she appear to be intoxicated to you?
17  A.  No.
18  Q.  Did you smell alcohol on her breath?
19  A.  No.
20  Q.  And did you know the victim prior to this flight?
21  A.  No.
22          MS. JAWAD:  At this time I'd like to publish
23  Government's Exhibit 1.
24          THE COURT:  Any objection?
25          MR. AMBERG:  None, Your Honor.

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1265   Page 50 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

50

```
1              THE COURT:  You may proceed.
2    BY MS. JAWAD:
3    Q.  Ms. Hathaway, is this the diagram of the plane that you
4    spoke about earlier?
5    A.  Yes.
6              MS. JAWAD:  And at this time we'd like to publish
7    Government's Exhibit 2.
8              THE COURT:  Any objection?
9              MR. AMBERG:  No, Your Honor.
10   BY MS. JAWAD:
11   Q.  Ms. Hathaway, is this the back area of the plane that --
12   where the assault was reported to you?
13   A.  Yes.
14   Q.  Okay.  And is that blue area in the bottom portion, is
15   that approximately where you were seated when the victim
16   approached you?
17   A.  Yes.
18   Q.  And those rows above it is -- is that approximately where
19   the victim was sitting before she approached you?
20   A.  Yes.
21   Q.  Okay.  And you stated earlier that the defendant's wife
22   tried to come to the back during the time that you were
23   speaking with the victim?
24   A.  Yes.
25   Q.  Is that right?
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1266   Page 51 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

51

1      And were the bathrooms back there functioning?

2    A.  No.

3    Q.  And was an announcement made prior to this to all of the

4    passengers that the bathroom wasn't working?

5    A.  Yes.

6           MS. JAWAD:  I have no further questions, Your Honor.

7           THE COURT:  Thank you very much.

8           Any cross-examination?

9           MR. AMBERG:  Yes, Your Honor, very briefly.

10                    CROSS-EXAMINATION

11   BY MR. AMBERG:

12   Q.  Good afternoon, Ms. Hathaway.  Thank you for being here.

13   I just have a few questions for you, okay?

14          At the time that this happened, how long had you

15   worked as a flight attendant?

16   A.  Seven months.

17   Q.  Okay.  And were you out of the training phase and just

18   working full time there at that point?

19   A.  Yes.

20   Q.  Okay.  And you weren't in charge of that flight that

21   night, right?

22   A.  I was not the lead.

23   Q.  Okay.  Who was the lead, if you remember?

24   A.  Oscar.

25   Q.  Okay.  And your job was to walk the halls of the plane?

1    A.   During the boarding process.

2    Q.   Okay.  Do you remember seeing the complainant during the

3    boarding process?

4    A.   No.

5    Q.   Okay.  You never saw her until she came back towards the

6    end of the flight?

7    A.   Not that I recall.

8    Q.   Okay.  What about Mr. Ramamoorthy, did you see him when he

9    boarded?

10   A.   Not that I remember.

11   Q.   Okay.  None of these -- him, his wife, did you see his

12   wife boarding?

13   A.   No one stood out to me during boarding.

14   Q.   Okay.  After you helped everybody on board, then do you go

15   to the back of the plane?

16   A.   Yes.

17   Q.   Okay.  And do you stay there for the duration of the

18   flight?

19   A.   No.

20   Q.   What do you do?

21   A.   We do a food and beverage service and intermittent aisle

22   walks.

23   Q.   Okay.  And is that you specifically that does that?

24   A.   Everybody.

25   Q.   Okay.  During this flight, how many times do you think

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1268   Page 53 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

53

1    throughout the flight did you walk up and down the aisleway?

2    A.  I don't recall.

3    Q.  I mean could it be as -- as little as one time?

4    A.  I don't recall the number.

5    Q.  Okay.  Did you notice anything unusual when you walked

6    down the aisleway?

7    A.  No.

8    Q.  Okay.  Now, the plane itself, how far feet-wise do you

9    think it is from one side of the plane to the other side if

10   you're standing there in the middle of the aisleway?

11   A.  Maybe -- from where -- from tail to end?

12   Q.  No, I mean like sideways, like...

13   A.  Oh, how wide is it?

14   Q.  Yeah, how wide is it on the inside?

15   A.  Maybe eight feet.  I'm not good at estimating --

16   Q.  That's okay.

17   A.  -- sizes.

18   Q.  Not a considerable distance, right?

19   A.  No.

20   Q.  Okay.  And within that sort of eight feet you have the

21   aisleway as well as seats on the other side of the aisleway,

22   right?

23   A.  Yes.

24   Q.  Okay.  And did this have three seats on each side or was

25   it three and two?

1    A.   Three and three.

2    Q.   Okay.  So six people would have been sitting there, right?

3    A.   In one row.

4    Q.   In one row, correct.

5         And you said the plane was full, right?

6    A.   Yes.

7    Q.   So where the complainant and Mr. Ramamoorthy were sitting,

8    there was three people right on the other side of the aisleway,

9    right?

10   A.   Across the aisle.

11   Q.   Okay.  And that's just a couple of feet away, right?

12   A.   Yes.

13   Q.   Okay.  The lighting on the airplane -- I understand it was

14   a red-eye, right?

15   A.   Yes.

16   Q.   Okay.  But the lights aren't completely off, right?

17   A.   In the cabin they were.

18   Q.   The -- it's completely dark?

19   A.   I can't quantify completely dark.

20   Q.   Well, I mean you're going to have to be able to see,

21   right?

22   A.   Yes, I can still see.

23   Q.   Okay.  So there must be some lighting, right?

24   A.   We keep lights on in the galley.

25   Q.   Okay.  And in the galley in the back?

1    A.   There's one in the front, one in the back.

2    Q.   Okay.  And then in the aisleway itself and anywhere around

3    that sort of compartment, are there lights on at all?

4    A.   There's glow path lighting on aisles.

5    Q.   So it's enough that you could see people in their seats?

6    A.   Yes, vaguely.

7    Q.   Well, is this -- if -- if you're standing there in the

8    aisleway and you're looking down at a seat right next to you,

9    you could see that person, right?

10   A.   Yes.

11   Q.   And if you're looking at two seats over, you can see them

12   too, right?

13   A.   Yes.

14   Q.   And three seats over as well, right?

15   A.   Yes.

16   Q.   Even in the way that it was lit that night, you could see

17   all three people?

18   A.   Yes.

19   Q.   Okay.  I mean even -- I mean this is such a small confined

20   area you could probably even touch all three people, right,

21   from the middle, right?

22   A.   I would struggle to touch the person on the window.

23   Q.   Okay.  Now, you indicated that alcohol sort of plays a

24   role in airplane flights, right?

25   A.   Sometimes.

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1271   Page 56 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

56

1  Q.   Okay.  What I mean by that is that sometimes people drink

2  alcohol before they get on their flights, right?

3  A.   They could.

4  Q.   I mean have you experienced that?

5  A.   I don't know what passengers do before they come on the

6  plane.

7  Q.   Well, aren't you trained to look for that kind of stuff?

8  A.   Yes, I observe.

9  Q.   Okay.  Have you ever had to report a passenger for

10  drinking too much?

11  A.   No.

12  Q.   Okay.  Is that something that a more experienced flight

13  attendant would handle?

14  A.   No.

15  Q.   So you've never seen somebody drunk on an airplane before?

16  A.   I've never had to report anything like you asked.

17  Q.   Okay.  But have you ever seen anybody drunk on an airplane

18  before?

19  A.   Yes.

20  Q.   Are you familiar with what drunk people do?

21  A.   Not all drunk people are the same.

22  Q.   Okay.  Right.  They don't always exhibit the same types of

23  behavior, right?

24  A.   I couldn't say.

25  Q.   Some people can be loud and obnoxious, right?

1    A.   They could.

2    Q.   Other people could be very quiet?

3    A.   They could.

4    Q.   Okay.  Now, you said something called the red zone with

5    people who are drinking.  Did I -- maybe I misheard that.  What

6    is that?

7    A.   Oh, it's a metaphor in training.  It's called a red light.

8    Q.   The red light.  Well, what does that mean?

9    A.   It's a point in time where you would discontinue serving

10   alcohol to a guest.

11   Q.   Okay.  And what happens, what -- what triggers the red

12   light?

13   A.   There's certain behaviors you can look for.

14   Q.   Like what?

15   A.   Slurring words, falling.

16   Q.   Okay.  Anything else?

17   A.   I would have to refer to my manual for whatever lists they

18   give us, but it's also judgment.

19   Q.   Okay.  And is there a manual available on the airplane?

20   A.   Yes.

21   Q.   Okay.  Did you look at the manual that night?

22   A.   No.

23   Q.   Okay.  As far as your observations go, you never saw Mr.

24   Ramamoorthy touch the complainant?

25   A.   No.

1    Q.  In fact, you never saw them have any type of interaction

2    together, right?

3    A.  Not that I saw.

4    Q.  You never walked by and made any sort of mental note about

5    how they were sitting or sleeping together in the seats, right?

6    A.  I did not observe anything in particular.

7    Q.  Okay.  And you walked by those seats at least at some

8    point or another while the flight was going on?

9    A.  Yes.

10   Q.  Okay.  Now, even after this allegation is made, you are

11   watching where Mr. Ramamoorthy is sitting, right?

12   A.  I did.

13   Q.  Okay.  And he never got up to go to the bathroom, right?

14   A.  At what point?

15   Q.  After -- after the complainant comes back, you are now

16   looking at where Mr. Ramamoorthy is sitting, right, you agree

17   with that?

18   A.  Yes.

19   Q.  He never got up to go to the bathroom?

20   A.  He did not get up.

21   Q.  Okay.  Who -- who did you contact once the allegation is

22   made?

23   A.  I didn't call anybody.  The other flight attendant called

24   the lead flight attendant.

25   Q.  Okay.  And that's Oscar?

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1274   Page 59 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

59

1   A.   Correct.

2   Q.   Did Oscar come back?

3   A.   Yes.

4   Q.   And did Oscar -- did you tell Oscar what was going on?

5   A.   Yes, we both informed him.

6   Q.   Okay.  One thing you testified to today is that the

7   complainant told you that Mr. Ramamoorthy unzipped her pants

8   and unbuttoned her shirt.  Is that exactly what happened?

9   A.   I do not remember the exact wording of what she told me,

10  but from what she said to me, that's what I gathered.

11  Q.   It's -- it's very important.  Did she say that to you or

12  not because you've testified she said that to you.  Did she say

13  that to you or not?

14  A.   I cannot give you the exact wording but that is what she

15  told me.

16  Q.   Okay.  Do you remember writing a statement the night of?

17  A.   Yes.

18  Q.   Okay.  Have you read your statement in preparation for the

19  trial today?

20  A.   I've read my statement.

21  Q.   When did you read your statement last?

22  A.   Yesterday.

23  Q.   Yesterday.

24           In that statement, did you ever say in there that the

25  complainant told you that Mr. Ramamoorthy unzipped her pants

1    and undid her shirt?

2    A.  I would have to read it again to say what I wrote.

3            MR. AMBERG:  Your Honor, may I approach?

4            THE COURT:  You may.

5    BY MR. AMBERG:

6    Q.  Ma'am, I would like you to take a look at this.  Do you

7    recognize that?

8    A.  Yes.

9    Q.  And what is that?

10   A.  The statement I wrote to the police.

11   Q.  Okay.  Anywhere in that statement do you say, "The

12   complainant told me that Mr. Ramamoorthy unzipped her pants or

13   unbuttoned her shirt"?

14   A.  I don't explicitly write that.

15           MR. AMBERG:  May I approach, Your Honor?

16           THE COURT:  You may.

17           MR. AMBERG:  Thank you.

18   BY MR. AMBERG:

19   Q.  Thank you, ma'am.

20           Would you agree with me that sometimes your memory

21   makes it so you can't remember everything, is that fair to say?

22   A.  I don't remember every second of every day.

23   Q.  Okay.  Fair enough.  I don't think anybody does.

24   A.  No.

25           MR. AMBERG:  If I could just have one second, Your

1    Honor.

2              (Brief pause)

3              I just have one more question, Your Honor, or one

4    more line of questions.

5    BY MR. AMBERG:

6    Q.  Ma'am, one thing I forgot to ask you about was you

7    testified that the complainant did not smell like alcohol?

8    A.  Yes.

9    Q.  Okay.  Did you have any suspicion that she might have

10   consumed alcohol?

11   A.  No.

12   Q.  None?

13   A.  No.

14   Q.  Did you have any conversation with the other flight

15   attendants about whether she had consumed alcohol?

16   A.  Yes.

17   Q.  Did you talk to the lead flight attendant about that?

18   A.  I don't recall.

19   Q.  Okay.  So nobody brought up that she smelled like alcohol?

20   A.  Not that I recall.

21   Q.  Okay.

22             MR. AMBERG:  I have no -- nothing further, Your

23   Honor.

24             THE COURT:  Thank you very much.

25             Any redirect?

```
 1              MS. JAWAD:  Yes, Your Honor.
 2                      REDIRECT EXAMINATION
 3    BY MS. JAWAD:
 4    Q.  Ms. Hathaway, at any point in your interaction with the
 5    victim, was she slurring her words?
 6    A.  No.
 7    Q.  And at any point was she falling down?
 8    A.  No.
 9    Q.  And unable to stand?
10    A.  No.
11    Q.  And when you walk up and down the aisles throughout the
12    course of the flight, are you looking at every single passenger
13    as you go by?
14    A.  No.
15    Q.  If someone was sleeping on the flight, would that have
16    been in any way unusual to you?
17    A.  No.
18    Q.  And on cross-examination you testified that you did not
19    write in your written statement that the victim told you that
20    the defendant unbuttoned her pants and shirt, is that right?
21    A.  Yes.
22    Q.  But you did say in your written statement that she stated
23    that she was asleep, and when she woke up the male had his
24    fingers inside her vagina and her pants and shirt were
25    unbuttoned, is that right?
```

1    A.   Yes.

2    Q.   Did the victim ever tell you that she herself unbuttoned

3    her shirt and her pants?

4    A.   No.

5              MS. JAWAD:  No further questions, Your Honor.

6              THE COURT:  All right.  Ladies and gentlemen, of the

7    jury, I mentioned to you that you would have the opportunity to

8    ask questions through submitting them in writing if you would

9    like to.  If any of you have any questions, you can write one

10   down and I will review it with the lawyers.  Do any of you have

11   any questions?  All right.  Write it down please.

12             (Brief pause)

13             Oh, all right.  I guess we -- there -- no question at

14   this time?  All right.  Yes, we do have a question.  Sorry.

15   Hang on.

16             MR. AMBERG:  We do?

17             MS. SMITH:  We do?

18             THE COURT:  Yes.

19             (Sidebar discussion as follows):

20             THE COURT:  Okay.  A juror asks, and I'm reading this

21   verbatim, "Understands 60 percent of English.  How was this

22   determined?"

23             I see this question as pertaining to a statement that

24   was made during opening statement and so it's not really

25   appropriate to ask this witness, and so I'm just going to

1   indicate that the question relates to the opening statement and

2   that the questions need to pertain to the testimony of the

3   witness, all right?

4           MS. SMITH:  Okay.

5           THE COURT:  Any -- any preferences on that?

6           MS. SMITH:  Yeah.  I'm just wondering would it also

7   be helpful to -- maybe not -- to remind the jury that the --

8   what the lawyers say is not evidence, the evidence is only -- I

9   don't know, maybe at the end?

10          MR. AMBERG:  I mean there is a witness that's going

11  to testify to that.

12          MS. SMITH:  That's fine to say it's not appropriate.

13          THE COURT:  All right.  Okay.

14          MR. AMBERG:  For this witness.

15          THE COURT:  Thank you very much.

16          (End of sidebar discussion)

17          THE COURT:  So a juror has asked a question, but the

18  question pertains to something that was stated during opening

19  statement rather than something that this witness testified

20  about.  And so what we'll do on this is to wait throughout the

21  case and see whether other evidence is presented that relates

22  to this question or not, and if there are issues that pertain

23  to it, then I can give you instructions regarding that later.

24          But are there any other questions that might be for

25  this witness?  All right.  Thank you very much then.

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1280   Page 65 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

65

```
 1              If there are no other questions from counsel, may
 2    this witness be excused?
 3              MS. JAWAD:  Yes, Your Honor.
 4              MR. AMBERG:  Yes, Your Honor.
 5              THE COURT:  Thank you very much.  You may be excused.
 6    Thank you for your testimony.
 7              (Witness excused at 3:37 p.m.)
 8              THE COURT:  Please call your next witness.
 9              MS. JAWAD:  The United States calls Oscar Burciaga.
10              THE COURT:  Come forward, sir, please.  Will you
11    raise your right hand?
12                    O S C A R   B U R C I A G A
13    was thereupon called as a witness herein, and after being
14    first duly sworn to tell the truth and nothing but the truth,
15    testified on his oath as follows:
16              THE WITNESS:  I do.
17              THE COURT:  You may be seated.
18                         DIRECT EXAMINATION
19    BY MS. JAWAD:
20    Q.  Good afternoon.
21    A.  Hi.
22    Q.  Could you please tell the jury your name?
23    A.  My name is Oscar Burciaga.
24    Q.  And could you spell that for the record?
25    A.  O-s-c-a-r, first name, last name, Burciaga,
```

1    B-u-r-c-i-a-g-a.

2    Q.  And where are you from, Mr. Burciaga?

3    A.  From El Paso, Texas.

4    Q.  Is that where you currently live?

5    A.  I do.

6    Q.  And what do you do for a living?

7    A.  I'm a flight attendant.

8    Q.  For what company?

9    A.  Spirit Airlines.

10   Q.  How long have you been a flight attendant with Spirit

11   Airlines?

12   A.  About four years.

13   Q.  Did you do anything before that?

14   A.  I was also a flight attendant before.

15   Q.  So how long total have you been a flight attendant?

16   A.  Five years about.

17   Q.  And what are some of your responsibilities as a flight

18   attendant for Spirit Airlines?

19   A.  The -- to maintain the -- the plane safe, make sure that

20   every passenger in there is safe.

21   Q.  And so what are some of the other things that you do

22   during the course of a flight?

23   A.  I make sure that, you know, the lavatories are -- are

24   good, make sure the passengers seated and following the -- the

25   rules, serve snacks, drinks, that thing.

Jury Trial: Volume 2B • Thursday, August 9, 2018

67

1    Q.  And have you received any type of training as to how to do

2    your duties as a flight attendant?

3    A.  Yes.

4    Q.  And what training is that?

5    A.  To -- the training that they give us there at Spirit, just

6    general for general things like emergencies, you know, crimes,

7    everything.

8    Q.  And when did you receive that training?

9    A.  When I first started, I started training on December 29th,

10   2014.

11   Q.  And so what are you supposed to do when you get a report

12   of a crime on board an aircraft?

13   A.  Well, we're supposed to follow our -- our file which

14   states, you know, you gotta follow our instructions, make sure

15   the passengers are safe.  The first thing we gotta do is make

16   sure that they are safe.

17   Q.  And in your five years as a flight attendant, how many

18   times have you had an incident that involved law enforcement

19   occur on a plane?

20   A.  This is my first time.

21   Q.  Okay.  This -- the reason that you're here today, that

22   incident that happened?

23   A.  Correct.

24   Q.  Okay.  And is it part of your duties and responsibilities

25   as a flight attendant to serve alcohol to the passengers?

1   A.   It is.

2   Q.   And are you trained in how to recognize signs of

3   intoxication?

4   A.   I am.

5   Q.   And why is it important that a flight attendant can

6   recognize when passengers are intoxicated?

7   A.   For the safety of the whole aircraft.

8   Q.   Are you trained to identify certain people who should not

9   board the plane because they pose a risk to other passengers?

10  A.   Yes.

11  Q.   And is intoxication one of the things that would cause a

12  risk to others?

13  A.   Correct.

14  Q.   Were you working as a flight attendant on January 2nd,

15  2018?

16  A.   I don't recall the date, but I'm assuming it's for the --

17  the incident that happened, correct?

18  Q.   Were you working at some point in January when an incident

19  was reported on a plane?

20  A.   Yes.

21  Q.   And do you remember where that flight took off from?

22  A.   Yes, I do.

23  Q.   Where was that?

24  A.   Las Vegas.

25  Q.   And where was the flight going?

1    A.   Detroit.

2    Q.   And what was your role on that plane?

3    A.   I was the lead flight attendant.

4    Q.   What does it mean to be the lead flight attendant?

5    A.   It means that you take care of the forward part of the

6    aircraft which is, you know, our galley and our cockpit door.

7    Q.   And what's a galley?

8    A.   It's where we prep, where we prepare ourselves to serve,

9    to do our service, our drink service.

10   Q.   And is that the little area where you see flight

11   attendants and food carts when you first board an airplane?

12   A.   Correct.  Yes, ma'am.

13   Q.   And is there also a galley in the back?

14   A.   There is.

15   Q.   So your responsibilities were the forward part of the

16   aircraft, is that right?

17   A.   Yes.

18   Q.   And did you mostly remain in the front galley?

19   A.   I did.

20   Q.   Were you standing in the front galley during the boarding

21   process of that flight?

22   A.   I was.

23   Q.   And what is -- what is your job during the boarding

24   process?

25   A.   To meet and greet the passengers, make sure I say hi to

1    them and welcome them, welcome them to the -- to the aircraft,

2    make sure that nothing of unsafe is coming into the aircraft.

3    Q.   So do you look at every single passenger as they board?

4    A.   I do.

5    Q.   Are you also trying to identify passengers that may be too

6    intoxicated to board?

7    A.   Yes.

8    Q.   And did you do that on that flight from Las Vegas to

9    Detroit?

10   A.   I did.

11   Q.   Was there anyone that you identified that was intoxicated

12   during the boarding process?

13   A.   No.

14   Q.   Was there anything unusual that stood out to you during

15   the boarding process?

16   A.   No.

17   Q.   And do you remember approximately what time that flight

18   took off, was it later in the evening, earlier in the day?

19   A.   Late evening.

20   Q.   Is that what's called a red-eye flight?

21   A.   It is.

22   Q.   And as the lead flight attendant, are you responsible for

23   turning the lights on and off in the cabin?

24   A.   I am.

25   Q.   Did you turn the lights off on that flight?

1   A.   I did.

2   Q.   And what do most people do on a red-eye flight?

3   A.   Sleep.

4   Q.   And during that flight did you also do food and beverage

5   service?

6   A.   We did.

7   Q.   And at some point did you learn that a young woman

8   reported a sexual assault to one of the other flight attendants

9   on the plane?

10  A.   I did.

11  Q.   And did you have a chance to interact with that woman?

12  A.   I did.

13  Q.   And when you interacted with her in connection with that

14  report of sexual assault, did you realize that you had

15  recognized her from the boarding process?

16  A.   Yes.

17  Q.   And what about her did you notice during the boarding

18  process?

19  A.   She -- she was a very attractive girl.

20  Q.   And at that time did she appear intoxicated to you?

21  A.   No.

22  Q.   Did you have any other interaction with the victim before

23  she reported the sexual assault.

24  A.   I did.

25  Q.   And what was that?

1  A.  She went to the forward lavatory, and as she waited in

2  line we just -- it was just a flight attendant conversation,

3  "Hi, how are you, how you doing?"

4  Q.  And did she appear intoxicated at that time?

5  A.  No.

6  Q.  Did you smell any alcohol on her breath while you spoke

7  with her?

8  A.  I don't remember at that time.

9  Q.  Okay.  At some point during your interactions with her on

10  the flight did you smell alcohol on her breath?

11  A.  Yes, I did.

12  Q.  All right.  Are you saying you can't recall if it was that

13  time or a different time?

14  A.  Correct.

15  Q.  But when you spoke with her while she was in line for the

16  bathroom, was she coherent enough to carry on a conversation

17  with you?

18  A.  She was.

19  Q.  And you said it was a normal, small talk type

20  conversation?

21  A.  Correct.

22  Q.  Do you often have conversations like that with passengers?

23  A.  All the time.

24  Q.  Is that one of the reasons you became a flight attendant?

25  A.  To interact with our passengers, correct.

Case 2:18-cr-20027-TGB-MKM  ECF No. 83  filed 03/05/19  PageID.1288  Page 73 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

73

1    Q.  And did you see the victim at any other point before the
2    sexual assault was reported?
3    A.  I did.
4    Q.  And when was that?
5    A.  It was when I was walking down the aisle doing my trash
6    run or service run when I noticed the victim laying on a man's
7    shoulder.
8    Q.  And was she awake during that time?
9    A.  She looked asleep.
10   Q.  And was that the man next to her?
11   A.  Correct.
12   Q.  Where was she sitting, in a window seat or a middle or
13   aisle?
14   A.  Window.
15   Q.  So was she leaning to her left onto the man next to her?
16   A.  Towards her left, yes, ma'am.
17   Q.  And were they both sleeping?
18   A.  It looked like they were both sleeping, yes.
19   Q.  At any point did the man complain to you that there was
20   someone sleeping on him?
21   A.  No.
22   Q.  And was there a third passenger in that row as well?
23   A.  Correct.
24   Q.  At any point did that woman complain about someone
25   sleeping on the man next to her?

```
 1   A.   No.
 2   Q.   And did you have any other interaction with the victim
 3   prior to the sexual assault?
 4   A.   I don't understand that question.  Like...
 5   Q.   Did you have -- did you see her any other time?
 6   A.   Okay.  Yes.
 7   Q.   Okay.  And what was that time?
 8   A.   Um, I was walking again, and when I walked and turned onto
 9   that side, it appeared that there was -- I don't know if it was
10   her, but there appeared to be something on the man's lap, a
11   black I don't know what, and I couldn't make out because she --
12   I couldn't see the figure on her window over of the lady.
13   Q.   So you're not sure whether she was in the man's lap?
14   A.   Correct.
15   Q.   And -- and you probably didn't get a close enough look to
16   see whether she was sleeping or awake, is that right?
17   A.   Correct.  Yes, ma'am.
18   Q.   This figure, the black figure that you described, was that
19   figure moving in any way?
20   A.   No.
21   Q.   And did you serve the victim drinks at any point on the
22   flight?
23   A.   No.
24   Q.   Did you serve her any food?
25   A.   No.
```

```
1   Q.  And at what point during the flight did she report the
2   sexual assault?
3   A.  It was about a -- about an hour prior to landing,
4   45 minutes prior to landing.
5   Q.  And when the plane landed, did you speak with the police
6   officers?
7   A.  I did.
8   Q.  Is that a common thing that you are greeted by police
9   officers upon landing a flight?
10  A.  No.
11  Q.  Did that make you a little bit anxious?
12  A.  It did.
13  Q.  And when you spoke to those police officers, did you tell
14  them that the sexual assault happened an hour into -- into the
15  flight?
16  A.  I could have but I was confused.
17  Q.  Okay.  Did you review the body cam footage?
18  A.  I did.
19  Q.  Okay.  And in that body cam footage, do you recall hearing
20  the statement that you made that the assault happened an hour
21  into the flight?
22  A.  I do.
23  Q.  But it's your testimony today that it happened an hour
24  before landing?
25  A.  That is correct.  Yes, ma'am.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1291   Page 76 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

76

1    Q.  So were you mistaken in your prior statement?

2    A.  I was.

3    Q.  Okay.  And why is that?

4    A.  I was a little nervous.  I was tired.

5    Q.  And once the -- who was it that reported the sexual

6    assault to you?

7    A.  I don't recall if it was Caitlin or Allie.

8    Q.  Were those the two flight attendants who were working in

9    the back galley?

10   A.  That is correct.  Yes, ma'am.

11   Q.  And what did you do when you received that information?

12   A.  I went to the back to make sure everything in the back was

13   okay with the -- with the young lady.

14   Q.  Did you also determine as the lead flight attendant to

15   turn the lights back on?

16   A.  I did.

17   Q.  And why is that?

18   A.  Just so that we can keep an eye on the whole cabin, make

19   sure we can keep an eye on the passengers.

20   Q.  So when you went to the back, were you able to speak with

21   the victim?

22   A.  I was.

23   Q.  And how did she appear to you?

24   A.  She was a little shaken, a little shocked, you know,

25   sobbing.

1   Q.   So she was crying?

2   A.   Yes.

3   Q.   And what did she say to you?

4   A.   She said that the man that she was sitting next to when

5   she woke up, she had -- the man had his hands, you know, inside

6   her pants and was groping her on her breast area.

7   Q.   Did she say that the man was groping her on her breast

8   area or is that something that she deduced based on her

9   appearance?

10  A.   She said that there was a man touching her.

11  Q.   Okay.  And did you notice anything about her clothing?

12  A.   Yeah.  Her shirt was, you know, untucked, and her pants,

13  the button on her pants was undone.

14  Q.   When you say her shirt was untucked, can you explain a

15  little bit about what you mean by that?

16  A.   Sure.  So it was loose, it's not -- not the way I saw it

17  at the beginning when she boarded the plane.

18  Q.   And how was it at the beginning when you boarded, was it

19  kind of tied up or scrunched up?

20  A.   Correct.  Yes, ma'am.

21  Q.   So then when you saw her afterward, the tie or scrunch was

22  loose?

23  A.   Yes.

24  Q.   And was it -- were the top buttons in the same condition

25  that they were in when she boarded the flight?

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1293   Page 78 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

78

```
1    A.   No.
2    Q.   Were they unbuttoned more?
3    A.   Yes.
4    Q.   Is it safe to say she appeared disheveled to you?
5    A.   Correct.  Yes, ma'am.
6    Q.   And after she reported this to you, what did you do?
7    A.   I notified the captain of the incident, then kept her in
8    the back of the aircraft.
9    Q.   Did you have any interaction with the defendant at all?
10   A.   Not at that moment, no.
11   Q.   Did you have any interaction with him later?
12   A.   Not with him but with the person sitting next to him.
13   Q.   Was that his wife?
14   A.   Yes, ma'am.
15   Q.   What was your interaction with his wife?
16   A.   When I weighed -- when I made my way back to the aft
17   galley, she asked if she wanted -- she wanted them to move, and
18   I said, you know, that -- you know, just stay where she was
19   fine, and she said, "Well, the young girl keeps getting up to
20   use the lavatory so we can, you know, move if you'd like."  I
21   said no.
22   Q.   And at that point when she asked you that, was the victim
23   already in the back galley with Caitlin and Allie?
24   A.   Yes, she was, ma'am.
25   Q.   Okay.  And you were walking back up to kind of figure out
```

 1   what to do about the situation?

 2   A.   Correct.  Yes, ma'am.

 3   Q.   And she stopped you as you were walking?

 4   A.   Correct, yes.

 5   Q.   And you said she asked if you wanted her to move?

 6   A.   Yeah, if I wanted them to move so that the girl if she

 7   needed to get up again wouldn't bother them while we were in

 8   flight.

 9   Q.   And at that time was she sitting on the flight with her

10   husband next to an empty seat where the victim had been?

11   A.   Yes.

12   Q.   All right.  And did they remain like that sitting together

13   for the remainder of the flight?

14   A.   Yes.

15   Q.   At some point did a different passenger join them?

16   A.   Yes, correct.

17   Q.   And why is that?

18   A.   Because I had them move, I had the man move to the window,

19   the wife to the middle, and the man, the other person, on the

20   aisle.

21   Q.   And was that other person just a random passenger who

22   agreed to move seats?

23   A.   Yes, ma'am.

24   Q.   Was that so that the victim could move into a seat that

25   was away from the defendant?

1    A.   Yes.

2    Q.   And once the plane landed, what happened?

3    A.   Well, we were greeted by the law enforcement officers at

4    the door.   They asked what had happened.

5    Q.   And did you then coordinate the deplaning of the victim

6    and the defendant?

7    A.   I did.

8    Q.   Who was -- came off the plane first?

9    A.   The young lady.

10   Q.   And then who was next after that?

11   A.   The gentleman, the man that was sitting next to her.

12   Q.   And at any point did you inform the defendant what the

13   victim had said about him?

14   A.   At no point did I do that.

15   Q.   At any point did you tell him what was going on?

16   A.   No.

17   Q.   And did you hear anyone else doing that?

18   A.   No.

19          MS. JAWAD:  If I could have one moment, Your Honor.

20          (Brief pause)

21          No further questions, Your Honor.

22          THE COURT:  Thank you very much, Ms. Jawad.

23          Any cross-examination?

24          MR. AMBERG:  Yes, Your Honor.

25                       CROSS-EXAMINATION

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1296   Page 81 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

81

1   BY MR. AMBERG:

2   Q.  Good afternoon, Mr. Burciaga.

3   A.  Hi.

4   Q.  Thank you for making your way up to Detroit.

5   A.  Thank you.

6   Q.  I thank you for being here right now.  I have a few

7   questions for you.

8           You were the lead flight attendant on this flight,

9   right?

10  A.  Yes.

11  Q.  And so when this happens, you've already done thousands of

12  flights in your career, right?

13  A.  Yes.

14  Q.  Okay.  I mean that's your job.  You literally every day

15  wake up and take a flight somewhere, right?

16  A.  Correct.

17  Q.  Okay.  So you've probably seen it all, right?

18  A.  Yeah.

19  Q.  You've seen everything from people being drunk on the

20  airplane, right?

21  A.  Correct.

22  Q.  Because I would imagine that probably happens all the

23  time, right?

24  A.  Sometimes.

25  Q.  And then you've seen people sleeping in weird ways and

Jury Trial: Volume 2B • Thursday, August 9, 2018

1   things like that too, right?

2   A.   Yes.

3   Q.   Okay.  All kinds of stuff happens on an airplane?

4   A.   Correct.

5   Q.   All right.  I want to talk about how people sleep on

6   airplanes.  Now, sometimes people wear sweatpants and things

7   like that to be more comfortable, right?

8   A.   Correct.

9   Q.   Because what we're dealing with is a Spirit Airlines

10  flight, it's a little tight in there, isn't it?

11  A.   It is.

12  Q.   Okay.  And I mean it's -- this is a -- you're putting

13  three people in what, something like three and a half feet wide

14  basically?

15  A.   I don't know the -- the length but...

16  Q.   It's about the size of the box you're in?

17  A.   Lot smaller.

18  Q.   It's smaller than that.  I think we've all been there and

19  understood.

20          So what people do is people will find different ways

21  to get comfortable, right?

22  A.   Sure.

23  Q.   One thing is like, for example, and why I brought

24  sweatpants up is that people with tight clothing on sometimes

25  will pop a button loose or -- or do things to make themselves

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1298   Page 83 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

83

1  feel more comfortable as they try to sleep, right?

2  A.  I -- I don't know.

3  Q.  I mean who knows what people do to get comfortable, right?

4  A.  Right.

5  Q.  You've seen all kinds of weird, different things I'm sure?

6  A.  Correct.

7  Q.  So it wouldn't surprise you if somebody did maybe unbutton

8  their jeans a button just to feel more comfortable, right?  It

9  happens.

10  A.  Sure.

11  Q.  Same thing with the shirt, you don't know, right?

12  A.  Right.

13  Q.  Okay.  Now, this plane in particular takes off from Las

14  Vegas, right?

15  A.  Yes, it is.

16  Q.  And the thing about Las Vegas, I'm sure that everybody

17  that does what you do knows that when people coming back from

18  Vegas, sometimes, you know, alcohol and fun and all kinds of

19  stuff happen a little more frequently than maybe the flight

20  from Des Moines back to Detroit, right?

21  A.  Yes.

22  Q.  Okay.  And this is like the day after New Year's Eve,

23  right, it's like the day after New Year's Day, so maybe there

24  was even more of a chance people might be drinking and things

25  like that, right?

1  A.  Correct.
2  Q.  And the thing about drinking on a plane is that this is
3  something that happens frequently, people drink on the
4  airplane, right?
5  A.  They do.
6  Q.  And they drink before, don't they?
7  A.  Sometimes.
8  Q.  I mean --
9  A.  Can't say for sure.
10 Q.  You've walked through many airports in your career, right,
11 yes?
12 A.  Yes.
13 Q.  And it's almost like on every corner there's another bar,
14 right?
15 A.  Right.
16 Q.  There's like you can even have club memberships to get
17 into the special bar, right?
18 A.  Right.
19 Q.  Guys like us don't get that but some people do, right?
20     And -- and so what -- the reason why is that people
21 like to drink because they're afraid of flying, right?
22 A.  Sure.
23 Q.  And that's something that you frequently see?
24 A.  Yes.
25 Q.  Okay.  Now, I want to talk about this flight on that

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1300   Page 85 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

85

1   evening.

2   A.   Okay.

3   Q.   You are familiar with the complainant, right, the lady who

4   came back and is the story --

5   A.   Yes.

6   Q.   -- the reason why we're here?

7   A.   Yes.

8   Q.   And you first become familiar with her because you see her

9   as she's boarding, right?

10  A.   Correct.

11  Q.   Did you actually speak to her at that point in time?

12  A.   No, I didn't.

13  Q.   How close did you get to her?

14  A.   From here to the computer maybe.

15  Q.   Okay.  You didn't walk up there and smell her breath,

16  right?

17  A.   No.

18  Q.   Okay.  So she could have had all kinds of alcohol on

19  board, you never would have known, right?

20  A.   Correct.

21  Q.   I mean she was able to walk onto the plane, right?

22  A.   Yes.

23  Q.   And just 'cuz somebody's had a few cocktails before they

24  get on there doesn't mean they're not boarding that airplane?

25  A.   Yes.

1  Q.  You have to be like a belligerent drunk person to be

2  kicked off?

3  A.  Correct.

4  Q.  Okay.  And you remember her because she was attractive?

5  A.  Yes.

6  Q.  And there's nothing wrong with that.  But what's important

7  about that is that you remembered her?

8  A.  Correct.

9  Q.  For the duration of the flight she was memorable to you,

10  right?

11  A.  Sure.

12  Q.  Okay.  And one of the things that you remember is that you

13  do have an interaction with her, right?

14  A.  Correct.

15  Q.  And that was at the front bathroom?

16  A.  Yes.

17  Q.  All right.  And when did that happen?

18  A.  Maybe about -- I don't know, I don't recall, I don't

19  recall exactly what time it was.

20  Q.  Okay.  Was this right before the -- the allegation

21  happens?  Was this -- was this long before, I mean do you

22  remember?

23  A.  I don't.

24  Q.  Okay.  Had you also seen her get up any other times?

25  A.  No, I didn't.

```
1    Q.  Just that one time?
2    A.  Correct.
3    Q.  Okay.  Now, she was waiting in line for the bathroom,
4    right?
5    A.  Yes.
6    Q.  And at that point in time you decide you're going to talk
7    to her?
8    A.  Correct.
9    Q.  Okay.  Now, from the time that she entered the plane to --
10   and I assume she must have walked past you.  What were you,
11   standing outside of the -- the plane letting everybody in, is
12   that what was going on?
13   A.  I'm sorry, I didn't understand.
14   Q.  When everybody's coming in the plane, how does that work,
15   are you standing outside?
16   A.  No, inside.
17   Q.  Inside.
18   A.  Inside the aircraft.
19   Q.  Like probably where the captain is?
20   A.  Yes.
21   Q.  Okay.  And people are walking by?
22   A.  Correct.
23   Q.  Okay.  So you see her when she walks in?
24   A.  Mm-hmm.
25   Q.  And then later on you see her in the bathroom line.  Did
```

88

1   you see her at all in between there?

2   A.  No.

3   Q.  You didn't see her go and try to put her bag up to the

4   front of the plane?

5   A.  No.

6   Q.  Okay.  Now, did you walk by her seat?  Did you know where

7   she was sitting?

8   A.  I didn't.

9   Q.  Okay.  Now, you start talking to her in the bathroom line,

10  right?

11  A.  Correct.

12  Q.  And this is a nice conversation, right?

13  A.  Not really.

14  Q.  I mean you said five to ten minutes.  You must have talked

15  about something.

16  A.  Yeah.  I never said five, ten minutes.

17  Q.  Oh, okay.  How long did you talk to her for?

18  A.  Few minutes, maybe two, three.

19  Q.  What did you talk to her about?

20  A.  Just normal flight attendant talk, "How are you?  Where

21  you going, business, pleasure?"

22  Q.  Okay.  At that point in time could you smell the alcohol

23  on her breath?

24  A.  No.

25  Q.  You couldn't?

```
 1   A.   No.
 2   Q.   Okay.  After that, did you see her go back to the seat?
 3   A.   I stayed in the front, so I mean she went on her way and I
 4   didn't see her walk back.
 5   Q.   Okay.  Eventually you do see her, right?
 6   A.   Correct.
 7   Q.   Okay.  And let me just make sure I understand what's going
 8   on here.  What's going on is as the lead flight attendant, you
 9   have to walk the aisles, correct?
10   A.   That is correct.
11   Q.   Okay.  And that's what you do throughout the course of
12   this flight, right?
13   A.   Sure.
14   Q.   How often do you walk that aisle?
15   A.   Every 15, 20 minutes.
16   Q.   Fifteen -- every 15 to 20 minutes you walk down that plane
17   and make sure the passengers are safe, right?
18   A.   Yes, sir.
19   Q.   Okay.  So if something was happening that was unsafe, you
20   are trained to identify that, right?
21   A.   Correct.
22   Q.   All right.  And nothing like that happens?
23   A.   No.
24   Q.   Okay.  And, in fact, what happens is that you see her in
25   the seat, right?
```

1    A.  Correct.

2    Q.  And what she's doing is she's sleeping, right?

3    A.  Yes.

4    Q.  Yes?

5        And she's sleeping on the gentleman that's sitting

6    next to her, right?

7    A.  That's correct.

8    Q.  Like she's laying on his shoulder sleeping, right?

9    A.  Correct.

10   Q.  And he's sleeping?

11   A.  Yes.

12   Q.  Okay.  Every time you saw him up until the end he was

13   sleeping?

14   A.  Correct.

15   Q.  Did you even recognize the lady sitting next to him on the

16   other side, did you have any memory of that?

17   A.  No.

18   Q.  She could have been up for all you know, right?

19   A.  Correct.

20   Q.  Or sleeping.  Who knows, right?

21   A.  Yeah.

22   Q.  What about the other people around there, how about the

23   people that were to the left?

24   A.  I don't recall.

25   Q.  Okay.  But there was three people sitting there, right?

1    A.   To the left?

2    Q.   Yeah.

3    A.   Yeah.

4    Q.   Right?

5    A.   Yeah.

6    Q.   Because it's six seats, right?

7    A.   Three on the left, three on the right.

8    Q.   Okay.  Close enough to where if anything was happening,

9    people could probably hear, right?

10   A.   Sure.

11   Q.   And probably see, right?

12   A.   Sure.

13   Q.   Could you tell me how close these aisle -- these two aisle

14   seats are together, the two aisle seats, how close are they

15   together?

16   A.   This close.

17   Q.   Okay.  About two and a half, three feet, something like

18   that?

19   A.   Sure.

20   Q.   And that's how big the aisle is?

21   A.   Yes, sir.

22   Q.   Okay.  Very close quarters, right?

23   A.   Correct.

24   Q.   Okay.  And what happens is you walk by and you remember

25   her, right?

1    A.   Right.

2    Q.   Because you saw her and you thought she was attractive and

3    then you had the conversation with her, right?

4    A.   Yeah.

5    Q.   Okay.  Did you think anything of it when you saw her?

6    A.   No.

7    Q.   Did you think she was like with that guy that you saw her

8    sleeping on?

9    A.   I did.

10   Q.   Okay.

11          THE COURT REPORTER:  I'm sorry, you did or you

12   didn't?

13          THE WITNESS:  I did.

14   Q.   Now, 20 minutes later you walk by again, right?

15   A.   About that time, yeah.

16   Q.   Okay.  Now, you're back there.  Is the guy in the middle

17   sleeping?

18   A.   Yes.

19   Q.   Okay.  You can see something on his lap, right?

20   A.   Correct.

21   Q.   And it sure looked like a person, right?

22   A.   I couldn't tell for sure.

23   Q.   It was something?

24   A.   There was something.

25   Q.   A object of some sort, right?

1    A.  Correct.

2    Q.  What was it, like something -- I mean what else could it

3    have possibly have been?

4    A.  I -- a bag.  I don't know.

5    Q.  You thought it was a person?

6    A.  I did.

7    Q.  Right.  You thought it was her laying on his lap?

8    A.  I did but I'm -- I'm not 100 percent sure.

9    Q.  Okay.  Pretty good possibility that's what you saw?

10   A.  Sure.

11   Q.  These seats are so tight together, where do you put your

12   hands, where do you put them?

13   A.  Right there.

14   Q.  Just like this?

15   A.  Sure.

16   Q.  When you're sleeping, so I mean people's hands can move

17   around, right?

18   A.  Correct.

19   Q.  Okay.  And that you see all the time?

20   A.  We do.

21   Q.  So it wouldn't surprise you if the guy sitting in the

22   middle's hand might have ended up on the seat to his right,

23   right?

24   A.  Correct.

25   Q.  Yeah, because that's what you see all the time?

1   A.   No.

2   Q.   People make all kinds of weird connections then when

3   they're sitting there on a Spirit Airlines flight, right?

4   A.   Right.

5   Q.   So you're just -- it's like sleeping and laying on top of

6   each other, right?

7   A.   Yep.

8   Q.   Okay.  Now, besides those interactions before you're

9   called to the back, did you make any other contact or see the

10  complainant at all besides that?

11  A.   No.

12  Q.   How long after you saw her laying on my client's lap did

13  the allegation happen?

14  A.   I'm not sure.

15  Q.   Okay.  When did the allegation happen, do you remember?

16  Were you guys getting pretty close to Detroit?

17  A.   We were.

18  Q.   Okay.  How many minutes away, do you remember that?

19  A.   It's between 45 and an hour, 45 minutes to an hour.

20  Q.   Forty-five minutes to an hour?

21  A.   Correct.

22  Q.   At what point do you have to kind of get the seat belt

23  lights going and the landing procedure ready?

24  A.   Around that time.

25  Q.   Okay.  So that's what you were doing, right?

1    A.   Sure.

2    Q.   Did you turn that -- all that -- okay, let's -- let's go

3    through that.  You have to --

4            THE COURT REPORTER:  Excuse me.

5            MR. AMBERG:  I'm sorry, I apologize.

6            THE COURT REPORTER:  You need to slow down.

7            MR. AMBERG:  I apologize, yes.

8    BY MR. AMBERG:

9    Q.   You have to turn on like the seat belt lights, right?

10   A.   Not ourselves; the pilots do that.

11   Q.   Okay.  Was that done?

12   A.   No, not at that time.

13   Q.   It wasn't?

14   A.   No.

15   Q.   Okay.  Were any other landing type lights or anything of

16   that nature on at that point in time?

17   A.   No.

18   Q.   Okay.  It was right before they come on, right?

19   A.   Correct.

20   Q.   Okay.  And what happens is is that you -- you then get

21   called back by the other flight attendants, right?

22   A.   That is correct.

23   Q.   Okay.  And at that point in time the complainant's already

24   in the back, right?

25   A.   Yes.

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1311   Page 96 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

96

1   Q.   Okay.  During that time, is that when you smelled the

2   alcohol?

3   A.   Yes.

4   Q.   Okay.  And how was that, was that when you were speaking

5   with her you could smell the alcohol?

6   A.   Correct.

7   Q.   Okay.  And was she telling you what happened, was that

8   sort of when you smelled that?

9   A.   That is correct, yeah.

10  Q.   Okay.  What kind of smell was that, was that something

11  that you noted when you were talking to her?

12  A.   Yeah.

13  Q.   Okay.  Did you think she might be intoxicated?

14  A.   She could have.

15  Q.   Okay.  Did you think that?

16  A.   I can't make that -- that -- that allegation, just I

17  smelled the alcohol.

18  Q.   Okay.  Well, later on you told the officers that you

19  thought she was intoxicated, right?

20  A.   I did say that, yes.

21  Q.   Okay.  Why would you say that?

22  A.   Because she smelled and the way she was talking.

23  Q.   Okay.  What do you mean by the way she was talking?

24  A.   You know, she was shooken up, so I was a little nervous

25  too when I was talking to the officers.

1    Q.  She was doing things that maybe people that are

2    intoxicated do, right?

3    A.  Correct.

4    Q.  Okay.  The way that she talked is the way that you've seen

5    people that are intoxicated talk?

6    A.  Correct.

7    Q.  Right.  The way that she smelled was the way that people

8    who are intoxicated smell?

9    A.  Sure.

10   Q.  Now, when you saw her, her zipper wasn't down, was it?

11   A.  No.

12   Q.  No, it was up?

13   A.  Correct.

14   Q.  It was her pant button that was undone, right?

15   A.  That's right.  That's what I saw.

16   Q.  Okay.  How long until you turned the lights on?

17   A.  As soon as the problem was reported to me, I turned the

18   lights on.

19   Q.  Okay.  Now, even with the lights off on the plane, you

20   could still see, right?

21   A.  Sure, yeah.

22   Q.  Because if you let people walk around in the dark in a

23   little spot like that, people will go flying all over the

24   place, correct?

25   A.  Correct.

1   Q.  So the average person can see on this plane even with the

2   lights off?

3   A.  Yeah.

4   Q.  Okay.  And so this whole period of time is very quick when

5   you turn those lights on, right?

6   A.  Yeah.

7   Q.  And what happens is, is through your training I assume,

8   you are now making sure that the guy in the seat's being

9   watched, right?

10  A.  No, I mean not -- not really.

11  Q.  I mean you were looking at him, right?

12  A.  Sure.

13  Q.  Right?

14  A.  Yeah.

15  Q.  And you didn't go away from the area, did you?

16  A.  I did.

17  Q.  Where did you go?

18  A.  To the front.

19  Q.  To tell the captain?

20  A.  Correct.

21  Q.  Okay.  The other flight attendants stayed there though,

22  right?

23  A.  Yes, sir.

24  Q.  To watch the guy, right?

25  A.  To watch the -- the young lady.

1    Q.   Okay.  And what you did was you had somebody else

2    ultimately go and sit next to the guy, right?

3    A.   Correct.

4    Q.   You never saw him get up and go to the bathroom, right?

5    A.   Yes.

6    Q.   And as a matter of fact, you never saw him ever touch the

7    complainant, right?

8    A.   No.

9    Q.   Up until the end there, the only time you had seen him was

10   him sleeping?

11   A.   Sure.

12   Q.   Okay.  Did you make a written statement?

13   A.   I didn't.

14   Q.   Okay.  Did anybody ask you to?

15   A.   No.

16   Q.   Okay.  When this happens, did any of the other passengers

17   report to you anything unusual?

18   A.   No.

19   Q.   Nobody heard anything, right?

20   A.   No.

21   Q.   You didn't hear anything, right?

22   A.   No.

23   Q.   No screams?

24   A.   No.

25   Q.   You didn't see anybody jump up out of their seat?

Jury Trial: Volume 2B • Thursday, August 9, 2018

1    A.   No.

2    Q.   And nobody else did to your knowledge?

3    A.   To my knowledge, no.

4    Q.   When the plane finally landed, my client was taken by the

5    officers off the plane, right?

6    A.   Correct.

7    Q.   And that's sort of when you lost sight of him for -- until

8    today probably, right?

9    A.   Yes.

10   Q.   Okay.  They -- you didn't see them let him go to the

11   bathroom, right?

12   A.   No.

13   Q.   He didn't have any wipes wiping his hands, did he?

14   A.   No.

15   Q.   Nothing like that.

16        Now, you did have a conversation with his wife,

17   right?

18   A.   I did.

19   Q.   At the time did you know it was his wife?

20   A.   I did not.

21   Q.   Okay.  But did you think that was unusual when all of a

22   sudden she's talking about them as a couple?

23   A.   I did.

24   Q.   Okay.  Because you -- you thought the other two people

25   were a couple?

1    A.   Correct.

2    Q.   Okay.  And she had complained to you that the complainant

3    had gotten up and that maybe they could move to different seats

4    or put her in different seats so they didn't have to deal with

5    that, right?

6    A.   That was after the incident happened.

7    Q.   Correct, after the incident --

8    A.   Yeah.

9    Q.   -- that's what happens, right?

10   A.   Mm-hmm.

11   Q.   Yes?

12   A.   Yes.

13   Q.   Okay.

14        MR. AMBERG:  If I could just have one second here.

15        THE COURT:  You may.

16        (Brief pause)

17   BY MR. AMBERG:

18   Q.   Sorry, sir.  I thought I was done.  I have a couple more

19   questions and I promise I'm done.

20        Once the lights go on, then they stayed on for the

21   duration of the flight, right?

22   A.   Correct.

23   Q.   And was there any announcement made to tell people to stay

24   in their seats or anything like that?

25   A.   Once we landed.

1    Q.  Okay.  What about before?

2    A.  No.

3    Q.  Okay.  But you didn't see Mr. Ramamoorthy walking around

4    the aisleway, did you?

5    A.  I didn't, no.

6    Q.  Okay.  And then once everybody landed, that's when the

7    officers took over?

8    A.  Correct.

9          MR. AMBERG:  Okay.  I have -- I have -- oh, actually,

10   Your Honor, if I could have one second.

11         (Brief pause)

12   BY MR. AMBERG:

13   Q.  Sir, I just have one quick question for you.  During this

14   flight there was turbulence, right?

15   A.  I don't remember.

16   Q.  Okay.  You just don't remember?

17   A.  I don't remember, yeah.

18   Q.  When there's turbulence, do you tell everybody to put

19   their seat belts on?

20   A.  Yes.

21   Q.  Okay.  And then do you walk, make the walk up and down the

22   aisle?

23   A.  Yes.

24   Q.  And make sure everybody's buckled up?

25   A.  Yeah.

1    Q.   Okay.  And so you or somebody, if there was turbulence,

2    would have had to observe the -- the people sitting there in

3    that seat where the complainant and the defendant are, right?

4    A.   Correct.

5    Q.   Okay.  Thank you.

6         MR. AMBERG:  No -- nothing further, Your Honor.

7         THE COURT:  Thank you very much.

8         Any redirect?

9         MS. JAWAD:  Yes, Your Honor.

10                     REDIRECT EXAMINATION

11   BY MS. JAWAD:

12   Q.   Mr. Burciaga, after the sexual assault was reported to

13   you, did you have eyes on the defendant the entire time?

14   A.   We knew where he was, we knew where he was sitting.

15   Q.   But were you watching him the entire time?

16   A.   No.

17   Q.   Was anyone sitting next to him to monitor him in any way?

18   A.   No.

19   Q.   And during the flight, since you were the lead flight

20   attendant, you were focusing on the front of the aircraft, is

21   that right?

22   A.   Yes, ma'am.

23   Q.   Okay.  And do you recall whether or not the back

24   lavatories were working?

25   A.   They were inoperable.

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1319   Page 104 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

104

1    Q.  So if the victim had been getting up repeatedly to go to

2    the bathroom, you would have seen her because the bathroom near

3    you was the only operable bathroom, is that right?

4    A.  Correct.

5    Q.  And you only saw her the one time?

6    A.  The one time, yes, ma'am.

7    Q.  But in terms of walking up and down the aisle and

8    monitoring the passengers, your focus was on the front of the

9    plane?

10   A.  Correct, yes.

11   Q.  And even when you're doing that, whether it's in the front

12   or the back, are you looking at every single passenger to see

13   what they're -- every single passenger's doing as you walk up

14   and down?

15   A.  It's a quick glance, yes.

16   Q.  But are you able to actually stop and pay attention to

17   what every passenger's doing?

18   A.  No.

19   Q.  And is it less likely that you would notice if something

20   is going on when the lights are off versus when the lights are

21   on?

22   A.  Sure.

23   Q.  Is it less likely that the other passengers would have

24   been able to see any type of strange behavior with the lights

25   off as well?

1   A.  Sure.

2   Q.  And is it less likely that you would have noticed sexually

3   assaultive behavior happening under a blanket versus happening

4   out in the open?

5   A.  Yes.

6   Q.  And when you said you saw something black in the lap area

7   of the defendant, could you see where his hands were?

8   A.  No.

9        MS. JAWAD:  No further questions, Your Honor.

10       THE COURT:  Thank you very much.

11       Ladies and gentlemen, I want to ask you again, do you

12  have any questions for this witness?  If you do, you can write

13  them down and I'll show them to the lawyers.  All right.  Go

14  ahead and write your question down.

15       (Brief pause)

16       Counsel approach.

17       (Sidebar discussion as follows):

18       THE COURT:  A juror asks, "Did the lady say if the

19  man's hand was over or under her shirt?"  Any objection?

20       MS. JAWAD:  No objection.

21       MS. SMITH:  No objection.

22       MR. AMBERG:  No objection.  I mean it's eliciting

23  hearsay.

24       MS. JAWAD:  I think we've established --

25       THE COURT:  I think he's already testified to what

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1321   Page 106 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

106

1    she said and there was no objection to that.

2            MR. AMBERG:  Yeah, that's fine.

3            THE COURT:  And so you may ask followup questions if

4    you wish.

5            MS. JAWAD:  Thank you, Your Honor.

6            THE COURT:  We have another question.  A juror asks

7    the question, "If a passenger has one drink, can you smell it

8    if you talk with him or her?"  Any objection?

9            MS. JAWAD:  No objection.

10           MR. AMBERG:  No objection.

11           THE COURT:  All right.  Thank you.

12           (End of sidebar discussion)

13           THE COURT:  Mr. Burciaga, I have two questions from

14   members of the jury for you.

15           THE WITNESS:  Okay.

16           THE COURT:  The first one is "Did the lady say if the

17   man's hand was over or under her shirt?"

18           THE WITNESS:  She said under her shirt.

19           THE COURT:  Another juror asks the question, "If a

20   passenger has one drink, can you smell it if you talk with him

21   or her??

22           THE WITNESS:  Sure.

23           THE COURT:  All right.  I would like to invite the

24   lawyers to ask any followup questions.  Any questions, Ms.

25   Jawad?

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1322   Page 107 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

107

1          MS. JAWAD:  Just one, Your Honor.

2                    REDIRECT EXAMINATION CONTINUED

3    BY MS. JAWAD:

4    Q.  With regard to the statements about a hand being under her

5    shirt, did the victim ever say that her bra was undone?

6    A.  Not to me.

7          MS. JAWAD:  No further questions.

8          THE COURT:  Mr. Amberg?

9          MR. AMBERG:  One second.

10                     RECROSS-EXAMINATION

11   BY MR. AMBERG:

12   Q.  Sir, I just have a couple questions about smelling

13   alcohol.

14   A.  Sure.

15   Q.  And the thing about smelling alcohol is this, and correct

16   me if I'm wrong, but you can't tell if somebody's drank one

17   drink or ten drinks from the smell, right?

18   A.  Sure.

19   Q.  Smelling alcohol is the smell of alcohol, right?

20   A.  Yes.

21   Q.  That means alcohol is on board that person?

22   A.  Sure.

23   Q.  Okay.  Thank you very much, sir.

24          MR. AMBERG:  I have no further questions, Your Honor.

25          THE COURT:  All right.  Thank you very much.

1          Ms. Jawad, may this witness be excused?

2          MS. JAWAD:  Yes, Your Honor.

3          THE COURT:  All right.  Thank you very much, Mr.

4    Burciaga.  You may step down.  Thank you for your testimony

5    today.

6          (Witness excused at 4:22 p.m.)

7          Ladies and gentlemen, I think this might be a good

8    time for us to break.  Let me ask counsel what you all think.

9          MS. SMITH:  I agree, Your Honor.

10         MR. AMBERG:  Second that.

11         THE COURT:  All right.  Then we will be adjourned

12   until Monday morning.  As you may recall, I indicated that

13   would be our schedule.  So let's get started right at 9:00 a.m.

14   Again, if you could come here a little bit earlier than that,

15   like around 8:45.  Try not to be any later than 8:45 to make

16   certain that you can get down here in time.

17         All right.  Thank you all very much.  Let's rise for

18   the jury.  I hope you have a great weekend.  Please don't

19   discuss the case, as you know, from my instructions.

20         (Jury excused at 4:23 p.m.)

21         THE COURT:  All right.  You may be seated.

22         Are there any matters that we need to address?

23         MS. SMITH:  Your Honor, I have two matters, if I may.

24         THE COURT:  Go ahead.

25         MS. SMITH:  The first one is that I didn't object

1    during the defendant's opening, but he referred to his client

2    by his first name and he referred to his client's wife by her

3    first name, and I know we are calling our -- our victim by her

4    first name but I think it's inappropriate to refer to the

5    defendant as anything other than either the defendant or Mr.

6    Ramamoorthy.

7            THE COURT:  All right.  I'm not sure exactly at this

8    point if there's anything that we can do about the opening

9    statement.

10           MS. SMITH:  No, no, I don't mean retroactively.  I

11   mean going forward.

12           THE COURT:  Right.  Well, I don't think -- I'm not

13   aware of a legal objection that would justify that.

14           So what else, what other -- what other matters.

15           MS. SMITH:  I believe Pretrial Services is here.  I

16   just want to verify that Mr. -- that the defendant is going to

17   have his tether reaffixed before the --

18           THE COURT:  Yes, I see we have Mr. Jonville.  Welcome

19   again, Mr. Jonville.

20           PRE-TRIAL OFFICER:  Thank you.  Yeah, we --

21           THE COURT:  And --

22           PRE-TRIAL OFFICER:  -- would just have to make sure

23   the unit is charged.  It's still on and it's deactivated.  We

24   need to make sure it's charged.  I'll have him report tomorrow

25   when he's back here and we should be okay.

```
 1              THE COURT:  Do you need to have him come up to your
 2     office?
 3              PRE-TRIAL OFFICER:  First thing in the morning I'm a
 4     have him come here.  He needs to go home and charge it first.
 5              THE COURT:  He needs to go home and charge it first
 6     himself.  All right.  So it's currently still on Mr.
 7     Ramamoorthy?
 8              PRE-TRIAL OFFICER:  Correct.
 9              THE COURT:  Okay.  So you understand, Mr.
10     Ramamoorthy, you have to charge your device?
11          (Brief pause)
12              MR. AMBERG:  Your Honor, if I may very briefly
13     discuss this, after speaking with Pretrial Services, it's my
14     understanding that the tether, to properly have it work, has to
15     be charged twice a day, and it sounds like what happened was
16     Mr. Ramamoorthy charged it last night but he's been here all
17     day so obviously it hasn't been charged.  I don't think he --
18     he wanted you to know that he didn't purposefully not charge
19     this thing.  He didn't think that it would obviously go off.
20              What I think the game plan is, what I'll tell him is
21     that early in the morning get that tether charged and ready to
22     go, and then it sounds like then he'll go up to Pretrial
23     Services just to make sure everything's good to go.  But I'm
24     going to tell him right now when we get out of here, you wake
25     up at 4:30 in the morning and hit that tether for two or three
```

Jury Trial: Volume 2B • Thursday, August 9, 2018

111

1    hours 'cuz I was told that it takes a couple hours to charge

2    it.

3              THE COURT:  What I would ask you to do is take a

4    moment, Mr. Amberg and Mr. Ramamoorthy and Mr. Vijay, and speak

5    with Mr. Jonville while he's here about the proper ways to

6    ensure that the device is charged.  Would you do that for me?

7              MR. AMBERG:  Yes, Your Honor.

8              THE COURT:  Okay.  Very good.

9              Are there any other matters that we need to take up?

10             MS. SMITH:  We would like to release the flight

11   attendants from the subpoena and let them fly home tonight.  Is

12   there any objection?

13             MR. AMBERG:  No objection.

14             MS. SMITH:  Okay.  Otherwise we don't have anything

15   else.

16             THE COURT:  All right.  Well, I want to thank counsel

17   for all their hard work in getting everything together today

18   despite our technical glitches here and there, and I hope you

19   all have a good weekend and we will see you on Monday morning.

20             MS. SMITH:  Thank you, Your Honor.

21             THE COURT:  We are adjourned.

22             MS. JAWAD:  Thank you, Your Honor.

23             MR. AMBERG:  Thank you very much, Your Honor..

24             MR. MANSOUR:  Thank you, Judge.

25             THE LAW CLERK:  All rise.  Court is in recess.

Case 2:18-cr-20027-TGB-MKM   ECF No. 83   filed 03/05/19   PageID.1327   Page 112 of 113
Jury Trial: Volume 2B • Thursday, August 9, 2018

112

```
1              (Court in recess at 4:28 p.m.)

2              (Proceedings in the above-entitled matter adjourned

3         to Monday, August 13, 2018)

4                          —  —  —

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 C E R T I F I C A T I O N

 2           I, Linda M. Cavanagh, Official Court Reporter of the

 3   United States District Court, Eastern District of Michigan,

 4   appointed pursuant to the provisions of Title 28, United States

 5   Code, Section 753, do hereby certify that the foregoing pages 1

 6   through 112 comprise a full, true and correct transcript of the

 7   proceedings held in the matter of United States of America vs.

 8   Prabhu Ramamoorthy, Case No. 18-20027, on Thursday, August 9,

 9   2018.

10

11

12                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                         Federal Official Court Reporter
                           United States District Court
14                         Eastern District of Michigan

15

16

17   Date: March 4, 2019
     Detroit, Michigan
18

19

20

21

22

23

24

25
```