Case 2:18-cr-20027-TGB-MKM  ECF No. 84  filed 03/05/19  PageID.1329  Page 1 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3
     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5    vs.                              Case No. 18-20027
                                      Hon. Terrence G. Berg
6    PRABHU RAMAMOORTHY,

7                        Defendant.
     _____/
8
                        JURY TRIAL: VOLUME 3
9
             BEFORE THE HONORABLE TERRENCE G. BERG
10              United States District Judge
             Theodore Levin United States Courthouse
11              231 West Lafayette Boulevard
                Detroit, Michigan  48226
12                Monday, August 13, 2018

13   APPEARANCES:

14   For the Plaintiff        MARGARET M. SMITH
     United States of America: AMANDA JAWAD
15                            U.S. Attorney's Office
                              211 W. Fort Street
16                            Suite 2001
                              Detroit, Michigan  48226
17                            313-226-9135

18   For the Defendant        JAMES AMBERG
     Prabhu Ramamoorthy:      Amberg and Amberg
19                            104 W. Fourth Street
                              Suite 305
20                            Royal Oak, Michigan  48070
                              248-681-0115
21
                              VICTOR MANSOUR
22                            Mansour & Mansour, P.C.
                              32000 Northwestern Highway
23                            Farmington Hills, Michigan 48334
                              248-932-3322
24
     Also Present:            Rengachari Vijayaraghavan
25                            Court Interpreter
```

1          To obtain a certified copy of this transcript, contact:
2               Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                             Official Court Reporter
3                    (313) 234-2616 • www.transcriptorders.com

```
 1                          TABLE OF CONTENTS

 2                                                           Page

 3    Government Witnesses (Continued):

 4    JOSEPH ALVARADO

 5        Direct Examination by Ms. Smith              8
          Cross-Examination by Mr. Amberg             27
 6        Redirect Examination by Ms. Smith           40

 7    JACKSON CHALMERS

 8        Direct Examination by Ms. Smith             44
          Cross-Examination by Mr. Amberg             62
 9        Redirect Examination by Ms. Smith           76
          Recross-Examination by Mr. Amberg           82
10
      LAURA ESQUEDA
11
          Direct Examination by Ms. Smith             88
12        Cross-Examination by Mr. Amberg            121
          Redirect Examination by Ms. Smith          160
13        Recross-Examination by Mr. Amberg          163
          Redirect Examination by Ms. Smith          163
14
      PAUL UMFLEET
15
          Direct Examination by Ms. Smith            168
16        Cross-Examination by Mr. Amberg            174

17    MARCY PLAZA

18        Direct Examination by Ms. Jawad            177
          Cross-Examination by Mr. Amberg            197
19        Redirect Examination by Ms. Jawad          204
          Redirect Examination Cont'd by Ms. Jawad   208
20

21

22

23

24

25
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1332   Page 4 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

4

EXHIBITS

| Identification | Offered | Received |
|---|---|---|
| Government Exhibit No. 6a,<br>Still shot of victim coming<br>off airplane | 15 | 15 |
| Government Exhibit Nos. 6b, 6c,<br>Still shots of victim in airport<br>terminal | 49 | 49 |
| Government Exhibit No. 6d,<br>Still shot of victim in airport<br>garage | 170 | 170 |
| Government Exhibit No. 7,<br>Video clip | 18 | 19 |
| Government Exhibit No. 8,<br>Video clip | 22 | 22 |
| Exhibit No. Exhibit No. 9,<br>Video clip | 52 | 52 |
| Exhibit No. Exhibit No. 10,<br>Defendant's statement | 53 | 54 |
| Government Exhibit No. 11,<br>Screen shot of text messages | 112 | 112 |

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1333   Page 5 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

5

```
1              Detroit, Michigan
2              Monday, August 13, 2018
3                        —  —  —
4              (Proceedings commenced at 9:06 a.m., all parties
5              present, jury not present)
6              THE LAW CLERK:  Court calls Case No. 18-20027, United
7    States of America versus Prabhu Ramamoorthy.
8              Counsel, will you please place your appearances on
9    the record?
10             MS. JAWAD:  Good morning, Your Honor.  Amanda Jawad
11   and Maggie Smith on behalf of the United States.  With us at
12   counsel table is Meghann O'Connor, a paralegal from our office,
13   and Special Agent Kyle Dodge, FBI.
14             THE COURT:  Good morning.
15             MS. SMITH:  Good morning.
16             MR. AMBERG:  And good morning, Your Honor.  It's
17   great to see you.  Jim Amberg on behalf of the defendant, Mr.
18   Ramamoorthy, who is standing next to my right.  Next to him
19   sitting, now standing, is Mr. Vijay, his interpreter.  Mr.
20   Mansour, as you can see, is not here right now but he will be
21   joining us in about two hours, so he's going to be here he said
22   at 11:00 o'clock.
23             THE COURT:  All right.  Good morning, Mr. Amberg.
24   Good morning, Mr. Ramamoorthy.  Good morning, Mr. Vijay.
25             Are we ready to bring in the jury?
```

1          MS. JAWAD:  Yes, Your Honor.

2          MR. AMBERG:  Yes, Your Honor.

3          THE COURT:  All right.  Let me just ask since, we had

4     a full day on Thursday, Mr. Vijay, have you been able to

5     conduct your interpretation and translation effectively to your

6     satisfaction?

7          THE INTERPRETER:  Yes, to my satisfaction.

8          THE COURT:  And Mr. Ramamoorthy, have you been able

9     to follow the proceedings by listening to the interpretation?

10         DEFENDANT RAMAMOORTHY:  Yes, Your Honor.

11         THE COURT:  All right.  Thank you very much.

12         MS. SMITH:  Your Honor, if I may, if I may, I do have

13    one small housekeeping issue.

14         THE COURT:  What issue is that?

15         MS. SMITH:  A housekeeping issue.

16         THE COURT:  Go ahead.

17         MS. SMITH:  My first two witnesses this morning are

18    from the Metro -- Metro -- the airport police, and I'm going to

19    be using some body cam clips with them.  We have transcribed

20    those clips, and the -- throughout this case the transcriptions

21    have been agreed upon by the defense as accurate, and when we

22    play the clip, there's going to be a trans -- a transcript that

23    runs simultaneously.

24         I have brought the jury instruction that is in the

25    set, I've brought the extra copy of the jury instruction that

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1335   Page 7 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

7

 1  the jury should rely on what they hear and not what they read.

 2  I don't know if the Court wants to read that instruction before

 3  I play that first exhibit, but I've brought it for you in case

 4  you want it.

 5          THE COURT:  I'd be glad to read it.  What do you

 6  think, Mr. Amberg?

 7          MR. AMBERG:  Let me just take a quick peek, Your

 8  Honor.

 9          MS. SMITH:  Sure.

10          (Brief pause)

11          MR. AMBERG:  I think that would probably be wise to

12  read that, Your Honor, now.

13          THE COURT:  All right.  And so --

14          MR. AMBERG:  Thank you very much.

15          THE COURT:  -- will you be calling the witnesses that

16  will be presenting these videos first?

17          MS. SMITH:  Yes.

18          THE COURT:  All right.  I will deliver it.  Why don't

19  you hand it to my clerk please.

20          MS. SMITH:  Yes.

21          THE COURT:  All right.  And so what I would propose

22  is that once the witness is on the stand and before you are

23  about to show the video, I'll give them this instruction.

24          MS. SMITH:  Very well.  Thank you.

25          THE COURT:  All right.  Are we ready for the jury?

1          MS. SMITH:  Yes, Your Honor.

2          MR. AMBERG:  Yes, Your Honor.

3          THE COURT:  Let's bring in the jury.

4          (Jury entered the courtroom at 9:10 a.m.)

5          THE COURT:  Good morning, ladies and gentlemen.  Good

6    morning everyone.  You may be seated.  And I hope you all had a

7    great weekend, an extra day of the weekend.

8          And the parties have indicated that they're ready to

9    proceed, and so without any further delay, let's call our next

10   witness.

11         MS. SMITH:  Thank you.  The United States calls

12   Sergeant Joseph Alvarado.  Sir, please come forward and get

13   yourself sworn in.

14         THE COURT:  Will you raise your right hand, sir?

15              J O S E P H   A L V A R A D O

16   was thereupon called as a witness herein, and after being

17   first duly sworn to tell the truth and nothing but the truth,

18   testified on his oath as follows:

19         MS. SMITH:  May I begin?

20         THE COURT:  You may.

21         MS. SMITH:  Thank you.

22                    DIRECT EXAMINATION

23   BY MS. SMITH:

24   Q.   Good morning.

25   A.   Good morning.

```
 1   Q.   Can you please introduce yourself to the jury?

 2   A.   I'm Sergeant Joseph Alvarado.

 3   Q.   Where do you work?

 4   A.   Wayne County Airport Authority.

 5   Q.   What do you do there?

 6   A.   I'm a midnight supervisor, sergeant, patrol.

 7   Q.   How long have you been with the Detroit Metro Airport

 8   Authority?

 9   A.   I actually started in 1988 with the sheriff's department,

10   transferred to the airport in '94.  The airport split and

11   became its own authority in '93, been there -- and I've been

12   there since.

13   Q.   Did you go to the police academy?

14   A.   Yes, ma'am.

15   Q.   What year did you graduate?

16   A.   '93.

17   Q.   Do you work at the airport?

18   A.   Yes, ma'am.

19   Q.   In Romulus?

20   A.   Yes, ma'am.

21   Q.   And what are some of your duties and responsibilities

22   there?

23   A.   Midnight supervisor.  I'm responsible for all the

24   officers' safety, issuing their equipment, making sure their

25   reports are in order.
```

```
 1              THE COURT REPORTER:  Excuse me.  You need to slow
 2   down please.
 3              THE WITNESS:  I'm sorry.
 4              THE COURT:  Yeah, let me just suggest, take your
 5   time, there's no rush.  Speak right into the microphone because
 6   it's a little bit hard to hear in here.
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  Go ahead, sir.
 9   A.   Again, midnight shift supervisor.  Beginning of the shift
10   we take rollcall, make sure the officers are there present,
11   issue them necessary equipment, inspect cars, make sure they're
12   in their duty areas, approve and correct reports, respond to
13   just about all incidents to make sure it's done properly,
14   supervise it, make sure officers have what they need, if they
15   need things.
16   Q.   Do you wear a uniform?
17   A.   Yes, ma'am.
18   Q.   And as part of your uniform do you wear a body camera?
19   A.   Yes, ma'am.
20   Q.   Can you describe that to the jury?
21   A.    I believe it's an Axon body cam, usually worn in the
22   center of my chest.  By policy, it's -- it remains on but not
23   recording 24-7.  And then prior -- as soon as we're dispatched
24   or get to an incident, we turn it on and record.
25   Q.   So as part of your uniform, you wear this body cam on your
```

1    chest?

2    A.    I wear it on my chest, yes.

3    Q.    And you have it running the entire shift?

4    A.    Yes.

5    Q.    And let me see if I understand this.   The -- the body

6    camera records video as well as separately records audio?

7    A.    Yes.

8    Q.    And so do you have the ability to control when that audio

9    comes on and off?

10   A.    When I put -- the camera is on a 30-second loop meaning it

11   records constantly, but at every 30-second interval a second

12   drops off every end.   So when I hit the record button itself to

13   record audio, the 30 seconds where prior to I hit -- me hitting

14   the button will be recorded as well, but there will not be any

15   audio for that portion.

16   Q.    And what happens to the -- the video and audio that's

17   recorded?

18   A.    At the end of the shift we put 'em in a carrier which

19   downloads all the information to the server.

20   Q.    Were you involved in an investigation of an individual by

21   the name of Prabhu Ramamoorthy?

22   A.    Yes, ma'am.

23   Q.    What was the nature of that investigation?

24   A.    Sexual assault.

25   Q.    Do you see the defendant in the courtroom today?

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1340   Page 12 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

12

```
 1    A.   Yes, ma'am.

 2    Q.   Could you point him out and identify an article of

 3    clothing he's wearing?

 4    A.   This gentleman sitting right here at the table facing me

 5    with the striped shirt.

 6              MS. SMITH:  May the record reflect that the witness

 7    has identified the defendant?

 8              THE COURT:  It does.

 9    BY MS. SMITH:

10    Q.   What was your role in that investigation?

11    A.   To -- I was a supervisor on the scene.  I supervised the

12    officers getting the victim and the defendant separated and

13    basically asked generic questions to make sure that the -- it

14    was handed over to the proper authority, which would be the FBI

15    in that case.

16    Q.   Who else was working with you on this investigation?

17    A.   Corporal Hunter was on scene, Corporal Wach, Officer

18    Chalmers, Officer Umfleet.

19    Q.   And were these officers also wearing body cameras?

20    A.   Yes.

21    Q.   Have you had an opportunity to review the body camera

22    footage from that morning?

23    A.   My body camera footage, yes.

24    Q.   And is it safe to say that if your camera is going as well

25    as the person standing next to you is going, that it's going to
```

1  show basically the same thing but maybe from a little different

2  angle?

3  A.  Yes.

4  Q.  And so do you find that when you collect all the body

5  cameras at the end of an incident, that many times there's kind

6  of a duplicate of what happened but just from slightly separate

7  angles?

8  A.  Yes.

9  Q.  Were you working the morning of January 3rd, 2018?

10  A.  Yes.

11  Q.  Okay.  Let's talk about that morning for a little bit.

12  Were you called out to investigate an incident?

13  A.  Yes, ma'am.

14  Q.  About what time of day was that?

15  A.  About 5:45 in the morning.

16  Q.  Okay.  And without telling me what anybody told you, what

17  was the nature of -- of getting called out?

18  A.  The dispatch run was a possible criminal sexual conduct on

19  board an aircraft.

20  Q.  And so was this aircraft taking off or landing at Detroit

21  Metro?

22  A.  It was landing.

23  Q.  Do you know where it was landing from?

24  A.  I believe Las Vegas.

25  Q.  And what time of day was it?

```
 1    A.   5:45 in the morning.

 2    Q.   Okay.  Did you arrive at the -- and meet the plane as it

 3    came in that morning?

 4    A.   Yes.  I arrived -- I arrived at the gate prior to the

 5    plane pulling in.

 6    Q.   And when you say the gate, are you talking about inside

 7    the terminal or in that little jetway area where the passengers

 8    are released?

 9    A.   In the jet bridge.

10    Q.   Okay.  And so who came off the plane first?

11    A.   The first person off the plane that met me was the -- it

12    was a flight attendant.

13    Q.   Okay.  And then after that?

14    A.   After that, I had the victim come off first.

15    Q.   Okay.  And do you know that victim by the name of Laura?

16    A.   Yes, ma'am.

17    Q.   I'm going to ask you to look in the exhibit book that's

18    sitting right in front of you and turn to tab 6a.  Let me know

19    when you're there.

20    A.   Yes, ma'am, I'm here.

21    Q.   Do you recognize that?

22    A.   Yes, ma'am.

23    Q.   What is it?

24    A.   That is a picture of Laura.

25    Q.   And is that a fair and accurate depiction of what she
```

```
1    looked like when she came off the plane that morning?
2    A.   Yes, ma'am.
3             MS. SMITH:  At this time, Your Honor, I move to admit
4    Exhibit 6a.
5             MR. AMBERG:  No objection.
6             THE COURT:  6a is admitted.
7             MS. SMITH:  May I publish to the jury?
8             THE COURT:  You may.
9    BY MS. SMITH:
10   Q.   Okay.  Let's take a look at 6a.
11            Okay.  So just for the record, can you describe
12   where -- what's hap -- what's going on in this picture?
13   A.   She's coming off the aircraft and I'm going to have her go
14   with the investigating officer so that he can talk to her.
15   Q.   So this picture is from either your body camera or another
16   body cam from an officer that was standing in the jetway?
17   A.   Yes.
18   Q.   And so we're looking at the door of the plane there?
19   A.   Yes.
20   Q.   And is she clutching what looks like a blanket in her
21   arms?
22   A.   Yes, it appears to be a blanket or a sweater.
23   Q.   Okay.  Where did you take her from there?
24   A.   From there she went directly with Corporal Wach and
25   Officer Chalmers.  They went up the jetway into the terminal
```

1    area.

2    Q.   Okay.  So we're going to come back to that, but now I want

3    to draw your attention to the defendant.  Did -- was the

4    defendant taken off the plane after Laura?

5    A.   Yes.

6    Q.   And was he taken off by himself?

7    A.   Yeah, I -- I -- no officer entered the aircraft at that

8    time.  I had asked the flight attendants to bring both the

9    victim off first and then the defendant off second.

10   Q.   Okay.  So did the defendant come off by himself then?

11   A.   He did.

12   Q.   Okay.  And why was he taken off alone?

13   A.   To eliminate any contact between the two.

14   Q.   Between which two?

15   A.   The victim and the defendant.

16   Q.   Did you have a conversation with the defendant in that

17   jetway area?

18   A.   Yes, I did.

19   Q.   Can you describe his general demeanor during that time?

20   A.   Kind of confused but cooperative.

21   Q.   Did you -- were you able to understand what he was saying

22   to you?

23   A.   Yes.

24   Q.   Did he appear to understand what you were saying to him?

25   A.   Yes.

1    Q.   So you were speaking in the English language?

2    A.   Yes, I was.

3    Q.   And what language was he using?

4    A.   English.

5    Q.   Did you tell him of the nature of your investigation?

6    A.   Not at that time, no.

7    Q.   Why not?

8    A.   Because I wanted him to tell me what was going on.  I -- I

9    hadn't determined that there was a sexual assault or there was

10   probable cause for it, only that we had information from the

11   tower, which is not always a hundred percent accurate.

12   Q.   And so as part of your investigation, do you ask

13   open-ended questions?

14   A.   Yes.

15   Q.   And so in this case did you ask an open-ended question?

16   A.   Yes, I did.

17   Q.   Do you remember what you asked?

18   A.   I asked him, "What's going on?"

19   Q.   Just simply, "What's going on here?," that's what you

20   asked him?

21   A.   Yes, ma'am.

22   Q.   Okay.  What was his response?

23   A.   He said that it was a late night and that the girl next to

24   him was sleeping on him but he did not know where his hands

25   were.

Case 2:18-cr-20027-TGB-MKM ECF No. 84 filed 03/05/19 PageID.1346 Page 18 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

18

1   Q.   Okay.  In your exhibit book --

2   A.   Yes, ma'am.

3   Q.   -- can you turn to Exhibit 7?  It should be a compact

4   disk, or at least a notation that there is.

5   A.   Yes.

6   Q.   Okay.  And in reading that, I believe that it's going to

7   say -- do you recognize what that says in there?

8   A.   Yeah.  It's CSC_part_2.  This is from my -- I believe from

9   my video camera, my body-worn camera.

10  Q.   Okay.  From approximately 5 minutes and 47 seconds to

11  about 7 minutes and 20 seconds?

12  A.   Yes, ma'am.

13  Q.   All right.  And you testified earlier that you've reviewed

14  this footage?

15  A.   Yes, ma'am.

16  Q.   And it is a fair and accurate representation or depiction

17  of what happened?

18  A.   Yes, ma'am.

19          MS. SMITH:  Okay.  At this time, Your Honor, I'm

20  going to move to admit Exhibit 7.

21          THE COURT:  Any objection to --

22          MR. AMBERG:  No objection.

23          THE COURT:  -- Exhibit 7?

24          MR. AMBERG:  No objection.

25          MS. SMITH:  Before I seek --

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1347   Page 19 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

19

 1            THE COURT:  Exhibit 7 will be received.

 2            MS. SMITH:  Excuse me.  Before I seek to publish this

 3       to the jury, there are two -- two things I'd like to ask the

 4       Court.  First I'd like to turn off these lights across here if

 5       I may so that the jury can see the screen better.

 6            And second, this would be the appropriate time to

 7       read the instruction on transcripts.

 8            THE COURT:  All right.  Thank you.

 9            So, ladies and gentlemen, we're going to play some

10       video recordings, and I want to give you an instruction

11       regarding the transcripts that will go along with the video

12       recordings.

13            You will hear some video recordings that were

14       received in evidence and there will be a transcript running

15       with the videos.

16            Keep in mind that the transcripts are not evidence.

17       They were given to you and are going to be shown to you only as

18       a guide to help you follow what is being said.  The videos

19       themselves are the evidence.  If you notice any differences

20       between what you hear on the videos and what you read in the

21       transcripts, you must rely on what you heard and what you hear,

22       not on what you read.  And if you could not hear or understand

23       certain parts of the tapes, you must ignore the transcripts as

24       far as those parts are concerned.

25            You may proceed.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1348   Page 20 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

20

```
 1           MS. SMITH:  Thank you.  May I publish this video?
 2           MR. AMBERG:  Your Honor, may I -- may I move or stand
 3   over here and watch this?
 4           THE COURT:  You may.
 5           MR. AMBERG:  Thank you.
 6           THE COURT:  Yes, you may present the video at this
 7   time.
 8           MS. SMITH:  Okay.
 9           (Video with audio being played)
10           MS. SMITH:  Thank you.
11   BY MS. SMITH:
12   Q.  All right.  Was this the first time you had spoken with
13   the defendant then?
14   A.  Yes, ma'am.
15   Q.  And did anything in particular strike you about his
16   statement?
17   A.  Yeah, it struck me that he was -- he didn't know where his
18   hands were at.
19   Q.  Because had you asked him anything about his hands?
20   A.  Nothing, I had asked him nothing.
21   Q.  And just for the record, is the defendant wearing a black
22   jacket in that video?
23   A.   (No response)
24   Q.  Did --
25           THE COURT REPORTER:  I'm sorry, I didn't hear your
```

```
 1   answer.
 2              THE WITNESS:  Yes.
 3              THE COURT REPORTER:  Thank you.
 4              THE WITNESS:  Sorry.
 5   Q.   Did you decide to take him then into the terminal?
 6   A.   Yes, ma'am.
 7   Q.   All right.  So while you're in that airport terminal, this
 8   is where the regular people are walking back and forth to get
 9   to their gate, is that right?
10   A.   Yes, ma'am.
11   Q.   Okay.  So when we say terminal, we're talking about where
12   the various gates are located for each of the flights?
13   A.   Yes, ma'am.
14   Q.   And so when you had him in the terminal, did you continue
15   to have a discussion with him?
16   A.   Yes.
17   Q.   And -- and what did he say this time?
18   A.   I had asked him, you know, "Did you intentionally touch
19   her?" and he said, "No, I don't know where my hands were."
20   Q.   Did he say anything about what his wife told him?
21   A.   His wife stated that the --
22   Q.   Let me rephrase -- let me -- you can't tell me what the
23   wife said, but did he tell you what his wife told him?
24   A.   Yes.
25   Q.   What did he say his wife said?
```

```
 1    A.   He said, "My wife said she was sleeping on me."

 2    Q.   Did the defendant ask you if there were -- about cameras

 3    in the plane?

 4    A.   He asked me if there were cameras on the aircraft.

 5    Q.   And did the defendant make any statements about his state

 6    of awake or drowsiness?

 7    A.   He said he was very sleepy.

 8    Q.   I'm going to have you look in your book at Exhibit 8.  Do

 9    you recognize that title of that video clip?

10    A.   Yes, ma'am.

11    Q.   And is that a clip from your body cam footage?

12    A.   Yes, ma'am.

13    Q.   Approximately 7 minutes and 20 seconds to 12 minutes and

14    5 seconds?

15    A.   Yes, ma'am.

16    Q.   So this clip is -- is immediately following the clip we

17    just saw, is that right?

18    A.   Yes, ma'am.

19         MS. SMITH:  Okay.  And at this time I move to admit

20    Exhibit 8.

21         THE COURT:  Any objection?

22         MR. AMBERG:  No objection.

23         THE COURT:  Exhibit 8 is received.

24         MS. SMITH:  Thank you.  May I publish it to the jury?

25         THE COURT:  You may.
```

```
 1          MS. SMITH:  Before I do, I would ask if the Court can
 2   hear if the volume is okay just so that everybody can hear.
 3   Can the Court hear the volume okay?
 4          THE COURT:  The volume I think could be turned up a
 5   little bit.  I'm not sure, ladies and gentlemen, do you agree
 6   with that?
 7          THE JURORS:  (Nod in the affirmative.)
 8          THE COURT:  Let's turn it up.
 9          (Video with audio being played)
10   BY MS. SMITH:
11   Q.  Sergeant Alvarado, when you -- after -- while we were
12   playing this, did you notice that the defendant had a watch on
13   his left hand?
14   A.  Yes, ma'am.
15   Q.  And during the conversation with the defendant did he
16   indicate that he could see his wife from where he was standing?
17   A.  Yes.
18   Q.  And do you know approximately how far away his wife was in
19   the terminal?
20   A.  Approximately 20 feet.
21   Q.  Okay.  So maybe across the hallway in the terminal?
22   A.  Yes.
23   Q.  And he could see that from where he was standing?
24   A.  Yes, ma'am.
25   Q.  During the course of this conversation did you notice that
```

```
 1   the defendant had kind of some spontaneous statements to you
 2   that were not in response to questions that you had posed?
 3   A.   Yes, ma'am.
 4   Q.   In fact, at one point were you trying to walk away and he
 5   continued to talk to you?
 6   A.   Yes, ma'am.
 7   Q.   And just so that the record is clear, did he say, "I am
 8   very sure I didn't do anything"?
 9   A.   He says, "I am pretty sure I didn't do anything."
10   Q.   Okay.  I'm going to direct your attention now to Laura.
11   You had testified earlier that she was taken off the plane
12   and -- and brought somewhere else in the terminal, is that
13   right?
14   A.   Yes, ma'am.
15   Q.   Did you have an opportunity to talk to her?
16   A.   Very briefly, yes.
17   Q.   Okay.  And what was your purpose in speaking with her?
18   A.   My purpose in speaking with her is to see if she needed
19   any medical attention, if she needed -- if she needed anything
20   from us, and to know that -- if -- that she understood what the
21   process was going on and to keep her informed.
22   Q.   Now, I don't want you to testify as to what she said to
23   you.
24   A.   Okay.
25   Q.   Okay.  But how did she appear to you when you looked at
```

1    her?

2    A.   Shellshocked.

3    Q.   How did her clothing appear?

4    A.   Like she had been traveling for four or five hours, just

5    normal clothing I guess.

6    Q.   Okay.  Was it disheveled in any way?

7    A.   Somewhat, yes.

8    Q.   Was she able to carry on a conversation with you?

9    A.   Yes, ma'am.

10   Q.   Did you smell alcohol on her breath?

11   A.   No, I did not.

12   Q.   Did she appear coherent?

13   A.   Yes.

14   Q.   Was she able to answer the questions that you asked in a

15   way that you knew she understood the -- that the -- what you

16   were asking?

17   A.   Yes, ma'am.

18   Q.   And when you say she looked shellshocked, what do you

19   mean?

20   A.   Victims of a crime or victims, you know, when something

21   shocks their conscience have a look of kind of like a blank

22   stare, disbelief.

23   Q.   And that's how she looked to you?

24   A.   Yes.

25   Q.   After you were done with this brief conversation, what was

1    the next step for Laura?

2    A.   When I had her escorted to our station by another officer

3    from the location.

4    Q.   And do you recall the name of the officer that took her?

5    A.   Corporal Umfleet.

6    Q.   Okay.  So after -- after Corporal Umfleet took Laura, what

7    did you do next?

8    A.   I had Corporal Umfleet take Laura to our station.

9    Corporal Wach and Officer Chalmers took the defendant to our

10   station as well.

11   Q.   And where did you go?

12   A.   From that point I remained on scene to collect witness

13   statements from the flight attendants.

14   Q.   And when you say the station, where is the station?

15   A.   Our station is located at the airport, approximately

16   three-quarters of a mile to a mile from that location?

17   Q.   So it's actually on the airport campus?

18   A.   Yes, it is.

19   Q.   And is it kind of near some parking decks?

20   A.   It is on the other side of the blue deck parking garage

21   from the north terminal.

22   Q.   Is it sometimes -- do you sometimes refer to it as the 610

23   building?

24   A.   Yeah, it is -- it is labeled as Building 610.  All

25   buildings at the airport are labeled by number.

1    Q.  And at some point was the decision made that this

2    investigation would be turned over to the FBI?

3    A.  Yes, ma'am.

4    Q.  And so is it -- is it fair to say that when that decision

5    was made, you -- you were kind of finished with what you were

6    doing at the airport?

7    A.  Yes, ma'am.

8    Q.  Okay.

9            MS. SMITH:  May I have one moment please?

10           (Brief pause)

11           I don't have any further questions at this time.

12   Thank you.

13           THE COURT:  Thank you very much, Ms. Smith.

14           Any cross-examination?

15           MR. AMBERG:  Yes, Your Honor.

16                        CROSS-EXAMINATION

17   BY MR. AMBERG:

18   Q.  Good morning, Sergeant.

19   A.  Good morning, sir.

20   Q.  I'll try to be brief.

21   A.  Quite all right.

22   Q.  Okay.  You were the sergeant in charge of this

23   investigation until the FBI took over?

24   A.  Yes.

25   Q.  Okay.  And what happens is is that you received some sort

1    of call through dispatch or -- or whomever saying there's been

2    an incident on this flight?

3    A.   Correct.

4    Q.   And what happens is is that you get your team together

5    which includes these officers that you've testified to and then

6    you go to the terminal, right?

7    A.   The dispatch dispatches the officers to the location, but

8    yes.

9    Q.   Okay.  And so everybody goes there?

10   A.   Yes.

11   Q.   All right.  Including you?

12   A.   Yes.

13   Q.   And what happens next is that you go up into the terminal

14   to meet the plane, right?

15   A.   I went onto the jetway to meet the aircraft.

16   Q.   And who was the first person that you talked to when the

17   plane opens up?

18   A.   The flight attendant.

19   Q.   All right.  The male flight attendant, right?

20   A.   Male flight attendant, yes.

21   Q.   And what he tells you is that the complainant in this case

22   is intoxicated?

23   A.   He said she -- he believes he was -- she was drinking,

24   yes.

25   Q.   Intoxicated was his words?

```
 1              MS. SMITH:  Objection, Your Honor.  This calls for
 2     hearsay.
 3              MR. AMBERG:  Your Honor, I mean it was testified to
 4     on Thursday.
 5              MS. SMITH:  Yes.
 6              THE COURT:  I'm going to allow an answer.  Go ahead,
 7     you may answer.
 8              THE WITNESS:  I don't remember his exact word,
 9     intoxicated or had been drinking, but it was one of the two.
10     BY MR. AMBERG:
11     Q.  Okay.  Then after that, what happens is that -- well, what
12     happens next, do you take that flight attendant off the plane
13     or what do you do next?
14     A.  I asked him to bring Laura off the aircraft.
15     Q.  Okay.  And so did you accompany her off the aircraft?
16     A.  She came off the aircraft on her own.
17     Q.  Okay.  And then you took her through the terminal?
18     A.  I directed her to Officer Wach and -- Corporal Wach and
19     Officer Chalmers, and they escorted her up into the terminal.
20     Q.  Okay.  And then is that when you then encounter my client?
21     A.  He then came up after -- after her, yes.
22     Q.  Okay.  Now, you had a brief conversation in the jetway,
23     right?
24     A.  Yes, sir.
25     Q.  Okay.  And we saw -- we saw that play out, right?
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1358   Page 30 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

30

 1    A.   Yes, sir.

 2    Q.   All right.  Now, you -- you could tell from talking to him

 3    that he had an accent, right?

 4    A.   Yes, sir.

 5    Q.   And that he was maybe a little bit hard to understand at

 6    times, right?

 7    A.   Yes, sir.

 8    Q.   Okay.  You said he looked confused?

 9    A.   Yes, sir.

10    Q.   And in part, was that because of the way that he would

11    answer those questions?

12    A.   I wouldn't -- I don't believe so, no.

13    Q.   Okay.  Well, what did you mean by confused?

14    A.   Confused as why I was there in the first place.

15    Q.   Okay.  Now, he indicated to you that his wife had told him

16    that the complainant was sleeping on his lap, right?

17    A.   That's what he said, yes.

18    Q.   Okay.  And that he didn't know where his hands were,

19    right?

20    A.   That's what he said, yes.

21    Q.   Okay.  Now, I want to stop you there.  Did you walk onto

22    that plane at all?

23    A.   I never boarded the aircraft.

24    Q.   Okay.  So you don't know how close those seats are to each

25    other?

1   A.  I can say I know how seat -- close those seats are

2   together being at the airport for several years and being on

3   several aircrafts.  Yes, they are very, very disclose.

4   Q.  Very -- those Spirit Airlines are the tightest of all

5   those seats, right?

6   A.  I don't know exact measurements, but they're all close.

7   Q.  I mean if you and I both sat on one right next to each

8   other, probably wouldn't be a lot of room in there, right?

9   A.  Probably.

10  Q.  Okay.  So what happens is that you then take Mr.

11  Ramamoorthy over to the terminal area which we saw, right?

12  A.  Yes.

13  Q.  Okay.  Now, from that point until when ultimately you --

14  you sort of hand him over to Corporal Wach and Officer

15  Chalmers, he never went to the bathroom, right?

16  A.  No.

17  Q.  He never washed his hands, right?

18  A.  No.

19  Q.  Okay.  You never discovered any evidence that he had gone

20  to the bathroom, right?

21  A.  No.

22  Q.  Nor washed his hands, right?

23  A.  I did not, no.

24  Q.  Right.  And that's important because one thing that was

25  going through your mind even then was that "we need to get the

```
 1    DNA check on his hands," right?
 2    A.   Could you rephrase -- rephrase the question?
 3    Q.   One thing that you were thinking about as you were doing
 4    this investigation at that point in time is you wanted to make
 5    sure that his hands could be checked for DNA, right?
 6    A.   I thought that would be a possibility, yes.
 7    Q.   Okay.  And that's important because that's something that
 8    is -- is very important when dealing with accusations like
 9    this, right?
10    A.   Yes.
11    Q.   Because you are taught that people can have DNA on their
12    hands if they touch somebody's private area like that, right?
13    A.   They could, yes.
14    Q.   And -- and, in fact, you're taught that you should always
15    check, right?
16    A.   I do not check for DNA evidence, no.
17    Q.   But -- or instruct somebody else to do that, right?
18    A.   If necessary, yes.
19    Q.   Okay.  And that's exactly what happens in this case,
20    right?
21    A.   I believe that was done, yes.
22    Q.   Okay.  Did you order that?
23    A.   No, I did not.
24    Q.   Okay.  But you made sure that he didn't sully that
25    evidence on his hands?
```

1    A.   I didn't tell him not to use the restroom and wash his

2    hands but --

3    Q.   But -- but he never did?

4    A.   Not in my presence, no.

5    Q.   Okay.  You didn't see him rubbing his hands out with a

6    Wet-Nap or anything, right?

7    A.   Not in my presence, no.

8    Q.   Okay.  One thing about that second conversation, it's very

9    important and you testified to this, is you say to him to -- I

10   think it was, "You didn't intentionally touch her," right, you

11   said that to him?

12   A.   That was -- that was a question, yes.

13   Q.   Okay.  That was the first time anything with intentional

14   touching was brought up, right?

15   A.   To my knowledge, yes.

16   Q.   And it wasn't him telling you, it was you telling him?

17   A.   Yes.

18   Q.   Okay.  So clearly from that question, I think one could

19   infer that all of a sudden this investigation's an about --

20   it's about an intentional touching, right?

21   A.   I'm not understanding your question.

22   Q.   I'll ask you again.  Based on what you asked him right

23   there, "You didn't intentionally touch her," one could infer

24   that this investigation was about whether he did or didn't

25   intentionally touch her, right?

 1          MS. SMITH:  Objection.  This calls for speculation.

 2    He can only testify to what he knows.

 3          THE COURT:  Sustained.

 4    BY MR. AMBERG:

 5    Q.   Now, Mr. Ramamoorthy asks you to -- to see if there's

 6    cameras on the plane, right?

 7    A.   He asked me if there were cameras on the aircraft, yes.

 8    Q.   Okay.  Did he ask you to preserve those cameras?

 9    A.   No, he did not.

10    Q.   Okay.  He just asked if they were on there, right?

11    A.   Yes.

12    Q.   Okay.  You didn't know at the time whether there were or

13    weren't, right?

14    A.   To my knowledge, no.

15    Q.   Okay.  He was coughing, right?

16    A.   He coughed, yes.

17    Q.   Okay.  And your interaction with him was pretty brief, I

18    mean all things considered, right, maybe 20 minutes?

19    A.   Yes, sir.

20    Q.   Okay.  You described at first the complainant as looking

21    like they had -- she had traveled for four hours, right?

22    A.   Yes.

23    Q.   That's what her clothing looked like, right?

24    A.   Yes, sir.

25    Q.   The word "disheveled," that came from this podium to you,

1    right?

2    A.   Yes.

3    Q.   You didn't describe her as disheveled, did you?

4    A.   No, I did not.

5    Q.   No.  She looked like somebody who had been in a flight for

6    four hours, right?

7    A.   Yes.

8    Q.   And this flight was a four-hour flight, right?

9    A.   I don't know the exact time frame.

10   Q.   Now, when you spoke with the complainant, you indicated

11   that you couldn't smell alcohol on her breath?

12   A.   I did not.

13   Q.   Okay.  Did you give her a Preliminary Breath Test to see

14   what her blood alcohol level was?

15   A.   I did not.

16   Q.   That was something you could have done, right?

17   A.   I had no probable cause to -- to give her a blood alcohol

18   level test.

19   Q.   In your -- in your job at the airport, I gotta believe

20   that a lot of what you do involves people that have been

21   consuming alcohol, right?

22   A.   We do deal with people that consume alcohol yes, sir.

23   Q.   Okay.  And that's because people like to drink at the

24   airport before they get on the airplanes, right?

25   A.   I don't know what people like to do before they get on the

 1    aircraft, sir.

 2    Q.   Well, they --

 3    A.   I can only say for me.

 4    Q.   -- they do it -- I mean correct me if I'm wrong, and if

 5    you don't know, let me know if you don't know.  But one thing

 6    people do because they're afraid of flying they drink, right?

 7    A.   I believe some people do.

 8    Q.   Okay.  I guess other people probably do it to have fun

 9    too, right?

10    A.   I would believe so.

11    Q.   All right.  So you've sort of seen the aftereffect of that

12    though, haven't you, of people drinking at the airport?

13    A.   I -- could you --

14    Q.   Sure.

15    A.   -- clarify what you mean --

16    Q.   Sure.

17    A.   -- in the aftermath?

18    Q.   Sure.  You've have had to deal with drunk people at the

19    airport before, right?

20    A.   Yes, I have.

21    Q.   Okay.  And when somebody is intoxicated, it can come in

22    many different forms, right?

23    A.   Yes.

24    Q.   Somebody doesn't necessarily have to be falling down drunk

25    to be intoxicated, right?

1    A.   Correct.

2    Q.   Somebody doesn't have to even slur their words to be

3    intoxicated, right?

4    A.   Correct.

5    Q.   You could, for all intents and purposes, look like you're

6    completely fine but still be intoxicated, right?

7    A.   Correct.

8    Q.   Okay.  I mean these are things that you've observed on the

9    job but also that you've been taught, right?

10   A.   Yes.

11   Q.   Okay.  When people are intoxicated, sometimes their memory

12   isn't the greatest, right?

13   A.   Correct.

14   Q.   Sometimes they tell you things that aren't true, right?

15   A.   Correct.

16   Q.   Sometimes they think something happened when it didn't

17   happen?

18   A.   Correct.

19   Q.   You knew a witness had said that she was intoxicated

20   before you even met the complainant, right?

21   A.   He had made claim that he believed she was, yes.

22   Q.   But you didn't make any type of followup to establish

23   whether she was or wasn't, right?

24   A.   No, I did not.

25   Q.   And you can do that too.  You have all kinds of tests that

1    can determine that, don't you?

2    A.   I do.

3    Q.   You have the breath test like we talked about, right?

4    A.   Yes, we do.

5    Q.   There's others tests too, the standardized field sobriety

6    test, right?

7    A.   Yes.

8    Q.   The -- the -- we've seen it all on the show Cops, one-leg

9    stand, heel-to-toe walk, stuff like that, right?

10   A.   Yes.

11   Q.   But you could even have just taken your finger and put it

12   in front --

13            THE COURT REPORTER:  Counsel, Counsel.

14            MR. AMBERG:  I apologize.

15            THE COURT REPORTER:  Slow down please.  Please ask

16   your question again.

17            MR. AMBERG:  Yes.

18            THE COURT REPORTER:  "You could even have just taken

19   your finger and put it in front..."

20   Q.   You could take taken your finger and put it in front of

21   her face and done what's called the Horizontal Gaze Nystagmus

22   Test, right?

23   A.   No, I could not.

24   Q.   Why not?

25   A.   I have not been trained on that specific test.

1    Q.   Okay.  Fair enough.

2             Mr. Ramamoorthy talked about being very tired, right?

3    A.   Yes.

4    Q.   He talked about how he had gone to the Grand Canyon and

5    got back late, right?

6    A.   He did.

7    Q.   Okay.  He said he was sleepy?

8    A.   He did.

9    Q.   Okay.  He also talked about the complainant being

10   intoxicated?

11   A.   He said he believes she was -- had been drinking, yes.

12   Q.   And he told you he doesn't drink?

13   A.   That's what he said, yes, sir.

14   Q.   Okay.  He said he didn't feel well, right?

15   A.   I don't remember him saying that.

16   Q.   Well, he said he has a cold?

17   A.   He did say that, yes.

18   Q.   And that he took a couple of Tylenols?

19   A.   Yes.

20   Q.   All right.

21            MR. AMBERG:  One second, Your Honor.

22            (Brief pause)

23   BY MR. AMBERG:

24   Q.   Sergeant Alvarado, I'm sorry about that.

25   A.   Quite all right, sir.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1368   Page 40 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

40

1    Q.   It was a question regarding when -- when you asked Mr.

2    Ramamoorthy about whether he intentionally touched the

3    complainant, his response was that to ask the air hosts or air

4    hostess or whatever he said to see a video, right, to watch the

5    video of the camera from the plane?

6    A.   I don't believe that was his exact response at that time.

7    Q.   It was something like that?

8    A.   He asked about cameras after -- were there cameras on the

9    aircraft after that question was answered.

10   Q.   He said get the air hostess to get the cameras?

11   A.   He didn't say any -- I don't recall him saying anything

12   about the air hostess or flight attendant.

13   Q.   Fair enough.

14            MR. AMBERG:   I have no further questions, Your Honor.

15            THE COURT:   Thank you.

16            Any redirect?

17            MS. SMITH:   Yes, Your Honor.

18                         REDIRECT EXAMINATION

19   BY MS. SMITH:

20   Q.   The word you used to describe Laura was shellshocked, did

21   I get that right?

22   A.   Yes.

23   Q.   In your years of service at the -- at the airport, are you

24   aware whether or not civil aircrafts have surveillance cameras?

25   A.   Not that I'm aware of.

1   Q.   So does -- Spirit Airlines doesn't have cameras on

2   their...

3   A.   Not that I'm aware of.

4   Q.   I've noticed that when the defense counsel was at the

5   table, you were sitting on the witness stand and you were kind

6   of rubbing your hands and you touched your face.  Was that a

7   nervous habit that you have?

8   A.   Hands are just a little cold, that's all.

9   Q.   Sure.  Okay.  And so did you realize that you were doing

10  that or were you just kind of...

11  A.   No, I realized it.  My -- like I said, my fingers are just

12  a little cold, that's all.

13  Q.   Yeah.  Okay.  All right.  So do you -- I think you

14  testified that it's not your job to collect DNA, is that right?

15  A.   That is correct.

16  Q.   So when -- when a person is removed from a plane in an

17  investigation for a criminal offense, is your first -- is your

18  first thought to gather the information from the parties or is

19  it to whisk somebody away to a laboratory?

20  A.   To get information.

21  Q.   And the questions and the answers from Laura, did they

22  seem logical and coherent to you?

23  A.   Yes.

24  Q.   How about from the defendant?  While you testified that at

25  times he may have been hard to understand, did you -- did you

```
1    and he -- or did you understand the answers to the questions
2    that you asked?
3    A.   Yes.
4    Q.   And did he appear to coherently answer the questions in a
5    logical fashion?
6    A.   Yes.
7              MS. SMITH:  I have nothing further.  Thank you.
8              THE COURT:  Thank you very much.
9              Ladies and gentlemen, this is your opportunity to ask
10   any questions.  If you have any questions, you can write them
11   down and I'll confer with counsel about them.  Are there any
12   questions?  If there are, raise your hand.  Any questions?  All
13   right.  I don't see any hands being raised.
14             All right, sir, go ahead and we'll take your
15   question.
16             (Brief pause)
17             THE COURT:  Counsel approach.
18             (Sidebar discussion as follows):
19             THE COURT:  A juror asks, "Was there a question to
20   what their interaction was before/during boarding the
21   aircraft?"
22             MS. SMITH:  Okay.  I can ask him if -- or you can ask
23   him.
24             THE COURT:  Well, I'll -- I'll ask the question and
25   you can ask any followup questions.  The question is do you
```

```
 1    object to this question?
 2           MS. SMITH:  I want to understand what the question
 3    is.  Do you all agree that the question is did the airport
 4    police have any interaction when they boarded the aircraft in
 5    Las Vegas, is that what that is?
 6           THE COURT:  I think -- I think the way I see this
 7    question is that he's asking whether or not this officer asked,
 8    "Was there a question" he says "to what their interaction was,"
 9    in other words, between the complainant and the defendant,
10    "before or during the boarding of the aircraft?"
11           MS. SMITH:  Oh, okay, okay.
12           MR. AMBERG:  That's fine.
13           THE COURT:  That's how I see it.
14           MS. SMITH:  I don't have any objection.
15           THE COURT:  Any objection?
16           MR. AMBERG:  No objection.
17           THE COURT:  You may ask followups.  Thank you.
18           MS. SMITH:  Okay.
19           (End of sidebar discussion)
20           THE COURT:  Sergeant, we have a question from a
21    juror.  A juror asks, "Was there a question to what their
22    interaction was before or during the boarding of the aircraft?"
23           THE WITNESS:  There was no questions asked by me as
24    to if there were any interactions in Las Vegas, which is
25    apparently where the flight came from.  No, I did not.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1372   Page 44 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

44

```
 1                 THE COURT:  Any followup questions?

 2                 MS. SMITH:  No, Your Honor.

 3                 MR. AMBERG:  No, Your Honor.

 4                 THE COURT:  Did that answer your question, sir?  All

 5      right.  We'll take that shrug as a good enough.

 6                 All right.  Well, thank you very much, sir.  May this

 7      witness be excused?

 8                 MS. SMITH:  Yes, thank you.

 9                 THE COURT:  You may be excused.  Call your next

10      witness.

11                 (Witness excused at 9:57 a.m.)

12                 MS. SMITH:  The United States calls Jackson Chalmers.

13      Sir, please come forward to the front of the courtroom.

14                 THE COURT:  Come forward, sir, please.  Raise your

15      right hand.

16                     J A C K S O N   C H A L M E R S

17      was thereupon called as a witness herein, and after being

18      first duly sworn to tell the truth and nothing but the truth,

19      testified on his oath as follows:

20                 MS. SMITH:  May I begin?

21                 THE COURT:  You may.

22                 MS. SMITH:  Thank you.

23                          DIRECT EXAMINATION

24      BY MS. SMITH:

25      Q.  Good morning.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1373   Page 45 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

45

1    A.   Good morning.

2    Q.   Could you please introduce yourself to the jury?

3    A.   My name is Jackson Chalmers.

4    Q.   And what is your current occupation?

5    A.   A police officer.

6    Q.   And where are you a police officer?

7    A.   I will be starting later this month with Plymouth Township

8    Police Department.

9    Q.   In January of 2018 where were you working?

10   A.   I was a police officer with the Wayne County Airport

11   Authority.

12   Q.   Sometimes is that referred to as the Metropolitan Airport?

13   A.   That is correct.

14   Q.   Sorry, Metropolitan Airport Authority?

15   A.   Yes, ma'am.

16   Q.   Or Detroit Metro Airport Authority?

17   A.   Correct.

18   Q.   Perhaps it makes a difference when you started with --

19   with the airport as to what you call it?

20   A.   Yeah, that would be correct.

21   Q.   And when you were a police officer with the Wayne County

22   Airport, what were some of your duties and responsibilities?

23   A.   General patrol, assisting TSA and other -- other

24   governmental agencies with general airport business, and then

25   the general patrol procedures of a police officer, and then

```
 1    directing traffic and so on and so forth.
 2    Q.   Is -- so is your jurisdiction on the ground then?
 3    A.   Correct.
 4    Q.   And is it the entire campus of the Detroit Metro Airport?
 5    A.   Detroit Metro Airport and then also Willow Run Airport.
 6    Q.   Okay.  Do -- did you wear a uniform when you're on duty?
 7    A.   Yes.
 8    Q.   And did that uniform include a body camera?
 9    A.   Yes.
10    Q.   And do most of the officers wear body cameras?
11    A.   Yes, ma'am.
12    Q.   Were you involved in an investigation of an individual by
13    the name of Prabhu Ramamoorthy?
14    A.   Yes, ma'am.
15    Q.   What was the nature of that investigation?
16    A.   The nature of that investigation was on the morning I was
17    in rollcall, our shift lieutenant sent myself and my training
18    officer at the time to meet officers already on the ground for
19    a potential CSC, criminal sexual conduct, a sexual assault that
20    occurred in flight.
21    Q.   Do you see the defendant in the courtroom today?
22    A.   Yes, I do.
23    Q.   Could you point him out and name an article of clothing
24    that he's wearing?
25    A.   He's wearing a purple striped, button down shirt.
```

1    Q.   Thank you.

2            MS. SMITH:  May the record reflect that the witness

3    has identified the defendant?

4            THE COURT:  It shall so reflect.

5    BY MS. SMITH:

6    Q.   And, sir, you were working the morning of January 3rd?

7    A.   That is correct.

8    Q.   And were you a relatively new officer that day?

9    A.   Yes, ma'am.

10   Q.   Were you paired up with another officer?

11   A.   Yes.  I was with Corporal Joseph Wach.

12   Q.   And is it fair to say that through the course of the

13   morning you and Corporal Wach were kind of side by side?

14   A.   That is correct.

15   Q.   When you arrived -- where did you go after you were given

16   this information?

17   A.   After we were given that information, we went to my patrol

18   vehicle, got in and drove along the AOA or the airfield

19   operations area where all the planes are coming in, over to

20   the -- the terminal to meet the plane that had actually just

21   arrived at the gate.

22   Q.   Was that Spirit Airlines Flight 788?

23   A.   That is correct.

24   Q.   And did you -- did you come up to the jetway to meet the

25   plane?

```
 1    A.   Yes, we -- we came in through the AOA side, walked up the
 2    jet bridge and then into the terminal.
 3    Q.   Were you involved in interviewing individuals involved in
 4    this?
 5    A.   Yes, I was.
 6    Q.   Were you also involved in taking their statements?
 7    A.   Yes, I was.
 8    Q.   I want to talk to you about this one at a time.  So let's
 9    first start with Laura.  Are you familiar with an individual
10    who we call Laura?
11    A.   Yes, I am.
12    Q.   I'm going to ask you to open up your exhibit book, it's
13    right in front of you, to Exhibit 6b and 6c.  Let me know when
14    you get there.
15    A.   Yes, 6b and c.
16    Q.   Do you recognize those?
17    A.   I do recognize these photos.
18    Q.   Okay.  So they're photos?
19    A.   Yes.
20    Q.   And just generally, what do they show?
21    A.   These show Laura coming off of the plane and then Laura
22    again seat -- seated in the boarding area.
23    Q.   And do you know these to come from body cam footage?
24    A.   I do.
25    Q.   And do these fairly and accurately depict what you saw of
```

```
 1   Laura that day?
 2   A.   Yes, ma'am, they do.
 3          MS. SMITH:  Your Honor, at this time I move to admit
 4   Exhibits 6b and 6c.
 5          MR. AMBERG:  No objection.
 6          THE COURT:  Without objection, Exhibits 6b and 6c may
 7   be admitted.
 8          MS. SMITH:  May I publish them one at a time?
 9          THE COURT:  You may.
10   BY MS. SMITH:
11   Q.   Let's start with 6b.  Okay.  What are we looking at here?
12   A.   Myself on the right side of the screen and this is Laura
13   seated across from the boarding area.
14   Q.   Okay.  And the girl in the picture is Laura?
15   A.   That is correct.
16   Q.   Okay.  And this is in the airport?
17   A.   Yes, ma'am.
18   Q.   Let's look at 6c.  Is this another picture in the same
19   location?
20   A.   Yes, ma'am.
21   Q.   And I think you said that's you in the right-hand corner?
22   A.   Correct.
23   Q.   And for the record, is there kind of a gray blanket in the
24   bottom right-hand corner?
25   A.   That is correct.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1378   Page 50 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

50

1    Q.   And it looks like there's a water bottle there, is that

2    right?

3    A.   Yes, ma'am.

4    Q.   Okay.  And what kind of shirt does Laura have on?

5    A.   She has a button down style shirt.

6    Q.   Okay.  And is it kind of open at the bottom?

7    A.   That is correct.

8    Q.   Okay.  And this again is a still shot from the body cam

9    video?

10   A.   Correct.

11          MS. SMITH:  Okay.  You can take that down.  Thank

12   you.

13   BY MS. SMITH:

14   Q.   When you first encountered Laura, how would you describe

15   her demeanor?

16   A.   My first encounter with Laura was when she was walking off

17   of the plane and she appeared visibly shaken up.

18   Q.   Did she appear intoxicated?

19   A.   No, ma'am.

20   Q.   Was she able to carry on a conversation?

21   A.   Yes.

22   Q.   Officer Chalmers, have you ever received training on

23   interviewing victims of sexual assault?

24   A.   In the academy, yes.

25   Q.   Now, I don't want you to tell me what Laura said to you,

```
1    but after you were done -- did you have a conversation with
2    her?
3    A.   I did.
4    Q.   And after you were done speaking with Laura, was she taken
5    somewhere?
6    A.   From my understanding at the time, she was still on by [as
7    spoken] while we were conducting the investigation, and then
8    officers went to transport her to the airport police station.
9    Q.   Was the defendant the next person that you spoke to that
10   morning?
11   A.   Yes, ma'am.
12   Q.   And was he in the terminal or in the jetway?
13   A.   He was in the terminal.
14   Q.   Okay.  And was he by himself or with other people?
15   A.   He was standing by with other officers, but other than
16   that he was by himself.
17   Q.   And when you conversed with him, were you able to
18   understand what he was saying to you?
19   A.   I was.
20   Q.   What language was he speaking to you in?
21   A.   English.
22   Q.   Did he appear to understand you?
23   A.   Yes.
24   Q.   Did you know if at that point, did you know if Sergeant
25   Alvarado had already spoken to him?
```

Jury Trial: Volume 3 • Monday, August 13, 2018

1   A.   Not to my knowledge.  At the time I didn't know if they

2   had already spoken.

3   Q.   Okay.  And I'm going to have you turn to your book,

4   Exhibit 9.  It's probably just a piece of paper that refers to

5   a -- a clip.

6   A.   A clip, yeah.

7   Q.   So you testified before that Corporal Wach was with you

8   the entire morning.  Have you had an opportunity to review his

9   body cam footage as well as yours?

10  A.   Briefly, yes.

11  Q.   Okay.  And do you -- when you reviewed that footage, was

12  it a fair and accurate representation or depiction of what

13  occurred in the airport that day?

14  A.   That is correct.

15  Q.   All right.  And is it fair that this is about clip from 10

16  minutes and 58 seconds to 14 minutes and 7 seconds?

17  A.   Yes, ma'am.

18          MS. SMITH:  At this time, Your Honor, I move to admit

19  Exhibit 9.

20          MR. AMBERG:  No objection, Your Honor.

21          THE COURT:  Without objection, Exhibit 9 is admitted.

22          MS. SMITH:  May I publish?

23          THE COURT:  You may.

24          (Video with audio being played)

25  BY MS. SMITH:

1  Q.   Was there anything that struck you about his statements to

2  you?

3  A.   In -- in general or from --

4  Q.   From the investigatory point of view?

5  A.   The -- the one thing that struck me, it was myself and

6  Corporal Wach, when we went to go talk to him, we never

7  mentioned Laura.  We just said, "What's going on?" and he

8  automatically started referencing this, the female passenger

9  that was seated next to him on the flight.

10  Q.   And he indicated that she was, quote, "sleeping on my

11  knees"?

12  A.   Correct, that her head had fallen in his lap and she was

13  sleeping.

14  Q.   Did he also say in that video, quote, "I am very decent"?

15  A.   That is correct.

16  Q.   Was the defendant asked to write a statement?

17  A.   Yes, he was.

18  Q.   I'm going to have you turn in your exhibit book to No.

19  10.  Do you recognize that?

20  A.   Yes, I do.

21  Q.   What is that?

22  A.   This is the statement form that I gave to the defendant.

23          MS. SMITH:  And at this time, Your Honor, I move to

24  admit Exhibit 10.

25          MR. AMBERG:  No objection.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1382   Page 54 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

54

1        THE COURT:  Without objection, Exhibit 10 will be

2   admitted.

3   BY MS. SMITH:

4   Q.  I have a couple of questions before you -- before we

5   publish it.  Did you -- did you tell the defendant what to

6   write?

7   A.  No, ma'am.

8   Q.  So how did you -- how did this statement come to be?

9   A.  After talking with him, I handed him this form and I said,

10  "All right, so I just need you to fill out this form just of

11  your recollection of the accounts of what happened on this

12  flight."

13  Q.  Okay.  And -- all right.

14        MS. SMITH:  Let's publish Exhibit 10.  All right.

15  Let's zoom into the -- just the top part, without the -- yep,

16  right there, right there's good.

17  BY MS. SMITH:

18  Q.  Okay.  Is this the -- the Wayne County Airport Police

19  statement form that you use?

20  A.  Yes, ma'am.

21  Q.  All right.  And it says at the top left "Page 1 of 1."

22  You see that?

23  A.  Yes.

24  Q.  You can -- if it's easier to look in your -- in your book,

25  you can look at the book because it's the same --

1    A.   Okay.

2    Q.   -- same thing.

3         Okay.  Whose name appears on the name there?

4    A.   Prabhu Ramamoorthy.

5    Q.   And did he write that or did you write that?

6    A.   He wrote that.

7    Q.   Okay.  So just for the record, there's a number of things

8    that are redacted here.  When you took this statement, they

9    were filled in, is that right?

10   A.   That is correct.

11   Q.   Okay.  Let's look down where it says "Summary of

12   Statement."  I'm going to have you read that into the record

13   for the -- from the best of your ability.

14   A.   Okay.  "Today, got a flight from Las Vegas to Detroit.

15   One strange girl came to my near seat and twice she got out in

16   the middle of travel.  I was not feeling well and took tablet.

17   In fall travel, I was in deep sleep."

18        MR. AMBERG:  I -- you know, Your Honor, I'm going to

19   object to that, Your Honor, because I don't know if that's what

20   that says.  I mean if he's just guessing on what's said, then I

21   can't -- I don't think he can just read it.  I think that it

22   speaks for itself for the jury.

23        MS. SMITH:  No, we need to make a record of this and

24   it's appropriate for him to read it to best of his ability into

25   the record.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1384   Page 56 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

56

```
 1              THE COURT:  Well, the jury will have the exhibit.
 2     The exhibit is the evidence, ladies and gentlemen, not the
 3     witness's attempt to read the exhibit, and so you may read the
 4     exhibit and do your best to understand it.  This is just in
 5     order to present it to you.  So go ahead.
 6     A.   "I was in deep sleep.  Though my wife I come to know that
 7     she was sleeping on my knees and I'm not sure where I kept the
 8     hand on her.  She was hearing music and sending message to
 9     someone.  I believe she drank some alcohol, it's my assumption.
10     Around 5 -- 4 -- 5 -- 5:10 p.m. -- 5:10 a.m. suddenly she gone
11     out.  I later through my knowledge I didn't anything to her."
12     BY MS. SMITH:
13     Q.   Thank you.
14              MS. SMITH:  You can take that down.
15     BY MS. SMITH:
16     Q.   So after you spoke with the defendant, did you turn your
17     attention to the defendant's wife?
18     A.   That is correct.
19     Q.   And you can't tell me what she said to you, but did you
20     notice her demeanor?
21     A.   Yes, I did.
22     Q.   What was her demeanor like?
23     A.   Her demeanor was that she was very concerned for her
24     husband and that something was going on.
25     Q.   Did you inform her of the specific facts of this
```

1    investigation?

2    A.   No, I did not.

3    Q.   And did she have a lot to say, a little to say or

4    something different?

5    A.   She had a lot to say.

6    Q.   And was there anything that struck you about all of the

7    things that she had to say?

8    A.   Um --

9           MR. AMBERG:  I would object to that.  It's -- it's

10   either going to be a hearsay response or invites an inference

11   on hearsay.

12          MS. SMITH:  I'm not asking -- I'm not eliciting

13   hearsay, Your Honor.  I'm asking after she made the statement,

14   what was his impression from an investigatory standpoint.

15          THE COURT:  Well, you may testify if you took any

16   investigative steps after you spoke with Mr. Ramamoorthy's wife

17   but not mention anything that she said to you.  Go ahead.

18   A.   After speaking with both Mr. Ramamoorthy and his wife, it

19   seemed as though there was a similar story that appeared to be

20   somewhat rehearsed, although --

21          MR. AMBERG:  I would object to that, Your Honor.

22   There's no foundation for that at all.

23          THE COURT:  All right.  I -- that's sustained.

24          So you're allowed to testify if you took certain

25   steps afterward but not -- not to your opinions about what she

1    said.

2            MS. SMITH:  I'll move on, Your Honor.

3            THE COURT:  Go ahead.

4    BY MS. SMITH:

5    Q.   Did you have a second encounter with the defendant?

6    A.   Yes, I did.

7    Q.   And was this after talking to the defendant's wife?

8    A.   That is correct.

9    Q.   And at some point after speaking with both -- with Laura

10   and the defendant and the defendant's wife, was there a

11   decision made that the defendant was going to be arrested?

12   A.   Yes, that -- that Sergeant Alvarado informed myself that

13   this was a federal matter since it occurred in the air in

14   flight and that he would be taken into custody and observed

15   until the FBI could arrive.

16   Q.   Did you slap the handcuffs on him in the terminal in front

17   of everyone?

18   A.   No, I did not.

19   Q.   Why not?

20   A.   One, so it was a crowded area, also in front of his wife,

21   and then we were -- to be escorted back to my patrol vehicle,

22   he would be going down the jet bridge and outside, and those

23   staircase that goes from the jet bridge to the ground can be a

24   little wobbly, so to speak, and it was also icy conditions so

25   we didn't want him to fall or potentially hurt himself.  And

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1387   Page 59 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

59

1    then once we got him down to the vehicle is when he was

2    handcuffed.

3    Q.   Did you transport him then to your police building?

4    A.   Yes, ma'am.

5    Q.   Is that the 610 building?

6    A.   That is correct.

7    Q.   And while you were there, did you -- was he processed at

8    the airport police station?

9    A.   That is correct.

10   Q.   And when a -- what does it mean to be processed?

11   A.   To be processed, it was to be taken a mugshot to be

12   picture linked and then live scanned and have information

13   entered into the system under -- under -- under his picture and

14   then to be fingerprinted.

15   Q.   Did you see him getting fingerprinted?

16   A.   That is correct.

17   Q.   And was there also a DNA test done on his hands at that

18   time?

19   A.   Yes.

20   Q.   Do you remember if that was before or after he was

21   fingerprinted?

22   A.   To my recollection it was after.

23   Q.   Now, sometimes fingerprints are done with the ink on -- on

24   paper.  Was that the way this was done?

25   A.   No, ma'am.

1    Q.   How was this one done?

2    A.   There was a machine that would electronically read your

3    fingerprints, so we would take the defendant's hand and

4    individually place and roll each finger on a machine that would

5    read them, so to speak.

6    Q.   And at that point had you received any command to take --

7    let me rephrase that question.  At the point that he was doing

8    the fingerprint, is that normal in the routine of processing an

9    arrest?

10   A.   Correct.

11   Q.   And in -- in the -- in the process of the arrest, do you

12   every single time take -- try to get DNA samples?

13   A.   No, ma'am.

14   Q.   And so at this point when he's getting his fingerprints

15   done, had another officer who does the DNA testing showed up

16   yet?

17   A.   He did not show up yet.

18   Q.   Okay.  And so did somebody show up to take a DNA test?

19   A.   Eventually, yes.

20   Q.   And was that test done at the 610 building?

21   A.   That is correct.

22   Q.   And during that test did you observe the officer swabbing

23   a Q-tip on the defendant's hands?

24   A.   Yes, I did.

25   Q.   And during that time did you have to command him to take

1   his hands out of his pockets?

2   A.   Yes.

3   Q.   Do you recall how many times you had to tell -- do you

4   remember how many times that he had to be commanded to remove

5   his hands from his pockets during that test?

6   A.   I believe it was at least twice.

7   Q.   After that test was done, was he allowed to use the

8   bathroom?

9   A.   Yes.

10  Q.   And at this point had anybody come to take any kind of

11  fingernail clippings from him?

12  A.   No.

13  Q.   And when he used the bathroom, did you put gloves on him?

14  A.   Yes, we had him put on a pair of Latex gloves.

15  Q.   And what was the purpose of that?

16  A.   To -- if there was any DNA or evidence that could be

17  collected, to try to preserve that evidence.

18  Q.   When he was allowed to use the bathroom, did anybody stand

19  and watch him use the bathroom?

20  A.   Yes, Corporal Wach --

21  Q.   Okay.

22  A.   -- monitored him.

23  Q.   Was -- and was he watching him the whole time or was he

24  just standing in front of the door?

25  A.   He was watching him.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1390   Page 62 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

62

1   Q.   Okay.  Now, after that was done, is that when the

2   investigation was turned over to the FBI?

3   A.   Correct.  At that time we received notification that the

4   FBI had arrived and was taking over the investigation.

5   Q.   Now, at any time during this morning and your interaction

6   with the defendant did he indicate that he doesn't speak the

7   English language?

8   A.   No.

9   Q.   Did he ask for an interpreter?

10  A.   No.

11  Q.   Did he tell you he didn't understand what was happening?

12  A.   No, ma'am.

13  Q.   Did he tell you he didn't understand what he was saying?

14  A.   No, ma'am.

15  Q.   What you were saying to him?

16  A.   No, ma'am.

17        MS. SMITH:  No further questions at this time.  Thank

18  you.

19        THE COURT:  Thank you very much.

20        Any cross-examination?

21        MR. AMBERG:  Yes, Your Honor.  One second.

22        (Brief pause).

23                      Cross-examination

24  BY MR. AMBERG:

25  Q.   Good morning, Officer Chalmers.

 1    A.   Good morning, sir.

 2    Q.   How you doing today?

 3    A.   All right, sir.  Yourself?

 4    Q.   Well, I'm working.

 5    A.   We're here.

 6    Q.   We are here.

 7              I've got a few questions for you.  It sounds like you

 8    are no longer working at the Airport Authority.

 9    A.   That is correct.

10    Q.   Okay.  And what'd you say, Clinton Township?

11    A.   Plymouth Township.

12    Q.   Plymouth Township.  Okay.

13              As an officer?

14    A.   Yes, sir.

15    Q.   All right.  This happened back in the beginning of this

16    year, right?

17    A.   That's correct.

18    Q.   At that point in time, how long had you been an officer

19    for?

20    A.   Just over two months, sir.

21    Q.   Okay.  You were about as green as they get, right?

22    A.   Yes, sir.

23    Q.   And one thing I notice, and correct me if I'm wrong, was

24    that Corporal Wach was trying to show you how to do an

25    investigation like this, right?

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1392   Page 64 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

64

1   A.   Guidance, yes, sir.

2   Q.   Okay.  And is this the first time you did an investigation

3   like this up to that point?

4   A.   That is correct.

5   Q.   Okay.  So this is the first time you've interviewed people

6   about an alleged sexual assault?

7   A.   That's correct.

8   Q.   All right.  Now, the basis of your knowledge for how to do

9   all this stuff was from the academy, right?

10  A.   That is correct.

11  Q.   How many hours did you actually work on these types of

12  cases?

13  A.   Not able to recall.

14  Q.   Not very many, right?

15  A.   Yes, sir.

16  Q.   So this is really a new experience for you that night?

17  A.   That is correct.

18  Q.   Okay.  Now, I want to talk first about the game plan for

19  the investigation.  Who -- who was telling you what to do for

20  this investigation?

21  A.   Corporal -- I was with Corporal Wach for the majority of

22  the time, but initially when I first talked to Laura, that was

23  just by my chance of just me interacting with her, and then

24  afterwards, once we started to interact with the defendant

25  more, it was Sergeant Alvarado and Corporal Wach.

```
1   Q.   Okay.  So your initial interview with her, with the
2   complainant, that was brought on by yourself?
3   A.   Myself and Corporal Wach who was standing by, yes.
4   Q.   Okay.  Now, I want to talk about when you speak with Mr.
5   Ramamoorthy.
6   A.   Yes, sir.
7   Q.   And that's you and Corporal Wach are together the whole
8   time speaking with him, right?
9   A.   Yes, sir.
10  Q.   Okay.  By that time Sergeant Alvarado had already spoke
11  with him?
12  A.   He may have.  I did not know.
13  Q.   Okay.  Do you know what Sergeant Alvarado told Mr.
14  Ramamoorthy?
15  A.   I do not.
16  Q.   Okay.  Do you think that what Sergeant Alvarado might have
17  told Mr. Ramamoorthy might have had some reason behind the
18  answers he was saying to your questions?
19          MS. SMITH:  Objection.  Calls for speculation.
20          MR. AMBERG:  I'll withdraw the question, Your Honor.
21          THE COURT:  Why don't you rephrase.  Thank you.
22          MR. AMBERG:  Thank you.
23  BY MR. AMBERG:
24  Q.   The point is this.  Sergeant Alvarado had numerous
25  contacts with Mr. Ramamoorthy before the interview that you
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1394   Page 66 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

66

1    conducted with him?

2           MS. SMITH:  Objection.  The --

3           MR. AMBERG:  If he knows.

4           MS. SMITH:  -- defense counsel is testifying.

5           THE COURT:  Please -- please -- just a moment.  I

6    understand the objection.  Mr. Amberg, put your statement in

7    the form of a question please.

8           MR. AMBERG:  Yes, Your Honor.

9    BY MR. AMBERG:

10   Q.  Isn't it true that Sergeant Alvarado had numerous contacts

11   with Mr. Ramamoorthy before your interview with him?

12   A.  All that I knew at the time is that he was standing by

13   with Mr. Ramamoorthy.  I don't know, I can't speak to whether

14   they had contact or anything of that nature.

15   Q.  Okay.  Now, you were with Mr. Ramamoorthy for a

16   considerable period of time, and I -- and before you answer the

17   question, it was from the terminal until the police station,

18   right?

19   A.  Yes, sir.

20   Q.  Okay.  During that entire time up until when he had the

21   DNA testing done on his fingers, he never went to the bathroom,

22   right?

23   A.  To my recollection, that is correct.

24   Q.  All right.  You never saw him wash his hands?

25   A.  No, sir.

```
 1   Q.   Okay.  You never saw him take a Wet-Nap and try to wipe

 2   his hands off, right?

 3   A.   No, sir.

 4   Q.   Okay.  And this is something that you and Corporal Wach

 5   were cognizant about, right?

 6   A.   Yes, sir.

 7   Q.   Okay.  Specifically throughout this process you and

 8   Corporal Wach were talking to each other about the DNA testing,

 9   right?

10   A.   Just that we needed to preserve whatever evidentiary

11   evidence there could be, that was it, and that the FBI and then

12   Corporal Denio would be coming to take swabs.

13   Q.   Okay.

14   A.   That's all we knew.

15   Q.   Something to the effect of Mr. Ramamoorthy wouldn't even

16   go into a cell until the DNA test was done, right?

17   A.   That is correct.

18   Q.   Okay.  Now, here's the thing.  You've been trained about

19   the preservation about DNA, right?

20   A.   Yes, sir.

21   Q.   Okay.  And you certainly had that training prior to this

22   incident, right?

23   A.   Yes, sir.

24   Q.   You never would have jeopardized the potential DNA on Mr.

25   Ramamoorthy's hands, right?
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1396   Page 68 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

68

1    A.   Yes, sir.

2    Q.   So the things that you did ensured that if there was DNA

3    on his hands, it should have been there?

4         MS. SMITH:  Objection.  He's asking the witness to

5    speculate again.

6         MR. AMBERG:  I -- I --

7         THE COURT:  Sustained.

8         MR. AMBERG:  I can rephrase that, Your Honor.

9    BY MR. AMBERG:

10   Q.   You did everything in your power to ensure that the DNA

11   evidence on his hand was preserved, right?

12   A.   The -- if there was DNA evidence, yes.

13   Q.   Okay.  Now, the thing is is that we can see it with

14   this -- what you guys do.  Eventually when Mr. Ramamoorthy did

15   want to go to the bathroom after the DNA sampling was done, you

16   put gloves on his hands, right?

17   A.   Yes, sir.

18   Q.   If you were concerned that the DNA would have been taken

19   off of his hands from the time you were at the terminal until

20   the time the testing was taken, you could have put the gloves

21   on his hands, right?

22   A.   Possibly, yes.

23   Q.   Okay.  You got gloves in that police vehicle, right?

24   A.   Yes, sir.

25   Q.   I mean tons of 'em, right?

1    A.   Yes, sir.

2    Q.   You're not required to do that though, are you?

3    A.   No, sir.

4    Q.   Because DNA's just going to stay on there.

5         MS. SMITH:  Objection.

6         MR. AMBERG:  Based on his training.  Testified he got

7    trained about it.

8         THE COURT:  Why don't you ask him if he's had

9    training on it.  Sustained.

10   BY MR. AMBERG:

11   Q.   In your training, are you taught for DNA preservation that

12   you're supposed to put gloves on everybody, on the person

13   that's the suspect?

14   A.   I can't speak to that, sir.

15   Q.   Okay.  But clearly if you remembered that, you probably

16   would have put the gloves on him, right?

17   A.   Yes, sir.

18   Q.   Okay.  And the times that you saw him with his hands in

19   his pockets and things like that, that didn't cause you to want

20   to put gloves on his hands, right?

21   A.   No, sir.

22   Q.   Okay.  That's because you weren't concerned about DNA

23   preservation?

24   A.   No, sir.

25   Q.   Okay.  You thought that the DNA preservation would be just

1   fine?

2   A.   If there was any, yes, sir.

3   Q.   Okay.  Another thing that you and Corporal Wach noticed

4   was that my client's eyes were bloodshot, right?

5   A.   I don't recall that specifically.

6   Q.   You guys even said that to each other, right?

7   A.   I do not recall.

8   Q.   Did you watch your body cam videos or Corporal Wach's body

9   cams video before you came in here?

10  A.   I went over mine, sir.

11  Q.   Okay.  Did you watch his?

12  A.   No, sir.

13  Q.   Because him and you were talking to each other the whole

14  time, right?

15  A.   That's correct.

16  Q.   Okay.  So is it possible that you did make an observation

17  that Mr. Ramamoorthy's eyes were bloodshot?

18  A.   It is possible, sir.

19  Q.   Okay.  And that either you or Corporal Wach, one of you

20  remarked that he took medication?

21  A.   Yes, sir.

22  Q.   Okay.  Did he seem to be out of it?

23  A.   No, sir.

24  Q.   Okay.  He was coughing at times during this, wasn't he?

25  A.   I believe so, yes, sir.

Case 2:18-cr-20027-TGB-MKM  ECF No. 84  filed 03/05/19  PageID.1399  Page 71 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

71

1    Q.   Okay.  Looked like he might be sick?

2    A.   Possibly a cold, but again, can't speak to that.

3    Q.   All right.  Now, you said you could understand him, right?

4    A.   There was a -- there was somewhat of a language barrier,

5    but predominantly he could be understood.

6    Q.   Okay.  What would happen is when you'd ask him a question,

7    sometimes his answers were hard to understand, right?

8    A.   Yes, sir.

9    Q.   Okay.  And that's because it was very clear that English

10   was not his first language?

11   A.   Yes, sir.

12   Q.   Okay.  Did you ask him what language he spoke?

13   A.   No, sir.

14   Q.   Did you ask if he wanted an interpreter?

15   A.   No, sir.

16   Q.   Okay.  Do you think it should be the duty of the

17   investigative person to ask for that?

18   A.   If it's apparent that he cannot speak the language, yes,

19   sir.

20   Q.   Well, isn't it your responsibility as the officer

21   conducting the interview to make sure that this person

22   understands everything you're asking about?

23   A.   That's correct.

24   Q.   Okay.  But you didn't ask him if he wanted a translator?

25   A.   No, sir.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1400   Page 72 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

72

1    Q.   Okay.  Now, it sounds like the DNA was done before the FBI

2    was even involved, right?

3    A.   I have no idea if the FBI -- FBI was involved at this

4    point.  I just know that we were supposed to be holding him

5    till someone could come take swabs.

6    Q.   Okay.

7    A.   And then -- and when the FBI would show up and he'd be --

8    the investigation would be turned over.

9    Q.   Okay.  So was that your understanding that the airport

10   police department was the -- the body that requested the DNA

11   sampling?

12   A.   No, it was my understanding that it was the FBI.

13   Q.   Okay.  Now, when Mr. Ramamoorthy went to the restroom, you

14   made sure those gloves were on him, right?

15   A.   Yes, sir.

16   Q.   Okay.  And was there additional testing that was done with

17   him afterwards?

18   A.   I was there for the swabs.  Anything that occurred after

19   that, I don't know.

20   Q.   Okay.  Did you preserve the complainant's clothes?

21   A.   I did not, sir.

22   Q.   Okay.  Why not?

23   A.   She was brought to the police station.  After that I had

24   no interaction with her besides talking with her in the -- in

25   the terminal.

1    Q.   Did anybody suggest that might be a good idea?

2    A.   Not to my understanding.

3    Q.   Okay.  One thing that -- when you were there at the

4    terminal when you and Corporal Wach were speaking about the

5    complainant is that she hadn't changed her clothes or gone to

6    the bathroom so there should be DNA, right?

7    A.   I believe so, yes, sir.

8    Q.   Okay.  So you guys were cognizant even then about DNA on

9    the complainant?

10   A.   Yes, sir.

11   Q.   Okay.  Did -- but you never -- you didn't take any steps

12   to preserve DNA with her?

13   A.   No, sir.

14   Q.   Okay.  Did you ask anybody else to do that?

15   A.   I did not, sir.

16   Q.   Okay.  During your experience as an officer there in the

17   two months that you worked there, were most of your cases about

18   alcohol?

19   A.   No, sir.

20   Q.   They weren't?

21   A.   There was a few but not the majority.

22   Q.   Up until that point, how many intoxicated people had you

23   dealt with in your job in those two months?

24   A.   Four, five.

25   Q.   Okay.  So you didn't have a large foundation to base

```
 1    your -- your knowledge of whether or not the complainant was
 2    intoxicated, right?
 3    A.   Not from that job, but I've had prior experience.
 4    Q.   Okay.  As a police officer?
 5    A.   Not as a police officer.
 6    Q.   As what?
 7    A.   I managed a college bar.
 8    Q.   Oh, okay.  So you know all about people that are drunk,
 9    right?
10    A.   Not -- not all about it, just plenty of interaction.
11    Q.   Here -- here's the thing.  You've had plenty of
12    interaction with drunk people, right?
13    A.   Yes.
14    Q.   Okay.  Drunk people lie to you, right?
15             MS. SMITH:  Objection, Your Honor.
16             THE COURT:  What's the objection?
17             MS. SMITH:  Speculation.
18             MR. AMBERG:  He -- I think he can testify in his
19    experience whether drunk people lie to him or not.  He was a
20    college bouncer at a bar.
21             THE COURT:  Just a moment.  You're asking for a
22    generalized answer as to all situations.  Why don't you narrow
23    it down to his experience.
24             MR. AMBERG:  Sure.
25    BY MR. AMBERG:
```

1    Q.   In your experience, you've had people in that college bar

2    that were drunk lie to you?

3    A.   Yes.

4    Q.   Yes.  You've had them misstate the truth to you, right?

5    A.   Yes.

6    Q.   You've had them describe things that have happened in a

7    way that you knew wasn't true?

8    A.   Yes.

9    Q.   And that's because that's what alcohol does to a person?

10   A.   To some people, yes.

11   Q.   Yes.  Even if somebody thinks something happened one way,

12   it's because of alcohol sometimes that they think that way?

13   A.   Yes, sir.

14   Q.   Okay.  And these are all things that you've experienced

15   just sitting there at the bar watching this all unfold, right?

16   A.   Yes, sir.

17   Q.   Sometimes people that drink a whole lot can appear to be

18   totally sober, right?

19   A.   Yes, sir.

20   Q.   Sometimes people that drink don't even really smell like

21   it, right?

22   A.   It's possible, yes, sir.

23   Q.   But they could be stone cold drunk, right?

24   A.   Yes, sir.

25   Q.   Now, you as an officer in the academy have learned all

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1404   Page 76 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

76

1    sorts of tests and things like that to determine whether

2    somebody is intoxicated or not, right?

3    A.   Yes, sir.

4    Q.   Okay.  Did you do anything on the complainant as far as

5    those types of tests are concerned?

6    A.   No, sir.

7    Q.   But you knew she'd been drinking, right?

8    A.   Yes, sir.

9    Q.   Okay.  Didn't you want to explore that to see if maybe the

10   alcohol was affecting her story?

11   A.   We did not do that, sir.

12   Q.   Okay.  Maybe you should have done that next time or you

13   would do that next time?

14   A.   Possibly, sir.

15   Q.   Okay.  Thank you very much.

16        MR. AMBERG:  One second, Your Honor.

17        (Brief pause)

18        No further questions, Your Honor.

19        THE COURT:  Thank you very much.

20        Any redirect?

21        MS. SMITH:  Yes, thank you.

22                      REDIRECT EXAMINATION

23   BY MS. SMITH:

24   Q.   Officer Chalmers, in your interactions with Laura, did she

25   give you any reason to believe that you ought to investigate

1    her further?

2    A.   No, ma'am.

3    Q.   The medication that the defendant told you that he was on,

4    that was one over-the-counter Tylenol tablet, is that right?

5    A.   Yes, ma'am.

6    Q.   And he told you that he took it about 2:00 or 3:00 in the

7    morning before, is that right?

8    A.   I believe so.

9    Q.   Now, when you took the defendant out into your police car,

10   you talked about how you didn't handcuff him.  What was the

11   weather like that day?

12   A.   It was cold, icy, wintery conditions.

13   Q.   So was it -- okay.  And did you watch the defendant go

14   into the car?

15   A.   I did.

16   Q.   Did he have to use the handrail?

17   A.   No.

18   Q.   You're not qualified to do DNA interpretation, are you?

19   A.   No, ma'am.

20   Q.   And so you testified earlier about the defendant having

21   his hands in his pockets.  Do you recall that testimony?

22   A.   Yes.

23   Q.   And that was actually occurring during the DNA swabbing,

24   is that right?

25   A.   Yes.

1    Q.   So during the DNA swabbing twice you had to command him to

2    remove his hands from his pockets?

3    A.   Yes, ma'am.

4    Q.   And you weren't with the defendant on a plane, were you?

5    A.   I was not.

6    Q.   And when -- I think you testified you met him in the

7    terminal after the flight had landed?

8    A.   Right.  After I finished talking with Laura, he was

9    standing by with other officers.

10   Q.   So you didn't know what he was doing on the plane, right?

11   A.   No, ma'am.

12   Q.   And finally, in terms of your interactions with him, was

13   there anything that he say or did that would make you think

14   that you ought to call for a translator?

15   A.   No, ma'am.

16   Q.   Because did you under -- did you and he have an

17   understanding when you spoke back and forth?

18   A.   Yes, ma'am.

19   Q.   And he was clear and logical in his answers?

20   A.   Yes, ma'am.

21         MS. SMITH:  No further questions, Your Honor.

22         THE COURT:  All right.  Thank you very much.

23         So, ladies and gentlemen, if you have any questions

24   for this witness, you can write them down.  Very good.  Thank

25   you very much.  Counsel approach.

```
 1                 (Sidebar discussion as follows):

 2            THE COURT:  A juror asks, "Approximately how much

 3   time passed from flight arrival to being processed for DNA?"

 4   Are there any objections?

 5            MS. SMITH:  No objection.

 6            MR. AMBERG:  No.

 7            THE COURT:  We have another question, we have another

 8   question that says, "Can the process of taking fingerprints

 9   take DNA off?"

10            MS. SMITH:  I don't know that he's going to be able

11   to answer that question.

12            THE COURT:  I'll ask him --

13            MS. SMITH:  You can ask it.

14            THE COURT:  -- based on his training or experience if

15   he knows that.

16            MS. SMITH:  Okay.

17            MR. AMBERG:  All right.

18            THE COURT:  All right.

19            MS. SMITH:  One thing I'd like to -- to mention is

20   our next witness is Laura.  It's going to take --

21            THE COURT:  We'll take a break before that.

22            MS. SMITH:  Thank you.  Okay.

23            MR. AMBERG:  And the only thing I would ask Your

24   Honor is with Officer Chalmers, I also subpoenaed him as well,

25   and I might want to keep him to maybe as a rebuttal witness.
```

```
 1              THE COURT:  Well, he can -- he can be recalled as for
 2   rebuttal if you have --
 3              MR. AMBERG:  Okay.  Just to --
 4              THE COURT REPORTER:  Wait, I can't hear you.
 5              MR. AMBERG:  I just want to make sure when -- when
 6   you say he's excused, that he knows that I would like him to
 7   stay here.
 8              THE COURT:  I'll mention that.
 9              MR. AMBERG:  Thank you, Your Honor.
10              THE COURT:  We have another question.  A juror asks,
11   "The idea that the DNA evidence on the defendant's hands would
12   still be preserved after he had had his fingerprints taken and
13   his hands in his pockets, is that based on your own assumption
14   or had you learned that during training?"
15              MS. SMITH:  I think that's a fair question.  He can
16   answer it to the best of his ability.
17              MR. AMBERG:  Sure.
18              THE COURT:  All right.  I will ask all of these
19   questions then and you may ask any followup questions.
20              MS. SMITH:  Thank you.
21              (End of sidebar discussion)
22              THE COURT:  Officer Chalmers, we have a number of
23   questions from the jury.  First a juror asks, "Approximately
24   how much time passed from flight arrival to being processed for
25   DNA?"
```

1        THE WITNESS:  Before being processed for DNA, I

2    wanted to -- I want to say it was at least -- at least two

3    hours minimum.  I can't exactly recall.

4        THE COURT:  Between the time that the flight arrived

5    and the time of being processed for DNA?

6        THE WITNESS:  For the swab collection, yes.

7        THE COURT:  All right.  A juror also asks, "Can the

8    process of taking fingerprints take DNA off?," if you know.

9        THE WITNESS:  Sometimes when you are trying to take

10   an individual's fingerprints, they need to be rehydrated, so

11   you will have a squirt bottle of water just to have them rub

12   between their fingers and in that case to roll it because it

13   won't be able to pop up on the machine, and that would be --

14   that could possibly remove DNA evidence but...

15       THE COURT:  Do you know if that happened in this case

16   while the fingerprints were being taken?

17       THE WITNESS:  Yes, water was placed on his

18   fingerprints to help them rehydrate.

19       THE COURT:  A juror also asks, "The idea that the DNA

20   evidence on the defendant's hands would still be preserved

21   after he had had his fingerprints taken and his hands in his

22   pockets, is that based on your own assumption or had you

23   learned that during training?"

24       THE WITNESS:  All that we knew at the time is that

25   there was the potential that there may be evidence and to try

```
 1    to preserve if there was any.
 2            THE COURT:  Does counsel wish to ask any followup
 3    questions?
 4            MS. SMITH:  No thank you, Your Honor.
 5            MR. AMBERG:  Yes, Your Honor.
 6                       RECROSS-EXAMINATION
 7    BY MR. AMBERG:
 8    Q.  Going to talk, Officer, about the -- the fingerprint
 9    testing.
10    A.  Yes, sir.
11    Q.  Are you a hundred percent sure that water was put on his
12    fingerprints?
13    A.  I believe so, yes, sir.
14    Q.  Are -- are you a hundred percent sure or not?
15    A.  I'm not a hundred percent.
16    Q.  Okay.  Did you watch that video at all before you came in
17    here to testify about that?
18    A.  (No response)
19    Q.  Okay.  So it's fair --
20            THE COURT REPORTER:  Wait, wait.  I didn't hear your
21    answer.
22            MR. AMBERG:  I'm sorry.
23            THE COURT REPORTER:  I didn't hear your answer.
24            THE WITNESS:  No, sir.
25    Q.  Okay.  So it is entirely possible that that did not
```

1    happen?

2    A.   It is possible.

3    Q.   Okay.  Now, as far as that goes with doing the fingerprint

4    testing, this is something where the fingers are just placed on

5    a glass sheet, right?

6    A.   Yes, sir.

7    Q.   Okay.  You are with Corporal Wach, right?

8    A.   Yes, sir.

9    Q.   You -- you and him have both discussed numerous times that

10   DNA testing is going to be happening with Mr. Ramamoorthy,

11   right?

12   A.   Correct.

13   Q.   Do you think for one second you would have jeopardized

14   that DNA test result by doing the fingerprints?

15   A.   At that time I -- I -- I wouldn't have, but I can't

16   exactly recall if we did it or not, but we generally do 'cuz we

17   have a lot of problems getting fingerprints.

18   Q.   Okay.  This is my question.

19   A.   Yes, sir.

20   Q.   During this entire investigation do you believe that you

21   complied with what you had to comply with to ensure this DNA

22   would be a good sample if it was on the fingers and the hands?

23   A.   Yes, sir.

24   Q.   Okay.  And during the fingerprints, that was something

25   that would -- in your mind when you did this, that would not

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1412   Page 84 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

84

```
 1    make that DNA sample any less likely, right?
 2    A.   Yes, sir.
 3    Q.   Right.  Because you wouldn't have done it had you thought
 4    that?
 5    A.   Yes, sir.
 6    Q.   Okay.
 7              MR. AMBERG:  No further questions, Your Honor.
 8              THE COURT:  Any followup?
 9              MS. SMITH:  No thank you.
10              THE COURT:  All right.  And so Officer Chalmers,
11    there's always a chance you might be recalled, but for now may
12    this witness be excused?
13              MS. SMITH:  Yes, thank you.
14              MR. AMBERG:  Your Honor, per what we discussed, but
15    yes.
16              THE COURT:  All right.  The witness may be excused
17    subject to possible recall for rebuttal if necessary.  All
18    right.  May -- if this witness may be excused, thank you very
19    much for your testimony, sir.  You may step down.
20              (Witness excused at 10:42 a.m.)
21              THE COURT:  Ladies and gentlemen, I think what we'll
22    do is we'll take a brief break at this point in our proceedings
23    for about 15 minutes, and we'll be back on the record in
24    15 minutes just as our morning break.
25              All rise for the jury.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1413   Page 85 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

85

```
 1              (Jury excused at 10:42 a.m.)
 2          THE COURT:  You may be seated.
 3          Are there any matters that either counsel wishes to
 4  raise before we take our break?
 5          MS. SMITH:  No, Your Honor.
 6          MR. AMBERG:  No, Your Honor.
 7          THE COURT:  So let's briefly go over the expected
 8  witness lineup here.
 9          MS. SMITH:  Yes, Your Honor.  Our next witness is
10  going to be Laura.  And then after that we intend on calling
11  Marcy Plaza, she's the DNA laboratory scientist.  And just as a
12  side note, I would point out that we don't use the term
13  "expert" in the courtroom.  I know the Court knows that.  So
14  we'll just refer to her as a scientist.
15          That's where we're at in terms of today's lineup.  We
16  have two additional witnesses on our list -- I'm sorry, I take
17  that back.  After -- after Laura is Corporal Umfleet.  I
18  apologize for that error.  So Laura is next and then Corporal
19  Umfleet and then Marcy Plaza.
20          And then we have the SAFE nurse, Erin Ivaniszyn.  She
21  is unavailable to testify today because of a death in her
22  family.  Should we get -- we don't expect to finish through
23  these next three witnesses before the day is out, but if we're
24  close to the end of the day, I would ask for the Court's
25  indulgence, that she will absolutely be here tomorrow morning
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1414   Page 86 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

86

 1    first thing.  And then we have Special Agent Aaron Erkkinen and
 2    then we will likely be prepared to rest.
 3            THE COURT:  All right.  Thank you very much.  Very
 4    well.  If there's nothing further, we'll take our 15-minute
 5    break.  Be back on the record in about 15 minutes.
 6            MS. SMITH:  Thank you.
 7            (Court in recess at 10:45 a.m.)
 8            (Proceedings resumed at 11:05 a.m., all parties
 9            present, jury not present)
10            THE LAW CLERK:  Court recalls Case No. 18-20027,
11    United States of America versus Prabhu Ramamoorthy.
12            Counsel, will you please replace your appearances on
13    the record?
14            MS. JAWAD:  Yes, Your Honor.  Amanda Jawad and Maggie
15    Smith on behalf of the United States.  With us is Meghann
16    O'Connor, a paralegal from our office, and Special Agent Kyle
17    Dodge is with us as well from FBI.
18            THE COURT:  Good morning.
19            MR. AMBERG:  And good morning, Your Honor.  Jim
20    Amberg again on behalf of Mr. Ramamoorthy who is standing to my
21    right, and to his right is Mr. Vijay, his interpreter.  To my
22    left is Victor Mansour, co-counsel on the case.
23            MR. MANSOUR:  Good morning, Judge.
24            THE COURT:  Good morning everyone.
25            Are we ready for the jury?

```
 1              MS. SMITH:  Yes.  Would you like me to bring her in
 2    now or call her in after the jury is seated?
 3              THE COURT:  You can bring her now if you wish.
 4              MS. SMITH:  Thank you.  Please come forward.
 5              THE COURT:  All right.  Let's bring in the jury
 6    please.  You can stand right there if you would.  All rise for
 7    the jury.
 8              (Jury entered the courtroom at 11:07 a.m.)
 9              THE COURT:  Good morning again, ladies and gentlemen.
10    You may be seated.
11              All right.  Call your next witness please.
12              MS. SMITH:  Thank you.  The United States calls Laura
13    to the witness stand.
14              THE COURT:  Will you raise your right hand please?
15                    L A U R A   E S Q U E D A
16    was thereupon called as a witness herein, and after being
17    first duly sworn to tell the truth and nothing but the truth,
18    testified on her oath as follows:
19              THE WITNESS:  Yes.
20              THE COURT:  You may be seated.  And let me just
21    remind both our lawyers and our witness to please keep your
22    voice up, speak into the microphone so that all the members of
23    the jury can hear you, and so thank you very much.
24              You may proceed.
25              MS. SMITH:  Thank you, Your Honor.
```

```
1                      DIRECT EXAMINATION
2    BY MS. SMITH:
3    Q.   Good morning.
4    A.   Good morning.
5    Q.   Using just your first name, can you introduce yourself to
6    the jury?
7    A.   My name is Laura.
8    Q.   And how old are you?
9    A.   Twenty-three.
10   Q.   Did you graduate from high school?
11   A.   Yes, I did.
12   Q.   And what year did you graduate high school?
13   A.   2013.
14   Q.   Are you currently employed?
15   A.   Yes.
16   Q.   What do you do for a living?
17   A.   I work full-time freelance.  I'm privately contracted by
18   multiple agencies as a commercial print and promotional model.
19   Q.   I'm going to ask you to slow down just a little bit
20   because our court reporter is trying to take everything down.
21          So let me make sure I got that right.  You said that
22   you work full time as a freelance.  Are you a model?
23   A.   Yes.
24   Q.   And so do you do print ads?
25   A.   Yes.
```

1    Q.   And do you do other types of advertising?

2    A.   Yes.

3    Q.   Are you also involved in shows and pageants?

4    A.   Yes.

5    Q.   Do you direct some of those?

6    A.   I do.

7    Q.   Do you work on -- do you work at various auto shows around

8    the country?

9    A.   I have in the past traveled the auto show circuit full

10   time.

11   Q.   So there's more than just the International Auto Show down

12   here at Cobo Hall?

13   A.   Yes.  That is the main one out of the five globals, but we

14   travel all across North America.

15   Q.   And what do you do for those auto shows?

16   A.   When I was working the auto shows and still other than

17   that in other programs, I work as an automotive product

18   specialist.

19   Q.   On the -- in the -- in the auto show circuit, if you will,

20   the -- are there a group of people that generally travel to

21   each show across the country?

22   A.   Across the board this industry is -- is contracted.  We're

23   all freelance so you're assigned for the year.  You usually

24   work with the same team so it is the same people that travel

25   for the season for each team.

1   Q.   Do you -- do you fly on an airplane frequently?

2   A.   Yes, for -- not just for automotive work but for others as

3   well like theater acting and other promotionals and print work.

4   Q.   So your work takes you outside the State of Michigan

5   frequently?

6   A.   Yes.

7   Q.   Are you frequently flying by yourself?

8   A.   Mostly if it's for work, sometimes they'll put us on

9   flights with people we're working with, but I'm -- it's -- it's

10  what I'm very -- I fly by myself a lot as well.

11  Q.   How about at nighttime, how frequently do you fly at

12  night?

13  A.   When it's something that I'm producing or directing, I

14  will.  Other than that, it's -- it's business hours for

15  flights.

16  Q.   Do you have a preference for flying during the day or

17  night?

18  A.   I prefer the day.

19  Q.   I'm going to direct your attention to January 2nd, 2018.

20  Were you in San Diego that -- that morning?

21  A.   Yes.

22  Q.   What were you doing in San Diego?

23  A.   I was in San Diego for the San Diego Auto Show.  I wasn't

24  working.  I was just visiting my boyfriend who was working.  So

25  I did fly --

```
 1                THE COURT REPORTER:  I'm sorry, you've got to keep
 2      your voice up.
 3                THE WITNESS:  Sorry.
 4                THE COURT REPORTER:  You did what?
 5                THE WITNESS:  I was in San Diego visiting my
 6      boyfriend who was working the auto show.
 7                THE COURT REPORTER:  Then you said, "So I did," and
 8      then you trailed off.
 9                THE WITNESS:  Oh, sorry.  So -- so I did fly by
10      myself on that one.
11      BY MS. SMITH:
12      Q.   You flew by yourself out to San Diego?
13      A.   Yes.  That wasn't for work.
14      Q.   And you didn't fly with your boyfriend out there?
15      A.   No.
16      Q.   Why not?
17      A.   It was last minute.  I wasn't booked or working, and I
18      just decided to go last minute to spend the holiday with him.
19      Q.   Do you -- were you coming back home on January 2nd to
20      Detroit?
21      A.   Yes.
22      Q.   And were you on the same flight or separate flights?
23      A.   Separate flights.
24      Q.   And why weren't you flying together on the way home?
25      A.   Because his is booked through work and mine was separate,
```

1   so separate entirely flights.

2   Q.   Do you remember what time his flight was originally

3   supposed to leave San Diego?

4   A.   It was originally early in the morning, but we woke up

5   late and it ended up being a little bit later in the afternoon.

6   Q.   Okay.  And what was your flight plan for the day?

7   A.   My plan was my flight was scheduled for later.  I was just

8   going to check my bags and hang out in San Diego for the day

9   when he left, but when he missed his flight we went to the

10  airport and decided that we would just kind of hang out

11  together until his next flight and mine.

12  Q.   Okay.  Was your original flight plan from San Diego to

13  Detroit without stopping or was there going to be a layover?

14  A.   There was a layover in Vegas.

15  Q.   So do you recall about approximately what time the Vegas

16  to Detroit flight was supposed to take place?

17  A.   That would have been late, late at night.  I can't recall

18  the time

19  Q.   Was it a red-eye flight?

20  A.   Yes.

21  Q.   And does red-eye mean an overnight flight?

22  A.   Yes.

23  Q.   So you testified earlier that the initial plan was that

24  your boyfriend was going to get an earlier flight and you woke

25  up late?

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1421   Page 93 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

93

1    A.   Mm-hmm, yes.

2    Q.   So what did you decide to do instead?

3    A.   So we decided to go to the airport together and see if he

4    had -- could get on a flight later that day sometime closer to

5    mine and we were just going to hang out at the airport

6    together.

7    Q.   So was he trying to get a standby flight?

8    A.   Yes.

9    Q.   Do you recall what you were wearing that day?

10   A.   Yeah.  I started in my jeans and then this crop top that

11   he got me for Christmas, but then after we were there I changed

12   into a blue button-up.

13   Q.   Okay.  Tell me about your jeans.

14   A.   They're kind of like stretchy, bigger, like a size too

15   big, with rips, just comfortable, kind of messy travel jeans.

16   Q.   They were loose at the top?

17   A.   Yes.

18   Q.   And did that make them more comfortable for you for flying

19   purposes?

20   A.   Yes.

21   Q.   And were you wearing underwear that morning?

22   A.   No.

23   Q.   What is the reason that you didn't have underwear on?

24   A.   I have started not wearing underwear when I started doing

25   pageants just because of outfit changes and everything, it just

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1422   Page 94 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

94

1   became easier and then I just kept -- kept with that.  It's

2   more comfortable.

3   Q.   So is there something about the designer's preference for

4   whether or not you have something on underneath their clothes?

5   A.   About -- it's just about the lines.  Usually you'll be

6   able to see some indent or -- or color, so it's just easier to

7   not.

8   Q.   To not wear any?

9   A.   To not wear any, yeah.

10  Q.   And is that common in your line of work of modeling?

11  A.   It's very common in -- in pageants definitely with quick

12  outfit changes and having to do everything, that's extremely

13  common.

14  Q.   You talked about having a crop top shirt on.  Did you

15  change your shirt sometime before you boarded the Las Vegas

16  flight?

17  A.   I changed my shirt sometime after I got to the San Diego

18  airport.

19  Q.   Okay.  And what was the reason for that?

20  A.   I -- I was wearing it because my boyfriend got it for me,

21  but it was pretty loose on the shoulders and it was a little

22  too short so it wasn't good to move in and functioning for

23  travel.

24  Q.   So what did you put on instead?

25  A.   So instead I put on the button-up, a blue button-up top

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1423   Page 95 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

95

1    that was just at the top of my luggage.

2    Q.   Okay.  And how do you normally wear that blue button-up

3    top?

4    A.   I usually tie it.  Most of my tops I just cut or tie into

5    a little knot to make them crop top or to fit better.

6    Q.   It looks like you're kind of making a knot at your

7    waistline?

8    A.   Oh, yeah.  I just gather the bottom of the shirt and tie

9    it.

10   Q.   Did you bring a blanket with you for the flight?

11   A.   I did.

12   Q.   What kind of blanket was that?

13   A.   It was kind of like a -- a bigger throw blanket, it was

14   gray.  I just got it for Christmas.  It was really fluffy.

15   Q.   And what -- I was just going to -- you took my next

16   question.  What kind of consistency was that blanket?

17   A.   Yeah, it was a nice soft, fluffy winter blanket.

18   Q.   Did you wear a jacket?

19   A.   No.

20   Q.   Why not?

21   A.   Oh, it was too warm.

22   Q.   In San Diego?

23   A.   Yeah.

24   Q.   All right.  Directing your attention to the San Diego

25   Airport, are you familiar with this airport?

1    A.   That was my first time at the San Diego Airport.

2    Q.   Is it big or small?

3    A.   It was very small.

4    Q.   And did you eat lunch there?

5    A.   I did.

6    Q.   And who did you have lunch with there?

7    A.   When I first arrived, I had lunch with my boyfriend, and

8    then he -- until he left, and then I ate later by myself.

9    Q.   How soon after you had lunch did he leave for his flight?

10   A.   It had to have been within the hour.

11   Q.   And when you say within the hour, are you talking about

12   within the lunch hour approximately?

13   A.   Within the hour of us eating after he -- after we got

14   done, probably 45 minutes to an hour after he left.

15   Q.   Okay.  Do you eat lunchtime at a normal time of day like

16   noon or 11:30 or somewhere around there?

17   A.   Yeah, it was -- it was probably before 2:00, sometime

18   between 12:00 and 2:00.

19   Q.   Okay.  Did he leave for his flight sooner than you both

20   anticipated?

21   A.   Yeah.  We thought that his next flight that he got would

22   have -- could have been a little bit later, but it happened to

23   be immediate.

24   Q.   And so your -- so your flight wasn't until about 8:40 that

25   night , is that right?

1    A.   Yeah.

2    Q.   So were you alone in the airport with a number of hours to

3    pass?

4    A.   Yes.

5    Q.   How did you pass the time?

6    A.   I had my laptop and my notebook so I was doing a lot of

7    writing.  I was planning the state pageant for the contest that

8    I direct, so I spent my time just working on that mostly.

9    Q.   And you said you ate a second time in the airport?

10   A.   Yes.

11   Q.   And what -- do you remember what you ate?

12   A.   I had -- I remember I had Margherita pizza.

13   Q.   A Margherita pizza.  Is that one of the -- is that a pizza

14   with cheese and tomato type?

15   A.   Yeah, oh, yeah, it was a flatbread.  It was, yeah, like

16   tomato

17   Q.   Laura, how do you feel about flying generally?

18   A.   I'm very comfortable flying.

19   Q.   What about flying overnight?

20   A.   Since I don't generally do it, I don't have a preset

21   opinion on it, but I usually just sleep so it doesn't matter.

22   Q.   Do you -- do you worry about the sleep?

23   A.   No.  I -- I worry about the sleep schedule from flying

24   definitely from -- from -- from West to East Coast and back and

25   forth, and with the overnight flight the idea was -- yeah.

```
1    Q.   Okay.  Let me -- let me reask that question so you

2    understand.  I probably didn't ask it right.

3    A.   Right.

4    Q.   As you're thinking about the fact that you're going to be

5    on a red-eye flight overnight, were you -- were you concerned

6    about sleeping?

7    A.   Yes.  So I kind of wanted to sleep on the flight so I

8    could be awake so my sleep schedule would be normal when I get

9    back, so I was awake before and then planned to sleep on the

10   flight.

11   Q.   Because the red-eye flight comes in the next day, right?

12   A.   Yeah.

13   Q.   Into Detroit?

14        So what are some of the things that you did to help

15   you to sleep on the plane for that trip?

16   A.   After eating I had my head -- had some beer, I put on my

17   headphones and curled up with my blanket.

18   Q.   Do you take any kind of prescription medication?

19   A.   I do.  I was just prescribed Adderall for my ADD.

20   Q.   Okay.  And -- and what does Adderall generally do for you

21   when you take it?

22   A.   So it -- it calms me down and helps me focus and be able

23   to elaborate better and it definitely helps with the attention,

24   but with that, it makes it harder to -- to fall asleep.  It

25   messes up your eating cycle as well.
```

1   Q.   So do you sometimes time when you take that medication to

2   help with your natural sleep cycle?

3   A.   Yes.  I had just got it changed so that's better, but at

4   the time I would have to plan it out.

5   Q.   And did you do that on that day?

6   A.   Yeah.

7   Q.   And did you time it so that you would be able to sleep in

8   flight?

9   A.   Yeah, so I would be awake when I was at the airport alone

10  that whole time and then sleep on the flight.

11  Q.   I want to talk to you about social drinking for a minute.

12  A.   Mm-hmm.

13  Q.   Do you drink alcohol?

14  A.   Yes.

15  Q.   And how frequently do you drink alcohol?

16  A.   Um, it depends.  Currently I haven't for the past couple

17  months because I'm on a cleanse with a workout, but then -- but

18  I used to bartend and that was very social.  When you're on the

19  road a lot sometimes there's nothing to do, but hotel

20  convention center you have a drink at the hotel bar.  So it

21  would be frequent when I'm not working out or plan to work out.

22  Q.   Did you drink while you were bartending?

23  A.   Yes.

24  Q.   So you would have drinks with the customers?

25  A.   Depending on the rules, but usually after with the -- with

1   the rest of the staff.

2   Q.   How would you describe your tolerance level for alcohol?

3   A.   I do have a -- a very good tolerance just from bartending

4   for years.  It was a professional thing.  You do have to be

5   able to hold your liquor and know how to drink, know how to

6   serve, know how to handle yourself.

7   Q.   When you were in the San Diego Airport waiting for that

8   first flight to Las Vegas, do you recall about how much you had

9   to drink in that time frame that you were there?

10   A.   Yeah.  When I had the Margherita pizza, I had about four

11   beers and then a shot with the beers.

12   Q.   You had one shot with each beer?

13   A.   One shot with each beer.

14   Q.   So you had approximately four shots of alcohol?

15   A.   Mm-hmm.

16   Q.   And four beers?

17   A.   Yes.

18   Q.   And this was over the course of the time after your

19   boyfriend left and before you got on the flight?

20   A.   Yes.

21   Q.   Okay.  How was that first flight from San Diego to Las

22   Vegas, was it -- anything happen on that flight that you

23   recall?

24   A.   No, it was quick.  I fell asleep immediately, woke up, we

25   were in Las Vegas.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1429   Page 101 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

101

```
1    Q.   And were you able to find your gate without a problem?

2    A.   Yes, yes, I'm familiar with that area.

3    Q.   Were you able to board the plane?

4    A.   Yes.

5    Q.   Did you interact with the flight attendants on that

6    flight?

7    A.   No.

8    Q.   Did you see them when you came on the plane?

9    A.   Yes, greeting everybody.

10   Q.   And were you able to find your seat okay?

11   A.   Yes.

12   Q.   And you slept through that flight?

13   A.   Yes.

14   Q.   When you arrived in Las Vegas, are you familiar with the

15   Las Vegas Airport?

16   A.   Yes.

17   Q.   How many -- how many times have you been there?

18   A.   My first time was last year for work, and I've been there

19   in layovers multiple times, less than five, including just

20   layovers.

21   Q.   Did you have a layover before your flight?  In between San

22   Diego and Las Vegas was there a layover?

23   A.   No.

24   Q.   Was there some time in between the two flights?

25   A.   Oh, oh, yes.  I'm sorry, yes.
```

```
1    Q.   That's okay.  I probably asked that wrong.
2              Do you know about how long was the time between,
3    between those two flights?
4    A.   I remember it was longer than scheduled.  I want to say it
5    had to have been around an hour.
6    Q.   And was there a bar at that airport?
7    A.   Yes.
8    Q.   What was the name of that bar, do you remember?
9    A.   Yeah, that's the Sam Adams Bar.
10   Q.   Did you visit that bar?
11   A.   Yes.
12   Q.   And tell me what happened in that bar.
13   A.   I had a -- I had a beer.  Then everybody at the rail
14   started talking, met a couple from Detroit, Detroit area.  I
15   was talking to the man next to me.  It was a friendly
16   environment so I just sat there and talked with everybody and
17   had drinks with them before getting on the flight.
18   Q.   When you say rail, what do you mean?
19   A.   Oh, the -- at the bar.
20   Q.   Okay.  So you were sitting up at the bar proper, if you
21   will?
22   A.   Yes.
23   Q.   And did anybody buy you a drink?
24   A.   Yeah.  The gentleman that was on my right side, he bought
25   everybody, everybody in the conversation a shot.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1431   Page 103 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

103

1    Q.   Do you remember what kind of shot it was?

2    A.   I believe that was Jameson.

3    Q.   Did you do that shot?

4    A.   Yes.

5    Q.   Okay.  And so before you board that plane home to Detroit,

6    do you have concerns about being able to sleep through this

7    flight?

8    A.   No, I definitely feel like I was going to sleep through

9    this flight.

10   Q.   And that was because of all the ways that you just

11   testified you had prepared yourself to fly?

12   A.   Yeah.

13   Q.   I'm going to direct your attention to Flight 788.  Was

14   that the flight that you took from Las Vegas to Detroit?

15   A.   I don't know the number.

16   Q.   Okay.  Was it a Spirit Airlines?

17   A.   Yes.

18   Q.   Do you remember where your seat was?

19   A.   Yes.  I was in the back at the window.

20   Q.   All right.

21          MS. SMITH:  Can we bring up Exhibit -- I think it's

22   Exhibit 2.

23   BY MS. SMITH:

24   Q.   Okay.  So here's a little diagram of the back of the

25   plane.  Do you see the seats there?

Case 2:18-cr-20027-TGB-MKM  ECF No. 84  filed 03/05/19  PageID.1432  Page 104 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

104

1    A.   Yes.

2    Q.   Okay.  Do you remember the exact row you were in?

3    A.   On the right side, a -- three or four up from the back.

4    Q.   Okay.  That looks like row 27, is that right?

5    A.   That looks right.

6    Q.   Okay.  And so there's -- for the record, we're looking at

7    the back of the airplane, and in the very back there it looks

8    like symbol for lavatories.  Do you see that?

9    A.   Yes.

10   Q.   And then there's a little coffee cup picture on the

11   right-hand side of what we're looking at.  So this is from the

12   back of the plane looking toward the front of the plane?

13   A.   Yes.

14   Q.   Okay.  And so in that row 27 there's -- there's six seats.

15   If we were to label them from left to right, A, B and C, and

16   then D, E and F, do you remember which seat you were in?

17   A.   I would have been in F.

18   Q.   On the window side?

19   A.   On the window side.

20   Q.   Okay.

21        MS. SMITH:  You can take that down.  Thank you.

22   BY MS. SMITH:

23   Q.   Do you remember how much luggage you had with you?

24   A.   I remember I had my travel purse with me.

25   Q.   Okay.  And were you able to put your luggage away?

```
1    A.   I had to put it in the top storage in the front of the --
2    of the plane.  There was no room at my seat.
3    Q.   All the -- all the storage space was full at your seat?
4    A.   Yes.
5    Q.   So you had to walk to the back of the plane and then to
6    the front to store your luggage?
7    A.   Yes.
8    Q.   When was the first time that you saw the defendant?
9    A.   When I got to my seat.
10   Q.   You hadn't seen him in the lobby?
11   A.   No.
12   Q.   You didn't see him standing in line to board the plane?
13   A.   No.
14   Q.   Who was he with?
15   A.   He was with a woman.
16   Q.   And did you know who that woman was?
17   A.   No.
18   Q.   Did you have any conversations with that woman?
19   A.   None.
20   Q.   And, in fact, to this day have you ever conversed with
21   her?
22   A.   No.
23   Q.   Did anyone ask you to switch your seats before takeoff?
24   A.   No.
25   Q.   Did -- where were they sitting?
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1434   Page 106 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

106

1    A.   The woman was on the aisle and then he was in the middle.

2    Q.   Okay.  So the woman would have been in that seat that we

3    looked at --

4    A.   Yes.

5    Q.   -- across, and then the defendant was in the middle seat?

6    A.   Correct.

7    Q.   Did the defendant ask you to switch seats during the

8    flight?

9    A.   No.

10   Q.   Did the woman sitting next to him ask you to switch seats?

11   A.   No.

12   Q.   Did you have any conversation with the defendant?

13   A.   None.

14   Q.   Tell me how you settled into that window seat.  Once your

15   luggage was up, what did you do next?

16   A.   Um, I got to my seat, put on my headphones, buckled up,

17   pulled up my blanket and leaned in and fell asleep.

18   Q.   What's going on in your headphones, what are you playing?

19   A.   Um, I have a few playlists on Spotify that I have saved so

20   I can listen to them in the air.  I'm not sure which one I was

21   listening to.  It was something relaxing.

22   Q.   And is the Spotify on your phone?

23   A.   Yes.

24   Q.   What kind of phone do you have?

25   A.   iPhone 7.

1   Q.   Okay.  An Apple iPhone?

2   A.   Yeah.

3   Q.   So as you're settling into the airplane seat, tell me how

4   you felt your level of sobriety was at that point.

5   A.   Was ready to sleep.  It was...

6   Q.   Okay.  Do you feel like you would be able to drive a car

7   at that moment in time?

8   A.   Oh, no.

9   Q.   Did you feel like you were able to get -- find your way to

10  your seat?

11  A.   Yeah, I did, but it -- I'm -- it felt like time to sit.

12  Q.   Time to sit?

13  A.   Yeah.

14  Q.   Okay.  And do you think you sleep harder when you drink?

15  A.   Absolutely.

16  Q.   And do you recall getting up during the flight?

17  A.   I -- I recall I did not get up during the flight.

18  Q.   Okay.  You were asleep?

19  A.   Mm-hmm.

20  Q.   Do you recall eating any snacks on the plane?

21  A.   I do not.

22  Q.   When did you fall asleep?

23  A.   Immediately.  I was asleep before takeoff, before snacks,

24  before all that.

25  Q.   And you had -- you said you have flown before?

1    A.   Mm-hmm.

2    Q.   Is it a -- kind of a distinct feeling when the plane takes

3    off?

4    A.   I don't notice it anymore.  Yeah, I always sleep through

5    it.

6    Q.   Was your goal to be asleep before the plane took off?

7    A.   Yeah.

8    Q.   Okay.  Where'd you put your blanket?

9    A.   I had it draped over me and then kind of like curled at

10   the top for a pillow too.

11   Q.   Okay.  Tell me the next thing that you remember.

12   A.   Um, the next thing I remember was kind of half waking up

13   and feeling -- feeling something, like there was -- like I felt

14   something, and I couldn't fully wake up, wake myself up.  Then

15   I fell back asleep and then I woke up and I saw his hands

16   inside me.  Well, I felt them is how I woke up because it was

17   very rough and then saw his hands coming out.

18   Q.   Okay.  When you say that you saw his hands, whose hands

19   are you talking about?

20   A.   The defendant, Prabhu --

21   Q.   The defendant?

22   A.   -- was the man sitting next to me.

23   Q.   Okay.  And when you saw the defendant's hands sitting next

24   to you, tell me, what did you feel physically on your body?

25   A.   Um, other than the feeling of his hands inside of me, I --

1   I couldn't tell you.  It was confusing.

2   Q.   Did you feel his fingers?

3   A.   Yeah.

4   Q.   Where were his fingers?

5   A.   His fingers were -- were inside of my vagina.  They

6   were...

7   Q.   And were they doing anything?

8   A.   Yeah, he -- he was moving them, he was shoving them in and

9   out.

10  Q.   How would you describe the movement?

11  A.   It was just a back and forth really fast, in and out.

12  Q.   What did you see the defendant do?

13  A.   When I fully woke up and moved, I saw his -- pull his

14  hands out and then he rolled over and pretended to be asleep on

15  the woman next to him.

16  Q.   And when you say rolled over, is he sitting in the seat?

17  A.   Yeah.

18  Q.   And so I'm going to make a motion of kind of turning my

19  body to the side.  Is that -- is that how he turned?

20  A.   Yeah, he -- he completely switched, like when my hand --

21  face scanned over, I saw him move as well.

22  Q.   And what was he doing after he turned?

23  A.   He was pretending to be asleep.

24  Q.   What did you observe as to your clothing at that moment?

25  A.   My top button, the first thing I noticed, my button was

1    undone and then they were unzipped and they were just -- my
2    pants were kind of just like folded down enough to make room.
3    Q.   You're talking about your pants button?
4    A.   Pants, yeah.
5    Q.   Did you unbutton your pants?
6    A.   No.
7    Q.   Did you pull your own zipper down?
8    A.   No.
9    Q.   But that's how you saw that when you woke up?
10   A.   Yes.
11   Q.   What about up top, was there anything different about up
12   top?
13   A.   Yeah.  It -- it took me a second to realize that my shirt
14   was untied and my bra was unhooked.
15   Q.   Did you untie your shirt?
16   A.   No.
17   Q.   Did you unhook your bra?
18   A.   No.
19   Q.   Where was your blanket, do you remember?
20   A.   Yeah.  At that point it was like on my knees, like falling
21   off.
22   Q.   How were you feeling in that moment in time?
23   A.   I think I was more just frozen, very confused.
24   Q.   Did you shout out?
25   A.   No.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1439   Page 111 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

111

1    Q.   Why didn't you shout out?

2    A.   It took a second to -- to process.  It was just so surreal

3    and weird.  Shouting wasn't my instinct.

4    Q.   Did you feel scared?

5    A.   Yeah.  I thought maybe I was like, you know, petrified,

6    frozen.

7    Q.   Okay.  Was he still sitting next to you pretending to be

8    asleep?

9    A.   Yeah.

10   Q.   So if you were to try to get up and leave, would you have

11   to pass him?

12   A.   Yeah.

13   Q.   So once you realize that this had happened to you, what

14   did you do next?

15   A.   Well, I -- because I didn't want to move, I just -- I

16   grabbed my phone, and I know we were in the air and it wouldn't

17   send but I was just steadily like typing out, texting what was

18   going on in my head to try to figure it out or tell it, process

19   it.

20   Q.   Who were you texting?

21   A.   I texted my boyfriend.

22   Q.   And did you send him a lot of texts?

23   A.   Yeah, just as my thoughts were coming.

24   Q.   And were you -- is it fair to say you were still

25   processing what had happened while you were texting?

1   A.   Yeah.

2   Q.   Were you still under the stress of what had just happened?

3   A.   Yeah.

4   Q.   I'm going to have you take a look -- there's an exhibit

5   book right in front of you.  Do you see it?  If you can turn to

6   Exhibit 11, it is -- it's a three-page exhibit.  Do you

7   recognize that, do you recognize those?

8   A.   Yes, these are the texts I sent.

9   Q.   These are the text messages that you sent?

10  A.   Yes.

11  Q.   And, in fact, did you make screen shots of those and give

12  them to the FBI?

13  A.   I did.

14  Q.   Okay.  And is this a fair and accurate representation of

15  the text messages that you sent while sitting on that airplane?

16  A.   Yes.

17          MS. SMITH:  At this time I move to admit Government's

18  Exhibit 11.

19          MR. AMBERG:  No objection.

20          THE COURT:  No objection, 11 is admitted.

21          MS. SMITH:  Okay.  I'd like to publish these one at a

22  time.  So let's put up -- may I publish?

23          THE COURT:  You may.

24          MS. SMITH:  Let's put up the first page.

25  BY MS. SMITH:

1  Q.  So we're going to go through these screen shots, and

2  because you took them as a screen shot, there's going to be

3  some repetition from page to page.

4       MS. SMITH:  So let's orient ourselves with just the

5  top three to start and the -- sorry, and the header.

6  BY MS. SMITH:

7  Q.  Okay.  So for the record, we're looking at a screen shot

8  from your Apple phone, is that right?

9  A.  Yes.

10 Q.  Okay.  And it says 2:59 p.m. up there.  Is that the time

11 that you actually preserved those screen shots for the FBI?

12 A.  That was the time I took the screen shots for them.

13 Q.  Okay.  And at the top it says "H" with the word "Handsome"

14 underneath.  Is that the word you used for your boyfriend?

15 A.  That was his name in my phone at the time, yes.

16 Q.  Okay.  Now, we're going to read these texts, but just to

17 orient the jury, it says "Wednesday 5:00 AM" at the top, and

18 then at the right there's a series of exclamation points with

19 some time stamps that say "Not Delivered."  So can you say with

20 any certainty exactly what time these texts were sent?

21 A.  No.

22 Q.  Okay.  All right.  Let's read the first one into the

23 record?

24 A.  "Oh my god.  I just woke up and this guy next to me had

25 his hands down my pants and in my vagina"

1       "Holy shit what the fuck just happened"

2       "I woke up thinking I felt something in me and then I

3   looked down and my pants are unbuttoned"

4   Q.   Hold on.

5       MS. SMITH:   Let's go to the next, the last two on

6   this page.

7   BY MS. SMITH:

8   Q.   Go ahead.

9   A.   "I didn't think that of course so I go back to sleep I'm

10  half awake I wasn't all the way asleep but I'm close to passed

11  out then I woke up because I felt his fingers in me"

12      "I woke up and jumped and he stopped and now he's

13  looking the other way"

14  Q.   Okay.   Let me stop you right there for a minute.   When you

15  say you jumped up, did you physically jump out of your seat?

16  A.   No, no.   I mean I became more conscious.   Like I woke up,

17  like my body woke up and I wasn't fully awake before.

18      MS. SMITH:   Okay.   Let's go to the next page of this

19  exhibit and if we zoom in on the first three or four.   Yep,

20  that's good.

21  BY MS. SMITH:

22  Q.   Okay.   So the first text is a repeat from the last page,

23  so read the next line please?

24  A.   "What the duck do I do"

25  Q.   Did you mean to say the word duck?

1   A.   No, that was autocorrect.

2   Q.   Did you perhaps mean to curse in that line?

3   A.   Yeah.

4   Q.   Okay.  The next two lines, go ahead and read those.

5   A.   "I swear this guy just shoved his fingers in my while I

6   was sleeping"

7            "My pants are fucking unbuttoned"

8            "Who do I" -- well --

9   Q.  Go ahead.

10           MS. SMITH:  Let's put up the next set of texts.

11  BY MS. SMITH:

12  Q.   Okay.  Go ahead and read the rest.

13  A.   "Who do I call"

14           "Do I tell a flight attendant"

15           "My phone's gonna die"

16           "Oh my god I'm gonna cry"

17           "I want to button my pants but I'm ducking mortified

18  and I can't move"

19           "Oh my god he's with a ducking woman and she keeps

20  looking at me"

21  Q.   Okay.  Let's stop there for a minute.  What -- what woman

22  are you referring to?

23  A.   Oh, I assume his wife, the woman that was in the aisle

24  seat.

25  Q.   But you're referring to the woman that was on the aisle

```
 1   seat?

 2   A.   Yes.

 3   Q.   You're referring to the woman on the aisle seat when you

 4   wrote this?

 5   A.   Yes, yes.

 6   Q.   Okay.  And was -- she was looking at you?

 7   A.   Mm-hmm, yes.

 8            MS. SMITH:  All right.  Let's go to the next page

 9   please.  Let's do the first half.

10   BY MS. SMITH:

11   Q.   Now, the first ones you were on the previous page, right?

12   A.   Yeah.

13   Q.   Yes.

14            MS. SMITH:  Let's go to the bottom half then, sorry.

15   BY MS. SMITH:

16   Q.   Okay.  "Her" -- start with "Her man."

17   A.   "Her man is a ducking rapist don't look at me like that"

18            "Fuck them"

19            "I'm telling the flight crew"

20            "Fuck being scared how fucking dare she -- me -- look

21   at lol like that"

22            "I'm telling"

23   Q.   Okay.  So when you say "she look at me lol that," did you

24   mean to type something else?

25   A.   "Like that."
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1445   Page 117 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

117

1   Q.   "Like that."  Okay.

2        And then did you read the last one?

3   A.   "I'm telling"

4   Q.   Okay.  And what is the next thing you did after you texted

5   your boyfriend that "I'm telling"?

6   A.   Then I -- I pushed past them and went to the back to find

7   the flight attendants.

8   Q.   Okay.  And was that the back area that we saw in that

9   prior picture with the bathrooms?

10  A.   Yeah.

11  Q.   Who was back there?

12  A.   There were about two flight attendants back there I think

13  at the time.  More came later.

14  Q.   Did you -- don't tell me what you said, but did you

15  explain to them what had happened?

16  A.   Yeah.

17  Q.   And what was their response?

18  A.   I don't remember.  I don't even remember what I said, but

19  they said "really," but they sat me down.

20       MR. AMBERG:  Object to the hearsay.

21       MS. SMITH:  Yep, she -- she's not testifying to

22  hearsay.

23  BY MS. SMITH:

24  Q.   Don't tell me what they said, tell me what they did for

25  you.

1    A.   They -- they sat -- they sat me down.

2    Q.   Did you stay in the back of the plane for a little while?

3    A.   Yes.

4    Q.   And then did they move your seat?

5    A.   Yes.

6    Q.   Where did they move you to?

7    A.   They moved me to the maybe mid-front on the left side.

8    Q.   At some point now were you taken off the plane when the

9    plane landed?

10   A.   Yes, yeah.

11   Q.   And did you notice anything else about the defendant --

12   the woman that was with the defendant during the time that you

13   were in the back of the plane?

14   A.   No.

15   Q.   Okay.  And after you got off the plane, did you speak to

16   some of the airport police?

17   A.   Yes.

18   Q.   And did they take you somewhere?

19   A.   Yeah.  They sat me down and talked to me and I wrote down

20   some -- about what happened, and then they took me to the

21   airport police station.

22   Q.   Okay.  And from there did you go to a hospital?

23   A.   Yeah.

24   Q.   Do you remember which hospital you were taken to?

25   A.   Yes.  One of the officers escorted me to the Beaumont that

1    was around there.

2    Q.   And what happened when you were at the Beaumont Hospital?

3    A.   I was waiting in a room in the robe to be checked on but I

4    don't think they could have done anything really there for a

5    while, and then they ended up taking me back to the station.

6    Q.   Did they instruct you to call a nurse with the Sexual

7    Assault Forensic Examination Unit?

8    A.   Yeah.

9    Q.   And did somebody call that nurse?

10   A.   Yeah.

11   Q.   And did you then go visit that nurse?

12   A.   Yeah.

13   Q.   And in between scheduling that appointment and going, did

14   you use the bathroom?

15   A.   Yeah.

16   Q.   Did you take a shower?

17   A.   Yeah.

18   Q.   Did anybody tell you not to, if you remember?

19   A.   Yeah, I don't -- I don't remember.  Oh, because at

20   Beaumont I did have to go to the bathroom to -- for them for

21   something so they didn't tell me not to.

22   Q.   You went to the bathroom at Beaumont for a sample?

23   A.   Yeah.

24   Q.   Tell me what happened when you got to the SAFE nurse.  Was

25   that at Detroit Receiving Hospital?

1    A.    Yes.

2    Q.    And what happened there?

3    A.    When we went into the office, they talked to me for a

4    second and then went back and did the -- did the rape kit, took

5    the swabs, talked to me for a little bit more and then I left.

6    Q.    When you say take the swabs, did they swab your body?

7    A.    Yes.

8    Q.    Did they swab your vagina?

9    A.    Yeah.

10   Q.    Did you -- did you have to lay on the table while they

11   took those samples?

12   A.    Yeah, in the robe.

13   Q.    So you testified that you had been drinking in the

14   airport?

15   A.    Mm-hmm.

16   Q.    And that you were a hard sleeper.  And certainly when you

17   got on that plane you were ready to go to sleep.  How do you

18   know for sure that this defendant had his fingers in your

19   vagina?

20   A.    It was unmistakable.  You can tell when somebody's inside

21   you.  It -- you felt it.  It was -- it wasn't a dream.

22            MS. SMITH:  May I have one moment?

23            THE COURT:  You may.

24            (Brief pause)

25            MS. SMITH:  I don't have any other questions at this

Case 2:18-cr-20027-TGB-MKM    ECF No. 84    filed 03/05/19    PageID.1449    Page 121 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

121

1    time.  Thank you.

2         THE COURT:  All right.  Thank you very much.

3         Any cross-examination?

4         MR. AMBERG:  There is, Your Honor.  I think I'm going

5    to be longer than 15 minutes though.

6         MS. SMITH:  It's 12:30 is our break.

7         MR. AMBERG:  Oh, 12:30?  Oh, okay.  We can do it.

8                    CROSS-EXAMINATION

9    BY MR. AMBERG:

10   Q.  Good morning.

11   A.  Good morning.

12   Q.  I have a few questions for you, okay?  I want to start out

13   by talking about getting ready for this today, okay?

14   A.  Mm-hmm.

15   Q.  And you have to answer yes or no or -- or -- you can't say

16   mm-hmm.

17   A.  Yes.

18   Q.  Okay.  Sorry about that, just clerical stuff.

19        You spoke with many different police officers and

20   agents leading up to today, right?

21   A.  Yes.

22   Q.  Okay.  And that took place, everything from right after

23   the plane ride up until probably today?

24   A.  Yeah, yes.

25   Q.  Okay.  And you spoke with the -- the U.S. Attorneys over

```
 1    here as well?
 2    A.   Yes.
 3    Q.   Okay.  And were you able to see all the different police
 4    reports that were generated in this case?
 5    A.   No, no, we didn't talk about all of that.  I saw what I
 6    wrote, my stuff, but I don't know any -- I -- I just know my
 7    stuff kind of.
 8    Q.   Okay.  Did you talk about what questions would be asked
 9    and answered today?
10    A.   Yeah, we -- we talked and we prepped and they kind of told
11    me how this -- how it works.  I've never testified before so
12    they prepared me for that.
13    Q.   Did they tell you what questions they would ask?
14    A.   Um, no, no, because they just kind of let me tell my story
15    again and listened to me.
16    Q.   Okay.  Well, then with that in mind, I want to talk about
17    the story, okay?  I want to talk first about San Diego, all
18    right?  Now, you were not there working, you were there with
19    your boyfriend, right?
20    A.   Correct.
21    Q.   So you were there on pleasure?
22    A.   Yes.
23    Q.   Okay.  And he was working at the auto show there?
24    A.   Correct.
25    Q.   So was this like a fun vacation type situation for you?
```

1    A.   It was more just for me to hang out and see him because I

2    ended up having a cold anyway so I didn't get to go anywhere

3    except CVS for medicine.

4    Q.   Okay.  You didn't go out to the beach or anything?

5    A.   No.  We sat by the pool on his lunch break a couple of

6    times.

7    Q.   Okay.  Did you -- were you drinking and things like that

8    while you were there?

9    A.   A little bit.  We -- just the normal amount, not when he

10   had morning shifts.  New Year's Eve fell asleep before

11   midnight.  But a little bit in the hotel room after he got off

12   shift.

13   Q.   What do you -- what do you mean by the normal amount?

14   A.   Like just a -- say after work with every -- when everybody

15   got off, they had everybody in the lobby, just like a casual...

16   Q.   Okay.  Now, as far as your drinking goes, how old were you

17   at that time on January 2nd of this year, how old were you?

18   A.   Twenty-two.

19   Q.   Twenty-two.

20        So how long have you been drinking for?

21   A.   Just in general?

22   Q.   Up until that point, consuming alcohol.

23   A.   I couldn't tell you, I don't know.

24   Q.   I mean was it high school, did you start when you were 21?

25   A.   You know, I was -- I've been bartending since I was 18, so

```
1    I've been around it -- 21 wasn't my first sip of alcohol, but I
2    couldn't tell you exact amount.
3    Q.   When you were bartending, were you drinking even when you
4    were 18 years old?
5    A.   No.  You can't.
6    Q.   Okay.  So it wasn't until much more recently in your
7    bartending, right, that you were drinking with customers or --
8    or with the other people on staff, right?
9    A.   I want to say I haven't bartended in a few years so it
10   wouldn't have been recent, but I'm not sure.
11   Q.   Had you -- did you bartend after you turned 21?
12   A.   Just bartending every -- every now and then when the
13   Tigers came to town.
14   Q.   Okay.
15   A.   When the Tigers played.
16   Q.   All right.  And you said you have a high tolerance because
17   of that?
18   A.   Yes.
19   Q.   The guest bartending?
20   A.   No.  I have a high tolerance, and then I used bartending
21   as one of the examples of where my tolerance comes from.
22   Q.   Okay.  At the time around this flight how often would you
23   drink alcohol?
24   A.   When we first start I was -- every couple hours.
25   Q.   Well, I -- I'm talking in general.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1453   Page 125 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

125

1   A.   I just --

2   Q.   Not -- not -- not specifically that -- that day.  In

3   general, how often would you drink alcohol?

4   A.   Oh, just in life?

5   Q.   Yes.

6   A.   How often?  It depends on -- on what's going on or

7   what -- what I'm doing.  Like I said, right now I haven't

8   drank.  I'm on my little cleanse because I'm training for

9   something.  If I have friends I need to go support or do

10  things, then I'll go to their events and have a drink,

11  sometimes I don't; it -- it just depends.

12  Q.   Around the time that -- that the flight happened, that's

13  my question, were you -- what was your alcohol consumption?  I

14  mean were you drinking every day, was this once in a while?

15  How much would you drink?

16  A.   I'm sorry.  Then I'm confused.  Can you -- what -- what's

17  the time frame then?

18  Q.   Sure.  The day that this flight happened.

19  A.   Yes.

20  Q.   Around that time.

21  A.   Yes.

22  Q.   Are you drinking every day?

23  A.   The -- the day of the flight, the week leading up to the

24  flight if -- if I'm correct?  I wasn't drinking every day.

25  Q.   Sure.  How about in the month up to the flight, did you

1  drink every single day?

2  A.   No, not every single day.

3  Q.   Okay.  Was it just like on the weekends?

4  A.   No.  Like I said, I work freelance projects and my

5  schedule's all over, it's -- it's sporadic.

6  Q.   Okay.  How many times in that month leading up to the

7  flight do you think you consumed alcohol?

8  A.   I honestly have no idea how to even guesstimate that.

9  Q.   Okay.  I mean are you a daily drinker, at the time were

10  you a daily drinker?

11  A.   No.

12  Q.   Okay.  When -- at that time when you drank, would you

13  drink to get intoxicated or would you normally just have a

14  couple of drinks?

15  A.   Just social, just as everybody was, depending on how the

16  night was.  It wasn't with the intent to get drunk.

17  Q.   Okay.  What's your normal amount at that point in time,

18  not now because I understand now you're not drinking because of

19  a cleanse, but at the time what was your normal amount you

20  would consume as far as alcohol goes in a night?

21  A.   Um, I have no idea, I honestly don't.

22  Q.   Okay.  The day started in San Diego, right?

23  A.   Yes.

24  Q.   Okay.  And you and your boyfriend were coming back to

25  Michigan, right?

1    A.    Yes.

2    Q.    Okay.  And you both had different flights, but eventually

3    was the plan that you would see him back here?

4    A.    Yeah.

5    Q.    Okay.  Do you live together?

6    A.    No.

7    Q.    Or did you live together at the time?

8    A.    No.

9    Q.    Okay.  And in the morning what did you do?

10   A.    The morning of the flight?

11   Q.    Yes.

12   A.    We packed our bags and went to the airport.

13   Q.    Okay.  Did you consume any alcohol at that point?

14   A.    No.

15   Q.    Did you use any drugs?

16   A.    No.

17   Q.    What about Adderall?

18   A.    I -- I took my prescriptions during the day, yes.

19   Q.    Okay.  That's in the beginning of the day?

20   A.    I took it a little bit later so I could eat lunch.

21   Q.    When did you take those Adderalls?

22   A.    It would have had to have been around a little maybe after

23   noon, probably right before I ate so that I could eat and then

24   it'd be worn off by the flight.

25   Q.    Okay.  Did you use marijuana that day?

1    A.    No.

2    Q.    Did you use marijuana at all while you were in San Diego?

3    A.    No.

4    Q.    Okay.  Did you take any other prescription medication?

5    A.    No.

6    Q.    Okay.  How many Adderalls do you take or what's the

7    prescription amount?

8    A.    I'm prescribed 20 milligrams and then they have another

9    one with two smaller ones if I need to take them during,

10   throughout the day, but I usually just take the 20.

11   Q.    So you took the 20 milligrams before you ate lunch in San

12   Diego, is that fair to say?

13   A.    Yes.

14   Q.    After that to the end of the night did you ever take any

15   other Adderall?

16   A.    No.

17   Q.    Now, did you drink at lunch?

18   A.    Not at lunch, not with my boyfriend.

19   Q.    Okay.  You don't drink until later on in that evening,

20   right?

21   A.    Yes.

22   Q.    Okay.  What time was that at?

23   A.    Probably less than an hour before I got -- an hour or two

24   before I got hungry and bored, so maybe mid-afternoon, like

25   3:00.

1    Q.   So your drinking started about an hour to two before you

2    boarded that flight to Las Vegas?

3    A.   No, no, no, no, no, I'm sorry.  It's about an hour after

4    my boyfriend left for his flight.

5    Q.   What time was that at?

6    A.   So I'm -- I'm still in the early mid-afternoon range.

7    Q.   Okay.  What time was that flight to Las Vegas?

8    A.   That was around 9:00, 10:00.

9    Q.   Okay.  So maybe 3:00 or 4:00 to 9:00 o'clock, that's the

10   range that we're talking about?

11   A.   Roughly.

12   Q.   Okay.  When did you have your first drink?

13   A.   I'm guessing around the beginning, around like 3:00.  I

14   couldn't say that was exact though.

15   Q.   Okay.  Was that at a bar?

16   A.   Yes.

17   Q.   Did you hang out at the bar the entire time to do your

18   work?

19   A.   Not the entire time.  I was back and forth, but I went

20   back to the bar to have the table.

21   Q.   Okay.  That first drink, what was it?

22   A.   It was probably an IPA and a Jameson.

23   Q.   Okay.  Let me stop you there.  Was it a draft IPA?

24   A.   Yes.

25   Q.   Okay.  Was that served in a pint glass?

1    A.   Yes.

2    Q.   Okay.  And you said it's an IPA, right?

3    A.   Mm-hmm.

4    Q.   Yes?

5    A.   Yes.

6    Q.   And that's what on the street we call an India pale ale?

7    A.   Yes.

8    Q.   And those particular types of beers have much higher

9    alcohol contents, right?

10   A.   Depending on what you are drinking.  There's some that are

11   sessions and there's some just with the lower alcohol content

12   around the normal like Bud Light, but there typically people

13   assume they have the higher alcohol content.

14   Q.   The ones that you were drinking had the higher alcohol

15   content?

16   A.   I don't remember.  I don't know what I was trying.

17   Q.   Did you try different kinds of IPAs?

18   A.   I can't -- I know my habits.  If there's IPA draft, I

19   would have wanted to try a different one.  I couldn't tell you

20   which I was.

21   Q.   Okay.  Was it a session IPA or was it just a regular IPA?

22   A.   That's -- that's what I don't recall.

23   Q.   Okay.  Because regular IPAs --

24   A.   Are those --

25   Q.   -- for the most part, they have much higher alcohol

1    contents, right?

2    A.   Right.  And session is the one with the lower alcohol

3    content.

4    Q.   Well, sessions -- and I'll give you an example of this.

5    And you drink IPAs, right?

6    A.   Yes.

7    Q.   Like an all-day IPA, you've drank those before, right?

8    A.   Yes.

9    Q.   Okay.  You know what I'm talking about, all-day IPA?

10   A.   Yes.

11   Q.   All right.  Their alcohol level is around 5 percent,

12   right, something --

13   A.   5.2.

14         THE COURT REPORTER:  Wait, wait.  Don't talk at the

15   same time.

16   BY MR. AMBERG:

17   Q.   5.2?

18   A.   Roughly.  Honestly, it was somewhere in the low 5s I

19   remember.

20   Q.   Okay.  And the reason why they call that a session IPA is

21   that you can drink a few of them and not be totally inebriated,

22   agree with me on that?

23   A.   That might not be their definition, but yeah.

24   Q.   Okay.  But the other kinds of IPAs have sometimes even

25   twice as much alcohol content, right?

1   A.   Yes, normally IPAs have around 7 percent.

2   Q.   Do you drink Two Hearted Ale from Bell's?

3   A.   I think that would be one of my favorites.

4   Q.   Okay.  And that's got a much higher alcohol content,

5   right?

6   A.   Yes.

7   Q.   Okay.  Now, you've testified today that you drank four of

8   these IPAs before you hopped on the flight to Las Vegas, right?

9   A.   I drank four beers.  I couldn't say they were all IPAs.  I

10   just --

11   Q.   Well, IPA's what you like?

12   A.   Yes.

13   Q.   And maybe, correct me if I'm wrong, but people who like

14   IPAs generally wouldn't be caught dead drinking a Miller Lite?

15   A.   I like Miller Lite too.

16   Q.   You took shots of Jameson?

17   A.   Yes.

18   Q.   Okay.  And how many shots did you take of Jameson?

19   A.   I took one with each beer.

20   Q.   Okay.  Now, you have a total of four pints and four shots

21   in that window of approximately four hours before you left to

22   Las Vegas, right?

23   A.   It was more than four hours but --

24   Q.   Well, how --

25             THE COURT REPORTER:  I'm sorry, it was what?

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1461   Page 133 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

133

```
 1              THE WITNESS:  It was more than four hours I believe,
 2    but yes.
 3    Q.  Well, I want to make sure exactly what we -- I don't want
 4    to put words in your mouth.  You said you didn't start drinking
 5    until after your boyfriend left, right?
 6    A.  Yes.
 7    Q.  And so we kind of figured a time around 3:00ish, 4:00ish,
 8    something like that?
 9    A.  I don't recall going as late as 4:00, but I said sometime
10    like mid-afternoon.
11    Q.  Okay.  And I'm sure you had to spend time boarding and
12    things like that, right?
13    A.  I guess.  I kind of wait for the line to go even if I'm up
14    front because everyone pushes past anyway, so...
15    Q.  Okay.  And so it was about what, four hours, something
16    like that?
17              MS. SMITH:  I'm going to object, Your Honor.
18    Q.  Or five hours?  I don't know.  I guess we're --
19              MS. SMITH:  Objection.
20              THE COURT:  What is the objection?
21              MS. SMITH:  She has already testified to the 3:00
22    o'clock to 10:00 o'clock window, which is not four hours.  I
23    would ask that he stop re-asking the same question over and
24    over again.
25              MR. AMBERG:  I can move on, Judge.
```

```
 1              THE COURT:  Why don't you go ahead.
 2              MR. AMBERG:  Okay.
 3              THE COURT:  Sustained.
 4    BY MR. AMBERG:
 5    Q.  Now, when -- when you were in San Diego, is it possible
 6    you drank more than four beers?
 7    A.  Not likely.
 8    Q.  Didn't you tell Officer Chalmers you drank five beers in
 9    San Diego?
10    A.  I don't remember my conversation for that day, but it was
11    a confusing day.
12    Q.  So is it possible you told him five beers?
13    A.  I guess it's possible.
14    Q.  Okay.  Do you remember exactly how many beers you drank?
15    A.  From my recollection, now that I'm clear-headed, as I've
16    been saying, around four, yes, four.
17    Q.  Do you think you were intoxicated at that time when you
18    got on the plane in San Diego?
19    A.  No, not -- not really for San Diego.  I mean I was feeling
20    buzzed and fell asleep but it wasn't too much.
21    Q.  Okay.  And how long was that flight to Las Vegas?
22    A.  That was a quick one, had to be around an hour.
23    Q.  Okay.  And then once you got to Las Vegas, you went to the
24    bar, right?
25    A.  Yes.
```

1   Q.   Okay.  And I think that what you said was that you drank a

2   beer?

3   A.   Yes.

4   Q.   And then you did a shot with the people there, right?

5   A.   Yes.

6   Q.   How many shots did you do there?

7   A.   Um, it must have been -- I know for sure just that one

8   that we bought everybody because I was just going for the beer,

9   for one beer before the flight, so that -- that might be it.

10  Q.   Do you remember telling Agent Erkkinen that you drank two

11  shots?

12  A.   That sounds more right, yeah.

13  Q.   Okay.  Do you think you had more than that?

14  A.   No.

15  Q.   Okay.  What were those shots of?

16  A.   I think he asked me so I said Jameson.  I'm pretty sure it

17  was Jameson.

18  Q.   Okay.  Those were the same shots that you had in San

19  Diego, right?

20  A.   Yes, keeping consistent.

21  Q.   Okay.  So although somebody else may have purchased one or

22  both of those shots in Las Vegas, were you the one that asked

23  for Jameson?

24  A.   No, I didn't, I didn't ask.  He offered to buy shots and

25  said what should we -- what do you all like, and I said, "I had

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1464   Page 136 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

136

 1    Jameson earlier" and they were like "Jameson," so...
 2    Q.   What is Jameson?
 3    A.   It's a whiskey.
 4    Q.   Okay.  Higher alcohol content than maybe some other kinds
 5    of shots?
 6    A.   There's a huge range of alcohol content in shots.
 7    Q.   You were a bartender.  I'm sure you probably made plenty
 8    of shots that had liqueurs in it and things like that, right?
 9    A.   Yes.
10    Q.   But this is straight whiskey, right?
11    A.   Yes.
12    Q.   Now, were these bigger shot glasses or were they the same
13    size as a normal shot glass?
14    A.   A shot is a four-count pour.
15    Q.   And were these poured to the top?
16    A.   Depending on the size of glasses, the content stays the
17    same.
18    Q.   Okay.  Do you remember if they were poured to the top of
19    the glass?
20    A.   No, I don't remember.
21    Q.   Okay.  You met people that were there at the bar in Las
22    Vegas, right?
23    A.   Yes.
24    Q.   Okay.  And you met them for the first time, you had never
25    met them before, correct?

1  A.  Correct.

2  Q.  Okay.  And you guys were having a good time, right?

3  A.  Correct.

4  Q.  Were these people that were like coming back from Vegas

5  and having fun kind of deal, is that what was going on?

6  A.  That was the general feel, yes, of the room.

7  Q.  Do you think you were acting unusual when you were at that

8  bar?

9  A.  No.

10  Q.  Did you think you were acting like you were intoxicated

11  when you were there?

12  A.  No.

13  Q.  Okay.  You were talking to two gentlemen in particular.

14  Who were they?  Or do -- or let me -- let me back up.  Do you

15  remember talking to two gentlemen in particular?

16  A.  I remember the man that was on my right because we were --

17  he was talking about his life and then we were all listening

18  and having a conversation.  There was a couple that we were

19  talking to and then maybe one or two people sprinkled around.

20  Q.  Okay.  What'd you guys talk about, if you remember?

21  A.  The -- the reason I remember -- I don't remember exact

22  content.  I just remember it was this man who bought us all

23  shots, he was telling us something about himself, where he was

24  going, and that's when we were all listening, and I don't know

25  if he was telling about like his heritage or something he did.

```
 1              THE COURT REPORTER:  Telling about his what?
 2   A.   About his heritage, what he is or his culture, something,
 3   he was talking about something personal to him and we were all
 4   listening.
 5   Q.   Okay.  After that you then get on the flight, right?
 6   A.   Yes.
 7   Q.   Okay.  Now, I think that you testified you are comfortable
 8   flying?
 9   A.   Yes.
10   Q.   Right?  You've done it many times?
11   A.   Yes.
12   Q.   You're not afraid of flying, right?
13   A.   Correct.
14   Q.   You don't need to drink 10 drinks or 11 drinks in order to
15   get on that airplane, right?
16   A.   No, not to get on the airplane.
17   Q.   Okay.  And it's -- it's not 'cuz of fear, that's not why
18   you were drinking, right?
19   A.   Yeah.
20   Q.   Okay.  You were drinking, and correct me if I'm wrong, but
21   you were drinking because you wanted to get some sleep, right?
22   A.   Correct.
23   Q.   But also because it's fun, right?
24   A.   I was there a long time.  I had -- I was bored.
25   Q.   Okay.  So it was something fun to do?
```

1    A.   Yeah.

2    Q.   Okay.  Now, how did you board that flight, were you the

3    last person on there or how did --

4    A.   Yeah, I was one of the last.

5    Q.   Okay.  And were you able to find your seat okay?

6    A.   Yes.

7    Q.   Okay.  Did you sit down first before you put your bag back

8    up there or what?

9    A.   No.  I had to -- I realized I had to put my bag up first

10   before I sat, so then I had to go back and put my bag up at the

11   front and then go back and sit.

12   Q.   Okay.  So you started by going over to the seat, right?

13   A.   Mm-hmm.

14   Q.   Yes?

15   A.   Yes.

16   Q.   And was that when you saw Mr. Ramamoorthy for the first

17   time?

18   A.   At a glance.

19   Q.   Okay.  But didn't say anything to him?

20   A.   No.

21   Q.   Or the lady sitting next to him?

22   A.   No.

23   Q.   Okay.  You went and then put the -- the bag back on top of

24   the rack where the plane -- you put your luggage at, right?

25   A.   Yes.

1    Q.   Okay.  But that was in the front of the plane?

2    A.   Yes.

3    Q.   Okay.  Then you came back?

4    A.   Yes.

5    Q.   All right.  During that time did you talk to anybody?

6    A.   No.

7    Q.   Okay.  And you sat down, right?

8    A.   Yes.

9    Q.   Did you make any small talk at all with these people

10   sitting there?

11   A.   None.

12   Q.   Okay.  You put your headphones on?

13   A.   Yes.

14   Q.   Okay.  And I think what you said on direct exam was you

15   were planning on getting to sleep immediately, right?

16   A.   Yes.

17   Q.   Now, I want to talk about your -- your state of mind at

18   the time, okay?

19   A.   Mm-hmm.

20   Q.   Yes?

21   A.   Yes.

22   Q.   All right.  Now, one thing that you testified to on direct

23   exam was that you felt as though you wouldn't be able to drive

24   a car, right?

25   A.   Correct.

1    Q.   Okay.  Why was that?

2    A.   Because I had a couple shots and beers.

3    Q.   Okay.  Did you feel like you might be over the legal limit

4    for driving?

5    A.   That was probably, yes.

6    Q.   Okay.  Did you think that maybe you might have been a

7    little bit buzzed?

8    A.   I was buzzed.

9    Q.   Okay.  Do you think you were intoxicated?

10   A.   Probably I was buzzed, getting there.  I definitely was

11   ready to sleep.

12   Q.   Okay.  Now, you -- did you fall asleep immediately?

13   A.   Yes.

14   Q.   Okay.  And -- and you fell asleep leaning on the window,

15   right?

16   A.   Yes.

17   Q.   Okay.  I think what your testimony is is the next thing

18   that you recall is that you wake up to this thing happening to

19   you, right?

20   A.   Correct.

21   Q.   Okay.  You never went to the bathroom at all during the

22   flight?

23   A.   No.

24   Q.   Okay.  If somebody came in and testified they had a

25   five-minute-long conversation with you at the bathroom, that

1    didn't happen?

2    A.   I don't recall.

3    Q.   Okay.  Do you think it's possible that you got up during

4    the flight and you just don't remember?

5    A.   Based off your questions, I'm going to have to say maybe,

6    but I don't recall.

7    Q.   Okay.  I want to talk about how alcohol affects you, okay?

8    Alcohol can affect your memory, right?

9    A.   Yes.

10   Q.   And, in fact, with you that's probably happened before,

11   right?

12   A.   Maybe.

13   Q.   Have you ever blacked out from drinking alcohol?

14   A.   I'm -- I'm sure maybe once but it's not a habit.

15   Q.   Okay.  You've had that experience where alcohol makes you

16   forget certain things, right?

17   A.   Sure.

18   Q.   And also that alcohol can make you remember things maybe a

19   little differently?

20   A.   Of course, sure.

21   Q.   Okay.  So just because you don't remember something

22   happening, it very well could have happened, right?

23   A.   Mm-hmm.

24   Q.   Yes?

25   A.   Yes.

1   Q.   And on that flight in particular you may not remember

2   everything because of the alcohol you consumed?

3   A.   Maybe.

4   Q.   Okay.  Now, do you remember getting up any other times?

5   A.   No.

6   Q.   Okay.  Do you remember sleeping on Mr. Ramamoorthy's

7   shoulder?

8   A.   I know I absolutely did not.

9   Q.   You did not do that?

10   A.   I did not do that.

11   Q.   So if somebody saw that, they must have been seeing

12   things?

13   A.   Correct.

14   Q.   Okay.  What about sleeping on his lap?

15   A.   Absolutely not.

16   Q.   You never did that?

17   A.   No.

18   Q.   So if somebody saw you sleeping on his lap, they must have

19   been seeing things, right?

20   A.   Correct.

21   Q.   Okay.  You never did that?

22   A.   I never did that.

23   Q.   How do you know?

24   A.   Because that doesn't make sense.  You can't physically

25   sleep on somebody's lap and I know I just wouldn't.  That's

1    extremely uncomfortable and a weird position to be in, and I

2    know I was sleeping on the window.

3    Q.   You don't think it's possible that you slept on his

4    shoulder?

5             MS. SMITH:  Objection.  He's asking for speculation.

6             THE COURT:  Overruled.

7    BY MR. AMBERG:

8    Q.   You don't think it's possible that you slept on his

9    shoulder?

10   A.   No, it's not possible.

11   Q.   You don't think it's possible that you slept on his lap?

12   A.   I absolutely do not believe that is possible.  That is

13   absolutely not possible.

14   Q.   Okay.  You don't move around while you sleep?

15   A.   Not like that.

16   Q.   Okay.  That's a tight quarter there in that seat, isn't

17   it?

18   A.   Yes.

19   Q.   Okay.  I mean you're literally right up next to this other

20   person, right?

21   A.   Correct.

22   Q.   Okay.  He was sleeping too, right?

23   A.   I wouldn't know.

24   Q.   When you woke up, okay, where were you -- where were you

25   at, were you leaning against the window?

1    A.   No, I was sitting up and back.

2    Q.   Okay.  Now, is it your testimony that when you got up, you

3    saw these hands in you?

4    A.   Yes.

5    Q.   You actually physically saw his hands in you?

6    A.   Physically saw.

7    Q.   Okay.  Both hands?

8    A.   Just one.

9    Q.   Which hand?

10   A.   His right hand.

11   Q.   Which way?

12   A.   Was his hand positioned or what -- I'm sorry, what do you

13   mean?

14   Q.   Tell me how, tell me which way please.

15   A.   I'm sorry, what do you mean, which way?

16   Q.   Which way was his hand, how -- where -- how was it?

17   A.   I just -- I just remember seeing it come out.  It might

18   have been -- it might have been this way.

19   Q.   You just remember seeing it come out, right?

20   A.   I remember it in there and coming out.

21   Q.   It was like underneath you, right?

22   A.   It was inside me.

23   Q.   It was -- and his hand was between you and the seat,

24   right?

25   A.   His hand was inside of my vagina.

1    Q.   Right.  I understand you testified to that.

2    A.   Okay.

3    Q.   But his hand was -- it wasn't all the way in, not all

4    fingers and hand was in, right?  Do you understand what I'm

5    saying?

6    A.   He had a couple fingers in.  I -- I don't know the

7    relation to his hand to the seat.  I was more focused on...

8    Q.   Okay.  Right.  Where you're -- where you were sitting, his

9    arm was underneath you, right?

10   A.   In -- in what sense do you mean underneath?  I'm sorry.

11   Q.   I -- I -- and all I can do is ask you if you remember, or

12   if you don't, just tell me.  You don't have to --

13   A.   But I don't remember.

14   Q.   Okay.  Is it possible that his arm was underneath you?

15   A.   Well, he was all around me so it's possible.

16   Q.   Okay.  He was sitting straightforward as well?

17   A.   I don't know how he was positioned.  I'm sure -- I feel he

18   was leaning towards me.

19   Q.   Okay.  He wasn't in front of you facing you, right?

20   A.   No.

21   Q.   Okay.  Is this a situation where you thought something was

22   happening and then went back to sleep, is that what happened?

23   A.   No, no, it wasn't like that.  It was like me trying to

24   make myself up, like my -- I was just so dead tired.  I was

25   almost awake but I couldn't get myself awake.

```
1   Q.   Were you in a -- in a haze because of the alcohol you
2   drank?
3   A.   I'm sure it was an issue of that and the exhaustion
4   because I had been up for a while.
5   Q.   Oka.  So you were in a haze because of alcohol, yes or no?
6   A.   A little bit.
7   Q.   Okay.
8   A.   Potentially.
9   Q.   So yes?
10  A.   Partially.
11  Q.   And because you had been up for so long, right?
12  A.   Yes.
13  Q.   Okay.  So between those two you were in a haze?
14  A.   Initially, yes.
15  Q.   Okay.  Now, this was all very quick, wasn't it?
16  A.   It seemed like forever.  I couldn't say how long it
17  actually was
18  Q.   Was this seconds, was this minutes that this was
19  happening?
20  A.   Had to have been minutes.
21  Q.   So he had -- so he had his -- his hands inside of you for
22  minutes?
23  A.   It felt like minutes.
24  Q.   Do you think it was minutes?
25  A.   I couldn't say.  It felt like a long time.
```

1    Q.   You watch him for minutes do this to you?

2    A.   I wouldn't -- I didn't like watch it for minutes, but I

3    was like trying to move and put myself away again.

4    Q.   What you do next is you didn't scream, right?

5    A.   No.

6    Q.   You didn't yell --

7    A.   No.

8    Q.   -- help, for help, right?

9    A.   Correct.

10   Q.   You didn't run away?

11   A.   Correct.

12   Q.   Okay.  What you did is you got your phone out?

13   A.   Yes.

14   Q.   And you texted?

15   A.   Yes.

16   Q.   And I counted many texts here that you read to us --

17   A.   Mm-hmm.

18   Q.   -- about a half an hour ago.

19   A.   Yes.

20   Q.   Okay.  You -- you texted for how long, about 10 minutes?

21   A.   It had to have been around there.

22   Q.   Okay.  So for 10 minutes you are sitting there next to

23   this guy texting, right?

24   A.   Yes.

25   Q.   Some of these texts you say things that I want to ask you

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1477   Page 149 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

149

1    questions about.

2    A.   Okay.

3    Q.   "I woke up thinking I felt something in me and then I

4    looked down and my pants are unbuttoned."  That was the third

5    text that you sent?

6    A.   Mm-hmm.

7    Q.   Yes?

8    A.   Yes.

9    Q.   Okay.  You didn't text, "I woke up and saw hands in me,"

10   did you?

11   A.   No.

12   Q.   Okay.  You thought you felt something, right?

13   A.   I know I did.  It was weird putting it in writing so I

14   just made it simple.

15   Q.   Okay.  The next text is, "I didn't think that of course so

16   I got -- I go back asleep I'm half awake I wasn't all the way

17   asleep but I'm close to passed out then I woke up because I

18   felt fingers in me."  You said that, right?

19   A.   Yes.

20   Q.   Okay.  So this wasn't like some abrupt thing, this is

21   happening over the course of time?

22   A.   That is exactly what I was saying, it was a while.  It

23   felt like forever that he was inside me, yes.

24   Q.   You think maybe you were just sitting on his hand?

25   A.   No.

1    Q.   Do you have any idea how your pant got unbuttoned?

2    A.   Because Mr. Prabhu unbuttoned them.

3    Q.   Do you remember that?

4    A.   I know I didn't.

5    Q.   How do you know?

6    A.   Because I didn't.

7    Q.   If you would have went to the bathroom during the flight,

8    you would have had to have take your pants off, right?

9    A.   Yes.

10   Q.   And that includes unbuttoning your pants, right?

11   A.   Yes.

12   Q.   I mean that's how you go to -- and I don't want to --

13   A.   The bathroom process, yes.

14   Q.   Right, right, that's a bathroom process is you unbutton

15   your clothing, right?

16   A.   Yes.

17   Q.   And if you went to the bathroom, isn't it possible you

18   just walked back with your pant unbuttoned?

19   A.   No.  I've been going to the bathroom for years and that's

20   never happened before.

21   Q.   Okay.  But you were also intoxicated?

22   A.   Yes.

23   Q.   One of these texts says, "I swear this guy just shoved his

24   fingers in me while I was asleep," right?

25   A.   Yes.

1   Q.   Okay.  That statement strikes me as being the kind of

2   statement that you think something may have happened but you

3   don't know for sure?

4   A.   I think "I swear" means I swear.  It was a crazy, weird

5   situation.

6   Q.   I understand that.

7   A.   So I just had to -- I swear this just happened.

8   Q.   Okay.  It's like, "I swear I saw this thing outside, I

9   swear," like that's a saying people just say a lot, right?

10  A.   I've heard that before.

11  Q.   Okay.  And it's that kind of saying where people say

12  something they thought they saw, right, like, "I swear I just

13  saw that plane go flying by" or, I don't know, something like

14  that, right?

15  A.   I guess so.

16  Q.   But sometimes when people say that, that doesn't

17  necessarily mean what they saw -- what they swear they saw

18  actually happened, right?

19  A.   In this case it did.

20  Q.   All right.  I'm just asking you in general.

21  A.   In general, sure.

22  Q.   Okay.  Now, you -- as -- as these texts go along --

23  A.   Mm-hmm.

24  Q.   -- it seems to me that you become more upset at what's

25  happening, right?

1    A.  Correct.

2    Q.  And then you're going to -- you're going to go let the --

3    that flight crew know what's going on, right?

4    A.  Correct.

5    Q.  And that's what you do?

6    A.  Yes.

7    Q.  Right?  Okay.

8           And when you went back there, your pants weren't

9    unzipped, were they?

10   A.  I -- I don't remember.

11   Q.  Okay.  I mean you couldn't have walked with your pants

12   unzipped, right?

13   A.  Probably not.

14   Q.  Okay.  When this happened, were your pants like down, were

15   your pants down?

16   A.  They were unzipped and pushed around.  I don't know how

17   far down they were.

18   Q.  Okay.  All right.  You then arrive at the airport, right?

19   A.  Mm-hmm.

20   Q.  Yes?

21   A.  Yes.

22   Q.  And you speak with the different officers and stuff that

23   are there, right?

24   A.  Yes.

25   Q.  All right.  Do you remember speaking with a guy named

1   Officer Chalmers?

2   A.   I don't remember the officers' names but I remember

3   speaking to officers.

4   Q.   All right.  Do you remember telling Officer Chalmers --

5   Chalmers you drank five beers?

6   A.   No, I don't remember.

7   Q.   Do you remember not telling Officer Chalmers that you

8   drank four shots in San Diego?

9   A.   I -- I don't remember.

10  Q.   And did you not tell these guys at the time that you also

11  had drank while you were in Las Vegas?

12  A.   There was a load of information I was trying to get out.

13  I don't know which ones --

14  Q.   Okay.

15  A.   -- I shared.

16  Q.   Was it possible -- well, what about when you met the SANE

17  agent, Ms. Ivaniszyn, remember that?

18  A.   Maybe.

19  Q.   Okay.  Did you deny drinking altogether to her?

20  A.   No.

21  Q.   Okay.  At the time that you get there, are you told to not

22  shower or go to the bathroom?

23  A.   I don't -- I don't remember that.  I just remember them

24  taking me to a room.

25  Q.   Okay.  I mean is it possible they told you not to do that,

1   the officers?

2           MS. SMITH:  Objection.  This calls for speculation

3   again.

4           MR. AMBERG:  If she -- if she remembers.  If she

5   doesn't remember, she doesn't remember.

6           THE COURT:  You can ask her what she remembered them

7   asking her.  Go ahead.

8   BY MR. AMBERG:

9   Q.   Okay.  And I'll ask you that.  Do you remember that?

10  A.   I don't remember that.

11  Q.   Okay.  You were taken to Beaumont?

12  A.   Yes.

13  Q.   And I think you said you were in a robe at that point,

14  right?

15  A.   Yes.

16  Q.   Okay.  What happened to your clothes?

17  A.   I put them on the chair next to the table I was sitting

18  on.

19  Q.   Okay.  And -- and this is Beaumont in Dearborn, right, I

20  think?

21  A.   The one by the --

22  Q.   One by the airport?

23  A.   Yes.

24  Q.   Wherever that is?

25  A.   Yes.

```
1   Q.   Because I think you say is ultimately you go to a
2   different hospital, right?
3   A.   Yes, later.
4   Q.   So the one in -- and that -- the first one that you're at,
5   why are you there?
6   A.   The officers told me to go get a -- a rape kit.  They
7   insisted that I needed to go and get tested or do the thing.
8   Q.   And -- and so did they drive you there?
9   A.   Yes.
10  Q.   Okay.  And did -- did you get a rape kit test done there?
11  A.   No.  I -- I don't know why they couldn't do it.  I had to
12  go to a different place later.
13  Q.   How much later?
14  A.   It was a couple hours.  It was a long, long day.
15  Q.   Okay.  Well, let me ask you, how long after you get off
16  the flight are you at that hospital?
17  A.   Over an hour.
18  Q.   Okay.  So about maybe a little more than an hour after you
19  get off the flight, now you are at that hospital, right?
20  A.   Yeah, over an hour after I get off the flight.
21  Q.   Okay.  Who said that they couldn't do this test?
22  A.   I'm not sure.  It was spoken between the doctors and my
23  police escort and all of that was told between them.  I just
24  was told that I had to go somewhere else by the cop that was
25  taking me.
```

```
1   Q.   Was there -- was there like an officer there with you the
2   whole time?
3   A.   Yes.
4   Q.   Okay.  Do you remember who it was?
5   A.   I don't remember his name, sorry.  He was really nice.
6   Q.   Okay.  Was it the same guy that you talked to in the
7   beginning when you were taken off the plane?
8   A.   I don't think so.  I don't remember faces then.
9   Q.   Okay.  And then when you had to go to the second hospital,
10  how long at that point -- let me -- let me strike that.  When
11  you went to the second hospital, who drove you there?
12  A.   My boyfriend.
13  Q.   Okay.  So did your boyfriend come to the first hospital?
14  A.   He -- he tried.  He went to the wrong one.  He got the
15  wrong directions.
16  Q.   Okay.  But did he pick you up from the first one and take
17  you to the second one?
18  A.   No, he was -- I was in one room in the police station with
19  the officers and he was in the waiting room the whole time.
20  Then when we left, they called him and told him where to go,
21  but I didn't see him until after I was all checked out and done
22  and good to go.  And then he -- then we went back to his house
23  and then we went to the second hospital.
24  Q.   Okay.  So you started off at the terminal, then to
25  Beaumont around the airport, then to the police station?
```

1   A.   I went from the terminal to the police station, to

2   Beaumont, to the police station, to boyfriend's house, to the

3   hospital.

4   Q.   Okay.  So you're transported from Beaumont back to the

5   police station by an officer, right?

6   A.   Yes.

7   Q.   Okay.  Then you're picked up by your boyfriend and then

8   you go to your house or his house or whoever's house?

9   A.   Yeah.

10  Q.   Okay.  Did you take a shower when you were there?

11  A.   I don't remember.  I just -- I know I sat down and then I

12  got a call that he answered and said that it was the hospital

13  and we had to go.  I don't know, I don't think I showered then,

14  but...

15  Q.   I mean is it possible that you showered at some point

16  before that second hospital?

17  A.   It was -- it happened so quick, just as soon as we got

18  back.  I don't think I showered then.

19  Q.   Okay.  So maybe you never showered at all before the

20  second hospital, right?

21  A.   I know I went to the bathroom and maybe -- I don't know.

22  Q.   Okay.  And then you go with your boyfriend to the second

23  hospital, right?

24  A.   Yes.

25  Q.   And that's when you are given this test?

```
 1    A.   Yes.

 2    Q.   Okay.

 3              MR. AMBERG:  If I could have one second, Your Honor.

 4              THE COURT:  You may.

 5              (Brief pause)

 6    BY MR. AMBERG:

 7    Q.   Ma'am, I just have a couple more questions for you and

 8    then I'll be done.  The clothes that you were wearing --

 9    A.   Mm-hmm.

10    Q.   -- were they ever preserved, like did you end up giving

11    them to any agents or anything like that?

12    A.   Yes.

13    Q.   When did that happen?

14    A.   Um, maybe the following week.

15    Q.   Okay.  Had you washed those clothes in between when

16    this --

17    A.   I don't -- no, I hadn't.

18    Q.   You hadn't washed the clothes, right?

19    A.   Yes.

20    Q.   Okay.  And then you gave them to who -- one of these

21    agents, right?

22    A.   Yes.

23    Q.   Okay.  And you haven't seen them since?

24    A.   The clothes?

25    Q.   Yeah.
```

1    A.   No.

2    Q.   Okay.  As far as the text messages go that we talked

3    about, did you take those screen shots and give them to the

4    FBI?

5    A.   Yes.

6    Q.   Okay.  Did you text anybody else while this was going on?

7    A.   I don't think so, no.

8    Q.   You don't think so or...

9    A.   No.

10   Q.   Okay.  And then as far as there's times on the side of

11   them, first being 5:00 a.m. and the last being 5:48, what was

12   going on there?

13   A.   It was in the air.  I don't know.  Those were the delivery

14   times.  I was just not looking to see the distance between the

15   texts.

16   Q.   Did you write those first -- the 5:04 text and then fall

17   back asleep and then wake up at 5:48?

18   A.   No, no.  I don't think the time stamps are reflective of

19   the actual time because we were in the air, there was no

20   service.  They were delivered weird.

21   Q.   Okay.

22   A.   It was more just to get a gist of the pace.

23   Q.   Do you remember buckling or unbuckling your seatbelt?

24   A.   I remember buckling my seatbelt when I sat down.

25   Q.   Okay.  So you think -- was your seatbelt buckled when you

```
 1   got up?

 2   A.   I don't remember.

 3   Q.   Okay.  Thank you very much.

 4        MR. AMBERG:  No further questions, Your Honor.

 5        THE COURT:  Thank you very much.

 6        Any redirect?

 7        MS. SMITH:  Very briefly.

 8                      REDIRECT EXAMINATION

 9   BY MS. SMITH:

10   Q.   Laura, I think when you testified, is it fair to say that

11   you don't remember every single solitary detail of everything

12   that happened that day and that night?

13   A.   Correct.

14   Q.   But how clear is your memory, how clear do you remember

15   this man shoving his fingers in your vagina?

16   A.   Very, very, very clearly.  That is without a doubt.

17   Q.   Thank you.

18        MS. SMITH:  No further questions.

19        THE COURT:  All right.  Thank you very much.

20        Ladies and gentlemen, you may ask any questions that

21   you wish to ask of this witness.  If you do, write them down,

22   raise your hand, let me know if you have a question.

23        (Brief pause)

24        All right.  Counsel approach.

25        (Sidebar discussion as follows):
```

```
 1            THE COURT:  Okay.  Juror asks, "At what point did you
 2   screen shot the text messages and give them to the FBI?"
 3            MS. SMITH:  Fair question.
 4            THE COURT:  Any objection?
 5            MS. SMITH:  No objection.
 6            MR. AMBERG:  No objection.
 7            THE COURT:  A juror asks the question, "Was one of
 8   his hands placed under your shirt when you woke up?"
 9            MS. SMITH:  Okay.  That's a fair question.
10            MR. AMBERG:  Yeah, that's fine.
11            MS. SMITH:  One more?
12            THE COURT:  Another question.  A juror asks, "Were
13   phone records of texts received from carrier to verify these
14   are all the texts at the time?"
15            MS. SMITH:  I don't think she can answer that.
16            THE COURT:  I'm not sure she knows the answer to this
17   question, but if there are no objections, I'll ask it.
18            MS. SMITH:  I don't have an objection.
19            MR. AMBERG:  No objection.
20            THE COURT:  All right.  Thank you very much.
21            (End of sidebar discussion)
22            THE COURT:  We have a number of questions from the
23   members of the jury.  There are three questions.  The first
24   question is, "At what point did you screen shot the text
25   messages and give them to the FBI?"
```

```
1              THE WITNESS:  Um, it would have been a few weeks
2    later when I had come to get information about the court date
3    and what I'm doing, testifying.
4              THE COURT:  Thank you.  A juror asks, "Was one of his
5    hands placed under your shirt when you woke up?"
6              THE WITNESS:  Not when I woke up.
7              THE COURT:  A juror asks this question, if you know
8    the answer.  "Were phone records of text messages or of texts
9    received from carrier to verify these are all the texts --
10   texts at the time?"
11             THE WITNESS:  I'm sure -- I don't have them on me but
12   they're somewhere.
13             THE COURT:  Do --
14             THE WITNESS:  These are all the texts.
15             THE COURT:  -- do you know whether the phone records
16   from the carrier were received by anyone, do you know whether
17   anyone got those records?
18             THE WITNESS:  If these messages went through, is that
19   the -- I'm sorry.
20             THE COURT:  I think the question is asking whether
21   you know whether these same text messages that you have here
22   were also provided by the company or only from you.
23             THE WITNESS:  Oh, I only have the screen shots from
24   me.
25             THE COURT:  All right.  Any followup questions?
```

```
 1              MS. SMITH:  No, thank you.

 2              MR. AMBERG:  Briefly, Your Honor.

 3                          RECROSS-EXAMINATION

 4    BY MR. AMBERG:

 5    Q.  Ma'am, did the FBI ever ask for your phone?

 6    A.  No.

 7    Q.  Okay.  You had this phone for weeks before you had that --

 8    taken those pictures for the text messages?

 9    A.  Yes.

10    Q.  Okay.  And this is an iPhone 7, right?

11    A.  Yes.

12    Q.  And that gives you the ability to delete text messages if

13    you want to, right?

14    A.  Yes.

15    Q.  Okay.

16              MR. AMBERG:  No further questions, Your Honor.

17              MS. SMITH:  May I ask a followup based on that?

18              THE COURT:  You may.

19              MS. SMITH:  Thank you.

20                          REDIRECT EXAMINATION

21    BY MS. SMITH:

22    Q.  Laura, when you met with the FBI, did you show them your

23    phone?

24    A.  Yes.

25    Q.  And, in fact, did you go through the messages with the
```

1    case agent?

2    A.   Yes.

3           MS. SMITH:  No further questions.  Thank you.

4           THE COURT:  All right.  Thank you very much.

5           If there are no further questions.  I don't see any

6    questions, followup questions from the jurors.

7           Okay.  May this witness be excused then?

8           MS. SMITH:  Yes, please.  Thank you.

9           MR. AMBERG:  Yes.

10          THE COURT:  All right.  Thank you very much.  Thank

11   you for your testimony.  You may be excused.

12          (Witness excused at 12:33 p.m.)

13          THE COURT:  Counsel, I see that it is about 12:34.

14   Let me ask you, would this be a good time for a lunch break?

15          MS. SMITH:  I think so.

16          MR. AMBERG:  Yes, Your Honor.

17          THE COURT:  Members of the jury, all in favor?  All

18   right.  Let's all stand for the jury and we'll break for lunch.

19   We'll be back on the record in an hour.

20          (Jury excused at 12:34 p.m.)

21          THE COURT:  You may be seated.

22          Are there any matter that we need to take up before

23   we take our lunch break?

24          MS. SMITH:  Not from the United States.

25          MR. AMBERG:  No, Your Honor.

1    THE COURT:  Let me just ask, so I think that the
2    government said that they have Corporal Umfleet and then the
3    DNA person, is that right?
4        MS. SMITH:  That's correct.
5        THE COURT:  And what about any other witnesses beyond
6    that?
7        MS. SMITH:  We have two more left on our list.  The
8    one is the SANE nurse that had a death in the family and
9    couldn't be here today, and the other is the case agent.  So
10   this trial is fortunately moving a lot faster than we
11   anticipated, and so we thought that -- that Ms. Plaza would
12   lead us all the way up till 5:00 o'clock.  I don't think she's
13   going to, although I'm not sure how much cross he's going to
14   have.  I would ask the Court's indulgence at -- at the end of
15   her testimony if we could break for the day and put our last
16   two witnesses on first thing tomorrow morning.  We will
17   probably be ready to rest before lunch.
18       THE COURT:  And Mr. Amberg, do you know how many
19   witnesses you intend to call at this point, have you given that
20   some thought?
21       MR. AMBERG:  I have.  Definitely think at least two,
22   maybe four at the most, but a lot of that has to do with what
23   happens this afternoon with Ms. Plaza for my expert witness,
24   and then I gotta have a conversation with the powers that be
25   here about an additional, you know --

 1          THE COURT:  About an additional?

 2          MR. AMBERG:  Well, one of my witnesses.

 3          THE COURT:  All right.  Well, that's fine.  I guess

 4   we can break after your second witness, but I would like to use

 5   as much of the time as possible tomorrow so let's be ready for

 6   that.  And we'll also try to use some time, maybe we can take a

 7   look at the proposed jury instructions and make sure that

 8   they're in order --

 9          MS. SMITH:  Yes, Your Honor.

10          THE COURT:  -- as well.  All right?

11          MS. SMITH:  Yes.

12          THE COURT:  Very well.  Let's take a break.  Thank

13   you very much.  We're in recess.

14          THE LAW CLERK:  All rise.  Court is in recess.

15          (Court in recess at 12:37 p.m.)

16          (Proceedings resumed at 1:40 p.m., all parties

17          present, jury not present)

18          THE LAW CLERK:  Court recalls Case No. 18-20027,

19   United States of America versus Prabhu Ramamoorthy.

20          Counsel, will you please replace your appearances on

21   the record?

22          MS. JAWAD:  Good afternoon.  Amanda Jawad and Maggie

23   Smith on behalf of the United States along with Meghann

24   O'Connor, a paralegal in our office, and Special Agent Kyle

25   Dodge with the FBI.

```
1          THE COURT:  Good afternoon.
2          MR. AMBERG:  And good afternoon, Your Honor.  Jim
3   Amberg on behalf of Mr. Ramamoorthy who is standing to my
4   right, and to his right is Mr. Vijay, the translator, and then
5   to my left is Victor Mansour who is co-counsel on the case.
6          THE COURT:  Good afternoon, Counsel.
7          MR. MANSOUR:  Good afternoon.
8          THE COURT:  All right.  Well, I guess the jury is
9   ready, so shall we bring in the jury?
10         MS. SMITH:  Yes, thank you.
11         THE COURT:  We tried to turn up the sound a little
12  bit here as well.
13         (Jury entered the courtroom at 1:41 p.m.)
14         THE COURT:  Good afternoon, ladies and gentlemen.
15  Please be seated.
16         Good afternoon.  I hope you all had a good lunch
17  break.  We did try to adjust the sound to increase the volume
18  somewhat and so that you'll be able to hear better.  I
19  understand that you conveyed that concern to Mr. Darling, and
20  thank you for doing that.
21         And also that you had not the best view of the
22  transcript that was rolling underneath the video, and so we'll
23  try to address that if they use it again by moving it closer so
24  you'll have a better ability to see it as it's going on.
25         I also have been informed that we have two more
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1496   Page 168 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

168

```
 1    witnesses, is that right, for today?
 2              MS. SMITH:  For today, yes.
 3              THE COURT:  And one witness was unavailable because
 4    of a family emergency, and so that witness will be presented
 5    tomorrow.  So we may get out a little early today is what I'm
 6    telling you.  All right.
 7              Okay.  If there's nothing further, let's call our
 8    next witness.
 9              MS. SMITH:  Thank you, Your Honor.  The United States
10    calls Corporal Paul Umfleet.
11              THE COURT:  Will you raise your right hand?
12                      P A U L   U M F L E E T
13    was thereupon called as a witness herein, and after being
14    first duly sworn to tell the truth and nothing but the truth,
15    testified on his oath as follows:
16              THE WITNESS:  I do.
17              THE COURT:  You may be seated.
18                      DIRECT EXAMINATION
19    BY MS. SMITH:
20    Q.   Good afternoon.
21    A.   Good afternoon.
22    Q.   Could you please introduce yourself to the jury?
23    A.   My name is Paul Umfleet.  I am a corporal with the Wayne
24    County Airport Authority Police Department.
25    Q.   How long have you been there?
```

1  A.  I've been with Airport Authority for 19 years.

2  Q.  Do you work at the Detroit Metro Airport in Romulus?

3  A.  Yes, ma'am.

4  Q.  What are some of your duties and responsibilities on the

5  airport police?

6  A.  To enforce the laws of the State of Michigan in addition

7  to the ordinances of the airport and regular patrol.

8  Q.  Do you wear a uniform?

9  A.  Yes, ma'am.

10  Q.  And does that uniform consist of a -- of a body camera?

11  A.  Yes, it does.

12  Q.  Can you just briefly describe that body camera?

13  A.  It's approximately three and a half inches by three and a

14  half inches, usually either on the right side or in the center.

15  It's attached by a magnet to my uniform, and it's activated

16  anytime that we have a run or any kind of incident involved at

17  the airport.

18  Q.  Were you working the morning of January 3rd, 2018?

19  A.  Yes, I was.

20  Q.  And do you recall that day?

21  A.  Yes, I do.

22  Q.  And what -- were you called to come to someplace in the

23  terminal at the airport?

24  A.  Yes.

25  Q.  What was the purpose of that?

1    A.   I was called there originally for scene security and then

2    assigned by Sergeant Joe Alvarado to transport Laura from the

3    terminal to the police station.

4    Q.   You've got an exhibit book in front of you.  Can you open

5    that up to Exhibit 6d?  Are you there?

6    A.   Yes.

7    Q.   Do you recognize that?

8    A.   Yes.

9    Q.   What is that?

10   A.   That's my patrol car in the police garage and that is

11   Laura.

12   Q.   Was that taken from your body camera?

13   A.   Yes, it was.

14          MS. SMITH:  I move to admit Exhibit 6d.

15          MR. AMBERG:  No objection.

16          THE COURT:  6d will be received.

17          MS. SMITH:  May I publish this to the jury?

18          THE COURT:  You may.

19   BY MS. SMITH:

20   Q.   Okay.  And just for the record, is there something around

21   her shoulders there?

22   A.   Yes, there is.

23   Q.   What is that?

24   A.   It's a blanket.  She didn't have a coat but she did have a

25   blanket.

1          MS. SMITH:  Okay.  You can take that down.

2   BY MS. SMITH:

3   Q.   Now, when you first encountered Laura, was it in the

4   terminal?

5   A.   Yes, it was.

6   Q.   And how did she appear to you?

7   A.   A little distraught, a little confused about what was

8   going on.

9   Q.   Can you describe her demeanor?

10  A.   It appeared -- she appeared to be upset.  I couldn't tell

11  exactly why yet because I hadn't been given all the details.  I

12  was just, like I said, there for scene security and then assign

13  a transporter.  But you could tell by the way that she was

14  acting that there was definitely something bothering her.

15  Q.   Did you take her to a patrol car?

16  A.   Yes, I did.

17  Q.   And where were you supposed to take her to?

18  A.   To our police station, Building 610 on the East Service

19  Drive.

20  Q.   And did you drive her somewhere else that morning?

21  A.   After we were at the station for a little while, I was

22  instructed by my lieutenant to take her to Beaumont Wayne

23  Hospital --

24  Q.   Okay.

25  A.   -- for an examination.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1500   Page 172 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

172

1    Q.   Okay.  So you spent some time with her that morning taking

2    her from one place to the next, is that fair?

3    A.   Yes, I did.

4    Q.   Did you engage her in conversation?

5    A.   Yes, I did.

6    Q.   Did you ask her about things that had happened on the

7    airplane?

8    A.   No, I did not.

9    Q.   What was your main goal with her?

10   A.   To keep her calm, comfortable and give her a feeling of --

11   of being safe now.

12   Q.   And did she at times bring up anything that happened on

13   the airplane?

14   A.   Not specifically.  She would talk a little bit about --

15           MR. AMBERG:  Object to hearsay, Your Honor.

16   BY MS. SMITH:

17   Q.   Okay.  Don't tell me what she said.  Let me ask you the

18   question in a different way.  Did she ever -- did she ever

19   broach the topic, without telling me what she said, of things

20   concerning her flight?

21   A.   No.

22   Q.   Okay.  Were there times during your conversation that she

23   appeared to be more upset when talking about certain things?

24   A.   After a little bit of conversation, she'd start tapping

25   her fingers or she'd get real quiet or a leg tap or something

1   like that like she was -- her mind was going someplace else.

2   Q.  When you arrived at the Beaumont Hospital in Wayne, what

3   happened there?

4   A.  We went in the original intake.  They gathered her vitals,

5   then we went back to one of the rooms.  I told her that I would

6   be standing right outside the door of her room.  The nurse came

7   in and began to begin the evaluation at that time.

8   Q.  You weren't in the room when the evaluation was done?

9   A.  No, I was not in the room.  I stood outside.

10  Q.  Okay.  And then did you receive information regarding her

11  having to go someplace else?

12  A.  Yes.  Eventually the doctor came down, and I had with me

13  an evidence collection kit, and the doctor said that

14  wouldn't --

15          MR. AMBERG:  Object to this, Your Honor.  This is

16  also hearsay.  Whatever the doctor said, it's going to be the

17  doctor saying it.

18  BY MS. SMITH:

19  Q.  Okay.  Don't tell me -- sorry.

20          THE COURT:  All right.  It is a valid objection so

21  why don't you rephrase your question.

22          MS. SMITH:  Sure.

23  BY MS. SMITH:

24  Q.  Don't tell me what the doctor said, but as a result of

25  your conversation, were you turned away from the hospital?

1    A.   Yes, we were.

2    Q.   Okay.  Where did you take Laura from there?

3    A.   Back to the police station.

4    Q.   And did you have anything else to do with this case after

5    that?

6    A.   Once I got back to the station, the FBI was there

7    preparing their -- beginning their case.

8    Q.   Were you done with your role at that point?

9    A.   I was.

10        MS. SMITH:  Okay.  No further questions.  Thank you.

11        THE COURT:  Any cross-examination?

12        MR. AMBERG:  Yes, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. AMBERG:

15   Q.   Good afternoon, Corporal.  It's good to see you.

16   A.   Thank you.

17   Q.   I just have a very few questions for you here.

18   A.   Okay.

19   Q.   It seems like your role in this was very limited.

20   A.   Yes, it was.

21   Q.   Okay.  And you didn't participate in any of the sort of

22   interviewing or anything like that, right?

23   A.   No, I did not.

24   Q.   Okay.  What about evidence collection, were you instructed

25   by anybody at the terminal to make sure that the complainant

```
 1   didn't take a shower or go to the bathroom?
 2   A.   At that time, no.
 3   Q.   Nobody said that?
 4   A.   At the terminal, not to me.
 5   Q.   Okay.  And did you -- did she take a shower to the best of
 6   your knowledge?
 7   A.   No.
 8   Q.   After she got back to the police station, after you guys
 9   got back from Beaumont Wayne, that was the last you saw her?
10   A.   Once we got back to the station, yes.
11   Q.   Okay.
12        MR. AMBERG:  If I can just have one second, Your
13   Honor.
14        (Brief pause)
15   BY MR. AMBERG:
16   Q.   Just a couple more questions, sir.  During that early
17   morning did any of the investigators involved in this case tell
18   you to make sure that she doesn't take a shower?
19        MS. SMITH:  Objection, Your Honor.  He is calling for
20   hearsay.
21        THE COURT:  It is calling for hearsay so please
22   rephrase your question.
23   BY MR. AMBERG:
24   Q.   At any point during your interaction with complainant, did
25   you ensure that she was not to take a shower?
```

1   A.   There's no place for her to take a shower in our station

2   for that specific situation.

3   Q.   Okay.  And then as far as going to the bathroom?

4   A.   She did not leave to go to restroom while I was with her.

5   Q.   The entire time?

6   A.   Yes.

7   Q.   Okay.  Fair enough.

8           MR. AMBERG:  Thank you very much, Your Honor.  Thank

9   you, sir.  No further questions.

10          THE COURT:  Any redirect?

11          MS. SMITH:  No thank you.

12          THE COURT:  Are there any questions from the members

13  of the jury for this witness?  I don't see any hands being

14  raised.

15          May this witness then be excused?

16          MS. SMITH:  Yes.  Thank you.

17          MR. AMBERG:  Yes, Your Honor.

18          THE COURT:  All right.  Thank you very much.  You may

19  step down.  Thank you for your testimony.

20          (Witness excused at 1:52 p.m.)

21          THE COURT:  Call your next witness

22          MS. JAWAD:  United States calls Marcy Plaza.

23          THE COURT:  Raise your right hand please.

24                  M A R C Y   P L A Z A

25  was thereupon called as a witness herein, and after being

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1505   Page 177 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

177

1    first duly sworn to tell the truth and nothing but the truth,

2    testified on her oath as follows:

3              THE WITNESS:  Yes, I do.

4              THE COURT:  You may be seated.

5                        DIRECT EXAMINATION

6    BY MS. JAWAD:

7    Q.   Good afternoon.

8    A.   Good afternoon.

9    Q.   Could you please introduce yourself to the jury?

10   A.   Yes.  Hello, my name is Marcy Plaza.

11   Q.   What is your occupation?

12   A.   I am a forensic examiner in the DNA Case Work Unit at the

13   FBI Laboratory.

14   Q.   And what are your responsibilities as a forensic examiner?

15   A.   As a forensic examiner, it's my responsibility to manage a

16   case as it makes its way through our unit for DNA examinations.

17   So that starts with me determining what evidence has been

18   submitted, what tests will be performed on that evidence, and

19   then I direct a biologist in the laboratory to perform those

20   tests.

21             When the DNA examinations are through, the data will

22   come to me, I will interpret that data and look at the results

23   and then issue a report based on those results.

24   Q.   And how long have you been doing this with the FBI?

25   A.   I've been employed by the FBI for two and a half years.

1    Q.   Did you have any other experience in the field of DNA

2    analysis prior to working with the FBI?

3    A.   Yes, I do.

4    Q.   And what is that experience?

5    A.   Prior to working for the FBI, I worked at Bode Cellmark

6    Forensics, which is a private DNA laboratory also in the

7    Washington, D.C. area

8    Q.   How long did you work at Bode Cellmark Forensics?

9    A.   I was at Bode Cellmark for a little over eight years.

10   Q.   And were you doing similar type work to what you're doing

11   at the FBI?

12   A.   Yes.  I was doing DNA analysis, and by the time I left

13   there, I was a case work supervisor.

14   Q.   And what does it mean to be a case work supervisor?

15   A.   As a supervisor, I had a team of about 20 analysts or DNA

16   examiners that were -- that I would manage and kind of manage

17   how they were doing their case -- caseload.

18   Q.   And so between your experience at Bode Cellmark and your

19   experience with the FBI, how long have you been conducting DNA

20   tests?

21   A.   For a little over ten years.

22   Q.   And what's your educational background?

23   A.   I have a bachelor's degree in biology from Slippery Rock

24   University which is in Pennsylvania, and I also have a master's

25   degree in marine biology from Nova Southeastern University

1   which is in Florida.

2   Q.   And when you got your master's in marine biology, did that

3   include any type of DNA research or work?

4   A.   Yes, it did.  My master's thesis work was looking at shark

5   DNA, and the methods that you use to look at shark DNA are very

6   similar to those that we use with human DNA.

7   Q.   And what type of training have you received in the area of

8   DNA analysis?

9   A.   I went through extensive training programs both at the FBI

10  Laboratory and at Bode Cellmark, and the training programs were

11  very similar to one another.  The FBI training lasted for

12  approximately 20 months and it incorporated some written and

13  oral examinations where I demonstrated my knowledge of DNA and

14  DNA testing.

15  Q.   Did you pass those examinations?

16  A.   I did.

17  Q.   And are you now what's called a qualified examiner?

18  A.   Yes.

19  Q.   Is that what you become once you've completed all of the

20  FBI training program?

21  A.   Yes.

22  Q.   And during that training program did you have an

23  opportunity to observe other people performing DNA analysis?

24  A.   I did, yes.

25  Q.   And did you also have an opportunity to perform DNA

1    analysis under the supervision of others?

2    A.   Yes, I did.

3    Q.   And you said that was for about 20 months?

4    A.   It was, yes.

5    Q.   And how long in total have you been with the FBI?

6    A.   For two and a half years.

7    Q.   Have you testified previously on DNA analysis?

8    A.   Yes, I have.  I have testified ten times previous to this

9    instance.

10   Q.   And are you required to continue your education in DNA

11   analysis?

12   A.   Yes, I am.  I am required to have eight hours of

13   continuing education every year, but it can be over that amount

14   of time as well.  I can get that either through conferences,

15   attending conferences that go over DNA topics.  Also we have

16   speakers that come into the laboratory to give presentations

17   about topics related to the DNA field.

18   Q.   Do you also keep up with the scientific literature in your

19   field?

20   A.   I do, yes.

21   Q.   In what ways do you do that?

22   A.   We have scientific articles that are brought to our

23   attention by our management who asks us to take a look at those

24   articles and review them.  In addition, I also keep up with the

25   literature just by looking at the journals that come out every

1    month related to DNA.

2    Q.  And do you have to take certain proficiency tests every so

3    often to ensure that you're keeping up to date?

4    A.  I do, yes.  I take proficiency tests two times a year, and

5    those tests are essentially a -- a mock case that is sent to us

6    from a mock agency.  I process that case the same way I would

7    any other case, send the results back, and then the agency will

8    let us know if that case was processed satisfactorily.

9    Q.  And have you been satisfactorily passing those tests ever

10   since?

11   A.  Yes, I have.

12   Q.  And what other types of quality controls are there on the

13   work that you do?

14   A.  There's a number of quality controls with DNA analysis.

15   We have internal quality assurance measures that we take at the

16   FBI Laboratory, and there are also external quality measures

17   that we adhere to outside of the FBI Laboratory.

18   Q.  And so are there certain protocols developed within FBI

19   about how to conduct DNA analysis?

20   A.  Yes.  We have our own standard operating procedures for

21   how we conduct DNA analysis at the laboratory.

22   Q.  And are those consistent with standards across the entire

23   DNA field?

24   A.  Yes, they are.

25   Q.  About how many DNA tests have you conducted in your time

1    with the FBI?

2    A.   I would estimate about 200 cases.

3    Q.   And if you include your experience at Bode Cellmark

4    Forensics, about how many DNA tests have you conducted

5    throughout your career?

6    A.   Since I was with Bode for a little over eight years, I

7    would say my number of cases there were in the thousands, so

8    quite a few.

9    Q.   All right.  And moving on to talking about what DNA is

10   generally, can you describe to the jury what DNA is?

11   A.   Sure.  DNA stands for deoxyribonucleic acid, and it's the

12   generic material that's found in all of the cells of our body.

13   A person will receive half of their DNA from their mother and

14   the other half of their DNA from their father.

15   Q.   Does every individual have their own unique DNA?

16   A.   With the exception of identical twins, everyone has their

17   own DNA.

18   Q.   And where is DNA found in the human body?

19   A.   DNA is found within all the cells of the body, and the

20   cells are the building blocks of your body.  You have many

21   different types of cell types such as blood cells, muscle

22   cells, skin cells, and DNA is contained within all of those.

23   It's important to note also that the DNA that's found within

24   all those different cells is exactly the same no matter where

25   it comes from.

1   Q.   And what are some of the ways that DNA can be left at a

2   crime scene?

3   A.   There's a number of ways that DNA can be left behind.  As

4   I said, it's contained in all the cells of your body.  So for

5   instance, as you walk around throughout the day, you're

6   shedding skin sells, so that's one way to leave DNA behind.

7           In the example of a sexual assault case, someone or

8   the perpetrator could leave semen behind or blood behind.  In

9   the case of a homicide, there can be blood left behind as well

10  or there could be DNA that's deposited on the weapon from that

11  homicide.

12  Q.   And in cases where there is a contact between two people,

13  what are some of the ways that someone can transfer their

14  DNL -- DNA cells to another person?

15  A.   DNA can be transferred from person to person through

16  skin-to-skin contact, so with handshakes, brushing up against

17  someone, any manner of -- of ways such as with -- with contact

18  between two people.

19  Q.   And does every contact result in a DNA transfer?

20  A.   No, not necessarily.

21  Q.   And what are some of the factors that affect whether DNA

22  is transferred from one person to another or from a person to

23  an object?

24  A.   There's actually a lot of different factors that come into

25  play with how DNA is left behind from skin cells or any other

1    type of cells.  There can be -- it's the -- it can involve the

2    amount of time that that object was touched or held.  It can

3    involve the environmental conditions, whether that person's

4    hands or whatever part was touching is sweaty, if it's dry,

5    anything like that, and all of those factors come together to

6    kind of determine how much DNA may or may not be left behind.

7    Q.   And do some people shed skin cells more easily than other

8    people or does it just defend on -- depend on all of those

9    factors that you just mentioned?

10   A.   It really just depends on all those factors that I

11   mentioned and the combination of all of them at any one moment

12   in time.

13   Q.   And when you're examining DNA, what kinds of differences

14   do you look at between people's DNA cells?

15   A.   Sure.  So as I mentioned, everyone has their own unique

16   DNA except for the case of identical twins.  99 percent of our

17   DNA, so that my DNA and your DNA, would be exactly the same,

18   and this makes sense since we are all human and have a lot of

19   similar characteristics.  The remaining one percent of our DNA,

20   however, is different between us, and that's what accounts for

21   our differences.

22        So when I'm doing my DNA testing, I'm looking at

23   areas within that one percent of the DNA that differs between

24   us.  These are called short tandem repeat or STRs for short.

25   And essentially what these are are short pieces of DNA that are

1    repeated back to back a certain number of times.  So, for

2    instance, at one of those locations I may have nine repeated

3    pieces of DNA where you may have 12.  So with my test I'm

4    looking at 21 of these STR locations and determining the number

5    of repeats at each one of those and putting all that

6    information together to create a DNA profile.

7    Q.   And how -- so how is DNA testing performed, are there a

8    certain amount of steps that you go through?

9    A.   Generally, yes.  There are about -- or there are five

10   general steps that go into DNA testing, and they are

11   collection, extraction, quantification, amplification and then

12   DNA separation.

13   Q.   Okay.  Let's talk about each of those one by one.  You

14   said the first step that you take in performing a DNA test is

15   collection.  What is that?

16   A.   So collection is where we take the evidence that's been

17   submitted, so, for instance, a swab, which is basically just a

18   sterile Q-tip that's been used to try to collect those cells

19   that may have been left behind that contain the DNA.  We'll

20   take a cutting of that swab in order to take those cells from

21   that crime evidence and get it ready for DNA processing.

22   Q.   And you said a swab is a sterile Q-tip that's used to

23   collect potential DNA cells?

24   A.   Yes.

25   Q.   Is that done just by swabbing that sterile Q-tip on the

1   surface that you're testing?

2   A.   Yes.

3   Q.   And that's usually done, the actual testing of the object

4   is usually done before it gets to you in the lab, is that

5   right?

6   A.   It can be, or if actual items of evidence are sent to us,

7   we can use swabs in the laboratory to test those items.

8   Q.   And do you always find DNA cells on every swab that you

9   receive?

10  A.   No, we don't.

11  Q.   Is it uncommon for you to not find any DNA on swabs that

12  you receive?

13  A.   No, it's not uncommon.

14  Q.   And you mentioned the second step that you take in your

15  DNA tests is extraction.  What is that?

16  A.   Extraction is where we take that cutting that we've taken

17  from the swab and we add a series of chemicals to it in order

18  to break open the cell and gain access to the DNA that's

19  contained within there.

20  Q.   And the next step would be quantification?

21  A.   Yes.

22  Q.   What is that?

23  A.   So quantification is a test that I will run once I have

24  that extracted DNA, and that extracted DNA is pure DNA with no

25  cell debris left behind or anything.  And that test is run, the

1    quantification test, in order to determine an estimate of how

2    much DNA has been obtained from that item of evidence.

3    Q.  Is it ever the case that you collect some DNA but you

4    don't have enough DNA to perform a satisfactory analysis?

5    A.  When we run the quant test, sometimes we do see that

6    there's a low amount of DNA, but again, this is just an

7    estimate to give us an idea of how much DNA we've collected.

8    We will take it forward to -- through the rest of the process

9    after that.

10   Q.  And the fourth step you mentioned is amplification.  What

11   is that?

12   A.  Yes.  Amplification is where we are making millions of

13   identical copies of those 21 STR regions that I explained to

14   you we're interested in looking at for the DNA tests.  The

15   reason we make millions of identical copies is because we need

16   a lot of DNA there to be able to detect that on our instruments

17   down the line for the processing.

18   Q.  And the last step, that's DNA separation you said?

19   A.  Yes.  DNA separation is where I take all of those millions

20   of identical copies and they are run on an instrument that

21   separates them out by size.  So whenever that's done, I'm able

22   to visualize all of the information at all of those locations

23   that I'm interested in looking at.

24   Q.  And is that where you encounter the DNA profile that you

25   mentioned?

1    A.   Yes, it is.

2    Q.   And each person has a separate DNA profile?

3    A.   Each person has their own unique DNA, of course with the

4    exception of identical twins, so every person has a different

5    DNA profile.

6    Q.   And when you compare DNA profiles, what are some of the

7    possible outcomes?

8    A.   Sure.  At the end of the testing when I have the evidence

9    DNA profile, I'll go ahead and compare that to any reference

10   profiles that I have for the case.  And a reference profile is

11   simply a sample that's been taken from a known person so I know

12   that that DNA profile belongs to that person.  I compare that

13   DNA profile to the DNA profile I obtained from the evidence to

14   see if there's a match.  So the three outcomes of that are that

15   when I make that comparison, I cannot exclude that person as a

16   contributor, I may be able to exclude that person as a

17   contributor, or it may be inconclusive.

18   Q.   So the three possible outcomes you said, the first one is

19   you're unable to exclude that person?

20   A.   Yes.  So basically when that happens, I look at the DNA

21   profile from the evidence, compare it to the DNA profile from

22   the reference, and they're either the same or similar that I'm

23   unable to exclude that person as a possible contributor to that

24   evidence.

25   Q.   And the second possibility is that you are able to exclude

1    them from the DNA evidence, is that right?

2    A.   That's correct.  And that's -- whenever I make that

3    comparison, the two DNA profiles are different, so I'm able to

4    exclude that person as possibly contributing DNA to that

5    evidence.

6    Q.   And the third possibility you mentioned is that it's just

7    inconclusive, is that right?

8    A.   Yes.  And inconclusive basically means that there's just

9    not enough information there when I make that comparison to

10   tell one way or the other as to whether that person could or

11   could not be a possible contributor to particular evidence.

12   Q.   So are you ever able to say with a hundred percent

13   certainty that there is a DNA match?

14   A.   No, I'm not able to say with a hundred percent certainty

15   when two profiles match that that person is absolutely the

16   contributor to that DNA.

17   Q.   And were you asked to conduct DNA analysis in the case of

18   the United States versus Prabhu Ramamoorthy?

19   A.   Yes, I was.

20   Q.   Did you receive a basic package containing evidence in the

21   case as well as an overview of the case?

22   A.   Yes, I did.

23   Q.   Did that overview contain basic information about the

24   nature of the test -- I mean, I'm sorry, the nature of the

25   case?

1   A.   Yes, it did.

2   Q.   And did you receive reference samples from the victim in

3   this case?

4   A.   I did, yes.

5   Q.   Did that contain her DNA profile?

6   A.   I processed that.  It was a buccal swab.  Buccal swab is

7   just a cheek swab that is taken from an individual.  And I

8   processed that and used that as her reference profile.

9   Q.   And did you also receive several swabs that came from the

10  victim's rape kit?

11  A.   I did, yes.

12  Q.   Did that include vaginal swabs?

13  A.   Yes, it does.

14  Q.   Is that for both the labia majora and labia minora?

15  A.   Yes.  Those were three separate samples.  There were

16  vaginal/cervical -- cervical swabs and then separate swabs

17  taken of the labia majora and the labia minora.

18  Q.   Did you also receive perianal swabs?

19  A.   Yes.

20  Q.   And is that just the area between the anus and the vagina?

21  A.   It is, yes.

22  Q.   And did you also receive separate swabs from the left and

23  right breast?

24  A.   I believe for those it was a set of swabs taken from both

25  left and right breasts.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1519   Page 191 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

191

1    Q.   And did you also receive a -- a set of a materials coming

2    from the defendant's body?

3    A.   I did, yes.

4    Q.   Did that include clippings from his left fingernails?

5    A.   Yes, it did.

6    Q.   As well as clippings from his right fingernails?

7    A.   Yes.

8    Q.   Did that also include swabs from his left fingers?

9    A.   Yes.

10   Q.   His right fingers?

11   A.   Yes.

12   Q.   And also a swab from his right hand?

13   A.   Yes.

14   Q.   And with -- with -- with regard to the fingernail

15   clippings, did you have more clippings from one hand versus the

16   other?

17   A.   Yes.  We received seven clippings, fingernail clipping

18   fragments from the left hand, and we received one fingernail

19   clipping from the right hand.

20   Q.   But you're not the person who actually clipped his

21   fingernails, is that right?

22   A.   That's correct.

23   Q.   And you didn't take any of the swabs that you analyzed in

24   this case?

25   A.   No, I did not.

 1    Q.   And when you analyzed the DNA swabs taken from the

 2    victim's body, did you encounter any DNA profiles that were

 3    found to be from someone other than the victim?

 4    A.   No.  When I looked at the DNA profiles from the intimate

 5    body swabs taken from the victim, the only DNA that was present

 6    there was consistent with the victim.

 7    Q.   And if the victim had showered prior to the DNA swabs

 8    being taken, would that affect the DNA tests?

 9    A.   It could, yes.

10    Q.   So if there was DNA on her body, could that have been

11    washed away in the shower?

12    A.   It could have been, yes.

13    Q.   Okay.  And now let's talk about the -- the items that were

14    received from the defendant.  With regard to the defendant's

15    right hand, was there any DNA that could possibly be the

16    victim's DNA on the swabs taken from his right hand, right

17    fingers and right fingernails?

18    A.   So I got different results for the swabs that were taken

19    from the hand and the fingers as opposed to what was on the

20    right hand fingernail.

21         I'll talk about the right hand fingernail first.

22    From that particular sample, I got a single source profile,

23    which means that it came from one individual.  And when I

24    compared that profile to that of the victim, she was excluded

25    as a possible contributor to that profile.

1              As far as the swabs from the right hand and the right

2     fingers on that hand, I obtained a DNA profile that was

3     consistent with a mixture of two individuals, meaning that

4     two -- it was assumed that two people had contributed DNA

5     there.  When I compared the victim's profile to that, she was

6     also excluded as a possible contributor.

7     Q.   And now let's talk about his left hand.  And excluding the

8     left fingernail, was there any evidence that matched the

9     victim's DNA on his left hand?

10    A.   No, there was not.

11    Q.   And what was the result from the test of his left

12    fingernail?

13    A.   For the left fingernail, there was a -- assumed to be a

14    mixture of two individuals on that item, and when I compared

15    that to the victim's reference profile, it was inconclusive as

16    to whether or not she could be a contributor to that DNA from

17    the evidence.

18    Q.   Does the fact that there was not a DNA match in this case

19    mean that the defendant did not touch the victim?

20    A.   Not necessarily, no.

21    Q.   Do you always find male DNA on a female sexual assault

22    victim?

23    A.   Not always, no.

24    Q.   Is every case different?

25    A.   Yes, every case is different.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1522   Page 194 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

194

1   Q.   And what are some of the reasons that you don't find DNA?

2   A.   There's a number of reasons why you may not find DNA.  The

3   most obvious is that DNA may not have been deposited there.

4   However, there may be DNA there that was deposited, but it

5   could be at levels that are not detectable by my tests.  We do

6   have a level where we just can't detect, it's not sensitive

7   enough to be able to detect any DNA that may be there.  Of

8   course, there's also environmental factors that can come into

9   play such as if you deposited DNA on someone's hands, if they

10  wash their hands, that can go away.  Also just factors that

11  environmentally affect DNA such as heat and humidity and being

12  left out in sunlight.

13  Q.   So because of all these reasons, is it typically ideal to

14  get a sample as soon as possible after an offense?

15  A.   Generally, yes.

16  Q.   And when there is a passage of time between when the

17  offense happens and when the DNA is collected, is it less

18  likely that you will get a DNA result the more time that

19  passes?

20  A.   I would say that with more time that passes, it is

21  possible that you may not -- that the DNA may -- could be

22  washed away, something could happen, it could be transferred

23  somewhere else.  So with the passage of time, you could obtain

24  more DNA or, excuse me, less DNA than what you would have had

25  had it been taken earlier.

1    Q.   So is it fair to say that it doesn't surprise you that you

2    wouldn't find DNA when a few hours has passed between the time

3    of an offense and the time of the collection?

4    A.   I think that's fair to say, yes.

5    Q.   And you mentioned washing your hands could have a -- an

6    effect on the DNA, any DNA that may have been deposited.  Are

7    there other things that one can do that would affect any DNA

8    that could have been on one's hands?

9    A.   Could you rephrase that question?

10   Q.   Sorry, that was a long question.  Are there other things

11   in addition to washing your hands that could affect the DNA

12   that's on your hand?

13   A.   If you're speaking about DNA that may have been deposited

14   on your hand?

15   Q.   Right.

16   A.   Washing your hands is -- is a big one.  There's also if

17   you rub it on any other surfaces, touch anything else, it's

18   possible to transfer DNA that may have been deposited on you

19   that way.

20   Q.   Would that include wiping your hands on a napkin?

21   A.   Yes, it could.

22   Q.   What about wiping your hands on your clothes?

23   A.   Yes, that's possible.

24   Q.   What about someone who has their hands in their pockets?

25   A.   Yes, that would be possible.

1   Q.   And what if someone is fingerprinted by the police before

2   the evidence is taken, would that affect the DNA on their

3   hands?

4   A.   It could.

5            MS. JAWAD:  If I could have one moment, Your Honor.

6            (Brief pause)

7   BY MS. JAWAD:

8   Q.   Are there ever times when the -- the presence of male DNA

9   can affect whether or not female DNA is detectable?

10  A.   So with my testing, as I told you, I look at 21 locations

11  that are the STR locations; those are the areas that are

12  different between us.

13           In addition to that, there are three locations that I

14  look at that can give some indication as to the gender of the

15  people or person or people that may have contributed DNA to

16  that evidence.  There's a particular location that's called

17  amelogenin.  Females will have two X alleles or pieces of DNA

18  information at that location whereas males will have an X and a

19  Y.  If the result of the testing has an X and a Y and they are

20  in balance, it could be there's definitely male DNA there, but

21  it can be difficult to tell if there's also female DNA.  So,

22  yes, there can be some question as to whether there's both male

23  and female DNA present in that sample.

24  Q.   And we talked about the variety of ways that DNA that's

25  been deposited can later be removed.  It's also possible for

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1525   Page 197 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

197

1    you to have skin-to-skin contact with someone that results in

2    no DNA transfer, am I understanding you correctly?

3    A.   Yes.  That's possible.

4           MS. JAWAD:  I have no further questions, Your Honor.

5           THE COURT:  Thank you very much.

6           Any cross-examination?

7           MR. AMBERG:  Yes, Your Honor.

8                         CROSS-EXAMINATION

9    BY MR. AMBERG:

10   Q.   Hello.

11   A.   Good afternoon.

12   Q.   Good afternoon.  It's good to see you.  Just have a few

13   questions for you.

14   A.   Okay.

15   Q.   I want to go right along with what Ms. Jawad was just

16   asking you about about what you may or may not expect as you're

17   doing these tests, okay?  The -- the key thing in this case is

18   this right hand, all right?  And what you just testified to was

19   that there was DNA on Mr. Ramamoorthy's right hand that

20   originated from two people, right?

21   A.   I believe that's correct, yes.

22   Q.   Yes?  Okay.

23           And that the complainant in this case, her DNA was

24   not on his right hand, right?

25   A.   She was excluded as a possible contributor.

1    Q.   Okay.  But there was somebody else's DNA on there, right?

2    A.   There was indication of two people's DNA there.

3    Q.   Right.  So if somebody like Mr. Ramamoorthy washed his

4    hand, he probably would have washed off everybody else's DNA,

5    right?

6    A.   He could have.

7    Q.   But that was not the case here, right?

8    A.   From that particular sample, there was a mixture of two

9    individuals.

10   Q.   That would suggest that, I don't know, maybe he didn't

11   wash his hand or anything, right?

12   A.   I can't really tell one way or the other from my testing.

13   Q.   Okay.  That all the DNA on his hand didn't get transferred

14   off through any touching or things like that, right?

15   A.   From my testing I can't tell anything about what was

16   transferred or what was not transferred.

17   Q.   Okay.  All right.  Well, let's kind of go through this

18   here.  DNA can be collected in many different ways as you've

19   testified to, right?

20   A.   That's correct.

21   Q.   And like you said, a simple handshake could give you DNA,

22   right?

23   A.   It could, yes.

24   Q.   Like me touching this podium, I'm putting my DNA on it,

25   right?

1    A.   You could be, yes.

2    Q.   You -- you could take a swab and, boom, there's my DNA on

3    there, right?

4    A.   That's possible yes.

5    Q.   Okay.  And that's what the DNA collectors in the field

6    will do, right, swab to find the DNA?

7    A.   They are swabbing to collect the cells that may have been

8    left behind, yes.

9    Q.   Okay.  And in this case there was a lot of different

10   samples that were given to you, right?

11   A.   Yes.

12   Q.   We had the samples from the complainant in this case from

13   her vaginal area, there were multiple samples, right?

14   A.   Yes.

15   Q.   Okay.  And her DNA was present in those, right?

16   A.   There was a DNA profile and, yes, it was consistent with

17   the victim.

18   Q.   Okay.  Mr. Ramamoorthy's DNA was not there, was it?

19   A.   There was no foreign DNA that was detected in those

20   samples.

21   Q.   Okay.  Same thing with her -- her breasts, that was

22   swabbed as well, right?

23   A.   That's correct.

24   Q.   Both breasts, right?

25   A.   Yes, that's correct.

1  Q.   And her DNA was present there, right?

2  A.   Yes.

3  Q.   Mr. Ramamoorthy's, nowhere to be found?

4  A.   There was no foreign DNA on those samples either.

5  Q.   Okay.  Now, I want to talk about the right hand fingernail

6  clipping, okay?  Now, fingernails are important for DNA

7  collection because they will collect DNA from other people,

8  right?

9  A.   It's possible, yes.

10 Q.   Well, I mean in a fight if -- if somebody gives the old

11 cat claw, you're probably going to have DNA of that person on

12 your fingernails, right?

13 A.   You would expect that, yes.

14 Q.   Okay.  In this particular situation the accusation is that

15 Mr. Ramamoorthy put his hands into the complainant's vaginal

16 area, into her vagina, okay?

17 A.   Yes.

18 Q.   From -- and you understand that, right?

19 A.   I do.

20 Q.   Okay.  From that, you would expect there to be DNA of the

21 complainant in the fingernails, right?

22 A.   It's possible.

23 Q.   Well, doesn't the -- the vaginal area contain very easily

24 transferrable DNA?

25 A.   It can, yes.

1    Q.   And because -- and I don't want to get too graphic in

2    this, okay, but that area of the body is very much conducive,

3    if you touch it, you're going to have a lot of DNA left on

4    whatever you've touched with it, right?

5    A.   You can, yes.

6    Q.   Especially a hand?

7    A.   You could, yes.

8    Q.   Right?

9         You -- it's not just you could.  You would expect

10   there -- if -- if the hand enters a vagina, you would expect

11   that hand to have DNA all over it?

12   A.   It could but it also could not.

13   Q.   You're saying that it -- it's possible that DNA couldn't

14   be transferred in that way?

15   A.   It depends also on how long that contact took place, that

16   can have an effect.  So it's possible that it could be there,

17   it's possible that it could not.

18   Q.   Okay.  Well, what if it -- what if it was a minute?

19   A.   It could.

20   Q.   His right hand fingernail had none of her DNA in it,

21   right?

22   A.   The right hand fingernail was a single source profile.

23   Q.   Right.  His source?

24   A.   It was a single source male profile, but I did not have a

25   reference from the defendant so I wasn't able to make that

1   comparison.

2   Q.   Okay.  The same thing goes with these -- the hand swabs on

3   his right hand.  You tested his right hand finger, right, or

4   the -- the swab must have said "right hand finger of Mr.

5   Ramamoorthy," right, or something to that effect?

6   A.   Yes, I believe so.

7   Q.   Okay.  And you tested that, right?

8   A.   Yes.

9   Q.   And the finger came up negative for his DNA -- or for her

10  DNA, right?

11  A.   When I compared her DNA, she was excluded as a possible

12  contributor, yes.

13  Q.   And -- and same thing with his right hand, correct?

14  A.   Yes, that's correct.

15  Q.   Okay.  Now, as far as his left hand, the -- the swab of

16  his left hand also indicated that the complainant was excluded

17  as anybody with DNA on his left hand, right?

18  A.   I'm sorry, could you ask that again?

19  Q.   Yeah, right.  Now we're on to the left hand, okay?  On the

20  left hand you -- that's where you discover -- did you discover

21  what, any of her DNA on the hand itself?

22  A.   From the swabs that were taken from the fingers, it was a

23  mixture of two individuals and she was excluded as a possible

24  contributor.

25  Q.   Okay.  You never found any of her DNA on him on anything

1    that was given to you?

2    A.   That's correct.

3    Q.   Okay.  Now, as far as DNA --

4    A.   Well, I'm sorry.  Could I answer that a little bit?

5    Q.   Sure.

6    A.   She was excluded from a number of the samples.  For one of

7    them she was inconclusive, so I wasn't able to tell one way or

8    the other --

9    Q.   Okay.

10   A.   -- as to whether she was a contributor.

11   Q.   Okay.  So what does that -- as inconclusive, okay, you

12   cannot say that that was her DNA, right, because otherwise

13   you'd say it?

14   A.   There was not enough -- not enough information either way

15   to tell.

16   Q.   And very well with inconclusive, it -- it is absolutely

17   possible that no contact ever occurred between these two

18   people?

19   A.   That's possible, yes.

20   Q.   Okay.  The -- the number one reason why there's not DNA on

21   one person when you think there might be is because the contact

22   never happened, right?

23   A.   That is a reason, yes.

24   Q.   Right.  It's like the primary reason.

25             Okay.  Now I want to talk about how DNA exists.  DNA,

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1532   Page 204 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

204

1    you can get that days later, right?

2    A.   I'm not sure I understand your question.

3    Q.   I -- I mean when you're -- when you're sampling for DNA,

4    you can get that days later?

5    A.   It's possible to sample an item days down the line and

6    there still be DNA left on that item, yes, that is true.

7    Q.   Okay.  So a couple of hours, that doesn't mean that

8    there's not going to be DNA on there, right?

9    A.   Not necessarily.

10   Q.   Right.  There very well could be, right?

11   A.   True.  Yes.

12   Q.   And especially if somebody's hand was in a vagina, you

13   would expect there to be a ton of DNA on there even hours

14   later?

15   A.   It's possible.

16            MR. AMBERG:  If I could have one second, Your Honor.

17            (Brief pause)

18            No further questions.  Thank you, ma'am.

19            THE WITNESS:  You're welcome.

20            THE COURT:  Thank you very much.

21            Any redirect?

22            MS. JAWAD:  Yes, Your Honor.

23                          REDIRECT EXAMINATION

24   BY MS. JAWAD:

25   Q.   Ms. Plaza, when defense counsel rubbed his hand on this

1    lectern and stated it's possible his DNA could be left behind,

2    is it also possible it couldn't be left behind or it wasn't

3    left behind?

4    A.   That's possible as well, yes.

5    Q.   And it's possible that you can touch something without

6    ever shedding any skin cells or leaving your DNA behind?

7    A.   Yes, that's possible.

8    Q.   And is there anything different about the vaginal area

9    versus other areas of the body or is it just that there's more

10   surface area there?

11   A.   The vaginal area contains epithelial cells which are skin

12   cells.  They're obviously contained within a confined area, but

13   they're skin cells just as the rest of the body.

14   Q.   And when defense counsel stated that it's -- not having

15   contact is the primary reason that DNA wouldn't be found in a

16   DNA analysis, were those his words or your words?

17   A.   Those were his words.  That's a reason that there may not

18   be any DNA there is because it was never left behind.

19   Q.   But is it also possible that a contact happened and DNA

20   was never left behind?

21   A.   Yes, that is possible as well.

22          MS. JAWAD:  No further questions, Your Honor.

23          THE COURT:  All right.  Thank you very much.

24          Let me ask our members of the jury, do you have any

25   questions for this witness?  Please pass them forward.  Counsel

1    approach.

2             (Sidebar discussion as follows):

3             THE COURT:  Okay.  The first juror asks, "Which right

4    hand fingernail was tested?"

5             MS. JAWAD:  No objection to that question.

6             MR. AMBERG:  No objection.

7             THE COURT:  Another juror asks, "Was defendant's

8    clothing tested for Laura's DNA?"

9             MS. JAWAD:  No objection.

10            MR. AMBERG:  If she knows.  I don't know if she would

11   know.

12            THE COURT REPORTER:  I can't hear you please.

13            MR. AMBERG:  Oh, I'm sorry.  I don't know if she

14   would know that or not.

15            THE COURT:  I will pose it that way.

16            This juror asks, "If defendant put his hands in his

17   mouth to, say, bite nails, would it remove complainant's DNA

18   from his hands?"

19            MR. AMBERG:  I mean that's -- that's a valid

20   question.

21            MS. JAWAD:  No objection.

22            THE COURT:  This question is -- juror asks, "What

23   percentage of evidence swabs are unsuccessful in obtaining DNA

24   material?"

25            MS. JAWAD:  No objection to the question.

 1          MR. AMBERG:  The only problem I have with that

 2    question is it's a pretty general question.  I mean maybe it

 3    should be more specified into something like this because who

 4    knows.

 5          MS. SMITH:  I think it's in her experience.  In her

 6    experience I think is okay.

 7          THE COURT:  I'll ask the question and you can ask any

 8    followup questions, but there are no objections?

 9          MR. AMBERG:  No objections.

10          (End of sidebar discussion)

11          THE COURT:  All right.  Ms. Plaza, we have a number

12    of questions from the members of the jury.  The first question

13    is, "Which right hand fingernail was tested if you know?"

14          THE WITNESS:  I don't have that information.

15          THE COURT:  A juror asks, "Was defendant's clothing

16    tested for Laura's," the complainant's, "DNA?"

17          THE WITNESS:  No, it was not.

18          THE COURT:  A juror asks, "If defendant put his hands

19    in his mouth to, say, bite nails, would it remove complainant's

20    DNA from his hands?"

21          THE WITNESS:  It's possible that it could.

22          THE COURT:  A juror asks, "What percentage of

23    evidence swabs are unsuccessful in obtaining DNA material?"

24          THE WITNESS:  It's really hard for me to estimate,

25    and the reason is because every case is different and every

1   item of evidence is different.  There's a number of different

2   textures, surfaces, those types of things that can be tested.

3   And again, it's -- it's variable as far as how much DNA is left

4   behind and whether DNA is left behind, so it's hard for me to

5   give you an estimate of the percentage.  I guess the best

6   answer would be that it's just everything is -- is variable

7   with DNA testing as far as the DNA that's left behind and the

8   collection of those types of things.

9          THE COURT:  All right.  Let's see if we have any

10  followup questions from counsel.  Are there any followup

11  questions?

12         MS. JAWAD:  Yes, Your Honor, just one.

13               REDIRECT EXAMINATION CONTINUED

14  BY MS. JAWAD:

15  Q.  I'd just like to clarify, Ms. Plaza, do you test both

16  DNA -- or DNA on both objects and people?

17  A.  Yes.  I can test DNA from objects as well as swabs that

18  have been taken from individuals, yes.

19         MS. JAWAD:  Thank you, Your Honor.

20         THE COURT:  Mr. Amberg, any followup questions?

21         (Brief pause)

22         MR. AMBERG:  No, Your Honor.  Thank you.

23         THE COURT:  Very well.  May this witness be excused?

24         MS. JAWAD:  Yes, Your Honor.

25         THE COURT:  Thank you very much, Ms. Plaza.  You may

1    step down.  Thank you for your testimony today.

2              (Witness excused at 2:35 p.m.)

3              THE COURT:  Ms. Smith or Ms. Jawad, do you have any

4    other witnesses you wish to present today?

5              MS. JAWAD:  No, Your Honor.

6              THE COURT:  All right.  Well, ladies and gentlemen,

7    as I said, we are going to break early today and we'll be back

8    tomorrow morning, and I expect tomorrow we'll probably put in a

9    full day.  And so I hope you'll be able to have a nice

10   afternoon and maybe kind of rest up a little bit.

11             Please don't discuss the case and don't do any kind

12   of research or anything like that.  As you know, until it's

13   time for deliberation, you may discuss the case, but you really

14   may not ever do any research other than looking at the evidence

15   that's presented in the courtroom.

16             Is there anything further that we need the jury to

17   address today or may they be excused?

18             MS. JAWAD:  Nothing further, Your Honor.

19             MR. AMBERG:  Nothing else.

20             THE COURT:  All right.  Thank you very much, ladies

21   and gentlemen.  We'll see you tomorrow morning.  All rise for

22   the jury.

23             (Jury excused at 2:36 p.m.)

24             THE COURT:  You may be seated.  All right.

25             Well, let's go over, first of all, what are the

1    remaining evidence, what are the remaining witnesses that the

2    government wishes to call?

3           MS. JAWAD:  Yes, Your Honor.  That would be Erin

4    Ivaniszyn, the SANE nurse who completed the rape kit, and the

5    case agent, Eric Erkkinen.

6           THE COURT:  Two more witnesses?

7           MS. JAWAD:  Yes.

8           THE COURT:  All right.

9           MS. JAWAD:  I don't believe they'll take longer than

10   the morning tomorrow.

11          THE COURT:  And Mr. Amberg, you do anticipate calling

12   a number of witnesses, and you said you're still trying to

13   determine exactly how many, but in the nature of about how

14   many?

15          MR. AMBERG:  Two for sure.  Got Thomas Selleke; I

16   don't think he's going to take more than a half an hour.  Mr.

17   Ramamoorthy's wife Geetha, I don't want to butcher her name,

18   Nataranji [sic], Nataran [sic] -- Natarajan.  Is that how you

19   say it?  Okay.  Close enough.  I don't think her testimony is

20   going to take more than an hour.

21          As far as my client testifying, that's something that

22   we need to discuss and I'm not sure.

23          As far as the -- our expert, Julie Howenstine, I've

24   got her ready to go for tomorrow, but I -- after Ms. Plaza just

25   testifying, I may not call Ms. Howenstine because I've got to

 1   just talk to her based on what I just heard in here to see

 2   if -- if we would just be being redundant.

 3            THE COURT:  Understood.  All right.  So we would have

 4   possibly four or five total witnesses or six if your DNA

 5   witness testifies?

 6            MR. AMBERG:  Yes, Your Honor.

 7            THE COURT:  Well, I think it's likely we would

 8   complete the evidence tomorrow then.  What do you all think?

 9            MS. JAWAD:  I think that's possible.

10            THE COURT:  It certainly seems possible.

11            MR. AMBERG:  I -- I definitely think we're going to

12   get done tomorrow, Your Honor.  And I guess the next question

13   would be do we say -- I mean my own personal feeling is this.

14   The trial's got -- gone on a lot faster than I think we thought

15   it would, and I would prefer if we did closings fresh on

16   Wednesday morning, but I mean I guess we could have it at the

17   end of the day.  I just -- I'm not fresh, you know, if it's

18   4:00 o'clock and I'm getting up here to do my closing.  So I

19   would ask that if this is the case, maybe we could sort of plan

20   ahead and say we'll be doing those closings Wednesday morning

21   and then go right into it.

22            MS. JAWAD:  No objection.

23            THE COURT:  Well, I think that's reasonable.  I want

24   to say though if we -- if by some unexpected turn of events we

25   finish at noontime, then we're going to use the afternoon to

```
1    have the closing arguments.

2              MS. JAWAD:  That's fair, Your Honor.

3              THE COURT:  I don't want to waste their time or not

4    use their time when they're here, okay?

5              All right.  Well, I thought we might just take a look

6    at your jury instructions that you submitted, that the

7    government submitted, and just kind of go over them here.  Do

8    you both have copies of the jury instructions?

9              MR. AMBERG:  Yes, Your Honor.

10             MS. JAWAD:  Yes, Your Honor.

11             THE COURT:  Okay.  So we have the "Introduction."

12   Are there any objection to that?

13             MS. JAWAD:  No, Your Honor.

14             THE COURT:  Okay.  And then we have "Jurors' Duties"

15   and then we have the "Presumption of Innocence" and the "Burden

16   of Proof."  Any objection to either of those?

17             MS. JAWAD:  No, Your Honor.

18             THE COURT:  Mr. Amberg, any objection to either of

19   those?

20             MR. AMBERG:  No, Your Honor.  I'm just trying to get

21   up to speed here.

22             THE COURT:  You might want to staple those.

23             MR. AMBERG:  I was being crafty, at least I thought I

24   was, when I put them in my notebook.

25             THE COURT:  How about the definition of evidence?
```

1        MR. AMBERG:  That looks good, Your Honor.

2        THE COURT:  So let's just -- when I say what the

3    instruction is, I would like the parties to indicate either

4    they have an objection or they have no objection.

5        So the definition of evidence?

6        MS. JAWAD:  Your Honor, we have no objection, but I

7    think we can in paragraph 2 remove the bracketed section that

8    says, "[the facts that I have judicially noticed]."  I don't

9    anticipate asking the Court to judicially notice any facts.

10       MR. AMBERG:  Agreed.

11       THE COURT:  All right.  And have -- were there any

12   stipulations either?

13       MR. AMBERG:  There's -- there's going to be one --

14       MS. JAWAD:  There's going to be one.

15       MR. AMBERG:  -- tomorrow.

16       THE COURT:  Okay.  I would tell you all as well that

17   I realize we're going over these in a somewhat cursory way

18   here, so please go over them more carefully between today and

19   tomorrow and if you see anything else that you think needs to

20   be changed, then let's bring it up, okay?

21       The next instruction is the "Consideration of

22   Evidence."  Any objection?

23       MR. AMBERG:  No objection from defense.

24       MS. JAWAD:  No, Your Honor.

25       THE COURT:  Then we have "Direct and Circumstantial

```
 1   Evidence" and "Credibility of Witnesses."  Any objection to
 2   those?
 3           MS. JAWAD:  No objection.
 4           MR. AMBERG:  No objection.
 5           THE COURT:  We have an instruction on the "Number of
 6   Witnesses" and -- and an instruction on "Lawyers' Objections."
 7   Any objections to those?
 8           MS. JAWAD:  No, Your Honor.
 9           MR. AMBERG:  No, Your Honor.
10           THE COURT:  We have the "Introduction — Defining the
11   Crime" and "Definition of the Crime."  Is there any objection
12   to those?
13           MS. JAWAD:  No, Your Honor.
14           MR. AMBERG:  No, Your Honor.
15           THE COURT:  There's a definition for "Attempt."  Is
16   that acceptable?
17           MR. AMBERG:  Yes, Your Honor.
18           MS. JAWAD:  Yes, Your Honor.
19           THE COURT:  All right.  We have "On or About" and
20   "Inferring Required Mental State."  Any objection to those?
21           MS. JAWAD:  No, Your Honor.
22           MR. AMBERG:  No, Your Honor.
23           THE COURT:  There's an 'Introduction for Evidentiary
24   Matters' and there's an instruction on "Defendant's Election
25   Not to Testify."  Obviously that will only be relevant if the
```

```
 1    defendant elects not to testify, but other than that, are there
 2    any objections?
 3               MS. JAWAD:  No, Your Honor.
 4               MR. AMBERG:  No.  We anticipate presenting evidence
 5    through -- through testimony.
 6               THE COURT:  Okay.  So we might need this regarding
 7    the right not to testify --
 8               MR. AMBERG:  Yes.
 9               THE COURT:  -- but not to present evidence.
10               MS. JAWAD:  Yes, Your Honor.
11               MR. AMBERG:  Yes, Your Honor.
12               THE COURT:  So we can definitely take out the "or
13    Present Evidence."
14               The -- there's an instruction in case the defendant
15    does testify, which would only be used if he did testify.
16               And then there's an instruction about "Opinion
17    Testimony."  We didn't really qualify the witness to offer
18    opinion testimony but she did offer opinion testimony, so it's
19    up to you all if you want to use this.
20               MR. AMBERG:  Yeah, I think that would make sense.
21               MS. JAWAD:  I think this should include Marcy Plaza,
22    Your Honor.
23               MR. AMBERG:  Yeah, no objection, Your Honor, because
24    then we know if they know who we're talking about.
25               THE COURT:  Well, the next one relates to someone who
```

 1    is both a fact and opinion witness, so do we need both of those

 2    or do we not need...

 3              (Brief pause)

 4              MR. AMBERG:  That's fine.

 5              MS. JAWAD:  Your Honor, I think we should get rid of

 6    the one that is just "Opinion Testimony" and use the one on

 7    page 26 for both facts and opinions for Ms. Plaza because she

 8    did testify to some facts as well.

 9              MR. AMBERG:  I -- oh, yeah.  Sorry.  I agree, Your

10    Honor.

11              THE COURT:  All right.  So I'll take out the one for

12    Opinion Testimony.

13              There's another one here for "Impeachment By Prior

14    Inconsistent Statement Not Under Oath."  I think we may have --

15    do we all want that instruction?

16              MR. AMBERG:  Your Honor, I think at this point that

17    hasn't happened, there hasn't been impeachment with like

18    testimony or anything.  So that may change but -- but at this

19    point it hasn't happened, so...

20              THE COURT:  Well, we'll put a question mark over this

21    one for now.  What do you think there, Ms. Jawad or Ms. Smith?

22              MS. JAWAD:  We agree.

23              THE COURT:  Okay.  I mean I think there were some

24    questions that were in the nature of impeachment type questions

25    but wasn't entirely clear they were based on a prior statement.

1          Then we have "False Exculpatory Statement."

2          MR. AMBERG:  This is the one that before the trial

3     started I had objected to.  I just -- I object to this

4     particular instruction for numerous reasons.  The Court giving

5     credence to somebody's prior statement being false, you're

6     taking the powers away from the jury to make that decision

7     about whether something's true or false.  They should be able

8     to give whatever weight they want, but when we say false

9     exculpatory statement, you are telling them that anything that

10    my client might have said to the officers was false and that

11    this crime happened.  So I just -- I don't see any way that

12    this could be read at all and I would ask that it not be read

13    in its entirety.

14          THE COURT:  Any response?

15          MS. JAWAD:  Yes.  Well, this is a pattern criminal

16    jury instruction from the Sixth Circuit.  And I think we can

17    proffer to the Court that the agent's testimony will show that

18    the defendant's statements to the police officers is

19    contradicted by his later admissions that he did intentionally

20    touch the victim, so it was a false statement that he gave to

21    those officers.

22          MR. AMBERG:  Well, maybe the second statement was

23    false.

24          THE COURT:  Well, I'm not really inclined to give

25    this instruction.  I'll think about it further and I'll defer

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1546   Page 218 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

218

 1    deciding until after all the evidence is in.  But it seems to

 2    me that it's more appropriate when you have a situation where

 3    it's clear, perhaps through one's own admission in their

 4    testimony, that they had given a false exculpatory statement or

 5    some other incontrovertible evidence that shows that a

 6    statement was false.

 7            The next one is for "Transcriptions of Recordings."

 8    Any objection there?

 9            MS. JAWAD:  No objection.

10            MR. AMBERG:  No objection.

11            THE COURT:  Then we have a "Statement by the

12    Defendant."  Any objection to that?

13            MS. JAWAD:  No objection.

14            MR. AMBERG:  No, Your Honor.

15            THE COURT:  And then there's one for "Stipulation."

16    Any objection there?

17            MS. JAWAD:  No, Your Honor.

18            MR. AMBERG:  No, Your Honor.

19            THE COURT:  And then we have "Deliberations and

20    Verdict."

21            MR. AMBERG:  You know, Your Honor, maybe going back

22    to that last one --

23            THE COURT:  Yes.

24            MR. AMBERG:  -- I don't think we stipulated on any

25    facts.  I think we're going to stipulate on that lab report

```
1    because we already have an instruction for that.
2              MS. JAWAD:  Okay.  Then we can remove this on page
3    31, Your Honor.
4              THE COURT:  Thank you.  And then we have
5    "Deliberations and Verdict."
6              MR. AMBERG:  No objection from defense.
7              MS. JAWAD:  No objection, Your Honor.  I just have a
8    question at -- each judge does this a little differently;
9    that's why number 4 is in brackets.  It says, "If you want to
10   see any of the exhibits that were admitted in evidence, you may
11   send me a message and those exhibits will be provided to you."
12   Some judges automatically send back the exhibits.  What is the
13   Court's practice?
14             THE COURT:  I would just as soon give them the
15   exhibits depending -- unless you object.
16             MS. JAWAD:  No objection.  So I think we can remove
17   paragraph 4.
18             MR. AMBERG:  No objection.
19             THE COURT:  One thing to keep in mind is that if they
20   want to view the videos, then we would need to have something
21   that they could view those on, so they may not be able to see
22   those right away.  Is that something that the U.S. Attorney's
23   Office usually provides or is that something that we provide
24   through the Court?
25             MS. SMITH:  In -- in my experience, if the jury wants
```

1    to view a video, they're usually brought out here and it's

2    played in the courtroom for them.  We will have disks of each

3    exhibit, so if -- if the parties agree to let your case manager

4    play it in the jury room, I don't know that I would object to

5    that if they use that disk and played it.  But when it goes

6    back into the jury, we create the disks that don't have the

7    transcripts running along the bottom.

8              MR. AMBERG:  No objection.

9              MS. SMITH:  So it's really up to the Court how you

10   want to do it.  Either they can come out here and we can play

11   it from our equipment, or if the Court has a laptop and wants

12   to play it off their laptop for the jury for the sake of

13   efficiency.

14             THE COURT:  I'll see what we have.

15             MS. SMITH:  All right.

16             THE COURT:  We'll get that resolved.

17             And then we have "Experiments and Research."  Any

18   objection to that one?

19             MR. AMBERG:  No objection.

20             THE COURT:  "Unanimous Verdict?"

21             MS. JAWAD:  No objection.

22             THE COURT:  "Unanimity" -- okay.  I -- there's one

23   here for here "Unanimity Not Required — Means."  Is that

24   acceptable?

25             MS. JAWAD:  Yes, Your Honor.

Case 2:18-cr-20027-TGB-MKM  ECF No. 84  filed 03/05/19  PageID.1549  Page 221 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

221

```
 1              THE COURT:  And then "Duty to Deliberate."  Any
 2    objection?
 3              MR. AMBERG:  No objection.
 4              MS. JAWAD:  No objection.
 5              THE COURT:  And then there's one for "Punishment."
 6              MS. JAWAD:  No objection.
 7              THE COURT:  And the "Court Has No Opinion."  Any
 8    objection to those?
 9              MR. AMBERG:  No objection.
10              MS. JAWAD:  No objection.
11              THE COURT:  There's one for "Juror Notes."
12              MS. JAWAD:  No objection.
13              THE COURT:  And one for "Verdict Form."  Now, I don't
14    think we have a verdict form yet that's been provided.  I would
15    ask you to see if you can agree on one of those and get that in
16    as soon as possible.
17              MS. JAWAD:  Your Honor, we did provide one via e-mail
18    along with the juror -- jury instructions.
19              THE COURT:  I'll take a look and see if I can find
20    that.
21              What about that, do you know, have you had a chance
22    to look at that, Mr. Amberg?
23              MR. AMBERG:  I -- I -- I think I have seen it, Your
24    Honor.  I mean I feel like I probably have.
25              MS. SMITH:  We can resend it.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1550   Page 222 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

222

1        MR. AMBERG:  Yeah, just if I could have -- I'm sure

2    it's fine, but I -- I would like to take a look at it just to

3    make sure again.  I don't want to tell you it looks fine and

4    then make an objection to it, so...

5        MS. SMITH:  We can resend it, that's no problem.

6        MR. AMBERG:  Yeah.

7        THE COURT:  I guess we don't seem to be able to find

8    it here immediately so if you have that --

9        MS. SMITH:  Sure.

10       THE COURT:  -- either bring it up or resend it.

11       MS. SMITH:  We'll resend it.  I don't seem to have it

12   either.  It's only one page.

13       THE COURT:  Thank you very much.  All right.  Is

14   there anything further that we should take up?

15       MS. JAWAD:  Your Honor, would you like me to make

16   those changes in the jury instructions and recirculate to

17   everyone?

18       THE COURT:  That -- yeah, that would be fine if you

19   could do that.  What I'll do is I'll -- I'll prepare a Court's

20   jury instruction as well.  But if you want to circulate one

21   that I will take as representing the instruction that

22   everyone's agreeing to, then I'll use that, and I'll just take

23   out the titles and that sort of thing so that the jury will

24   just have the language, all right?

25       MS. JAWAD:  Yes, Your Honor.

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1551   Page 223 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

223

```
 1              MR. AMBERG:  Thank you, Your Honor.

 2              THE COURT:  Okay.  Well, if there's nothing further,

 3    we can be adjourned for today and we'll see you tomorrow

 4    morning.  We'll get started at -- right at 9:00, and if you can

 5    get here a little bit before that, that would be great to give

 6    us enough time to get everything done.  And if we can complete

 7    the evidence tomorrow, then that will be good.

 8              MS. JAWAD:  Thank you, Your Honor.

 9              THE COURT:  All right.  If there's nothing further,

10    let's be in recess until tomorrow morning.  Thank you very

11    much.

12              THE LAW CLERK:  All rise.  Court is in recess.

13              (Court in recess at 2:54 p.m.)

14              (Proceedings in the above-entitled matter adjourned

15              to Tuesday, August 14, 2018)

16                             —  —  —

17

18

19

20

21

22

23

24

25
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 84   filed 03/05/19   PageID.1552   Page 224 of 224
Jury Trial: Volume 3 • Monday, August 13, 2018

224

```
 1              C E R T I F I C A T I O N

 2           I, Linda M. Cavanagh, Official Court Reporter of the

 3      United States District Court, Eastern District of Michigan,

 4      appointed pursuant to the provisions of Title 28, United States

 5      Code, Section 753, do hereby certify that the foregoing pages 1

 6      through 223 comprise a full, true and correct transcript of the

 7      proceedings held in the matter of United States of America vs.

 8      Prabhu Ramamoorthy, Case No. 18-20027, on Monday, August 13,

 9      2018.

10

11

12                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                         Federal Official Court Reporter
                           United States District Court
14                         Eastern District of Michigan

15

16

17      Date: March 4, 2019
        Detroit, Michigan
18

19

20

21

22

23

24

25
```