Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1553   Page 1 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,
 4
                        Plaintiff,
 5        vs.                            Case No. 18-20027
                                         Hon. Terrence G. Berg
 6   PRABHU RAMAMOORTHY,

 7                      Defendant.
     _____/
 8
                        JURY TRIAL: VOLUME 4
 9
              BEFORE THE HONORABLE TERRENCE G. BERG
10                  United States District Judge
             Theodore Levin United States Courthouse
11                 231 West Lafayette Boulevard
                     Detroit, Michigan  48226
12                   Tuesday, August 14, 2018

13   APPEARANCES:

14   For the Plaintiff         MARGARET M. SMITH
     United States of America: AMANDA JAWAD
15                             U.S. Attorney's Office
                               211 W. Fort Street
16                             Suite 2001
                               Detroit, Michigan  48226
17                             313-226-9135

18   For the Defendant         JAMES AMBERG
     Prabhu Ramamoorthy:       Amberg and Amberg
19                             104 W. Fourth Street
                               Suite 305
20                             Royal Oak, Michigan  48070
                               248-681-0115
21
                               VICTOR MANSOUR
22                             Mansour & Mansour, P.C.
                               32000 Northwestern Highway
23                             Farmington Hills, Michigan 48334
                               248-932-3322
24
     Also Present:             Rengachari Vijayaraghavan
25                             Court Interpreter
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1554   Page 2 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

2

To obtain a certified copy of this transcript, contact:
Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
Official Court Reporter
(313) 234-2616 • www.transcriptorders.com

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1555   Page 3 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

3

```
 1                          TABLE OF CONTENTS

 2                                                         Page

 3    Government Witnesses Continued:

 4    ERIN IVANISZYN
```

```
 5       Direct Examination by Ms. Jawad          10
         Cross-Examination by Mr. Amberg          22
 6       Redirect Examination by Ms. Jawad        30
```

```
 7    AARON ERKKINEN
```

```
 8       Direct Examination by Ms. Jawad          32
         Cross-Examination by Mr. Amberg          81
 9       Redirect Examination by Ms. Jawad       135
         Recross-Examination by Mr. Amberg       141
10
         GOVERNMENT RESTS                        145
11
```

```
      Defense Witnesses:
12
      THOMAS SELLEKE
13
```

```
         Direct Examination by Mr. Amberg        156
14       Cross-Examination by Ms. Jawad          167
         Redirect Examination by Mr. Amberg      172
15
```

```
      GEETHANJALI NATARAJAN
16
```

```
         Direct Examination by Mr. Amberg        176
17       Cross-Examination by Ms. Smith          216
```

```
18

19

20

21

22

23

24

25
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1556   Page 4 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

4

EXHIBITS

| Identification | Offered | Received |
|---|---|---|
| Government Exhibit No. 3, Flight manifest from Spirit Airlines | 45 | 45 |
| Government Exhibit No. 4, Flight records of defendant and his wife | 45 | 45 |
| Government Exhibit No. 5, Flight records of victim | 45 | 45 |
| Government Exhibit No. 12, Advice of Rights form | 64 | 64 |
| Government Exhibit Nos. 14 - 20, Clips from defendant's interview | 59 | 60 |
| Government Exhibit Nos. 21A - 21J, Clips from defendant's interview | 50 | 51 |
| Government Exhibit No. 22, Clip from defendant's interview | 41 | 41 |

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1557   Page 5 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

5

```
 1                 Detroit, Michigan
 2                 Tuesday, August 14, 2018
 3                              —  —  —
 4                 (Proceedings commenced at 9:05 a.m., all parties
 5                 present, jury not present)
 6                 THE LAW CLERK:  Court calls Case No. 18-20027, United
 7     States of America versus Prabhu Ramamoorthy.
 8                 Counsel, will you please place your appearances on
 9     the record?
10                 MS. JAWAD:  Good morning, Your Honor.  Amanda Jawad
11     and Maggie Smith on behalf of the United States.  With us at
12     counsel table is Meghann O'Connor, a paralegal from our office,
13     as well as Special Agent Kyle Dodge with the FBI.
14                 THE COURT:  Good morning.
15                 MR. AMBERG:  Good morning, Your Honor.  Jim Amberg on
16     behalf of Mr. Ramamoorthy; he is standing to my right.  To his
17     right is Mr. Vijay, his translator, and then to my left is
18     co-counsel, Victor Mansour.
19                 THE COURT:  Good morning, Mr. Amberg.  Good morning
20     everyone.
21                 MR. MANSOUR:  Good morning.
22                 THE COURT:  All right.  So are we ready to bring in
23     the jury or are there any other matters that we need to take
24     up?
25                 MR. AMBERG:  Two brief ones.  The first, I -- as you
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1558   Page 6 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

6

1    can see, the -- the screen has been moved up here.

2            THE COURT:  Yes.

3            MR. AMBERG:  And I know that in order for us to see

4    this, we're going to have to move.  I don't know where you want

5    us to move.  I guess my question is where would you like us all

6    to stand at?  I know Mr. Ramamoorthy would probably want to

7    watch this as well.

8            THE COURT:  Yes.  I see that the screen has been

9    moved forward, and I think that's a good idea because it was

10   kind of far from the jury.  And so I think one of them had

11   mentioned to Mr. Darling that it was difficult to see the words

12   that were part of the transcript, so that's a good idea to move

13   it closer.  If we have you move over in the gallery there,

14   would that work for you?

15           MR. AMBERG:  I think so.  How -- how about if Mr.

16   Ramamoorthy and Mr. Vijay stand in the gallery and then Mr.

17   Mansour and I can sort of stand where Ms. Smith is right there,

18   and that way everybody can see and -- and we all still have

19   that separation going on.

20           THE COURT:  What do you think, Ms. Jawad and Ms.

21   Smith?

22           MS. JAWAD:  That's fine with us.

23           THE COURT:  Yeah.  I think essentially we'll just --

24   before we show anything on the screen, let's just make a point,

25   if I don't say something, Mr. Amberg or Ms. Smith or Ms. Jawad,

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1559   Page 7 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

7

1    just bring up the fact that we need to make certain that the

2    defendant and his attorney can see properly, and so they may

3    move around the courtroom.

4           MR. AMBERG:  Thank you, Your Honor.

5           THE COURT:  Okay.

6           MR. AMBERG:  The second thing is something that is

7    going to happen later on in the trial, and that's this decision

8    that Mr. Ramamoorthy has to make about whether or not he's

9    going to testify, and it's something that I spoke about with

10   him I mean many different times.  With Mr. Vijay here, I've --

11   I've spent considerable amount of time yesterday talking with

12   him about it and then even this morning a little bit.  But

13   based on my conversation this morning, I think that before that

14   part of the trial happens that he would testify, I would ask

15   for maybe a ten-minute break where I could go back and just

16   make sure I understand exactly -- that he understands exactly

17   what he wants to do.

18          THE COURT:  Mm-hmm.

19          MR. AMBERG:  And then that way we could put it on the

20   record either way, yeah, after the close -- I mean I know we're

21   going to have a couple of defense witnesses so -- and I don't

22   think they'll take that long, but it would be after that that

23   he would testify if he was going to.

24          THE COURT:  I understand.  And I think that we can

25   also put on the record now, and I would be glad to briefly tell

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1560   Page 8 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

8

1    Mr. Ramamoorthy, that he does have the right to testify in this
2    case.  So Mr. Ramamoorthy, you have the right to testify in
3    your own behalf if you want to testify.  You don't have to
4    testify, however.  And the fact that you do not testify, if you
5    choose not to testify, cannot be used against you by the jury
6    or by the Court or by anyone because you are presumed innocent,
7    and no one can infer any guilt simply because you choose not to
8    testify.
9          Do you think you understand what your rights are
10   regarding whether to testify or not?
11               DEFENDANT RAMAMOORTHY:  Yes, Your Honor.
12               MR. AMBERG:  He understands everything?
13               THE INTERPRETER:  Yeah.
14               MR. AMBERG:  Okay.  Well, I -- Your Honor, I -- I
15   still want to make sure for -- because I just -- I want to make
16   sure that him and I have had our final conversation.  I know
17   he -- he -- Mr. Vijay is indicating that Mr. Ramamoorthy
18   understands those rights, and I have talked about those rights
19   many times with him as well.  Just I know at the end of this
20   when it's his chance to testify, I would feel more comfortable
21   with just having about ten minutes to just sit down with him
22   with Mr. Vijay there and he can make that decision, because I
23   thought we were going to have that decision this morning and --
24   and then that sort of went up in the air.  So...
25               THE COURT:  You may have as much time as you think is

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1561  Page 9 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

9

1   reasonable under the circumstances to confer with Mr.

2   Ramamoorthy about whether to testify and we'll see how long

3   that takes.

4         MR. AMBERG:  Excellent.  I appreciate it, Your Honor.

5   Thank you.

6         THE COURT:  Okay.  Is there anything further we need

7   to address?

8         MS. JAWAD:  Not at this time, Your Honor.

9         MR. AMBERG:  No, Your Honor.

10        THE COURT:  Very good.  Let's bring in the jury.

11        (Jury entered the courtroom at 9:11 a.m.)

12        THE COURT:  Good morning again, ladies and gentlemen.

13   Welcome.  You may be seated.

14        So welcome back, ladies and gentlemen.  Hope you had

15   a nice evening.  And, of course, I want to tell you again we

16   appreciate your attention during this trial, which has been

17   quite clear that you've been paying close attention.

18        And we are in the middle or getting near the latter

19   part of the government's case, and so let me just ask Ms.

20   Smith, are you ready to call your next witness?

21        MS. JAWAD:  Yes.  I'll be calling the next witness.

22        THE COURT:  Ms. Jawad.

23        MS. JAWAD:  United States calls Erin Ivaniszyn.

24        THE COURT:  Please come forward.  Will you raise your

25   right hand?

```
1              E R I N   I V A N I S Z Y N
2    was thereupon called as a witness herein, and after being
3    first duly sworn to tell the truth and nothing but the truth,
4    testified on her oath as follows:
5              THE WITNESS:  I do.
6              THE COURT:  You may be seated.
7                         DIRECT EXAMINATION
8    BY MS. JAWAD:
9    Q.   Good morning.
10   A.   Good morning.
11   Q.   Could you please introduce yourself to the jury?
12   A.   My name is Erin Ivaniszyn and I am a registered nurse for
13   the Wayne County SAFE Program.
14   Q.   And what is the Wayne County SAFE Program?
15   A.   The Wayne County SAFE Program is a nonprofit organization
16   that provides comprehensive care to patients after an acute
17   sexual assault.
18   Q.   And do you have a specific position within the Wayne
19   County Safe Program in addition to being a registered nurse?
20   A.   Yes.  I am currently the co-Program Director of Sexual
21   Assault Forensic Examiners for Wayne County SAFE.
22   Q.   What are some of your responsibilities as the co-director?
23   A.   As the co-director, I oversee a group of 10 to 15 forensic
24   examiners as well as taking on call and doing acute sexual
25   assault exam cases.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1563   Page 11 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

11

1    Q.   And how long have you been a registered nurse?

2    A.   I have been a registered nurse since 2012.

3    Q.   What type of schooling is required to become a registered

4    nurse?

5    A.   Initially I started by receiving my associate's degree of

6    Applied Science in Nursing and then I continued on to receive

7    my bachelor of science in nursing.

8    Q.   And do you also have any special certifications?

9    A.   Yes, I do.  I'm board certified by the International

10   Association of Forensic Examiners and Sexual Assault Forensic

11   Exams in the adult and adolescent population.

12   Q.   So what is a forensic exam?

13   A.   A forensic exam is an exam after a patient is sexually

14   assaulted in the acute phase.  What that means is up to five

15   days after an assault we see the patient and provide a physical

16   exam as well as evidence collection with appropriate

17   medications and followup.

18   Q.   And you mentioned that you have a certification as a

19   Sexual Assault Nurse Examiner?

20   A.   Yes.  I'm board certified by the International Association

21   of Forensic Nurses.

22   Q.   Is that what's commonly referred to as SANE?

23   A.   Yes that is.

24   Q.   And what were the requirements you needed to complete in

25   order to receive that certification?

1  A.   Initially there is a 40-hour didactic training accompanied

2  by clinicals that are completed after the training.  In order

3  to sit for the exam, you're -- it's recommended that you've

4  completed over a hundred exams and over 300 hours of practicum.

5  Q.   And did you complete those hours?

6  A.   Yes, I did.

7  Q.   Did you then take the examination?

8  A.   Yes, I did.

9  Q.   Did you pass that examination?

10  A.   Yes, I did.

11  Q.   Do you have any other certifications in addition to the

12  Sexual Assault Nurse Examiner certification?

13  A.   I am certified as a trauma nurse as well as I have ACLS,

14  which is Advanced Cardiac Life Support certification.

15  Q.   And what does it mean to be a trauma nurse?

16  A.   The trauma nurse certification is a class that's taken for

17  nurses who work in trauma areas such as the emergency

18  department.

19  Q.   And did you say how long you've been a Sexual Assault

20  Nurse Examiner?

21  A.   I've been a Sexual Assault Nurse Examiner since 2013.

22  Q.   And did you receive education and training specifically

23  about how to conduct these forensic examinations of sexual

24  assault victims?

25  A.   Yes, I did.

Jury Trial: Volume 4 • Tuesday, August 14, 2018

1    Q.   About how many would you say you've completed in the

2    course of your career?

3    A.   To date I've completed over 600 exams.

4    Q.   And are those exams also sometimes referred to as rape

5    kits or is that something different??

6    A.   A rape kit is a component of our medical forensic exam.

7    Q.   So it's just one part of the full exam that you do?

8    A.   That is correct.

9    Q.   And can you walk us through all of the parts of an

10   examination?

11   A.   Yes.  We start with our patient by conducting a brief

12   medical history, asking things such as allergies, past medical

13   conditions.  We then obtain a history of the assault which is

14   very important because based on what the patient tells us

15   happened is where we are looking for evidence as well as where

16   you're -- we are looking and documenting injury.  So based on

17   what the patient tells us happened, we recommend certain

18   medications based on the assault.

19            And then we also do a complete physical exam.  So

20   just like when you go to the doctor and they check you from

21   head to toe, we do the same, specifically looking for any

22   injuries.  If there are any injuries such as bruises, things

23   like that, we do take photographs to document those injuries.

24            We then move to the evidence collection, which is

25   more commonly known as the rape kit, and at that point we

1  collect evidence from areas of the patient's body based on what

2  they tell us happened in the assault.

3  Q.   Were you working as a SANE nurse on January 3rd, 2018?

4  A.   Yes, I was.

5  Q.   At some point that day do you remember seeing a patient

6  named Laura?

7  A.   Yes, I do.

8  Q.   About what time did you treat her?

9  A.   I would have to refresh my memory.  I know I did write it

10  down on my report.  I would have to look at that.

11  Q.   And would looking at a copy of your report refresh your

12  memory as to what time it was?

13  A.   Yes, it would.

14          MS. JAWAD:  Your Honor, may I approach the witness?

15          THE COURT:  You may.

16          MS. JAWAD:  And for the record, I am showing defense

17  counsel the document.

18          MR. AMBERG:  That's fine.

19  A.   I saw Laura at 1:45 in the afternoon on January 3rd.

20  Thank you.

21  BY MS. JAWAD:

22  Q.   Do you remember how you first came into contact with her?

23  A.   Yes, I do.  We received a referral from a local hospital

24  that the patient had presented to.

25  Q.   So where did you first meet her?

1   A.   Laura came to one of our clinics.  We have five clinics in

2   Wayne County.  She came to our clinic at Detroit Receiving

3   Hospital to have the exam completed.

4   Q.   Was anyone else present for her exam?

5   A.   During the exam it's always myself as the nurse and then

6   we do have an advocate that's present as well.

7   Q.   And what did you do first when you met Laura?

8   A.   When we meet the patient, we bring them up to our clinic,

9   and then when we start with the exam, we have the patient sign

10  consents giving us permission to go through the different parts

11  of the exam and explain the exam to the patient.  We do make

12  sure that the patient knows that everything that we do is

13  completely up to them, so we have them sign consents giving us

14  permission.  And as long as the patient gives us permission to

15  continue on with the exam, that's when we start with our

16  medical history and then our history of the assault and then go

17  into the physical exam.

18  Q.   And why is it important to let the patient know that

19  everything you do is up to them?

20  A.   The exam is invasive.  We have the patient naked and we

21  are looking at them from head to toe collecting evidence from

22  their body, so it's very important that the patient knows what

23  they are doing and that they are willing to participate in the

24  exam.

25  Q.   And why is it important to get the complete medical

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1568   Page 16 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

16

1   history of the patient?

2   A.   It is important to get the complete medical history

3   because we are assessing the body for injuries, so it's

4   important to know if the patient has had any recent surgeries,

5   particularly in the genital area, as well as, depending on the

6   assault, we do recommend certain medications and we do provide

7   certain medications, so it is important to know their medical

8   history and allergies to make sure that we're making

9   appropriate recommendations.

10  Q.   Is it also important to discuss with the patient the

11  details of the assault that happened?

12  A.   It is very important to discuss the details of the

13  assault.  Based on what the patient tells us of the assault is

14  what guides my entire physical exam and helps me with the

15  diagnosis and treatment of the patient.

16  Q.   Did you discuss with Laura what happened earlier that day?

17  A.   Yes, I did.

18  Q.   And what did she say?

19  A.   From what I recall --

20       MR. AMBERG:  I mean I would object to that.  I think

21  it's hearsay.

22       MS. JAWAD:  The witness has -- has established that

23  it's a hearsay exception under 803(4), which is a statement

24  pertinent to medical diagnosis and treatment.

25       MR. AMBERG:  I don't think this is medical diagnosis

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1569   Page 17 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

17

1    and treatment.  This is made in preparation for a potential

2    criminal case, which we're standing here doing right now.

3            THE COURT:  Well, the witness has indicated that she

4    took this information in order to determine what type of

5    medical treatment to provide and what type of action to take

6    regarding the examination, and so it's not being offered for

7    the truth of the matter asserted but just to explain what she

8    did next.

9            And so with that in mind, you may proceed.

10   Overruled.

11   BY MS. JAWAD:

12   Q.   What did Laura say to you?

13   A.   I have it written in my report, if I could just refresh my

14   memory.

15           MS. JAWAD:  May I approach the witness, Your Honor?

16           THE COURT:  You may.

17   A.   I have documented that Laura told me that when she woke

18   up, "I felt his hand in my vagina vigorously going in.  My

19   pants were down, my shirt around my waist untied and my bra

20   unhooked."

21   BY MS. JAWAD:

22   Q.   And based on that information, what did you do?

23   A.   I proceeded to ask some clarifying questions.  We continue

24   assessing the patient based on their initial statement, and the

25   purpose of that is to, again, guide where we are going to be

1    assessing the patient for injury and then also collecting

2    evidence.

3    Q.   And did she say where this happened?

4    A.   She stated that it happened on an airplane.

5    Q.   Is it important to ask whether penetration occurred?

6    A.   Yes, it is important.

7    Q.   And can penetration be by fingers or objects?

8    A.   Yes, it can.

9    Q.   And based on your training and experience in the nursing

10   profession, how do you define penetration?

11   A.   Penetration is defined as anything that goes past to the

12   labia majora.  And what that means is the female genitalia has

13   several different parts.  The outermost part is the labia

14   majora.  Those are the outer lips that protect the inner

15   structures of the vagina.  When anything goes past the labia

16   majora, that is when penetration occurs.  It's a common

17   misconception that something, a finger or a penis, has to be

18   inserted inside the vaginal opening for penetration to occur.

19   However, penetration is defined as anything past the labia

20   majora.

21   Q.   And did Laura tell you that day whether or not she

22   showered?

23   A.   She did, yes.

24   Q.   She did tell you or she did shower?

25   A.   I believe she did shower, yes.

1  Q.   And how did you go about the physical examination of

2  Laura?

3  A.   After we ask all the questions needed, we bring the

4  patient into the exam room where we have them take all their

5  clothes off and get into a gown.  At that point when we're in

6  the exam room, that's when I start from head to toe looking all

7  over the body for injury.  We start by inspecting the body and

8  then we do the evidence collection after that.

9  Q.   And when you examined her body, did you note any injuries?

10 A.   No, I did not.

11 Q.   Is it common that there is -- are no injuries reported

12 during your sexual assault examinations?

13 A.   It is very common for there not to be any physical

14 injuries after a sexual assault.

15 Q.   Do you know about what percentage of the examinations you

16 do have patients who indicate no injuries?

17 A.   Based on my experience of doing over 600 exams, I have had

18 patients with injury in less than ten percent of my exams.  And

19 when I say less than ten percent, I'm talking about genital

20 injury, not physical injury.

21 Q.   Did she report any physical symptoms?

22 A.   She did complain of a general soreness to her vaginal

23 area.

24 Q.   And after you examined her body for physical injury, did

25 you then take DNA swabs for testing?

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1572   Page 20 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

20

```
1    A.   Yes, I did.

2    Q.   And how do you collect those swabs?

3    A.   The swabs come packaged in our evidence collection kit.

4    We open the kit and all the swabs are in the kit that we use.

5    Based on what Laura told me happened to her, I collected swabs

6    of different parts of her body such as the labia majora, the

7    labia minora.

8    Q.   Did you also collect swabs from her breast area?

9    A.   I would have to refresh my memory by looking at the chart.

10             MS. JAWAD:  May I approach the witness, Your Honor?

11             THE COURT:  You may.

12   A.   I did collect swabs of the right and left breast, yes.

13   BY MS. JAWAD:

14   Q.   Ms. Ivaniszyn, about how many of these exams do you do

15   each week?

16   A.   I do anywhere from typically 15 to 20 a month.  Based on

17   the week is a bit hard to tell.

18   Q.   So is it fair to say you've done a number of these since

19   January?

20   A.   Yes, that's correct.

21   Q.   Is that why you may not remember every detail about the

22   examination?

23   A.   Yes, that's correct.

24   Q.   And is that also why you complete a comprehensive report?

25   A.   Yes.
```

1  Q.  Once you collected the evidence swabs from Laura, did you

2  also collect a -- a reference -- reference swab, which is also

3  known as a buccal swab?

4  A.  Yes, we do collect a buccal swab on every patient.

5  Q.  And what did you do with those swabs that you collected?

6  A.  Our swabs are sealed into the evidence collection kit

7  where they are locked and held to maintain chain of custody

8  until they are signed out to the appropriate law enforcement

9  official.

10  Q.  And based on your training and experience, particularly

11  with respect to trauma, and also your extensive experience in

12  speaking with victims of sexual assault, do you have any

13  knowledge about how female sexual assault victims respond at

14  the time of the assault?

15  A.  Based on my experience, yes, I do.

16  Q.  And what is your understanding of how -- how they do

17  typically respond?

18  A.  After an acute sexual assault or any traumatic event, it's

19  normal for each individual person to respond in a different

20  way.  The brain has chemical responses that are released.

21  Sometimes it's a fight, flight or freeze.  Some people tend to

22  act out initially.  Some people tend to not process any

23  emotions initially.  Each different reaction is normal because

24  each different person is processing this traumatic event at a

25  different rate and in a different way.

```
 1              MS. JAWAD:  No further questions, Your Honor.
 2              THE COURT:  Thank you very much.
 3              Any cross-examination.
 4              MR. AMBERG:  Yes, Your Honor.
 5                          CROSS-EXAMINATION
 6    BY MR. AMBERG:
 7    Q.   Hello, ma'am.
 8    A.   Good morning.
 9    Q.   Good morning.  How you doing today?
10    A.   Well, thank you.
11    Q.   Good.  I just have a few questions for you.  I want to
12    talk about -- I want to first talk about when patients come in
13    and they've -- are under the influence of drugs and alcohol,
14    okay?
15    A.   Okay.
16    Q.   This is something that I'm sure you've seen, right?
17    A.   Correct.
18    Q.   And it happens all the time, right?
19    A.   Correct.
20    Q.   People can come in there and they're intoxicated?
21    A.   Correct.
22    Q.   And so sometimes when people are intoxicated, they may not
23    recall things correctly, right?
24    A.   That would be fair to say, yes.
25    Q.   Okay.  And especially if you're more intoxicated, right?
```

```
 1    A.   Depending on the person, yes.

 2    Q.   Okay.  And sometimes they may remember things differently

 3    than what really happened, right?

 4    A.   That would be fair to say as well, correct.

 5    Q.   Okay.  Now, in this case, I notice on page 2 of your

 6    report there's a question that says, "Patient alcohol and/or

 7    drug use at the time of assault."

 8    A.   Correct.

 9    Q.   Do you remember what you wrote on there?

10    A.   I would have to refresh my memory by looking at the

11    report.

12           MR. AMBERG:  If I could approach, Your Honor.

13           THE COURT:  You may.

14    BY MR. AMBERG:

15    Q.   Just let me know when you're done.

16    A.   I have written down in my report that the patient denied

17    any alcohol or drug use at time of the assault.

18    Q.   At the time of the assault?

19    A.   Correct.

20    Q.   So just so I understand this, the complainant in this case

21    told you that at the time that this allegedly happened, she

22    wasn't using alcohol?

23    A.   That is what I have documented, that is correct.

24    Q.   Okay.  So if she was using alcohol at the time of the

25    assault, it would be a lie what she told you, right?
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1576   Page 24 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

24

1    A.   I can't say that it would be a lie --

2    Q.   Well --

3    A.   -- because she was using alcohol.

4    Q.   Okay.  Well, it wouldn't be true, right?  What she told

5    you was that she wasn't using alcohol, right?

6    A.   That's correct, yes.

7    Q.   Okay.  But that's something that may not surprise you

8    because people that are intoxicated lie?

9    A.   I don't know that I can answer that for sure.

10   Q.   I mean I'm sure you've seen that in your -- in your work?

11   A.   That is something that does happen at times, yes.

12   Q.   Absolutely.  Now, you didn't observe any cuts or anything

13   like that to the complainant?

14   A.   That is correct.

15   Q.   No other physical injury, right?

16   A.   That is correct.

17   Q.   Now, many times when there's no injury, that's because

18   nothing happened, right?

19   A.   As I said, in my experience, less than ten percent of the

20   cases I've done have had genital injury, so that's what I would

21   have to go off of.

22   Q.   Okay.  It also means certainly possible that nothing

23   happened?

24   A.   That is always possible, correct.

25   Q.   Yeah.  Now, on the first page you testified that the

```
 1   complainant in this case told you what happened, right?  I
 2   think you even read verbatim what was written down in your
 3   report, right?
 4   A.  Yes, we write down exactly what the patient tells us in
 5   our report.
 6   Q.  What she never said to you was that she saw my client's
 7   hand, right, she doesn't say she sees the hand?
 8   A.  I only have what I have written down that I read, correct.
 9   Q.  What -- what you wrote down was that she said she felt,
10   correct?
11   A.  Correct.
12   Q.  Not saw?
13   A.  Correct.
14   Q.  What she said was that the -- what she felt was that there
15   was a hand in her going vigorously in and out of her, right?
16   A.  That is correct.
17   Q.  Okay.  And so, you know, one thing that you do as part of
18   these -- the testing is you do the DNA testing, right?
19   A.  We have the kit sent to the lab for testing, that is
20   correct.
21   Q.  How much do you know about DNA testing?
22   A.  I know how to collect the evidence.  I don't have
23   knowledge in the DNA testing that goes to the crime lab.
24   Q.  In this case you did DNA testing, right?
25   A.  I collected the evidence, yes.
```

```
 1    Q.   Because there's a very good possibility that if what she
 2    said was true, there would be DNA in her vagina?
 3              MS. JAWAD:  Objection.  Calls for speculation.
 4              MR. AMBERG:  I'm just asking if she knows or she
 5    doesn't know.
 6              THE COURT:  You may answer if you know.
 7              THE WITNESS:  It is possible.
 8    BY MR. AMBERG:
 9    Q.   Okay.  Now, I know you wrote on there she took a shower,
10    right?
11    A.   That's correct.
12    Q.   Okay.  Did you ask her how she showered?
13    A.   We don't ask in detail how the patient showered.  We ask
14    if they washed their genital area.
15    Q.   Okay.
16    A.   And then we also ask if they took a bath or shower.
17    Q.   Okay.  She -- all right.  Did you ask her when that
18    happened, the shower?
19    A.   We ask if it's happened post-assault.  We don't ask the
20    specific time of the day that it happened, but she had showered
21    since the assault.
22    Q.   Okay.  Here's my question.  Are you in communication with
23    the authorities that are investigating this case?
24    A.   We're in communication with them to maintain chain of
25    custody to sign the evidence collection kit out, and we also at
```

1    times receive referrals from -- directly from law enforcement

2    to get the patient to our clinic to have the exam done.

3    Q.  Doesn't law enforcement know from what you tell them to

4    make sure to tell these people to not taint evidence by

5    showering?

6            MS. JAWAD:  Objection.  He can't -- she can't testify

7    to what law enforcement knows.

8            MR. AMBERG:  She can testify what they tell law

9    enforcement.

10            MS. JAWAD:  That would be hearsay.

11            THE COURT:  Just why don't you ask the witness about

12    what her own experience is in this case.  Go ahead.

13            MR. AMBERG:  Thank you, Your Honor.

14    BY MR. AMBERG:

15    Q.  In this case were you in communication with the

16    investigating officers when this was going on?

17    A.  If we receive a referral from them, then yes, and then

18    also after the exam to have the evidence collection kit signed

19    out.

20    Q.  Okay.  But my question is -- I understand generally that's

21    what you do.

22    A.  Right.

23    Q.  In this case were you in communication with the

24    investigating officers?

25    A.  I believe in this case the referral I got was from

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1580   Page 28 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

28

 1   Beaumont Wayne Hospital from an ER physician.  I'm not sure if

 2   the investigating officers spoke with anyone at the hospital,

 3   but I was not at Beaumont Wayne.  The patient met me at our

 4   clinic at Detroit Receiving.

 5   Q.   Okay.  Because doesn't that concern you that evidence

 6   could be tainted?

 7   A.   Can you clarify that question?

 8   Q.   Sure.  Don't you want to make sure, for the sake of

 9   everybody and the truth, that the person who you're going to do

10   the test on preserves the evidence as best they can?

11   A.   That would be what I would hope would happen, yes, that's

12   correct.

13   Q.   Okay.  Is this something, to your knowledge, that is told

14   to the patient?

15   A.   I would say it's something that should be told to the

16   patient.  In my experience with working with law enforcement

17   and physicians and nurses at the hospitals, in my experience it

18   isn't always correctly told to the patient.

19   Q.   Okay.  What about the FBI?

20   A.   I can't speak other than to my experience working with

21   local law enforcement as well as physicians at the hospital.

22   Q.   Okay.  Now, even if somebody takes a shower, that does not

23   mean that the DNA of other people is gone from the vaginal

24   area, right?

25   A.   It's possible, but it is correct that the DNA may still be

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1581   Page 29 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

29

 1   present.

 2   Q.   Absolutely.  Because if the -- if it wasn't the case, you

 3   wouldn't even do these tests?

 4   A.   Yes.  If a patient had showered and there was no

 5   possibility, we -- there wouldn't be a point of doing the exam

 6   for the evidence collection.

 7   Q.   Thank you, ma'am.

 8           MR. AMBERG:  If I could have one second, Your Honor.

 9           THE COURT:  You may.

10           MR. AMBERG:  Thank you.

11           (Brief pause)

12           MR. AMBERG:  I just have a couple questions.

13   BY MR. AMBERG:

14   Q.   Ma'am, just a few more questions.  I want to talk about

15   injuries to the vaginal area that you've -- you've experienced

16   and seen in your work.  In this case there's this allegation

17   that you are aware of that the -- my client had his hand go

18   vigorously in and out of the complainant's vagina?

19   A.   Correct.

20   Q.   Okay.  And he had nails, right, like fingernails?

21   A.   I would assume so, yes.

22   Q.   All right.  And that enough nails to where they could cut

23   the nails and have samples sent to a lab?

24   A.   That I can't say.  I did not see the defendant's hands.

25   Q.   Right.  Right.  No, I understand.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1582   Page 30 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

30

```
 1              If somebody vigorously goes in and out of a vagina
 2    with longer nails, there is a decent chance that you're going
 3    to see some cutting in the vaginal area from those nails?
 4    A.   Not necessarily.
 5    Q.   But that is certainly possible?
 6    A.   It is certainly possible.
 7    Q.   And you have seen that in the past?
 8    A.   Yes, I have.
 9    Q.   Okay.
10              MR. AMBERG:  No further questions, Your Honor.  Thank
11    you.
12              THE COURT:  Thank you very much.
13              Any redirect?
14              MS. JAWAD:  Yes, Your Honor.
15                        REDIRECT EXAMINATION
16    BY MS. JAWAD:
17    Q.   Ms. Ivaniszyn, when you asked Laura about her drinking or
18    drug use, was that at the time of the assault?
19    A.   Yes.  We ask the patient if there's drinking or drug use
20    at the time of the assault.
21    Q.   And did she tell you what time the assault happened?
22    A.   I believe she did.
23    Q.   Do you recall what she said?
24    A.   I would have to refresh my memory.
25              MS. JAWAD:  May I approach the witness?
```

```
 1              THE COURT:  You may.

 2              MR. AMBERG:  Could you grab my page too?  I left it

 3     up there.  Thanks.

 4     A.   She has the time of the assault she told me between 5:00

 5     and 6:00 a.m.

 6              MS. JAWAD:  No further questions.

 7              THE COURT:  Thank you very much.

 8              Ladies and gentlemen of the jury, you may ask any

 9     questions you wish to ask.  If you have a question, raise your

10     hand and pass it forward and I'd be happy to confer with

11     counsel and ask the question if it's appropriate.  Are there

12     any questions?  Okay.  I don't see any hands being raised at

13     this time.

14              Ms. Jawad, may this witness be excused?

15              MS. JAWAD:  Yes, Your Honor.

16              THE COURT:  Thank you very much for your testimony.

17     You may be excused.

18              THE WITNESS:  Thank you.

19              (Witness excused at 9:43 a.m.)

20              THE COURT:  Call your next witness.

21              MS. JAWAD:  United States calls Special Agent Aaron

22     Erkkinen.

23              THE COURT:  Come forward please, sir.

24                     A A R O N   E R K K I N E N

25     was thereupon called as a witness herein, and after being
```

```
 1    first duly sworn to tell the truth and nothing but the truth,
 2    testified on his oath as follows:
 3                    THE WITNESS:  Yes.
 4                    THE COURT:  You may be seated.
 5                           DIRECT EXAMINATION
 6    BY MS. JAWAD:
 7    Q.   Good morning.
 8    A.   Good morning.
 9    Q.   Could you please introduce yourself to the jury?
10    A.   Yeah.  My name is Aaron Erkkinen.  I'm a Special Agent
11    with Detroit FBI.
12    Q.   How long have you been with the FBI?
13    A.   I've been with the FBI for a little over four years now,
14    and that includes some training at Quantico, so I've been a
15    Special Agent for about three and a half years.
16    Q.   And how long was your training at Quantico?
17    A.   The training at Quantico was approximately five months.
18    Q.   What is Quantico?
19    A.   So Quantico is the FBI academy.
20    Q.   And what are your primary responsibilities as a Special
21    Agent?
22    A.   My responsibilities as an agent are to investigate
23    violations of federal law related to national security.
24    Q.   And is that because you're in a particular group within
25    the FBI?
```

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1585  Page 33 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

33

1  A.  Yes.

2  Q.  And what group is that?

3  A.  My group in Detroit is known as CT-4; it's a

4  counterterrorism group.

5  Q.  And as part of that group do you also investigate crimes

6  that happen on airplanes?

7  A.  Yes.

8  Q.  And what types of crimes would those be?

9  A.  Well, those types of crimes could be anywhere from a theft

10  that occurs on an airplane anywhere up -- that seems pretty

11  simple up to more complicated cases such as terrorism.

12  Q.  What's your educational background?

13  A.  I have a bachelor's degree in communication from Concordia

14  University in St. Paul Minnesota, and I have a master's degree

15  in counseling from Oakland University in Michigan here.

16  Q.  And what did you do before you became an FBI agent?

17  A.  Well, right out of my bachelor's program I worked in

18  public relations, did some web design in television production

19  as a part of that.

20      And then as I attained my master's degree, I

21  worked -- right out of the master's program I worked in an

22  alternative education program for a local school district

23  around Detroit here.  I worked with mostly teenagers but

24  seventh -- sixth, seventh, eighth graders all the way up

25  through older, older individuals who were either removed from

```
 1   like a traditional educational setting or were -- made the
 2   choice to come to an alternative education program.
 3           After that I worked with -- like in a therapeutic
 4   role with geriatrics, senior citizens, for a number of years
 5   after that.
 6   Q.  And was this after you obtained your master's in
 7   counseling?
 8   A.  Yes.
 9   Q.  And you decided to become an FBI agent after that?
10   A.  Yes.
11   Q.  And at some point were you assigned to assist in the
12   investigation of Prabhu Ramamoorthy?
13   A.  Yes, I was.
14   Q.  Do you see the defendant in the courtroom here?
15   A.  Yes, I do.
16   Q.  And can you point him out and identify a piece of clothing
17   that he's wearing?
18   A.  Yeah.  Mr. Ramamoorthy is wearing some headphones over
19   there.  He's got a dark blue button-up.
20           MS. JAWAD:  May the record reflect that the witness
21   has identified the defendant?
22           THE COURT:  It does.
23   BY MS. JAWAD:
24   Q.  Did you report to the airport on the morning of
25   January 3rd, 2018?
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1587   Page 35 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

35

1    A.   Yes, I did.

2    Q.   Do you remember what day of the week that was?

3    A.   That was a Wednesday.

4    Q.   And how did you know to go to the airport that day?

5    A.   Well, I arrived at work at kind of my typical time.

6    Usually I get to work around 7:30 or 8:00.  And I was actually

7    talking with one of my co-workers at the time who -- while I

8    was talking with him, he received a call and he said, "I got to

9    take this."  So I went back to my desk to finish logging on my

10   computer, and a few minutes later he came by my desk and said,

11   "Hey, that was Kyle out at the airport.  I need you to head to

12   the airport and he'll brief you on the way."

13   Q.   And at some point did you learn of the nature of the

14   investigation that was happening at the airport?

15   A.   Yes, I did.

16   Q.   Was that a sexual assault?

17   A.   Yes, that was my understanding, yeah.

18   Q.   And when you got to the airport, had the defendant already

19   been taken into custody?

20   A.   Yes, he had.

21   Q.   Was that by the Wayne County Airport Police?

22   A.   Yes, he -- yes, that's right.

23   Q.   What are some of the things that you did?

24   A.   Well, on my way there I called Special Agent Kyle Dodge

25   just to kind of get briefed on what -- what was going on.  And

1    when I got to the airport, he and I met up and we kind of

2    decided on who we needed to talk to, and -- and we were kind of

3    waiting as well to see who was -- who was where.  We kind of

4    had to, you know, lay out who we wanted to talk to and when.

5    Q.   Was one of the people that you spoke with the victim in

6    this case?

7    A.   Yes.

8    Q.   How would you describe her demeanor during that interview?

9    A.   Well, in that interview she kind of struck me as she

10   looked kind of messy, kind of like she was shook up.  As -- as

11   we were talking, like her demeanor was kind of -- kind of

12   blunted or flat I guess.

13   Q.   What do you mean when you say blunted or flat?

14   A.   Well, normally like a person would be kind of engaged in a

15   conversation and kind of maybe smiling or gesturing.  She just

16   seemed kind of reserved and like -- like everything was kind of

17   tamped down, all of her emotion was kind of tamped down.

18   Q.   And did you have another opportunity to speak with the

19   victim on a different day?

20   A.   Yes.

21   Q.   When was that?

22   A.   Five days later, I believe that was the 8th.  It would

23   have been a Monday.

24   Q.   And what was the purpose of that later interview?

25   A.   Well, we wanted to chat with her again.  I know that there

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1589   Page 37 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

37

1    was -- we wanted to maybe get some additional details that

2    maybe she -- she would have remembered.  I know sometimes like

3    when a person's gone through something, you know, sometimes it

4    takes a little bit of time to process what happened, and it was

5    an effort to kind of meet with her along with the prosecution.

6    Q.   During that meeting did she offer for you to look at her

7    phone?

8    A.   Yes, she did.

9    Q.   Did you look at her phone?

10   A.   Yes, we did.

11   Q.   What was the purpose of looking at her phone?

12   A.   Well, during that interview it came up that she had kind

13   of sent off a number of text messages to her boyfriend, and so

14   we requested that we take a look and see what those text

15   messages looked like, so she kind of offered that up to us.

16   Q.   And did you physically look in her phone?

17   A.   Yes, we did.

18   Q.   Did you see those text messages that you were referring

19   to?

20   A.   Yes, we did.

21   Q.   And did you look at the text messages before or after to

22   see if those were relevant as well?

23   A.   Yes.

24   Q.   And did you preserve the relevant text messages?

25   A.   Yes, we did.

```
 1    Q.   How did you preserve those?
 2    A.   Well, we identified the ones that were pertinent to the
 3    investigation and she took screen shots of them and e-mailed
 4    them to us.
 5    Q.   And were you physically present while she took those
 6    screen shots?
 7    A.   Yes, I was.
 8    Q.   Did you observe her doing that?
 9    A.   Yes.
10         MS. JAWAD:  I'd like to publish what's already been
11    admitted as United States Exhibit 11.
12         THE COURT:  Any objection?
13         MR. AMBERG:  No objection.
14         THE COURT:  You may do so.
15    BY MS. JAWAD:
16    Q.   And Special Agent Erkkinen, you can turn to tab 11 in your
17    binder if you can't see the screen.
18         MS. JAWAD:  Can we zoom in on the top half of these?
19    BY MS. JAWAD:
20    Q.   And Special Agent Erkkinen, is this an example of one of
21    the screen shots that you were referring to?
22    A.   I can't see it but...
23    Q.   It's the -- it's in -- the first three in tab 11.
24    A.   Yes.  Those are the screen shots, yes.
25    Q.   And what is the date that's indicated on the top there?
```

1    A.   At the top it says Wednesday.

2    Q.   And what is the time?

3    A.   5:00 a.m.

4    Q.   And you said that when the screen shots were taken, this

5    was five days after the incident, is that right?

6    A.   Yes.

7    Q.   So what day would that have been?

8    A.   That would have been Monday, January 8.

9    Q.   And do you have an iPhone yourself?

10   A.   I do.

11   Q.   So you're familiar with the ways that iPhones log dates?

12   A.   Yes, I am.

13   Q.   So is that Wednesday referring to the Wednesday prior to

14   the Monday meeting?

15   A.   Yes, it is.

16   Q.   And that would have been January 3rd?

17   A.   January 3rd, yes.

18            MS. JAWAD:  We can take it down.

19   BY MS. JAWAD:

20   Q.   Special Agent Erkkinen, did you know who her cell phone

21   carrier was at the time?

22   A.   Yes.  She said it was AT&T.

23   Q.   And did you take any steps to try to obtain those messages

24   straight from AT&T?

25   A.   Yes, we did.

1  Q.   What did you do?

2  A.   I was in contact with AT&T and they replied back to me.

3  Q.   Were you able to retrieve those text messages from AT&T?

4  A.   No, I was not.

5  Q.   Why not?

6  A.   They indicated that they don't store text messages unless

7  it's requested by the subscriber.

8  Q.   And is that something the subscriber would have to do when

9  they set up the account?

10  A.   Yes.

11  Q.   At some point did you also collect Laura's clothes?

12  A.   Yes, we did.

13  Q.   What items of clothing did you collect?

14  A.   It was a shirt and a pair of jeans.

15  Q.   And approximately when was that?

16  A.   I believe that was in March.  No, I'm not sure exactly.

17  Q.   But is it fair to say it was after that --

18  A.   Yeah.

19  Q.   -- second interview?

20  A.   Yes, it was after the second interview for sure.

21  Q.   And what did you do with the clothes?

22  A.   We sent them to the FBI lab.

23  Q.   What was the purpose of sending them to the lab?

24  A.   They were going to pull off any kind of evidence that they

25  could, evidence that we couldn't see physically I guess, trace

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1593   Page 41 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

41

 1    evidence.

 2    Q.   What is trace evidence?

 3    A.   I think they were looking for fiber, you know, any kind of

 4    fibers and potentially some DNA as well.

 5    Q.   When you say fibers, do you mean threads from the

 6    clothing?

 7    A.   Yes.

 8    Q.   And did you receive a report as a result of sending those

 9    in?

10    A.   Yes, we did.

11    Q.   If you could turn to tab 22 in your binder.  What is

12    behind tab 22?

13    A.   Tab -- tab 22 is a laboratory report.

14    Q.   And is that the report -- is that a report that concerns

15    the clothing items that were sent in?

16    A.   Yes.

17         MS. JAWAD:  Your Honor, the parties have stipulated

18    to the admission of this report.  At this time we'd move to

19    admit United States Exhibit 22.

20         MR. AMBERG:  No objection, Your Honor.

21         THE COURT:  Exhibit 22 is admitted.

22         You may proceed.

23         MS. JAWAD:  May I publish it to the jury?

24         THE COURT:  You may.

25         MS. JAWAD:  If we could zoom in on the top half, like

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1594   Page 42 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

42

 1    that, yes.

 2    BY MS. JAWAD:

 3    Q.   Special Agent Erkkinen, on the front of this lab report,

 4    is that the defendant's name?

 5    A.   Yes, it is.

 6    Q.   Listed under "Subject"?

 7    A.   Yes.

 8    Q.   And is the victim listed as Laura?

 9    A.   Yes.

10         MS. JAWAD:  If we could now zoom in to where the

11    items are.

12    BY MS. JAWAD:

13    Q.   And what were the items that were compared during this

14    test?

15    A.   Well, Item Number 9 says "Jeans -- jeans from Laura."

16    Q.   Okay.  And what are Items 10 and 11?

17    A.   Items 10 and 11 are "Left hand fingernail clippings from

18    Prabhu Ramamoorthy" and Item 11 is "Right hand fingernail

19    clippings from Prabhu Ramamoorthy."

20         MS. JAWAD:  If we could now zoom in -- actually go --

21    moving to the second page of Government's Exhibit 22, if we

22    could zoom in on the results of the examination.

23    BY MS. JAWAD:

24    Q.   Can you read the -- where it says under the results of the

25    examination?

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1595   Page 43 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

43

1  A.   Yes.  There's also the examinations, "Textile fibers of

2  various types and colors were recovered from Items 10 and 11.

3  These fibers are microscopically dissimilar to the fibers

4  comprising Item 9.  Accordingly, these fibers are not

5  consistent with originating from Item 9."

6  Q.   Thank you.  And could we now move to the next page of the

7  report?

8         MS. JAWAD:  Can you zoom in on that last paragraph

9  before "Remarks" please?

10  BY MS. JAWAD:

11  Q.   And Special Agent Erkkinen, would you mind reading that

12  last paragraph before the remarks?

13  A.   It says, "The inability to associate persons/items through

14  a microscopic hair/fiber examination does not necessarily mean

15  the person/items of interest had no contact.  A number of

16  factors can produce this result, including: 1) Hair/fiber

17  evidence may not have transferred.  2) Hairs/fibers that did

18  not transfer may have been lost prior to submission to the

19  laboratory.  3)" --

20  Q.   Sorry, did you mean to say "did transfer"?

21  A.   Number 2, yeah, "Hairs/fibers that did transfer may have

22  been lost prior to submission to the laboratory.  3) The

23  hairs/fibers transferred or the known sample submitted may not

24  be representative of the source.  And 4) The hairs/fibers may

25  be from a different source."

1    Q.   Okay.  Thank you, Special Agent Erkkinen.

2         And just to be clear, you didn't conduct these tests?

3    A.   No, I did not.

4         MS. JAWAD:  You can take it down.

5    BY MS. JAWAD:

6    Q.   And going back to January 3rd when you reported to the

7    airport, did you also interview the defendant's wife that day?

8    A.   Yes, we did.

9    Q.   Did she willingly talk to you?

10   A.   Yes, she did.

11   Q.   What was her demeanor like generally?

12   A.   She looked tired.  She was cooperative though and she had

13   some questions about what was going on with her husband and

14   with her.

15   Q.   At some point during the interview was she informed of the

16   nature of the investigation?

17   A.   Yes, she was.

18   Q.   What did she do?

19   A.   Um, when she asked and was told what the nature of the

20   investigation was, she threw her hands up and kind of covered

21   her face and kind of slouched over in her seat and just kind of

22   howled.  It was kind of -- it was loud.

23   Q.   Was she crying at that point?

24   A.   I thought she would be, but when she kind of came back up

25   and she pulled her hands away from her face, she was not, she

1    was not crying, there were no tears.

2    Q.    And during the course of this investigation did you obtain

3    flight records from Spirit Airlines?

4    A.    Yes, we did.

5    Q.    If you could turn to tabs 3, 4 and 5 in the binder that

6    you have.

7    A.    Mm-hmm.

8    Q.    What do these tabs contain?

9    A.    These contain the materials from Spirit Airline that we

10    received from a subpoena.

11         MS. JAWAD:  Your Honor, at this time I'd like to

12    admit Government's Exhibits 3, 4 and 5.

13         MR. AMBERG:  No objection.

14         THE COURT:  3, 4 and 5 will be admitted.

15         MS. JAWAD:  If we could publish -- publish each

16    separately, starting with Government's Exhibit 3.

17         THE COURT:  You may do so.

18         MS. JAWAD:  And let's zoom in on the relevant

19    portion.

20    BY MS. JAWAD:

21    Q.    Special Agent Erkkinen, do you see where there are three

22    names listed in the middle of the record that is Government's

23    Exhibit 3?

24    A.    Yes, I do.

25    Q.    And whose names are those?

1    A.   Prabhu Ramamoorthy, Geethanjali Natarajan and Laura.

2    Q.   And is that second name that you read the defendant's

3    wife?

4    A.   Yes, it is.

5    Q.   And is there a column about one, two, three, four columns

6    from the right?

7    A.   Mm-hmm.

8    Q.   And what does that column indicate?

9    A.   It says "Seat."

10   Q.   And are those seat numbers that correspond to the people

11   listed in the third column from the left?

12   A.   Yes.

13   Q.   And what are those seat numbers?

14   A.   27D, 27E and 27F.

15   Q.   Whose seat number is 27D?

16   A.   Seat 27D is Prabhu Ramamoorthy.

17   Q.   Would that have been the middle seat or the aisle seat?

18   A.   That would have been the aisle seat.

19   Q.   And whose seat number is 27E?

20   A.   Says "Geethanjali Natarajan."

21   Q.   Would that have been the middle seat or the aisle seat?

22   A.   That would have been the middle seat.

23   Q.   And whose seat number is 27F?

24   A.   That's Laura's.

25   Q.   And is that the window seat?

1    A.   Yes.

2           MS. JAWAD:  If we could also publish Government's

3    Exhibit 4.

4           THE COURT:  You may.

5           MS. JAWAD:  Thank you, Your Honor.

6           If we could zoom in on where it says "Passengers."

7    BY MS. JAWAD:

8    Q.   And Special Agent Erkkinen, are -- is Government's

9    Exhibit 4 just a record of the defendant and his wife having

10   purchased tickets for Spirit Flight 788?

11   A.   Yes, it is.

12          MS. JAWAD:  And if we could publish Government's

13   Exhibit 5, and zoom in on "Passengers."

14   BY MS. JAWAD:

15   Q.   Similarly, is Government's Exhibit 5 a record that Laura

16   purchased a flight and was on Flight Spirit 788?

17   A.   Yes, it is.

18          MS. JAWAD:  Thank you.  We can take it down.

19   BY MS. JAWAD:

20   Q.   And Special Agent Erkkinen, in the course of your

21   investigation did you also obtain body camera videos from the

22   Wayne County Airport Authority police officers who assisted in

23   the investigation?

24   A.   Yes, we did.

25   Q.   Have you had an opportunity to review that camera footage?

1    A.   Yes, I have.

2    Q.   And during the course of the investigation did you also

3    learn that the Wayne County Airport Authority obtained swabs

4    from the defendant's hands?

5    A.   Yes, we did.

6    Q.   And did that happen before or after you arrived at the

7    airport?

8    A.   That happened before I arrived at the airport.

9    Q.   So did you have any involvement in the collection of swabs

10   from the defendant at the airport?

11   A.   No, we did not.

12   Q.   Was there also a separate collection of samples from the

13   defendant later in the day?

14   A.   Yes, there was.

15   Q.   And what did that entail?

16   A.   That was an execution of a search warrant after Special

17   Agent Kyle Dodge and I transported Mr. Ramamoorthy downtown for

18   his initial appearance.

19   Q.   And what were you or the agents who assisted collecting

20   in -- at that time?

21   A.   They were collecting fingernail clippings and a DNA swab.

22   Q.   What type of DNA swab did they collect at that time?

23   A.   It's a -- like a mouth swab.

24   Q.   Is that just a reference sample?

25   A.   Yes.

1    Q.   And you said they also collected fingernail clippings?

2    A.   Yes.

3    Q.   Around what time was that?

4    A.   I think that was around 4:00 p.m.

5    Q.   Did you also learn in the course of this investigation

6    that there was a period of time between when this actual

7    assault happened and -- or when this sexual assault was

8    reported and when the passengers got off the plane?

9    A.   Yes.

10   Q.   And there was also a passage of time between when the

11   plane landed and when the DNA swab was collected from the

12   defendant?

13   A.   Yes.

14   Q.   And have you reviewed the body cam footage between the

15   time that the defendant got off the plane and the time that you

16   conducted your interview of him?

17   A.   Yes, I have.

18   Q.   Well, I should ask, did you conduct an interview of the

19   defendant that day?

20   A.   Yes, we did.

21   Q.   I'd like you to turn to Exhibit 21 or Proposed Exhibit 21,

22   and these are 21A through J.  And what do those placeholders

23   indicate?

24   A.   These placeholders indicate that there's some clips of

25   videos from body cameras of the officers, the airport police.

1    Q.   Have you reviewed these clips prior to your testimony

2    today?

3    A.   Yes, I have.

4         MS. JAWAD:  Your Honor, I move to admit Government's

5    Exhibit 21 the body cam clips A through J.

6         THE COURT:  Any objection?

7         MR. AMBERG:  No objection, Your Honor.

8    BY MS. JAWAD:

9    Q.   Special Agent Erkkinen, what is the general nature of

10   these clips?

11   A.   These clips are body camera footage from the officers that

12   were at the airport there and that had dealings with -- with

13   Prabhu Ramamoorthy.  And you can see him being transported, you

14   can see him coming to the station, you can see him before and

15   during and up to -- up to the point where we interviewed him.

16   Q.   And did you specifically select clips of the defendant

17   wiping his hands or touching other objects?

18   A.   Yes, we did.

19   Q.   Are these the clips that you reviewed?

20   A.   Yes.

21        MS. JAWAD:  Your Honor, at this time I'd like to

22   publish these clips.  They're short clips but there's about ten

23   of them, so it may make sense for defense counsel and the

24   defendant to move so that they can see the screen.

25        THE COURT:  All right.  I'll allow that.  Mr. Amberg

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1603   Page 51 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

51

1   and Mr. Ramamoorthy may move about the courtroom so that they

2   can see the screen which has been moved closer for the jury's

3   convenience and somewhat out of the view of where Mr. Amberg

4   and Mr. Ramamoorthy were sitting.

5            MS. JAWAD:  And, Your Honor, just to clarify, has the

6   Court received Government's Exhibit 21A through J?

7            THE COURT:  21A through J are admitted.

8            MS. JAWAD:  Thank you.  I'd like to publish 21A.

9            (Video with audio being played)

10           MS. JAWAD:  Your Honor, if the witness could move so

11  that he can also see the screen.

12           THE COURT:  Yes.

13  BY MS. JAWAD:

14  Q.  But Special Agent Erkkinen, you may want to take the

15  microphone with you so that the court reporter can hear you if

16  it's possible.  There's a chair.

17           MS. JAWAD:  If we could replay clip A.

18           (Video with audio being played)

19  BY MS. JAWAD:

20  Q.  Special Agent Erkkinen, what is the defendant doing in

21  this clip?

22  A.  The defendant is reaching into his pocket and pulling out

23  his wallet.

24           MS. JAWAD:  If we could publish clip B.

25           (Video with audio being played)

```
 1    BY MS. JAWAD:

 2    Q.   And what is the defendant doing in this clip?

 3    A.   He's preparing to write a statement of what happened.

 4    Q.   And does he have a pen in his right hand?

 5    A.   Yes, he does.

 6    Q.   Now moving to Government's clip C.

 7              (Video with audio being played)

 8    Q.   Where are the defendant's hands in this clip?

 9    A.   He's got his hands crossed so they're kind of tucked under

10    his armpits.

11    Q.   Moving now to clip D.

12              (Video with audio being played)

13    Q.   Special Agent Erkkinen, where was this video taken?

14    A.   This is in the lockup at the Metro Air Police.

15    Q.   And what's happening here?

16    A.   The officers are asking him to empty his pockets so he's

17    reaching into his pockets and pulling out his -- his wallet and

18    his cell phone.

19    Q.   And for the record, did he also pat his body?

20    A.   Yes, he did.

21    Q.   And what was in his pockets?

22    A.   Well, he had his wallet and his cell phone and looked like

23    some wadded up tissues.

24    Q.   Could you tell which hand he was wearing his watch on?

25    A.   Yeah.  His watch was on his left hand.
```

1    Q.   And is this clip from -- based on your review of all of

2    the footage, did this clip happen before the DNA swab?

3    A.   Yes.

4    Q.   Moving to United States Exhibit E.

5         (Video with audio being played)

6    Q.   And what -- what is the defendant doing in this clip?

7    A.   He's using that tissue that -- to blow his nose.

8    Q.   Is this also prior to the DNA swabs?

9    A.   Yes.

10   Q.   And moving now to clip G, or sorry, clip F.

11        (Video with audio being played)

12   Q.   And what's happening in clip G?

13   A.   The officers are taking the fingerprints of the defendant.

14   Q.   Did that also happen prior to the DNA swabs?

15   A.   Yes.

16   Q.   And moving now to clip H.  There are only three clips

17   left.  Oh, sorry, clip G is next.

18        (Video with audio being played)

19   Q.   And what's happening here?

20   A.   The officers are preparing to take a DNA swab of his

21   hands.

22   Q.   What do they have to instruct the defendant?

23   A.   The officers ordered him not to -- to keep his hands out

24   of his pockets.

25   Q.   And now moving to clip H.

1          (Video with audio being played)

2   Q.   And did the officers in clip H again have to instruct the

3   defendant to keep his hands out of his pockets?

4   A.   Yes, they did.

5   Q.   Was that a separate time from clip G?

6   A.   Yes, it was.

7   Q.   And moving now to clip I.  Only two more left.

8          (Video with audio being played)

9   Q.   And did the defendant have his hands in his pockets in

10  this clip?

11  A.   Yes, he did.

12  Q.   And just to be clear, this video, is this after the swabs

13  have been taken?

14  A.   Yes, it is.

15  Q.   But are we still before the fingernail clips were

16  collected?

17  A.   Yes, that's true.

18  Q.   And finally, United States clip J.

19          (Video with audio being played)

20  Q.   Is the defendant being interviewed by you here?

21  A.   Yes.

22  Q.   Or rather was this prior to your interview with the

23  defendant?

24  A.   Just prior to, yes.

25  Q.   And what was he doing in that clip?

1   A.   Well, he was sitting there waiting and, you know, clearly

2   he was kind of combing his hair over.

3   Q.   And was that prior to the fingernail clipping test that

4   was done?

5   A.   Yes.

6   Q.   Okay.

7          MS. JAWAD:  Your Honor, I'm going to move into

8   talking about the defendant's interview.  There are also a

9   number of video clips.  I think it makes sense to keep everyone

10  here if that's okay.

11         THE COURT:  Yes.  I think though we should probably

12  take a break before you get into that.  We haven't had a

13  morning break yet.  It's almost 10:20.  And so let's do that

14  unless there's any objection.  Any objection to taking a break?

15         MS. JAWAD:  No objection.

16         THE COURT:  All right.  Let's take a break for about

17  15 minutes.  All rise for the jury.

18         (Jury excused at 10:18 a.m.)

19         THE COURT:  All right.  You may be seated.

20         And so we'll take a 15-minute break.  Agent Erkkinen,

21  obviously you're still under oath.  Thank you very much.  We're

22  in recess.

23         MS. SMITH:  Thank you, Your Honor.

24         (Court in recess at 10:18 a.m.)

25         (Proceedings resumed at 10:33 a.m., all parties

1          present, jury not present)

2          THE CLERK:  Court recalls Case No. 18-200 -- 20027,

3   United States of America versus Prabhu Ramamoorthy.

4          Counsel, will you please replace your appearances on

5   the record?

6          MS. JAWAD:  Yes.  Good morning, Your Honor.  Amanda

7   Jawad and Maggie Smith on behalf of the United States.  Meghann

8   O'Connor and Kyle Dodge are with us as well.

9          THE COURT:  Good afternoon.

10         MR. AMBERG:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. AMBERG:  Time flies when you're having fun.  Jim

13  Amberg on behalf of Mr. Ramamoorthy.  He is in the gallery

14  behind me.  Sitting next to him is Mr. Vijay, his interpreter,

15  and to my right is Victor Mansour, co-counsel in the case.

16         THE COURT:  Very good.  Are we ready to bring in the

17  jury?

18         MR. AMBERG:  Yes.

19         THE COURT:  All right.  Let's bring in the jury.

20         (Jury entered the courtroom at 10:34 a.m.)

21         THE COURT:  Good morning again, ladies and gentlemen.

22  Welcome back.  You may be seated.

23         And so as you recall, we were continuing with the

24  testimony of Special Agent Erkkinen, and so Ms. Jawad, you may

25  proceed.

| | |
|---|---|
| 1 | MS. JAWAD:  Thank you, Your Honor. |
| 2 | BY MS. JAWAD: |
| 3 | Q.  Special Agent Erkkinen, before we took a break we saw a |
| 4 | beginning of your interview with the defendant.  Do you recall |
| 5 | that? |
| 6 | A.  Yes. |
| 7 | Q.  When did you interview the defendant? |
| 8 | A.  That was January 3rd, 2018. |
| 9 | Q.  And that was the date of the incident? |
| 10 | A.  Yes. |
| 11 | Q.  Was that after you had spoken with his wife? |
| 12 | A.  Yes, it was. |
| 13 | Q.  Was it also after you had spoken with the victim? |
| 14 | A.  Yes. |
| 15 | Q.  Who was present for this interview? |
| 16 | A.  For the interview with the defendant it was myself and |
| 17 | Special Agent Kyle Dodge. |
| 18 | Q.  Where did the interview take place? |
| 19 | A.  It took place at the Metro Airport Police lockup in an |
| 20 | interview room. |
| 21 | Q.  Is that where you first met the defendant? |
| 22 | A.  Yes, it is. |
| 23 | Q.  So were you already in the room when the defendant walked |
| 24 | in? |
| 25 | A.  Yes, I was. |

1    Q.   What was his demeanor like when he entered the room?

2    A.   He was cordial, respectful.

3    Q.   Did he offer to shake your hand?

4    A.   Yes, he did.

5    Q.   Did you shake his hand?

6    A.   I did not.

7    Q.   Why not?

8    A.   At that point, given the nature of the accusation, I

9    thought it was best to preserve any evidence that might have

10   been on his hand.

11   Q.   Do you typically shake defendants' hands?

12   A.   Yes.

13   Q.   And was this interview recorded?

14   A.   Yes, it was.

15   Q.   Is it FBI policy to record interview with suspects?

16   A.   Yes.  When -- when it's at all possible, yes.

17   Q.   So what happens when it's not possible?

18   A.   When we don't have like suitable recording equipment,

19   then, you know, we're not allowed to record like on our cell

20   phones or anything like that.

21   Q.   But you do record interviews when you have the suitable

22   recording device available?

23   A.   Yes, we do.

24   Q.   Okay.  And did you have a suitable recording device

25   available that day?

1    A.   Yes, we did.

2    Q.   Did you review that recording prior to your testimony

3    today?

4    A.   I did, yes.

5    Q.   And in the recording that we're talking about, is that an

6    enhanced version of the recording or is that the original?

7    A.   It is an enhanced version.

8    Q.   And why was it enhanced?

9    A.   The original, the audio was a little bit hard to decipher

10   what, you know, what I was saying, what Special Agent Dodge was

11   saying and what the defendant was saying, so it was a little

12   bit hard to understand.

13   Q.   So was it the audio that was enhanced in the video?

14   A.   Yes, it was the audio.

15   Q.   And if you could turn to Government Proposed Exhibits 14

16   through 20.  Are these clips taken from the recording of your

17   interview with the defendant?

18   A.   Yes, they are.

19   Q.   And have you reviewed each of these clips before your

20   testimony today?

21   A.   Yes, I have.

22   Q.   Do these clips fairly and accurately depict the interview

23   as it occurred on January 3rd, 2018?

24   A.   Yes, it does.

25            MS. JAWAD:  Your Honor, at this time we move to admit

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1612   Page 60 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

60

 1     the United States' Exhibits 14 through 20.

 2            THE COURT:  Any objection?

 3            MR. AMBERG:  No objection.

 4            THE COURT:  Without objection, Exhibits 14 through 20

 5     will be admitted.

 6            MS. JAWAD:  And I will seek to publish those in just

 7     one moment.

 8     BY MS. JAWAD:

 9     Q.   But first, Special Agent Erkkinen, did you and Agent Dodge

10     explain to the defendant while you were -- why you were there?

11     A.   Yes.

12     Q.   And was the defendant willingly talking with you?

13     A.   Yes, he was.

14     Q.   Did he also have some questions for you?

15     A.   He did have some questions, yes.

16     Q.   And before you got into the substance of the interview,

17     did you or Special Agent Dodge first collect basic background

18     information from the defendant?

19     A.   Yes.  That's pretty standard.

20     Q.   And does that include things like his name and occupation?

21     A.   Yes.

22     Q.   Does it also include someone's level of education?

23     A.   Yes.

24     Q.   And why is it important to gather those details?

25     A.   Um, well, we would want to know, you know, the person that

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1613   Page 61 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

61

 1   we're talking to and potentially look for their ability to

 2   understand certain things.  You know, level of education might

 3   indicate that.

 4   Q.  And did Mr. Ramamoorthy indicate that he had a certain

 5   level of indication -- of education?

 6   A.  Yes, he did.

 7   Q.  And what was that education?

 8   A.  A bachelor's degree.

 9   Q.  And did he respond to your questions in English?

10   A.  Yes, he did.

11   Q.  Did he appear to understand the questions?

12   A.  Yes, he did.

13        MS. JAWAD:  At this time I'd like to publish, with

14   the Court's permission, United States Exhibit 14.

15        THE COURT:  Any objection to 14?

16        MR. AMBERG:  No objection.

17        THE COURT:  Okay.

18        MS. JAWAD:  And, Your Honor, this is a video with a

19   transcript that we'll be scrolling, and both parties have

20   reviewed the transcripts and stipulate to its accuracy.

21        THE COURT:  You may proceed.

22        (Video with audio being played)

23   BY MS. JAWAD:

24   Q.  And Special Agent Erkkinen, is that you sitting in the

25   interview room?

1    A.   Yes, it is.

2    Q.   Are you the one wearing the hat?

3    A.   Yes.

4    Q.   And is that the defendant sitting across from you?

5    A.   Yes, that's him.

6    Q.   Did the defendant ask for a translator at this time?

7    A.   No, he did not.

8    Q.   And was there anything unusualable [sic] -- unusualable

9    [sic] -- unusual about the way that the defendant said his name

10   to you?

11   A.   It was unusual that he spelled it out the way he did, with

12   phonetic.

13   Q.   What did that indicate to you?

14   A.   Well, it indicated that he -- that he had maybe an unusual

15   name but that, you know, he knew that he could clarify that by

16   using the phonetic, you know, the -- the words that represent

17   his letter.

18   Q.   And did you take that to mean that he could understand

19   English words?

20   A.   Yes.

21   Q.   Did he ever say that he would be more comfortable if there

22   were a translator present?

23   A.   He did not say that.

24   Q.   And after you and Special Agent Dodge collected his basic

25   biographical information, did you and Special Agent Dodge give

1    the defendant his Miranda warnings?

2    A.   Yes, we did.

3    Q.   And what do the Miranda warnings include?

4    A.   It includes the rights that he has as a person that's

5    being questioned in connection with a criminal violation and

6    he's -- and who's in custody.

7    Q.   And what are some of those rights?

8    A.   Some of them would be like the right to remain silent and

9    the right to an attorney.

10   Q.   Did you or Special Agent Dodge explain that the defendant

11   didn't have to talk to you if he didn't want to?

12   A.   Yes, we did.

13   Q.   Did you tell him he could stop talking to you at any time?

14   A.   Yes, we did.

15   Q.   And did you tell him that he had the right to an attorney?

16   A.   Yes, we did.

17   Q.   Did you ever yell at him at any point in this interview?

18   A.   No.

19   Q.   Did anyone raise their voices during this interview?

20   A.   No.

21   Q.   Did you display your weapons at any time?

22   A.   We did not.

23   Q.   Did you make any kind of threats to him?

24   A.   No, we did not.

25   Q.   And did you go over these rights both orally and in

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1616   Page 64 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

64

1    writing?

2    A.   Yes, we did.

3    Q.   If you could turn to your exhibit book, the United States

4    Proposed Exhibit 12.  Do you recognize that document?

5    A.   Yes.

6    Q.   What is it?

7    A.   It's our Advice of Rights form.

8    Q.   And does that form contain the Miranda warnings?

9    A.   Yes, it does.

10   Q.   Is that a standard form that the FBI uses or was that

11   specific to this case?

12   A.   No, it's a standard form.

13   Q.   And is your signature or Special Agent Dodge's signature

14   on that form?

15   A.   Yes, both of ours as witnesses, yes.

16   Q.   And is that the -- the form that you recall using on that

17   day?

18   A.   Yes, it is.

19            MS. JAWAD:  At this time, Your Honor, we move to

20   admit United States Exhibit 12.

21            MR. AMBERG:  No objection.

22            THE COURT:  Exhibit 12 is admitted.

23            MS. JAWAD:  May I publish it to the jury?

24            THE COURT:  You may.

25            MS. JAWAD:  If we could zoom in on the top portion.

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1617  Page 65 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

65

```
1    BY MS. JAWAD:
2    Q.   And what are we looking at here, Special Agent Erkkinen?
3    This is about two to three inches of the top of the page.
4    A.   So this is the top of the Advice of Rights form, and it --
5    you'll see at the top right there it says the place where
6    this -- the advice of rights were administered, the date and
7    the time.
8    Q.   And was that something filled out by you or Special Agent
9    Dodge?
10   A.   Yes.
11   Q.   And what was the time of the interview?
12   A.   The time was approximately 2:08 p.m.
13        MS. JAWAD:  And if we could now zoom in on the rights
14   that are listed here.
15   BY MS. JAWAD:
16   Q.   Are these the rights that you and Special Agent Dodge went
17   over with the defendant?
18   A.   Yes, those are the rights, yes.
19   Q.   And what are those letters we see on the left?
20   A.   The letters "PR," the defendant's initials.
21   Q.   And did you ask the defendant to initial each line?
22   A.   Yes, we did.
23   Q.   Why is that?
24   A.   We asked him to initial next to the line that -- that
25   indicated that he understood what that line meant.
```

1    Q.   Okay.  And could you read each line?

2    A.   Sure.  The first one says, "Before we ask you any

3    questions, you must understand your rights.

4           "You have the right to remain silent.

5           "Anything you say can be used against you in court.

6           "You have the right to talk to a lawyer for advice

7    before we ask you any questions.

8           "You have the right to have a lawyer with you during

9    questioning.

10          "If you cannot afford a lawyer, one will be appointed

11    to you before any questioning if you wish."

12          And "If you decide to answer any questions now

13    without a lawyer present, you have the right to stop answering

14    at any time."

15    Q.  And did the defendant read these lines aloud to you?

16    A.  Yes, he did.

17    Q.  And did he make any indication that he understood?

18    A.  Yes, by initialing each line.

19    Q.  Did he also ask questions about the form?

20    A.  Yes.

21    Q.  Did you answer those questions?

22    A.  Yes, we did.

23    Q.  About how long would you say you spent going over this

24    form with the defendant?

25    A.  Several minutes, probably close to 10 or 11 minutes.

```
 1            MS. JAWAD:  And if we could see now what's on the
 2     bottom of the form.
 3     BY MS. JAWAD:
 4     Q.  If you could read the line before where we see the
 5     signatures.
 6     A.  The line says, "I have read this statement of my rights
 7     and I understand what my rights are.  At this time I'm willing
 8     to answer questions without a lawyer present."
 9     Q.  And whose signature appears right below that?
10     A.  That's the defendant's signature.
11     Q.  Did you witness him signing that document?
12     A.  Yes, I did.
13     Q.  And is that your signature on the document as well?
14     A.  Yes.  It's the second one down under the witnesses.
15     Q.  And what time was this signed?
16     A.  2:19 p.m.
17     Q.  Okay.
18            MS. JAWAD:  At this time, Your Honor, we would like
19     to play the United States Exhibit 15.
20            THE COURT:  You may do.
21            (Video with audio being played)
22     BY MS. JAWAD:
23     Q.  Special Agent Erkkinen, in the beginning of this clip when
24     the defendant says, "I don't understand this," what was he
25     referring to?
```

```
 1              MR. AMBERG:  I object to that.  How does he know?
 2   BY MS. JAWAD:
 3   Q.  Well, in -- what had you instructed him to do --
 4              THE COURT:  All right.
 5              MS. JAWAD:  I can rephrase.
 6              THE COURT:  Just a moment.  So the objection is that
 7   you're saying he doesn't have knowledge of that, is that what
 8   you're saying?
 9              MR. AMBERG:  Right, because that is an issue in this
10   case.
11              THE COURT:  All right.  You rephrase your question
12   then.  Go ahead.
13   BY MS. JAWAD:
14   Q.  At what point in the discussion did Mr. Ramamoorthy say,
15   "I don't understand"?
16   A.  When he -- when we were talking about, you know, what
17   rights that he might have, he spoke -- he asked, you know, "I
18   don't understand what happens with the procedure."
19   Q.  But before that, did he say he didn't understand after you
20   told him to initial next to the line?
21   A.  Yes.
22   Q.  And did you then clarify what you meant by --
23   A.  Yes.
24   Q.  -- putting his initials down?
25   A.  Yeah.  I didn't tell him put PR but I said "your
```

1    initials."

2    Q.   And he knew what that meant?

3    A.   Yes.

4    Q.   Okay.  And when you said he didn't understand the

5    procedure, he was talking about the court procedure that was

6    going to happen after that interview?

7    A.   Yes.

8    Q.   And did you and Special Agent Dodge do your best to

9    explain to him what was going on?

10   A.   Yes, we did.

11   Q.   And based on this initial interaction, did you feel like

12   he was understanding the questions?

13   A.   Yes.

14   Q.   Did he answer them appropriately?

15   A.   Yes, he did.

16   Q.   Did he also nod his head to indicate that he understood

17   his rights?

18   A.   Yes, he did.

19   Q.   And did he ask you a question about cameras on the

20   airplane?

21   A.   Yes, he did.

22   Q.   What did he ask?

23   A.   He asked if Spirit had any cameras.

24   Q.   And after this clip did you continue to go through the

25   rest of the form with him?

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1622   Page 70 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

70

1   A.   Yes, we did.

2   Q.   Did he continue to ask questions?

3   A.   He did.

4   Q.   At some point did he begin to volunteer information about

5   what happened on the airplane?

6   A.   Yes.

7   Q.   Did you -- did you engage in that conversation?

8   A.   We kind of tried to stop that since we wanted to get

9   through the advice of rights first.

10   Q.   Why is that?

11   A.   Well, we wanted him to fully understand what all of his

12   rights were before he started telling us his side.

13   Q.   And when you're interviewing a suspect of a crime, how do

14   you typically go about asking your questions?

15   A.   Well, typically after an advice of rights like this, you

16   know, we probably start off with some open-ended questions

17   like, you know, tell us what happened, just to hear his side of

18   the story or her side of the story.

19   Q.   And did you say you're a licensed professional counselor?

20   A.   Yes.

21   Q.   And do you use some of that training and experience in

22   your interviews with the FBI?

23   A.   Yes, I do.

24   Q.   What are some of the techniques that you use based on your

25   experience as a counselor?

1    A.   Typically I would find it most effective in talking with

2    others to ask open-ended questions, to ask some clarifying

3    questions if I don't understand.  Another big thing that I do

4    is I rephrase what they're saying just to make sure that I'm

5    understanding what they're talking about.

6    Q.   And did you do that throughout the interview?

7    A.   Yes.

8    Q.   And when he was done signing the Advice of Rights form,

9    did the defendant ask you any questions about the victim in the

10   case?

11   A.   Yes.

12   Q.   What did he ask you?

13   A.   He asked -- he wanted to know the nature of the complaint

14   against him.

15   Q.   And did he want to know that before he answered any of

16   your questions?

17   A.   Yes.  He asked us that before we got a chance to ask him.

18   Q.   Did you ever tell the defendant what the victim said about

19   him?

20   A.   No, not at that time.

21   Q.   And why is that?

22   A.   Well, it's an effort to kind of hear an unsolicited side

23   from -- from him, so that way anything that he might hear from

24   us might steer his side of the story.

25   Q.   And did he begin to offer information about what happened

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1624   Page 72 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

72

1    on the airplane?

2    A.   Yes, he did.

3         MS. JAWAD:   Your Honor, if we could play Government's

4    Exhibit 16 at this time.

5         THE COURT:   You may.

6         (Video with audio being played)

7    BY MS. JAWAD:

8    Q.   And Special Agent Erkkinen, at the end of this clip are

9    you checking in with the defendant to ask whether he

10   understands you?

11   A.   Yes.

12   Q.   And did he indicate he had any trouble understanding you?

13   A.   No.  He indicated he didn't have any trouble understanding

14   me.

15   Q.   And when the defendant was talking about what happened on

16   the airplane, was that in response to any questions?

17   A.   No.

18   Q.   Did he volunteer that information?

19   A.   Yes, he did.

20   Q.   And at some point did he talk about what the victim was

21   doing on the airplane?

22   A.   Yes.

23   Q.   What did he say?

24   A.   He said that she was resting on his shoulder and on his

25   lap and kind of moving, moving her legs around kind of in and

 1   out.

 2   Q.   Did he describe her demeanor in any way?

 3   A.   No.  I mean he said that she was kind of sniffing and

 4   maybe muttering and she was text messaging or he said

 5   messaging, she was messaging and chatting, so he said that he

 6   thought that she might be drunk.

 7   Q.   And did he also demonstrate to you that she had fallen

 8   asleep on him?

 9   A.   Yes.

10   Q.   Did he begin to demonstrate where he was placing his

11   hands?

12   A.   Yes, he did.

13   Q.   And where did he indicate that he placed his hands?

14   A.   Well, he said that she kind of fell on his shoulder and

15   then --

16   Q.   And for the record, are you pointing at your left or your

17   left shoulder?

18   A.   I'm pointing to my right shoulder.

19        So that she kind of fell on his right shoulder and

20   then fell on his lap, and that he initially had kept his hand

21   back like this, like across looked like maybe the back of her

22   seat, and then he said that his arm started to kind of get

23   tired and so he rested his hand on her back.

24        MS. JAWAD:  At this time, Your Honor, we'd like to

25   play Government's Exhibit 17.

```
 1                THE COURT:  Okay.
 2                (Video with audio being played)
 3   BY MS. JAWAD:
 4   Q.   So for the record, is he showing you all of the places
 5   that he put his hands on her, on the victim's body?
 6   A.   Yes.
 7   Q.   And is he describing her as sleeping while this happens?
 8   A.   Yes, he is.
 9   Q.   And again, for the record, we saw the defendant.  Was he
10   moving his legs outward and inward --
11   A.   Yes.
12   Q.   -- to demonstrate what the victim was doing?
13   A.   Yes.
14   Q.   Can you describe his -- his body movements as he explained
15   what the victim was doing?
16   A.   Yes.  He was showing us at this point how she was kind of
17   sleeping and falling -- falling asleep on his shoulder and then
18   how she flopped down on his lap, and he described how her arms
19   were kind of like over the top of his lap and touching him.
20                MR. AMBERG:  I would object to this, Your Honor, and
21   this is my objection.  The tape speaks for itself.  He's now
22   interpreting what Mr. Ramamoorthy is trying to convey is
23   inappropriate.  I think the jury can interpret for themselves
24   what the video says and shows.  I don't think having any --
25                THE COURT:  All right.  Thank you.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1627   Page 75 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

75

1          Any response?

2          MS. JAWAD:  Your Honor, I'm just trying to unpack

3     what was said and make clear for the record what the gestures

4     were.

5          THE COURT:  You may question the witness about if

6     there were things that happened that are not contained in the

7     clips, you may ask about that, but let's just focus on what

8     happened in the video.  Go ahead.

9          MS. JAWAD:  Thank you, Your Honor.

10    BY MS. JAWAD:

11    Q.   Did the defendant's version of the facts begin to change

12    as the interview progressed?

13    A.   Yes, they did.

14    Q.   And at some point did you or Special Agent Dodge speak

15    with him about telling the truth?

16    A.   Yes, we did.

17    Q.   And what did you say to him?

18    A.   We gave kind of a standard warning of helping him to

19    understand that it's important for him to tell the truth and

20    that there's a potential for being charged with another crime

21    of -- a federal violation if it's determined that he's not

22    giving us truthful information.

23    Q.   And what was the purpose of telling him this?

24    A.   Just so that he understood the importance, you know, how

25    important it was for him to tell us the truth.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1628   Page 76 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

76

1          MS. JAWAD:  At this time I'd like to play

2    Government's Exhibit 18.

3          THE COURT:  You may.

4          (Video with audio being played)

5    BY MS. JAWAD:

6    Q.   And just to be clear, was the defendant gesturing in this

7    video with his right hand or his left hand?

8    A.   He was gesturing with his right hand.

9    Q.   And as you continue to speak with the defendant, did he

10   give an opinion on whether or not he thought she had been

11   drinking?

12   A.   Yes.  He thought she was drunk.

13   Q.   What, if anything, did he say about his sleep?

14   A.   He said that he was in a deep sleep and then there were

15   times where he said he wasn't asleep.

16   Q.   And was he able to give details about what the victim was

17   doing?

18   A.   Yes.

19   Q.   Did he begin to talk with you about what the victim was

20   wearing?

21   A.   Yes, he did.

22   Q.   And did he eventually begin to talk about touching her --

23   A.   Yes.

24   Q.   -- in more detail?

25   A.   Yes, he did.

1    Q.   At some point did you and Special Agent Dodge suggest to

2    the defendant that maybe the victim was flirting with her?

3    A.   Yes.

4    Q.   Or him?

5    A.   Yes, we did.

6    Q.   And why did you do that?

7    A.   Part of it was just to kind of get -- get an understanding

8    of what he might have been seeing or what he might have been

9    witnessing or if he was getting some kind of message from her

10   that indicated that she wanted him to touch her.

11   Q.   And what did he say about that?

12   A.   He said no, she wasn't flirting.

13          MS. JAWAD:  Your Honor, at this time we'd like to

14   play United States Exhibit 19, and there are two left.

15          THE COURT:  You may.

16          MS. JAWAD:  Thank you.

17          (Video with audio being played)

18   BY MS. JAWAD:

19   Q.   Special Agent Erkkinen, after this clip does the defendant

20   eventually begin to talk about what he did to the victim's bra?

21   A.   Yes.

22   Q.   And what does he say?

23   A.   He says that he was playing with --

24          MR. AMBERG:  Again I'm going to object to this.  It

25   speaks for itself.  We don't need somebody to tell us what a

1    video shows us.

2            THE COURT:  I think it's better to play a video, so

3    let's go with the video.  You may ask questions that relate to

4    events or anything that happened outside the video.

5            MS. JAWAD:  Thank you, Your Honor.  At this point we

6    would ask to play United States Exhibit 20, and this is the

7    last one.

8            (Video with audio being played)

9            MS. JAWAD:  And, Your Honor, this was the end of the

10   video clips if people would like to move back to their seats.

11   BY MS. JAWAD:

12   Q.  Special Agent Erkkinen, during that video we just saw, for

13   the record, was the defendant gesturing on his own body to

14   indicate what he was doing to the victim's body?

15   A.  Yes, he was.

16   Q.  And just one quick question about the clarifying

17   questions.  You said that you continued to ask clarifying

18   questions of the defendant throughout the interview?

19   A.  Yes.

20   Q.  If there was a time that the defendant didn't agree that

21   you had the right interpretation of what he was saying, did he

22   tell you that?

23   A.  Yes, he did.

24   Q.  And did he say no sometimes when you asked him if he did a

25   certain thing?

Jury Trial: Volume 4 • Tuesday, August 14, 2018

1    A.   Yes.

2    Q.   And at some point was the interview cut short?

3    A.   Yes, it was?

4    Q.   Why was that?

5    A.   Well, we wanted to get him downtown to get in front of a

6    judge for his initial appearance.

7    Q.   And is that where you went next?

8    A.   Yes.

9    Q.   And was there a certain deadline you were trying to make

10   to get downtown?

11   A.   Yes.  I think the judge had kind of stood by, so I want to

12   say that we tried to get him down here 4:00 or 4:15 that

13   afternoon.

14   Q.   And how did you transport the defendant downtown?

15   A.   He was transported in the back of Special Agent Dodge's

16   vehicle.

17   Q.   Did you ride in the car with him?

18   A.   Yes, I did.

19   Q.   Where did you sit?

20   A.   I sat behind Special Agent Dodge who was driving, next to

21   the defendant.

22   Q.   And did you continue to speak with the defendant about

23   what happened?

24   A.   Yes, I did.

25   Q.   Was that conversation recorded?

1   A.   No, it was not.

2   Q.   Why not?

3   A.   Well, we didn't have recording equipment in Special Agent

4   Dodge's vehicle.

5   Q.   And why did you keep talking to him?

6   A.   Well, because we wanted to get him downtown and time was

7   kind of of the essence at that point.  Towards the end of the

8   interview his -- his story had kind of evolved, and right at

9   the end I think, you know, it sounded like we were starting to

10   get some more details that I wanted to flesh out, so I was

11   asking him if there was any difference between basically what

12   he was saying, if his story would change in the -- in the

13   vehicle at all.

14   Q.   And what did he say in the vehicle?

15   A.   Well, in the vehicle he indicated that he tried to get her

16   pants undone.  He had spoken about earlier that his -- that he

17   was not right-handed and so his right hand wasn't quite as

18   coordinated and that might have been why his -- he couldn't --

19   couldn't get the zipper down, and that also he couldn't tell if

20   he was touching her underwear or her skin.

21   Q.   And what's the next thing that happened?

22   A.   We arrived downtown and the defendant was taken up to the

23   U.S. Marshals for processing.

24   Q.   And Special Agent Dodge, in your training and experience

25   with the FBI, is it common for defendants to confess in small

1    increments?

2    A.    Yeah.  Erkkinen, but yes.

3    Q.    Sorry, what did I call you?

4    A.    Dodge.

5    Q.    Oh, I'm sorry.

6    A.    Yes.  Yes, it is not uncommon to see a confession change

7    as time goes on.

8         MS. JAWAD:  No further questions, Your Honor.

9         THE COURT:  All right.  Thank you very much.

10        Any cross-examination?

11        MR. AMBERG:  Yes, Your Honor.

12                      CROSS-EXAMINATION

13   BY MR. AMBERG:

14   Q.    Agent Erkkinen, hello.

15   A.    Hi, Mr. Amberg.

16   Q.    Good to see you as always.  I've got a lot of questions

17   for you so --

18   A.    I'll do my best.

19   Q.    -- bear with me as I get set up.

20        Okay.  Agent Erkkinen, first I want to talk about the

21   investigation itself and then talk about the interview

22   afterwards, okay?

23   A.    Okay.

24   Q.    Okay.  Now, you and Agent Dodge are the agents that were

25   working this case for the FBI, right?

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1634   Page 82 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

82

1    A.   Yes.

2    Q.   And you were both really the agents in charge of this

3    investigation?

4    A.   Yes.

5    Q.   Okay.  And you work together on these kinds of cases,

6    right?

7    A.   Not typically, but in this case, yes.

8    Q.   Okay.  And so you were familiar with everything that Agent

9    Dodge was doing and vice versa, right?

10   A.   Mostly familiar, yes.

11   Q.   Okay.  One thing I want to talk about first was the -- the

12   evidence of the -- the fibers, okay?  And that was you who

13   requested that be done, right?

14   A.   I'm not sure if I processed that.  I just collected --

15   collected them from the victim.

16   Q.   Okay.  And what you collected from the complainant were

17   the jeans, right?

18   A.   Yes.

19   Q.   They were the same jeans that she was wearing that day,

20   right?

21   A.   That's what she told me, yes.

22   Q.   Okay.  And they looked like them too, right?

23   A.   Yeah.

24   Q.   Okay.  Did you take the fabric sample or what, did you cut

25   a piece of the jeans off or send the whole jeans out there or

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1635   Page 83 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

83

1    what?

2    A.   No.  I brought the jeans and I believe it was Special

3    Agent Dodge that had it sent to the lab.

4    Q.   Okay.  So that -- they in their entirety were sent there,

5    right?

6    A.   As far as I understand.  I wasn't that did that though.

7    Q.   Okay.  But you guys wanted them to test for was the fibers

8    to see if they matched the fibers on Mr. Ramamoorthy's

9    fingernails, right?

10   A.   I -- I didn't submit that request, but that was my

11   understanding that that's what we were looking for, yeah.

12   Q.   Right, because you've been taught and you've probably seen

13   it in your experience that people when they touch clothing and

14   stuff like that can get fibers of that clothing on their

15   fingernails, right?

16   A.   That's my understanding, yes.

17   Q.   And not just that but hair as well, right?

18   A.   Yes.

19   Q.   Okay.  And did you ask them to test for DNA on the pants?

20   A.   I believe there was -- I believe that was part of the

21   request.  I didn't submit that request though, so...

22   Q.   But you think it was part of it, right?

23   A.   I believe so, yeah.

24   Q.   It was -- there was no DNA of Mr. Ramamoorthy on those

25   pants, right?

1   A.   As far as I understand in the report, I don't think there

2   was, no.

3   Q.   Okay.  And one thing about the report, I know it's in

4   evidence, but both his right and left hand fingernails were

5   tested for fibers, right?

6   A.   Yes.

7   Q.   Okay.  And on page 2 of this report it reads as follows:

8   "Textile fibers of various types and colors were -- were

9   recovered from Items 10 and 11."  Okay.  Items 10 and 11, 10 is

10  the left hand fingernail clipping of Mr. Ramamoorthy, right?

11  A.   Yes.

12  Q.   11 is the right hand fingernail clipping, right?

13  A.   Yes.

14  Q.   So in both of his fingernail clippings there's various

15  types of fibers found in the nails, right?

16  A.   According to the results, yes.

17  Q.   Okay.  Well, wouldn't this indicate that things weren't

18  washed from his hands but instead there was a multiple amount

19  of different types of fibers on the -- the fingernails and the

20  clippings?

21  A.   I'm not sure.  I'm not -- I'm not like a DNA or a fiber

22  expert.  Based on this, I can only go with the report, what it

23  says, that there were a variety of fibers collected.

24  Q.   All you can say is that, yes, there were different types

25  of colors, different types of fibers --

1    A.   That's what it looks like, yes.

2    Q.   -- in the fingernails, right?

3    A.   That's what the -- that's what the results say, yeah.

4    Q.   And those fibers and different things that were found

5    under the nails did not match those pants?

6    A.   It says that the fibers were dissimilar to the fibers from

7    the jeans, Yes.

8    Q.   Correct.  And the last part of this report on that

9    paragraph it says, "Accordingly, these fibers are not

10   consistent with originating from Item 9."

11   A.   Yes, that's what it says.

12   Q.   Well, this is evidence that Mr. Ramamoorthy did not touch

13   these pants, correct?

14   A.   I'm not sure if I could say that.  I'm not a fiber expert.

15   Q.   Well, the other way around, if there were fibers from

16   those pants, then I'm sure you would say, well, that is

17   evidence that he touched those pants, right?

18   A.   I would assume that he would have touched the pants if

19   there were his -- yeah, if there were her fibers under his

20   fingernails.

21   Q.   And so likewise, when there's nothing that connects the

22   pants to what was found, that would suggest that he did not

23   touch the pants?

24   A.   That part I'm not sure of.

25        MS. JAWAD:  Your Honor, I'm going to object.  He

1    can't interpret someone else's report.

2          THE COURT:  I think the question's been asked and

3    answered.  Why don't you move on.

4          MR. AMBERG:  Thank you, Your Honor.

5    BY MR. AMBERG:

6    Q.  In addition to that, was there fingerprint evidence done

7    in this case?

8    A.  Fingerprints, like were his fingerprints taken from --

9    Q.  Well, didn't you guys try to do some fingerprint analysis

10   on a napkin or something like that?

11   A.  Oh, there was some fingerprints, yeah, yeah.

12   Q.  His fingerprints weren't on those either, right?

13   A.  My understanding is they were not.

14   Q.  Okay.

15   A.  Yeah.

16   Q.  Now, you were trained in Quantico for like four or five

17   months, right?

18   A.  Yes.

19   Q.  And they teach you in great detail how to conduct all

20   sorts of types of investigations?

21   A.  I'd say maybe not great detail, but...

22   Q.  You learn that in cases where there's a potential for DNA

23   evidence to preserve that evidence?

24   A.  Yes, we learned it's important to preserve DNA evidence.

25   Q.  Okay.  And, in fact, was that one of the first things that

1    you thought of when you got the call in this case?

2    A.   I'm not sure if that was the first thing I thought of.  I

3    knew it was important.

4    Q.   It was important?

5    A.   Yeah.

6    Q.   It was something that you thought of?

7    A.   It was something I thought of at some point, yeah.

8    Q.   Okay.  And did you discuss that with Agent Dodge?

9    A.   Yes.

10   Q.   Did you call or in any other way communicate to the

11   officers that were on scene to preserve DNA evidence?

12   A.   No, I did not.

13   Q.   Okay.  Why not?

14   A.   I was coming in secondary I guess.  I figured maybe that

15   was handled already before I got there.

16   Q.   Well, don't you want to make sure?

17   A.   I mean yeah, sure.

18   Q.   Because when there's DNA on somebody, that's like

19   incontrovertible evidence of guilt, right?

20   A.   That I'm not -- I don't know about that.

21   Q.   Well, if Mr. Ramamoorthy's DNA was in the vaginal cavity

22   of the complainant, that would be proof that his hand was

23   inside of her?

24   A.   I'm not a DNA expert so I'm not sure.

25   Q.   Okay.  And just like with the fiber evidence, likewise

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1640   Page 88 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

88

1   when there's no evidence of DNA inside of her of Mr.

2   Ramamoorthy's, that would be evidence that he didn't touch her

3   like that?

4   A.   Again, I'm not sure about that.  I'm not a DNA expert.

5   Q.   All right.

6   A.   Fiber expert.

7   Q.   Okay.  So as far as the collection of DNA goes, I know

8   that you mentioned that -- that you didn't shake his hand

9   because you were concerned that maybe you -- it would rub DNA

10  off of his hand?

11  A.   Right.

12  Q.   Well, here's the thing.  I mean do you -- by this point in

13  time you and Agent Dodge are -- are well involved in this case,

14  right?

15  A.   Yes.

16  Q.   Why not tell these people to throw gloves on him?

17  A.   I'm not sure about that.

18  Q.   You didn't do that?

19  A.   I didn't -- I didn't ask to put gloves on him, no.

20  Q.   Well, and even when you got in there, you didn't ask for

21  him to put gloves on, right?

22  A.   No.

23  Q.   You let him touch himself all over the place, right?

24  A.   Well, I mean it's up to him whether he touches himself I

25  guess, but...

1    Q.   If you were concerned about the DNA evidence leaving his

2    hands, then why would you not immediately have him put gloves

3    on?

4    A.   I'm not sure.

5    Q.   All right.  Instead you conducted that whole interview and

6    never once mentioned that?

7    A.   Right.  Yes.

8    Q.   That interview took place how long after he came off that

9    flight?

10   A.   How long after the defendant came off the flight?  It

11   would have been a number of hours at that point, yeah.  I think

12   if -- if -- yeah, number of hours.

13   Q.   Like it's in what, like 6:00 in the morning, something

14   like that?

15   A.   It was something to that effect, yeah.

16   Q.   This is taking place at 2:00 in the afternoon?

17   A.   Yes.

18   Q.   Okay.

19   A.   Yeah.

20   Q.   Now, I know that you watched all of these different videos

21   and things like that, and you testified to these little clips

22   in the beginning of your testimony on direct exam.

23   A.   Yes.

24   Q.   And you were asked by the -- I guess the U.S. Attorney to

25   do that?

1    A.    To?

2    Q.    To look and see and find videos of when Mr. Ramamoorthy

3    might have been touching objects and things.

4    A.    Yes.

5    Q.    Okay.  When was that asked of you to do, when were you

6    asked to do that?

7    A.    I'm not sure.  I've -- I've reviewed that video numerous

8    times so...

9    Q.    Okay.  Well, couple of things.  When the fingerprints are

10   done to Mr. Ramamoorthy, you saw that, right?

11   A.    When -- when the airport police took the fingerprints?

12   Q.    Yes.

13   A.    Yes.

14   Q.    You never saw them spray his hand down with any type of

15   water or any other materials, right?

16   A.    No, not that I recall.

17   Q.    Okay.  It was just a dry finger on the thing, finger off,

18   right?

19   A.    Yeah.  As far as I can -- as far as I -- the video showed.

20   Q.    You never saw at any point in time him washing his hands,

21   right, up until when the swabs happened?

22   A.    No, I don't believe I did.

23   Q.    And I just want to be clear so the jury understands this.

24   From the point that he gets off the plane until the point that

25   you sit in that interview with -- room with him a half a day

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1643   Page 91 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

91

```
 1   later, there is a camera on him the entire time?
 2   A.   Well, there are cameras around.  I'm not sure if they're
 3   pointing at him at all times.
 4   Q.   Well, in that police station that camera rolled the entire
 5   time?
 6   A.   In the interview room?
 7   Q.   Even before that.  You watched -- clearly you watched all
 8   the -- the hours and hours of videos of him sitting there in
 9   the police station before the interview, right?
10   A.   Yes.
11   Q.   He never once put anything on his hands during that,
12   right?
13   A.   During the parts that I -- where he's visible on camera.
14   There are parts where he's not on camera.
15   Q.   Anytime he's not right in front of that camera he is with
16   officers?
17   A.   Yes.
18   Q.   Okay.
19   A.   As far as I know.
20   Q.   At no point during -- before the swabs happened on his
21   hands did he have any opportunity after he was taken off the
22   plane to do anything to his hands?
23   A.   You mean like wash his hands?
24   Q.   Yeah, wash his hands.
25   A.   I wasn't there.  Judging from what I can see on the video,
```

1    I didn't see him wash his hands on the video, no.

2    Q.   I mean here's the thing.  If you had some evidence that

3    something like that happened, you probably would have played

4    that today?

5    A.   I'm assuming.

6    Q.   Right.  And that's because you're taught about DNA in

7    Quantico, right?

8    A.   We're taught about the importance of, yeah, maintaining

9    evidence.

10   Q.   Right.  And you're taught that -- well, I mean are you

11   taught about DNA specifically?

12   A.   It's touched on, but it's not like a -- it's not something

13   I would consider myself an expert in.

14   Q.   Okay.  But you have learned that DNA can exist on somebody

15   not just for days but for weeks and even months after the fact,

16   right?

17   A.   I might have read that somewhere, yeah.

18   Q.   Okay.  So just 'cuz a couple hours go by between when

19   somebody touches something and then the DNA swab takes place,

20   that doesn't mean the DNA just magically disappears, right?

21   A.   I'm not sure I understand.  Are you saying -- could you

22   maybe rephrase that?

23   Q.   Sure.

24   A.   Okay.

25   Q.   How about this.  DNA certainly could have existed on Mr.

1    Ramamoorthy's hands hours after the alleged incident occurred?

2    A.   I --

3           MS. JAWAD:  Your Honor, I'm going to object.  He's

4    already testified that he's not a DNA expert and has no basis

5    for answering these questions.

6           MR. AMBERG:  Your Honor, I think he can -- from what

7    he knows from Quantico, I mean he's an agent who has been

8    trained on this.

9           THE COURT:  You may ask if he's had training in that.

10          MR. AMBERG:  Thank you.

11   A.   Okay.  I'm sorry.

12   BY MR. AMBERG:

13   Q.   This is about the time where I forget my question.  All

14   right.

15          Here's the thing.  You test for that DNA because it

16   is there a lot of times, right?

17   A.   Um, we -- we -- I'm not sure.  We test for DNA.  We

18   attempt to take a DNA sample, if that's what you're talking

19   about.  I don't test anything though.  I mean I take a DNA

20   sample.

21   Q.   Right.  Right.  That's what I mean.

22   A.   Okay.

23   Q.   You take that sample because of that?

24   A.   Yeah, I mean in case there's evidence.

25   Q.   Here's another thing too.  In that -- in all those

1   videos -- and you watched them all, right?

2   A.   Yes.

3   Q.   You never see Mr. Ramamoorthy biting off his nails, right?

4   A.   No.

5   Q.   No.  You never see him trying to rip off his nails, right?

6   A.   No.

7   Q.   You never see him trying to do things to his nails, right?

8   A.   No.

9   Q.   Even at that one thing that you showed where he's getting

10  his hands swabbed and they say, "Get your hand out of your

11  pocket," remember that?

12  A.   I do.

13  Q.   You saw that and clearly you remember then that the hand

14  that he put down was the hand that had just been swabbed,

15  right?

16  A.   There was a time I think where he was -- it was -- it was

17  one hand or the other, but, yeah, the -- he was ordered not to

18  put his hands in his pockets.

19  Q.   Right.  After they swabbed his hand, he put his hand down

20  his pocket?

21  A.   I think it happened maybe before and after, yeah.

22  Q.   Before?

23  A.   No, I mean like before he was swabbed.  He had -- you

24  know, he has two hands, so I'm not sure which hand he was told

25  not to put in his pocket, but...

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1647   Page 95 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

95

1    Q.   Okay.

2    A.   Yeah.

3    Q.   As far as the investigation itself, there's a lot of

4    people on this airplane, right?

5    A.   According to the records that we got, yeah.

6    Q.   Okay.  Well, let's talk about those records.  You know,

7    I'll -- let's talk about them in a second.

8    A.   Okay.

9    Q.   There are all sorts of people that are on this flight,

10   right?

11   A.   Yes.

12   Q.   Did you talk to anybody that was sitting around where

13   these people were sitting?

14   A.   Yes.

15   Q.   Okay.  Did anybody have any information that would --

16   that'd make you think that they saw something?

17   A.   We talked to some people who said that they --

18            MS. JAWAD:  I'm going to object to hearsay.

19            THE COURT:  It is hearsay, so the objection is

20   sustained.

21   BY MR. AMBERG:

22   Q.   Did you actually talk to any of the people on the plane

23   besides the -- the parties that are all involved in this?

24   A.   Yes.

25   Q.   The -- the passengers?

1    A.   Yes.

2    Q.   Did you talk to every single passenger that surrounded

3    these people?

4    A.   No.

5    Q.   Okay.  Did you make any attempt to try to figure out who

6    those people were?

7    A.   Who, the people surrounding?

8    Q.   Yes.

9    A.   Yes.

10   Q.   How?

11   A.   There were subpoenaed records for the -- the flight

12   manifest who were --

13   Q.   Okay.

14   A.   -- the people.

15   Q.   Did you subpoena those records?

16   A.   Special Agent Dodge did.  We did, yes.

17   Q.   Right.  Are you talking about the manifest that was

18   there --

19   A.   Yes.

20   Q.   -- that was provided that -- that you showed?  You guys

21   subpoenaed those records?

22   A.   I -- I did not submit the subpoena.

23   Q.   Okay.  You think maybe I subpoenaed those records?

24   A.   I'm not sure.

25          MS. JAWAD:  I'm going to object, Your Honor.  He has

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1649   Page 97 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

97

1    no basis of knowledge as to that question.

2          THE COURT:  I think he indicated he was not sure, so

3    move on to another topic.

4          MR. AMBERG:  Okay.

5    BY MR. AMBERG:

6    Q.  When you did receive that manifest, how long after this

7    did you get that?

8    A.  How long after the --

9    Q.  The -- the allegations take place on January 2nd or 3rd.

10   Do you remember when you got that?

11   A.  No, I don't recall.

12   Q.  Okay.  Once you got that, did you make any attempt to

13   contact all those other people that were sitting around there?

14   A.  I made some effort to contact some people around.

15   Q.  Okay.  Did you get any -- any evidence at all that you

16   could bring in here to talk about in this case?

17   A.  I talked to some people that were sitting around, and are

18   you -- am I allowed to tell you what they said?

19   Q.  No.

20   A.  Okay.  So, yes, I talked to some people around.

21   Q.  Okay.

22   A.  Yeah.

23   Q.  All right.  Didn't lead you to investigate anything else?

24   A.  No, I don't think so.

25   Q.  All right.  I want to talk about the complainant's phone.

1    A.    Mm-hmm.

2    Q.    Okay.  And it sounds like you made efforts to look on her

3    phone to see what was on there, right, or she showed you what

4    was on there as far as these text messages go?

5    A.    Yes.

6    Q.    Okay.  And you took screen shots of these?

7    A.    She did, yes.

8    Q.    Okay.  And that's on her iPhone, you can take little

9    pictures?

10    A.    Yes.

11    Q.    Okay.  Did you actually get a chance to look at her phone?

12    A.    She handed us -- as far as I understand, if -- if I

13    remember correctly, she either showed it to us or handed it to

14    us and we were able to look at the text messages from that day.

15    Q.    Okay.  Was she willing to let you guys look at her phone?

16    A.    Yes.

17    Q.    Okay.  Did you take that opportunity up to look at her

18    phone?

19    A.    We looked at the text messages from that day.

20    Q.    All the text messages?

21    A.    No, from -- from that section where -- where the

22    allegations.

23    Q.    But just the ones that she showed you?

24    A.    Yeah.  We didn't look through her entire phone if that's

25    what you're asking.

1   Q.   You didn't look to see if there were other text messages

2   sent around that same time?

3   A.   No, not that I recall.

4   Q.   Do you think that might have been a good idea to see who

5   else she was texting?

6   A.   Maybe.  I mean she was the victim, so...

7   Q.   Well --

8   A.   Yeah.

9   Q.   -- you never know, right?

10  A.   You never know.

11  Q.   You never know.

12       What you did try to do is you tried to call AT&T up

13  and see if they could get you those messages, right?

14  A.   Yes.

15  Q.   And they said no?

16  A.   They said no.

17  Q.   Right.  But here's the thing.  You work for the FBI?

18  A.   Yes.

19  Q.   And you have unlimited amounts of resources when it comes

20  to analyzing these phones, right?

21  A.   I wouldn't say that, but we have -- we have resources.

22  Q.   Have you ever done a phone dump before on a phone?

23  A.   Not myself, no.

24  Q.   Do you know what that is, a phone dump?

25  A.   I'm sure there's different varieties of phone dumps, but

1    you mean kind of cloning or pulling everything off of it, all

2    the data?

3    Q.  Right, when you take all the data off the phone, have you

4    ever done that before?

5    A.  I have not, no.

6    Q.  Okay.  You're familiar that you guys can do that, right?

7    A.  Yes.

8    Q.  Okay.  And that was something that certainly was available

9    to you then?

10   A.  Potentially, yes.

11   Q.  Okay.

12   A.  Yeah.

13   Q.  You --

14   A.  Probably.

15   Q.  Probably, right?  You could just make a phone call and

16   ask?

17   A.  And some paperwork I'm sure, yeah, right.

18   Q.  But it could be done?

19   A.  As far as I understand, yeah.

20   Q.  And when you do that, when you take all the data off of

21   the phone, it will show literally every single text message

22   that that phone has contained on it?

23   A.  I -- I suppose.

24   Q.  But you guys didn't do that?

25   A.  No, we did not, no.

1   Q.   Now, when -- when you get to the police station in the

2   Wayne County airport, that's about what time, 1:30-ish,

3   something like that?

4   A.   No, it would have been -- I think it would have been

5   earlier than that.

6   Q.   When's the first time you saw Mr. Ramamoorthy though?

7   A.   It probably would have been closer in the afternoon

8   towards like maybe 1:30 or 2:00 o'clock.

9   Q.   Okay.  Because I saw on the -- the Miranda statement that

10  it said like 2:00 p.m. or 2:08, something like that, so...

11  A.   Yeah, something like that.

12  Q.   So that's around -- that's when you first meet him, right?

13  A.   Yeah, I believe so.  I think that was the first time I met

14  him, yeah.

15  Q.   You're actually sitting in the room that's -- and he's

16  brought in there and that's when you first meet him?

17  A.   Yes.

18  Q.   Okay.  I want to talk about how he -- how he was put in

19  the station before you meet him, okay?

20  A.   Okay.

21  Q.   Now, you saw all those videos of how that station looked

22  when he was in there, right?

23  A.   Yes.

24  Q.   There's different rooms?

25  A.   (Nods in the affirmative.)

1   Q.   And then there's like that main little lobby area, right?

2   A.   Yes.

3   Q.   And he was kept in that main little lobby area, right?

4   A.   For most of the time.  He moved around a little bit, but

5   yeah.

6   Q.   Well, officers moved him around a little bit?

7   A.   Right, mm-hmm.

8   Q.   There was a room in there with a bed and a sheet and a

9   cot, right, you see that on the video?

10  A.   I'm sure there was.  I'm not -- I -- I don't remember

11  though.

12  Q.   They didn't let Mr. Ramamoorthy go in there to get some

13  sleep, right?

14  A.   Not that I saw, no.

15  Q.   Because from what he ultimately tells you, he had been up

16  since earlier the day before at the Grand Canyon, right?

17  A.   He said he was at the Grand Canyon, yeah, the day before.

18  Q.   And clearly when you watch that video, he doesn't get any

19  sleep while he's waiting around in that police station, right?

20  A.   I don't -- I don't think he was sleeping at all, yeah.

21  Q.   So he was up at that point in time for over 24 hours

22  straight, right?

23  A.   I'm not sure.

24  Q.   Okay.  Let's talk about that condition about where he was

25  placed.  All right.  This wasn't like a comfortable chair he

1   could sit in, right?

2   A.   I don't believe so.

3   Q.   No.  What it was was a two-and-a-half-foot concrete bench,

4   right?

5   A.   I believe so, yeah.

6   Q.   And he's surrounded by this little concrete wall?

7   A.   Mm-hmm.

8   Q.   Right?  Yes?

9   A.   Yes.  Sorry.

10  Q.   And there's no cushion there for him to sit on, right?

11  A.   I don't think so.

12  Q.   And throughout that entire video that you watched you

13  could see him trying to move around the entire time to maybe

14  get comfortable, who knows, but that's what he's doing, he's

15  moving around there, right?

16  A.   Moving around, yes.

17  Q.   Okay.  He is not sound asleep, right?

18  A.   Oh, as far as I saw, I don't remember him sleeping in

19  that -- at that time.

20  Q.   Okay.  Now, that's not a nice condition for somebody to be

21  in, right?

22  A.   You mean like locked up or just sitting on a concrete

23  bench or --

24  Q.   The way that that was set up, that was not comfortable?

25  A.   I'm not sure.  I wouldn't --

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1656  Page 104 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

104

1    Q.   You wouldn't think that was comfortable?

2    A.   I probably wouldn't think that's comfortable.

3    Q.   Right.

4    A.   Yeah.

5    Q.   So he sits there for hours and hours and hours, okay,

6    right?  Are you with me?

7    A.   Well, he's moving around, but he's -- he's there in that

8    location for hours I believe, yeah.

9    Q.   Okay.

10   A.   Until we talked to him.

11   Q.   And this is already a stressful location beyond the way

12   that he's sitting, right?

13   A.   Maybe.  I mean it would probably be up to him, but I'm

14   assuming.

15   Q.   He's not free to leave?

16   A.   He's not, no.

17   Q.   Right?

18   A.   Mm-hmm.

19   Q.   He's being told what to do, right?

20   A.   Yeah.

21   Q.   Okay.  This is a situation that could be scary?

22   A.   It could be.

23   Q.   All right.  Fearful?

24   A.   It could be scary.

25   Q.   Now, before you even meet with Mr. Ramamoorthy you know

1    that there's issues with his English?

2    A.   I'm not -- I'm not sure about that actually.

3    Q.   Oh, so that's -- you didn't know that he wasn't an English

4    first speaker until you met him?

5    A.   I don't recall if -- if that was discussed beforehand.

6    Q.   Okay.

7    A.   Like to what level his English was, you know, how

8    proficient he was.

9    Q.   Okay.  As soon as you start talking to him, it's very

10   clear that English is probably not his first language?

11   A.   It was clear to me, yes.

12   Q.   Okay.  I mean the first time he opens his mouth, it's

13   pretty clear that he is from some country, right?

14   A.   It would -- it became clear pretty quickly that English

15   wasn't his first language.

16   Q.   Okay.

17   A.   Yes.

18   Q.   And the thing about this is is that I know on direct exam

19   you testified that he did not ask for a translator, right?

20   A.   Right.

21   Q.   But you never suggested to him that maybe he should get a

22   translator, right?

23   A.   No, I did not.

24   Q.   You could have done that, right?

25   A.   Yes, I could have.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1658   Page 106 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

106

1   Q.   Because one thing is you want to make sure when somebody's

2   being interrogated that they understand exactly what's being

3   asked, right?

4   A.   Yeah, I wanted to make sure that he understood.

5   Q.   You didn't even bring up the subject with him that that

6   was something that was available, right?

7   A.   Right, I did not.

8   Q.   Right.  And you could have got a translator for him,

9   right?

10  A.   That I'm not sure of.

11  Q.   He was also sick, wasn't he?

12  A.   I'm not sure.

13  Q.   I mean you saw him even on these videos wiping his nose,

14  you saw him do that, right?

15  A.   I did see him wipe his nose.  I heard him cough.

16  Q.   Coughing, you saw that, right?

17  A.   I did.

18  Q.   He even said something that he was sick during the

19  interview, he talked about that, didn't he?

20  A.   Yeah.

21  Q.   Okay.

22  A.   In the interview he did.

23  Q.   Okay.  So we have somebody who is sleep-deprived, in a

24  very scary and uncomfortable spot for hours and hours and

25  hours, who is not well and does not speak English as a first

1    language, that's how this interview starts, right?

2    A.   I suppose.

3    Q.   Okay.  Now I want to talk about your training in

4    interrogation, okay?

5    A.   Mm-hmm.

6    Q.   You learned about interrogation at Quantico, right?

7    A.   Yes.

8    Q.   Okay.  This is a very important part of investigating a

9    crime, right?

10   A.   It could be, yes.

11   Q.   Interrogation sometimes can lead to answers that you could

12   not otherwise get, right?

13   A.   I -- I suppose.

14   Q.   That's why you do it.  Who knows what you'll hear, right?

15   Right?

16   A.   I don't know, sure.

17   Q.   I would imagine that in your training you are also taught

18   certain cautions about how to do those interrogations, right?

19   A.   Yes.

20   Q.   You need to be cautious when somebody is sleep-deprived,

21   right?

22   A.   I'm not sure I recall that, hearing that.

23   Q.   You've never been taught that?

24   A.   That you should be careful when someone's sleep-deprived?

25   Q.   So you think it's okay if somebody has been up for over

```
 1   24 hours in a highly stressful situation to conduct an
 2   interrogation?
 3   A.   No.  I said that I wasn't taught that.
 4   Q.   Okay.
 5   A.   I didn't say that was all right.
 6   Q.   They -- they teach you at Quantico, and correct me if I'm
 7   wrong --
 8   A.   Okay.
 9   Q.   -- but that sometimes when people are interrogated, that
10   they may say things that are not true to you, right?
11   A.   I'm not sure if I saw that or if I was told that directly
12   at Quantico.
13   Q.   They call it false confessions?
14   A.   Okay.
15   Q.   Okay.  Have you heard about that?
16   A.   False confessions, yes.
17   Q.   You know about that, right?
18   A.   I know about false confessions, yes.
19   Q.   Like this is something you need to watch out for, right?
20   A.   Right.
21   Q.   Right.  Because you don't want people to say things that
22   aren't true, right?
23   A.   Right.
24   Q.   Because what happens is sometimes people will say things
25   to you that aren't true, but they say that because they think
```

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1661  Page 109 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

109

1   that's what you want to hear, right?

2   A.  Um, sometimes people say things that are not true, and

3   there are times where people might say that because they think

4   that somebody else wants to hear it?

5   Q.  Right.

6   A.  Yeah.

7   Q.  Okay.  That happens?

8   A.  It does happen.

9   Q.  Okay.  And you've been taught that that happens?

10  A.  I know that that happens, yes.

11  Q.  Okay.  You've -- have you ever experienced that yourself?

12  A.  You mean personally --

13  Q.  In you --

14  A.  -- like with my kids?

15  Q.  Well, you don't want to talk about interrogation with my

16  kids.  You gotta come over for that experience.  But I want to

17  talk about in your job.

18  A.  Right.

19  Q.  Okay?

20  A.  Sorry.

21  Q.  Now, you've had a lot of history outside of -- of working

22  at the FBI?

23  A.  Yes.

24  Q.  You came into the FBI with sort of a different path,

25  right?

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1662   Page 110 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

110

1    A.   Yeah.  Everybody comes with a different path, but yes.

2    Q.   You came as a counselor?

3    A.   Yes.

4    Q.   Right?

5         You would meet with people, right?

6    A.   Yes.

7    Q.   You would talk to people?

8    A.   Yes.

9    Q.   Okay.  You would understand even from that that when

10   people are put in situations that are highly stressful, that

11   maybe they can't really say what they really want to say,

12   right?

13   A.   They can struggle with it for sure.

14   Q.   Okay.  Now, how many interrogations had you done up until

15   this point for the FBI?

16   A.   I -- I'm not sure.

17   Q.   I mean are we talking one or two?

18   A.   No.

19   Q.   We talking a thousand?

20   A.   No, not a thousand.

21   Q.   We talking like ten, like -- I mean give me like a -- if

22   you don't know --

23   A.   Probably.

24   Q.   -- you don't know, but --

25   A.   Yeah, probably.  I -- I -- I really don't know.  I'm not

1    sure.  Probably less than a hundred.

2    Q.  Okay.

3    A.  But...

4    Q.  So it's something that happens to you pretty frequently,

5    right, that you interrogate somebody?

6    A.  We question people, and sometimes that turns into, you

7    know, maybe more direct questions, more of an interrogation

8    scenario.

9    Q.  Okay.  Now, you -- getting back to what I was talking

10   about before, the concern about a false confession --

11   A.  Mm-hmm.

12   Q.  -- one thing is that if -- in addition to the sleep

13   deprivation, the fear of being held for so long, that can add

14   to a potential for a false confession, right?

15         MS. JAWAD:  Objection.  Calls for speculation.

16         MR. AMBERG:  I'm talking in general, Your Honor, with

17   the things that he'd indicated.

18         THE COURT:  You may ask him about whether he's had

19   any training in that area.

20   A.  So could you rephrase it?

21   BY MR. AMBERG:

22   Q.  Sure.  In addition to the sleep deprivation, placing

23   somebody in fear for a considerable period of time could also

24   potentially add to false confessions?

25         MS. JAWAD:  Objection.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1664   Page 112 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

112

```
1          THE COURT:  Counsel, I said you may ask him if he had
2    training in that area.
3          MR. AMBERG:  Oh, I'm sorry, Your Honor.
4          THE COURT:  Rephrase your question.
5          MR. AMBERG:  Yes, yes.
6    BY MR. AMBERG:
7    Q.   Well, you've had training in this area, right?
8    A.   In?
9    Q.   In false confessions?
10   A.   Oh, in false confessions?
11   Q.   Yeah.
12   A.   I wouldn't say I've had training in false confessions.
13   I'm aware that false confessions can happen.
14   Q.   Okay.  Have you read articles about it?
15   A.   Not that I recall.
16   Q.   Does the FBI have any sort of check guards or -- or
17   safeguards to make sure that somebody is not giving a false
18   confession?
19   A.   Are you talking about like a polygraph exam or something
20   like that?
21   Q.   No, I'm talking about like a checklist: has -- did this
22   person got enough sleep --
23   A.   No.
24   Q.   -- does this person know what's going on?
25   A.   Not that I'm aware of, no.
```

1  Q.   Okay.  Does this person speak English well enough to do

2  this, stuff like that.

3  A.   Not that I'm aware of.  A checklist?

4  Q.   Yes.

5  A.   No.

6  Q.   Has -- has anybody ever told you that you should be very

7  keyed in on that as you're doing these interrogations?

8  A.   Keyed in on?

9  Q.   On the -- the potential that maybe the person is saying

10  things to maybe get out of there maybe because they're scared

11  but that it's not accurate?

12  A.   You mean -- sorry, are we --

13  Q.   A false confession.

14  A.   Right.  Are we -- I'm not sure if I was trained in

15  detecting what a false confession might look like.

16  Q.   I mean has anybody even brought that up from the FBI to

17  you?

18  A.   What's that?

19  Q.   False confessions.

20  A.   I mean I'm aware that false confessions can happen and I'm

21  aware that, you know, we should be careful about, you know,

22  somebody confessing falsely, yes.

23  Q.   Do you think that when somebody's sleep-deprived for that

24  long, there's a potential that maybe you're going to get more

25  of a false confession?

1    A.   That I'm not sure.

2    Q.   Okay.

3    A.   I'm not sure if that affects it.

4    Q.   Is it possible?

5    A.   It's possible.

6    Q.   Okay.

7    A.   Mm-hmm.

8    Q.   Is being in fear for so long potentially add to the chance

9    it would be a false confession, is that possible?

10   A.   Can fear lead to, you know, a false confession?

11   Q.   Sure.

12   A.   I believe so, yeah.

13   Q.   There's many things that could?

14   A.   Sure.

15   Q.   Right.  That's why you have to make sure that other

16   evidence corroborates whatever that person says, right?

17   A.   That's a reason why it would be important to corroborate,

18   yeah.

19   Q.   Okay.  Now, I want to talk about the interview itself.

20        THE COURT:  Why don't we take a break right now

21   because it's about 12:30 and you're getting into a new area,

22   and we indicated to the jury that we would stop at about 12:30

23   and they may want to have something for lunch, and so let's

24   take a lunch break at this time.

25        Let's all rise for the jury.

```
1              (Jury excused at 12:26 p.m.)

2              THE COURT:  We'll be back on the record in about an

3    hour.  You may be seated.

4              Are there any matters we need to take up before we

5    take a lunch break?

6              MS. SMITH:  Not from the United States.

7              MR. AMBERG:  No, Your Honor.

8              THE COURT:  All right.  Thank you very much.  We can

9    be in recess then.  You're still under oath, Special Agent

10   Erkkinen.  Thank you very much.

11             THE LAW CLERK:  All rise.  Court's in recess.

12             (Court in recess at 12:27 p.m.)

13             (Proceedings resumed at 1:38 p.m., all parties

14             present, jury not present)

15             THE CLERK:  Court recalls Case No. 18-20027, United

16   States of America versus Prabhu Ramamoorthy.

17             Counsel, will you please replace your appearances on

18   the record?

19             MS. JAWAD:  Good afternoon, Your Honor.  Amanda Jawad

20   and Maggie Smith on behalf of the United States.  With us at

21   counsel table is Meghann O'Connor, a paralegal from our office,

22   as well as Special Agent Kyle Dodge with the FBI.

23             THE COURT:  Good afternoon.

24             MR. AMBERG:  And good afternoon, Your Honor.  Jim

25   Amberg on behalf of the defendant, Mr. Ramamoorthy, who is
```

Case 2:18-cr-20027-TGB-MKM ECF No. 85 filed 03/05/19 PageID.1668 Page 116 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

116

1    standing to my right.  To his right is Mr. Vijay, the

2    interpreter, and to my left is co-counsel, Victor Mansour.

3              THE COURT:  Good afternoon, Counsel.  Good afternoon,

4    Mr. Ramamoorthy.  Are we ready to bring in the jury?

5              MS. JAWAD:  Your Honor, there is one matter I'd like

6    to take up with the Court before one of the defense witnesses

7    testifies and that's Thomas Selleke.

8              THE COURT:  Yes.

9              MS. JAWAD:  He does have a prior felony conviction

10   within the past ten years that we would like to introduce as

11   impeachment evidence under 609(a)(1)(A), which is -- sorry,

12   Your Honor -- any civil -- in any civil case or criminal case

13   in which the witness is not a defendant, any conviction from

14   the last ten years, any felony conviction.

15             THE COURT:  All right.  And is there any objection to

16   that?

17             MR. AMBERG:  Well, this is what I would say to this,

18   Your Honor.  Second part of 609(a)(1), any evidence that an

19   accused has been -- let's see.  Sorry, I'm sort of looking at

20   this while I'm thinking out loud here.

21             (Brief pause)

22             Okay.  So here's the argument, Your Honor.  Mr.

23   Selleke is a -- I know he's our witness, but he is simply a

24   witness who observed the complainant in this case at the bar in

25   Las Vegas.  He's -- this is not like somebody who's connected

1   to my client.  His prior felony is a felony drunk driving from

2   2015.

3            I know that the government can technically use a

4   prior conviction to impeach under certain circumstances but

5   it's subject to the limitations of Rule 403, which is the

6   exclusion of relevant evidence on grounds of prejudice,

7   confusion or waste of time.  That's that probative value

8   analysis.

9            I would say that the fact that Mr. Selleke had a

10  drunk driving felony in 2015 has no probative value to this

11  case.  This is not a situation where he had a prior crime that

12  involves dishonesty or anything like that.  It's a crime that

13  happens all the time in Michigan, and I don't think it would

14  aid the jury in any way in their analysis of his credibility.

15  But at the same time, it's very -- it's very much highly

16  prejudicial and unfair.

17           I look at him like an independent witness.  He's just

18  a guy that was there, that's it.  So I don't understand what --

19  what purpose it would even be to bring that in.

20           THE COURT:  Well, Rule 609 indicates that the rule

21  that applies if you're attacking a witness's character for

22  truthfulness by evidence of a criminal conviction, that if it

23  is a crime that in the convicting jurisdiction was punishable

24  by death or by imprisonment for more than one year, that the

25  evidence must be admitted subject to Rule 403 in a civil case

1    or in a criminal case in which the witness is not a defendant.

2    In this case the witness is not a defendant.

3            It would be subject to the 403 balancing test in

4    terms of whether it's more prejudicial than it is probative.  I

5    don't think it has particularly high probative value of truth

6    telling, but I also don't think it has particularly high

7    prejudicial impact either.

8            The rule appears to be written to cover this kind of

9    a conviction, and so I will allow the government to ask the

10   question and take the answer, but I don't expect a lot of

11   additional questions beyond that.  Is that clear?

12           MS. JAWAD:  Understood, Your Honor.

13           THE COURT:  All right.  Anything else?

14           MS. JAWAD:  Not from the government, Your Honor.

15           MR. AMBERG:  (Nods in the negative.)

16           THE COURT:  Very good.  Should we bring in the jury?

17           MS. JAWAD:  Yes, Your Honor.

18           (Jury entered the courtroom at 1:43 p.m.)

19           THE COURT:  Good afternoon everyone.  Welcome back.

20   Very good.  Let's be seated.

21           And we had Special Agent Erkkinen on the stand during

22   cross-examination, and Mr. Amberg, do you wish to inquire?

23           MR. AMBERG:  Yes, Your Honor.

24           THE COURT:  You may continue.

25           MR. AMBERG:  Thank you, Your Honor.

```
 1   BY MR. AMBERG:
 2   Q.   Good afternoon again, Agent Erkkinen.  It's good to see
 3   you.
 4   A.   Likewise.
 5   Q.   Feel like I've been seeing you a lot lately.
 6            I sort of left it off at a big part of this which is
 7   the video, okay, and interview, and I wanted to ask you some
 8   questions about that.
 9            So I want to talk about Mr. Ramamoorthy and your
10   impression of him.  Now, you were in this interview for what,
11   about an hour, give or take, something around that?
12   A.   Yeah, longer than that, yeah.
13   Q.   Longer, little longer than that?
14   A.   Mm-hmm.
15   Q.   Yes?
16   A.   Yes.
17   Q.   And you were able -- you didn't ask most of the questions;
18   Agent Dodge did, right?
19   A.   Yes, I would say he asked most of the questions.
20   Q.   Okay.  And you were sort of the -- the agent that kind of
21   listens and, you know, tries to hear what this -- this suspect
22   is saying, right?
23   A.   Right.
24   Q.   Okay.  And I know we already sort of discussed that he has
25   a -- a thick accent, right?
```

1    A.   He does have an accent.

2    Q.   Okay.  And I think he even told you he's from India,

3    right?

4    A.   He did, yes.

5    Q.   And that he's been in the United States for a couple of

6    years?

7    A.   Yeah.  I think he said he had the job for a few years.

8    Q.   Okay.

9    A.   In the U.S., yes.

10   Q.   And, you know, as the questioning happened, what I noticed

11   was this, and correct me if I'm wrong because I want to get

12   your impression about this, is that he would just -- he would

13   answer a question and like ramble on and on.  Is that fair to

14   say?

15   A.   Um, at times he went beyond what maybe the specific

16   question was, yes.

17   Q.   And the -- and the answers that he would give would be

18   somewhat strange, right, at times?

19   A.   Strange?

20   Q.   I mean I don't know, I'll give you an example.  He --

21   he -- you asked him -- well, you know, I'll -- let me give you

22   a specific example of this --

23   A.   Okay.

24   Q.   -- because it's very important I think to this case.

25   A.   Sure.

1    Q.  One -- one thing that was shown here with you was there

2    was a part of this video and it ends right on here, and I'm

3    going to read what the transcript said.  And this --

4            MS. JAWAD:  Excuse me, Your Honor.  Can I just ask

5    what page you're reading from?

6            MR. AMBERG:  Oh, 321.

7            MS. JAWAD:  Thank you.

8            MR. AMBERG:  Yep.

9    A.  And I don't -- I don't have that up in front of me, just

10   so you know.

11   BY MR. AMBERG:

12   Q.  I'm going -- I'll just read it to you.  If you want to

13   look at it, I'll -- I'll -- just ask me, I'll show it to you,

14   okay, how about that?

15   A.  Okay.

16   Q.  It says "AE," which is you, right?

17   A.  That is me, yes.

18   Q.  Okay.  "I might have you slow down or repeat some things

19   every once in a while, and are you having trouble understanding

20   at all?"  You remember asking that question to him?

21   A.  Yes.

22   Q.  That's the last question in that one video clip that we

23   watched, right?

24   A.  I believe so, yes.

25   Q.  Your answer was that --

1    A.   His answer?

2    Q.   He -- what was your -- I -- you -- you gave your answer

3    about what you thought he said in response, that he understood

4    you, was that what it was?

5    A.   That -- that he had no trouble, he has understanding.

6    Q.   Let me read what he says to you in response to that

7    because it wasn't played here.

8    A.   Right.

9    Q.   "No, I was not troubling.  Only was I not troubling.

10   Morning onwards I'm frustrating and I didn't do anything and I

11   donno about anything, simply they locked me, this is the first

12   time, in my native also nothing happened, its my first history,

13   very frustrated, from morning, I'm not okay, everything goes

14   wrong, I donno why she complaint, what does she want."  Okay?

15   A.   Okay.

16   Q.   That answer to you made you think that he understood what

17   you were saying because that's what you testified to?

18   A.   Yes.  That's when he said -- when I said, "Are you having

19   trouble understanding me?" and he says no.

20   Q.   He says, "No, I was not troubling."

21   A.   "Not troubling," mm-hmm.  Yes, I took that to mean that he

22   didn't have an under -- have a problem understanding me.

23   Q.   Okay.  And then he just goes on and on about his

24   frustrations, right?

25   A.   He does.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1675   Page 123 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

123

```
 1    Q.   Okay.

 2    A.   Yeah.

 3    Q.   Why didn't you inquire more at that time to make sure he

 4    understood exactly what you were saying?

 5    A.   I'm not sure.

 6    Q.   Okay.  Instead he just sort of goes on, right?

 7    A.   Yes, he does.

 8    Q.   Okay.

 9    A.   Yep.

10    Q.   And throughout this interview I noticed that what would

11    happen is that a question was asked and his answer may have

12    nothing to do with the question, right, and that Agent Dodge

13    would just stop him and ask another question.  I mean that

14    happened throughout this interview.

15         MS. JAWAD:  Your Honor, I'm going to object.  Defense

16    counsel's testifying.

17         MR. AMBERG:  I've --

18         THE COURT:  Counsel, frame your question along the

19    lines of whether or not he remembers something happening in the

20    interview.

21         MR. AMBERG:  Okay.  I will, I will, Your Honor.

22    BY MR. AMBERG:

23    Q.   Throughout this interview he says he did not intentionally

24    touch her, right?

25    A.   He does say that.
```

1    Q.    You remember?

2    A.    Yes.

3    Q.    We saw that even on here?

4    A.    He does say that.

5    Q.    And that was --

6    A.    Intentionally.

7    Q.    Not intentionally, that's throughout this interview,

8    right?

9    A.    He says -- you know, he says lots of things, but yes, he

10   says, "I did not intentionally" --

11   Q.    Touch her?

12   A.    I'm -- I'd have to look at the transcript specifically,

13   but it's a lot.

14   Q.    Okay.  One thing that I noticed in this interview was that

15   he repeatedly asks to see or to have the camera from the plane

16   be obtained, right?

17   A.    He asked if there was a camera.

18   Q.    Okay.  And -- and although that's brought up at different

19   times by him, right?

20   A.    Yes.

21   Q.    Okay.  And he's saying things about the plane like the --

22   the -- the -- the video from the plane would save him, right,

23   he said that?

24   A.    Something to that effect I think.

25   Q.    And that it may help him?

1    A.   It would help him, he thought it would help him.

2    Q.   Okay.

3    A.   Mm-hmm.

4    Q.   He -- throughout this, at least for the first majority of

5    this, he's trying to tell you what happened as far as her

6    sleeping on his lap and things like that, right?

7    A.   He's -- he is telling us -- if -- I'm not sure what you're

8    asking.  Yes, he's telling -- I mean he's telling us that --

9    what happened with relation to her.

10   Q.   And -- and over -- it was not just one time where he told

11   you that story about how she was laying on him and where his

12   hands might have been while she was laying on him.  That took

13   place multiple times throughout that interview?

14   A.   He reiterated a few different times and changed some

15   things as time went on.

16   Q.   Okay.  But for the majority of that interview he tells you

17   that at least three or four different times?

18        MS. JAWAD:  Objection.  He's just going through

19   everything the transcript says that he's reading and not asking

20   any questions.

21        MR. AMBERG:  I mean I'm just asking --

22        THE COURT:  I'm going to sustain the objection.  You

23   need to focus your question on specific things in the interview

24   if you wish but not to characterize from your opinion as to

25   what happened throughout the interview.

BY MR. AMBERG:

Q.   Another example that I wanted to bring up was that like you discussed on direct exam about how Agent Dodge tells him at one point, "Hey, Mr. Ramamoorthy, you know if you lie to us, it's a crime."  You remember what I'm talking about with that?

A.   Yes.

Q.   Okay.  And after he gets done telling Mr. Ramamoorthy that, Mr. Ramamoorthy, at least from what we could see because we saw that transcript, it looks like he thinks that -- that Agent Dodge is talking about the armrest, right?

         MS. JAWAD:  Same objection, Your Honor.

         MR. AMBERG:  Your Honor, I think he can testify to that.

         THE COURT:  Why don't you just rephrase the question and try to narrow it down to the exact point that you're trying to get at.

         MR. AMBERG:  Okay.

BY MR. AMBERG:

Q.   When that was brought up, okay, the -- the response by Mr. Ramamoorthy had to do with the armrest, right?

A.   Yes, initially.

Q.   Okay.

A.   Yes.

Q.   Did you think that was strange?

A.   Not particularly.

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1679  Page 127 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

127

1  Q.   Okay.  When he spoke at times, he spoke like he spoke in

2  broken English, is that fair to say?

3  A.   You could tell that English wasn't his first language.

4  Q.   And there were times that you found him harder to

5  understand?

6  A.   Yes.

7  Q.   Okay.  And he said things during this interview at times

8  like -- like he says he was sleeping at times, right, the whole

9  time?

10  A.   He does say he was sleeping at times.

11  Q.   Other times -- at least one time I noticed that he talked

12  about -- talking about scenarios, right?

13  A.   Yes.

14  Q.   Okay.  And that Agent Dodge told him that he didn't want

15  to hear scenarios, right?

16  A.   I'm not sure if that was the right words, but it was

17  something like that.  I think it was theories.

18  Q.   Theories was the next thing I was going to ask, that --

19  that Mr. Ramamoorthy had said in -- that this is a theory or

20  this is in theory or something like that, right?

21  A.   I think Mr. Ramamoorthy said scenario and I think Agent

22  Dodge said theory.

23  Q.   Okay.  Now, it's towards the end of the questioning that

24  things become -- like certain things become much more

25  discussed, which is the touching and things like that, right?

1    That's sort of right at the end of the interview, the -- like

2    the -- the bra, the -- the pants and things like that?

3    A.   The specifics --

4    Q.   Yes.

5    A.   -- of what -- where the touch happened?  Yes.

6    Q.   Yes.  And I want to talk about how those specifics come to

7    be.

8    A.   Okay.

9    Q.   It wasn't Mr. Ramamoorthy who brought up flirting, right?

10   A.   The term flirting?

11   Q.   Yes.

12   A.   No, he did not bring up the term flirting.

13   Q.   It was Agent Dodge or you?

14   A.   If I remember correctly, it -- it was us, yeah.

15   Q.   Okay.  It wasn't Mr. Ramamoorthy who brought up the

16   complainant being attractive?

17   A.   I don't -- I don't believe so, no.

18   Q.   It was -- it was you or Agent Dodge?

19   A.   Yes.

20   Q.   Right.  As far as unhooking the bra goes, that was a

21   question not from -- that wasn't a statement from Mr.

22   Ramamoorthy, that was a question from Agent Dodge, right?

23   A.   Agent Dodge asked, yeah, a pointed question about

24   unhooking her bra.

25   Q.   All right.  And unhooking the bra was not mentioned until

1    that point in the interview?

2    A.   Not specifically unhooking her bra.

3    Q.   Even unbuttoning the pants, that was something that came

4    out of not Mr. Ramamoorthy's mouth for the first time but

5    either your mouth or Agent Dodge's mouth?

6    A.   I believe so, I believe that's right, yes.

7    Q.   Okay.  So have you ever heard of the term "suggestive

8    questioning"?

9    A.   I'm not sure if I've heard it called that.

10   Q.   Okay.  Do you think you know what I'm talking about?

11   Okay.  What is -- what do you think I'm talking about?

12   A.   Kind of like what you just did to me.  Yeah, I think I

13   have an idea.

14   Q.   It's a suggestive part.  And what it is is -- and this is

15   something that you're trained about, right?  You were trained

16   when you're doing an interrogation, sometimes you can inject a

17   term or you can inject an idea into the questioning and then

18   talk about it, right?

19   A.   I'm not sure if I've heard it called that, but I mean part

20   of talking to people and -- and talking to them specifically

21   about events would be bringing up specific things that we're

22   interested in.

23   Q.   Well, like in this case when Agent Dodge says, "How did

24   you unhook the bra?," I mean that's the first time that that's

25   brought up is "How did you do that?"

1  A.  Right.

2  Q.  That's -- that's not just simply asking Mr. Ramamoorthy,

3  "Did you unhook the bra?"  He's -- he's implying that he did.

4  A.  It's a different type of question, yes.

5  Q.  Right.  That's a much more suggestive type question,

6  right?

7  A.  It's -- it's kind of a directed question.

8  Q.  When you do those kinds of questions, you have to be

9  careful because sometimes people will just go along with those

10 suggestive questions, right?

11 A.  I guess it depends.

12 Q.  Well, I mean that's what was going on towards the end of

13 this interview, right?

14 A.  That I don't know.

15 Q.  Okay.

16 A.  I mean -- I don't know if he was feeling that.  I'm not --

17 I mean that would be him.

18 Q.  Okay.  Now, I want to talk about his -- his use of terms,

19 okay?

20 A.  Mm-hmm.

21 Q.  Mr. Ramamoorthy, you know obviously he couldn't speak --

22 you know, English wasn't his first language and things like

23 that and you're trying to understand what he says.  I want to

24 talk about the first time that the word -- that he uses the

25 term "tried," okay?

1    A.   Tried?

2    Q.   Tried, yes.

3         Now, I'm going to just kind of read -- read this

4    transcript, and this was played but I'll just read it and I

5    want to ask you some questions about it.  Now, this is Agent

6    Dodge.  "I mean, you know, there's -- there's like they just

7    don't come apart necessarily.  They -- they -- you have to

8    unhook them."

9         "UI" means unintelligible, right?

10   A.   Unintelligible, right.

11   Q.   So we don't even know what Mr. Ramamoorthy says, right?

12   We saw that on that transcript.  There was times where it would

13   say "unintelligible"?

14   A.   Unintelligible, right.

15   Q.   Agent Dodge then says, "So you -- I mean," and this is

16   what he says in response.  "No, that, uh, definitely,

17   intentionally I did not do that, but I -- yes, but I -- my

18   think I was tried.  That I am sure because the dress came up."

19        Agent Dodge then says, "So you might have

20   accidentally done it?"  Mr. Ramamoorthy responds, "Yes, might

21   be chance like that."

22        THE COURT:  Counsel, ask a question.

23        MR. AMBERG:  I'm -- I'm going to ask about the --

24        THE COURT:  Ask a question.

25        MR. AMBERG:  Yes.  Okay.  Okay.

1  BY MR. AMBERG:?

2  Q.   To your knowledge, was that the first time he says the

3  term "tried"?

4  A.   I -- I don't -- I'm not sure.  You mean in this interview?

5  Q.   Correct.

6  A.   It might be.

7  Q.   Okay.

8  A.   Yeah.

9  Q.   And what's happening when he says he tried, "my think I

10  was tried, that I am sure," he's saying he didn't do it, right,

11  that's what he said?

12       MS. JAWAD:  Objection, Your Honor.  He can't testify

13  as to what the defendant meant.

14       MR. AMBERG:  Well, that -- I can -- I'll -- I'll

15  move -- I'll -- strike that answer or strike that question,

16  Your honor.  I'll move on to my next question about that.

17       THE COURT:  All right.  And let me also suggest that

18  if you have an extra copy of the transcript and you want to

19  draw the witness's attention to certain portions of the

20  interview, that that might be more convenient rather than

21  trying to read the entire section.

22       MR. AMBERG:  Yes, Your Honor.  We have an extra one

23  right here, but I don't think I'll have much more to -- to ask

24  about it.

25       THE COURT:  All right.  Go ahead.

1          MR. AMBERG:  But if I could just briefly approach.

2          THE COURT:  You may.

3          MR. AMBERG:  This is just the transcript.

4          THE COURT:  For the record, why don't you indicate

5    where that is on the transcript so that counsel can follow

6    along.

7          MR. AMBERG:  Yes, Your Honor.  I pointed Agent

8    Erkkinen 921 to 930 on the transcript.  I don't have the page

9    number but it's numerically numbered.

10   BY MR. AMBERG:

11   Q.   And Agent Erkkinen, you've looked at that, right?

12   A.   Yes.

13   Q.   Okay.  Now, at that point in time did you or Agent Dodge

14   ask him what he meant by the term "tried"?

15   A.   No.

16   Q.   Okay.  The reason why I bring up the term "tried" is

17   because "tried" and "trying" are the -- is the primary term

18   that he uses for the remainder of this interview after that

19   point to describe the answers to your questions.

20         MS. JAWAD:  Objection.  Is there a question?

21         MR. AMBERG:  Yes.  It's coming right now.

22   BY MR. AMBERG:

23   Q.   During anytime after that did you ask him what he meant by

24   the term "tried" or "trying" as he answered these questions?

25   A.   Not that I recall, no.

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1686  Page 134 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

134

1    Q.   Okay.  One thing that when you're doing an interrogation

2    that you can do is at the end of the interrogation, you have

3    the person write down what they've told you orally that they've

4    done, right?

5    A.   You mean like a -- like a confession letter?

6    Q.   Right.

7    A.   That is one thing that can be done, yeah.

8    Q.   Okay.  That will allow the person to look to see what --

9    what -- what supposedly they've said and either acknowledge it

10   or not acknowledge it, right?

11   A.   It lets them write out, yeah, their account of what

12   they're telling us.

13   Q.   That did not happen after the interview in this case?

14   A.   No, we did not.

15   Q.   Why not?

16   A.   Not sure.  I mean we were driving at that point.  We --

17   were -- we were running out of time.

18   Q.   Okay.

19   A.   Mm-hmm.

20   Q.   I mean you -- you could have -- you brought him here,

21   right?

22   A.   Yes.

23   Q.   You could have put him right in the -- to the lockup right

24   here and had him fill out right there, right?

25   A.   Yeah, probably.

1    Q.   Okay.

2            MR. AMBERG:  Can I have one second?

3            (Brief pause)

4    Q.   All right, Agent Erkkinen.  Thank you very much, sir.

5            MR. AMBERG:  I have no other questions.

6            THE COURT:  Thank you very much, Mr. Amberg.

7            Is there any redirect?

8            MS. JAWAD:  Yes, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MS. JAWAD:

11   Q.   Special Agent Erkkinen, this statement was video-recorded,

12   is that right?

13   A.   The statement?

14   Q.   The interview.

15   A.   Yes.

16   Q.   So was there any need to obtain a written confession when

17   the defendant's statements are on video?

18   A.   No.

19   Q.   And going back to when the defendant was saying the word

20   "try," were there times in the video that you saw where he

21   said, "I tried but no success"?

22   A.   Yes.

23   Q.   And did that indicate to you that he understood what the

24   concept of trying is?

25   A.   Yes.

1   Q.   And you mentioned on direct that you tend to begin an

2   interview with open-ended questions, is that right?

3   A.   That's right.

4   Q.   And then as the interview progresses, do you change your

5   questioning in any other way, do you --

6   A.   Yes.

7   Q.   And how do you that?

8   A.   Well, as the information starts to come in, it begins to

9   taper or shape how we might ask future questions based on what

10  we're getting without asking much.  And so as we start to drill

11  down into some details, the questions become a little bit more

12  pointed just to kind of obtain more details about what evidence

13  we might have.

14  Q.   And whose -- or let me ask it this way.  Is it the

15  defendant's decision to proceed with the interview or not

16  proceed?

17  A.   Yes, it was the defendant's decision.

18  Q.   And did you and Special Agent Dodge make it clear to him

19  that he didn't have to speak with you at all?

20  A.   Yes.

21  Q.   And if he chose not to speak with you, what would you have

22  done?

23  A.   We would have ended the interview.

24        MS. JAWAD:  No further questions, Your Honor.

25        THE COURT:  Thank you very much.

```
 1              Ladies and gentlemen, I'd like to ask if you have any

 2      questions for this witness.  If you do, raise your hand.  All

 3      right.  Please write down your questions and I'll present them

 4      to counsel.

 5              (Side-bar discussion as follows):

 6              THE COURT:  Okay.  We have a number of questions

 7      here.  The first question says -- a juror asks, "In the last

 8      interview did the defendant say, 'I liked her like that' when

 9      talking about her skirt length?"

10              MR. AMBERG:  This is sort of my thought about that.

11      We have the video evidence.  The jury's going to have a chance

12      to have that and they're going to watch it and listen to it

13      themselves versus -- versus the agent testifying about what was

14      said.  I think we both had objections on that.  I think during

15      the cross, maybe -- maybe it's just let 'em watch the video.

16              MS. JAWAD:  I think it's fair to ask if he remembers

17      and they can also watch the video as well.

18              THE COURT:  Not entirely sure what is meant by the

19      last interview.  I'm not sure if the question is referring to

20      the interview in the car or -- because I don't remember that

21      statement either way.

22              MS. JAWAD:  I think they might be referring to the

23      last clip that was played.  I -- I'm not sure that statement

24      was -- was made, but I do believe that's when he was talking

25      about her outfit.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1690   Page 138 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

138

```
 1              THE COURT:  All right.

 2              MS. SMITH:  He used the term "dress" in the last

 3   video.

 4              THE COURT:  Okay.  Let's see how many of these

 5   other -- go ahead.

 6              MR. AMBERG:  I think it makes more sense to just say,

 7   "You will have an opportunity at the end of this trial to view

 8   all of this evidence," and that's part of the evidence they

 9   viewed.  They have that accessible to them to watch.

10              THE COURT:  Okay.  Well, let's see how many of these

11   questions are like this in terms of characterizing the video.

12              Okay.  Juror asks, "Did defendant use the restroom

13   privately after being detained and DNA samples taken

14   approximately from 6:00 a.m. until 5:00 p.m.?"

15              MS. JAWAD:  No objection.

16              MR. AMBERG:  No objection to that question.

17              THE COURT:  A juror asks, "Did defendant seem

18   sleep-deprived during interview?"  And then also, "Was the

19   handling of DNA evidence proper by all agencies involved?"

20              MR. AMBERG:  Not -- no objection.

21              MS. SMITH:  No objection.

22              MS. JAWAD:  No objection.

23              THE COURT:  A juror asks two questions.  "Given that

24   the defendant had taken Tylenol, was ill, and had at the time

25   of the interview been up all night, did he appear to be sick,
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1691   Page 139 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

139

1    ill during the interview process or afterwards?"

2         MS. JAWAD:  No objection.

3         MR. AMBERG:  No objection.

4         THE COURT:  "Based on the boarding manifest, was the

5    defendant assigned to 27D, yet ended up in sitting -- ended up

6    actually sitting in 27E next to 27F and Laura?"

7         MS. JAWAD:  No objection.

8         MR. AMBERG:  No objection.

9         THE COURT:  All right.  So I think with regard to

10   this first question, I think I will tell them that they can

11   watch the video to determine whether things were said on the

12   video rather than asking the witness.

13        MS. JAWAD:  All right.

14        (End of side-bar discussion)

15        THE COURT:  Ladies and gentlemen, after conferring

16   with counsel, one of the questions pertained to asking the

17   witness whether the witness remembered the defendant saying or

18   making a certain statement during the video, and after

19   conferring with counsel, I'm going to direct you to review the

20   evidence yourselves and determine what was said during the

21   video rather than to ask this witness to try to remember what

22   was said during the video.  So that's how we'll deal with that

23   question.

24        Now, we have a number of other questions here.

25   First, a juror asks, "Did defendant seem sleep-deprived during

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1692   Page 140 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

140

1   the interview?"

2           THE WITNESS:  I guess I'm not sure -- I guess

3   everybody would look a little differently when they're

4   sleep-deprived, but I didn't get that impression.

5           THE COURT:  A juror asks, "Has the handling of DNA

6   evidence -- or was the handling of DNA evidence proper by all

7   the agencies involved?"

8           THE WITNESS:  I'm -- I'm assuming that the airport

9   police handled it according to their own protocols.  When it

10  came to us, we followed our protocols and had it shipped to the

11  lab, so...

12          THE COURT:  Another juror asks, "Did defendant use

13  the restroom privately after being detained and DNA samples

14  taken from 6:00 a.m. until 5:00 p.m. approximately?"

15          THE WITNESS:  The -- the defendant used the restroom,

16  as far as I understand, I could see -- I saw body camera

17  footage of the defendant in that lockup area moving -- he asked

18  to use the restroom.  They -- as far as I remember, they gloved

19  him up and he went to the bathroom.  The -- the officer that

20  was there kind of turned away so the camera wasn't capturing

21  him using the restroom.  I'm assuming he actually used the

22  restroom.  The officer kind of stands in the doorway of the --

23  where the restroom area was, so...

24          THE COURT:  A juror asks, "Given that the defendant

25  had taken Tylenol, was ill, and had at the time of the

1    interview been up all night, did he appear to be sick, ill

2    during the interview process or afterwards?"

3           THE WITNESS:  Um, I heard -- during the interview I

4    didn't get the impression that he was ill.  He mentioned that

5    he had taken a tablet, and in the body cam footage you can hear

6    him coughing.  I'm not sure if that answers the question.

7           THE COURT:  "Based on the boarding manifest," a juror

8    asks, "was the defendant assigned to 27D, yet ended up actually

9    sitting in 27E next to 27F and Laura?"

10           THE WITNESS:  So according to the records that we

11    received, the defendant was assigned to 27Delta, or D, which is

12    the aisle seat, and his wife was assigned to 27Echo, or E,

13    which is the middle seat.  My understanding was the way that

14    they were seated and from all the people that I've talked to,

15    the wife was sitting in the aisle seat, defendant was sitting

16    in the middle seat and Laura was sitting in the window seat.

17           THE COURT:  Any followup questions from counsel?

18           MS. JAWAD:  No, Your Honor.

19           MR. AMBERG:  Yes, Your Honor.

20                      RECROSS-EXAMINATION

21    BY MR. AMBERG:

22    Q.   Agent Erkkinen, hello again.

23    A.   Hi, Mr. Amberg.

24    Q.   Just a couple of questions about what the jurors asked.

25    When this interview starts, you never ask Mr. Ramamoorthy if he

1    was sleep-deprived, right?

2    A.   That's correct.

3    Q.   You never asked if he was given food or anything?

4    A.   Not that I recall, no.

5    Q.   Did you even ask if he had been given anything to drink?

6    A.   I don't recall asking that, no.

7    Q.   And you watched the -- the -- all these videos.  He was

8    never eating any food on those videos, right?

9    A.   Not that I remember.  I don't remember him eating anything

10   on video.

11   Q.   And I'm going to skip ahead to the third question, but

12   it's important because it's a part of that first question.

13   You -- you never asked him about whether he was ill while the

14   interview was taking place, right?

15   A.   I think we asked -- we asked him about medications that he

16   might have been on or any kind of -- any kind of pill, but I'm

17   not sure if we asked him specifically if he was sick or ill.

18   Q.   Okay.  You didn't ask him, "Do you have a cold?"

19   A.   I don't -- I don't recall asking him that.

20   Q.   You didn't ask him if he had the flu?

21   A.   I remember him offering that information.

22   Q.   Okay.  The -- the restroom issue and the questions about

23   the bathroom, when you watched all those videos, he doesn't use

24   the restroom at the police station until after the swabbing of

25   his hands is done?

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1695  Page 143 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

143

1    A.   Yes, that's my understanding, yeah.

2    Q.   So even after the swabbing was done, the officers at the

3    police station had him put Latex gloves on when he went to the

4    bathroom, right?

5    A.   They had him put gloves on.

6    Q.   Okay.

7    A.   Yeah.

8    Q.   And to your knowledge, that was done to make sure that

9    evidence was preserved, right?

10   A.   I believe they say that on the body cam footage.

11   Q.   Okay.

12   A.   Yeah.

13   Q.   At no time did you see him go to the bathroom without that

14   happening, right?  It was just that one time.

15   A.   I don't think he went to the bathroom without -- yeah, at

16   a different time as far as I understand.

17   Q.   Okay.  And you never asked him before that interview

18   started whether he wanted to use the restroom before the

19   interview started?

20   A.   No, I don't think we did, no.

21   Q.   Okay.

22        MR. AMBERG:  If I could just have one second, Your

23   Honor.

24        (Brief pause)

25   BY MR. AMBERG:

1   Q.   Regarding the questions about whose seat was whose on the

2   flight, are you aware of who was sitting in those seats first?

3   A.   Um --

4   Q.   Was it Mr. Ramamoorthy that was sitting there first or was

5   it the complainant, do you know?

6   A.   Are you talking about the --

7   Q.   When everybody boarded the flight.

8   A.   When they boarded the flight, yeah, my understanding is

9   having talked to some -- the people that were in that row, that

10  the couple was seated first, the defendant and his wife.

11  Q.   Couple's first, then the complainant comes?

12  A.   Yes.

13  Q.   Okay.

14          MR. AMBERG:  No further questions.  Thanks, Your

15  Honor.

16          THE COURT:  Any other followup questions?

17          MS. JAWAD:  No, Your Honor.

18          THE COURT:  All right.  May this witness then be

19  excused?

20          MS. JAWAD:  Yes, Your Honor.

21          THE COURT:  Thank you very much, Special Agent

22  Erkkinen.  You can step down.  Thank you for your testimony.

23          (Witness excused at 2:22 p.m.)

24          THE COURT:  Does the government have any more

25  evidence or witnesses it wishes to present?

1        MS. JAWAD:  No, Your Honor, the United States rests.

2        THE COURT:  Is there -- are there any stipulations or

3   any other kinds of exhibits that the government wishes to place

4   on the record?

5        MS. JAWAD:  No, Your Honor.

6        THE COURT:  All right.

7        MR. AMBERG:  I -- I -- maybe at this time I'd like to

8   make a motion, Your Honor.  Brief recess before we start, but

9   I'm presenting witnesses.

10        THE COURT:  All right.  Well, let's -- let's take a

11   recess and we'll deal with some legal matters.  And so, ladies

12   and gentlemen, please stand as the jury leaves the courtroom,

13   and ladies and gentlemen, you can be excused for now.

14        (Jury excused at 2:23 p.m.)

15        THE COURT:  Okay.  I thought we should double-check

16   on the exhibits here to make certain that we have all of the

17   evidence in the record.  The -- in looking at my exhibit list,

18   it looks as if Government Exhibits 1 through 5 were admitted,

19   is that right, does everyone agree with that?

20        MS. SMITH:  Yes.

21        THE COURT:  6 I think must just be a summary name, is

22   that right?

23        MS. SMITH:  Correct.

24        THE COURT:  6a through d were admitted, correct?

25        MS. SMITH:  Yes.

 1            MR. AMBERG:  Yes.

 2            THE COURT:  7, 8 and 9 were admitted?

 3            MS. SMITH:  Yes.

 4            THE COURT:  10, 11 and 12 were admitted?

 5            MS. SMITH:  Yes.

 6            THE COURT:  What about 13?

 7            MS. SMITH:  13 we've decided not to use.

 8            THE COURT:  All right.  So 13 was not admitted.

 9       It looks to me like we had 14 through 20, those were

10  the clips of the defendant's interview.  Those were admitted,

11  correct?

12            MS. SMITH:  Yes.

13            THE COURT:  And we have 21B through -- let's see.  On

14  my list I have B, 21B, C, D, E, F.  Now, I don't seem to have G

15  and H on my list, but I do think G and H were.

16            MS. SMITH:  I believe we updated this list as late as

17  this morning, but we -- my records show we moved to Exhibit 21A

18  through J.

19            THE COURT:  All right.

20            MS. SMITH:  And I think that our paralegal gave

21  somebody a copy of that this morning, but we can get another

22  one to the Court if you can't seem to locate it.

23            THE COURT:  I think I probably have it here too, but

24  I didn't realize that you had submitted it.  So is -- do you

25  agree with that, Mr. Amberg?

1    MR. AMBERG:  Yes, Your Honor.  Those were the little

2  clips --

3    THE COURT:  All right.

4    MR. AMBERG:  -- that --

5    THE COURT:  Yeah.

6    MR. AMBERG:  Yeah.

7    MS. SMITH:  Yep.

8    THE COURT:  And I thought there was going to be a

9  stipulation of some kind.  Was there a stipulation previously

10  placed on the record?

11    MS. SMITH:  We -- we stipulated on the record as to

12  the admissibility of Exhibit 22 which otherwise would have been

13  hearsay but the parties agreed to admit it, and so it's already

14  been admitted and received by the Court.

15    MR. AMBERG:  That's correct, Your Honor.

16    THE COURT:  And what about the federal jurisdiction

17  element?

18    MS. SMITH:  We have not sought a stipulation on that.

19  I don't know what the defendant's feelings are.

20    MR. AMBERG:  I wasn't intending on arguing this.

21    THE COURT:  I'm sorry?  You were not intending to

22  argue it or you were intending to argue it?

23    MR. AMBERG:  No.  The special aircraft jurisdiction

24  of the United States, I wasn't intending on arguing that.

25    THE COURT:  Right.  I mean the evidence, there is

 1    evidence obviously that this was a civil aircraft, but

 2    oftentimes jurisdiction elements like this are subject to

 3    stipulation, and I just wanted to make sure we knew what the

 4    state of the agreement was with the parties.

 5            So we can -- government can rest on the evidence and

 6    they're perfectly in their rights to do so.

 7            MR. AMBERG:  As far as the -- and I -- maybe we can

 8    even agree on this.  I -- it just sort of dawned on me as I was

 9    looking at the -- the elements of the case.  When we talk about

10    the term "sexual act," there's a number of sexual acts that are

11    not -- I don't think it would be in dispute in this case that

12    they didn't happen.  If you look at page 17 of the -- the final

13    jury instructions, we have the definition of the crime.  Number

14    (2), "The term 'sexual'" --

15            THE COURT:  I don't think I have my jury instructions

16    up here with me right now.

17            MR. AMBERG:  Your Honor, what it is, it's the

18    definition of the crime, and it's giving us or it's giving the

19    jury the elements of the crime, and basically you have this

20    definition of what a sexual act is.  It has "(A) contact

21    between the penis and vulva or the penis and the anus."  I

22    don't believe we have that here.

23            "(B) contact between the mouth and the penis, the

24    mouth and the vulva, or the mouth and the anus."  I --

25    that's -- I don't think that that's been shown here, I don't

1    think it's been argued.

2              (C), I'm going to hold off on talking about that

3    because that's different.  I think that's what we're dealing

4    with here.

5              (D) is "the intentional touching, not through the

6    clothing, of the genitalia of another person who has not

7    attained the age of 16 years with the intent to abuse,

8    humiliate, harass, degrade, or arouse or gratify the sexual

9    desire of any person."

10             So that's (A), (B) and (D) I don't think are

11   applicable.  (C) I think is why we're here: "The penetration,

12   however slight, of the anal or genital opening of another by a

13   hand or finger or by any object, with an intent to abuse,

14   humiliate, harass, degrade, or arouse or gratify the sexual

15   desire of any person."

16             So I would just move that what the jury ultimately

17   sees in -- in this jury instruction -- and maybe I guess it

18   would be a motion for directed verdict just on those parts of

19   the sexual act.  I don't think it necessarily would be.  I mean

20   I think we can agree to that.  I don't think the jury should

21   see that when they look at the definition of the crime, now

22   that I think about it.

23             MS. SMITH:  I object because that's not how this

24   works.  The definition of the crime comes from the statutory

25   language, and therefore the entire statutory language ought to

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1702   Page 150 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

150

1    be included in this jury instruction.  Now, we aren't

2    necessarily going to argue that the defendant completed this

3    crime by the means, every single means that's noted in this

4    statute, but it is proper and -- well, it's proper under the

5    law, and it should be that the entire statutory language

6    remains in the jury instruction.

7              MR. AMBERG:  I'm just concerned that that could

8    confuse the jury.  Most of that is completely irrelevant to

9    this case.

10             THE COURT:  Well, it is -- I agree that that language

11   doesn't relate to the evidence that was presented in this case.

12   Sometimes parties will agree with one another that the

13   statutory language that doesn't directly apply here need not be

14   given to the jury.

15             So I would just say we're not going to get to the

16   jury instructions I don't believe until tomorrow.  Does anyone

17   think we will?  I don't think we will.

18             MS. SMITH:  Well, if we go till 5:00.  Well, I guess

19   the question is does the Court give the instructions before

20   closings or after closings?

21             THE COURT:  That's another issue depending on what

22   you all would like to do.  Oftentimes I do give them before

23   closings.

24             But -- so anyway, as to this dispute, I feel like we

25   could go either way.  I don't think the jury is going to be

```
 1   applying these elements of the definition of sexual act in this
 2   case, so...
 3              MS. SMITH:  I don't think they will be, but I -- I --
 4   but it's not error to include it but it might be error to
 5   exclude portions of the statute in the jury instruction, but I
 6   feel confident that it's not error to include the entire
 7   statutory language.
 8              MR. AMBERG:  I -- I have my concerns with it, Your
 9   Honor.  I've put it on the record.
10              THE COURT:  Okay.  Thank you.  And what else, what
11   else do we need to consider right now?
12              MR. AMBERG:  Well, Your Honor, I have two witnesses.
13              THE COURT:  Yes.
14              MR. AMBERG:  And I think we're going to be done well
15   before 5:00 o'clock.  I did ask in the beginning this morning
16   if we could do our closings fresh in the morning, and I would
17   feel much better about doing the closing tomorrow morning as
18   opposed to like 4:00 o'clock this afternoon, so...
19              THE COURT:  I think that would be fine.  Let's just
20   complete the evidence today and we'll allow you to do your
21   closings tomorrow.
22              MR. AMBERG:  Thank you, Your Honor.
23              THE COURT:  Were you going to make a motion of some
24   kind?
25              MR. AMBERG:  That was my motion, Your Honor.
```

```
1          THE COURT:  That was a motion regarding the jury
2    instructions?
3          MR. AMBERG:  Yeah, I guess it really wasn't a motion.
4    I mean maybe I sought some clarification for that.  I just want
5    to make sure that when we're -- you know, I don't forget it,
6    so...
7          THE COURT:  Okay.  You don't have any other motion
8    about the evidence or you want to wait until you're done with
9    your case?
10         MR. AMBERG:  I'm sorry?
11         THE COURT:  You could make a motion --
12         MR. AMBERG:  For directed verdict?
13         THE COURT:  If you wish --
14         MR. AMBERG:  Well, your Honor --
15         THE COURT:  -- or you could wait until you're done
16   with your evidence, whatever you prefer.
17         MR. AMBERG:  I -- I -- I would like to wait until --
18   because I am presenting evidence in this case, so maybe I could
19   wait until tomorrow to make the motion if this goes a little
20   late today, and that way I can just look and maybe look up some
21   case law on it if -- if it's applicable.  But I -- I mean I
22   think we're going to probably be done at 4:00 today with both
23   witnesses.  So -- and I'm going to call Thomas Selleke up
24   first, so I don't know, do you want me to just bring him in
25   right now?
```

1          MS. SMITH:  Hold on.

2          THE COURT:  Don't bring him in yet.

3          MR. AMBERG:  Okay.

4          MS. SMITH:  May I be heard?

5          THE COURT:  Yes, you may.

6          MS. SMITH:  Okay.  As to the Rule 29 motion, the

7    rules do require that the defendant raise that issue after the

8    United States rests.  We are willing to -- to waive that.  If

9    he wants to raise it -- he's supposed to raise it twice, once

10   after the United States and once again after his case, but we

11   are willing to let him present it all at once on that.

12          Additionally, I would just point out, for

13   housekeeping matters, that the defendant will need to decide

14   today whether or not he's going to testify, and we would ask

15   that the Court voir dire him outside the presence of the jury

16   when that time comes as well.

17          MR. AMBERG:  And, Your Honor, first, thank you to the

18   government for that.

19          And second, I completely agree.  I -- I did bring up

20   before the -- giving me that ten-extra-minute break there

21   before that happens, and maybe it would be wise after the -- my

22   second witness testifies, then I could have the ten minutes

23   with Mr. Ramamoorthy.  But most likely you could probably let

24   the jury go and then we can come back and he can be voir dired

25   on that.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1706   Page 154 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

154

```
 1              MS. SMITH:  I object to that.  I want -- I think that
 2    before we let the jury go today he is going to be done with his
 3    case, and we need the defendant's decision on the record
 4    whether or not he intends to testify.
 5              MR. AMBERG:  I mean that's fine.
 6              THE COURT:  Let's just make sure we use all of our
 7    time today to present any additional evidence we have, whether
 8    it's the defendant testifying or not testifying.
 9              And so Mr. Amberg, do you wish to for the record
10    indicate whether you're going to move under Rule 29 based on
11    the government's proofs.
12              MR. AMBERG:  Um --
13              THE COURT:  We can take it up as an argument either
14    after all the evidence is presented today or even tomorrow
15    morning, but I think you should -- if you're going to make the
16    motion, I think you need to do so.
17              MR. AMBERG:  Okay.  Well, I would like to make the
18    motion but reserve my argument until after I've presented the
19    defendant's proofs.
20              THE COURT:  Any objection?
21              MS. SMITH:  No, Your Honor.
22              THE COURT:  All right.  Motion is under advisement.
23              MR. AMBERG:  Thank you, Your Honor.
24              THE COURT:  Are we ready for the jury?
25              MS. SMITH:  Yes.
```

```
1              THE COURT:  Please bring in the jury.  All rise.
2              (Jury entered the courtroom at 2:35 p.m.)
3              THE COURT:  All right.  Welcome back, ladies and
4    gentlemen.  You may be seated everyone.
5              And Ms. Jawad, I believe you've indicated the
6    government has no additional evidence at this time, is that
7    correct?
8              MS. JAWAD:  That's correct, Your Honor.
9              THE COURT:  Does the government rest?
10             MS. JAWAD:  Yes, Your Honor, the United States rests.
11             THE COURT:  Thank you very much.
12             Mr. Amberg, do you wish to present any evidence?
13             MR. AMBERG:  Yes, Your Honor.  I'm going to -- if I
14   could to call my first witness, Your Honor.
15             THE COURT:  Call your first witness.
16             MR. AMBERG:  Thank you.
17             (Brief pause)
18             THE COURT:  Mr. Amberg, who is your first witness?
19             MR. AMBERG:  Thomas Selleke, Your Honor.
20             THE COURT:  Come forward please, Mr. Selleke.  Will
21   you raise your right hand, sir?
22                  T H O M A S   S E L L E K E
23   was thereupon called as a witness herein, and after being
24   first duly sworn to tell the truth and nothing but the truth,
25   testified on his oath as follows:
```

```
1              THE WITNESS:  Yes, I do.

2              THE COURT:  You may be seated.

3              MR. AMBERG:  May I proceed, Your Honor?

4              THE COURT:  You may.

5              MR. AMBERG:  Thank you.

6                       DIRECT EXAMINATION

7    BY MR. AMBERG:

8    Q.  Good afternoon, sir.

9    A.  Good afternoon.

10             THE COURT REPORTER:  Pull the mic toward you please.

11   Q.  There we go.

12             I just have a few questions for you.

13   A.  Okay.

14   Q.  First, what's your name?

15   A.  Thomas Martin Selleke.

16   Q.  Okay.  And, sir, what connection do you have to a flight

17   that went from Las Vegas to Detroit back in January of this

18   year?

19   A.  Well, I took the flight from a vacation we took.

20   Q.  Okay.  And you were on vacation where?

21   A.  In Las Vegas.

22   Q.  Okay.  And how long were you there for?

23   A.  About three days.

24             THE COURT:  Mr. Selleke, could you please speak right

25   into the microphone?
```

```
 1              THE WITNESS:  Oh, sorry.
 2              THE COURT:  It's a little bit hard to hear sometimes.
 3              THE WITNESS:  Sorry.
 4              THE COURT:  Go right ahead.
 5    A.   About two days, three days.
 6    BY MR. AMBERG:
 7    Q.   And what were you doing there?
 8    A.   We went to a bunch of shows.  I'm in the restaurant
 9    industry so we went to quite a few high-end restaurants to
10    experience the cuisine and critique it.
11    Q.   And who were you with?
12    A.   My former wife.
13    Q.   Okay.  Now, I know I brought up this flight.  Did you fly
14    there and home from Vegas, did you take a flight to and from
15    Vegas to get there to come home?
16    A.   Yes.
17    Q.   Okay.  And do you remember that flight home from Vegas?
18    A.   Yes.
19    Q.   Okay.  Before you boarded that flight, did you do
20    anything?
21    A.   Yes.
22    Q.   Okay.  What did you do?
23    A.   I sat at the bar that was at the departure level for about
24    five flights and I had some snacks, a sub, I had a beer, and
25    basically waited approximately an hour before my flight left.
```

1   Q.   Okay.  And were you the only person at the bar?

2   A.   No.

3   Q.   Okay.  Who else was there, if you can recall?

4   A.   My former wife was sitting on one side of me.  There was

5   three people from Fort Lauderdale I had a conversation with

6   about building, and there was a young lady that was sitting on

7   the wing end of the bar.

8   Q.   Okay.  And how -- you said you had a conversation with the

9   people from Fort Lauderdale?

10  A.   Yes.

11  Q.   You didn't know them before?

12  A.   No.

13  Q.   That was -- just struck up a conversation at the bar?

14  A.   Yes.

15  Q.   Okay.  What about the lady that was there, did you know

16  her?

17  A.   No.

18  Q.   Did you eventually know who she was in any way?

19  A.   Yes.

20  Q.   Okay.  At the time that you were sitting there, what was

21  she doing?

22  A.   She was drinking, sitting by herself drinking at the end

23  of the bar.

24  Q.   Okay.  And did you see what she was drinking?

25  A.   I couldn't see what was mixed when he gave it to her,

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1711  Page 159 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

159

1   but -- he had his back to us but it was in a tall glass.  It

2   wasn't beer; it was some sort of mixed drink.

3   Q.   Okay.  And was she talking to anybody?

4   A.   She was talking a few times to the two people that were to

5   my right, which they were a little older and they had a younger

6   gentleman with them from Fort Lauderdale, and he was swinging

7   up conversations with her and turning back and with a big grin

8   on his face and making comments to the gentleman, other

9   gentleman from Fort Lauderdale.

10  Q.   Okay.  Did you ever talk to her?

11  A.   No.

12  Q.   Okay.  How was her demeanor?

13  A.   She looked a little worn out like she had -- what she had

14  been doing, I don't know.

15  Q.   Okay.  When you say worn out, what do you mean?

16  A.   Laid back, tired, maybe had been drinking.  I don't know,

17  I don't want to speculate.

18  Q.   Okay.  Did you see her drink that drink that she had?

19  A.   Yes.

20  Q.   Okay.  How long -- well, let me ask you this.  When you

21  got to the bar, was she already there?

22  A.   No.  She came just very shortly I believe after we sat

23  down.

24  Q.   Okay.  And about how long were you together at the bar?

25  A.   I'm going to say at the most an hour or maybe a little

1    longer, whatever it took before the flight time.  We were there

2    about an hour and a half before the flight.  And then, like I

3    said, we had eaten snacks and had some food before we got there

4    and I ate some more before I got on the plane, and it was

5    approximately an hour, maybe an hour and a half at the most.

6    Q.  And was she at the bar the entire time you were there

7    after she got there?

8    A.  Yes.

9    Q.  Okay.  And did she have a drink in front of her the entire

10   time if you remember.

11   A.  To the best of my recognition, yes.

12   Q.  And I know you already testified to it.  I just want to

13   make sure I understand this.  Was that a mixed drink in front

14   of her?

15   A.  I believe so, yes.

16   Q.  And what kind of glass was it in?

17   A.  It was in a tall, clear glass.  I remember the glasses

18   were clear because the people sitting next to me also were

19   drinking mixed drinks in tall, clear glasses.

20   Q.  Okay.  Did you ever see anybody ever handing out drinks at

21   the bar?

22   A.  Handing out drinks?  I don't understand the question.

23   Q.  Any of the fellow people at the bar, did they ever hand

24   out drinks to anybody?

25   A.  Yeah.  Actually, yes, they -- the guys from Lauderdale,

1   they had ordered some drinks that were mixed incorrectly or

2   something.  They were offering them up to the other people at

3   the bar.

4   Q.  Did you see if -- that the young lady at the bar took any

5   of those drinks?

6   A.  I couldn't say that for sure, no.

7   Q.  Okay.  Did you see her leave the bar?

8   A.  No, I really didn't pay much attention.  Once our flight

9   was called up, I pretty much just left.

10  Q.  Okay.  And when you got on the plane, did you see her get

11  on the plane?

12  A.  I didn't -- I don't recall seeing her get on the plane,

13  but I do recall seeing her get off.

14  Q.  Okay.  Well, let's talk about that.  You -- how do you

15  recall her getting off the plane?

16  A.  Well, we were stuck on the tarmac for a period of time, it

17  was getting hot and uncomfortable, and then suddenly they

18  brought her off the plane with a blanket on her and she passed

19  me and I recognized her from sitting at the bar.

20  Q.  Okay.  And after that, did you ever see her again?

21  A.  No.

22  Q.  You have no idea who she is?

23  A.  I have absolutely no idea who -- idea who any of those

24  people are.

25  Q.  And I was going to ask you that.  Do you -- do you know

1    Mr. Ramamoorthy at all?

2    A.   No.

3    Q.   And you don't know her at all?

4    A.   No, sir.

5    Q.   And up until today, you never met me?

6    A.   Actually no.

7    Q.   Okay.  How -- how did the information come to be that you

8    had -- or how did it come to be that you had information about

9    this case, do you remember?

10   A.   Well, I just -- I read a lot.  So I thought it was

11   unusual, everything that was going on, but I didn't really pay

12   much attention to it at the time.  I read on I believe it was

13   Yahoo or one of the news sites about a gentleman who had gotten

14   into a confrontation with a lady on the flight.

15   Q.   Let me stop you there because I don't -- I don't think we

16   should be going into the specifics of what you read, but --

17   A.   All right.

18   Q.   -- did any agents ever contact you initially about this?

19   A.   No.

20   Q.   Okay.  Did you make the effort to contact somebody about

21   this?

22   A.   Yes.

23   Q.   Okay.  Now, let's just talk real briefly about this plane.

24   Were these seats comfortable or uncomfortable?

25   A.   Probably the worst flight I've taken in 40 years.

1    Q.   And why is that?

2    A.   When I originally took the flight to Las Vegas, I had a

3    leg injury, some chronic problems, and it was so cramped and

4    tight between me and three other guys or two other gentlemen

5    that were sitting with me, you could barely move your arms,

6    your knees were up in your face.  It became extremely

7    uncomfortable and almost intolerable actually to a point where

8    I had to get up and stand in the aisle for a good period of

9    time.

10            Once I arrived in Las Vegas, one of the first things

11   we did was to call and get my seat moved and pay more money to

12   get into a -- an exit door area so that I could extend my seat

13   and fit.  It got a little wider, but the seats directly behind

14   us and all behind I guess get smaller and smaller and I

15   couldn't even imagine that.

16   Q.   Okay.  Well, let me ask you this.  With the -- at some

17   point did you have people in front of you sitting, or where

18   you -- where you were sitting, it sounds like that was an exit

19   row?

20   A.   Yes.

21   Q.   Okay.  How far back were the people behind you?

22   A.   I didn't look that far back but it was at least, you know,

23   ten rows or more.

24   Q.   Well, I'm talking not about these people in this case but

25   just in general.  I want to get an idea of what this was like

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1716   Page 164 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

164

1    to sit in this plane.  The people -- how far are the people

2    behind you when you're sitting down in this -- in this plane,

3    the people directly behind you?

4    A.   They're right up on top of you.  I mean it's -- they

5    shrunk the planes this way and this way.  I mean the seating is

6    just extremely uncomfortable.  Anybody my size is just -- or

7    even smaller in most cases, it's very uncomfortable.

8    Q.   And could you hear the people behind you?

9    A.   Oh, yeah.

10   Q.   And -- and how about on the side of you for the next --

11   the row on the -- the other side of the aisle, could you --

12   A.   Oh, yeah, yeah.

13   Q.   These -- are these seats where you can't see other people

14   or can you see everybody there?

15   A.   You're right -- everybody's right on top of you.  I mean

16   the next person sitting next to you on either side, his face is

17   like right here, their face is, and then the other aisle is

18   right there, and then the people behind you, you just gotta

19   turn your head and they're like right there.  It's very

20   compact, that's all I can say.

21   Q.   Okay.  Now, on this flight did you hear anything unusual

22   while you were flying?

23   A.   No.

24   Q.   You never heard anybody screaming or anything like that?

25   A.   No, absolutely not.

1   Q.   Okay.  And it was -- was this an uneventful flight until

2   the end I guess, if that makes sense?  Was it for you

3   uneventful until the end when you're on the tarmac?

4   A.   Pretty much so.  I didn't sleep through the flight.  Just

5   still the seats are uncomfortable sitting, but I had a

6   three-hour drive ahead of me so I -- yeah, but there was pretty

7   much uneventful, yeah, I guess you could call it that.

8   Q.   Okay.  As far as when the flight is in the air, are -- are

9   a lot of lights turned off on the plane?

10  A.   No, there's some lights on throughout the aisleways and

11  stuff and some people got their lights on while they're

12  reading.  I actually had mine on and was reading at one point.

13  Q.   Okay.  And could you see throughout the plane even when

14  the main lights were off?

15  A.   Certainly you could see down the aisleway in either

16  direction, yes.

17  Q.   Could you see the people on the other side of the aisle

18  that were sort of parallel to you?

19  A.   Yes.

20  Q.   And the people behind you?

21  A.   Well, if I turned around, yes.

22  Q.   Okay.  What about the people in front of you?

23  A.   Yes.  If -- you're talking about when I first came, flight

24  in and flight back, I am on an exit seat, so it's different,

25  set up differently.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1718   Page 166 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

166

```
1    Q.   But -- well, let me ask you this.  On the flight in was
2    the plane very similar as far as how it was set up?
3    A.   Absolutely.
4    Q.   And on the flight in did you have a seat where people were
5    right in front of you?
6    A.   Yes.
7    Q.   And how close were they to you?
8    A.   Very close, within a hand's reach.
9    Q.   And the way that these seats are set up, could you see in
10   between the seats to see the people in front of you?
11   A.   I couldn't say for sure.
12   Q.   How about hearing them?
13   A.   Yes, you can hear people talking around you because I
14   remember a lady in the back was talking quite a bit behind me.
15   Q.   Was that on the way there or the way back?
16   A.   On the way there.
17   Q.   Okay.  All right.  Mr. Selleke, give me one second, okay?
18        (Brief pause)
19        Mr. Selleke, just a couple more questions for you
20   here.  During this flight home from Vegas to Michigan to
21   Detroit, did the air -- the air hostesses and air hosts, did
22   they walk up and down the aisle throughout the flight.
23   A.   Yes.
24   Q.   Okay.  Was that pretty frequently?
25   A.   They'd come and go, you know, they're -- from the front to
```

1    the back and back and forth.

2    Q.   Okay.  And I know you said that you drank some alcohol

3    while you were at the bar there?

4    A.   Yes.

5    Q.   Did that impair your ability in any way to --

6    A.   No.

7    Q.   Okay.  So you knew what was going on?

8    A.   Absolutely.

9    Q.   All right.  Thank you very much, sir.

10              MR. AMBERG:  I have no further questions, Your Honor.

11              THE COURT:  Thank you very much.

12              Any cross-examination?

13              MS. JAWAD:  Yes, Your Honor.

14                        CROSS-EXAMINATION

15    BY MS. JAWAD:

16    Q.   Good afternoon, Mr. Selleke.

17    A.   Good afternoon.

18    Q.   So you testified that you were drinking at the bar in Las

19    Vegas while you were waiting for your --

20    A.   Yes.

21    Q.   -- flight back to Detroit, is that right?

22    A.   Yes.

23    Q.   And how many drinks did you have at the bar?

24    A.   Probably no more than maybe two.  I had a situation where

25    I have an inner ear problem and flying nowadays is very

1    difficult for me and going on boats is intolerable, so I try to

2    eat as much as I can and try to avoid too much drinking.

3    Q.   And you said you saw a woman that was -- she was across

4    the bar from you?

5    A.   The bar is set up kind of like in a round L, and she was

6    sitting -- would be sitting directly like where that

7    gentleman's sitting right there.

8    Q.   And for the record, the witness has identified someone

9    that's about ten feet away from you?

10   A.   Approximately ten feet.

11   Q.   Would you agree with that?

12   A.   Yes, ma'am.

13   Q.   And you could see in her cup from there?

14   A.   Well, the glass was sitting right in front of her on the

15   bar.

16   Q.   Okay.  And there were -- were there several people in

17   between you and the woman?

18   A.   Well, the way the bar was set up, these people line up to

19   my right, and then she was on the turn where you could -- if I

20   was to look to my left, she's directly across from me.

21   Q.   And you weren't sitting next to her?

22   A.   No.  No, ma'am.

23   Q.   You had no interaction with her?

24   A.   No.

25   Q.   You didn't speak with her?

1    A.   No.

2    Q.   And you didn't speak with the defendant in this case at

3    all?

4    A.   No.

5    Q.   And you said you were sitting in an exit row when you got

6    on the flight?

7    A.   On the trip, return trip, yes.

8    Q.   Right.  That's the flight from Las Vegas to Detroit?

9    A.   Yes.

10   Q.   You were in the exit row?

11   A.   Yes.  I had transferred to that seating 'cuz of the

12   problems from the flight to Detroit, from Detroit to Las Vegas.

13   Q.   And exit row seats are typically in the middle of the

14   plane, is that right?

15   A.   Yes.

16   Q.   And perhaps a little bit closer to the front?

17   A.   You know, I didn't look to see what I was particularly

18   seeing.  Some planes are bigger and some have more exit seats.

19   Q.   But you were not sitting in the back of the plane?

20   A.   Not to the far back, no.

21   Q.   And there were several seats in between you and the back

22   of the plane?

23   A.   Yes.

24   Q.   You said the main lights were off on the airplane?

25   A.   Well, they go to those dimmer lights when people in the

1    evening, when they sleep I guess, the other people sleep.

2    Q.   This flight was darker than a -- a daytime flight?

3    A.   Of course.

4    Q.   And at some point you contacted somebody about this case

5    after reading about this case in the newspaper?

6    A.   On the Internet.

7    Q.   Okay.  In -- on the Internet in the news?

8    A.   Yes.

9    Q.   So you thought you had some information about a criminal

10   case that would be important?

11   A.   Well, it just felt -- it just seemed very unusual to me,

12   the whole thing seemed very unusual to me.  I mean I remember

13   seeing the lady, I remember seeing this.  I actually at one

14   point thought she was taken off the plane due to drugs or

15   something because of the legalization in Nevada, so I didn't

16   pay much attention to it.

17        Once I had read a little bit more about it, I was

18   shocked because I had not heard anything.  And I had remembered

19   seeing her sitting at the bar and I kind of didn't think much

20   about it, just kept it stuck in my mind, and I just kept

21   thinking I should -- maybe I should call someone and just tell

22   'em that I seen her sitting at the bar.  Whether it's relevant

23   or not, I don't know.  I still don't know to this day, to be

24   honest with you.

25        But I -- for some reason something told me it was

1  very unusual.  I remember seeing her sitting at the bar, I

2  remember what she was wearing.  I don't know why.  It just

3  seemed unusual that she was traveling alone with no jacket.

4  She was kind of wearing like a Daisy Duke type top with the top

5  open, and I just remembered her and I -- when I seen her come

6  off the plane.  And then I heard about --

7  Q.   I'm going to stop you.

8  A.   Okay.  I'm sorry.  I just --

9  Q.   You have to respond to a question.

10  A.   Yes.

11  Q.   But -- so you -- you thought you had information that may

12  possibly be significant to a criminal investigation?

13  A.   May or may not.  I did not know.

14  Q.   But you didn't contact the police?

15  A.   No, because I had seen this gentleman's name was attached

16  to the article I believe or I -- so I can't remember even how I

17  got his -- I called his law office.

18  Q.   And you didn't call the FBI?

19  A.   No.  I wasn't even aware the FBI was involved with it

20  until they called me like a week ago.

21  Q.   So you called -- you notified the defense attorney?

22  A.   Yes.

23  Q.   And you know a thing or two about the criminal justice

24  system, is that right?

25  A.   A little.

1   Q.   You have a prior felony conviction from 2015, is that

2   right?

3   A.   Yes, for drinking and driving.

4          MS. JAWAD:  No further questions, Your Honor.

5          THE COURT:  Any redirect?

6          MR. AMBERG:  Very briefly, Your Honor.

7                     REDIRECT EXAMINATION

8   BY MR. AMBERG:

9   Q.   The fact that you had a drinking and driving in 2015, did

10  that have any effect on what you saw there?

11  A.   Absolutely not.

12  Q.   Okay.  And it sounds like you saw -- the only thing that

13  indicated who was handling anything with this case was the name

14  of a -- a defense firm or attorney or something, right?

15  A.   Yes.

16  Q.   Okay.  It did not mention what investigating agency was

17  investigating it?

18  A.   No.

19  Q.   Okay.  Had that been on there, would you have called them?

20  A.   I don't know.

21  Q.   Okay.  And you had described what the -- the young lady at

22  the bar looked like?

23  A.   Yes.

24  Q.   Okay.  And -- and just let me ask you that.  What did she

25  look like when you saw her, just generally the -- what clothes

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1725   Page 173 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

173

1    did she have on things like that?

2    A.   She was a younger lady dressed in a -- a -- a lighter top

3    with the top opened up, like a Daisy Duke you would call it

4    like from the Dukes of Hazard or something, and with the

5    midriff type thing, and she was -- and I just remembered her

6    basically from that.

7    Q.   And was that the same person that you saw being taken off

8    the plane?

9    A.   Yes.

10   Q.   Okay.

11   A.   I just found it unusual without the jacket, considering it

12   was like 20 degrees in Detroit, and what she was wearing I was

13   thinking, you know, "You're going to be freezing," you know.

14   Q.   Right.  Well, which is pretty cold.

15   A.   Which is why it stuck in my head.

16   Q.   Fair enough.  Thank you very much, sir.

17        MR. AMBERG:  I have no further questions, Your Honor.

18        THE COURT:  All right.  Are there any questions from

19   the members of the jury for this witness?  I see one question.

20   Counsel approach.

21        (Side-bar discussion as follows):

22        THE COURT:  A juror asks, "What actual row number was

23   this witness seated in?"

24        MS. JAWAD:  Fair question.

25        MR. AMBERG:  Yeah, sure.

1              (End of side-bar discussion)

2         THE COURT:  Mr. Selleke, we have a question from one

3    of the members of the jury, and the question is, "What row

4    number was this witness seated in, what actual row number was

5    this witness seated in?"  So what row number were you seated

6    in, if you recall?

7         THE WITNESS:  I can't recall the row number I was

8    sitting in.  I just know it was an exit, an exit aisle, which

9    either puts me to the -- sometimes they have two of them.  I

10   just don't recall.  Or they're right in the middle of the

11   plane.

12             And as far as the lady that was there, she was

13   certainly sitting behind me because she walked -- when they

14   brought her off the plane, she was coming back and walked right

15   past me because we were sitting on the tarmac waiting for

16   whatever the problem was, and if you've ever been on a --

17   trapped on a plane, you know how hot it starts getting all of a

18   sudden in there.

19             And so that's -- I couldn't get -- I guess the answer

20   is I do not know what their seat number is.  I guess I could

21   find out my seat number because I would have to probably look

22   up my flight plan, but I was definitely in the exit, exit door

23   to let people off.  If there was an emergency exit door, that's

24   where I was sitting.  And she was absolutely sitting behind me

25   though; how many rows back, I cannot say.

```
 1              THE COURT:  All right.  Any followup questions from
 2    the attorneys?
 3              MS. JAWAD:  No, Your Honor.
 4              MR. AMBERG:  No, Your Honor.
 5              THE COURT:  Thank you very much.  Mr. Amberg, may
 6    this witness be excused?
 7              MR. AMBERG:  Yes, Your Honor.
 8              THE COURT:  Thank you very much, Mr. Selleke, for
 9    your testimony.  You may be excused.
10              (Witness excused at 3:01 p.m.)
11              THE COURT:  Call your next witness if you have
12    another witness you'd like to present.
13              (Brief pause)
14              THE COURT:  Come forward please.  Would you please
15    indicate who your next witness is, Mr. Amberg?
16              MR. AMBERG:  Yes, Your Honor.  We would call Geetha
17    Natarajan to the stand.
18              THE COURT:  Thank you very much.
19              Ms. Natarajan, will you raise your right hand please?
20              G E E T H A N J A L I   N A T A R A J A N
21    was thereupon called as a witness herein, and after being
22    first duly sworn to tell the truth and nothing but the truth,
23    testified on her oath as follows:
24              THE WITNESS:  (Nods in the affirmative.)
25              THE COURT:  You may be seated.  You may be seated.
```

                            DIRECT EXAMINATION

 1

 2    BY MR. AMBERG:

 3    Q.   Good afternoon.

 4    A.   Good afternoon.

 5    Q.   Ma'am, could you please state your name for the record?

 6    A.   Geetha Natarajan.  My full name is Geethanjali Natarajan.

 7    Q.   Okay.

 8    A.   You can call me Geetha.

 9    Q.   Geetha?

10    A.   Yes.

11    Q.   We know each other, right?

12    A.   Yes.

13    Q.   Okay.  Now, Geetha, I want to ask you some questions about

14    the situation here, okay?

15    A.   Mm-hmm.

16    Q.   Yes?

17    A.   Yes.

18    Q.   And you have to answer into the microphone so we can pick

19    it up, okay?

20    A.   Okay.

21    Q.   Do you know who this gentleman is that is sitting at the

22    table over here?

23    A.   Yes.

24    Q.   Who is he?

25    A.   He's my husband.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1729   Page 177 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

177

1  Q.  Okay.  And just sort of so everybody understands, I notice

2  that your last name and his last name are different.

3  A.  Yes.

4  Q.  Okay.  Why is that?

5  A.  I go with my father's last name which is Natarajan, his

6  name is Natarajan.

7  Q.  Okay.  And you guys are married?

8  A.  Yes.

9  Q.  Okay.  Now, where -- where are you from?

10  A.  I'm from Tamil Nadu, India.

11  Q.  In India?

12  A.  Yes.

13  Q.  Okay.  And do you know where Mr. Ramamoorthy's from?

14  A.  Yes, he is also from India.

15  Q.  Okay.  Did you guys meet in India?

16  A.  Yes.

17  Q.  Okay.  Did you get married in India?

18  A.  Yes.

19  Q.  Okay.  Where do you live now?

20  A.  We live in United States, Rochester Hills.

21  Q.  Okay.  And how long ago did you move out here?

22  A.  Right after our marriage, Prabhu got an offer through his

23  company that he was assigned to a project which needed his help

24  and he needed to travel in the United States.

25  Q.  Okay.  And when you arrived in the United States, was that

```
1    the first time that you've been to the United States?

2    A.   Yes.

3    Q.   Okay.  What about -- you called -- his first name is

4    Prabhu?

5    A.   Yes, Prabhu.

6    Q.   What about Prabhu, was that his first time to your

7    knowledge of coming to the United States?

8    A.   Yes.  Yes.

9    Q.   Okay.  And was this a few years ago?

10   A.   I think it was 2015.  That's when we got married, and he

11   moved right after our marriage to United States.

12   Q.   Okay.  And did you move with him?

13   A.   Yes.  Right -- like there was -- yes.  Actually like three

14   weeks after he was -- after coming here, after that I moved

15   here.

16   Q.   Okay.  And since the move, have you -- have you lived in

17   the United States in Rochester?

18   A.   Actually we first were living in Troy.

19   Q.   Okay.

20   A.   And then we moved to Rochester Hills.

21   Q.   Okay.  And let me ask you this.  How did you learn how to

22   speak English?

23   A.   I took my own interest in speaking English when I got to

24   know that I have to travel to United States.  So I watched

25   movies and also read books through understanding to speak
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1731   Page 179 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

179

1    English.

2    Q.   And can you understand what I'm saying to you right now?

3    A.   Yes.  You are -- you are in my speed, in a speed which I

4    can understand, so yes.

5    Q.   Okay.  Are there times when it becomes more difficult to

6    understand English?

7    A.   Yes.

8    Q.   Okay.  Could you give me an example?

9    A.   Any normal American, if they are having a conversation and

10   if they were trying to crack a joke that -- in which I have

11   experienced couple of cases where I didn't get what they were

12   trying to say.

13   Q.   Okay.

14   A.   And if -- if they are too -- if the words that they use is

15   not normal and if it is too -- like I don't know how to put it,

16   but there are some cases where I feel difficult to understand

17   English.  If I am -- I have some difficulty, then I would ask

18   them to -- either I would ask them to repeat the question.

19   Q.   Okay.  What about Prabhu?  You live with him, right?

20   A.   Yes.

21   Q.   How is his English?

22   A.   So actually I took some efforts to learn English because I

23   know that I'll be coming here and I have to talk with people.

24   But his English was good in his technology site, so that --

25   that's what I understood from his level of English knowledge.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1732   Page 180 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

180

 1    So he is -- he will be able to understand what the word was

 2    communicated in terms of technology projects and his

 3    work-related stuff.  If you can talk anything related to his

 4    work, he will be able to understand.  Apart from that, normal

 5    conversations are pretty difficult for him to understand.

 6    Even, for example --

 7    Q.  Well, let me -- let me ask you this.  I want to sort of

 8    break that down so I understand this.  When dealing with work,

 9    I just -- I don't want to misquote you here, but he's okay

10    speaking in English when talking about technical stuff?

11    A.  Not speaking.  I -- I thought you were -- your question

12    was more on understanding English.

13    Q.  Okay.  Well, let me ask you that then so I understand

14    that.  His understanding of technical stuff with his work --

15         MS. SMITH:  Objection, Your Honor.  She can't testify

16    to what the defendant understands.

17         MR. AMBERG:  Well, I -- I think that she could if she

18    knows.

19         THE COURT:  Well, why don't you ask the question

20    directed to that exact point, what her experience is with his

21    ability to understand from experiences that she has had.

22         MR. AMBERG:  Sure.

23    BY MR. AMBERG:

24    Q.  Let's talk about experience that you and Prabhu have had.

25    A.  Yeah.

1    Q.   Okay.  Have you ever seen him have difficulty in

2    understanding American English?

3    A.   Yes.

4    Q.   Okay.  Could you please give me an example?

5    A.   Many cases I can give.  Salesmen, sales representatives,

6    when we go shopping outside and if -- if a salesperson is

7    asking some -- talking to him, like even we were in a showroom

8    to find a perfect shirt for him, in Van Design Showroom, where

9    he couldn't exactly ask what he was trying to find to the

10   salesperson.

11   Q.   Okay.

12   A.   So...

13   Q.   Now --

14        THE COURT REPORTER:  Could you pull the mic more

15   towards you?  Just move it -- no, no, you can sit back and be

16   comfortable.  Just move the microphone up to you.  You have a

17   soft voice.

18        THE WITNESS:  Oh, sorry.  Okay.

19        THE COURT REPORTER:  That's okay.  Thank you.

20   BY MR. AMBERG:

21   Q.   Now, what -- what does he do or what have you seen him do

22   if he can't tell the person what he wants to say, what does he

23   do?

24   A.   If I was near, if I was with him, and he would ask me to

25   tell that to that person.

1    Q.   Okay.  So have you acted as his interpreter?

2    A.   Sort of, many times.

3    Q.   Okay.  To your -- to the best of what you've seen with

4    him, how much English does he understand?

5    A.   Maybe 60 percent, 50 to 60 percent.

6    Q.   Okay.  And what about speaking, how about speaking of

7    English?

8    A.   I have always -- this might go out of topic but I have

9    always --

10   Q.   Well, I want you to listen to my question and answer my

11   question.  As far as him speaking, can he speak English?

12   A.   Yeah, he can.

13   Q.   Okay.  Does he speak it well or what?

14   A.   No, he can't communicate his thoughts through his words.

15   Q.   And is that something that you've observed with him?

16   A.   Yes.

17   Q.   Okay.  And is that something that happens frequently?

18   A.   Yes.

19   Q.   Okay.  And is that -- what kind of people does that happen

20   with?

21   A.   In bank, when we go to bank with the cashier, with the

22   clerks that happened.  And there was another case where we

23   experienced in Costco when we were talking with the customer

24   service representative, that happened.

25   Q.   Okay.  Have you ever helped him work on his English?

1    A.   Yes.

2    Q.   Could you please explain to the jury that?

3    A.   Okay.  So I was trying to tell him the importance of this

4    language.  If we were living in India, it wouldn't have been --

5    there wouldn't have been this much need to learn this language.

6    Though he -- he was able to write English in technical terms,

7    but when it comes to speaking to the people and conveying his

8    thoughts, what I saw in him was he's trying to put words

9    together but it is not framing in the right way as it should

10   be.  So I was trying to show him some conversations on Youtube

11   that people make on like normal instances like a phone call

12   conversation between a business user and a technical person.

13   Those kind of stuffs I was helping him with.

14   Q.   Okay.  Would he ever get confused, to your knowledge, what

15   you saw, would he get confused when speaking in English?

16   A.   He was not sure what he's talking so only then he will be

17   confused, right.  So what in his thought he is telling the

18   right thing what he's thinking, but in actual it's not the

19   case.

20   Q.   Okay.

21   A.   So I would ask him to -- I -- I would give a topic to him

22   and ask him to talk few sentences on that topic.  And again I

23   would interpret those -- his own sentences back to him and I

24   would ask him, "This is what were you trying to tell?," and he

25   would say, "No, I was trying to tell a different thing."  So...

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1736   Page 184 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

184

1   Q.   And was this something that you would do often with him?

2   A.   Whenever we'd get some time, we actually learn a lot

3   together so -- because both office are in technology,

4   technology field of work, so we have to spend some time in

5   learning together.

6   Q.   Okay.  Well, let me ask you about the language that you're

7   speaking outside of work.

8   A.   Yes.

9   Q.   What language do most of your friends speak?

10  A.   You mean -- I'm sorry, friends means?

11  Q.   People that you hang out with.

12  A.   It's our own community people say that -- they talk in our

13  language.

14  Q.   Okay.  What community do you hang out with?

15  A.   Tamil.

16  Q.   Okay.  And is that -- what is Tamil?

17  A.   Tamil is a language spoken in India, it's southern part of

18  India.  It's not northern, it's southern part of India.

19  Q.   Okay.  And the people that you hang out with here, are

20  they from that part of India?

21  A.   Yes.  They are even -- even they are from same place where

22  I am, so...

23  Q.   And do you speak Tamil with them?

24  A.   Yes.

25  Q.   Okay.  As far as hobbies --

1    A.   Uh-huh.

2    Q.   -- are you active in any community type things or anything

3    like that?

4    A.   Yes.  Actually we volunteer to the temple which is also a

5    part of our community.

6    Q.   And what is the temple?

7    A.   It is Parashakthi Temple which is in Pontiac.

8    Q.   And what language is spoken at the temple?

9    A.   It's mostly Tamil.  Tamil is -- even the goddess for which

10   the temple was built, it is a Tamil goddess.

11   Q.   Is it fair to say that most of the conversations that --

12   that involve you and Prabhu --

13   A.   Yes.

14   Q.   -- are in Tamil?

15   A.   Yes.

16   Q.   Together do you speak English or do you speak Tamil?

17   A.   Mostly we'll speak Tamil.

18   Q.   Okay.

19   A.   Only during the sessions that I was telling you when we

20   were working together on the language, then that's when we

21   tried to talk in English.

22   Q.   Now, I want to talk about the events in this case, okay?

23   A.   Okay.

24   Q.   And you're very familiar with what's going on, right?

25   A.   Yes.

1    Q.   Okay.  You understand your husband is on trial?

2    A.   Yes.

3    Q.   Okay.  I want to talk about what you guys did before the

4    flight.  What were you doing, were you on vacation or

5    something?

6    A.   So we took around I think -- Detroit to Las Vegas, Las

7    Vegas to Seattle, Seattle to Las Vegas -- we took around four

8    flights in this total trip.

9    Q.   Okay.

10   A.   So which flight you would like me to talk?

11   Q.   Okay.  Well, what was the -- where -- let me ask you this.

12   Where were you going when you started the trip?

13   A.   So the starting off the trip was on -- was from Detroit to

14   Seattle.

15   Q.   Okay.  And what was going on in Seattle?

16   A.   So we were visiting one of Prabhu's friend and his family

17   who is living there in Seattle with kids.

18   Q.   And are these people who speak Tamil as well?

19   A.   Yeah, they -- they speak Tamil and also a different

20   language, so they mostly speak Tamil, yes.

21   Q.   So when you were there, what language were you speaking

22   with these people?

23   A.   Tamil only.

24   Q.   Okay.  And what was going on with Prabhu, anything as far

25   as his health?

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1739   Page 187 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

187

1    A.   No.  No.

2    Q.   Nothing was going on with him?

3    A.   When we were in Seattle is what you're asking?

4    Q.   Yes, when you were in Seattle.

5    A.   No, when we were visiting Seattle, nothing happened.

6    Q.   Okay.  Was he healthy at that point in time?

7    A.   Yeah, when we leave Seattle he was healthy.

8    Q.   Okay.  Where did you go from Seattle?

9    A.   So we stayed there for four days and we came back through

10   Las -- Las Vegas, yes.

11   Q.   Okay.  And why did you go to Las Vegas?

12   A.   Actually we planned a trip which included Seattle or Grand

13   Canyon, and so also the flight that offered that we got was

14   from Seattle to Nevada, then Nevada to Detroit.

15   Q.   Okay.

16   A.   So we took that offer from the Spirit Airlines and we

17   booked the flight and that's when we went to Nevada.

18   Q.   Okay.  Nevada is what you're saying?

19   A.   Yes.

20   Q.   Okay.  And how long were you in Las Vegas for?

21   A.   We were there for 30th, 31st, 1st and 2nd.  We were there

22   for four days.

23   Q.   And what did you do when you were there?

24   A.   Actually we didn't -- we couldn't do much.  So when we

25   were taking off from Seattle, Prabhu was not feeling well.

1  Q.   Okay.  Could you describe to the jury what you mean by he

2  wasn't feeling well?

3  A.   So we left Seattle on I think the 23rd of December, 2017.

4  We visited them actually for the Christmas Eve because they are

5  Christians from India and they wanted us to celebrate the

6  Christmas with them.  So we went there and we started

7  decorating their houses for the Christmas, and -- and on 24th

8  we visited the nearby church and we -- we baked foodstuffs and

9  we were so busy on the Christmas Eve, and the next day we got

10 the first snow in Seattle.

11 Q.   Okay.

12 A.   It's not the first snow for us but it's for them, so they

13 just came from India to U.S. so it's -- it's the first snow for

14 them.  So --

15 Q.   So what happened with the snow?

16 A.   They got excited and they -- they had kids who -- who

17 loves Prabhu a lot.

18 Q.   Well, well, let me stop you here.  Did -- did Prabhu --

19 was he outside in the snow?

20 A.   Yes.

21 Q.   Okay.  Did he -- because my original question was did

22 he -- you know, was he feeling well or feeling unwell and you

23 were telling this story.  As far as after him going out in the

24 snow, did he get sick eventually?

25 A.   Yes.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1741   Page 189 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

189

1   Q.   Okay.  And when did that -- when did those symptoms start

2   happening?

3   A.   Right after leaving Seattle.

4   Q.   Okay.  And what were his symptoms?

5   A.   Initially he started sneezing a lot, he had runny nose,

6   that's -- that's the symptom I noticed.

7   Q.   Did he have a fever?

8   A.   Not at that time, no.  Just runny nose, sore throat and

9   that's what he was telling.

10  Q.   Okay.  So when you were in Vegas, did you guys do

11  anything?

12  A.   No, that's -- that's the reason so we couldn't do

13  anything.  He -- when we landed in Las Vegas, he was pretty

14  tired already and he wanted to get some sleep, that's what he

15  told.

16  Q.   Okay.  And is that what he did?

17  A.   Yes.  We -- both of us needed a very good sleep so we went

18  to the hotel room and we slept.

19  Q.   Okay.  And do you drink alcohol?

20  A.   No.

21  Q.   To your knowledge, does Prabhu drink alcohol?

22  A.   Never, no.

23  Q.   Never?

24  A.   Never.

25  Q.   And so I take it you guys didn't go out and drink alcohol

1   in Las Vegas, right?

2   A.   No.

3   Q.   Okay.  Did you end up doing anything as far as the Grand

4   Canyon goes?

5   A.   Yes.  So we planned for the Grand Canyon trip from Nevada

6   on 1st January, but which we couldn't do.

7   Q.   Why couldn't you do it?

8   A.   Because he -- that's -- that's when he got his fever.  In

9   Nevada when he was resting in the hotel room, he got fever

10  already.

11  Q.   So he had a fever on January 1st?

12  A.   Yes.

13  Q.   Okay.  Did you guys go to the Grand Canyon?

14  A.   We couldn't because of that, and also there was another

15  reason that we couldn't get a cab, I mean a car, rental car.

16  Q.   Okay.  Were you eventually able to go to the Grand Canyon?

17  A.   Yes, we were -- we were able to, yes.

18  Q.   And when did that happen?

19  A.   That happened on 2nd January.

20  Q.   Okay.  Now, was this the -- the day that the flight was

21  leaving back to Detroit?

22  A.   Yes, you're right.

23  Q.   Okay.  So that day --

24  A.   Yeah.

25  Q.   -- did you travel to the Grand Canyon?

1   A.   Yes.

2   Q.   And how did you travel to the Grand Canyon?

3   A.   So on January 1st at the end of the day we were able to

4   get the rental car under Prabhu's name and we used that car for

5   our Grand Canyon trip.

6   Q.   Okay.  And how long was that drive to the Grand Canyon?

7   A.   We started around 5:00 a.m. and reached there around 10:00

8   a.m. I think, approximately.

9   Q.   Okay.  So at 5:00 a.m. --

10  A.   Yes.

11  Q.   -- were you both up?

12  A.   No.  We were up much earlier actually.

13  Q.   What time do you think you both woke up?

14  A.   I woke up around 3:30 and he woke up around 4:00, 4:30,

15  something like that.

16  Q.   Okay.  Who drove?

17  A.   Obviously he need -- he needed to because they did not

18  allow me to drive in the car rental.

19  Q.   Why did they not allow you to drive?

20  A.   I was under 25 and they -- they didn't allow me to drive

21  and they said just to my husband to drive.

22  Q.   Okay.  So Prabhu was the driver from Las Vegas to the

23  Grand Canyon?

24  A.   Yes.

25  Q.   How long did that trip take to drive?

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1744   Page 192 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

192

1    A.   It was around four hours, four or four and a half hours I

2    think.

3    Q.   Okay.

4    A.   But we took stop in between because he -- he needed some

5    rest.  So we took one hourlong gap for coffee and for our

6    breakfast.

7    Q.   Stopped to eat?

8    A.   Yes.

9    Q.   Okay.  Once you got to the Grand Canyon, how long did you

10   spend there?

11   A.   Pretty much the entire day.

12   Q.   What'd you do there?

13   A.   We -- we parked our car.  We couldn't use our car there so

14   we pretty much walked along the trails that they have.

15   Q.   How much walking did you guys do?

16   A.   All day actually, all day.

17   Q.   All day.  How many hours do you think that was?

18   A.   Then when we were starting back to the airport.

19   Q.   Do you remember what time you left the Grand Canyon?

20   A.   It was around 4:00 p.m. I think, 4:00 or 5:00 p.m.

21   Q.   Okay.  And who drove back to the airport?

22   A.   Prabhu.

23   Q.   Okay.  So it's fair to say that Prabhu had eight hours of

24   driving that day?

25   A.   Yes.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1745   Page 193 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

193

1  Q.   Now, where did you drive to when you drove back to Las
2  Vegas?
3  A.   We -- he drove back to the petrol station first to fill --
4           THE COURT REPORTER:  I'm sorry, I'm sorry, to the
5  what station?
6           THE WITNESS:  To the petrol station.
7           THE COURT REPORTER:  The petrol station.
8  A.   So then we went back and gave the car back to the rentals,
9  so we went to the rental office.
10  Q.   And where did you go after that?
11  A.   They shuttled us to the airport.
12  Q.   Okay.  And once at the airport, did you go on your flight?
13  A.   Actually we were one hour early I think because shuttle
14  dropped us one hour early in the airport.  He was sitting in
15  front of the gate.  I went out and looked for some shops that
16  were open to get some food for us but I couldn't find any
17  shops.  I came back and told Prabhu that I couldn't find any
18  shops, so...
19  Q.   Is it hard to find food that Prabhu can eat?
20  A.   Even -- even it applies for me, so it's really hard to
21  find food that we eat.
22  Q.   Okay.  What kind of food can you eat?
23  A.   We eat meatless and we prefer more vegan kind of thing,
24  so...
25  Q.   Throughout that day how -- from what you could see, how

1   was Prabhu feeling?

2   A.   The reason why I didn't take him to go and look for shops

3   was because his eyes were already red.  He couldn't -- he was

4   literally tired and I don't want him to roam around the airport

5   to find shops with me, so I went alone for finding the shops

6   and getting food.

7   Q.   What about his sickness, was he still sick?

8   A.   Yeah, he was -- he's still sick.

9   Q.   Okay.  And when you got back, were you able to find any

10  kind of food or anything for him?

11  A.   I was able to find some fries

12  Q.   Some french fries?

13  A.   Yes.

14  Q.   Did you split that with him?

15  A.   Yeah, he -- he didn't need it.  He couldn't eat because of

16  his throat being like he had.

17  Q.   Sore throat?

18  A.   Yeah.

19  Q.   Okay.  So did he eat much of anything at all that day?

20  A.   He preferred something to drink hot or warm.

21  Q.   What did you get for him?

22  A.   I was able to only get hot chocolate from the shops

23  nearby.  There was nothing else.

24  Q.   Okay.  Once the plane was ready, do you remember boarding

25  the plane?

1    A.   Yes, boarding process started and they had started to call

2    the seat numbers.

3    Q.   Okay.

4    A.   So we were called I think at last, last during the

5    boarding process.

6    Q.   You were the last ones called?

7    A.   Yeah, because our seats were pretty much in the back side

8    of the flight.

9    Q.   Okay.  And did you go to your seats?

10   A.   Yes.

11   Q.   Okay.  And when you sat down in your seats, was there

12   anybody else sitting down in your seat, in that row actually?

13   A.   No, no, no.

14   Q.   How many seats were in that row that you sat down?

15   A.   It was three.

16   Q.   Okay.  And so you and Prabhu sit down but nobody was in

17   the other seat?

18   A.   No.

19   Q.   Did you have any idea when you sat down who was going to

20   be in the other seat?

21   A.   No.

22   Q.   At some point or another did you encounter the person who

23   was going to sit in the other seat?

24   A.   Sorry?

25   Q.   Did any -- I'll strike that.

1          Did anybody else then sit in that other seat?

2    A.   No one was sitting in the other seat.

3    Q.   Okay.  At some point does somebody come to sit in the

4    other seat?

5    A.   Oh, sorry.  Yes.

6    Q.   Okay.  And --

7    A.   But you're asking did someone came and sat there?

8    Q.   Sure, yes.

9    A.   Yes.

10   Q.   Okay.  And was that after you had already sat down there?

11   A.   Yes.

12   Q.   Okay.  And where was that person's seat in relation to the

13   three seats?  You have an aisle seat, a middle seat and a

14   window seat.

15   A.   Yes.

16   Q.   What seat was theirs?

17   A.   The person was about to sit to the window seat.

18   Q.   Okay.  And when that person came up to you and Prabhu,

19   did -- did he or she say anything?

20   A.   I didn't really notice her coming towards us because I was

21   booking a cab on my mobile.

22   Q.   Okay.

23   A.   But I did saw her when she came close to us.  She was

24   standing next -- next to me because I was the one sitting in

25   the aisle.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1749   Page 197 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

197

1   Q.   Did she make any -- well, let me ask you this.  You said

2   you were doing a cab on your mobile?

3   A.   Yes.

4   Q.   What is that, you were on your cell phone?

5   A.   Oh, we -- we needed ride, right.  So once we reach

6   Detroit, we need someone to take us from Detroit airport to our

7   home, so I wanted to book a cab on my mobile.

8   Q.   Okay.  And so while you're doing that, that's when this --

9   she -- was she a female?

10  A.   Yes.

11  Q.   That's when she walks up and now wants to get into the

12  seat?

13  A.   Yes.  So she had --

14  Q.   Did she talk to you guys at all?

15  A.   No to me, but --

16  Q.   Okay.  Did she talk to Prabhu?

17  A.   Yeah.  She give her belongings to my husband and asked him

18  to keep it under her seat.

19  Q.   Okay.  Did he do that?

20  A.   Yeah, he did.

21  Q.   Okay.  Did she say anything else?

22        MS. SMITH:  Objection.  That calls for hearsay.

23        MR. AMBERG:  I can move on, Your Honor.

24        THE COURT:  Move on.

25        THE WITNESS:  No.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1750   Page 198 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

198

```
1    BY MR. AMBERG:

2    Q.   Okay.  So did she eventually sit in the seat?

3    A.   Yes.

4    Q.   Did she do anything else before sitting in the seat?

5    A.   She had another luggage with her which was a really big

6    one, and she was looking for some space to keep that luggage in

7    the -- in the upper storage area in the flights.

8    Q.   She was looking for a place to store her bigger luggage?

9    A.   Yes.

10   Q.   Did you see her put the luggage away anywhere?

11   A.   I didn't really notice but she -- she was looking for the

12   space for long, long time, and I think she went all the way to

13   the front of the flight to find some space and she came back.

14   Q.   Okay.  And then did she sit in the seat?

15   A.   Yes.  I -- I stood and moved and Prabhu stood up and gave

16   her the space to go in, yes.

17   Q.   Okay.  Without telling me what she said, at that point

18   before the plane took off, did -- did you have any conversation

19   at all with her?

20   A.   No.

21   Q.   Okay.  Were you talking to Prabhu?

22   A.   Yes, I was telling him about the --

23            MS. SMITH:  Objection.

24   BY MR. AMBERG:

25   Q.   Without telling --
```

```
 1              MS. SMITH:  That would be hearsay.

 2              MR. AMBERG:  I agree.

 3    BY MR. AMBERG:

 4    Q.  Without telling me what was said, my question was were

 5    you -- you don't have to tell us what -- what was said.  Were

 6    you talking to Prabhu?

 7    A.  Yes, I was.

 8    Q.  Okay.  And he was talking to you?

 9    A.  Yes, he was.

10    Q.  Did you notice before the plane took off what the -- the

11    female sitting in the window seat was doing, if anything?

12    A.  I remember seeing her when I was talking to my husband,

13    she was putting her headsets on and she was listening to music

14    and typing something on her mobile, that's what I can

15    recollect.

16    Q.  Okay.  And once the plane took off, what -- what was going

17    on with you, what did you do after the plane got airborne?

18    A.  So when plane was taking off, I was just having my own

19    headsets, I use that as my buds because I -- I feel some -- I

20    feel some pain when a flight is taking off so I use that as

21    buds.

22    Q.  Okay.  Once the plane was airborne, what -- what was

23    Prabhu doing?

24    A.  He was getting ready to sleep.

25    Q.  Okay.  And did you see him sleep?
```

1   A.   Yeah, he was about to sleep, yes.

2   Q.   Okay.  And was this in the beginning of the flight?

3   A.   Yes.

4   Q.   Okay.  And did he go to sleep?

5   A.   Yeah, he did, but I didn't -- so I -- I was pretty sure he

6   slept before I go to sleep, so...

7   Q.   Okay.  You made -- you waited until he went to sleep

8   before you went to sleep?

9   A.   I didn't wait intentionally but I did not sleep until he

10  went to sleep.

11  Q.   Okay.

12  A.   Because he was sleeping on my shoulders, so...

13  Q.   Okay.  And did -- when he was sleeping on your shoulder at

14  that point, did it look like he was in a deep sleep?

15  A.   Yeah.

16  Q.   Okay.  What about the passenger sitting next to him, what

17  was she doing, if anything?

18  A.   I don't know.  I didn't -- I didn't really see.

19  Q.   Okay.  You didn't recognize anything or nothing out of the

20  ordinary?

21  A.   No.

22  Q.   Okay.  Did you eventually then go to sleep?

23  A.   Yeah, even truly I did, but I don't know when I did but I

24  did sleep at that point of time.

25  Q.   Okay.  Did you sleep the entire flight or did anything

1   wake you up?

2   A.   Oh, there were a lot of distractions.

3   Q.   Okay.  Well, let me -- let me ask you first.  What was the

4   first disruption that woke you up?

5   A.   Prabhu.

6   Q.   Okay.

7   A.   Not for him but the person who was sitting next to him,

8   she wanted to go out.

9   Q.   Okay.

10  A.   So that's -- that's the first time I woke up.

11  Q.   Okay.  Do you know how long into the flight that was?

12  A.   I couldn't say so specific.  It should be at least an

13  hour.

14  Q.   Okay.  And did you let the person go through?

15  A.   Yeah.

16  Q.   Okay.  Do you remember how long she was gone for?

17  A.   No.

18  Q.   Do you know what she was doing?

19  A.   No.

20  Q.   Okay.  Do you remember her coming back in?

21  A.   Yes.

22  Q.   Okay.  And I guess maybe a better question is did she come

23  back?

24  A.   Yeah.  Yeah.

25  Q.   And did she go sit back down in her seat?

1    A.   Yes.

2    Q.   Okay.  After that happened, did you see Prabhu go back to

3    sleep?

4    A.   He was already sleep, he didn't wake up.

5    Q.   He was already sleeping?

6    A.   Yeah.

7    Q.   Okay.  And did you go back to sleep at that point?

8    A.   I was trying to actually.

9    Q.   Okay.  And did -- did you have any interruptions after

10   that?

11   A.   Yes.  My -- I started to feel cold because of the

12   temperature that was in the flight.

13   Q.   Okay.

14   A.   Because I also had my shoes out, off my leg.

15   Q.   Okay.

16   A.   So I really felt cold and I wanted to put on my shoes and

17   that's when I opened my eyes.

18   Q.   You did -- I'm sorry, I didn't hear that?

19   A.   That's when I again woke up.

20   Q.   Okay.  When you woke up at that point, did you see Prabhu?

21   A.   Yeah, I did see him.

22   Q.   What was he doing?

23   A.   He was sleeping.  When he was sleeping, I was able to see

24   his legs right against his front seat.

25   Q.   Okay.  What about the -- the lady sitting next to him,

1   could you recognize anything with her at that point in time?

2   A.   During that time, that's when I saw her leaning towards my

3   husband's right knee.

4   Q.   What do you mean by leaning towards his right knee?

5   A.   When I was seeing -- so my -- my husband was keeping his

6   legs towards his front seat like this.

7   Q.   Okay.

8   A.   And the girl next -- sitting next to him, her head was

9   like -- it was like this, I don't know, by --

10  Q.   On -- was it on his knee?

11  A.   Yeah, on his right knees.

12  Q.   When you saw that, did you -- I mean what did you think

13  about that when you saw that?

14  A.   I thought she -- she's -- by sleeping she had fallen on my

15  husband's knee, and I tried to wake my husband and say that,

16  you know, she is sleeping on your knee.

17  Q.   Okay.  So you tried to wake Prabhu up?

18  A.   Yes.

19  Q.   Okay.  Did you wake Prabhu up?

20  A.   No, but instead she -- she woke up.

21  Q.   Okay.

22  A.   And she went back to her seat.

23  Q.   Oh.  So she was on his knee and then got -- she didn't

24  leave, she just went to lean back in the seat?

25  A.   Yeah, she said -- she just leaned back to her seat when I

1   was trying to wake Prabhu up.

2   Q.   Okay.

3   A.   So nothing -- so I -- I left it alone.

4   Q.   Okay.  And let me ask you this.  Is this a pretty tight

5   area, this -- these three seats?

6   A.   Yes.

7   Q.   Okay.  Being in such close quarters to people you don't

8   know, is that something that you're used to when you're

9   traveling?

10  A.   Oh, yes.

11  Q.   Why?

12  A.   In India, everyone -- like if you travel for long

13  distances, people even sleep on our shoulders, so...

14  Q.   So that didn't -- did that bother you when you saw her

15  sleeping on his knee?

16  A.   No.  She was sleeping.  If she was -- if she was awake,

17  she wouldn't have leaned on my husband's knee.

18  Q.   All right.

19  A.   So...

20  Q.   Okay.  So after that incident, did you then go back to

21  sleep?

22  A.   After that, I was going back, I was trying to sleep again

23  but there was a turbulence.

24  Q.   Okay.

25  A.   Which -- which --

1  Q.   Well, could you describe to the jury the turbulence?

2  A.   Okay.  So we had around six flights in total in this trip

3  during which I never experienced turbulence, which is like

4  flight is getting disturbed by the air or the wind or I don't

5  know how -- how it is happening.

6  Q.   Okay.

7  A.   But it was pretty heavy shake.

8  Q.   Well, how did that make you feel when that happened?

9  A.   I was literally afraid.  I thought something was going to

10  happen, and you know, I was -- was really afraid.

11  Q.   Okay.  Did that scare you?

12  A.   Yes, for a bit.

13  Q.   Okay.  So after that point did you ever fall back asleep

14  again?

15  A.   No.  I couldn't actually.

16  Q.   Okay.  What about Prabhu, what happened when the

17  turbulence hit, what was he doing?

18  A.   He was not aware of the turbulence.  He didn't --

19  Q.   Well, how did you know he wasn't aware?

20  A.   I turned back to him and he was sleeping still.

21  Q.   Okay.

22  A.   And then pilot spoke in -- from the flight.  He was

23  talking about the turbulence and he was -- he was assuring us

24  that nothing is -- nothing bad is happening, it's just -- it's

25  just the wind or the weather, please fasten your seatbelts.

1   Q.   Okay.  So did you fasten your seatbelt?

2   A.   Yes.  The seatbelt sign came on so I fastened mine and I

3   also fastened Prabhu's.

4   Q.   Okay.  So you fastened his as well?

5   A.   Yes.

6   Q.   Okay.  After that did -- did -- with the -- did you notice

7   anything with the lady sitting next to Prabhu?

8   A.   When I was buckling his seatbelt, that's when I saw her

9   awake.

10   Q.   Okay.

11   A.   So I thought even she got awake because of the turbulence.

12   Q.   Okay.  And what was she doing?

13   A.   I was able to see her awake because she had a -- her phone

14   on her -- her hand actually while -- and she was doing

15   something.  I couldn't see what she was doing.  She had a phone

16   on her hand.

17   Q.   Okay.  So after that, anything eventful happen in the

18   seat?

19   A.   Sorry?

20   Q.   After that, after the turbulence happens and you -- you

21   put the seatbelt on Prabhu, anything happen after that of

22   interest?

23   A.   So then I -- I went back to my seat after fastening his

24   seatbelt and I couldn't sleep as I was telling you.  Then it

25   should be around 30 minutes or so, the person who was sitting

1    next to Prabhu stood up and asked for to leave.

2    Q.   Okay.  And when referring to her, this person as the

3    person sitting next to Prabhu --

4    A.   Yes.

5    Q.   -- do you know this person's name?

6    A.   No.

7    Q.   Okay.  And so what happens with her?

8    A.   She stood up, so I woke up Prabhu asking him to give her

9    space to leave out.  So then I came out of the seat and he gave

10   the space for her to come out of the seat.

11   Q.   Okay.  And then did she come back to the seat after that?

12   A.   Yeah -- I think the last time, no, she did not.

13   Q.   Okay.  Where did she go?

14   A.   I don't know.  She went back, I think she went for the

15   restroom.

16   Q.   Okay.

17   A.   And she didn't come back after that.

18   Q.   Okay.  Did you ever get up after that?

19   A.   After that, I did woke up for -- for going to restroom.

20   Q.   Okay.

21   A.   So that's when I went back.  I stood up and I went back to

22   the restroom to use the restrooms.

23   Q.   Okay.  So you went to the back of the plane?

24   A.   Yeah, to use my -- to use the restrooms.

25   Q.   Did you see the -- the lady that was sitting next to

1   Prabhu back there?

2   A.   No, not that time I didn't see her, but when I was sitting

3   in my seat, I turned back to see is anyone waiting outside the

4   restroom.  If someone is in queue, then there -- there's no

5   need for me to go and stand in the queue.  So when I was

6   standing back to see someone in the line for the restroom, I

7   couldn't see anyone and that's when I saw her talking to the

8   air hostess.

9   Q.   Okay.  Did anybody approach you at that point and talk to

10  you?

11  A.   No.

12  Q.   Okay.  Did anybody tell you to go back into your seat?

13  A.   Sorry?

14  Q.   Did anybody tell you to go back into your seat at that

15  point?

16  A.   When I was going back?

17  Q.   Yes.

18  A.   Yes.

19  Q.   Okay.

20  A.   Air hostess --

21  Q.   Who told you that?

22  A.   Air hostess did.

23  Q.   Okay.  Were you able to go to the bathroom then?

24  A.   No, they didn't allow me.

25  Q.   They did not allow you to go to the bathroom?

```
1   A.   Yeah.

2   Q.   Did they tell you to go back to your seat?

3   A.   Yes.

4   Q.   Did they say why?

5   A.   No.

6   Q.   What do you think?

7   A.   I thought it might be time for the landing so they're not

8   allowing me to use the restroom because during landing they

9   won't allow us to use the restrooms.

10  Q.   Okay.  And so at some point or another did you speak with

11  any other -- any other flight attendants?

12  A.   Yes.

13  Q.   Okay.

14  A.   So I went back to my seat after the air hostess instructed

15  me to go back to my seat.  Then pilot announced that we will be

16  landing in -- in few minutes.  So instead of us waking up when

17  the person -- till then the person next to my husband was not

18  coming back to her seat.  So what I thought was let's move to

19  the window seat so whenever she comes, she can take the aisle

20  seat and sit -- sit there.

21  Q.   Okay.  And did you explain this to the flight attendant?

22  A.   I -- I explained that to flight attendant and --

23  Q.   Was that a man or a woman flight attendant?

24  A.   A male.

25  Q.   A male?
```

1   A.   Yes.

2   Q.   Okay.  And what did they do in response to that, without

3   telling me what was said?

4   A.   No, they didn't ask -- they didn't tell me anything.  They

5   just collected her belongings and he went.

6   Q.   Okay.  Did anybody ever sit next to you guys in that same

7   aisle afterwards?

8   A.   Oh, it was very last few minutes before the landing

9   proceedings, a person from I think -- a different person came

10  and sat next to me.

11  Q.   Next to you?

12  A.   Because Prabhu moved to window seat, I moved to aisle

13  seat, and there was a different person coming and sitting next

14  to me.

15  Q.   Okay.  And at that point in time did -- did you ever see

16  Prabhu go up and go to the bathroom?

17  A.   No.

18  Q.   Okay.  Did you think anything was wrong at that point in

19  time?

20  A.   No.

21  Q.   Okay.  Everything seemed normal when the plane landed?

22  A.   Yes.

23  Q.   Okay.  Did something strange happen though the way that

24  they asked people to get off the plane?

25  A.   That is when the flight landed and it was taxiing and

Case 2:18-cr-20027-TGB-MKM ECF No. 85 filed 03/05/19 PageID.1763 Page 211 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

211

1    that's when pilot announced that no one should be leaving the

2    flight.

3    Q.   Okay.

4    A.   And someone is coming in to check or I don't know what

5    exactly they were telling, but they asked not to leave the

6    flight.

7    Q.   Okay.  Did anybody make contact with you or Prabhu?

8    A.   After landing of -- we approach the gate, the flight

9    approached the gate and it stood, no one was -- no one was

10   standing, the -- I think the main flight attendant came inside.

11   Everyone around us were peeking, peeking and seeing what is

12   happening.

13   Q.   Okay.

14   A.   So I saw -- even I intended to see what is happening.  The

15   male flight attendant came and took someone outside the flight.

16   Q.   Okay.  Did you see who that person was?

17   A.   It was like the person who was sitting next to my husband.

18   Q.   Okay.  But could you tell for sure at that point?

19   A.   No.

20   Q.   Okay.  What happened next?

21   A.   Then the same person came towards our seat and he asked my

22   husband to come along with him.

23   Q.   Okay.  How did that make you feel?

24   A.   I really had no clue even, we both of us had no clue.  So

25   we were seeing each other for a minute and he insisted, "Sir,

1    you should be coming along with us now."  So he just stood and

2    went out with the person.

3    Q.   Okay.  And then how did you get off the plane?

4    A.   Again, he came back and asked me to come along with him

5    and he said I can take all my belongings.  So I got my luggage

6    and his luggage and I went outside the gate.

7    Q.   Okay.  And was everybody else in the plane still sitting

8    down when you were escorted --

9    A.   Yes.

10   Q.   -- off the plane?

11   A.   Yes, yes.  They were sitting down in the flight when I was

12   going out.

13   Q.   Okay.  And where were you taken to?

14   A.   I was not taken to anywhere, just in the front of the gate

15   in the airport, that's where I was -- I was taken to.

16   Q.   And could you see Prabhu?

17   A.   Yes, I was able to see Prabhu in the long distance, yes.

18   Q.   Okay.  And were -- did you see police officers at that

19   point?

20   A.   Yeah, a lot of police officers were there, yes.

21   Q.   Did you see them talking to Prabhu?

22   A.   Yeah.

23   Q.   What about the -- the lady who was in the aisle with you,

24   did you see her?

25   A.   Yes.  Surprisingly I saw her too talking with the

```
1    officers, yes.
2    Q.   Okay.  Were you scared at that time?
3    A.   Yes.
4    Q.   Okay.  Why were you scared?
5    A.   Because there were around 50 passengers would have
6    traveled in that flight.  No officers were talking to any of
7    the passengers except me and my husband.  That -- that made me
8    a little afraid.
9    Q.   Okay.  And did you try to talk to the officers that were
10   there without telling me what was being said?
11   A.   No, I was trying to ask them first what is happening.
12   Q.   Okay.
13   A.   No one was ready to tell me.  And then I wanted to tell
14   something.  So first I was trying to understand what is
15   happening.  I couldn't get any answers.
16   Q.   Did you know what was happening?
17   A.   No.
18   Q.   Okay.  Were you aware at that point of these allegations
19   that were against your husband?
20   A.   Not so sure, no.
21   Q.   Okay.  Was it later on when agents told you what the
22   accusations were?
23   A.   Yes, in police department, yes.
24   Q.   And the -- at the police station?
25   A.   Yes.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1766   Page 214 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

214

1    Q.   Okay.  I'm going to ask you a couple questions about that,

2    okay?  You know what your husband is accused of doing, or do

3    you know what your husband is accused of doing?

4    A.   Now?

5    Q.   Now.

6    A.   Yes.

7    Q.   Okay.  You -- as you sit here today in the seat, you know

8    what he's accused of doing?

9    A.   Yes.

10   Q.   Okay.  Did you ever see Prabhu touch the lady sitting next

11   to him in any sexual way?

12   A.   No.

13   Q.   I want to ask you this and I want you to tell the jury.

14   If you would have seen him do that, what would you have done to

15   him?

16        MS. SMITH:  Objection.  That calls for spec --

17   A.   I would --

18        MS. SMITH:  Excuse me.  Objection.  That calls for

19   speculation.

20        MR. AMBERG:  I think she could answer that, Your

21   Honor.

22        THE COURT:  Overruled.

23   BY MR. AMBERG:

24   Q.   I'll ask that again.  If you saw Prabhu touch this girl

25   sexually, what would you have done?

1    A.   I would have stood up and slapped right on his face.

2    Q.   Are you here to protect your husband?

3    A.   No.

4    Q.   You never saw him do any of that stuff?

5    A.   No.

6    Q.   Did you ever see your husband unbutton the lady's bra?

7    A.   Might be inappropriate but he doesn't know to do it.

8    Q.   Doesn't know what?

9    A.   No, he didn't do it.

10   Q.   How do you know?

11   A.   Because I know that -- yes, I know.

12   Q.   Okay.  Did you ever see him touch her private area?

13   A.   No.

14   Q.   Were you shocked when you heard what the allegations were?

15   A.   Yes.

16   Q.   Did you and Prabhu conspire while you were on the airplane

17   and come up with an elaborate story to try to get him out of

18   trouble?

19   A.   Conspire means?

20   Q.   Did you guys discuss some sort of story together?

21   A.   No.

22   Q.   Okay.

23   A.   We -- we -- we didn't talk.  I didn't meet -- I -- I

24   didn't get chance to talk to him once I came out of the flight.

25   He was taken away from me at that point of time.  We were

1    separated for 40 days.  We didn't talk.

2    Q.   Okay.

3              MR. AMBERG:  If I could have just one second, Your

4    Honor.

5              (Brief pause)

6              MR. AMBERG:  Thank you very much, Your Honor.  Thank

7    you.

8              THE COURT:  Any cross-examination?

9              MS. SMITH:  Yes.  Thank you.

10                          CROSS-EXAMINATION

11   BY MS. SMITH:

12   Q.   Good afternoon.

13   A.   Good afternoon.

14   Q.   My name is Maggie Smith.  I'm an Assistant United States

15   Attorney.  I think you've probably seen me before but we've

16   never actually met, have we?

17   A.   No.

18   Q.   So I have a few questions that I want to ask you, and you

19   are under oath so your job is to tell the truth and answer

20   these questions to the best of your ability, okay?

21   A.   Sure.

22   Q.   How old are you?

23   A.   I'm 25.

24   Q.   How old is your husband?

25   A.   He's 33.

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1769   Page 217 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

217

1    Q.    So he's a few years older than you?

2    A.    Yeah.

3    Q.    What -- did you have an arranged marriage?

4    A.    No.

5    Q.    So the two of you met and fell in love and you got

6    married?

7    A.    Yes.

8    Q.    Your parents didn't help you get married?

9    A.    No, they did.

10   Q.    I'm sorry?

11   A.    They did.

12   Q.    They did?

13   A.    Yes.  They agreed to our love and they -- they helped us

14   get married, yeah.

15   Q.    Do you have an education?

16   A.    Yes.

17   Q.    Where did you go to school?

18   A.    I went to school in India.

19   Q.    And what type of education did you receive?

20   A.    It's the bachelor's degree, they -- we call it as

21   bachelor's degree.

22   Q.    A bachelor's degree?

23   A.    Bachelor's degree in information technology, yes.

24   Q.    What was the subject area of your bachelor's degree?

25   A.    Information technology.

1    Q.   Is that like computers?

2    A.   Yes.

3    Q.   Your husband has a degree too?

4    A.   Yes.

5    Q.   Is it a bachelor's degree?

6    A.   Yes.

7    Q.   Is it also in computers?

8    A.   Yes.

9    Q.   You work here in the United States?

10   A.   Yes, I do.

11   Q.   And while you and your husband you testified talk to each

12   other in your native language, you speak English to other

13   people, right?

14   A.   So you're asking me whether we speak in Tamil or in

15   English with other people?

16   Q.   Do you speak English with other people?

17   A.   Yes, I -- I do.

18   Q.   Right, because you and I are speaking in English, right?

19   A.   Yes.

20   Q.   Okay.  And I think you said sometimes your husband can

21   communicate in English, right?

22   A.   Can or cannot?

23   Q.   He can.

24   A.   Yes.

25   Q.   And sometimes if he can't say what he wants to say, will

1    he sometimes use hand gestures to get his word across?

2    A.   Even though he wouldn't get it right using gestures, he

3    wouldn't -- he will not be able to make the signs where he's

4    trying to say.

5    Q.   Okay.  Let me give you an example.  If he wanted to ask

6    for something to drink and the -- and he didn't know the word

7    for the type of drink, if he gestured like this making a cup

8    and going back into his mouth, would that be something your

9    husband would be able to do to communicate to other people what

10   he means?

11   A.   Probably.

12   Q.   So you testified about your trip right around New Year's

13   2017 into 2018, and you said that your husband was sick?

14   A.   Yes.

15   Q.   And he had a runny nose?

16   A.   And a fever, yes.

17   Q.   And a fever?

18   A.   Yes.

19   Q.   Okay.  And you treated that by giving him a Tylenol, is

20   that right?

21   A.   Yes.

22   Q.   Okay.  So one Tylenol tablet?

23   A.   No.  On 30th night I took -- I gave -- that's when I

24   purchased Tylenol from Walgreen's from the Flamingo Road in

25   Nevada.  So on that day I gave him two, on 31st morning I gave

1   him two, 31st night I gave him two.  So till the very last time

2   I was giving him the same tablet.

3   Q.   So you're giving him two Tylenols that you bought at

4   Walgreen's?

5   A.   Yes.

6   Q.   Per day?

7   A.   Per -- that night I gave two, the next day I gave two in

8   the morning, two in the night, and on the 1st January I gave

9   two in the morning, two in the night.

10  Q.   I'm sorry, did you say he was 33 years old, your husband

11  is 33?

12  A.   Yes.  Should be now 34; it's July past, so...

13  Q.   Oh, he's 34 now?

14  A.   Yes.

15  Q.   Okay.

16  A.   He -- he has -- he had his birth -- birthday recently.  I

17  missed that.

18  Q.   Okay.  He's 34?

19  A.   Yeah.

20  Q.   Got it.  Okay.

21       So during this flight that you took from Las Vegas to

22  Detroit, you said that you had put some headphones in your

23  ears, is that right?

24  A.   Yes.

25  Q.   And you saw that the girl that was sitting on the window

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1773   Page 221 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

221

1   had headphones in her ears too, right?

2   A.   Yes.

3   Q.   Okay.  Did you testify that you were awake?  Sorry, you

4   testified that you had slept some on that flight?  Just now

5   when Mr. Amberg was asking you questions --

6   A.   Yeah.

7   Q.   -- I think I heard you say that you slept some time on the

8   flight?

9   A.   During the first part of the flight, yes.

10  Q.   Okay.  So do you remember making a statement to the police

11  in the airport terminal that day?

12  A.   Airport terminal, yes.

13  Q.   Yes.  Do you remember telling them that you were awake the

14  entire time?

15  A.   Not the entire time.

16  Q.   Do you remember -- you don't remember making that

17  statement?

18  A.   No.

19  Q.   When you were on that flight were you wearing a winter

20  coat?

21  A.   Yes, I was.

22  Q.   What color was that coat?

23  A.   Black.

24  Q.   And was your husband wearing a coat?

25  A.   Yes.

1    Q.   What color was his coat?

2    A.   Black.

3    Q.   And how did he have his coat during the flight?

4    A.   We both used to use that as a blanket for ourselves so

5    we -- we were having our coat on ourselves.

6    Q.   When you have your coat on yourself, do you have it with

7    the opening in the front or do you turn it around to help cover

8    the -- your entire body?

9    A.   We'll cover entire -- the entire body.

10   Q.   Okay.  So as your husband's sleeping, he's -- he turned

11   his coat around to cover his body with that black jacket?

12   A.   Even -- yes.  That's how I was also sleeping, yes.

13   Q.   Did you see the girl on the window's blanket?

14   A.   Yeah.  She brought -- brought her -- she brought the

15   blanket with her when she was coming inside.

16   Q.   So you saw that blanket?

17   A.   Yes, I saw.

18   Q.   And I think you testified that you saw that she was

19   sleeping?

20   A.   She was sleeping?

21   Q.   On the flight, that the girl on the window had slept on

22   the flight?

23   A.   Sorry, I don't recollect.  Can you please help me?

24   Q.   Okay.  Was the girl that was on the window seat next to

25   your husband sleeping during that flight?

1    A.   I don't really notice that her sleeping.

2    Q.   Okay.  How about when she is leaning over on your husband,

3    is she sleeping at that point?

4    A.   I couldn't see her face at that time.

5    Q.   Okay.  So you see this girl on your husband and you don't

6    know if she's sleeping or not?

7    A.   No, because I was telling earlier, so her head was like

8    this and her face was facing the window.

9    Q.   Okay.

10   A.   So...

11   Q.   You didn't call the flight attendant?

12   A.   No.

13   Q.   And I think you testified that you had to tell your

14   husband that he -- that she was on his lap, is that right?

15   A.   Yes.

16   Q.   And did you, in fact, warn him to be careful?

17   A.   No.

18   Q.   Okay.  Do you remember giving a statement in the airport

19   terminal?

20   A.   Yes.  I gave the statement like I tried to wake him up.

21   Q.   Okay.  Do you remember telling the officers that you told

22   your husband to, quote, "be careful"?

23   A.   Yes.  That was after he -- he woke up, we -- we were

24   talking about it.

25   Q.   Okay.  So after the woman left the seat for the last time

1   and you never saw her again come -- you didn't see her come

2   back, right, you and your husband were left sitting together

3   before the flight landed, right?

4   A.   Yes.  Yes.

5   Q.   Did you have -- don't tell me what you said, but would --

6   did you have an opportunity to converse, to talk with each

7   other during that time?

8   A.   Yes.

9   Q.   Okay.  And did he tell you anything about what might have

10   happened?

11   A.   And that's when I told him about her leaning towards his

12   knee.

13   Q.   Okay.  And so you did talk about the incident while you

14   were on the plane together?

15   A.   No, not -- when you say incident I don't really understand

16   what you're trying to --

17   Q.   Okay.  I'm just trying to ask the questions, I'm not

18   trying to trick you.

19        So when you and your husband are on the plane

20   together after the woman on the window left --

21   A.   Yes.

22   Q.   -- there is a period of time where the two of you can talk

23   to each other, right?

24   A.   Yes.

25   Q.   Okay.  And did -- did he say anything to you about his

1    interaction with this girl?

2    A.   No, no.  I was the one initiated the conversation about

3    the turbulence and everything.

4    Q.   Okay.

5    A.   And I was also telling him how deep he was asleep without

6    knowing the girl was, you know, on his knees.  I was just

7    pulling him on for that.

8    Q.   Once you were in the terminal, I think you testified that

9    you could see your husband kind of across the -- across the way

10   being spoken to by the police?

11   A.   Yeah.  He was standing across the gate.

12   Q.   Maybe -- maybe almost the distance from me to you, does

13   that sound about right?

14   A.   No, it's far.

15   Q.   You think it was further?

16   A.   It -- the corridor was -- it was huge.

17   Q.   It was huge?

18   A.   Yeah.

19   Q.   Okay.  How far apart do you think you were?

20   A.   From here to the front door, that was the distance.

21   Q.   That's pretty far.

22   A.   Yeah.

23   Q.   Okay.

24        MS. SMITH:  May I approach the witness?

25        THE COURT:  You may.

1          MS. SMITH:  Thank you.  I'm going to show defense

2    counsel a couple of screen shots here from the body cam.

3    BY MS. SMITH:

4    Q.   Okay.  So I'm going to show you some screen shots of that

5    day.

6    A.   Okay.

7    Q.   Okay?  And they're in sequential order here.  So there's

8    four pictures, there's four pictures here, okay, and the first

9    one shows your husband.  Do you see him standing there?

10   A.   Yeah, this is my husband.

11   Q.   And do you see --

12          THE COURT:  Are these marked?

13          MS. SMITH:  They -- they are not, but I will mark

14   them as Government's Exhibit 23.

15   BY MS. SMITH:

16   Q.   Okay.  And for the record, so -- so do you recognize these

17   pictures?

18   A.   It is from the airport.

19   Q.   From the airport, right.

20   A.   Yes.

21   Q.   Okay.  And do you see your husband in these pictures?

22   A.   Yeah, I see him here.

23   Q.   Okay.

24   A.   See him here.

25   Q.   Okay.  And then do you see -- do you see yourself in this

1   second set of pictures?  You might have to take a close look.

2   A.   This is me.

3   Q.   That's right.  Okay.  Okay.

4        And so do you see in the first picture there's a

5   picture of your husband with a National Coney Island sign?

6   A.   Yes.

7   Q.   Okay.  And the second picture shows kind of the -- the

8   terminal hallway, does that sound right?

9   A.   Yes.

10   Q.   And then the third picture shows that same terminal

11   hallway.  Do you see how the gate numbers are the same?

12   A.   Yes.  Yes.

13   Q.   And then you are standing right by that gate number, does

14   that sound right?

15   A.   Yes.

16   Q.   Okay.  So does it look like from these pictures that maybe

17   you're just a hallway apart from each other?

18   A.   Yes.

19   Q.   Maybe that's just a little bit closer than from here to

20   all the way over there?

21   A.   No, it was similar to that distance.

22   Q.   And during that -- when you talked to the police in the

23   terminal there, you didn't -- you could see your husband,

24   right?

25   A.   Yeah, I was able to see him.

1    Q.   And you never told the police he doesn't speak English,

2    did you?

3    A.   No.

4    Q.   No.  You didn't say, "Hey, he needs a translator, he's

5    only going to understand 60 percent of what you're saying," you

6    never said that, did you?

7    A.   No, but I was trying to ask him a word -- a word -- a word

8    that claims that they were making.

9    Q.   Now, you know a lot about this case, right?  Well, it's

10   your husband, right, who's on trial here?

11   A.   Yes.

12   Q.   And you have not been in the courtroom every day?

13   A.   No.

14   Q.   But have you talked to your husband about the case?

15   A.   No, I'm not allowed to speak --

16   Q.   Okay.

17   A.   -- about this case with my husband.  All I was telling him

18   is to be strong and we will get over this, this is some hard

19   times in our life.

20   Q.   Okay.  How about -- how about before the trial, did you

21   have conversations with your husband about this case before the

22   trial?

23   A.   We -- when he was in custody, I got to speak with him over

24   the phone.

25   Q.   Okay.  So the question is, and you can answer yes or no,

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1781   Page 229 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

229

1    before this trial, did you talk about the case with your

2    husband?

3    A.    No.

4    Q.    You never talked about this case with your husband?

5    A.    No.

6    Q.    Okay.  Did you talk to your husband's attorney about this

7    case?

8    A.    No.  I -- I was asking him what I should be doing for this

9    case, that's all I would talk to Jim.  So most of the time Jim

10   and Prabhu will be talking about this case.

11   Q.    Have you read the documents in this case?

12   A.    No.

13   Q.    You don't remember a conversation with your husband where

14   you told him you've read the documents in the case?

15   A.    When you say documents, does it include the -- what --

16   what you call the first copy that was given to me by Richard

17   O'Neill, the attorney who got assigned by the government for my

18   husband?

19   Q.    I'm talking about the reports from the case, the police

20   reports.  Have you seen the police reports in the case?

21   A.    Oh, no, no.

22   Q.    Have you reviewed the transcript of your husband's

23   interview with FBI?

24   A.    No.

25   Q.    You've never reviewed that?

```
1    A.   No.
2    Q.   Do you remember talking to your husband about that
3    transcript over the phone?
4    A.   No.
5    Q.   So you sit here today, your testimony under oath is that
6    you've never had a discussion with your husband about this
7    case?
8    A.   This case, yes.
9    Q.   Okay.  I'm going to direct your attention to a phone call
10   that you had with your husband on the 19th of January 2018.
11   A.   Mm-hmm.
12   Q.   Do you remember having a conversation with him about the
13   DNA test in this case?
14   A.   About DNA test results?
15   Q.   Yes or no, do you remember having a conversation about a
16   DNA test with your husband?
17   A.   We might have talked about -- not specific to this DNA
18   analysis, but in general.
19   Q.   In fact, did you not say to him that the DNA test, quote,
20   "That is not a positive for us," do you remember saying that?
21   A.   No.
22   Q.   Do you remember saying, quote, "We need to try to prove
23   differently," do you remember saying that to him?
24   A.   I'm -- I'm not so sure.  It's very generic statement.
25   Q.   Okay.  Do you remember saying to him about the DNA, quote,
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1783   Page 231 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

231

1    "That is a big problem actually," do you remember that?

2    A.   I don't remember.

3    Q.   How about talking to him about helping him to make up the

4    story about him not understanding the FBI interview, do you

5    remember having a phone conversation with your husband about

6    that?

7    A.   What is the question?

8    Q.   Do you remember talking to your husband about making up a

9    story that your husband didn't understand the FBI during his

10   interview?

11   A.   Making up story?

12   Q.   Do you remember having a conversation about that with him?

13   A.   No.

14   Q.   Okay.  This would have been in January.  Do you remember

15   saying, quote, "Whatever you gave that day, that cannot be

16   changed.  I have read all the pages.  What we should do now is

17   explain the meaning of what you said that day."  Do you

18   remember saying that?

19            MR. AMBERG:  Your Honor --

20   A.   Yes.

21            MS. SMITH:  Excuse me.

22            MR. AMBERG:  Could we approach briefly?

23            MS. SMITH:  Sure.

24            THE COURT:  You may.

25            (Side-bar discussion as follows):

```
 1              THE COURT:  All right.  Do you have an objection?
 2              MR. AMBERG:  Yeah.  Well, yeah, Judge.  I mean
 3     it's -- what's happening is is that I assume that the witness
 4     is being impeached with jail calls.  And I've been provided a
 5     copy of a translation by a service that the government used to
 6     translate these jail calls, but I do have an issue with them
 7     being used like this 'cuz I'm not sure that's exactly what it
 8     said on this translation, so...
 9              MS. SMITH:  Okay.  We used the same translator for
10     the jail calls, didn't we --
11              MS. JAWAD:  No.
12              MS. SMITH:  -- as the -- okay.  Here's -- here's my
13     answer.  First of all, she just answered she remembered saying
14     what I asked her.  So that's -- that's one.
15              MR. AMBERG:  That's the first thing.
16              MS. SMITH:  Secondly, we provided these transcripts
17     long before trial and he's never said a word about the accuracy
18     of these translations.  I am properly using her own words to
19     impeach her credibility in front of the jury.
20              THE COURT:  All right.  Well, obviously, Mr. Amberg,
21     you know that you could have requested a different translator
22     earlier if you had wanted to and so you didn't do so, and so
23     you've had them all this time and so we're just going to have
24     to deal with what we have.  Thank you.
25              MS. SMITH:  Thank you.
```

```
 1              MR. AMBERG:  It's not all this time.

 2              THE COURT REPORTER:  I'm sorry, I didn't hear you.

 3              MR. AMBERG:  Okay.  It's not all this time.  It's not

 4    like I've had --

 5              THE COURT:  When did you receive the records?

 6              MR. AMBERG:  What, three weeks ago, month ago maybe,

 7    three weeks ago?  I could look, I got the e-mail.

 8              MS. JAWAD:  He's had the originals for several

 9    months, the Tamil language recordings, but it did take a while

10    for the translations to be made from the translation company,

11    but he's had those for I want to say at least two weeks.

12              MR. AMBERG:  Two weeks, three weeks.

13              MS. SMITH:  Probably more, yeah.

14              MR. AMBERG:  I have the e-mail.  I mean I've had them

15    for a couple of weeks.  I don't know.

16              THE COURT:  Well --

17              MS. SMITH:  She can deny that she said what she said,

18    but she just acknowledged she did, so we used a certified

19    translation service.

20              THE COURT:  Okay.  You have the translator who's

21    present in court.  You can show him these and if he's got a

22    different translation, you can deal with it on redirect.

23              That's it.  Thank you.  Step back.

24              MS. SMITH:  Thank you.

25              (End of side-bar discussion)
```

```
 1              THE COURT:  You may proceed.
 2              MS. SMITH:  Thank you.
 3    BY MS. SMITH:
 4    Q.   In that same conversation do you remember telling your
 5    husband, quote, "You did yourself in with your own mouth"?
 6    A.   The police reports?  I want -- I want to understand what
 7    document are you trying to ask me?
 8    Q.   I'm just asking you if you remember having that
 9    conversation with your husband on the phone?
10    A.   I would like to understand your question about the
11    document, which document you are referring to.
12    Q.   Okay.  I'm referring to --
13    A.   It's not the police report.
14    Q.   No.  What I'm referring to are phone conversations that
15    you and your husband had before this trial.  You remember
16    talking to him on the phone?
17    A.   But your date back to January, that's what I am little
18    confused.
19    Q.   Right.  You had conversations with him right after he was
20    arrested on the telephone.  You remember those?
21    A.   Yeah, when was -- when he was in custody, yes.
22    Q.   Do you remember that you told your husband, "I am
23    believing that nothing happened"?
24    A.   Yes.
25    Q.   Do you remember telling him that "I am believing what you
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1787   Page 235 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

235

1    said and that should be the truth"?

2    A.   Yes.

3    Q.   Does your husband always tell you the truth?

4    A.   Yeah.

5    Q.   I'm sorry?

6    A.   Yes, he always tells me the truth.

7    Q.   He's never lied to you?

8    A.   No.

9    Q.   How long have you been married?

10   A.   We have been married for three years and we have been

11   knowing each other for four years now.

12   Q.   And you support your husband?

13   A.   Each other, yes.

14   Q.   Do you see him as the head of the household?

15   A.   Yes.

16   Q.   Is marriage for life in your culture?

17   A.   It is.

18   Q.   And so would -- would something like a divorce be

19   scandalous in your culture or disgraceful?

20   A.   Disgraceful?  How do you put that?

21   Q.   You want me to say it differently?

22   A.   Yeah.

23   Q.   Is divorce bad in your culture?

24   A.   It's not bad but we don't do it.

25   Q.   You don't do it?

```
 1   A.   We don't prefer doing it.
 2   Q.   So your job is to support your husband for life, is that
 3   right?
 4   A.   Not support, to live a -- to live.
 5   Q.   Well, he -- he teaches you to be a good wife, doesn't he?
 6   A.   Yes.
 7   Q.   Does he teach you the right way to be?
 8   A.   Sometimes, yes; not all the time.
 9   Q.   And, in fact, is he currently trying to get you ready to
10   have children?
11   A.   What do you mean by that?
12   Q.   Well, that's what you told the FBI about your relationship
13   with your husband, that he is trying to get you ready for
14   children, does that sound right?
15   A.   They -- seems like they understood it wrong.
16   Q.   You want to be a good wife to your husband though, don't
17   you?
18   A.   Everyone does, yes.
19   Q.   I'm sorry?
20   A.   Yes.
21   Q.   Do you -- have you -- so part of being a good wife is
22   trusting your husband, right?
23   A.   Yes.
24   Q.   And part of being a good wife is being loyal to him?
25   A.   Sorry?
```

1    Q.   Part of being a good wife is honoring him?

2    A.   Honoring him?

3    Q.   Well, he's your head -- he's the head of your household,

4    right?

5    A.   Yes.

6    Q.   And so part of being a good wife to him is to be -- to be

7    kind to him, right?

8    A.   Yeah.  Love -- love is all we expect, right, so...

9         THE COURT REPORTER:  I'm sorry, I didn't hear that, I

10   didn't hear that last part of that.

11        THE WITNESS:  Sorry.  So love is all we expect in a

12   married life, right.

13   Q.   You blame yourself for all this, don't you?

14   A.   Why -- why should I?

15   Q.   Do you blame yourself?

16   A.   In some cases, yes.  I should have trained my husband and

17   learn this language in well advance, and I should have made him

18   confident in this language and should be -- should have made

19   him -- you know, I -- I thought I -- I missed helping in that

20   part.  He helped me in all other stuff.

21   Q.   So in some sense you blame yourself for all this, right?

22   A.   I don't know in what case you're asking.

23   Q.   Didn't you tell your husband that you blame yourself for

24   all this?

25   A.   All this, what is this?

1    Q.   All of this that's happening now?

2    A.   No.

3    Q.   You didn't tell him that?

4    A.   I didn't mean that, no.

5    Q.   But didn't he, in fact, say that he's the one to blame to

6    you?

7    A.   He didn't mean that either.

8    Q.   Did he say to you he's the one to blame?

9    A.   For what?  I don't understand.  For what he needs to be

10   blamed?

11   Q.   Do you remember having a conversation on the phone with

12   him about whose fault this situation, meaning your husband's

13   arrest and him having to go to trial, do you remember that

14   conversation?

15   A.   This doesn't mean trial or this doesn't mean ever this

16   case.

17   Q.   Okay.

18   A.   This means the life we are in.  This means the situation

19   we are in.  We think it is a bad luck of our spouse if we go

20   through some bad times in our life, and that is exactly I meant

21   it's my fault saying that it's my misfortune brought you into

22   this situation.

23   Q.   But he assured you that he's the one to blame here, didn't

24   he?

25   A.   His misfortune is to blame and not mine.

1        MS. SMITH:  Nothing further, Your Honor.  Thank you.

2        THE COURT:  All right.  Well, thank you very much.

3        Now, I know we still have Mr. Amberg's redirect here,

4   but I think it would be a good time for us to break and we'll

5   allow Mr. Amberg to take that up tomorrow morning.  And so let

6   me ask counsel, does that sound like a good plan?

7        MR. AMBERG:  Yes, Your Honor.

8        MS. SMITH:  If -- if that's what the Court would like

9   to do, yes.

10       THE COURT:  All right.  Very good.  Well, ladies and

11  gentlemen, we're going to adjourn for today and we'll be back

12  on the record tomorrow morning at 9:00 o'clock.  I think that

13  we will be likely to complete the evidence and move on to oral

14  arguments and jury instructions tomorrow if all goes as is

15  expected.  Is that what counsel expects as well?

16       MS. SMITH:  Yes, Your Honor.

17       MR. AMBERG:  Yes, Your Honor.

18       THE COURT:  All right.  Just in terms of timing and

19  what to expect, I wanted to let you know that.  So we're a

20  little bit ahead of schedule.

21       Thank you all very much.  Let's all rise for the

22  jury.  We'll see you tomorrow morning.

23       (Jury excused at 4:19 p.m.)

24       THE COURT:  You may be seated.

25       Now, let's put a few things on the record here.  The

1  recorded calls -- first of all, are we finished with the

2  witness for now?

3          MS. SMITH:  Yes.

4          THE COURT:  Can the witness be excused for our

5  proceedings now?

6          MR. AMBERG:  Yes, until we --

7          THE COURT:  Until tomorrow?

8          MR. AMBERG:  Yes, Your Honor.

9          THE COURT:  All right.  Ms. Natarajan, you may step

10  down for now.  Tomorrow morning we'll resume your testimony.

11  You're still under oath, you'll be under oath then.  You may be

12  excused.

13          (Witness excused at 4:21 p.m.)

14          THE COURT:  Ms. Smith, why don't you place on the

15  record what you were using for the impeachment there when those

16  recordings were made, where they came from, and I'll allow Mr.

17  Amberg to state whatever his objection was a moment ago.  Go

18  ahead.

19          MS. SMITH:  Sure.  We were kind of jumping around a

20  little bit because it was cross-examination, but the jail --

21  sorry, they -- these are a series of jail calls.  They -- the

22  transcripts totalled about 168 pages.  So there are dates and

23  times of recordings that I can refer to and the page number for

24  the specific --

25          THE COURT:  What's the time period covered by the

Case 2:18-cr-20027-TGB-MKM   ECF No. 85   filed 03/05/19   PageID.1793   Page 241 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

241

1    calls?

2           MS. SMITH:  January 6th through I think -- what was

3    the last day, the 20 -- towards the end of January, so well

4    before the trial.  It was before he was released on bond,

5    whenever that date was.

6           THE COURT:  And these conversations were reduced to

7    transcripts?

8           MS. SMITH:  He was provided the Tamil raw recordings

9    in discovery, and then we had them transcribed and sent those

10   transcripts over to the defense.

11          THE COURT:  And the recordings that were in Tamil,

12   those were provided to the defense approximately when?

13          MS. JAWAD:  I can't recall exactly, Your Honor.  I

14   want to say maybe two months ago.  I can check and get back to

15   you.

16          THE COURT:  Let's get that information and we'll have

17   that available.  By tomorrow I want to know when the Tamil

18   language recordings, the original recordings of these jailhouse

19   calls were provided to the defendant.  When were they

20   translated into English?

21          MS. SMITH:  You can answer that.

22          MS. JAWAD:  The tran -- it took a -- a while for the

23   process to be completed, but the government did not obtain them

24   until I believe two weeks ago but I can have the exact date

25   tomorrow, and as soon as we obtained them, we turned them over

Case 2:18-cr-20027-TGB-MKM ECF No. 85 filed 03/05/19 PageID.1794 Page 242 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

242

1    to defense counsel.

2            MS. SMITH:  I would also point out for the record,

3    Your Honor, that this is not our witness, so I was impeaching

4    the defense witness with her own statements.  So --

5            THE COURT:  I'm well aware of that.  I was present

6    during the courtroom and I saw what happened, so that's fine.

7    The question is when were these turned over to the other side,

8    that's what I'm trying to get at here.

9            MS. SMITH:  Sure.

10           THE COURT:  And so you say about two weeks ago they

11   were translated into English and they've been provided to the

12   other side approximately the same time when you received, that

13   is to say the government, received the translations, is that

14   right?

15           MS. JAWAD:  That's right.  It was the same day that

16   the government received the translations from the translation

17   company.

18           THE COURT:  All right.  So Mr. Amberg, do you want to

19   place your objection on the record, whatever it may be?

20           MR. AMBERG:  Yeah.  First I -- I pulled the e-mail,

21   and the government did provide this stuff to me.  They provided

22   the -- the jail calls, which are all in Tamil.  I mean you --

23   unless you speak Tamil, you would not understand anything.

24           THE COURT:  No, but your client understands.

25           MR. AMBERG:  He understands, right.

Case 2:18-cr-20027-TGB-MKM  ECF No. 85  filed 03/05/19  PageID.1795  Page 243 of 247
Jury Trial: Volume 4 • Tuesday, August 14, 2018

243

1      THE COURT:  And so does his wife, so go ahead.

2      MR. AMBERG:  So I provided that to him, you know.  He

3  has those.  I got the transcripts, and I -- I just pulled the

4  e-mail up, on August 3rd, and I have read through all of them,

5  the English translation.

6      And so I guess -- trying to think of what my

7  objection would be.  I mean I just -- maybe if I could just

8  have the -- the different calls themselves that were discussed

9  on impeachment, that might be helpful to me, and at least I can

10  prepare for the -- the redirect tomorrow.  Because like I said,

11  Your Honor, this is like 150 pages.  When I got it, I read

12  through it.  I brought them here with me today.  So I can do

13  that tonight and be ready tomorrow.

14      MS. SMITH:  Your Honor, I hear him saying that he's

15  withdrawing his objection provided that I give him the exact

16  jail calls that I used during impeachment.  I have 20 jail

17  calls.  I didn't use them all.  I impeached her with just a

18  few.

19      MR. AMBERG:  Yep.

20      MS. SMITH:  With the Court's indulgence, I can go

21  back to my office and send it to him in the next couple of

22  hours so that he knows exactly where those calls were coming

23  from.

24      MR. AMBERG:  And then I -- yeah, and I would -- like

25  I said, Your Honor, look, when the government got that, they

1    gave them to me.  As soon as they got the stuff they gave it to

2    me, and like I said, I've gone through it.

3            I just -- yeah, I withdraw my motion, draw [sic] my

4    objection, and I think that would work.  As long as I know --

5    because I -- I -- it's -- even within these calls it's

6    confusing.  That way I can look at it.  I've got the

7    interpreter here.  I can then go and pull these calls up and I

8    can bring -- put on my iPad, bring it in tomorrow and he can

9    listen it to, and then that'll -- that would be acceptable.

10           THE COURT:  I think that's a good idea just because

11   if there is any concern about the questions that were asked and

12   the predicate of the questions being an English interpretation

13   of a Tamil statement of the witness, that the defense should

14   have the opportunity to check that translation and be in a

15   position to ask the witness questions based on that.

16           But I would also say that, Mr. Amberg, you need to

17   provide whatever the translation is that you get to the

18   government --

19           MR. AMBERG:  Okay.

20           THE COURT:  -- so they know what it is you're saying

21   the Tamil says, just as they have provided you the translation

22   that they believe the Tamil says, and I think that will put you

23   in the best position to be able to ask the witness questions.

24           Needless to say, no one will talk to this witness

25   between now and the next time she gets on the stand.  She will

1    not be shown these translations.  She will not be shown

2    anything or asked any questions or -- nor will she in any way

3    be prepared or have any communications regarding the case

4    between now and tomorrow.  Is that clear?

5            MR. AMBERG:  Absolutely, Your Honor.

6            THE COURT:  Do you make sure that Mr. Ramamoorthy

7    understands that?

8            MR. AMBERG:  That's what I will make sure of that.

9            THE COURT:  Make sure now.

10           MR. AMBERG:  Okay.  Why don't you -- why don't you

11   guys stand up here.  I'm going to put this on the record now.

12   Please tell this to Mr. Ramamoorthy: Do not show your wife a

13   copy of the transcript of these jail calls.

14           (Brief pause for interpretation)

15           Do not discuss the jail calls with your wife.

16           (Brief pause for interpretation)

17           Do not let her listen to the jail calls that you

18   already have.

19           (Brief pause for interpretation)

20           And -- and with that in mind, you cannot discuss her

21   testimony or this case in any way with her.  You understand

22   what I'm saying?

23           DEFENDANT RAMAMOORTHY:  Yeah.

24           MR. AMBERG:  You understand what the judge has said

25   to you?  You need to tell him.

1          THE COURT:  And we might add that tomorrow Mr. Amberg

2    will have the opportunity to go over any relevant portions of

3    those recorded calls with the witness and give her the

4    opportunity to answer his questions, and that is the way we

5    will make sure that the process is fair, all right?

6          MS. SMITH:  Thank you, Your Honor.

7          MR. AMBERG:  Thank you, Your Honor.

8          THE COURT:  All right.  Is there anything else we

9    should cover for now?

10         MS. SMITH:  Not from the United States.

11         MR. AMBERG:  No, Your Honor, from defense.

12         THE COURT:  Okay.  Very good.  Well, we'll be back on

13   the record then tomorrow morning.  Thank you very much.

14         MS. SMITH:  Thank you.

15         THE COURT:  We're in recess.

16         THE LAW CLERK:  All rise.  Court is in recess.

17         (Court in recess at 4:31 p.m.)

18         (Proceedings in the above-entitled matter adjourned

19         to Wednesday, August 15, 2018)

20                          —  —  —

21

22

23

24

25

1          C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3  United States District Court, Eastern District of Michigan,

4  appointed pursuant to the provisions of Title 28, United States

5  Code, Section 753, do hereby certify that the foregoing pages 1

6  through 246 comprise a full, true and correct transcript of the

7  proceedings held in the matter of United States of America vs.

8  Prabhu Ramamoorthy, Case No. 18-20027, on Tuesday, August 14,

9  2018.

10

11

12                    s/Linda M. Cavanagh
                      Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                    Federal Official Court Reporter
                      United States District Court
14                    Eastern District of Michigan

15

16

17  Date: March 4, 2019
    Detroit, Michigan
18

19

20

21

22

23

24

25