Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1800   Page 1 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

1



```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5   vs.                                Case No. 18-20027
                                        Hon. Terrence G. Berg
 6   PRABHU RAMAMOORTHY,

 7                        Defendant.
     _____/
 8
                          JURY TRIAL: VOLUME 5
 9
            BEFORE THE HONORABLE TERRENCE G. BERG
10               United States District Judge
            Theodore Levin United States Courthouse
11              231 West Lafayette Boulevard
                 Detroit, Michigan  48226
12              Wednesday, August 15, 2018

13   APPEARANCES:

14   For the Plaintiff       MARGARET M. SMITH
     United States of America:  AMANDA JAWAD
15                           U.S. Attorney's Office
                             211 W. Fort Street
16                           Suite 2001
                             Detroit, Michigan  48226
17                           313-226-9135

18   For the Defendant       JAMES AMBERG
     Prabhu Ramamoorthy:     Amberg and Amberg
19                           104 W. Fourth Street
                             Suite 305
20                           Royal Oak, Michigan  48070
                             248-681-0115
21
                             VICTOR MANSOUR
22                           Mansour & Mansour, P.C.
                             32000 Northwestern Highway
23                           Farmington Hills, Michigan 48334
                             248-932-3322
24
     Also Present:           Rengachari Vijayaraghavan
25                           Court Interpreter
```

1   To obtain a certified copy of this transcript, contact:

2    Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
         Official Court Reporter

3    (313) 234-2616 • www.transcriptorders.com

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1802   Page 3 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

3

```
 1                        TABLE OF CONTENTS

 2                                                       Page

 3   Defense Witnesses Continued:

 4   GEETHANJALI NATARAJAN

 5      Redirect Examination by Mr. Amberg          17

 6   DEFENSE RESTS                                   34

 7   CLOSING STATEMENT BY MS. JAWAD                  44
     CLOSING STATEMENT BY MR. AMBERG                 64
 8   REBUTTAL STATEMENT BY MS. JAWAD                 88
     JURY INSTRUCTIONS BY THE COURT                  93
 9
     RULE 29 MOTION:
10
     Motion by Mr. Amberg                           115
11   Comments/Ruling by the Court                   115

12   JURY VERDICT                                   128

13   MOTION FOR BOND REVOCATION:

14   Motion by Ms. Smith                            132
     Response by Mr. Amberg                         133
15   Comments/Ruling by the Court                   133

16

17

18

19                          EXHIBITS

20   Identification                  Offered   Received

21   NONE

22

23

24

25
```

```
 1          Detroit, Michigan
 2          Wednesday, August 15, 2018
 3                        —  —  —
 4          (Proceedings commenced at 9:08 a.m., all parties
 5          present, jury not present)
 6          THE LAW CLERK:  Court calls Case No. 18-20027, United
 7   States of America versus Prabhu Ramamoorthy.
 8          Counsel, will you please place your appearances on
 9   the record?
10          MS. JAWAD:  Good morning, Your Honor.  Amanda Jawad
11   and Maggie Smith on behalf of the United States.  With us at
12   counsel table is Meghann O'Connor, a paralegal from our office,
13   and Special Agent Kyle Dodge with the FBI.
14          THE COURT:  Good morning.
15          MS. SMITH:  Good morning.
16          MR. AMBERG:  Sorry.  Good morning, Your Honor.  Jim
17   Amberg on behalf of Mr. Ramamoorthy; he is standing to my
18   right.  To his right is Mr. Vijay and to my left is co-counsel,
19   Victor Mansour.
20          THE COURT:  Well, good morning, Counsel.  Good
21   morning Mr. Ramamoorthy.
22          So I understand that one of our jurors has a problem
23   that I wanted to explain to you.  You may be seated.  There was
24   a note -- not a note but a notification I guess I should say
25   from Mr. Hester who is the juror sitting in seat number eight;
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1804   Page 5 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

5

1    that's in the front row on the right-hand side.  He has had --

2    apparently his steering column on his car fell out when he came

3    in to park today because he had recently had some repair work

4    on it, and he has reported to Ms. Chubb that he has blood

5    pressure problems and is concerned about continuing in his

6    service here.

7            So wanted to bring this to your attention to get your

8    input on it, and so I'd be happy to hear any thoughts that you

9    may have.

10           MS. SMITH:  Well, we do have two alternates and so we

11   have room for the dismissal of two jurors.  I know we decided

12   to do it randomly.  I don't know if the Court wants to voir

13   dire a little bit more, but the fact that you indicated that

14   this juror is talking about his blood pressure, I'm wondering

15   if he is trying to say that he's not sure that he would be able

16   to deliberate.  Is that -- is that the message that he's

17   sending?

18           THE COURT:  That -- the impression that I get is just

19   that this is getting very hard for him.  He's also from pretty

20   far away, from like Lake Orion, so he has a ways to go.

21           MS. SMITH:  I -- I think I'm going to take no

22   position on this, Your Honor.  I don't --

23           THE COURT:  You wouldn't object to excusing him

24   though?

25           MS. SMITH:  I don't think so, no.

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1805   Page 6 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

6

1          THE COURT:  All right.  What do you think, Mr.
2     Amberg?
3          MR. AMBERG:  I think that it would probably be wise
4     to at least do some limited voir dire on the record so we've
5     got a record of it.  But I mean if he's medically unfit to sit
6     there, I can't ask somebody to sit there and risk having a
7     heart attack.  But my only -- and I -- I don't want to knock
8     him, but at the same time, this trial's been going on for a
9     week now and -- and we asked about medical conditions and
10    things like that in the beginning.  I mean he's had issue with
11    the mechanics of his vehicle, but now at the same time I mean
12    is this what's causing the -- the heart blood pressure issues
13    and things like that?  So I think maybe just some voir dire to
14    see, and then depending on what he says...
15         THE COURT:  So you would like to do that here in the
16    courtroom?
17         MR. AMBERG:  Sure.
18         THE COURT:  And --
19         MR. AMBERG:  Yes.
20         THE COURT:  All right.  What do you think about that,
21    Ms. Smith, any objection?
22         MS. SMITH:  I don't have an objection to that.
23         THE COURT:  All right.  Well, Mr. Darling, can you
24    ask Mr. Hester to join us?
25         THE LAW CLERK:  Yes.

```
 1              (Brief pause)

 2              (Juror Hester entered courtroom at 9:12 a.m.)

 3              THE COURT:  Hello, sir.  Would you have a -- why

 4     don't you have a seat in your chair there and everyone can be

 5     seated.

 6              So welcome, good morning.  Sorry about your car

 7     trouble, Mr. Hester.  I understand that you had some difficulty

 8     with your vehicle and that you may also have some medical

 9     issues there.

10              JUROR NO. 8:  I'm -- I'm on blood pressure and little

11     things get me going.

12              THE COURT:  Okay.

13              JUROR NO. 8:  I didn't have a problem with my vehicle

14     coming down, parked on the fourth floor and backed my truck up

15     and put it in park and shut it off.  Sorry.

16              THE COURT:  Go ahead.

17              JUROR NO. 8:  And with the -- with the keys out of

18     the ignition, the vehicle started going forward, so I tried to

19     put it back in -- in park and it got stuck in neutral, and I

20     can't turn the key and nothing happens.  So my mechanic worked

21     on it Monday and I drove it all day Monday afternoon and then

22     all day yesterday, no problem, so...

23              THE COURT:  Well, I've told the parties and their

24     lawyers about your issue, and we're just trying to determine

25     whether you are able to continue serving or not under these
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1807   Page 8 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

8

1    circumstances, and so what -- what do you think about that?

2         JUROR NO. 8:  To be very honest, I really hate to do

3    this but I'm a little bit dizzy right now.  Little things get

4    me -- get me going.  Even though I took my blood pressure pill

5    this morning, I'm still a little -- because I've got a long day

6    ahead of me now.  I've got to find a way to get my vehicle

7    home.  I live in Lake Orion.

8         THE COURT:  Do you think that the difficulties of

9    serving as a juror may be creating some problems for you in

10   light of your blood pressure situation?

11        JUROR NO. 8:  Oh, there's no doubt because I was fine

12   coming down.

13        THE COURT:  I would like to ask the lawyers if they

14   would like to ask any questions, you're welcome to do so.

15        MS. SMITH:  I have no questions, Your Honor, and I

16   also have no objection.

17        MR. AMBERG:  No questions, Your Honor.  Sounds like

18   the gentleman is dizzy even right now.  I don't know how -- how

19   he could be able to focus on all this if he's -- you know,

20   medically he can't even -- he's got to worry about himself I

21   think.

22        JUROR NO. 8:  Thank you.

23        THE COURT:  Thank you very much.  All right.  Well,

24   Mr. Hester, I'm going to excuse you from your service in light

25   of your difficulty that you're having today both with your

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1808   Page 9 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

9

 1    vehicle and because of your -- your medical situation.  And

 2    fortunately we do have alternates here; that's why we selected

 3    extra people.

 4              And so obviously this is not your fault and

 5    everyone's very appreciative of the fact that you've donated

 6    and dedicated your time and your attention to this case just as

 7    your other fellow jurors did, and I thank you for that on

 8    behalf of the Court and on behalf of the parties who are here

 9    as well and appreciate your service.

10              JUROR NO. 8:  Well, thank you very much.

11              THE COURT:  And so you can be excused, sir, and I

12    think probably go back to the jury assembly room and let them

13    know what happened, and good luck with your issue.

14              JUROR NO. 8:  Okay.  Thank you.

15              MS. SMITH:  Your Honor, before we go off the record,

16    may I just ask you to remind this juror that he is still not to

17    talk about the case to anybody because --

18              THE COURT:  That's a good idea.  And so Mr. Hester,

19    I'm sure you understand that.

20              JUROR NO. 8:  Yes.

21              THE COURT:  But don't talk about what the -- the case

22    is about or indicate any of your -- your judgment about the

23    case one way or the other.  Of course, once the case is

24    completed, you could talk about your service.

25              JUROR NO. 8:  Okay.  Thank you.

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1809   Page 10 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

10

1            THE COURT:  All right.  Thank you.

2            MS. SMITH:  Thank you.

3            (Juror Hester excused at 9:16 a.m.)

4            THE COURT:  Let's -- I want to ask the lawyers

5    another question.  So you may be seated.

6            The other issue I wanted to bring up was that we do

7    have our other interpreter who was engaged for the purpose of

8    being available if Mr. Ramamoorthy testifies, and that was at

9    the government's request, correct?

10           MS. SMITH:  Yes, Your Honor.

11           THE COURT:  And so I'm not sure where our interpreter

12   is, but are you present in the courtroom?  All right.  Could

13   you just tell us your name please.

14           THE INTERPRETER:  Haresh Kumar, Your Honor.

15           THE COURT:  All right.  And Ms. Smith, what is

16   your -- what is your intention regarding Ms. Kumar?

17           MS. SMITH:  Your Honor, for the record, the -- Mr.

18   Vijay who has been interpreting through this trial is also here

19   today, and it is my understanding that the defendant intends to

20   waive his right to testify today.  And so at this point in the

21   procedure, because we have two interpreters here, the United

22   States does not have an objection to allowing the defendant to

23   choose which interpreter he would like to keep for the day so

24   long as the defendant has indicated that he is happy with the

25   services of -- if he chooses to keep Mr. Vijay, that he

1    indicates he's happy with the translation services that are

2    being provided.

3              THE COURT:  All right.  Do you think that it would be

4    appropriate to utilize Ms. -- Ms. Kumar for purposes of the

5    inquiry and the voir dire of Mr. Ramamoorthy about his decision

6    whether to testify or does that matter with respect to your

7    position?

8              MS. SMITH:  Well, if the defendant is indicating to

9    the Court that he understands his interpreter and that his

10   interpreter is accurately interpreting, I think it's the

11   defendant's -- I don't speak the language so only he can tell

12   us if he understands this interpreter and if he's comfortable

13   with how the interpretation has been through the proceedings.

14             THE COURT:  All right.  Thank you.  Mr. Amberg?

15             MR. AMBERG:  Yes, Your Honor.  Couple things.  First,

16   as -- as you note, there are two interpreters here.  Ms. Kumar

17   was the interpreter who interpreted when Mr. Ramamoorthy

18   testified.

19             This decision about whether -- whether or not to

20   testify has been going on for a couple of days now, as the

21   Court is aware.  I've spoke with Mr. Ramamoorthy with Mr. Vijay

22   on every one of those occurrences when we discussed whether to

23   testify or not testify.  And I know we have the -- the end of

24   our redirect on Ms. Natarajan, but right after that I

25   anticipate closing and anticipate placing on the record that he

Case 2:18-cr-20027-TGB-MKM    ECF No. 86    filed 03/05/19    PageID.1811    Page 12 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

12

1    is not going to testify.

2           And I also discussed with Mr. Ramamoorthy with Mr.

3    Vijay this morning the -- the fact that there are two

4    interpreters here, and I asked him with Mr. Vijay if he wanted

5    to continue with Mr. Vijay or to go and use Ms. Kumar because,

6    you know, she was fine before and I thought did a pretty good

7    job of interpreting, and he indicated to me through Mr. Vijay

8    that he wanted to keep Mr. Vijay.

9           So -- and if you wanted to voir dire my client or if

10   you wanted me to, I could do that as well.

11          THE COURT:  So Mr. Ramamoorthy, why don't you stand

12   please.  And let me just ask you, did you hear what Mr. Amberg

13   just said?

14          DEFENDANT RAMAMOORTHY:  Yes, Your Honor.

15          THE COURT:  And do you prefer to have Mr. Vijay

16   continue as your interpreter?

17          DEFENDANT RAMAMOORTHY:  Yes, Your Honor.

18          THE COURT:  And have you been satisfied with his

19   interpretation of the proceedings so that you can understand

20   everything that's going on?

21          DEFENDANT RAMAMOORTHY:  Yes, Your Honor.

22          THE COURT:  All right.  Well, then I will allow you

23   to continue to use Mr. Vijay as your interpreter and we'll

24   proceed accordingly.

25          And I apologize to Ms. Kumar for the inconvenience of

```
 1   traveling here today.  It was necessary because of the fact
 2   that Mr. Ramamoorthy was continuing -- was considering
 3   testifying.  Perhaps I should take a moment and discuss that
 4   briefly with Mr. Ramamoorthy as well.
 5           Mr. Ramamoorthy, do you understand that you have the
 6   right to testify in this case?
 7           DEFENDANT RAMAMOORTHY:  Yes, Your Honor.
 8           THE COURT:  You could tell your story and your
 9   attorney could ask you any questions that he wanted to ask you
10   about the case and you could say whatever you wanted to say in
11   this trial.  Do you understand that?
12           DEFENDANT RAMAMOORTHY:  Yes, Your Honor.
13           THE COURT:  This decision about whether to testify is
14   your decision only.  By that I mean it's not up to your lawyer,
15   it is up to you.  Do you understand that?
16           DEFENDANT RAMAMOORTHY:  Yes, Your Honor.
17           THE COURT:  What is your decision about whether you
18   want to testify or you do not want to testify?
19           DEFENDANT RAMAMOORTHY:  No, Your Honor, I'm not...
20           (Brief pause)
21           MR. AMBERG:  Can I -- can I voir dire as well, Your
22   Honor, a little bit here?
23           THE COURT:  You may, loudly.
24           MR. AMBERG:  Could you please ask Mr. Ramamoorthy did
25   he understand what the Court just asked him about his decision
```

1    to testify.

2              (Brief pause for interpretation)

3              MR. AMBERG:  Well, why don't you -- then you need to

4    say that on the record so the judge --

5              THE COURT:  Speak into the microphone, sir, Mr.

6    Vijay.

7              THE INTERPRETER:  I have explained to him clearly

8    that he has the right and he understood that.  And then I asked

9    him was it his decision and not influenced by anybody else, and

10   he said yes, it was his decision.

11             And then I asked him, the judge was asking to tell

12   the judge that it was his decision, and he asked me, "You go

13   ahead and tell the judge exactly because if I say something,

14   that it will not come out right in the proper form."  So he

15   says, "You tell the judge that it was my decision and I do not

16   want to testify today."

17             THE COURT:  Okay.  Well, I appreciate that.  I would

18   like to nevertheless have the record show that Mr. Ramamoorthy

19   is answering the question.  He may answer it in Tamil if he

20   wishes, and then I would -- if he does answer it in Tamil, then

21   you may answer it in English.  But I want Mr. Ramamoorthy to

22   answer my question.  Do you, Mr. Ramamoorthy, wish to testify

23   in this trial, yes or no?

24             DEFENDANT RAMAMOORTHY:  No, Your Honor.  No, Your

25   Honor.

```
1          THE COURT:  All right.  Thank you.  And you do
2   understand that if you do not testify, the fact that you do not
3   testify cannot be used against you.  You understand that,
4   right?
5          DEFENDANT RAMAMOORTHY:  Yes, Your Honor.
6          THE COURT:  And I will tell the jury that that is the
7   law.  Thank you.
8          DEFENDANT RAMAMOORTHY:  Thank you.
9          THE COURT:  Are there any other questions that either
10  attorney wishes to ask at this point?
11         MS. SMITH:  No, Your Honor.  But as I understand the
12  law, the defendant has to be given an opportunity to change his
13  mind before the close of evidence for the defense, so I just
14  want the record to reflect that we ought to just check back
15  after the defense rests.
16         MR. AMBERG:  I agree.
17         THE COURT:  Let's make sure that we do that.  All
18  right.  You may be seated.
19         So we have -- we have on the stand Ms. Natarajan and
20  she is going to be questioned on redirect by Mr. Amberg, and
21  then if there are any additional witnesses you may call them,
22  and then we will proceed to closing arguments.  I think we
23  should probably take a break after evidence is closed.  Does
24  the government intend to put any rebuttal case?
25         MS. SMITH:  No, Your Honor.
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1815   Page 16 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

16

```
 1              THE COURT:  Okay.  All right.  Is there anything else
 2      we should take up or should we bring in the jury?
 3              MS. SMITH:  We're ready for the jury.
 4              MR. AMBERG:  Ready for the jury.
 5              THE COURT:  Bring in the jury.
 6              (Jury entered the courtroom at 9:29 a.m.)
 7              THE COURT:  Good morning, ladies and gentlemen.
 8              THE JURORS:  Good morning.
 9              THE COURT:  You may be seated.  Welcome, ladies and
10      gentlemen.
11              I'm sure that you noticed and perhaps you spoke with
12      Mr. Hester and that he has been excused because of some issues
13      that he had regarding his vehicle and some medical issues.  And
14      so we did select two additional jurors as alternates here so he
15      will be one of our alternates.  We'll still need to select at
16      random one other alternate because only 12 of you will
17      deliberate in this case.  But I did want to let you know that
18      that is what the decision was regarding his service.  And so we
19      thank him for the time and the attention that he devoted to the
20      case as well as we thank all of you for what you've devoted to
21      the case so far.
22              So we were in the middle of the testimony of a
23      witness and we will presume -- we will continue with that
24      witness.
25              Are you ready, Mr. Amberg?
```

Case 2:18-cr-20027-TGB-MKM    ECF No. 86    filed 03/05/19    PageID.1816    Page 17 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

17

```
 1              MR. AMBERG:  Yes, Your Honor.

 2              THE COURT:  All right.  You may call your witness.

 3              All right.  Please come forward.

 4                G E E T H A N J A L I   N A T A R A J A N

 5     was thereupon recalled as a witness herein, and after being

 6     previously first duly sworn to tell the truth and nothing but

 7     the truth, resumed the stand and testified on her oath as

 8     follows:

 9              THE COURT:  All right.  You are still under oath from

10     yesterday and you may be seated, Ms. Natarajan.

11              MR. AMBERG:  May I proceed, Your Honor?

12              THE COURT:  You may.

13              MR. AMBERG:  Thank you.

14                          REDIRECT EXAMINATION

15     BY MR. AMBERG:

16     Q.   Ma'am, good morning.

17     A.   Good morning.

18     Q.   I just have a few questions, okay?

19     A.   (Nods in the affirmative.)

20     Q.   And please just ask -- answer in the best that you can.

21     A.   Okay.

22     Q.   I want to talk about the questions that were asked to you

23     by the prosecutor.

24     A.   Okay.

25     Q.   Okay.  I want to first ask you about your role in this
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1817   Page 18 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

18

1    marriage with Mr. Ramamoorthy.  Do you believe that you are a

2    subservient person to him?

3    A.   Can you explain that word to me?

4    Q.   Is he in charge of your relationship?

5    A.   Are you asking me is he asking me to be with him, is that

6    is what you are trying to ask?

7    Q.   Well, let me -- let me back that up.  Are you -- I think

8    you've testified you and him are both from India?

9    A.   Yes.

10   Q.   Okay.  And you met and fell in love in India?

11   A.   Yes, we both, yes.

12   Q.   Is the man in charge of the relationship?

13   A.   No.

14   Q.   Is it an equal relationship?

15   A.   Yes, it is.

16   Q.   Okay.  Is Mr. Ramamoorthy in charge of you?

17   A.   I don't understand that question.

18   Q.   Are you allowed to have your own thoughts?

19   A.   Yes.

20   Q.   Maybe let's talk about an example of this.

21   A.   Okay.

22   Q.   What is your last name?

23   A.   Natarajan.

24   Q.   What is his last name?

25   A.   Ramamoorthy.

1   Q.   In your culture is the woman supposed to take the man's

2   last name?

3   A.   If they are married, yes.

4   Q.   Why is your name not the same name as his?

5   A.   I wanted to have my own father's name as my last name.  I

6   asked Prabhu for this after our marriage got registered and he

7   agreed to it, so I am allowed to have my father's last name.

8   Q.   Okay.

9   A.   That is what I wished.

10  Q.   Is your marriage equal between you and him?

11  A.   Yes.

12  Q.   He doesn't have control over you?

13  A.   No.

14  Q.   What about divorce?  If you wanted to divorce him, could

15  you divorce him?

16  A.   If I want to, yes.

17  Q.   Okay.  Now, are you just here to have his children?

18  A.   What do you mean by that?

19  Q.   Do you remember the prosecutor asking you questions about

20  that yesterday?

21  A.   Yes.

22  Q.   Okay.  Do you think you're here just to have Mr.

23  Ramamoorthy's children?

24  A.   No.

25  Q.   Okay.

1   A.   That -- that is part of our life.

2   Q.   I'm sorry, what did you just say?

3   A.   That is just part of our life, like we have to be

4   together.  Children is also a part of our life.

5   Q.   Is it fair to say children are part of a marriage?

6   A.   Yes.

7   Q.   Okay.  You have your own career?

8   A.   Yes, I do.

9   Q.   And what is your career?

10   A.   I work as a business analyst.

11   Q.   Okay.  And you went to college?

12   A.   Yes, I did.

13   Q.   Okay.  If Mr. Ramamoorthy tells you to do something or not

14   do something, are you just going to do whatever he says?

15   A.   No.  If -- if I'm doing something wrong, he would say.

16   Apart from that, we are not working for -- for the same people,

17   so he would never tell me what to do in my work or in my life,

18   wherever I go.

19   Q.   Okay.  Even right now as you testify in this case today --

20   A.   Yes.

21   Q.   -- are you doing this of your own free will?

22   A.   Yes, I wanted to do this.

23   Q.   And if you saw him do something wrong, would you be here

24   testifying on his behalf today?

25   A.   Not on behalf.

```
 1    Q.   Whose behalf would you have testified on?

 2    A.   Maybe government's.

 3    Q.   Now, the prosecutor brought up how you had seen documents

 4    in this case.  Do you remember that?

 5    A.   From yesterday?

 6    Q.   From when -- when you were cross-examined yesterday --

 7    A.   Yeah.

 8    Q.   -- the government brought up that you had discussed on a

 9    jail call that you had seen documents in this case.  Do you

10    remember that?

11    A.   Documents?  Yesterday, yes, she was asking me that

12    question, yes.

13    Q.   Okay.  Were those documents the -- the Complaint and other

14    charging documents in this case?

15    A.   I don't know what -- what is that called, but it was given

16    to me by his lawyer, Richard O'Neill, and it -- it -- it stated

17    what is the charge that he's accused of and all the

18    conversation that happened during the FBI.  FBI have written

19    all those statements in that document and I got to read that

20    document.

21    Q.   Okay.  And was that -- that was something that wasn't

22    given by me, that was from the prior lawyer?

23    A.   Yeah, the lawyer who was assigned to my husband during the

24    arrest to say on January 3rd it was happened.

25    Q.   Okay.  And do you know if that was just a public document
```

1   that anybody could look at?

2   A.   At that point I don't know what are all those documents,

3   even I don't know what it is called, but I know it -- it -- it

4   had the charges in them for him.

5   Q.   Okay.  It was something that the Court was talking about

6   when you were in court?

7   A.   Yeah, that is what they used to read when they were

8   calling Prabhu on the stage.

9   Q.   Okay.  So that was done in open court?

10  A.   Yeah, it was upstairs.

11  Q.   Here?

12  A.   Here, yes.

13  Q.   Okay.  Have you ever seen any police reports in this case?

14  A.   No.

15  Q.   Did you watch the interview video in this case?

16  A.   No.

17  Q.   Did you see the transcript of the interview video in this

18  case?

19  A.   Interview with the transcript?

20  Q.   Yes?

21  A.   No, no.

22  Q.   Okay.  How long after your husband was charged did I

23  become his lawyer, do you remember?

24  A.   Oh, yes.  Actually I have -- I was the one looking for the

25  lawyer because there was no one here for us to help.  On

1    January 3rd he got arrested.  I was looking for some lawyer's

2    help.  I think January 6th is -- I -- in my mind I have

3    January 6th as the date that I was able to confirm Mr. Amberg

4    as my husband's lawyer.

5    Q.   Okay.  Have I ever given you a single page of discovery in

6    this case?

7    A.   No.

8    Q.   Have I ever let you watch any videos in this case?

9    A.   No.

10   Q.   Have I told you that's okay to do that?

11   A.   No.

12   Q.   What did I tell you?

13   A.   Actually I got not even in -- we never discussed about

14   this case because you -- you were advising us to not to discuss

15   about this case, which you promised that it will help us by not

16   discussing, discussing will not help us, so...

17   Q.   Okay.  And did you honor what I told you to do?

18   A.   Yes.

19   Q.   Okay.  What did I tell you to do about testifying?

20          MS. SMITH:  I'm going to object here, Judge.  The --

21   the defense counsel is testifying here.

22          MR. AMBERG:  I'm just trying to --

23          MS. SMITH:  Also eliciting hearsay.

24          THE COURT:  All right.  The subject of redirect needs

25   to be directly connected to what was gone into on

```
 1   cross-examination, so refer to what was on cross-examination
 2   and then ask your question.
 3              MR. AMBERG:  Okay.
 4   BY MR. AMBERG:
 5   Q.  I want to talk about some of the conversations that you
 6   had with your husband.
 7   A.  Okay.
 8   Q.  Okay.  There was one conversation where you talked about
 9   DNA, if you remember?
10   A.  Actually I remember talking to him two times --
11   Q.  Okay.
12   A.  -- about DNA.
13   Q.  Okay.  Were you worried that there would be DNA on him
14   because the -- the lady was laying on him?
15   A.  No.  We were talking about the DNA in general, not
16   specific to this case.  Because we don't know about any law
17   process, so I was telling him this is what next happening, so
18   we are waiting for a DNA test results while we were waiting for
19   the DNA test results.
20   Q.  Okay.
21   A.  He was not with me to understand everything that is
22   happening outside the world so I -- I have to tell him what is
23   happening in this case, so every day he asked me what -- what
24   is the focus.
25              MS. SMITH:  Objection, Your Honor.  She's offering a
```

```
1    narrative here.

2              MR. AMBERG:  I can move on, Your Honor.

3              THE COURT:  Sustained.

4              MR. AMBERG:  If I could have one second, Your Honor.

5              THE COURT:  Go ahead.

6              (Brief pause)

7              MR. AMBERG:  One last thing.

8    BY MR. AMBERG:

9    Q.   I want to talk about what you and the -- the prosecutor

10   talked about about when you had a jail call with Mr.

11   Ramamoorthy about his story.  Do you remember that?

12   A.   His story means?

13   Q.   Okay.

14             THE COURT:  The question is whether you remember

15   that.

16   BY MR. AMBERG:

17   Q.   Do you remember that?

18   A.   I really don't understand the question.  What --

19             THE COURT:  Rephrase your question.

20             MR. AMBERG:  Sure.  Sure.

21   BY MR. AMBERG:

22   Q.   Yesterday on cross-examination the government asked some

23   questions about a jail call that took place between you and

24   your husband about his story.  Do you remember that or not?

25   A.   No, I don't remember.
```

```
 1    Q.   Okay.

 2    A.   His story means?

 3    Q.   Okay.  Let me ask the question.

 4    A.   Yeah.

 5    Q.   Okay.

 6    A.   Is it possible to see the transcription or conversation or

 7    play the audio so that I can listen?

 8    Q.   Yes.

 9              (Brief pause)

10              MR. AMBERG:  May I approach, Your Honor?

11              THE COURT:  You may.

12    BY MR. AMBERG:

13    Q.   I'm going to show you something here.  Want you to take a

14    read where it's highlighted and let me know when you're done.

15              (Brief pause)

16    A.   Yes, I'm done.

17    Q.   Okay.

18              MR. AMBERG:  May I approach, Your Honor?

19              THE COURT:  You may.

20    BY MR. AMBERG:

21    Q.   Now, ma'am, you've had an opportunity to look at that?

22    A.   Yes.

23    Q.   Does that refresh your memory about a conversation?

24    A.   Yes.

25    Q.   Okay.  I want to talk about that conversation.
```

1    A.   Okay.

2    Q.   Okay.  In this conversation were you trying to tell your

3    husband to change his story?

4    A.   No.

5    Q.   Okay.  What was the context of that conversation?

6    A.   Okay.  He was trying to tell me that is when you are --

7           MS. SMITH:  Objection as to hearsay.  She can only

8    talk about what she knows, not what he said.

9           MR. AMBERG:  I don't think --

10   A.   Okay.

11          MR. AMBERG:  Your Honor, I don't think it goes to the

12   truth of the matter asserted.  I think it goes to the

13   explanation of what she thought was happening, and it was

14   brought up on impeachment but I think that she should be

15   allowed to --

16          THE COURT:  I think you need to direct her attention

17   to certain parts of the conversation, and if you need to ask

18   her to explain what she meant or what she understood, you may

19   do so.

20          MR. AMBERG:  Okay.  Thank you, Your Honor.

21   BY MR. AMBERG:

22   Q.   Without telling me what was said, what -- what was the

23   context of that conversation?

24   A.   It was explaining him the law so when a statement is

25   given, it is given, you cannot change the statement.  So when

1    your attorney meets you who is not aware of what happened in

2    the interview because I hire him on January 6th and the

3    incident happened on January 3rd, so try explain him what

4    happened there, do not change anything.  And he didn't intend

5    to change anything.  I was just giving him that this is how the

6    law works because I read few forums about the -- the law of the

7    United States during this case and I got to know what the

8    statute is which cannot be changed, so that is all I was trying

9    to tell him.

10   Q.   And that's why you specifically brought up the statute?

11   A.   Yes.

12   Q.   Okay.  Were you trying it -- in any way to tell him to

13   change his story?

14   A.   I -- no, I did not.

15   Q.   Okay.  Have you ever told him this entire time to change

16   his story?

17   A.   No.

18   Q.   Have you ever even asked him what his story was from what

19   happened?

20   A.   No.

21   Q.   Okay.  And why is that?

22   A.   You are asking me why I didn't ask him the story?

23   Q.   Yes.

24   A.   Because I was not allowed to talk about it.

25   Q.   Okay.

```
1          MR. AMBERG:  No further questions, Your Honor.  Thank
2    you, ma'am.
3          THE COURT:  All right.  Thank you very much.
4          MR. AMBERG:  Oh, Your Honor, I apologize.  I -- I
5    apologize for -- for interrupting you.  Can I -- can I talk to
6    Mr. Ramamoorthy for one second?
7          THE COURT:  You may.
8          MR. AMBERG:  Thank you.
9          (Brief pause)
10         MR. AMBERG:  No further questions, Your Honor.  Thank
11   you very much.
12         THE COURT:  All right.  Thank you.
13         Ladies and gentlemen, I'd like to ask you if you have
14   any questions for this witness.  If you do, write them down and
15   I'll take them up with counsel.
16         (Brief pause)
17         THE COURT:  Counsel approach.
18         (Sidebar discussion as follows):
19         THE COURT:  A juror asks, "Did you sleep on the plane
20   ride?"  Any objection?
21         MS. SMITH:  No objection.
22         MR. AMBERG:  No objection.
23         THE COURT:  A juror asks, "What is the witness's
24   credentials/expertise that supports an evaluation of the
25   defendant's ability to speak and understand English?  The
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1829   Page 30 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

30

```
 1   60 percent comment, does the witness have a 100 percent command
 2   of the English language?"
 3           MS. SMITH:  I don't think she -- I would object to
 4   that question.  She cannot testify as to how much he
 5   understands.  She has --
 6           THE COURT:  Well, the question -- just a minute.  The
 7   question isn't how much does -- exactly how much does he
 8   understand.  The question is, "What is the witness's
 9   credentials or expertise that supports an evaluation of the
10   defendant's ability to speak and understand English?  The
11   60 percent comment, does the witness herself have a 100 percent
12   command of the English language?"
13           MS. SMITH:  Okay.
14           MR. AMBERG:  It's almost like two different
15   questions.
16           MS. SMITH:  If it's written as -- okay.  I guess I
17   don't have any objection to that.
18           THE COURT:  The way I see this question, I think the
19   juror is asking to try to understand what is the basis upon
20   which she can rest that judgment about how well he understands
21   English, and I think it's a fair question.
22           MR. AMBERG:  And I agree.  I -- I -- I actually
23   think -- I think there's two, Your Honor, two in there, but
24   then the second question is how well does she understand
25   English.
```

Case 2:18-cr-20027-TGB-MKM  ECF No. 86  filed 03/05/19  PageID.1830  Page 31 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

31

1        THE COURT:  "Does the witness have a hundred percent

2   command of the English language?"

3        A juror asks, "Did you both have English language

4   learning while in school in India?"  I assume that means both

5   her and her husband.

6        MS. SMITH:  I do too.

7        THE COURT:  Any objection?

8        MS. SMITH:  No.

9        MR. AMBERG:  No objection.

10        THE COURT:  All right.

11        (End of sidebar discussion)

12        THE COURT:  Ms. Natarajan, there are three questions

13   from the members of the jury.  The first question is, "Did you

14   sleep on the plane ride?"

15        THE WITNESS:  Yes, for the first part, yes.

16        THE COURT:  The next question is two separate

17   questions, and I'm going to rephrase this a little bit.  Do you

18   have any credentials or expertise that would support your

19   evaluation of Mr. Ramamoorthy's ability to speak and understand

20   English?  Do you have any credentials or expertise that support

21   your evaluation of the defendant's ability to speak and

22   understand English?

23        THE WITNESS:  Are you asking me how am I evaluating

24   his knowledge in English?

25        THE COURT:  The question is whether you have any

 1  credentials or expertise in evaluating English.  Do you have

 2  any credentials or expertise in evaluating --

 3          THE WITNESS:  Like a certificate?

 4          THE COURT:  I'm sorry.

 5          THE WITNESS:  Like a certificate or a study?

 6          THE COURT:  Yes.

 7          THE WITNESS:  Well, in my college I have done some

 8  English classes, yes.

 9          THE COURT:  All right.  The -- and that would be

10  your -- that's what you base your evaluation of his ability to

11  speak English?

12          THE WITNESS:  Correct.  They have taught how to speak

13  and everything in my --

14          THE COURT:  Say that again.  I'm sorry.

15          THE WITNESS:  They have taught us how to speak in

16  English to the strangers and how to gesture and everything.  We

17  had classes on it.

18          THE COURT:  Thank you.  You made the statement that

19  you felt that he had a 60 percent command of English, is that

20  right?

21          THE WITNESS:  Yeah, approximately, yes.

22          THE COURT:  Do you yourself have a 100 percent

23  command of English?

24          THE WITNESS:  I wouldn't say that because I -- I

25  now -- I have -- I have difficulties in understanding few words

1  when people are talking, so...

2          THE COURT:  All right.  Thank you.  A juror asks did

3  both you and Mr. Ramamoorthy have English language learning

4  while in school in India?

5          THE WITNESS:  Do me and Prabhu was learning English,

6  that's what you're asking?

7          THE COURT:  Yes.

8          THE WITNESS:  In books?

9          THE COURT:  In school.  The question is whether or

10 not you studied any English language learning while in school

11 in India.

12         THE WITNESS:  Yeah, when -- when we were in school

13 like 10th grade, yes.

14         THE COURT:  You would -- you would take English

15 classes in school?

16         THE WITNESS:  Yes.  It -- it was --

17         THE COURT:  Both you and --

18         THE WITNESS:  -- it was always optional, yes.

19         THE COURT:  You say it was optional?

20         THE WITNESS:  Yeah, over our mother tongue.  Either

21 we can choose our mother tongue or we can choose English, we

22 have that option.

23         THE COURT:  And you took those classes yourself?

24         THE WITNESS:  I took, yes.

25         THE COURT:  And did Mr. Ramamoorthy take those

1  classes?

2          THE WITNESS:  While in college he started to take

3  English.

4          THE COURT:  Only in college?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.  Any followup questions from

7  the attorneys?

8          MS. SMITH:  No, thank you.

9          MR. AMBERG:  None, Your Honor.

10          THE COURT:  All right.  May this witness be excused?

11          MR. AMBERG:  Yes, Your Honor.

12          THE COURT:  All right.  Thank you very much for your

13  testimony.  You may be excused.  You may step down.

14          THE WITNESS:  Thank you.

15          (Witness excused at 9:55 a.m.)

16          THE COURT:  All right.  Mr. Amberg, do you wish to

17  call any additional witnesses?

18          MR. AMBERG:  No, Your Honor.

19          THE COURT:  Thank you very much.  Does the defense

20  rest?

21          MR. AMBERG:  We rest, Your Honor.

22          THE COURT:  All right.  So, ladies and gentlemen, the

23  defense has rested.

24          And let me just ask Ms. Smith on behalf of the

25  government, do you wish to present any rebuttal evidence?

```
 1              MS. SMITH:  We do not.  Thank you.

 2              THE COURT:  So, ladies and gentlemen, the evidence is

 3   closed at this point.  The next step would be for us to allow

 4   the attorneys to present their closing arguments to you.

 5              Before we do so, let's just take a brief break

 6   because I'm going to go over with them the -- the jury

 7   instructions that I'll be giving you and a few preliminary

 8   matters.  So let's take a break before we have our closing

 9   arguments.

10              Please rise for the jury.  Don't discuss the case, as

11   you know.

12              (Jury was excused at 9:56 a.m.)

13              THE COURT:  You may be seated.

14              One matter we should address is the issue of Mr.

15   Ramamoorthy's decision not to testify because the evidence has

16   closed.  And so Mr. Ramamoorthy, let me ask you again, do you

17   understand that you do have the right to testify?

18              DEFENDANT RAMAMOORTHY:  Yes, Your Honor.

19              THE COURT:  And do you wish to testify or do you not

20   wish to testify?

21              DEFENDANT RAMAMOORTHY:  Not wish to, Your Honor.

22              THE INTERPRETER:  He's saying that he does not wish

23   to testify.

24              THE COURT:  All right.  Thank you very much.  Does

25   either counsel wish to ask any followup questions?
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1835   Page 36 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

36

1        MS. SMITH:  No thank you.

2        THE COURT:  All right.  Thank you very much.  You may

3   be seated, Mr. Ramamoorthy.

4        Let me ask counsel, what is your position with

5   respect to jury instructions and whether or not you would want

6   me to give any or some of the instructions before or after you

7   give your closing statements.

8        MS. JAWAD:  Your Honor, I'd prefer that you give them

9   before the closing statements.

10       THE COURT:  Mr. Amberg?

11       MR. AMBERG:  I would prefer it afterwards.  I can't

12  believe we're finally disagreeing on something here.  But I

13  think that, you know, right now we've just gotten done

14  hearing -- hearing the testimony, we get right into these

15  closings, and then, Your Honor, it'll be sort of towards the

16  lunchtime hour, you read those instructions, then they can go

17  right into doing their deliberations.  I think it would be a

18  fine oiled legal machine.

19       MS. JAWAD:  Your Honor, I do think it's helpful when

20  the jury has a basic overview of the law when they're analyzing

21  the closing argument.  That's the basis of my preference.

22       THE COURT:  Well, the jury sometimes benefits from

23  hearing what the elements of the offenses are, and since we're

24  going to agree to these jury instructions before you do your

25  closings, I don't think there would be any problem with counsel

1   on either side referring to the written jury instructions.

2   What do you all feel about that?  In other words, you may say

3   that the Court will instruct you that the elements are X, Y and

4   Z.

5          MR. AMBERG:  I have no objection.  I was intending on

6   talking about the instructions.

7          MS. JAWAD:  I have no problem with that as well.

8          THE COURT:  All right.  Well, I'm going to deliver

9   them after your arguments, largely just because that's what the

10  defendant is seeking and he does not bear any burden of proof,

11  and so I'm going to go along with that.

12         So let's just take them here anyway so we won't use

13  up -- won't use up too much time.  The -- there was an issue

14  regarding whether or not those elements with respect to the

15  definition of "sexual act" should include the subsections (A)

16  and (B) and (D) because those sexual acts are not at issue in

17  this case.  What I understood before was that Mr. Amberg

18  preferred not to mention (A), (B) and (D), but the government

19  made the argument that because those are part of the statute,

20  that it would be an error to exclude them from the definition

21  of "sexual act."  Is that still the position of the parties?

22         MS. SMITH:  Yes, Your Honor.  And I would also note

23  that you read this to the jury in the beginning of the case as

24  well.

25         THE COURT:  I did.  All right.  Well, I do think it's

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1837   Page 38 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

38

1    a little bit confusing, but Mr. Amberg, do you wish to address

2    it?

3              MR. AMBERG:  Yeah.  I think it's -- it's not just a

4    little bit confusing.  You're putting all these sexual acts in

5    there.  You're throwing in all these real strong language.

6    You're talking about things that are done to somebody under

7    16 years old, penis and vulva, penis and anus.  None of this

8    has anything to do with this case, but when you hear it and you

9    read it, it just sounds so terrible.  I don't see how it's

10   relevant in this case.

11             I know Your Honor read it in the beginning and I

12   thought that was proper at the time, but now that the proofs

13   are in, I don't think that the government's going to be arguing

14   (A), (B) or (D), so why should the jury hear this prejudicial

15   information that serves no purpose in this case?

16             THE COURT:  Any response?

17             MS. SMITH:  My response is that this is -- this is

18   how the statute is worded.  It is the statutory language and

19   it's proper to instruct the jury how the statute defines the

20   term "sexual act."

21             THE COURT:  If the defendant doesn't want those parts

22   of the instruction to be mentioned and they are not relevant to

23   this case, in what sense if -- in what sense is it wrong to not

24   mention them?  I'm trying to understand why -- why -- how can

25   it be an error that would affect the actual result of the case?

Case 2:18-cr-20027-TGB-MKM ECF No. 86 filed 03/05/19 PageID.1838 Page 39 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

39

1    MS. SMITH:  I don't -- I don't know that it is
2    necessarily reversible error, but I think if you are limiting
3    the statutory definition to one means, then perhaps -- there's
4    more than one -- sexual act means more than one thing, and so
5    to direct the jury that sexual act only means this one thing is
6    just not -- not a proper summary of the law.  I -- I -- I
7    don't -- I mean maybe we can compromise this and say, "The term
8    'sexual act' means, among other things," and then read letter
9    (C).
10        THE COURT:  Let's do that.
11        MR. AMBERG:  Your Honor, I -- I would object to that
12    though too.  It has to be -- it has --
13        THE COURT:  What if we were to say, "The terms
14    'sexual act' is defined in pertinent part to mean"?
15        MR. AMBERG:  I just want to make sure the jury
16    understands that they are limited to deciding this case --
17    bless you -- and that the allegations of acts in this case to
18    that one section because if -- if the jury is told, hey,
19    "sexual act" could mean a lot of different things or there's
20    some additional things, then they might find or make a finding
21    based on that and not what the law is.
22        Now, I mean as part of my Rule 29 motion I'll argue
23    that the vast majority of the statute is not proven.  And I
24    don't think the government's going to argue that the
25    complainant was under 16.  I don't think they're going to argue

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1839   Page 40 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

40

```
1    that there was this type of contact between mouth and penis or

2    penis and vulva or anus.

3            And so I don't -- I'm just trying to think.  I don't

4    think it would be -- you know, maybe some other cases you don't

5    have to throw the entire statute in there.  For purposes --

6    this -- this statute encompasses different acts.  I mean the

7    only act we're dealing with is (C), that's what we're dealing

8    with.  Why -- why prejudice this -- this jury with these other

9    definitions or leave it out there like -- to them to say, "Hey,

10   maybe something that's not in here is a sexual act and this is

11   just up to you."  That's not fair for Mr. Ramamoorthy.  It

12   should be did he do (C) or did he attempt to do (C).  That's --

13   that's -- I -- I can't see any reason for including anything

14   else like that.

15           MS. SMITH:  My response is that if there's a

16   disagreement between the parties, my position is that the

17   statutory language should be read as is.

18           THE COURT:  Mm-hmm.  I think the main point is that

19   the jury understand a correct statement of the law, and as it

20   relates to the facts of this case, for them to understand that

21   (C) is the act, the "sexual" -- the definition of "sexual act,"

22   that is, the pertinent and relevant definition of "sexual act,"

23   is sufficient to make certain that the jury understands what

24   the law is.

25           I also want to make it clear, and Mr. Amberg, you
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1840   Page 41 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

41

1   need to make it clear, do you -- if this is an error, the

2   government believes it's not reversible error that -- but if it

3   is an error, you waive any error challenge to that, do you not,

4   Mr. Amberg?

5           MR. AMBERG:  Well, of course if it's an error to do

6   that, I'm waiving it because I don't want the stuff in there.

7           THE COURT:  Well, I want to make that clear.

8           MR. AMBERG:  Clearly, yes.  Yes, that's -- that would

9   be -- if there's any error in just reading parts of the

10  charging statute in the closing final instructions, we would

11  waive any error when it comes to how it is read so long as it's

12  read the way that we request it.

13          THE COURT:  I don't think it is error because, as I

14  said, I think the jury will understand the applicable law to

15  this case.  And I also think that there's at least a

16  possibility that the use of somewhat inflammatory and -- and

17  more difficult language could divert their attention from what

18  the case is about.  So I'm comfortable with instructing them

19  that "sexual act" means (C), okay?  That's what I'm going to do

20  on that one.

21          Now, we have to also deal with the instructions

22  regarding the defendant's testimony.  So on page 24 we have the

23  Jury Instruction 16.  That's the one where the Court indicates

24  that the defendant has an absolute right not to testify, so we

25  will deliver that one.  We will not deliver the instruction on

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1841   Page 42 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

42

```
 1    page 25 because that was to be used if the defendant testified.

 2    Okay.  Any objection to that?

 3              MS. SMITH:  No, Your Honor.

 4              MR. AMBERG:  No.

 5              THE COURT:  I am not going to use the "False

 6    Exculpatory Statement" jury instruction on page 28.

 7              MS. SMITH:  And may I just say for the record that I

 8    do object to you removing that from the set?

 9              THE COURT:  All right.  Well, let me -- I can

10    indicate my reason for this is that although the -- the

11    evidence was that the defendant gave inconsistent statements,

12    the evidence was not clear that the -- which statement was

13    false.  And so to -- for the Court to say that the testimony

14    was that the defendant gave a false exculpatory statement would

15    not be an accurate statement, and that's why I'm not going to

16    give that instruction.

17              Are there any other instructions that either side

18    believes present any problems?

19              MS. SMITH:  Not from the United States.

20              MR. AMBERG:  No, Your Honor.

21              THE COURT:  Okay.  Very good.  So we'll deliver these

22    to the jury after you do your closings.

23              Does -- do you wish to take a break before we do our

24    closings?  Do you want to take a brief break, Counsel, for

25    yourselves?
```

```
 1              MS. JAWAD:  Yes, Your Honor.

 2              MR. AMBERG:  Yes, please, Your Honor.

 3              THE COURT:  All right.  Let's just take about a

 4    ten-minute break, just make it quick, and we'll be back on the

 5    record in ten minutes.

 6              THE LAW CLERK:  All rise.  Court is in recess.

 7              (Court in recess at 10:09 a.m.)

 8              (Proceedings resumed at 10:22 a.m., all parties

 9              present, jury not present)

10              THE LAW CLERK:  Court recalls Case No. 18-20027,

11    United States of America versus Prabhu Ramamoorthy.

12              Counsel, will you please replace your appearances on

13    the record?

14              MS. JAWAD:  Yes.  Good morning again, Your Honor.

15    Amanda Jawad and Maggie Smith on behalf of the United States.

16    With us at counsel table is Meghann O'Connor, a paralegal from

17    our office, and Special Agent Kevin -- Kyle Dodge with the FBI.

18              MR. AMBERG:  And good morning, Your Honor.  Again,

19    Jim Amberg on behalf of Mr. Ramamoorthy.  Directly to my right

20    is Mr. Victor Mansour, co-counsel in the case.  Next to him is

21    Mr. Ramamoorthy and next to Mr. Ramamoorthy is Mr. Vijay, his

22    translator.

23              THE COURT:  Well, good morning again everyone.  Are

24    we ready to present our closings?

25              MS. JAWAD:  Yes, Your Honor.
```

```
1            MR. AMBERG:  Yes, Your Honor.

2            THE COURT:  Let's bring in the jury.

3            (Jury entered the courtroom at 10:24 a.m.)

4            THE COURT:  Good morning again, ladies and gentlemen,

5    and thank you for your patience.  We had a number of

6    preliminary matters to take care of and we were able to do

7    that.

8            I wanted to let you know -- you may be seated --

9    we're going to have our closing arguments at this time, and the

10   order will be that the government will go first and present

11   their closing argument and then the defendant will follow that.

12   Government is allowed to present a rebuttal argument as well

13   because they bear the burden of proof.  And that will complete

14   the closing arguments and then I will instruct you in the law

15   in this case.

16           Are we ready to proceed?

17           MS. JAWAD:  Yes, Your Honor.

18           THE COURT:  You may do so.

19           MS. JAWAD:  Shellshocked.  Frozen.  Sobbing.  Visibly

20   shaken up.  Look of disbelief.  Agitated.  These are not words

21   that people use to describe someone who just woke up from a bad

22   dream.  These are words that describe real trauma, the trauma

23   that results from the unmistakable feeling of a stranger's

24   fingers inside of the most intimate part of your body.

25           Ladies and gentlemen, you heard from Laura on Monday.
```

1   She told you that she was visiting her boyfriend on a work trip

2   in San Diego.  She told you that on her way back to Detroit she

3   arrived at the San Diego airport mid-afternoon for a flight

4   that would take off late in the evening.

5          She told you that she had several drinks at the

6   airport that day.  She told you that even though she was

7   feeling buzzed, she was able to board both flights, first from

8   San Diego to Las Vegas, then from Las Vegas to Detroit.

9          She told you that when she got on the flight to

10  Detroit, she curled up in her blanket.  She used the blanket to

11  cover her body and she leaned into the window seat.  She told

12  you that she fell asleep before the flight even took off.

13         She told you that the next thing she remembers is

14  starting to wake up and feeling something on her body.  She

15  wasn't quite fully awake yet.  But the next thing she knew, she

16  felt the defendant's fingers shoving in and out of her vagina.

17  She told you that when the defendant realized that she was

18  awake, the defendant turned around and pretended to sleep on

19  his wife.  She told you that she looked down and found her

20  pants undone, her shirt untied at the bottom and unbuttoned,

21  later realizing that her bra was unhooked in the back.

22         She told you that in that moment she froze, that she

23  didn't know what to do, that she was scared.  She told you all

24  of this in no uncertain terms.  She was sure about what she saw

25  and sure about what she felt.  And if you believe Laura, ladies

1    and gentlemen, you are beyond a reasonable doubt that the

2    defendant is guilty.

3            But you don't have to just take Laura's word for it

4    because Laura's testimony is corroborated, it's supported by

5    the other evidence in this case.  And let's take a look at some

6    of the evidence that we've seen.

7            We know from the flight records that Laura, the

8    defendant and the defendant's wife all had seats in row 27 in

9    the back of Flight 788.  We know from the flight records that

10   the defendant was assigned to the seat in the aisle but ended

11   up in the middle next to Laura.

12           We know that Laura boarded the flight with a blanket.

13   Multiple witnesses describe the blanket, including -- and the

14   defendant and his wife also mentioned a blanket and we have

15   these pictures here.

16           We know that Laura texted her boyfriend immediately

17   after the assault.  Special Agent Erkkinen told you that he saw

18   Laura take these screen shots from her phone directly, and the

19   date of these screen shots matches up with the date and time of

20   the assault.  And you can even see on these text messages that

21   they were not delivered, which corroborate that they were sent

22   from the air.

23           We know that after the assault Laura's shirt was

24   untied, we know from this picture, and it was unbuttoned at the

25   top.  Multiple witnesses, including flight attendants and the

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1846   Page 47 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

47

1    airport officers who responded to the scene, confirmed this as

2    well.

3            We also know about all the things the defendant said.

4    You saw and heard those clips.  We know that one of the first

5    thing he says -- first things he said when he stepped off that

6    plane was, "I don't know where I kept my hand," and that was

7    before anyone told him anything about why Laura got up from the

8    plane.

9            We know that throughout the course of the day his

10   story changed, it evolved, until he eventually admitted to the

11   FBI that -- and demonstrated to them that he put his fingers

12   into Laura's pants and tried to get them in her vagina.  You

13   heard and saw those clips.

14           Now, you're going to receive instructions from the

15   judge about the elements of Sexual Abuse.  Those are just the

16   parts of the crime that we must prove beyond a reasonable doubt

17   in order for you to find the defendant guilty.  I'm going to go

18   through each of these elements with you now and show you how

19   each element has been proved beyond a reasonable doubt.

20           Starting with the first element, the first element is

21   that the defendant knowingly engaged in a sexual act with

22   Laura, and the judge is going to tell you that sexual act means

23   penetration, however slight, of the anal or genital opening of

24   another by a hand or finger or by any object with an intent to

25   abuse, humiliate, harass, degrade, or arouse or gratify the

Case 2:18-cr-20027-TGB-MKM  ECF No. 86  filed 03/05/19  PageID.1847  Page 48 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

48

1    sexual desire of any person.

2         You have heard the testimony from Erin Ivaniszyn.

3    She was the Sexual Assault Nurse Examiner, also known as a SANE

4    nurse, who examined Laura that day.  She testified that

5    penetration means anything that goes past the labia majora,

6    which is the outer layer of the vagina.  She stated it's

7    actually a common misconception that people think in order to

8    have penetration, you need to actually be inside of the vagina

9    or vaginal canal.  She also stated that Laura complained of

10   soreness when she was examining her.

11        So the defendant's fingers didn't even need to enter

12   Laura's vagina for there to be a sexual act, but we know that

13   it did.  Laura described to you what she saw and what she

14   heard -- sorry, what she felt.  She felt the unmistakable

15   feeling of the defendant shoving his fingers in and out of her

16   vagina.  She mentioned that feeling in the text message to her

17   boyfriend.  She also told us you know when something is inside

18   of you.

19        We also heard from the defendant himself.  He told

20   the FBI agents that he tried to put his hands in her pants and

21   he tried to get one or two fingers inside of her.  And the

22   defendant inferred to the FBI agents that he was aroused.  He

23   described how Laura had fallen asleep in his lap and claimed

24   that her hands were grazing his crotch area.  This shows that

25   he had the intent of gratifying his own sexual desire by taking

1    advantage of Laura.  But you can also use your own common sense

2    in determining why or for what purpose the defendant would

3    place his hands inside Laura's vagina.  That unmistakable

4    feeling of a stranger's fingers would certainly be humiliating

5    and degrading.

6           All of this evidence supports that the defendant

7    knowingly penetrated Laura with his fingers with the purpose of

8    arousing or gratifying his sexual desire.  We've proven this

9    element beyond a reasonable doubt.

10          Now, the second element is that the defendant knew

11   Laura was incapable of apprising the nature of the conduct or

12   physically incapable of declining participation in or

13   communicating unwillingness to engage in the sexual act.  And,

14   ladies and gentlemen, all this means is that Laura was unable

15   to understand the nature of what was going on or physically

16   incapable of saying yes or no to the sexual act, and she was

17   not able to do that because she was asleep.

18          Let's talk about the evidence that supports this

19   element.  Nearly every witness on the plane stated that Laura

20   was asleep.  The defendant himself says it several times.  In

21   fact, he says it every time he talks to law enforcement.  He

22   tells the airport officers that "she was sleeping on my legs

23   but I don't know where I placed my hand."  He tells the FBI

24   that five to ten minutes after she boarded she went into a deep

25   sleep.  He also demonstrates in that video to the FBI that she

1    was sleeping on his shoulder.  He even leans forward on the

2    table to show that she was sleeping on his leg.  But the

3    defendant doesn't just say she was sleeping; he says many times

4    he believed that she was intoxicated.  Based on those

5    statements and the fact that he said she was sleeping, the

6    defendant knew that Laura was unable to understand what was

7    going on when he put his fingers inside her vagina.

8            The defendant's wife also testified that Laura had

9    headphones in and she was sleeping on her husband's shoulders

10   at one point.  She also claims that this is a common thing in

11   India, that people just fall asleep on other people during

12   their commute because it's crowded.

13           Mr. Burciaga, the male flight attendant from Spirit

14   Airlines who testified last week, said Laura was sleeping on

15   the plane.

16           Laura's own statements also support that she was

17   physically unable to understand what was going on or tell the

18   defendant that she didn't want to participate.  She said she'd

19   had enough alcohol that day to induce a hard sleep.  She even

20   timed her Adderalls to ensure that she'd be able to sleep

21   deeply on the flight.

22           Ladies and gentlemen, Laura was physically incapable

23   of speaking or communicating to the defendant that she did not

24   want him to put his hands inside of her vagina.  The

25   penetration had already occurred by the time she woke up and it

1   was too late.  We've proven this element beyond a reasonable

2   doubt.

3         Now, the third element and the final element is that

4   the offense was committed within the special aircraft

5   jurisdiction of the United States.  And there's no dispute here

6   that this offense took place on Spirit Airlines Flight 788

7   which originated from an airport in the United States, that was

8   Las Vegas, and landed in an airport in the United States, which

9   is -- was in Detroit, and all of the testimony from the

10  witnesses support that this assault occurred while the flight

11  was in air.  We have proven the last and final element beyond a

12  reasonable doubt.

13        Now, the judge is also going to give you some

14  instructions about attempt.  He will tell you that the

15  indictment in this case includes both the crime of sexual

16  assault and the crime of attempted sexual assault.  You can

17  find that the defendant committed the crime either way in order

18  to find him guilty, and all of you do not need to agree on

19  which way the defendant committed the crime.  If some of you

20  think that he committed the crime of Sexual Abuse and some of

21  you think that he attempted the crime of Sexual Abuse, that is

22  enough to convict him of this charge.

23        Now, there's ample evidence to support that he did

24  commit the crime of Sexual Abuse, but we have also proven to

25  you beyond a reasonable doubt that he attempted to commit the

 1    crime of Sexual Abuse.

 2            For you to find that the defendant was guilty of

 3    attempting to commit Sexual Abuse, you must first find that the

 4    defendant intended to commit the crime of Sexual Abuse, and

 5    second, that the defendant did some overt act that was a

 6    substantial step in -- towards committing the crime.  He

 7    doesn't have to complete all the steps but just one overt act

 8    that would be considered a substantial step.

 9            So let's go over the -- just the overt acts that he

10    admitted to.  The defendant admitted to unzipping Laura's

11    pants.  The defendant admitting -- admitted to trying to unhook

12    her bra, and we know that her bra was, in fact, unhooked.  Most

13    people understand that unhooking a bra is not always an easy

14    task, it's not something that happens accidentally, especially

15    with one hand.  It shows that the defendant was preparing her

16    for the penetration that occurred later.

17            The defendant also admitted to trying to get his

18    fingers inside of her.  When asked specifically by Special

19    Agent Dodge if he was trying to get his fingers inside, the

20    defendant said, "I was trying, I won't say I did not try."

21            All of this probably took some time.  Laura was sound

22    asleep under that blanket with music in her ears.  It was dark

23    on the flight and many people sleep on red-eye flights.  The

24    defendant had plenty of opportunity to put his hand underneath

25    the blanket and even had his own jacket covering his body as we

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1852   Page 53 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

53

1    heard from his wife.  He had time while his wife was sleeping

2    to slowly work on undoing Laura's clothing and gaining access

3    to the most private part of her body.  These actions show

4    deliberate acts on the part of the defendant.

5            Now, the judge will also instruct you that you can't

6    rely solely on the defendant's uncorroborated statements, but

7    all of these overt acts that the defendant admitted to are

8    corroborated by all of the other evidence in this case,

9    including Laura's testimony.  Any one of these acts is enough

10   to find beyond a reasonable doubt that the defendant attempted

11   the crime of Sexual Abuse.

12           Now, I want to talk for a moment about the

13   credibility of witnesses.  A lot of the evidence of this case

14   comes from the witnesses who testified here in court, and the

15   judge will instruct you that it's up to you to determine which

16   witnesses are credible and which witnesses are not.

17           So let's start with Laura's credibility.  There are

18   two important factors to think about as you discuss and

19   evaluate her credibility: corroboration and consistency.  And

20   I've already talked about all the ways in which Laura's

21   statements are corroborated or supported by the other evidence

22   in the case.  That includes her text messages, everything the

23   other witnesses have said, their descriptions of her demeanor,

24   those adjectives that I read at the beginning of this closing,

25   closing.  They also include the statements of the defendant.

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1853   Page 54 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

54

1          But it's also important to think about how consistent

2     Laura's statements have been since she came off the plane and

3     even before she came off the plane.  There were several

4     witnesses who testified about statements that Laura made to

5     them.  First was Ali Hathaway, the first flight attendant from

6     Spirit Airlines; second was Oscar Burciaga, the second flight

7     attend from Spirit Airlines; and third was Erin Ivaniszyn the

8     SANE nurse examiner.  And we also heard from Laura.  Laura told

9     the same set of facts to all the people that you have heard

10    from.  She's told the same set of facts to us on Monday.

11    Laura's account has never wavered.  Corroboration and

12    consistency.

13         In contrast, the defendant's statements from the

14    moment he walked off the plane were constantly evolving.  He

15    first made a statement to Sergeant Alvarado immediately after

16    walking off the plane.  Now, let's look at that clip again.

17    This is Government's Exhibit 7.

18         (Video with audio being played)

19         Now, ladies and gentlemen, I know that was difficult

20    to hear, but you will have an opportunity to review the

21    exhibits as you deliberate and you can listen and watch that

22    clip again.  As you can see from the video, all Sergeant

23    Alvarado said when he first met the defendant was, "What's

24    going on today?"  He didn't say anything about Laura or ask

25    her -- him any questions about what happened on the airplane.

1    The defendant immediately begins talking about Laura: "She was
2    trying to come out.  She was sleeping on me."
3         He then starts talking about his hands, specifically
4    the right hand.  He says, "I don't know where I kept the hand."
5    He repeats it later in the clip, "I'm not sure where I kept my
6    hands."
7         And, ladies and gentlemen, did you notice in this
8    clip that he also says it was his neighbor, his neighbor told
9    him that the victim was sleeping on him, not his wife but he
10   says the word "neighbor."
11        At this point the defendant knew nothing about the
12   investigation, no one told him anything about it.  All we know
13   is that he had at least 45 minutes to talk with his wife before
14   he got off the plane and think about his story.  His wife
15   confirmed in her testimony that they discussed Laura after
16   Laura got up before the plane landed.
17        The defendant then talks to Officer Chalmers and
18   Officer Wach at the gate.  He tells them how he took a tablet
19   because he wasn't feeling well and that he fell into a deep
20   sleep, and that tablet ended up just being regular Tylenol.
21   And for someone who claims to be in such a deep sleep, he sure
22   does remember a lot of details about what Laura was doing on
23   the plane.  As you can see in this screen shot from Exhibit 9,
24   the defendant continues gesturing with his right hand when he
25   talks about knowing -- not knowing where they were on the

 1    flight.

 2         Next the defendant writes out a written statement

 3    where he repeats "I'm not sure where I kept the hand on her."

 4    Think about that, ladies and gentlemen.  If nothing happened,

 5    if all he knows is that Laura, the person sitting next to him

 6    on the plane, got up and didn't come back, he would have had no

 7    idea why it is that she got up.  She could have had a medical

 8    emergency.  She could have just wanted to switch seats for

 9    whatever reason.  All he knew, if nothing happened, was that

10    the person sitting next to him on the plane got up and later a

11    different person sat in that seat.  But his first reaction was

12    to discuss his hands.  That, ladies and gentlemen, is evidence

13    of a guilty conscience.

14         Now, yesterday you heard and saw from Agent Erkkinen

15    about the interview he did with the FBI in this case and you

16    watched clips from that interview.  You saw that the defendant

17    initially deflected attention away from him.  He asked the

18    agents if they would arrest Laura too if he complained that she

19    was sleeping on his leg.  He starts talking about how Laura was

20    doing all kinds of things: moving her legs in and out,

21    chatting, getting up to eat chips, talking on the phone.  But

22    the defendant can't keep up with his stories because later in

23    the interview he tells the agents after five or ten minutes

24    after she sat down, she fell into a deep sleep.  That's just

25    one of the ways that the defendant's story evolves throughout

Case 2:18-cr-20027-TGB-MKM ECF No. 86 filed 03/05/19 PageID.1856 Page 57 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

57

1  the course of the interview.

2          The defendant is constantly adjusting his story to

3  try to fit with the information he thinks the FBI knows, and he

4  tries to gather information as it goes.  You heard him asking,

5  "Can I know what the complaint is first before I talk about

6  it?"  He asks several times throughout the day, "What has she

7  said about me?  I don't know what she's complained about me."

8  He asks four separate times -- sorry -- whether or not there

9  were cameras on the plane.  He's trying to figure out what they

10  know so that he can adjust his story to explain the facts.

11          In Exhibit 20, that's the last clip that we saw, you

12  can see the moment when the defendant learns that the FBI

13  agents know that Laura's bra was unhooked.  When he's answering

14  questions about that, he takes a pause, he says, "Um, um, um."

15  You can see the wheels spinning in his head, and you can see

16  even in a span of minutes as the agents are asking him about

17  how her bra got unhooked, how her pants got unzipped, how his

18  statements evolved even in that short span of a few minutes.

19  First he says, "Intentionally I did not do that."  Then "This

20  one," and he's gesturing toward the bra area, "I remember

21  was up, I was trying.  I won't say I did not try."  Later as

22  they're talking about trying to undress her and put his hands

23  in her pants, he looks down and says, "I tried, I tried."

24  These are just some examples of the way the defendant's story

25  changed throughout the day.

1          Now, the defendant's trying to say, or he's tried to

2    say through his counsel, that he didn't understand what the

3    agents were saying, that they somehow coerced him into making

4    all of these admissions.  But you saw the video, ladies and

5    gentlemen.  You saw the agents asking him if they understood

6    what he was saying.  He shook his head and said, "No

7    troubling."  So maybe his verb tense was a little bit off but

8    his message was the same.

9          You saw the agents explain to him that he didn't have

10   to talk to them, he didn't have to answer any of the questions.

11   When they went over that line of the Miranda Rights, the

12   defendant said, "Okay, that means I don't have to answer all of

13   the questions?," and Special Agent Dodge said, "No, that means

14   you don't have to answer any of the questions."  The agents

15   spent over ten minutes going over the Miranda Rights, making

16   sure the defendant understood that he didn't need to talk to

17   them, and that if he wanted to, he could have had a lawyer with

18   him in the interview.  The defendant chose to proceed with the

19   interview.  He didn't tell them "I'm too tired to talk or I'm

20   hungry and I don't want to talk right now."  He immediately

21   lunged into his explanation that, as you've seen, made no

22   sense.

23          And the best indication that he understood English

24   during the interview is his answers to the questions that he

25   asked.  And unprompted, he gave hand gestures that happened to

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1858   Page 59 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

59

1    coincide with everything he was saying.  He did that on his own

2    and he understand -- understood what he was doing.  Now, was

3    there a language barrier?  To some extent, yes.  But you saw

4    the back and forth happening between the agents to make sure

5    that they understood what the defendant was saying and that he

6    understood them.  And it doesn't matter what language you're

7    speaking.  When you're using your hands to gesture exactly what

8    you're doing to the victim's body, everyone understands what

9    you're saying.  Sexual assault has no language barrier.

10           Ladies and gentlemen, we've also heard from a DNA

11   examiner in this case.  She told us she was not able to

12   identify a match between the victim's swabs and the defendant's

13   swabs, and we've heard that there's a variety of reasons for

14   why that might be.  She said it was possible that there was no

15   transfer at all.  That could be due to skin composition, air

16   environment, things like lotion on the hands.  She also said

17   that not every touch results in a DNA transfer.

18           And as you also saw, the defendant had plenty of time

19   to rub his hands which can also affect the DNA.  In

20   Exhibit 21 -- excuse me -- we showed you all of the ways that

21   the defendant was touching his body, had his hands in his

22   pockets and touching other objects.  He also blew his nose on a

23   napkin, and that napkin was in his pocket when he arrived at

24   the station, which means it was on him when he was on the

25   airplane before he got off the plane.

1           And you heard from the officers that the defendant

2   was not swabbed right after he walked off the plane.  Was this

3   a perfect investigation?  No.  But the judge is not going to

4   ask you to decide whether the Metro Airport Police should have

5   been more proactive in securing the hand swabs.  You'll only be

6   asked to evaluate the evidence in front of you.  And remember

7   what the judge told you during jury selection: DNA evidence is

8   not required to find the defendant guilty beyond a reasonable

9   doubt.  The DNA evidence doesn't change the fact that the

10  defendant admitted to doing these things.  Think about the

11  evidence in the case and how it all fits together.

12          I want to take a moment now to talk about the two

13  witnesses that the defense put on.  We heard from them

14  yesterday and this morning.  The first was Mr. Selleke.  He had

15  nothing relevant to say about the case.  Instead, he focused on

16  what Laura was wearing that day, what Laura was drinking that

17  day.

18          The second witness was the defendant's wife.  She

19  made statements that just don't fit with the other evidence in

20  this case.  Her testimony is not only inconsistent with prior

21  things that she said, but it's inconsistent with what her

22  husband has said.  For example, she said that Laura got up and

23  went past them, but she said that the defendant didn't wake up

24  when that happened, that he stayed asleep.  But the defendant

25  himself told us he remembers Laura getting up and down.  He

1   even says in the interview something like "she tapped me and I

2   laughed with her."  This doesn't support his wife's testimony

3   that he was sleeping the entire time.  But it's not surprising

4   that the defendant's wife would say she didn't see anything

5   happening.  She has every incentive to protect her husband.

6          Ladies and gentlemen, the judge has instructed you

7   that you can consider a witness's -- or the judge will instruct

8   you that you can consider a witness's bias in determining

9   whether to believe their testimony.  One of the ways you can do

10  this is think about what a person may have to gain or lose from

11  the outcome of the case.  I suggest that you ask yourselves

12  what does Laura have to gain in making something like this up?

13  She didn't know the defendant before this happened.  What

14  possible reason could she have to make this up?

15         Think about all that she was subjected to during --

16  during the course of this investigation.  She had to endure

17  questioning from the police.  She had to endure going to the

18  hospital with a police escort just to be turned away because

19  they couldn't do the rape kit there.  She then had to go a

20  second time to another hospital to have a rape kit performed on

21  her, which is, as Dr. Ivaniszyn testified -- or not Dr. --

22  Nurse Ivaniszyn testified, a very invasive vaginal exam.  And

23  then there was this trial.  Months after her traumatic event

24  she came to court, she sat before you and she described in

25  detail how this man sexually violated her.

1          Laura is a 22-year-old girl.  Maybe she could have

2     made better choices that day, but ladies and gentlemen, you're

3     not -- the Court is not going to be asking you to decide

4     whether she should have spent her time in the airport in a

5     better way.  The Court is not going to ask you to decide what

6     she should have been wearing that day.  The Court is not going

7     to ask you to decide whether she should have been wearing a

8     winter jacket as Mr. Selleke suggested.  That is because Laura

9     is not the one on trial here.  But ask yourselves, why would

10    anyone go through all of this if they weren't sure?

11          As you go back to the jury room to deliberate, think

12    about whether it even makes sense that this didn't happen.  The

13    defense has tried to say that Laura was so intoxicated that she

14    just imagined this assault.  And Laura admits she did have

15    enough to drink before the flight that it induced a hard sleep,

16    but the witnesses who talked about her demeanor after she woke

17    up describe it as coherent.  They didn't say that she seemed

18    intoxicated after.  The airport flight attendants and the

19    officers could have coherent conversations and she could carry

20    on the conversation.  In her text messages you can see that

21    she's clearly upset and rattled, but you can use your common

22    sense in analyzing whether she's able to put together coherent

23    enough sentences and words in a way that is not reflective of

24    someone who's blackout drunk.

25          In order to believe the defendant's theory that she

1    somehow imagined or dreamed the assault, you would have to

2    believe that Laura unbuttoned her own pants, untied her own

3    shirt, unbuttoned the top of her own shirt, unbuttoned her own

4    pants, unzipped her zipper, and that the defendant just

5    happened to admit to doing all of these things afterward.  But

6    how coincidental is it that the defendant confessed to the

7    exact same sexual act that the victim described?

8           Ladies and gentlemen, were you watching in the

9    interview the hand gestures the defendant made when he spoke

10   with the FBI?  Did you notice that he twisted his arm like this

11   when he showed them how he was touching Laura?  Did that

12   gesture seem familiar to you?  If it did, that's because that

13   is the exact same gesture that Laura made when she was on the

14   stand on Monday and defense counsel was asking her how it is

15   that she saw the defendant's hand touching her vagina.  Laura,

16   who testified that she's never seen any of the other reports in

17   this case, she testified that she only looked at what she's

18   written in the case, made the exact same twist of the arm that

19   the defendant made in his interview with the FBI only a few

20   hours after the assault.

21          The fact that there's no DNA in this case, there are

22   reasonable explanations for that.  The fact that the defendant

23   and the victim made the exact same hand gestures months later,

24   the only explanation for that is that this is how the defendant

25   got his hands into her vagina on that airplane.

1          Ladies and gentlemen, this is a simple case.  The

2     defendant took advantage of a 22-year-old girl alone, sleeping

3     and trapped in the window seat where she couldn't get up to

4     escape.  He saw Laura and decided to act on his urges while she

5     was helpless to resist.  All of the evidence in this case

6     brings you to the only conclusion that makes sense: the

7     defendant is guilty.  Thank you.

8          THE COURT:  Thank you, Ms. Jawad.

9          Mr. Amberg, are you ready to proceed?

10         MR. AMBERG:  I'm ready, Your Honor.  Just want to

11    shut this off here.

12         THE COURT:  You may proceed.

13         MR. AMBERG:  It's distracting.

14         Prabhu's day started at 4:30 that morning.  He woke

15    up because for the last couple of days before that in Las Vegas

16    he couldn't do anything.  He was sick, he had a fever, he

17    didn't feel well, he had one of those colds that we've all

18    probably had.  All you want to do is just sit there and rest

19    and try to get better.  But he was on vacation with his wife

20    and he promised her that they would go to the Grand Canyon that

21    day, and so he sucked it up and he got into their rental car

22    and drove for four hours while he was exhausted to the Grand

23    Canyon.  Once he was there, he spent the entire day with his

24    wife walking around and doing things actively, things that when

25    you're sick you just don't want to do, because when you're

1    sick, all you want to do is rest.

2            Now, a four-hour drive is exhausting enough.  We've

3    all done it.  You drive up north, that's not an easy drive.

4    Then you do something all day and then he drives back to the

5    airport, another four hours.  So that's eight hours of driving

6    while already exhausted, not feeling well and everything else.

7            Eating?  Not much because when you're sick, you don't

8    eat much.  And with Prabhu and his wife, as we know, their food

9    that they eat, it's very limited.  So when he gets to the

10   airport with his wife, all he can eat is a couple of french

11   fries and a cup of hot chocolate.  He doesn't sleep there.

12   They get on the plane and that's that.

13           Now, it's clear that his intention is that he wants

14   to sleep on the plane.  Him and his wife get there first to

15   their seats.  Nobody else is sitting there.  They sit down,

16   just like many -- probably all of us have in the past on these

17   Spirit Airlines flights, and they are ready to go.  They're

18   speaking to each other in their own language, and then all of a

19   sudden the complainant shows up.  She asks for a favor to put

20   her stuff under Prabhu's seat.  He complies.  She's got a lot

21   of stuff, so she then goes back to the front of the plane and

22   finds a place to put her bag.  Everything's normal.  These are

23   experiences we've all had.

24           Now, at this point in time, this is very late in the

25   evening, this is a red-eye flight, and Prabhu has now been up

1    for the greater part of almost 24 hours at that point.  And

2    like I said, when you are sick, all you want to do is sleep.

3    His wife gives him some Tylenol.  That's exactly what he does,

4    he falls asleep.

5            Now, the complainant's sitting next to him, she's

6    sleeping as well.  And as we heard, and I'll get into in

7    greater detail in a minute here, but she's got a lot of alcohol

8    on board with her.  She had her own things that she was doing

9    while she was in Las -- or in San Diego and then Las Vegas, and

10   she is sleeping as well.

11           First she falls asleep on the window, but as we heard

12   from different witnesses, she then falls asleep on Prabhu's

13   shoulder and then on his lap.  Prabhu's out cold, and that

14   makes sense because who, any of you, do you think you'd be up

15   and awake after the day he had?  No, there is no way.

16           So what happens is this.  The complainant, who you

17   heard how adamant she was about how she never would sleep on

18   him, never, she wakes up and there she is sleeping on him.

19   Now, when you're drunk, when you're in that haze, when you

20   don't know what's going on and you're dreaming, you think

21   something happened, that's exactly what happens here.

22           So she gets up, she doesn't scream or anything like

23   that.  She gets on her cell phone and for ten minutes texts,

24   and the texts are all over the place.  Sometimes the texts

25   are -- and you'll see 'em, they're in evidence -- sometimes the

1    texts are about "was I -- I don't know what was happening, this

2    is what I was thinking" and things like that.  Then she leaves.

3            Now, Prabhu and his wife don't really know anything

4    yet about those accusations.  What happens is is that she never

5    comes back to the seat and another gentleman is now sitting in

6    the seat.  They moved over.

7            Plane lands and then it becomes unusual because they

8    see her, the complainant in this case, taken off the plane

9    first.  Then the next unusual thing is that Prabhu is taken off

10   the plane.  Now, as we know, Prabhu's wife had told him that

11   she, the complainant, was sleeping on him.

12           Almost immediately, as you can see, the officers

13   are -- are surrounding him, and as he's escorted out of this

14   terminal he can see the complainant sitting there talking to

15   other officers.  The one officer asks him real quick, "Did you

16   intentionally touch her?"  I think anybody could put two and

17   two together to know what's going on.  You got this guy who's

18   not from this country, who doesn't speak English as his first

19   language, he doesn't speak English that well, it's gotta be

20   just a nightmare.

21           And what do you say?  It's so easy to come in here

22   today like the government and play Monday morning quarterback

23   and what you should do and how you should act.  Imagine if that

24   was you.  Imagine if you were in India.  Imagine if officers

25   that don't really understand you and your language are now

1    questioning you, and all you do is say that you didn't do

2    anything, and you don't even know what you're accused of except

3    you know she's over there and you know she was laying on you.

4    That's what's going on here, that's all that there is.  And the

5    thing is is that the evidence certainly backs that up.

6           Now, before I get into the evidence itself, it's so

7    easy to make an accusation.  Once you make an accusation on

8    somebody, that's it, these officers automatically think you did

9    it.  And that was the case here.  They never gave him the real

10   chance.  They never waited till the evidence came back.  They

11   never did anything.  They thought he was guilty just by the

12   accusation.  Put yourself in those shoes.

13          And I'm kind of jumping ahead but think about that

14   interview.  They already knew they were taking him to court.

15   You take somebody you didn't think do it or maybe give him that

16   fair shake that he deserved?  You think you -- you're taking

17   him to court right away 'cuz of that?  No, you do it because

18   you heard what she said and you just believed her, that's it.

19          So let's talk about the evidence because it's one

20   thing to accuse somebody and have some statements done after

21   somebody's been up for a day and a half straight sick as a dog,

22   no food, no drinks or anything like that, yeah, that's real

23   easy to manipulate somebody into saying something, and I'll get

24   to that in a second.  But at the end of the day, the one thing

25   that Prabhu has to -- to rely on is that the evidence does not

1      suggest that this happened at all.

2             So let's start off with the DNA, the evidence.  We

3      know that the hand in question here is the right hand.  All

4      right.  And I don't -- I apologize I have to be graphic on

5      this, but I have to because it's -- because I have to show you

6      how obvious this is.  If you put your hand into a vagina, you

7      will have DNA all over that hand.  All right.  There will be

8      DNA all over the hand.

9             You heard the flight attendants say as soon as this

10     accusation happens, that they, either Burciaga or the female

11     attendant, watched him the entire time while he was in the air.

12     Then when they land, these officers have watched him ever

13     since.  And there's even cameras.  You didn't get to see it

14     all, but I asked Agent Erkkinen about it.  There's cameras that

15     watched him literally the entire time.  He never washed his

16     hands.  This idea that you can somehow go like that and

17     magically all that DNA comes off is preposterous, it is

18     preposterous.  I get it, the government's witness, their

19     expert, will come up there and say what they gotta say to make

20     it seem like that's a possibility, but it's preposterous, okay?

21            But it's not just that.  Okay.  And -- and I can tell

22     you right now how we know that's wrong right off -- right off

23     the bat.  It's not just that it's just Prabhu's DNA on his

24     hand; there's somebody else's DNA on his hand.  So -- so I

25     guess what happened, did -- did Prabhu go in there with a

1    microscope and kind of wipe around, you know, where her DNA

2    was?  That makes no sense at all, at all.  You heard they did

3    all the protocols the way they were supposed to do.  DNA exists

4    for weeks as long as you don't wash the hand with stuff or

5    whatever, and they didn't, so there should have -- it should

6    have been there and it wasn't.

7            So, yeah, it's easy to make an accusation, and when

8    the evidence doesn't suggest it, you gotta look at that

9    accusation with a grain of salt.

10           Now, it doesn't end there because if it was just one

11   swab, I suppose, well, I guess it's a possibility magically

12   this DNA left his hand, but it's not.  We have testing on the

13   fingertips, on the hand itself.  You have testing on her, and

14   not just around her breast area but, again, in her vagina,

15   okay?  The way she described this was that his hands go

16   vigorously in and out of her vagina.  Now, it was unclear from

17   her how long that was, which is another problem with her story.

18   But I'm telling you right now, folks, if this actually happened

19   like that, there would be DNA inside of her.

20           They talk about this shower thing and all that stuff.

21   What -- if you're doing an investigation like this, you make

22   sure that person is ready to go, you make sure to preserve that

23   evidence, and you do that if you actually are concerned about

24   him.  You don't do that if you already got your mind made up,

25   you got the court date set, let's get that fake confession and

1    get outta here, okay?

2            Anything that they screwed up on, the government,

3    their officers, you must hold it against them because I'm

4    telling you, I wish that they would have done the real proper

5    procedure and made sure that she didn't do anything and do that

6    test because you know what?  I could have come up here and said

7    exactly what's the truth, which is that there is no DNA of his

8    in her, all right?  To believe her you have to disbelieve real

9    evidence.

10           Now, it's not just that because it sounds like after,

11   you know, the DNA evidence doesn't work out for him and, hey,

12   maybe this guy's not guilty after all, oh, well, we better go

13   do the fiber evidence, right?  So this is another key piece of

14   evidence.  You can literally touch this and have fibers on your

15   hands, okay?  That's how it works.

16           Now, they cut Prabhu's nails, and guess what?

17   There's fibers on those nails, multiple, different kinds of

18   fibers.  You can look at that report.  Not only does that show

19   that he wasn't washing his hands or, you know, cranking his

20   nails like that, it shows that there was material that was

21   collected from fibers.  None from those jeans.  You want to

22   believe he was trying to get in those jeans and you're telling

23   me that he didn't get fibers on his fingers?  Gimme a break,

24   gimme a break.

25           Can you imagine if it was the other way around?  The

Case 2:18-cr-20027-TGB-MKM ECF No. 86 filed 03/05/19 PageID.1871 Page 72 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

72

1    government would be up here telling you that this is the

2    ultimate science, this is it.  How could -- how could he be

3    innocent, it's -- it's fibers on there.  But there's not, so

4    they just gloss over it because they hope -- and then this is

5    what they have done in their closing argument -- they hope that

6    you think she's a girl and that she's innocent and all this

7    other stuff and how horrible this was that she had to go

8    through this.  But that's not facts, that's not evidence.  No

9    fibers is evidence.  No DNA is evidence.  They even did a

10   fingerprint test.  Guess what?  Negative, okay?  So there's no

11   actual, real, physical evidence, the best kind of evidence.

12          Let's talk about the complainant and her drinking

13   because it's very important for this case.  I want to talk

14   about how much she drank.  Now, to different people at

15   different times she sort of says different things about what

16   she drank.  I mean at one point with the SANE nurse she

17   tells --

18          THE COURT REPORTER:  Mr. Amberg, you need to slow

19   down please.

20          MR. AMBERG:  Okay, I will.  I apologize.

21          At one point with the SANE nurse she clearly says she

22   denies drinking at all, which is a lie.

23          MS. JAWAD:  Objection.  That's not what the evidence

24   shows.

25          MR. AMBERG:  It says, "Patient denies."  I don't know

1    what else it could mean.

2         THE COURT:  Counsel, all right.  Just be conscious of

3    the need to summarize the evidence accurately.  Go ahead.

4         MR. AMBERG:  And as you heard, folks, that's exactly

5    what was written down there on that report: "Patient denies."

6    Okay.

7         Now, so let's talk about the person who denied using

8    alcohol.  In San Diego she starts drinking, not when she gets

9    there at the airport, but later on after her boyfriend's now

10   gone, she's doing some work, she's working on something, I

11   don't know, she says that she drinks four beers, okay?  That's

12   what she says, "I drank four beers and four shots."  Okay.

13   Eight drinks, right?  But it's not eight drinks, it's not.

14   It's pints.  A pint of beer is bigger than a regular 12-ounce

15   beer.  A pint is 16 ounces.  Okay.  So right off the bat it's

16   not four drinks, it's six drinks.

17        Now, a regular beer, a regular drink, Labatt, Miller

18   Lite, stuff like that, it has a alcohol content, normal alcohol

19   content, but that's not what she's drinking.  She's drinking

20   IPAs.  And I even asked her about 'em.  I asked what kind of

21   IPAs she liked.  Two Hearted Ale.  This is not a wimpy drink.

22   This is something with a much higher alcohol content in it, so

23   six beers really become something like ten beers.

24        You add four shots.  These aren't kamikaze shots,

25   these aren't those cool shots you get when you're walking

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1873   Page 74 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

74

1    around the bar and, you know, there's liqueur in there.  This

2    is Jameson whiskey, this is the real deal.  She takes four

3    shots of Jameson.  She's got a lot on board by the time she

4    leaves San Diego.

5           Now, I tried to ask her about her drinking habits

6    because that's important.  Now, she's young, she's 22, but

7    she's not a daily drinker.  She's also very petite, which is

8    important for how alcohol, you know, we can -- common

9    knowledge, folks, it doesn't take that much.  Think about your

10   own experiences if you drink 16 drinks in about three hours of

11   time, how would you feel?

12          But what happens is is that it doesn't end there

13   because the flight from San Diego to Las Vegas is less than an

14   hour, and as soon as she gets there, she continues the drinking

15   again during her layover.  You heard Tom Selleke, he told you

16   he's got no skin in the game.  He was just there with sounds

17   like there was a former wife.  I'm sure there was a story

18   there.  But at the end of the day he recognizes her, something

19   calls his attention and he sees what she's drinking.

20          Now, what she testified to is she drank a beer, and I

21   would preface that with we don't know if that was a regular

22   beer or a pint of an IPA, which is really about two beers.  And

23   then she also said she was drinking shots or taking drinks from

24   somebody and things like that.  But what Mr. Selleke says that

25   he sees is that he sees her drinking a large mixed drink.  What

1    is in that we don't know because she doesn't remember doing it,

2    okay?  That's the problem with everything she says, she doesn't

3    remember.

4              Mr. Selleke sees her and how she looks, the way that

5    her outfit is.  He described it as a Daisy Duke type outfit.

6    We talk about unbuttoning and things like that.  It sounds like

7    that shirt was already unbuttoned.  She was chatting it up with

8    some guy at the bar.  I mean who knows what's going on there?

9              So then they all get on the plane.  But before I want

10   to talk about what happens on the plane, I asked almost every

11   witness that came up here that had some sort of interaction

12   with people that are drinking about alcohol and what it can do.

13   And I know this is common knowledge but I thought it was

14   important to hear it from the government's own witnesses,

15   including the complainant.  Alcohol causes loss of memory, we

16   all know that, they all admitted it.  When people are drunk,

17   they can lie, we all know that, we probably all seen it.

18             People that are drunk have a misperception of

19   reality.  If you've been drinking and you've had what looks to

20   be at least 20 different drinks all added together, you could

21   have a misperception of reality.  They all admitted you could

22   have an incorrect memory, you can have false memories, you can

23   think things happened that didn't happen.

24             When you look at what she drank and you look at her

25   accusation versus the hard facts, that's not hard to put two

1    and two together.  She wakes up, she's drunk, she's in that

2    haze and she has no idea what's going on.  Maybe she felt

3    Prabhu moving around because, as Mr. Selleke described this

4    airplane, it's like you are literally right on top of each

5    other, and it's not a big stretch to say, you know, people are

6    moving and she wakes up and she sees some guy's hand on her,

7    she could think something happened.

8           Now, her memory is a major issue in this case.  And I

9    know that the government got up here and talked about

10   consistency, about how she's consistently remembered things.  I

11   mean look, once you make an accusation, it's pretty easy to

12   remember the accusation you made, all right?

13          And let's talk about her real memory from real

14   evidence, not stuff that came from somebody who is clearly out

15   of their element.  Remember how she was when I asked her about

16   sleeping on Prabhu, remember that?  She was adamant, she was

17   adamant that that never happened.  "Ah, I would never do that."

18   Okay.  "I would never sleep on his shoulder, I would never be

19   in his lap," kind of like I was crazy for asking that.

20          But as we know because you were all attentively

21   listening during Mr. Burciaga's testimony, Mr. Burciaga saw the

22   complainant sleeping on Prabhu, on his shoulder.

23          MS. JAWAD:  Objection.  That's not what the testimony

24   was.

25          THE COURT:  All right.  This is closing argument so

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1876   Page 77 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

77

```
 1    you may have some leeway.  Ladies and gentlemen, you need to
 2    rely on your own recollection of what the evidence was in the
 3    case.
 4          So go ahead.
 5          MR. AMBERG:  Thank you, Your Honor.
 6          And that's what he said.  You folks heard him.  You
 7    remember what you remember.  That's what he said.  He said he
 8    saw her sleeping on his shoulder.  He remembers her because he
 9    found her attractive and even had struck up a conversation with
10    her before that happened.  So he knew when he looked at her.
11    He was looking for her.  This wasn't just some random person.
12    This is somebody who he had made a connection with.
13          Now, maybe what the government is talking about is
14    the second time he walks by and he sees something in Prabhu's
15    lap.  Now, I agree that he can't get up there -- he didn't get
16    up there and say, "I could positively identify it as Ms. -- you
17    know, the complainant."  But of course I asked him a bunch of
18    questions, you folks remember that.  I said, "Whad'ya think it
19    was, a bag sitting in there in Prabhu's lap?"  No.  I mean you
20    could put two and two together: she was sleeping in his lap.
21    So how did she forget that?  How does she not remember that?
22    The person whose testimony you have to believe a hundred
23    percent has a major problem with that remembering of a major
24    event.
25          Now, the second issue is this, and I'll tell you, you
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1877   Page 78 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

78

```
 1    heard this.  Mr. Burciaga gets up here and he says he -- he
 2    makes that connection with her, and the connection that he
 3    makes with her isn't sitting there in the seat; it's where
 4    she's in line in the bathroom.  They have a five-minute
 5    conversation.  I mean this isn't small talk.  "Hi."  That's one
 6    second.  "Ma'am, are you okay, do you need anything?"  That's
 7    three seconds.  But when you have a guy who's attracted to this
 8    person, who is, you know, got nothing better to do, it's the
 9    midnight flight, she smells like alcohol and everything else,
10    he's going to chat her up, and that's what he does.  It's
11    astounding that she does not remember that, it's astounding.
12    She even admitted that she was intoxicated.  Now, I asked her
13    that.  I think she denied it but the way she admitted it was
14    this: she couldn't drive a car, okay?
15            Now, her actual story is confusing.  I tried to ask
16    her how it went down.  "I don't know how long this happened."
17    Okay.  She says that somehow Prabhu must have unbuttoned her
18    pants.  How do you not wake up when that happens, how, how do
19    you not wake up?  Maybe it's because she just had her pants
20    unbuttoned when she came back from the bathroom.  Who knows?
21    Maybe she did it herself because she wanted to get more
22    comfortable on the flight.  You heard Mr. Burciaga say people
23    do all kinds of stuff to get comfy on that Spirit Airlines
24    flight.
25            As far as the bra goes, who knows, who knows?  That
```

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1878   Page 79 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

79

1    could be the same thing.  You heard Geetha, Prabhu's wife, say

2    he doesn't know how to open up a bra.  And he's left-handed,

3    not right-handed, so he's doing this -- if this is what

4    happened, he's doing this with his off hand.

5           The thing about the shirt being open and -- and stuff

6    like that, that shirt was set up to do that when she walked on

7    that plane.  Okay.  It wasn't all buttoned up, it was already

8    like that.  And you know what?  Just think about it.  You're

9    moving around, you're sleeping, head's on his shoulder, now

10   you're like this, guess what's moving around?  I mean look at

11   my suit moving around.  But when the shirt is just tied in

12   there like that with a knot, it's going to move around.

13          I mean that brings me to one point before I'll move

14   on to the next topic, and that's how -- how you can see how

15   suggestive answering happens.  Think about all these people up

16   here that testified and saw her.  The government would throw

17   those -- they -- they would ask the question, "Didn't she look

18   disheveled?"  "Oh, yes, she looked disheveled."  You saw how

19   easy it was to agree, for somebody to just automatically agree

20   with what the government was asking them, okay, but we'll have

21   more on that later.

22          Because I want to talk about independent evidence in

23   the plane.  These seats are extremely tight, I mean three

24   people in a span like that.  Mr. Selleke had such a terrible

25   time that he switched to the special seats because it was so

1    uncomfortable.  While this was supposedly going on, he could go

2    like this and actually touch six people besides Prabhu and his

3    wife.

4           Are you kidding me that nobody saw this or heard this

5    happening?  The plane is not completely dark.  You have to be

6    able to see enough to get around and for the flight attendants

7    to see and aisle lights were on and things like that.  How does

8    nobody see that?  I mean there must have been a person sitting

9    in front of these people literally this far away from the scene

10   of the crime but they don't see anything?  I'll guarantee you

11   if they did, they would have been brought in here, but they

12   weren't.  Point your finger to the -- to the left in this case,

13   there's three more people literally.  They don't see anything,

14   nothing?

15          The flight attendants walk these aisles, and they

16   don't just walk it once or twice; it's like every 20 minutes.

17   Every time Mr. Burciaga walked by, he saw that Prabhu was

18   sleeping.  Okay.  He wasn't awake, he was out cold.  Are you

19   telling me that he just happened to, after the day he had, woke

20   up and then decided to do this real quick with nobody looking

21   and his wife sitting there who is also up because by that point

22   in time the turbulence had hit?  It just didn't happen, okay,

23   it just didn't happen.

24          Look at her behavior.  And I get it, the SANE nurse

25   comes in and, you know, that -- this is a government witness

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1880   Page 81 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

81

1    that is, you know, one of these people that just believes

2    whatever is said without actually looking at the facts, okay?

3    You know, they just -- the -- the SANE nurse is somebody who

4    hears an accusation and believes it.  Okay.  That's who she is,

5    it's what she does.  She's an advocate for the people that are

6    supposedly assaulted.

7         And of course she's got an answer for why the

8    complainant doesn't immediately freak out.  "Oh, well,

9    sometimes people get scared and they don't do anything."  She

10   could have jumped up; she didn't.  She could have screamed; she

11   didn't.  She could have knocked him right in the face; she

12   didn't.  I guess if she was petrified, I guess maybe that

13   happens, but why get the cell phone out?  And the texts aren't

14   necessarily "Oh, I'm scared."  And that was ten minutes, and

15   then after ten minutes then she goes and leaves, okay?

16        The reason why her behavior is what it is is because

17   it didn't happen, okay?  Once again, the alcohol haze, when you

18   are in that haze, when you are in that blackout haze, this is

19   the kind of stuff that happens.

20        Now, let's look at Prabhu and what happens to him,

21   okay?  He's taken off this plane, he's thrown right into

22   interrogations right off the bat.  These guys are trying to ask

23   him what happened and the entire time he's telling them "I

24   don't think I did anything," you know.  I think you can tell

25   from the way he talks he has a hard time saying things in

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1881   Page 82 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

82

1    English the right way.  All right.

2            But rather than ever do anything to actually help

3    him -- because once that accusation's made, you're guilty,

4    right?  I mean legally no, but the reality is that's what's

5    happening here.  Never, never getting him a translator, never

6    asking if he's all right.  He just keeps trying to tell them

7    over and over again that he didn't do anything wrong.

8            This stuff about how he should have known or he -- he

9    knew it had something to do with his hands before, I'll tell

10   you what, folks.  Think about it, think about the situation.

11   Like I said in the beginning of my closing, you see her taken

12   off the flight and then you're taken off the flight and your

13   wife tells you that she was sleeping on your lap, anybody could

14   put two and two together about what's going on.  I mean he's in

15   this terminal and he's being interrogated.  He can see her,

16   she's being talked to by officers.

17           Sergeant Alvarado asks him, "Did you intentionally

18   touch her?"  Key words because those are words he uses later to

19   say that this didn't happen.  But as you can see throughout

20   this, nobody listened because you don't listen to a guy you

21   think did it.

22           Look at the treatment that he went through, okay?  He

23   doesn't get any respect, he doesn't get any benefit of the

24   doubt.  He's whisked away without even being told why to the

25   police department.  And even though they had a room in there

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1882   Page 83 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

83

1   with a nice little cotton bed, do you know where he's put?

2   He's put on this little concrete slab surrounded by concrete.

3   Do you think that's done to make sure he's all right?  That's

4   done to rattle you.  That's the kind of stuff you read in

5   newspapers about.

6            And that's what they do, they watch him like a hawk.

7   He doesn't do anything as far as the DNA goes, as we already

8   know, but the thing is is he sits there and sits there and sits

9   there.  He can't sleep.  By this point in time he's been up for

10  30 hours.  Try to get comfortable on a cement bench like that,

11  no pillow on there, nothing.

12           This goes on until about 2:00 o'clock when Agent

13  Erkkinen decides to start conducting this interview with Agent

14  Dodge.  At this point keep in mind of his state of mind,

15  Prabhu's.  He's still sick, and this isn't just something I'm

16  saying.  You saw him wiping his nose, you saw him coughing all

17  throughout this with different people, it's on all those body

18  cams, so he's sick, okay?

19           Imagine if you were up for 30 hours straight, you're

20  sick, you're separated from your wife, you have no idea what's

21  going on, you're sitting there in a foreign country where these

22  people don't really understand you and you don't know what to

23  do, that's his mentality.  They don't give him any food.  They

24  don't -- they're not nice to him in any way as far as to make

25  sure he's all right.  Instead, he goes in that interview like

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1883   Page 84 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

84

1    that.  He's exhausted, he's sleep-deprived.  This is a recipe

2    for disaster as far as a fair and honest interview.

3           Now, Agent Erkkinen, he knows that my client doesn't

4    speak English well.  That's very obvious the second you talk to

5    him.  All right.  And the thing is is rather than ask "Do you

6    need a translator?," they just get on with that interview,

7    okay?  Imagine if you were in India and that happened.  Do you

8    think --

9           MS. JAWAD:  Judge, this is improper argument.

10           MR. AMBERG:  I'll -- I'll con -- I'll withdraw that,

11    Your Honor.

12           It shouldn't be the person being interviewed's

13    responsibility to say, "Hey, I need a translator."  When you're

14    in fear and you're scared and you're exhausted and you're sick

15    and you're tired and you're hungry and you don't know what's

16    going on, the detectives should do that, it's as simple as

17    that, because we owe that kind of fairness to Prabhu, but he

18    doesn't get that.

19           Instead, they just start this thing, they start

20    throwing stuff at him, and, you know, when it's -- remember

21    that one clip where they -- they said, "Prabhu, do you

22    understand?," and then they stopped it so you couldn't see the

23    rest of the clip but I read it.  Look at how he responds to

24    that: "I was troubling, I was" -- I mean just almost a

25    nonsensical answer.  I mean that was what was really happening.

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1884   Page 85 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

85

1    You guys saw clips of the interview, but that's what was really

2    happening during this thing.

3            They don't ask if he's tired.  They don't ask how

4    long he's been up for.  They don't ask if he's well.  They

5    don't ask if he's sick.  They don't ask if he needs food.  They

6    don't ask if he needs water.  They don't even shake his hand.

7    That's not giving somebody a fair shake, no pun intended.

8            Now, here's the thing.  He is trying, even during

9    this interview and throughout, he says multiple times, "I

10   didn't intentionally touch her."  Not only that, but he's

11   asking for these cameras, and when he's asking for the cameras,

12   it's "they will save me, they will help me."  Why, if you did

13   something wrong, would you be telling these people to do that,

14   okay, because if there was cameras in there and you did

15   something wrong, it'd be right on the camera.  Why would you

16   say that?

17           He's asking about his charges, what's going on, but

18   here's the thing.  This interview's gotta wrap up because they

19   gotta get over to the court, all right?  So the interview's

20   going nowhere.  He keeps on saying he didn't do it.  He keeps

21   on trying to explain what it might be like when he was

22   sleeping.  They don't care.  So what do they do?  They start to

23   inject.  Just like injecting the disheveled thing of the

24   witnesses, now they're injecting their words into this.  It

25   wasn't Prabhu that brought up the bra.  It was, "Prabhu, how

1    did you unhook the bra?"  Okay.

2           Now, we know false confessions and things like that

3    happen, the agent even admitted it.  He doesn't know any

4    protocols for how to prevent that, but this stuff does happen,

5    and this is the perfect recipe for this kind of thing, okay,

6    because all of this happens right at the end and this is all

7    suggestive: the bra, the flirting, the attractiveness.  Prabhu

8    doesn't bring any of that stuff, they do, they do.

9           And even when he says, when he says, "I tried, I

10   tried," the reason why I brought up that first time he says

11   that in that interview is because it's important because when

12   he says, "I tried," he's saying that he didn't do anything

13   wrong.  But then they -- they just look at what he's saying and

14   never really ask him what he means by "I tried."  They got what

15   they wanted, okay?  Who cares about evidence?  "I got somebody

16   who says this happened, I'm going to believe them.  I got this

17   guy in here who doesn't speak English very well, who's not from

18   this country, who's been up forever, who's sick, how we didn't

19   give him any food, I didn't show him any respect by shaking his

20   hand, we let him sit there for like eight hours on that

21   concrete bench.  You know what?  This guy's like putty in our

22   hands."

23          That's why you'll got -- you'll get that instruction.

24   Takes more than just somebody's statements to convict him, all

25   right?  You folks look at those instructions.  They'll read

1    what reasonable doubt is, and I think it's very important.  And
2    I know you folks are going to get these instructions and I
3    would ask that you go through them and you apply them.  Proof
4    beyond a reasonable doubt means proof which is so convincing
5    that you would not hesitate to rely and act on it in making the
6    most important decisions in your own lives.  That's what this
7    is.
8            Now, he didn't do this, okay?  But what really
9    happened makes more sense than what the complainant said.  She
10   was drunk, she didn't know what was going on, she thinks she
11   might have felt something.  There's no DNA, there's no fibers,
12   there's no nothing, nobody sees anything.  It just doesn't make
13   any sense.
14           Now, the last thing I'll talk about is this.  The
15   government has come in and said, well, you know, this is what
16   happened, but if you don't think so, you can charge him with --
17   you can convict him of attempt anyways.  Don't fall for the
18   bait, okay?  They told you what they thought happened, all
19   right?
20           But even if you're looking at this attempt and
21   thinking about it, I would ask that you look at those elements
22   of what a sexual act is.  What's the evidence that -- even if
23   you believe everything that Prabhu said in that video, what's
24   the evidence of what he was going to do if he got the pants
25   open?  There's none, okay?  So what was he attempting to do?

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1887   Page 88 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

88

1    You have to attempt to penetrate the vagina.  Where's that?

2    But like I said, that's just the bait, okay?

3           I thank you for being here, folks.  This is not an

4    easy trial, all right, but I know you'll give him that fair

5    shake.  I know that you'll do what's right because he deserves

6    that.  So thank you very much for your time in this case and

7    thank you very much, Your Honor.

8           THE COURT:  Thank you, Mr. Amberg.

9           All right.  You may present any rebuttal at this

10   time.

11          MS. JAWAD:  Thank you, Your Honor.

12          THE COURT:  Keep in mind you have less time.

13          MS. JAWAD:  Yes, Your Honor.

14          Ladies and gentlemen, you have pictures and videos

15   from this case.  You can decide for yourself whether the victim

16   looked disheveled that day.  You can decide for yourself

17   whether the agents and the officers treated the defendant

18   fairly that day or whether they mistreated him as the defendant

19   claims.

20          I want to first address defense counsel's statement

21   that once the accusation is made, he's guilty.  You heard from

22   Sergeant Alvarado.  He explained to you that when he arrived at

23   the gate before anyone was taken off the airplane, he wanted to

24   find out the truth.  He said it is sometimes the case that

25   things are reported from the tower that don't end up being

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1888   Page 89 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

89

1    true.  That's why he was asking the defendant, "What's going

2    on?"  The decision to arrest the defendant was not made until

3    after the officers talked to the defendant and gathered all of

4    the information.  The decision wasn't made until after they saw

5    the defendant gesturing with his hands and saying, "I don't

6    know where my hands were."

7            And you also heard from Officer Chalmers who said,

8    "We didn't slap handcuffs on him right at the gate.  We asked

9    him to come with us to the car, and we didn't put cuffs on him

10   so that he wouldn't fall on the icy railway."

11           They didn't subject him to harassment or

12   embarrassment in front of the people at the gate or in front of

13   his wife.

14           And you heard from Special Agent Erkkinen about what

15   happened during the interview, and you saw yourselves the

16   demeanor and the way that the agents were speaking with the

17   defendant.  Special Agent Erkkinen said, "I wanted to make sure

18   that he understood what I was saying and that I understood what

19   he was saying," and you heard all of the clarifying questions

20   that were asked.  This was not an interrogation as the defense

21   claims.

22           And I want you to ask yourselves, ladies and

23   gentlemen, how much time did Mr. Amberg spend on distractions,

24   on things that don't matter?  How much time did he spend

25   talking about DNA evidence?  Mr. Amberg stated that if you put

1    your finger into a vagina, you will have DNA evidence all over

2    your hand.  There was no evidence that that is the case

3    presented in this trial.  In fact, that's not what the DNA

4    scientist said when she testified.  She said it's possible that

5    there may be DNA and that it would even perhaps be likely if

6    you put your finger into a vagina that there would be evidence,

7    DNA on your hand.

8            The only person throughout this entire trial to say

9    that you would have DNA covering you all over your hand is the

10   defense attorney.  He even told you in opening you're going to

11   hear from an expert that's going to say that.  He did not

12   present an expert who said that, and that is not what the

13   government's DNA scientist said.

14           That's not the only thing that Mr. Amberg said that's

15   not supported by the evidence.  He started by saying she had

16   alcohol on board while she was on the airplane.  You heard from

17   Laura.  There's no evidence that she had alcohol on the

18   airplane.  You heard from the flight attendants.  All of them

19   stated they didn't serve Laura any alcohol on the plane.

20           You also heard Mr. Amberg say that Oscar Burciaga

21   said he saw Laura sleeping on the defendant's lap, but what Mr.

22   Burciaga said was that he saw a black figure on the defendant's

23   lap.  He wasn't sure if it was Laura sleeping on his lap or

24   not.  You heard from the defendant's wife who said that he had

25   a black jacket on and you saw his black jacket in the video.

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1890   Page 91 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

91

1    Mr. Burciaga never said that the defendant -- or that the
2    victim was sleeping on the defendant.
3           Does it matter that Laura doesn't remember going to
4    the bathroom on the flight or doesn't remember sleeping on the
5    defendant's shoulder, if it's true that she even did that?  You
6    heard from Laura, she says she flies often for work.  Her job
7    requires that she flies all the time.  She's probably been on
8    several flights since January and probably took several flights
9    before that.  She not -- may not remember on which flights she
10   went to the bathroom.  She may have had too much to drink that
11   she just doesn't remember that incident.  Whatever the reason,
12   we remember significant events in our lives.  Going to the
13   bathroom is not always one of them.  What Laura does remember
14   and what she's been unequivocal about is that she woke up to
15   the defendant's hand in her vagina.
16          Now, I'd like to talk about hands for a little bit
17   here.  The defendant mentions his hands throughout the entire
18   day, didn't know where his hands were.  And, ladies and
19   gentlemen, we've all been in situations where we've been in
20   enclosed spaces or tight quarters.  The defendant has -- or the
21   defense attorney has talked about tight spaces throughout this
22   trial.  In the jury box now you maybe feel somewhat restricted.
23   When you're walking back and forth into the jury room and into
24   the jury box, you may be aware of where you are in relation to
25   other people so that you're not hitting into them or touching

1    them as you get in and out of your seats.  Are you aware of

2    where your body parts are?  Wouldn't you be likely to notice if

3    your arm was suddenly drifting into the space of the juror next

4    to you?  Ladies and gentlemen, when was the last time you just

5    didn't know where your hands were in a public place?

6          And defense counsel has said over and over again that

7    Laura didn't jump up, she didn't scream out, that no one on the

8    plane heard the sexual assault happen.  Ms. Ivaniszyn, the SANE

9    nurse, talked about the body's reaction to trauma.  She said

10   that not every victim of trauma reacts in the same way.  She

11   said sometimes victims yell out but sometimes they freeze, and

12   all of those things are natural reactions in the body.  Laura

13   was frozen and she was scared.

14         These are just some of the ways that the defendant is

15   trying to avoid responsibility for violating Laura by

16   distracting you from the fact that he confessed.  Why would you

17   need DNA evidence when the defendant admitted what he did?  If

18   this didn't happen, why is the first thing that comes out of

19   the defendant's mouth "I don't know where I kept my hand"?  If

20   this didn't happen, why did he demonstrate with his fingers how

21   he tried to unhook the victim's bra?  If this didn't happen,

22   why did he pull up his own shirt to show the FBI how he touched

23   her back?  If this didn't happen, why did he take his fingers

24   and put them in his own zippers to show the FBI what he did to

25   Laura?  If this didn't happen, why did the defendant and the

1    victim both independently use the same gesture to show how he

2    got his fingers inside of her?

3         If this was a dream, the defendant and the victim

4    must have both been in the same dream.  It wasn't a dream, it

5    was a nightmare and it was real.  Laura told us clearly, "I

6    didn't dream it, I know what happened."  The defendant is

7    guilty.

8         THE COURT:  All right.  Thank you very much.

9         Ladies and gentlemen, it's now time for me to give

10    you your jury instructions and -- but before I do that, I

11    wanted to briefly confer with counsel so let's have counsel

12    approach.

13         (Sidebar discussion as follows):

14         THE COURT:  I wanted to point out that in Jury

15    Instruction Number 11, that's the elements of the offense, we

16    had had the language that said "Adult Victim 1" rather than the

17    name Laura.  I would suggest that I use the name Laura instead

18    of the name Adult Victim 1.

19         MS. SMITH:  That's fine by us.

20         MR. AMBERG:  No objection.

21         THE COURT:  All right.  That's the only change that

22    I'm aware of.  Thank you.

23         MS. SMITH:  Okay.  Thank you.

24         (End of sidebar discussion)

25         THE COURT:  All right.  Members of the jury, now it's

1    time for me to instruct you about the law that you must follow

2    in deciding this case.

3          I'll start by explaining your duties and the general

4    rules that apply in every criminal case.

5          Then I will explain the elements or parts of the

6    crime that the defendant is accused of committing.

7          Then I will explain some rules that you must use in

8    evaluating particular testimony and evidence.

9          And last, I will explain the rules you must follow

10   during your deliberations in the jury room and the possible

11   verdicts you may return.

12         Please listen carefully to everything that I say.

13         You have two main duties as jurors.  The first one is

14   to decide what the facts are from the evidence that you saw and

15   heard here in court.  Deciding what the facts are is your job,

16   not mine.  And nothing that I have said or done during this

17   trial was meant to influence your decision about the facts in

18   any way.

19         Your second duty is to take the law that I give to

20   you, apply it to the facts and decide if the government has

21   proved a defendant guilty beyond a reasonable doubt.  It is my

22   job to instruct you about the law, and you are bound by the

23   oath that you took at the beginning of the trial to follow the

24   instructions that I give you even if you personally disagree

25   with them.  This includes the instructions that I gave you

1    before and during the trial and these instructions.  All the

2    instructions are important and you should consider them

3    together as a whole.

4           The lawyers have talked about the law during their

5    arguments, but if what they said is different from what I say,

6    you must follow what I say.  What I say about the law controls.

7           Perform these duties fairly.  Do not let any bias,

8    sympathy or prejudice that you may feel toward one side or the

9    other influence your decision in any way.

10           As you know, the defendant has pleaded not guilty to

11   the crime charged in the indictment.  The indictment is not any

12   evidence at all of guilt.  It is just the formal way that the

13   government tells the defendant what the crime he -- what crime

14   he is accused of committing.  It does not even raise any

15   suspicion of guilt.

16           Instead, a defendant starts the trial with a clean

17   slate, with no evidence at all against him, and the law

18   presumes that he is innocent.  This presumption of innocence

19   stays with him unless the government presents evidence here in

20   court that overcomes the presumption and convinces you beyond a

21   reasonable doubt that he is guilty.

22           This means that a defendant has no obligation to

23   present any evidence at all or to prove to you in any way that

24   he is innocent.  It is up to the government to prove that he is

25   guilty, and this burden stays on the government from start to

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1895   Page 96 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

96

1   finish.  You must find a defendant not guilty unless the

2   government convinces you beyond a reasonable doubt that he is

3   guilty.

4           The government must prove every element of the crime

5   charged beyond a reasonable doubt.  Proof beyond a reasonable

6   doubt does not mean proof beyond all possible doubt.  Possible

7   doubts or doubts based purely on speculation are not reasonable

8   doubts.  A reasonable doubt is a doubt based on reason and

9   common sense.  It may arise from the evidence, the lack of

10   evidence or the nature of the evidence.

11           Proof beyond a reasonable doubt means proof which is

12   so convincing that you would not hesitate to rely and act on it

13   in making the most important decisions in your own lives.  If

14   you are convinced that the government has proved a defendant

15   guilty beyond a reasonable doubt, say so by returning a guilty

16   verdict.  If you are not convinced, say so by returning a not

17   guilty verdict.

18           You must make your decision based only on the

19   evidence that you saw and heard here in court.  Do not let

20   rumors, suspicions or anything else that you may have seen or

21   heard outside of court influence your decision in any way.

22           The evidence in this case includes only what the

23   witnesses said while they were testifying under oath, the

24   exhibits that I allowed into evidence and the stipulations that

25   the lawyers agreed to.

1          Nothing else is evidence.  The lawyers' statements

2    and arguments are not evidence.  Their questions and objections

3    are not evidence.  My legal rulings are not evidence.  And my

4    comments and questions are not evidence.

5          During the trial I might -- I may not have let you

6    hear the answers to some of the questions that the lawyers

7    asked.  I may have ruled that you could not see some of the

8    exhibits that the lawyers wanted you to see.  And sometimes I

9    may have ordered you to disregard things that you saw or heard

10   or struck something from the record.  You must completely

11   ignore all these things if they occurred.  Do not even think

12   about them.  Do not speculate about what a witness might have

13   said or what an exhibit might have shown.  These things are not

14   evidence and you are not bound -- I'm sorry, and you are bound

15   by your oath not to let them influence your decision in any

16   way.

17         Make your decision based only on the evidence as I

18   have defined it here and nothing else.

19         You should use your common sense in weighing the

20   evidence.  Consider it in light of your everyday experience

21   with people and events and give it whatever weight you believe

22   it deserves.  If your experience tells you that certain

23   evidence reasonably leads to a conclusion, you are free to

24   reach that conclusion.

25         Now, some of you may have heard the terms "direct

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1897   Page 98 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

98

1    evidence" and "circumstantial evidence."

2           Direct evidence is simply evidence like the testimony

3    of an eyewitness, which, if you believe it, directly proves a

4    fact.  If a witness testified that he saw it raining outside

5    and you believed him, that would be direct evidence that it was

6    raining.

7           Circumstantial evidence is simply a chain of

8    circumstances that indirectly proves a fact.  If someone walked

9    into the courtroom wearing a raincoat covered with drops of

10   water and carrying a wet umbrella, that would be circumstantial

11   evidence from which you could conclude that it was raining.

12          It is your job to decide how much weight to give the

13   direct and the circumstantial evidence.  The law makes no

14   distinction between the weight that you should give to either

15   one or say that one is any better evidence than the other.  You

16   should consider all the evidence, both direct and

17   circumstantial, and give it whatever weight you believe it

18   deserves.

19          Another part of your job as jurors is to decide how

20   credible or believable each witness was.  This is your job, not

21   mine.  It is up to you to decide if a witness's testimony was

22   believable and how much weight you think it deserves.  You are

23   free to believe everything that a witness said, or only part of

24   it, or none of it at all, but you should act reasonably and

25   carefully in making these decisions.

1          Let me suggest some things for you to consider in

2     evaluating each witness's testimony.

3          Ask yourself if the witness was able to clearly see

4     or hear the events.  Sometimes even an honest witness may not

5     have been able to see or hear what was happening and may make a

6     mistake.

7          Ask yourself how good the witness's memory seemed to

8     be.  Did the witness seem able to accurately remember what

9     happened?

10          Ask yourself if there was anything else that may have

11     interfered with the witness's ability to perceive or remember

12     the events.

13          Ask yourself how the witness acted while testifying.

14     Did the witness appear honest or did the witness appear to be

15     lying?

16          Ask yourself if the witness had any relationship to

17     the government or the defendant or anything to gain or lose

18     from the case that might influence the witness's testimony.

19     Ask yourself if the witness had any bias or prejudice or reason

20     for testifying that might cause the witness to lie or to slant

21     the testimony in favor of one side or the other.

22          Ask yourself if the witness testified inconsistently

23     while on the witness stand or if the witness said or did

24     something or failed to say or do something at any other time

25     that is inconsistent with what the witness said while

1    testifying.  If you believe that the witness was inconsistent,

2    ask yourself if this makes the witness's testimony less

3    believable.  Sometimes it may, other times it may not.

4    Consider whether the inconsistency was about something

5    important or about something -- about some unimportant detail.

6    Ask yourself if it seemed like an innocent mistake or if it

7    seemed deliberate.

8            And ask yourself how believable the witness's

9    testimony was in light of all the other evidence.  Was the

10   witness's testimony supported or contradicted by other evidence

11   that you found believable?  If you believe that a witness's

12   testimony was contradicted by other evidence, remember that

13   people sometimes forget things and that even two honest people

14   who witness the same event may not describe it exactly the same

15   way.

16           These are only some of the things that you may

17   consider in deciding how believable each witness was.  You may

18   also consider other things that you think shed some light on

19   the witness's believability.  Use your common sense and your

20   everyday experience in dealing with other people, and then

21   decide what testimony you believe and how much weight you think

22   it deserves.

23           One more point about the witnesses.  Sometimes jurors

24   wonder if the number of witnesses who testified makes any

25   difference.

1       Do not make any decisions based only on the number of

2   witnesses who testified.  What is more important is how

3   believable the witnesses were and how much weight you think

4   their testimony deserves.  Concentrate on that, not the

5   numbers.

6       There is one more general subject that I want to talk

7   to you about before I begin explaining the elements of the

8   crime charged.

9       The lawyers for both sides may have objected to some

10  of the things that were said or done during the trial.  Do not

11  hold that against either side.  The lawyers have a duty to

12  object whenever they think that something is not permitted by

13  the rules of evidence.  Those rules are designed to make sure

14  that both sides receive a fair trial.

15      And do not interpret my rulings on their objections

16  as any indication of how I think the case should be decided.

17  My rulings were based on the rules of evidence, not on how I

18  feel about the case.  Remember that your decision must be based

19  only on the evidence that you saw and heard here in court.

20      That concludes the part of my instructions explaining

21  your duties and the general rules that apply in every criminal

22  case.  In a moment I will explain the elements of the crime

23  that the defendant is accused of committing.

24      But before I do that, I want to emphasize that the

25  defendant is only on trial for the particular crime charged in

Case 2:18-cr-20027-TGB-MKM  ECF No. 86  filed 03/05/19  PageID.1901  Page 102 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

102

1    the indictment.  Your job is limited to deciding whether the

2    government has proved the crime charged.

3            Count One in the indictment accuses the defendant of

4    Sexual Abuse, in violation of federal law.  Title 18 United

5    States Code, Section 2242(2) makes it a crime for anyone to

6    engage in a sexual act with another person if that person is

7    incapable of appraising the nature of the conduct, incapable of

8    declining to participate in the sexual act, or incapable of

9    communicating unwillingness to engage in the sexual act.  For

10   you to find the defendant guilty of this crime, you must be

11   convinced that the government has proved each and every one of

12   the following elements beyond a reasonable doubt:

13           First, the defendant knowingly engaged in a sexual

14   act with Laura.

15           Second, the defendant knew that Laura was incapable

16   of appraising the nature of the conduct, physically incapable

17   of declining participation in or communicating unwillingness to

18   engage in that sexual act.

19           And third, the offense was committed within the

20   special aircraft jurisdiction of the United States.

21           The term "sexual act" means the penetration, however

22   slight, of the anal or genital opening of another by a hand or

23   finger or by any object with an intent to abuse, humiliate,

24   harass, degrade, or arouse or gratify the sexual desire of any

25   person.

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1902   Page 103 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

103

1        The term "special aircraft jurisdiction of the United

2   States" includes a civil aircraft of the United States.

3        If you are convinced the government has proved all of

4   these elements, say so by returning a guilty verdict on this

5   charge.  If you have a reasonable doubt about any one of those

6   elements, then you must find the defendant not guilty of this

7   charge.

8        Count One of the indictment includes attempting to

9   commit the crime of Sexual Abuse.  For you to find the

10  defendant guilty of attempting to commit Sexual Abuse, you must

11  be convinced that the government has proved beyond a reasonable

12  doubt:

13       First, that the defendant intended to commit the

14  crime of Sexual Abuse.

15       Second, that the defendant did some overt act that

16  was a substantial step towards committing the crime of Sexual

17  Abuse.

18       Merely preparing to commit a crime is not a

19  substantial step.  The defendant's conduct must go beyond mere

20  preparation and must strongly confirm that he intended to

21  commit the crime of Sexual Abuse.  But the government does not

22  have to prove that the defendant did everything except the last

23  act necessary to complete the crime.  A substantial step beyond

24  mere preparation is enough.

25       If you are convinced that the government has proved

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1903   Page 104 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

104

1    both of these elements, say so by returning a guilty verdict on

2    this charge.  If you have a reasonable doubt about either one

3    of these elements, then you must find the defendant not guilty.

4            Next I want to say a word about the date mentioned in

5    the indictment.

6            The indictment charges that the crime occurred on or

7    about January 3rd, 2018.  The government does not have to prove

8    that the crime happened on that exact date, but the government

9    must prove that the crime happened reasonably close to that

10   date.

11           Next I want to explain something about proving a

12   defendant's state of mind.

13           Ordinarily there is no way that a defendant's state

14   of mind can be proven directly because no one can read another

15   person's mind and tell what that person is thinking.

16           But a defendant's state of mind can be proved

17   indirectly from the surrounding circumstances.  This includes

18   things like what the defendant said, what the defendant did,

19   how the defendant acted, and any other facts or circumstances

20   in evidence that show what was in the defendant's mind.

21           You may also consider the natural and probable

22   results of any acts that the defendant knowingly did or did not

23   do and whether it is reasonable to conclude that the defendant

24   intended those results.  This, of course, is all for you to

25   decide.

Case 2:18-cr-20027-TGB-MKM  ECF No. 86  filed 03/05/19  PageID.1904  Page 105 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

105

1      That concludes the part of my instructions explaining

2  the elements of the crime.

3      Next I will explain some rules that you must use in

4  considering some of the testimony and evidence.

5      A defendant has an absolute right not to testify.

6  The fact that a defendant did not testify cannot be considered

7  by you in any way.  Do not even discuss it in your

8  deliberations.

9      Remember that it is up to the government to prove a

10  defendant guilty beyond a reasonable doubt.  It is not up to a

11  defendant to prove that he is innocent.

12      You have heard the testimony of Marcy Plaza from the

13  FBI who testified to both facts and opinions.  Each of these

14  types of testimony should be given the proper weight.

15      As to the testimony on facts, considered the factors

16  discussed earlier in these instructions for weighing the

17  credibility of witnesses.

18      As to the testimony on opinions, you do not have to

19  accept Marcy Plaza's opinions.  In deciding how much weight to

20  give them, you should consider the witness's qualifications and

21  how she reached her conclusions along with the other factors

22  discussed in these instructions for weighing the credibility of

23  witnesses.

24      Remember that you alone decide how much of a

25  witness's testimony to believe and how many weight it deserves.

1        You have heard the testimony of a number of

2   witnesses.  You have also heard that before trial some of these

3   witnesses made statements that may be different from his or her

4   testimony here in court.

5        These earlier statements were brought to your

6   attention only to help you decide how believable his or her

7   testimony was.  You cannot use it as proof of anything else.

8   You can only use it as one way of evaluating his or her

9   testimony here in court.

10       You have heard some video recordings that were

11  received in evidence and you were given some written

12  transcripts of the videos.

13       Keep in mind that the transcripts are not evidence.

14  They were given to you only as a guide to help you follow what

15  was being said.  The videos themselves are evidence.  If you

16  noticed any differences between what you heard on the videos

17  and what you read in the transcripts, you must rely on what you

18  heard, not what you read.  And if you could not hear or

19  understand certain parts of the tapes, you must ignore the

20  transcripts as far as those parts are concerned.

21       You have heard evidence that the defendant, Prabhu

22  Ramamoorthy, made a statement in which the government claims he

23  admitted certain facts.  It is for you to decide whether the

24  defendant made that statement and, if so, how much weight it

25  deserves.  In making these decisions, you should consider all

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1906   Page 107 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

107

1   of the evidence about the statement, including the

2   circumstances under which the defendant allegedly made it.

3            You may not convict the defendant solely upon his own

4   uncorroborated statement or admission.

5            That concludes the part of my instructions explaining

6   the rules for considering some of the testimony and evidence.

7   Now let me finish up by explaining some things about your

8   deliberations in the jury room and your possible verdict.

9            The first thing you should do in the jury room is

10  choose someone to be your foreperson.  This person will help to

11  guide your decisions and will speak for you here in court.

12           Once you start deliberating, do not talk to the jury

13  officer or to me or to anyone else except each other about the

14  case.  If you have any questions or messages, you must write

15  them down on a piece of paper, sign them and give them to the

16  jury officer.  The officer will give them to me and I will

17  respond to them as soon as I can.  I may have to talk to the

18  lawyers about what you have asked, so it may take me some time

19  to get back to you.  Any questions or messages normally should

20  be sent to me through your foreperson.

21           If you want to see any of the video exhibits that

22  were admitted in evidence or any of the exhibits, you may send

23  me a message and those exhibits will be provided to you.

24           One more thing about messages.  Do not ever write

25  down or tell anyone how you stand on your votes.  For example,

1    do not write down or tell anyone that you are split 6 to 6 or

2    8 to 4 or whatever your vote happens to be.  That should stay

3    secret until you are finished.

4            Remember that you must make your decision based only

5    on the evidence that you saw and heard here in court.

6            During your deliberations you must not communicate

7    with or provide any information to anyone by any means about

8    this case.  You may not use any electronic device or media such

9    as a telephone, cell phone, smartphone, iPhone, Blackberry or

10   computer, the Internet, or any Internet service, or any text or

11   instant messaging service, any Internet chat room, blog or

12   websites such as Facebook, MySpace, LinkedIn, YouTube or

13   Twitter to communicate to anyone any information about this

14   case or to conduct any research about this case until I accept

15   your verdict.  In other words, you cannot talk to anyone on the

16   phone, correspond with anyone, or electronically communicate

17   with anyone about this case.  You can only discuss the case in

18   the jury room with your fellow jurors during deliberations.  I

19   expect you will inform me as soon as you become aware of

20   another juror's violation of these instructions if that

21   happens.

22           You may not use these electronic means to investigate

23   or communicate about the case because it is important that you

24   decide this case based solely on the evidence presented in this

25   courtroom.  Information on the Internet or available through

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1908   Page 109 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

109

1    social media might be wrong, incomplete or inaccurate.  You are

2    only permitted to discuss the case with your fellow jurors

3    during deliberations because they have seen and heard the same

4    evidence you have.  In our judicial system it is important that

5    you are not influenced by anything or anyone outside of this

6    courtroom.  Otherwise, your decision may be based on

7    information known only by you and not your fellow jurors or the

8    parties in this case.  This would unfairly and adversely impact

9    the judicial process.  A juror who violates these restrictions

10   jeopardizes the fairness of these proceedings and a mistrial

11   could result which would require the entire process to start

12   over.

13          Your verdict, whether it is guilty or not guilty,

14   must be unanimous.

15          To find the defendant guilty of a particular charge,

16   every one of you must agree that the government has overcome

17   the presumption of innocence with evidence that proves the

18   defendant's guilt beyond a reasonable doubt.

19          To find the defendant not guilty of a particular

20   charge, every one of you must agree that the government has

21   failed to convince you beyond a reasonable doubt.

22          Either way, guilty or not guilty, your verdict must

23   be unanimous.

24          One more point about the requirement that your

25   verdict must be unanimous.  Count One of the indictment accuses

1    the defendant of committing the crime of Sexual Abuse in more

2    than one possible way.  The first is that he committed Sexual

3    Abuse.  The second is that he attempted to commit Sexual Abuse.

4            The government does not have to prove all of these

5    for you to return a guilty verdict on this charge.  Proof

6    beyond a reasonable doubt of any one of these ways is enough.

7    In order to return a guilty verdict, all 12 of you must agree

8    that at least one of these has been proved.  However, all of

9    you need not agree that the same one has been proved.

10           Now that all of the evidence is in and the arguments

11   are completed, you are free to talk about the case in the jury

12   room.  In fact, it is your duty to talk with each other about

13   the evidence and to make every reasonable effort you can to

14   reach unanimous agreement.  Talk with each other, listen

15   carefully and respectfully to each other's views, and keep an

16   open mind as you listen to what your fellow jurors have to say.

17   Try your best to work out your differences.  Do not hesitate to

18   change your mind if you are convinced that other jurors are

19   right and that your original position was wrong.

20           But do not ever change your mind just because other

21   jurors see things differently or just to get the case over

22   with.  In the end, your vote must be exactly that, your own

23   vote.  It is important for you to reach unanimous agreement,

24   but only if you can do so honestly and in good conscience.

25           No one will be allowed to hear your discussions in

1    the jury room and no record will be made of what you say, so

2    you should all feel free to speak your minds.

3            Listen carefully to what the other jurors have to say

4    and then decide for yourself if the government has proved the

5    defendant guilty beyond a reasonable doubt.

6            If you decide that the government has proved the

7    defendant guilty, then it will be my job to decide what the

8    appropriate punishment should be.

9            Deciding what the punishment should be is my job, not

10   yours.  It would violate your oaths as jurors to even consider

11   the possible punishment in deciding your verdict.

12           Your job is to look at the evidence and decide if the

13   government has proved the defendant guilty beyond a reasonable

14   doubt.

15           Let me finish by repeating something that I said to

16   you earlier.  Nothing that I have said or done during this

17   trial was meant to influence your decision in any way.  You

18   decide for yourselves if the government has proved the

19   defendant guilty beyond a reasonable doubt.

20           Remember that if you elected to take notes during the

21   trial, your notes should be used only as memory aids.  You

22   should not give your notes greater weight than your independent

23   recollection of the evidence.  You should rely upon your own

24   independent recollections of the evidence and you should not be

25   unduly influenced by the notes of other jurors.  Notes are not

 1    entitled to any more weight than the memory or impression of

 2    each juror.

 3            Whether you took notes or not, each of you must form

 4    and express your own opinion as to the facts of this case.

 5            I have prepared a verdict form that I will provide to

 6    you that you should use to record your verdict.  You will also

 7    receive a copy of these jury instructions after I confer with

 8    counsel, and you will have them with you to refer to if you

 9    wish to.

10            Now, we do need to perform our duty of selecting the

11    alternate to be excused at this time, is that right, Counsel?

12            MS. SMITH:  Yes, Your Honor.

13            MR. AMBERG:  Yes, Your Honor.

14            THE COURT:  So I'm going to ask Ms. Chubb, our case

15    manager, to select at random the names of one of the jurors and

16    that person will not be participating during deliberations.

17            (Brief pause)

18            All right.  The number that has been selected at

19    random is No. 10, and that is Ms. Kristin Matthews.  And so Ms.

20    Matthews, I -- I must tell you that you may be excused at this

21    time and I want to thank you.  I can tell by your expression

22    that you paid close attention during the trial and that you

23    were certainly willing to participate during deliberations.

24    And so to the extent that you are disappointed that you will

25    not participate in the ultimate decision, I nevertheless want

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1912   Page 113 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

113

1    to thank you for your time and your attention and to remind you

2    not to discuss the case with anyone else.

3            And is there anything further we need to do regarding

4    this juror?

5            MS. SMITH:  Yes, Your Honor.  As you discussed that

6    she shouldn't discuss the case with anybody else, there's

7    always a possibility that she may be called to come back for

8    deliberations, so until the -- until the jury has finished

9    deliberations, she is still under her oath.

10           THE COURT:  Yes, that's a good point.  That's also a

11   reason we choose alternates because we need 12 people to

12   consider the evidence, and if -- if for some reason someone

13   should fall ill or have some other difficulty in serving, you

14   might be required to return.  And so that's another reason not

15   to talk about the case, not to do any research about the case,

16   not to do anything that would affect your ability to serve as a

17   fair and impartial juror.

18           All right.  Anything further?  All right.  Thank you

19   very much.

20           (Juror Matthews excused at 12:24 p.m.)

21           We will all rise for the jury and -- sorry, hold on

22   one -- I -- I realize I need to swear our deputies, right?

23   Okay.  We are going to have Mr. Darling and Ms. Chubb sworn to

24   be the person who's going to communicate between you and the

25   Court during your process, and so they are the folks that you

 1    can communicate to.

 2            So please raise your right hands.  Do you solemnly

 3    swear that you will keep all members sworn upon this panel in

 4    some private and convenient place, and that you will permit no

 5    one to communicate with them nor communicate with them yourself

 6    except to inquire if they have agreed upon a verdict until

 7    discharged by this Court, so help you God?

 8            THE CLERK:  I do.

 9            THE LAW CLERK:  I do.

10            THE COURT:  All right.  Then you may be the bailiffs

11    in this case for the jury.  And we can all rise for our members

12    of the jury and you may retire to the jury room.

13            (Jury excused at 12:24 p.m.)

14            THE COURT:  You may be seated.

15            The jury, as I understand it, is going to have lunch

16    brought in, so they'll be able to have lunch brought in.  They

17    don't necessarily have to break for lunch.

18            Are there any matters we need to up regarding the

19    jury instructions?

20            MS. SMITH:  Oh, not the jury instructions, Your

21    Honor.

22            THE COURT:  All right.

23            MR. AMBERG:  No, Your Honor.

24            THE COURT:  Do we need to deal with motions?

25            MR. AMBERG:  Yes.  The Rule 29 motion, Your Honor, I

1    know that the government allowed me to argue this now as

2    opposed to when it probably should have been argued after the

3    close of their proofs.

4          You've heard my extensive closing argument and our

5    position about all the evidence.  I would argue that, you know,

6    based on the -- the lack of DNA evidence, the lack of any other

7    physical evidence and things of that nature, that Your Honor

8    should acquit the defendant even in the light most favorable to

9    the government.

10         THE COURT:  All right.  Thank you very much, Mr.

11   Amberg.

12         In terms of your motion, I would indicate that I have

13   been present throughout the proceedings and presided over the

14   trial.  I was paying attention during the testimony, and in

15   particular the testimony of the victim in this case, Laura, who

16   did testify that she recalled a sexual act occurring in the

17   sense that she recalled the defendant's finger penetrating her

18   vagina on the aircraft and that she had no doubt of that.  That

19   was evidence that would prove the defendant's guilt of this

20   offense in terms of the count.

21         In addition, that she was asleep prior to that and

22   that that incident is what woke her up would deal with the

23   element of her inability to appraise the nature of the conduct.

24         There's no dispute that the incident occurred on an

25   aircraft in the special aircraft jurisdiction of the United

1    States.

2            And the additional evidence included the videotaped

3    statement, the interview of the defendant.  The interview

4    includes statements that could reasonably be interpreted as

5    admissions by the defendant that he tried to penetrate the

6    victim, and that would be sufficient to prove attempt.

7            There was additional corroborating evidence that

8    consisted of the other witnesses who testified, including the

9    flight attendants and the -- the nurse from SANE.

10           And although I certainly do understand the arguments

11   of the defense here with respect to the fact that there was no

12   confirmation in terms of the presence of DNA from the victim on

13   Mr. Ramamoorthy or from Mr. Ramamoorthy on the victim, viewing

14   this evidence in the light most favorable to the government,

15   which I must do, I believe a reasonable juror could find beyond

16   a reasonable doubt that Mr. Ramamoorthy is guilty of the

17   offense charged in the indictment.  And so the motion will be

18   denied.

19           So that's my ruling on that.  Is there anything else

20   we need to handle?

21           MS. SMITH:  Not from the United States.

22           MR. AMBERG:  I guess housekeeping, as we wait for the

23   verdict, where do you want us, do you want us here or could I

24   maybe sneak out and grab a salad?

25           THE COURT:  I think we can take a break for lunch, I

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1916   Page 117 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

117

```
1    think that would be perfectly fine if -- if you all want to go
2    and have lunch for an hour or so.  After that I would say if
3    you can remain nearby.  Your office is not downtown, correct,
4    Mr. Amberg?
5              MR. AMBERG:  No, it's on top of Tom's Oyster Bar in
6    Royal Oak, Your Honor.
7              THE COURT:  All right.  No comment about the --
8              MR. AMBERG:  It's fun.
9              THE COURT:  Yes.  Well, that's probably better that
10   you stay here.
11             MR. AMBERG:  Absolutely.  I just --
12             THE COURT:  And I guess I'll leave it up to the
13   government, since they're across the street, if they want to
14   stay across the street.  What's your preference on that?
15             MS. SMITH:  I think we'll stay here.
16             THE COURT:  All right.  Sounds good.
17             Were there any issues about the jury instructions
18   that we need to take up, were there anything that --
19             MS. SMITH:  No, I don't think so.
20             MR. AMBERG:  No, Your Honor.  Did we -- you know,
21   I -- the other day we were talking about the verdict form.  I
22   did get it, I reviewed it, I have no objection to it.
23             MS. SMITH:  Okay.
24             MR. AMBERG:  I don't know if we put that on the
25   record or not but I...
```

Case 2:18-cr-20027-TGB-MKM ECF No. 86 filed 03/05/19 PageID.1917 Page 118 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

118

1      THE COURT:  Do we have that, do we have the verdict

2  form right here handy?  We have it back there.  All right.

3  I'll go inspect the verdict form and we'll deliver it -- both

4  of you have seen the verdict form and neither side has any

5  objections to the verdict form, is that right?

6      MS. SMITH:  No, Your Honor, no objections.

7      MR. AMBERG:  That's correct, Your Honor, no

8  objections.

9      THE COURT:  Then I will deliver the verdict form to

10  them along with the jury instructions.  And we'll give them a

11  copy of the indictment as well?

12      MS. SMITH:  No objection to that.

13      MR. AMBERG:  No objection.

14      THE COURT:  All right.  Let's not -- we probably

15  don't need to include this cover sheet on the back.  All right.

16      Well, thank you very much.  Then we can -- yes, Ms.

17  Smith.

18      MS. SMITH:  Sorry, one more.  I just noticed that Ms.

19  Kumar is still in the courtroom.  I believe she's waiting to be

20  dismissed by the Court.

21      THE COURT:  All right.  Any objection to dismissing

22  our intrepid second translator?

23      MR. AMBERG:  No objection, Your Honor.

24      THE COURT:  All right.  Thank you very much, Ms.

25  Kumar, for coming.  You may be excused.  And again I apologize

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1918   Page 119 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

119

```
 1    for the disruption of your schedule.

 2            All right.  If there's nothing further, then let's be

 3    adjourned and we'll be in recess while the jury's in

 4    deliberation.  Thank you very much.

 5            MS. SMITH:  Thank you.

 6            THE LAW CLERK:  All rise.  Court is in recess.

 7            (Brief pause)

 8            THE COURT:  Ms. Smith, Mr. Amberg?

 9            MR. AMBERG:  Yes.

10            THE COURT:  Just hold on.  I wanted to ask you about

11    the exhibits so we're going to go back on the record for a

12    moment.

13            MR. AMBERG:  Okay.

14            MS. SMITH:  On the record?

15            THE COURT:  Yes.

16            MS. SMITH:  Okay.

17            THE COURT:  All right.  So I wanted to ask counsel

18    whether or not we should just give the jury the book of

19    exhibits or not.

20            MS. SMITH:  I -- I'd prefer that the jury ask if they

21    want to see the exhibits as opposed to just giving them the

22    whole book.

23            THE COURT:  Okay.

24            MR. AMBERG:  It doesn't -- I apologize, Your Honor.

25            THE COURT:  Go ahead.
```

1        MR. AMBERG:  It doesn't matter to me.  I would just

2   ask that the -- the front part, Department of Justice logo

3   thing, is taken out of there so it just looks like it's totally

4   independent.  And I don't think there's anything else in there

5   besides that, right?

6        THE COURT:  And so we will -- we'll hold on to them

7   unless they ask for them.

8        With respect to playing any videos, if they ask to

9   play any videos, did we determine whether anybody has a laptop

10  that can be used or what are we going to do on that?

11       THE LAW CLERK:  We have one.

12       THE COURT:  We have one.  All right.  So the Court

13  has -- has a blank one that we can use?

14       THE LAW CLERK:  Yes.

15       THE COURT:  All right.  So the Court will provide a

16  blank laptop that they could play.  Is there any special

17  software needed for that?

18       MS. SMITH:  I don't think so.

19       MS. O'CONNOR:  No.  You should be able just to pop

20  the disk in and play it.

21       THE COURT:  Very good.  All right.  Thank you all

22  very much.

23       MR. AMBERG:  Thank you, Your Honor.

24       MS. SMITH:  Thank you.

25       (Court in recess at 12:34 p.m.)

```
 1              (Proceedings resumed at 3:44 p.m., all parties

 2              present, jury not present)

 3              THE COURT:  Good afternoon, Counsel.

 4              So we have a question from the jury that I would like

 5    to share with you.  The question is, "Are there two charges

 6    under consideration, i.e., one, Sexual Abuse, two, attempted

 7    Sexual Abuse."  There follow three question marks.  Then the

 8    statement, "The verdict form only includes Sexual Abuse.

 9    Please clarify.  Thank you."

10              So I'm open to your thoughts on this.  I will tell

11    you, if you would like, what I was thinking of doing.  What I

12    was thinking of doing was to refer them to those parts of the

13    jury instructions that contain the elements for Sexual Abuse,

14    those parts of the jury instruction that contain the elements

15    of attempted Sexual Abuse, and then Jury Instruction 24 which

16    explains that they need not be unanimous on which way the

17    offense is committed.

18              To be more specific, I can tell you exactly what I

19    was thinking of doing.  What I was thinking of doing was to say

20    this.  The charge contained in Count One of the Superseding

21    Indictment of Sexual Abuse includes both Sexual Abuse and

22    attempted Sexual Abuse.

23              To find the defendant guilty of Sexual Abuse, you

24    must find that the government has proved all of the elements in

25    Jury Instruction 11 beyond a reasonable doubt.
```

1        To find the defendant guilty of attempted Sexual

2   Abuse, you must find the government has proved all the elements

3   in Jury Instruction 12 beyond a reasonable doubt.

4        Then I was going to essentially reread Jury

5   Instruction 24.

6        So that's my proposal, but I'd be interested in

7   hearing what counsel has to say.

8        MS. SMITH:  I think that's right.  I think that

9   explaining -- rereading, yes, I agree.  I think that's the

10  correct way to handle it.

11       MR. AMBERG:  Agreed, Your Honor.

12       THE COURT:  And so again, so that we're clear, I will

13  not reread the words of Jury Instruction 11 and Jury

14  Instruction 12.  I will simply refer them to those.  But I will

15  reread all of Jury Instruction 24.

16       MS. SMITH:  And 24 is the one where you say that it

17  can be proved either way and they don't have to be unanimous,

18  is that the right one?

19       THE COURT:  Yes.  This is what it says: "One more

20  point about the requirement that your verdict be unanimous.

21  Count One of the indictment accuses the defendant of committing

22  the crime of Sexual Abuse in more than one possible way.  The

23  first is that he committed Sexual Abuse.  The second is that he

24  attempted to commit Sexual Abuse.

25       "The government does not have to prove all of these

1    for you to return a guilty verdict on this charge.  Proof

2    beyond a reasonable doubt of any one of these ways is enough.

3    In order to return a guilty verdict, all 12 of you must agree

4    that at least one of these has been proved.  However, all of

5    you need not agree that the same one has been proved."

6              MS. SMITH:  I agree.

7              THE COURT:  That's what that instruction says.

8              MS. SMITH:  Yes, we agree with that.  Thank you.

9              MR. AMBERG:  That's fine, Your Honor, yes.

10             THE COURT:  Very good.  Should we bring in the jury

11   and I will deliver that answer?

12             MS. SMITH:  Yes.  Thank you.

13             (Jury entered the courtroom at 3:48 p.m.)

14             THE COURT:  Well, good afternoon, ladies and

15   gentlemen.  You may be seated.  You may be seated, Counsel.

16             Ladies and gentlemen, I received a question from you

17   from your foreperson and this is the question.  I have already

18   presented this to the attorneys in this case and discussed it

19   with them and also discussed what the answer to the question

20   is.  And so I'm going to read your question and then I will

21   indicate the answer.

22             The question that I received is: "Are there two

23   charges under consideration, i.e., one, Sexual Abuse, two,

24   attempted Sexual Abuse?"  There follow three question marks.

25   "The verdict form only includes Sexual Abuse.  Please clarify.

1    Thank you."

2           In response to this question, after conferring with

3    counsel, the charge in Count One of the Superseding Indictment

4    of Sexual Abuse includes both Sexual Abuse and attempted Sexual

5    Abuse.

6           To find the defendant guilty of Sexual Abuse, you

7    must find the government has proved all the elements in Jury

8    Instruction 11 beyond a reasonable doubt.

9           To find the defendant guilty of attempted Sexual

10   Abuse, you must find the government has proved all of the

11   elements in Jury Instruction 12 beyond a reasonable doubt.

12          One more point about the requirement that your

13   verdict must be unanimous, and this is taken from Jury

14   Instruction 24. These are jury instructions that you already

15   have. Count One of the indictment accuses the defendant of

16   committing the crime of Sexual Abuse in more than one possible

17   way. The first is that he committed Sexual Abuse. The second

18   is that he attempted to commit Sexual Abuse.

19          The government does not have to prove all of these

20   for you to return a guilty verdict on this charge. Proof

21   beyond a reasonable doubt of any one of these ways is enough.

22   In order to return a guilty verdict, all 12 of you must agree

23   that at least one of these has been proved. However, all of

24   you need not agree that the same one has been proved.

25          The jury instructions that I've just mentioned were

1    Jury Instructions 11, Jury Instructions 12 and Jury Instruction

2    24.

3           That is the answer of the Court.  And so unless there

4    is anything else that the attorneys wish to add, or let me just

5    ask you, are you satisfied with the answer that the Court has

6    given?

7           MS. SMITH:  Satisfied, Your Honor.

8           MR. AMBERG:  Satisfied, Your Honor.

9           THE COURT:  Very good.  All right, ladies and

10   gentlemen, you may return to your deliberations.  All rise for

11   the jury.

12          (Jury entered the courtroom at 3:52 p.m.)

13          THE COURT:  You may be seated.

14          It is approximately ten minutes or five minutes to

15   4:00 o'clock.  I think what I may do, depending on what you all

16   think of this, is to have Ms. Chubb inquire whether the jury

17   believes that they would want to continue deliberating until

18   the end of today or whether they would rather come back until

19   tomorrow in light of where they currently are.  What are your

20   preferences regarding that?

21          MS. SMITH:  I guess we don't have a preference.  When

22   you say end of the day, are talking one more hour or are you

23   talking later than 5:00?

24          THE COURT:  Well, I think -- what I'm getting at,

25   needless to say, is that if they are near reaching a verdict

 1    but they're feeling that they just need to discuss a little bit

 2    longer, then I hesitate to have them come back tomorrow.

 3            But on the other hand, if they know that they really

 4    have a lot more to discuss in this case and maybe they're tired

 5    and they'd rather take a break, then I would be happy to let

 6    them take a break.

 7            So I was just going to try to see where we were on

 8    that.  But we could also just wait and depend on them to -- if

 9    we don't hear from them, I'll probably, let's say, let them go

10    at about 4:30, quarter to 5:00 just so they can beat the

11    traffic.  But I think they know that the business day is pretty

12    much the end of their deliberations day.

13            MS. SMITH:  Right.

14            THE COURT:  So what are your -- what are your

15    preferences?

16            MS. SMITH:  I guess -- do we have a preference?  I

17    don't think we have a preference.

18            MR. AMBERG:  I think that's a good idea what you

19    proposed, Judge, see what they want to do.  If they want to

20    come back in the morning, you know, when they're fresh, there's

21    more issues they want to discuss, versus going at it at the end

22    of the day.

23            THE COURT:  All right.  What we'll do is we'll let

24    them know that if they -- if they feel it would be beneficial

25    to continue until the end of the day, that we'll allow them to

 1   do that.

 2          MS. SMITH:  Okay.

 3          THE COURT:  Otherwise, we'll probably let them go at

 4   about 4:30, quarter to 5:00.

 5          MS. SMITH:  That seems fine.

 6          MR. AMBERG:  Okay.  Thank you, Your Honor.

 7          THE COURT:  All right.  Thank you very much.  We're

 8   in recess.

 9          THE CLERK:  Court is in recess.

10          (Court in recess at 3:55 p.m.)

11          (Proceedings resumed at 4:05 p.m., all parties

12          present, jury not present)

13          THE COURT:  Counsel, would you place your appearances

14   on the record again please?

15          MS. JAWAD:  Yes.  Good afternoon, Your Honor.  Amanda

16   Jawad and Maggie Smith on behalf of the United States.  With us

17   at counsel table is Meghann O'Connor, a paralegal from our

18   office, and Special Agent Kyle Dodge with the FBI.

19          THE COURT:  Good afternoon.

20          MR. AMBERG:  And good afternoon, Your Honor.  Jim

21   Amberg on behalf of Mr. Ramamoorthy.  He is standing to my

22   right.  To his right is Mr. Vijay.  To my left is co-counsel,

23   Victor Mansour.

24          THE COURT:  Good afternoon, Counsel.  Good afternoon,

25   Mr. Ramamoorthy.

1    Well, I understand that the jury has indicated that

2    they have reached a verdict, and so my intention would be to

3    take the verdict at this time.  Is there anything that we need

4    to do before we bring in the jury?

5         MS. SMITH:  Not before, no.  Thank you.

6         THE COURT:  All right.  Let's bring in the jury.

7         (Jury entered the courtroom at 4:06 p.m.)

8         THE COURT:  Good afternoon, ladies and gentlemen.

9    You may be seated.

10        So, ladies and gentlemen, I received a notification

11   that you indicated that you had reached a verdict.  And so let

12   me first ask were you able to select a foreperson?  All right.

13   And can I ask the foreperson to raise his or her hand?  Thank

14   you, sir.

15        Now, is it -- without telling me what the verdict is,

16   is it true that you were able to reach a verdict?

17        JUROR NO. 1:  Yes.

18        THE COURT:  All right.  Without indicating what the

19   verdict is, could you hand the verdict to my law clerk please,

20   and let's also give it to our...

21        All right.  I'm going to give the verdict form to Ms.

22   Chubb in order for her to publish it in open court.

23        THE CLERK:  In the matter of the United States of

24   America versus Prabhu Ramamoorthy, Criminal No. 18-20027,

25   verdict form, the jury unanimously finds the following on Count

1   One:  With respect to the charge in Count One of the

2   indictment, which charges the defendant with Sexual Abuse, the

3   jury finds guilty.  Signed and dated this day, August 15th,

4   2018, signed by the foreperson.

5           THE COURT:  All right.  Thank you very much.

6           Now, I want to ask counsel if you wish to have the

7   jury polled.  So, ladies and gentlemen, the counsel have a

8   right to ask whether or not for each of you the verdict that

9   was just read in open court is your verdict, and so I'm asking

10  the lawyers whether or not they wish to do that.  Does either

11  counsel wish to have the jury polled?

12          MS. SMITH:  I don't need to, Your Honor.

13          MR. AMBERG:  Yes, Your Honor.

14          THE COURT:  All right.  Then Ms. Chubb, I would ask

15  you to please poll the jury.

16          THE CLERK:  Juror in seat number one, Mr. Pletcher --

17          THE COURT:  And if you could stand when you --

18          THE CLERK:  -- you've listened to the verdict as the

19  Court has read it.  Is that and was that your verdict?

20          JUROR NO. 1:  Yes, ma'am.

21          THE CLERK:  Thank you.

22          Juror in seat number two, was that and is that your

23  verdict.

24          JUROR NO. 2:  Yes, ma'am.

25          THE CLERK:  Thank you.

```
 1              Juror No. 3, is that and was that your verdict?

 2              JUROR NO. 3:  Yes.

 3              THE CLERK:  Thank you.

 4              Juror in seat number four, is that and was that your

 5   verdict?

 6              JUROR NO. 4:  Yes.

 7              THE CLERK:  Thank you.

 8              Juror in seat number five, is that and was that your

 9   verdict?

10              JUROR NO. 5:  Yes.

11              THE CLERK:  Juror in seat number six, is that and was

12   that your verdict?

13              JUROR NO. 6:  Yes.

14              THE CLERK:  Juror in seat number seven, is that and

15   was that your verdict?

16              JUROR NO. 7:  Yes.

17              THE CLERK:  Thank you.

18              Juror in seat number nine, is that and was that your

19   verdict?

20              JUROR NO. 9:  Yes.

21              THE CLERK:  Thank you.

22              Juror in seat number 11, is that and was that your

23   verdict?

24              JUROR NO. 11:  Yes.

25              THE CLERK:  Thank you.
```

Case 2:18-cr-20027-TGB-MKM  ECF No. 86  filed 03/05/19  PageID.1930  Page 131 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

131

1        Juror in seat number 12, is that and was that your

2   verdict?

3        JUROR NO. 12:  Yes.

4        THE CLERK:  Juror in seat number 13, is that and was

5   that your verdict?

6        JUROR NO. 13:  Yes.

7        THE CLERK:  Juror in seat number 14, is that and was

8   that your verdict?

9        JUROR NO. 14:  Yes.

10       THE COURT:  Well, thank you, ladies and gentlemen.

11  I'm going to discharge you from your service at this time,

12  unless there's any issue that the parties believe they wish to

13  raise in the presence of the jury at this time.

14       MS. SMITH:  No thank you.

15       MR. AMBERG:  No, Your Honor.

16       THE COURT:  All right.  And, ladies and gentlemen, if

17  you'd be kind enough to wait briefly in the jury room, I would

18  like to confer with you for just a few moments and then you can

19  be discharged after that.

20       And so let's all rise for the jury.  Let me thank you

21  as well on the record for your service in this case which I

22  know is difficult and a sacrifice.

23       (Jury excused at 4:10 p.m.)

24       THE COURT:  You may be seated.

25       Are there any matters we need to take up at this

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1931   Page 132 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

132

 1    time?

 2            MS. SMITH:  Yes, Your Honor.  Now that the jury has

 3    reached a verdict and the defendant has been convicted, we are

 4    moving under 18 United States Code, Section 3143(a)(2) for the

 5    defendant's remand into custody.

 6            THE COURT:  Now, when you say (a)(2), what are you

 7    referring to exactly?

 8            MS. SMITH:  I am referring to the provision in the

 9    Bail Reform Act that states that "Release or Detention Pending

10    Sentence," which is where we are at now under criminal

11    procedure, and it states that "the judicial officer shall order

12    a person who has been found guilty of an offense in a case

13    described in subparagraph (A), (B) or (C) of subsection

14    parentheses (f) parentheses (1) of Section 3142 and is awaiting

15    the imposition or execution of sentence be detained unless,"

16    and under Section (A)(i) it says "unless the judicial officer

17    finds there is a substantial likelihood that a motion for

18    acquittal or new trial will be granted, or an attorney for the

19    government has recommended no sentence of imprisonment be

20    imposed on the person, and that the judicial officer finds by

21    clear and convincing evidence that the person is not likely to

22    flee or pose a danger to any other person or the community."

23            Your Honor, this defendant's offense qualifies under

24    subsection (f)(1) of 3142 because it is an offense for which

25    the maximum sentence is life.

Case 2:18-cr-20027-TGB-MKM  ECF No. 86  filed 03/05/19  PageID.1932  Page 133 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

133

1      And I can provide further argument for the basis as
2  to why the defendant cannot show by clear and convincing
3  evidence that he is not likely to flee or pose a danger if the
4  Court would like me to.
5      THE COURT:  All right.  Thank you very much.
6      Any response?
7      MR. AMBERG:  Yes, Your Honor.  I would ask that he be
8  allowed to stay out on bond pending sentencing.  He's done
9  great so far since he's been on bond.  He has a tether.  He has
10 ties to the community.  He has a job here, as you know.  His
11 wife is here as well.  Allowing him to stay out on bond pending
12 sentencing will allow him to get his affairs in order.
13      Although, yes, it is a life sentence on the other
14 side, I don't believe there's any mandatory minimum, and I'll
15 be asking for a low sentence at the time of sentencing.
16      And so I would ask that you allow him to stay out
17 here.  So far he's been able to do it.  He's had I think no
18 problems from what I can remember while he's been out on bond.
19 He's been out on bond since I think since February or March.
20 And so I would ask that you continue the bond.
21      THE COURT:  The Court has reviewed the statute that
22 is referred to by the government, which is Section 3143, and
23 the offense is an offense that would require detention upon
24 conviction except in the circumstances that are specifically
25 listed there.  I do not believe there's a substantial

1    likelihood that a motion for acquittal or a new trial would be

2    granted.  The government has not recommended a sentence of no

3    imprisonment.

4           The question of whether or not I can find by clear

5    and convincing evidence that Mr. Ramamoorthy is not likely to

6    flee is the issue that I need to decide.

7           We did have a detention hearing in this case, and

8    although I did grant Mr. Ramamoorthy a bond at that time, the

9    question there was whether or not there was clear and

10   convincing evidence that he was going to flee, not whether

11   there was clear and convincing evidence that he is not going to

12   flee.  There was evidence presented at the time that Mr.

13   Ramamoorthy did have an incentive to flee.

14          At the same time, I recognize that he has complied

15   with his bond conditions up until this point, and that's the

16   argument that Mr. Amberg is mentioning that I think is

17   relevant.

18          On the whole, however, I believe that the type of

19   offense is a serious offense, and the defendant has been found

20   guilty of this offense, and there is not clear and convincing

21   evidence that he is not likely to flee.  And so for that

22   reason, bond is revoked and the defendant will be remanded to

23   the custody of the U.S. Marshal pending the sentencing.  That

24   is my decision.

25          MS. SMITH:  Thank you, Your Honor.

1    THE COURT:  We need to set a date for the sentencing

2    in this matter, so I want to ask Ms. Chubb to set the date for

3    sentencing.

4    THE CLERK:  Sentencing will be held on December 12th,

5    2018 at 2:00 o'clock p.m.

6    MR. AMBERG:  I'm sorry, what time was that at?

7    MS. SMITH:  2:00 p.m.

8    THE CLERK:  2:00 o'clock p.m.

9    THE COURT:  Let me just say a couple of things here.

10   First of all, I want to indicate that I believe that the

11   attorneys in this case on both sides have done a very good job

12   in representing their respective clients.  I think that the

13   government did a good job putting the evidence together, and I

14   think that Mr. Amberg did a very good job defending Mr.

15   Ramamoorthy during this trial, and I want to thank the counsel

16   for the work that they did in preparing the case and presenting

17   their respective sides of the case.

18   Sometimes counsel believes that they can learn from

19   talking to members of the jury who have sat through the case

20   and have watched the presentation of the evidence.  I'm going

21   to confer with the jury now.  I will ask them whether they wish

22   to speak with counsel about the case.  If they do wish to speak

23   with counsel, I will let you know that.  And if you wish to

24   speak with them, let Mr. Darling or Ms. Chubb know that and I

25   will convey that to them.

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1935   Page 136 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

136

1          And so we can be adjourned then in this matter?

2          MS. SMITH:  Nothing further from the United States.

3          MR. AMBERG:  If I could have one second.

4          (Brief pause)

5          Nothing further, Your Honor.

6          THE COURT:  All right.  Thank you very much.

7          THE CLERK:  Please rise.  Court is in recess.

8          (Court in recess at 4:19 p.m.)

9                              —  —  —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:18-cr-20027-TGB-MKM   ECF No. 86   filed 03/05/19   PageID.1936   Page 137 of 137
Jury Trial: Volume 5 • Wednesday, August 15, 2018

137

```
1                    C E R T I F I C A T I O N

2           I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 136 comprise a full, true and correct transcript of the

7    proceedings held in the matter of United States of America vs.

8    Prabhu Ramamoorthy, Case No. 18-20027, on Wednesday, August 15,

9    2018.

10

11

12                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                         Federal Official Court Reporter
                           United States District Court
14                         Eastern District of Michigan

15

16

17   Date: March 4, 2019
     Detroit, Michigan
18

19

20

21

22

23

24

25
```